# EXHIBIT A

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| CITY OF SUNRISE FIREFIGHTERS' PENSION FUND, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED,<br><br>     Plaintiff,<br><br>  v.<br><br>CITIGROUP INC., MICHAEL L. CORBAT, JOHN C. GERSPACH, and MARK A. L. MASON,<br><br>     Defendants. | Case No. 1:20-cv-9132 |

**Declaration of Michael L. Hartzmark, Ph.D.**

**January 19, 2021**

## Table of Contents

I.    Background and Qualifications ................................................................................1

II.   Scope of Engagement and Background ...................................................................5

III.  It Is Likely that Artificial Inflation Varied over the Class Period and Varied
      Between Different Types of Citigroup Securities .....................................................6

      A.   The Number and Timing of the Alleged Partial Corrective Disclosure
           Dates .............................................................................................................6

      B.   The Information Concealed from the Public Changed over the
           Proposed Class Period ...................................................................................7

      C.   The Length of the Proposed Class Period.......................................................7

      D.   The Likely Price Impact from the Revelation of the Truth About
           Internal Control Deficiencies.........................................................................8

IV.   The August 10, 2018 Stock Price Decline Is Statistically Significant ....................11

V.    "*Dura*" Loss Calculations ........................................................................................12

      A.   Introduction..................................................................................................12

      B.   *Dura* Losses Including the Disclosure on August 10, 2018 ..........................12

      C.   *Dura* Losses Including the Disclosure on August 10, 2018 and
           Including PSP's Gains and Losses on Bond/Option Transactions ................13

      D.   *Dura* Losses Excluding the Disclosure on August 10, 2018 and
           Including PSP's Gains and Losses on Bond/Option Transactions ................13

I, Michael L. Hartzmark, Ph.D. declare:

## I.    BACKGROUND AND QUALIFICATIONS

1.    I am President of Hartzmark Economics Litigation Practice, LLC and prior to this I was a Principal and Director at Navigant Economics (formerly dba Chicago Partners, LLC, a subsidiary of Navigant Consulting, Inc.).  Both firms specialize in the application of economics and finance to legal, commercial and regulatory issues, including issues such as those addressed in this report.  I also am currently engaged as an independent contractor by the Office of the Attorney General of the State of New Jersey and was previously engaged by the Office of the Attorney General of the State of New York, to assist in investigations of the mortgage-backed securities market.[1]

2.    I have served as a testifying and consulting expert in numerous securities class actions.  In addition, I have published scholarly articles on a multitude of issues in financial economics including those associated with securities class actions, including the topic of market efficiency.  I have spent much of my time as an economic consultant evaluating issues related to market efficiency, including its relation to the certification of securities class actions.  My primary focus has been on securities such as common stock, corporate bonds, Treasury and energy futures, swaps, swaptions and options, and asset-backed securities.  My expert reports which included the topics of market efficiency and common damages methodology have been cited with approval by the Second Circuit Courts in *In re Signet Jewelers Limited Securities Litigation*,[2] and *William D. Wallace, et al. v. IntraLinks*

---

[1]    "A residential *mortgage-backed security* (MBS) is an instrument whose cash flow depends on the cash flows of an underlying pool of mortgages." Frank J. Fabozzi and Steven V. Mann, The Handbook of Fixed Income Securities, Seventh Edition, McGraw-Hill Education (2005), p. 16 ("Handbook").

[2]    *In re Signet Jewelers Limited Sec. Litig.*, 2019 WL 3001084 (S.D.N.Y. 2019) at *20 (finding that "Plaintiff's burden at this stage is simply to propose a methodology for calculating damages that corresponds to its theory of liability.  It has done so here.  Dr. Hartzmark's purports to 'us[e] the results of an event study along with the disclosures of firm-specific information' to measure 'the level of artificial inflation in the prices of the Signet common stock' based upon 'price reactions to disclosures revealing [Defendants'] alleged misstatements and omissions.' . . . 'From this, daily levels of inflation can be calculated by adjusting the inflation measure for each day throughout

*Holdings, Inc., et al.*[3]   Other courts have cited or relied upon my expert reports with approval, including courts in *In re: CenturyLink Sales Practices and Securities Litigation*,[4] *Laurence Rougier, et al. v. Applied Optoelectronics, Inc., et al.*, (which included the certification of the class of options holders),[5] *Christakis Vrakas, et al. v. U.S. Steel Corp.,*

———————————————

the Class Period.' This methodology, which applies on a class-wide basis, is capable of measuring the out-of-pocket losses suffered by the Class members.") (citations omitted).

[3]   *William D. Wallace, et al. v. IntraLinks et al.*, Opinion (S.D.N.Y., September 30, 2014), Dkt. 99, at 19 (finding that "While calculating the proper damages based on the date of purchase and sale may be complicated, it does not demand excessive individual inquiry. Plaintiff's proposed determination of damages by event study appears to be a workable methodology of determining damages on a class-wide basis that conforms to its theory of liability, thus meeting the requirements of *Comcast Corp. v. Behrand*, 133 S. Ct. 1426 (2013).").

[4]   *In re: CenturyLink Sales Practices and Securities Litigation*, Memorandum of Law and Order (D. Minn. Sept. 14, 2020), Dkt. 813.

The Court also noted that "Because price impact can be observed on 'front end' (*i.e.,* misstatements causing or maintaining inflation) or on the 'back end' (*i.e.,* a decline in price caused by the corrective disclosures), Defendants must affirmatively disprove both to satisfy their burden." (p. 31, citing Ark. Teacher Ret. Sys. v. Goldman Sachs Grp., Inc. (2d. Cir. 2020).

"Defendants' criticisms of the specifics of which techniques will be used to construct the inflation ribbon and actually calculate losses with Hartzmark's damages model are premature. At the class certification stage, Plaintiffs need merely show, as Hartzmark has done, that 'the techniques used to estimate the true price (and thus calculate artificial inflation) will be common to all putative class members and will be applied on a class-wide basis.'" p. 42.

"There is nothing about there being more plaintiffs that makes the damages model more or less accurate, because there is no argument here that damages would be individualized." p. 44.

[5]   *Laurence Rougier, et al. v. Applied Optoelectronics, Inc., et al.*, No. 4:17-cv-02399, ECF Nos. 125, 131 (S.D. Tex. Nov. 13, 2019), at 30 (finding that "Plaintiffs' proposed damages model comports with the requirements of Rule 23(b)(3) as set forth in *Comcast Corp. v. Behrend*, 569 U.S. 27 (2013))"; at 31 (finding that "Furthermore, courts recognize event studies, like the one used by Dr. Hartzmark, as an accepted method for determining artificial inflation and out-of-pocket damages in suits involving fraud on the market liability."); at 34-35 (finding that "Dr. Hartzmark's report and supplemental report describe at length his method for calculating the "but for" value of the stock, for disaggregating inflation or price fluctuations not related to the misrepresentations found by a jury, and how he would use the inflation ribbon to

*et al* (which included the certification of the class of options holders),[6] *Lord Abbett Affiliated Fund, Inc. et al. v. Navient Corp. et al.* (which included the certification of the class of options holders),[7] *West Palm Beach Police Pension Fund, et al. v. DFC Global Corp., et al.*,[8] and *In re Cobalt International Energy, Inc. Securities Litigation* (which included the certification of the class of bond holders).[9]  I also wrote a series of reports cited in the district court's opinion granting class certification of DVI common stock and corporate bonds in *In re DVI, Inc. Securities Litigation*, 249 F.R.D. 196 (E.D. Pa. 2008), which was affirmed by the Third Circuit in *In re DVI, Inc. Securities Litigation*, 639 F.3d 623 (3d Cir. 2011) (which included the certification of the class of bond holders).  Further, I authored reports cited in the Honorable William Alsup's opinion granting class certification of Symantec common stockholders in *SEB Investment Management AB v.*

---

methodically calculate damages for each Class Member. Thus, unlike the plaintiffs in *BP I*, the Plaintiffs here have satisfied their burden to demonstrate a damages model that calculates artificial inflation, the but for price, and will disaggregate inflation unrelated to fraud. Also, as was the case for the post-explosion subclass the district court certified in *BP II*, there is no disconnect between Plaintiffs' theory of liability and damages model in violation of *Comcast*.") (citations omitted); at 36 ("As detailed above, Plaintiffs' method for demonstrating class-wide damages is consistent with its fraud on the market theory of liability, Dr. Hartzmark proposes a damage methodology that will disaggregate losses not attributable to fraud found by the jury, and class certification under Rule 23(b)(3) will not violate *Comcast*."); and at 38 (finding that "Plaintiffs have also proposed a damages methodology that is common to the class and is properly tethered to their corrective disclosure theory of liability.").

[6]  *Christakis Vrakas, et al. v. U.S. Steel Corp., et al.*, Memorandum Order (W.D. Pa., Dec. 31, 2019), Dkt. 215, at 16 (finding that "Plaintiffs cite several cases in this Circuit and elsewhere that affirm the appropriateness of the out-of-pocket methodology that Dr. Hartzmark proposes as a sufficient damages model for class certification purposes." (footnote omitted)).

[7]  *Lord Abbett Affiliated Fund, Inc. et al. v. Navient Corp. et al.*, Memorandum Opinion (D. Del. Aug. 25, 2020).

[8]  *W. Palm Beach Police Pension Fund, et al. v. DFC Global Corp., et al.*, 2016 WL 4138613, at *13 (E.D. Pa. Aug. 4, 2016) (finding that "Dr. Hartzmark has data underlying his conclusions and [the defendants' expert] just has noise").

[9]  *In re Cobalt Intl. Energy, Inc., Sec. Litig.*, 2017 WL 2608243 (S.D. Tex. 2017) at 19 (finding that "Plaintiffs have provided expert testimony demonstrating, at this class certification stage, that the market for Cobalt Notes was adequately efficient to allow them to rely on the fraud-on-the market presumption of reliance.").

*Symantec Corporation, et al.*[10]  I have also co-authored three law review publications discussing the commonly used empirical tests applicable to securities class actions.[11]

3.    I earned my B.A. in economics from The University of Michigan and my M.A. and Ph.D. in economics from The University of Chicago.  I have taught economics and financial economics in the Department of Economics at The University of Chicago and jointly in the Michigan Business School (now the Ross School of Business) and the Department of Economics at the University of Michigan.

4.    At the University of Michigan, I created and taught courses on financial and commodity futures markets.  While an Assistant Professor at the University of Michigan, I received a research grant from the University of Chicago Center for the Study of Futures Prices, as well as the John M. Olin Faculty Fellowship to further my research in financial markets.  In addition, I published articles in peer-reviewed journals related to financial markets.  Prior to my tenure track appointment at the University of Michigan, I was employed as a Financial Economist at the Commodity Futures Trading Commission, Division of Economics and Education.

5.    I have been a holder of the Series 7 and 63 registered representative licenses and have served as a Financial Advisor at Fahnestock & Co., Inc. (now Oppenheimer & Co., Inc.).  I was also founder and President of DARMA, LLC, a wealth and asset advisory company affiliated with Oppenheimer & Co., Inc.

6.    My qualifications, publications, and expert engagements are summarized in detail in my *curriculum vitae*, which is attached to this report as **Appendix A**.  Hartzmark Economics Litigation Practice, LLC is being compensated at my standard rate of $700 per

---

[10]  *SEB Investment Management AB v. Symantec Corporation, et al.*, 3:18-cv-02902-WHA (N.D. Cal.), Dkt. 227 at 15, 16.

[11]  Michael L. Hartzmark, Cindy A. Schipani, H. Nejat Seyhun, *Fraud on the Market: Analysis of the Efficiency of the Corporate Bond Market*, 2011 Colum. Bus. L. Rev., 654-716 (2011); Michael L. Hartzmark, H. Nejat Seyhun, *The Curious Incident of the Dog That Didn't Bark and Establishing Cause-and-Effect in Class Action Securities Litigation*, 6 Va. L. & Bus. Rev., 415-66 (Winter 2012); Michael L. Hartzmark, H. Nejat Seyhun, *Understanding the Efficiency of the Market for Preferred Stock*, 8 Va. L. & Bus. Rev., 149-230 (Spring 2014).

hour for my work in this matter.  My compensation is not dependent on my opinions expressed in this report or the outcome of this matter.  The materials I relied on are cited in this Declaration.

## II.    SCOPE OF ENGAGEMENT AND BACKGROUND

7.    I have been retained by Motley Rice LLC and Bernstein Litowitz Berger & Grossmann LLP (collectively, "Counsel"), on behalf of lead plaintiff movants KBC Asset Management NV ("KBC") and Pembroke Pines Firefighters & Police Officers Pension Fund  ("Pembroke Pines") to: (i) assess whether the "fraud premium"—the amount by which the prices of securities were artificially inflated—likely varied during the period from January 15, 2016 and October 12, 2020 (the "Class Period"); and (ii) to evaluate whether there were any additional partial disclosures not pled in the filed complaints that are statistically significant when compared with the broader market and financial industry. I was also asked to perform analyses of losses incurred by KBC and Pembroke, as well as competing lead plaintiff movant PSP Investments ("PSP"), applying loss causation principles espoused in *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336 (2005) ("*Dura*") under assumptions that I provide below.

8.    I understand that "this securities class action (the "Action") [was brought] against Citi and certain of the Company's current and former senior executives (collectively, "Defendants") under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5 promulgated thereunder on behalf of all investors who purchased or otherwise acquired Citi securities" during the Class Period.[12]

9.    I also understand that it is alleged that "[T]hroughout the Class Period, Citi assured investors that there were no significant deficiencies or material weaknesses in the Company's internal controls.  When faced with periodic regulatory penalties for noncompliance, the Company continued to assure investors that the specific deficiencies

---

[12]   Complaint for Violations of the Federal Securities Laws, ECF No. 1, filed October 30, 2020 (the "Complaint"), p. 1.

at issue were being remediated promptly and that internal controls and regulatory compliance were a top priority at Citi. In particular, Citi assured investors that it satisfied all regulatory requirements and maintained adequate internal controls, data governance, compliance risk management, and enterprise risk management."[13]

### III.    IT IS LIKELY THAT ARTIFICIAL INFLATION VARIED OVER THE CLASS PERIOD AND VARIED BETWEEN DIFFERENT TYPES OF CITIGROUP SECURITIES

10.    The daily levels of artificial inflation—the "fraud premium"—is measured as the difference between the actual prices paid for the securities on a given day and the true or "but-for" values of the securities absent the alleged misrepresentations and omissions (*i.e.*, had the truth been disclosed the price would have been the true value).  As a result of the multitude of corrective disclosures, changes to the regulatory environment, the length of the proposed Class Period, and varying economic factors, the fraud premium likely fluctuated during the proposed Class Period.

A.  The Number and Timing of the Alleged Partial Corrective Disclosure Dates

11.    It is my understanding that the three currently filed complaints in this action assert a total of seven disclosures wherein the truth was partially revealed and, as indicated *infra* ¶22, there may be additional dates on which information correcting the alleged misrepresentations was disclosed, disseminated, and processed by market participants causing a statistically significant decline in the prices of Citigroup securities.  Depending on the number of dates that are determined to have had alleged partial corrective disclosures and the relative timing of those dates, the level of artificial inflation will likely vary over the Class Period.  In addition, because different securities, such as common stock, bonds, and options, all have slightly different features and characteristics, they will all likely respond to the alleged misrepresentations, but may not reflect the same degree of artificial

---

[13]  Complaint, ¶3.

inflation at any given time.  Moreover, the impact of the release of corrective information will likely have differential price impacts on the different securities.[14]

### B. The Information Concealed from the Public Changed over the Proposed Class Period

12.  Over the proposed Class Period, the information concealed from the market likely changed over time.  Citigroup also likely faced changes to the regulatory and economic environments.

13.  For example, the currently filed complaints allege a variety of compliance and control failures throughout Citigroup's business that changed over time, including: (i) an accidental payment of bank funds; (ii) failure to maintain adequate risk management systems; and (iii) inadequate data governance, compliance risk management, and enterprise-wide management.  The complaints further allege that Citigroup would have to make a substantial investment in its infrastructure to come into compliance with consent orders with the OCC and the Federal Reserve, and other remediation costs related to internal control deficiencies—investments that allegedly should have been made at varying times during the Class Period.

14.  Because of these changes, the fraud premium likely varied over the proposed Class Period.

### C. The Length of the Proposed Class Period

15.  As shown below, during the nearly five-years of the proposed Class Period (plus the day of the alleged price impact from the final alleged corrective disclosure), Citigroup's stock price ranged from $34.98 per share to $81.91 per share.  Therefore, to the extent that the artificial inflation varied over time in proportion to the fluctuations in Citigroup's stock price, the fraud premium likely would have had wide variation during

---

[14]  See, for example, Michael L. Hartzmark, H. Nejat Seyhun, *The Curious Incident of the Dog That Didn't Bark and Establishing Cause-and-Effect in Class Action Securities Litigation*, 6 Va. L. & Bus. Rev., 415-66 (Winter 2012) at 447.  ("Securities may also have unique features (e.g., subordination, conversion, callability, etc.) that make them substantially different from other securities issued by the same corporation, thus leading to separate and seemingly unrelated price reactions.")

the proposed Class Period.  A similar fluctuation in the fraud premia likely would also be reflected in Citigroup's other securities.



**Citigroup Common Stock Daily Price**
**January 15, 2016 – October 13, 2020**

Source: Bloomberg

D. The Likely Price Impact from the Revelation of the Truth About Internal Control Deficiencies

16.    There has been extensive peer-reviewed academic literature on the valuation effects on a corporation's stock price that quantifies the reputational harm caused by the disclosure about ineffective internal controls.  In a 2018 survey article, Amiran *et al*. review the literature relating to "Financial reporting fraud and other forms of financial reporting misconduct."[15]  Based on their review of the literature, Amiran *et al.* (2018) summarize their analysis as finding that:

> A significant body of research shows that financial reporting
> misconduct is associated with an array of negative

---

[15]   Dan Amiran, Zahn Bozanic, James D. Cos, Quentin Dupont, Jonathan M. Karpoff and Richard Sloan, *Financial reporting fraud and other forms of misconduct: a multidisciplinary review of the literature*, 23 Rev. Acctg. Stds., 732, 732 (2018).

consequences. These include loss of future sales, stock price declines, increases in the cost of capital, and—perhaps most important—the loss of reputation and trust.[16]

17.    In particular, Karpoff *et al*. (2008) succinctly describe the theory on the effect of reputation loss:

> … the revelation of misconduct can have real effects on the firm's cost and operations. We refer to the present value of such effects as the firm's reputation loss. Reputation can be lost if customers change the terms on which they are willing to do business with the firm because of an increased probability of cheating or the perception that the firm cannot support warranties or supply compatible parts in the future. Diminished reputation also can reflect an increase in the firm's cost of capital or trade credit, as input suppliers change the terms with which they do business with the firm. In addition, the firm can suffer real losses as managers are required to divert resources to the investigation and away from company business. The revelation of financial reporting problems could also force the firm to implement new monitoring and control policies, increasing the cost of operations. We group all such real effects on firm value into the reputation loss.[17]

18.    There are many academic studies of the effect on the stock prices of firms when financial misconduct is revealed, with Amiran *et al*. (2018) citing to multiple studies, although point estimate results (*e.g.*, average stock price reactions) can vary widely.[18] Amiran *et al.* (2018) then discuss how the literature has studied the reputational loss from financial misconduct:

> …    In reasonably efficient markets, share prices reflect investors' expected values of future cash flows to equity, changing when expectations change. This implies that changes in share values upon the revelation of the firm's misconduct provide a measure of investors' expectations of the losses faced by the firm. The losses can include direct costs, such as

---

[16]    Amiran *et al.* (2018) at 736.

[17]    Jonathan M. Karpoff, D. Scott Lee and Gerald S. Martin, *The Cost to Firms of Cooking the Books*, 43 Jnl. Finl. & Quant. Analysis, 581, 598-599 (2008) (citation omitted).

[18]    Amiran *et al.* (2018) at 758; footnote 21 lists 28 articles.

regulatory fines, class-action settlements, and increased legal expenses. They also likely include a decline in share value as investors realize they had been relying on incorrect financial information to forecast the firm's future cash flows, that is, a reversal of the share price inflation attributable to the incorrect financials. The losses can also include lost reputation, that is, the loss in value if the firm faces a higher cost of capital, lower sales, or higher operating costs as the revelation of misconduct changes the terms by which counterparties are willing to do business with the firm.[19]

19. In Karpoff *et al*. (2008), the authors quantify the stock price effects and

find that fines or civil settlements are imposed on firms in 231 of these 585 cases, and sometimes these penalties are large. But the largest monetary penalties are not imposed by regulators or courts. Rather, they are imposed by the market. On average, firms lose 38% of their market values when news of their misconduct is reported. We estimate that 24.5% of these losses reflects the market adjusting to a more accurate representation of firms' financial situations. This is the adjustment to the "true" firm value if managers had not cooked the firm's books. Another 8.8% reflects the expectation of legal penalties, including SEC and Department of Justice (DOJ) fines and settlements of securities class-action lawsuits. The remaining 66.6% is what Karpoff and Lott (1993) label lost reputation. This is the decrease in present value of the firm's cash flows as investors, customers, and suppliers are expected to change the terms of trade with which they do business with the firm. The reputation loss exceeds the legal penalty by over 7.5 times, and it exceeds the amount by which firm value was artificially inflated by more than 2.5 times.[20]

20. Because the depreciation of reputational capital is often reflected in a percentage decline of the common stock price, the impact of the disclosure of the truth about the internal control deficiencies on any date during the proposed Class Period in the

---

[19]   Amiran *et al.* (2018) at 759.

[20]   Jonathan M. Karpoff, D. Scott Lee and Gerald S. Martin, *The Cost to Firms of Cooking the Books*, 43 Jnl. Finl. & Quant. Analysis, 581, 582 (2008).

but-for world would likely change based on the level of Citigroup's stock price on that date.

21.    As a result of the varying fraud premium, comparing lead plaintiff movants based on the number of securities purchased does not necessarily provide a relative measure of harm caused by the fraud, because different securities purchased at different points in the proposed Class Period would not be equally inflated due to the alleged fraud.

## IV.    THE AUGUST 10, 2018 STOCK PRICE DECLINE IS STATISTICALLY SIGNIFICANT

22.    I have reviewed the three complaints filed in this action, which allege that the truth emerged through a series of disclosures over a period of time during calendar 2020. I also understand that the specific dates asserted in this action as alleged partial corrective disclosures may not be exhaustive.  For example, it is my understanding from Counsel that on August 10, 2018, Citigroup was fined $8.6 million and entered into a consent order with the Federal Reserve Board as a result of improper execution of residential mortgage-related documents.  That day, the closing price of Citigroup common stock declined by $1.72 per share from $71.98 to $70.26.  This 2.39% price decline is statistically significant at or below the commonly utilized 5% significance level.[21]  This means that there is no more

_____

[21]    To detect whether the price of Citigroup common stock rapidly reacted to the disclosure on August 10, 2018, I ran an empirical test using the results from what economists call "an event study."  Event studies are widely used in academia, securities litigation matters and investment practices, and have been a standard statistical procedure used by financial economists for over thirty years.  They are generally used to measure the reaction of market participants (and thus the security price) to the disclosure of new information.  In an event study, generally-accepted statistical methods are used to test whether (after removing the outside influences on a security price), the residual or abnormal price movement on a particular date is statistically significant – *i.e.,* is of a large enough magnitude to allow a statistician to conclude it is not the consequence of chance.  In this case, my event study (using an estimation period of 120 days prior to August 10, 2018 and a multi-factor model with the S&P 500 Total Return Index, the S&P 500 Financials Sector Total Return Index and the S&P 500 Banks Total Return Index, with Citigroup's return removed from the latter two indexes) obtains an abnormal return of negative 1.52% and the probability that the abnormal return was zero is 2.6%—meaning it is statistically significant at or below the 5% level.

than a five percent chance that the stock price decline on this date is explained by the normal random variations of the stock price. Therefore, should this date be determined to correct an alleged misrepresentation or omission, then it is likely that on August 10, 2018 artificial inflation was removed from Citigroup's common stock price and holders who acquired their stock (and likely other Citigroup securities) on or after January 15, 2016 and held those shares through this disclosure would likely be harmed.

## V.    "*DURA*" LOSS CALCULATIONS

### A. Introduction

23.    I was also asked to perform analyses of possible losses incurred by KBC and Pembroke, as well as competing lead plaintiff movant PSP, applying loss causation principles espoused in *Dura* with respect to all common stock transactions. Specifically, I have been asked to calculate the market losses for common stock purchases made during the Class Period by the movants that were held over certain dates.[22] In particular, I have been asked to provide calculations based on two sets of dates. One set of dates is based on the seven alleged partial corrective disclosures asserted in the three complaints, namely August 13, 2020, August 17, 2020, August 20, 2020, September 8, 2020, September 14, 2020, September 15, 2020, and October 13, 2020. The other set of dates includes August 10, 2018 in addition to the seven dates from the complaints. In addition, I was also asked to include any gains or losses during the Class Period on all bond and options transactions.

### B. *Dura* Losses Including the Disclosure on August 10, 2018

24.    The following table provides the calculated losses for common stock purchases under LIFO if shares are held over August 10, 2018 *OR* one of the seven alleged partial corrective disclosure dates.

---

[22]    In calculating these profits and losses, I have been asked to apply the Last-In-First-Out ("LIFO") share matching methodology. For transaction prices, I have relied on data provided in electronic format from Counsel. My results may not exactly match other results given rounding of transaction prices. In addition, for shares not sold as of December 28, 2020, I have been asked to apply a sales price of $51.1898.

| | |
|---|---|
| **KBC** | ($18,703,517) |
| **PRICOS** | ($115,519) |
| **PRICOS DEFENSIVE** | ($507) |
| **PEMBROKE** | ($52,612) |
| **TOTAL** | ($18,872,155) |

| | |
|---|---|
| **PSP (Stock)** | ($14,312,354) |

C.  *Dura* Losses Including the Disclosure on August 10, 2018 and Including PSP's Gains and Losses on Bond/Option Transactions

25.    The following table provides the calculated losses for common stock purchases under LIFO if shares are held over August 10, 2018 *OR* one of the seven alleged partial corrective disclosure dates, as well as PSP's gains and losses on all Class Period transactions in Citigroup bonds and options.

| | |
|---|---|
| **KBC** | ($18,703,517) |
| **PRICOS** | ($115,519) |
| **PRICOS DEFENSIVE** | ($507) |
| **PEMBROKE** | ($52,612) |
| **TOTAL** | ($18,872,155) |

| | |
|---|---|
| **PSP (Stock)** | ($14,312,354) |
| **PSP (Bonds)** | $1,579,855 |
| **PSP (Options)** | $1,660,791 |
| **PSP (Total)** | ($11,071,708) |

D.  *Dura* Losses Excluding the Disclosure on August 10, 2018 and Including PSP's Gains and Losses on Bond/Option Transactions

26.    The following table provides the calculated losses for common stock purchases under LIFO if shares are held over one of the seven alleged partial corrective disclosure dates, as well as PSP's gains and losses on all Class Period transactions in Citigroup bonds and options.

| | |
|---|---:|
| **KBC** | ($6,208,044) |
| **PRICOS** | $238,660 |
| **PRICOS DEFENSIVE** | $7,130 |
| **PEMBROKE** | ($52,612) |
| **TOTAL** | ($6,014,865) |

| | |
|---|---:|
| **PSP (Stock)** | ($10,255,446) |
| **PSP (Bonds)** | $1,579,855 |
| **PSP (Options)** | $1,660,791 |
| **PSP (Total)** | ($7,014,800) |

I declare under penalty of perjury that the foregoing is true and correct.

*RESPECTFULLY SUBMITTED THIS 19th DAY OF JANUARY 2021*

Michael L. Hartzmark, Ph.D.

- 14 -

# APPENDIX A

# MICHAEL L. HARTZMARK, PH.D.
4950 S. Chicago Beach Drive, Suite 6A
Chicago, IL 60615
(312) 718-9699
mhartzmark@HELP-Econ.com

## PRESENT POSITIONS

HARTZMARK ECONOMICS LITIGATION PRACTICE, LLC
> President (2013 - present)
> Specializing in the application of economic, financial and accounting principles to securities, complex commercial, investment, intellectual property, antitrust and automotive litigation and regulatory matters

OFFICE OF THE ATTORNEY GENERAL – STATE OF NEW JERSEY
> Independent Contractor (2015 - present)

MDA FINANCIAL, INC.
> President (1981 - present)

FINRA (fka NATIONAL ASSOCIATION OF SECURITY DEALERS) Dispute Resolution
> Member Arbitrator (2005 - present)

## EDUCATION

Ph.D.    Department of Economics, the University of Chicago, 1984
         (Doctoral Exams in Industrial Organization and Regulation; Public Finance)
M.A.     Department of Economics, the University of Chicago, 1982
B.A.     The University of Michigan (Economics, High Honors and Phi Beta Kappa), 1978

## ACADEMIC HONORS AND FELLOWSHIPS

*John M. Olin Faculty Fellowship*, (George Stigler, Director) (1986 - 1987)
*PEW Teaching Fellow*, the University of Chicago (1980 - 1981)
*Phi Beta Kappa,* the University of Michigan (1978)
*Parker Prize,* in Labor Economics, University of Michigan (1978) -- Given for the best graduate or undergraduate paper in Labor Economics

## GRANTS

Grant from the University of Chicago (1984). Center for the Study of Futures Prices: grant to analyze margin regulation for the Chicago Board of Trade Studies.

**PROFESSIONAL EXPERIENCE**

OFFICE OF THE ATTORNEY GENERAL – STATE OF NEW YORK
       Independent Contractor (2013 - 2019)
CRA INTERNATIONAL, INC.
       Independent Contractor (2015)
NAVIGANT ECONOMICS (FORMERLY CHICAGO PARTNERS, LLC)
       Academic Affiliate (2012 - 2013)
       Principal/Director (2008 - 2012)
       Vice President (2004 - 2007)
DARMA, LLC
       President (2005 - 2008)
PACIFIC BIOMETRICS, INC.
       Interim Chief Financial Officer (2004 - 2006)
CRAGAR INDUSTRIES, INC.
       Chairman, CEO, President and Treasurer (1993 - 2004)
MDA FINANCIAL, INC.
       President (1981 - present)
FAHNESTOCK & Co., Inc. (now Oppenheimer & Co., Inc.)
       Financial Consultant (Series 7 and Series 63) (2001 - 2003)
ECONOHIO CORPORATION
       President (1989 - 1992)
LEXECON INC.
       Senior Economist (1987 - 1989)
UNIVERSITY OF CHICAGO, Center for the Study of the Economy and the State, and the
       Graduate School of Business (now the Chicago Booth School of Business)
       John M. Olin Visiting Scholar (1986 - 1987)
UNIVERSITY OF MICHIGAN, Joint with Michigan Business School (now the Stephen M.
       Ross School of Business) and Department of Economics
       Assistant Professor (1984 - 1988)
       Lecturer (1984)
COMMODITY FUTURES TRADING COMMISSION, Division of Economics and
       Education, Washington, D.C.
       Financial Economist (1982 -1983)
UNIVERSITY OF CHICAGO, Department of Economics
       Instructor for Economic Analysis (1981)
       Research Assistant for A. C. Harberger (1982)
       Research Assistant for Sam Peltzman (1981 - 1982)
U. S. DEPARTMENT OF THE TREASURY, Office of Tax Analysis, Washington, D.C.
       Research Assistant (1981)

## PUBLICATIONS

"Understanding the Efficiency of the Market for Preferred Stock," (with H. Nejat Seyhun), Virginia Law & Business Review, Volume 8, Number 2, Spring 2014.

"An Economist's View of Amgen," Law360, May 2, 2013.
http://www.law360.com/articles/438303/an-economist-s-view-of-amgen.

"The Curious Incident of the Dog that Didn't Bark and Establishing Cause-and-Effect in Class Action Securities Litigation," (with H. Nejat Seyhun), Virginia Law & Business Review, Volume 6, Number 3, 2012.

"Fraud on the Market:  Analysis of the Efficiency of the Corporate Bond Market," (with Cindy A. Schipani and H. Nejat Seyhun), Columbia Business Law Review, Number 3, Volume 2011.

"Luck Versus Forecast Ability: Determinants of Trader Performance in Futures Markets," Journal of Business, January 1991. Also reprinted in Classic Futures: Lessons from the Past for the Electronic Age, by Lester Telser, Risk Books, March 2000.

"Business Valuations for the Personal Lawyer," Law and Fact, September 1991.

"Is Risk Aversion a Theoretical Diversion?" The Review of Futures Markets, Volume 7, Number 1, 1988.

"Returns to Individual Traders of Futures: Aggregate Results," Journal of Political Economy, December 1987.

"Regulating Futures Margin Requirements," Review of Research on Futures Markets, Volume 5, Number 3, 1986.

"The Effects of Changing Margin Levels on Futures Market Activity, the Composition of Traders in the Market, and Price Performance," Journal of Business, April 1986.

"Individual Income Taxation, 1947-1979," (with Eugene Steuerle), National Tax Journal, June 1981.

## BOARDS

POWHATAN BUILDING CORPORATION, Director, Treasurer, (2010 - 2016)

MIDTOWN EDUCATIONAL FOUNDATION, Auxiliary Board Member, (2009 - 2013)

GLOBAL ENTERTAINMENT CORPORATION (Formerly AMEX: GEE, currently not listed); Director, Audit Committee Member (2004 - 2008);

THE BOARD INSTITUTE (private software company), Financial Advisory Board (2004 - 2006)

SHAKER INVESTMENTS, Financial Advisory Board (1992 - 2005)

PACIFIC BIOMETRICS, INC. (OTC BB: PBMC currently not listed and renamed as Pacific Biomarkers), Director and Chairman of Audit Committee (2002 - 2004)

CRAGAR INDUSTRIES, INC. (Formerly OTC BB: CRGR, company sold); Director and Chairman of the Board (1993 - 2004)

**EXPERT REPORTS, DECLARATIONS AND DISCLOSURES PAST FOUR YEARS**

In re Altisource Portfolio Solutions, S.A. Securities Litigation. U.S. District Court for the Southern District of Florida; Report (8/12/2016); Deposition (11/9/2016); Damages Report (12/30/2016); Rebuttal Report (1/2/2017).

Barry R. Lloyd, et al. v. CVB Financial Corp., et al. U.S. District Court for the Central District of California; Report (9/9/2016); Declaration (1/23/2017).

Fixed Income Shares: Series M, et al. v. Citibank N.A. U.S. District Court for the Southern District of New York; Report (9/16/2016); Rebuttal Report (11/14/2016); Damages Report (11/28/2016); Deposition (12/22/2016).

BlackRock Core Bond Portfolio, et al. v. U.S. Bank National Association. U.S. District Court for the Southern District of New York; Report (11/1/2016); Rebuttal Report (3/3/2017); Amended Report (6/21/2017); Supplemental Report (8/18/2017).

In Re Cobalt International Energy, Inc. Securities Litigation. U.S. District Court for the Southern District of Texas; Report (11/2/2016); Deposition (12/20/2016); Rebuttal Report (5/26/2017).

BlackRock Balanced Capital Portfolio (FI), et al. v. HSBC Bank USA, National Association.  U.S. District Court for the Southern District of New York; Report (1/20/2017); Amended Report (5/4/2017); Amended Rebuttal Report (6/2/20017); Deposition (7/14/2017).

In Re CommVault Systems, Inc. Securities Litigation. U.S. District Court for the District of New Jersey; Report (5/12/2017).

In Re Finisar Corporation, Inc. Securities Litigation. U.S. District Court for the Northern District of California; Report (8/14/2017); Deposition (9/14/2017); Rebuttal Report (11/3/2017); Deposition (11/7/2018).

Robert Burke and Rachel Burke v. R.O. Reichel & Sons Trucking & Excavating, Inc., et al. Circuit Court of Cook County; Report (9/15/2017).

BlackRock Allocation Target Shares: Series S Portfolio, et al. v. Wells Fargo Bank, N.A.  U.S. District Court for the Southern District of New York; Report (10/30/2017); Deposition (11/16/2017); Rebuttal Report (1/26/2018).

Christopher S. Porrino, Attorney General of New Jersey on behalf of Amy G. Kopleton, Deputy Chief of the New Jersey Bureau of Securities v. Credit Suisse Securities (USA) LLC, et al.  Superior Court of New Jersey, Chancery Division Mercer County; Report (12/1/2017); Opposition Report (5/14/2018); Reply Report (7/16/2018); Deposition (2/13/2019).

BlackRock Balanced Capital Portfolio (FI), et al. v. Deutsche Bank National Trust Company, and Deutsche Bank Trust Company Americas. Superior Court of California in and for the County of Orange; Report (1/17/2018); Deposition (3/13/2018); Rebuttal Report (4/30/2018).

BlackRock Balanced Capital Portfolio (FI), et al. v. Deutsche Bank National Trust Company, and Deutsche Bank Trust Company Americas. U.S. District Court for the Southern District of New York; Report (1/26/2018); Deposition (3/13/2018); Rebuttal Report (4/16/2018).

Brian J. O'Donoghue, as authorized representative vs. Inland Bank and Trust, et al. U.S. District Court for the Northern District of Illinois Eastern Division; Report (4/1/2008).

In Re TerraForm Global, Inc. Securities Litigation. U.S. District Court for the Southern District of New York; Report (7/30/2018); Updated Report (8/17/2018); Reply Report (11/1/2018).

In Re Illumina, Inc. Securities Litigation. U.S. District Court Southern District of California; Report (9/14/2018); Deposition (10/19/18).

John Cumming, derivatively on behalf of New Senior Investment Group, Inc., v. Wesley R. Edens, et al. Court of Chancery of the State of Delaware; Report (11/9/2018).

The Arbitrage Fund, on behalf of itself and all other similarly situated shareholders of Exactech, Inc. v. William Petty, et al. Circuit Court of Florida, Eleventh Judicial Circuit, Miami-Dade County; Report (12/6/2018).

Oklahoma Law Enforcement Retirement System vs. Adeptus Health Inc. U.S. Eastern District of Texas, Sherman Division; Report (12/7/2018); Rebuttal Report (3/22/19).

In the Matter of the Trusts established under the Pooling and Servicing Agreements relating to the Wachovia Bank Commercial Mortgage Trust Commercial Mortgage Pass-Through Certificates, Series 2007-C30, et al. v. Appaloosa Investment L.P., et al. U.S. District Court for the Southern District of New York; Report (1/18/2019); Rebuttal Report (2/8/2019); Deposition (3/12/19).

Marc J. Muri, individually and on behalf of all others similarly situated v. National Indemnity Company. U.S. District Court District of Nebraska; Report (1/24/2019); Reply Report (2/14/2019); Deposition (3/4/2019).

In Re HD Supply Holdings, Inc. Securities Litigation. U.S. District Court for the Northern District of Georgia; Report (3/1/2019); Deposition (5/2/2019).

In Re Signet Jewelers Limited Securities Litigation. U.S. District Court for the Southern District of New York; Report (3/15/2019); Rebuttal Report (5/17/2019); Deposition (6/7/2019); Damages Report (9/20/2019); Damages Rebuttal Report (11/13/2019).

Tracey Rogers v. Aphria et al./ Garri Mirzoian v. Aphria et al. Ontario, Superior Court of Justice; Affidavit (4/5/2019).

In Re U.S. Steel Consolidated Cases. U.S. District Court for the Western District of Pennsylvania; Report (4/19/2019); Deposition (6/4/2019) Rebuttal Report (7/18/2019).

Timber Hill LLC. v. Kraft Heinz Company et al. U.S. District Court for the Northern District of Illinois; Declaration (5/15/2019).

Laurence Rougier, et al. v. Applied Optoelectronics, Inc., et al. U.S. District Court for the Southern District of Texas; Report (5/28/2019); Supplemental Report (8/26/2019).

Lord Abbett Affiliated Fund, Inc., et al, v Navient Corporation, et al. U.S. District Court for the District of Delaware; Report (9/6/2019); Deposition (10/23/2019); Reply Report (12/20/2019); Damages Report (11/3/2020); Damages Rebuttal (12/1/2020).

Graaf v. SNC-Lavalin Group Inc., et al. Quebec, Superior Court; Expert Report (10/15/2019).

BRS v. Volkswagen AG, et al., ("Bondholders Securities Action"), U.S. District Court for the Northern District of California; Report (11/8/2019); Deposition (1/10/2020).

SEB Investment Management AB. v. Symantec Corp. and Gregory S. Clark. U.S. District Court for the Northern District of California; Report (1/17/2020); Deposition (2/7/2020); Reply Report (3/14/2020).

In re: CenturyLink Sales Practices and Securities Litigation, U.S. District Court for the District of Minnesota; Report (1/21/2020); Deposition (2/25/2020); Rebuttal Report (5/4/2020); Deposition (6/5/20).

Abram B. Dyck v. Tahoe Resources Inc. and Ronald Wayne Clayton, Ontario, Superior Court of Justice; Affidavit (5/28/2020).

Patricia A. Shenk, et al., v. Mallinckrodt PLC et al., U.S. District Court for the District of Columbia; Report (7/22/2020).

In Re Tesla, Inc. Securities Litigation, U.S. District Court for the Northern District of California; Report (9/22/2020); Deposition (11/19/2020).

Jennifer Phillips, et al., v. Help at Home, LLC., U.S. District Court for the Northern District of Illinois Eastern Division; Report (10/2/2020).

Chad Lindsey Moshell, et al., v. Sasol Limited et al., U.S. District Court for the Southern District of New York; Report (10/2/2020).

Cambridge Retirement System, et al. v Amneal Pharmaceuticals, Inc., et al.. Superior Court of New Jersey, Somerset County Law Division; Report (10/30/2020).

In Re Evoqua Water Technologies Corp. Securities Litigation, U.S. District Court for the Southern District of New York; Report (12/4/2020).

A-5