**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE CITIGROUP SECURITIES LITIGATION | Case No. 1:20-cv-09132-AJN<br><br>**CLASS ACTION**<br><br>**JURY TRIAL DEMANDED** |

**CONSOLIDATED AMENDED CLASS ACTION COMPLAINT**
**FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

## TABLE OF CONTENTS

I.     NATURE OF THE ACTION ................................................................. 1

II.    JURISDICTION AND VENUE ......................................................... 9

III.   PARTIES ........................................................................................ 10

    A.   Plaintiffs ............................................................................... 10

    B.   Defendants ........................................................................... 11

        1.  Corporate Defendant ..................................................... 11

        2.  Officer Defendants ........................................................ 12

        3.  Director Defendants ....................................................... 13

IV.   SUBSTANTIVE ALLEGATIONS .................................................. 21

    A.   Relevant Background ........................................................... 21

        1.  Citigroup's Acquisition Spree And Uncontrolled Growth Before The Class Period ........................................................... 21

        2.  Citigroup's Regulatory Framework ................................ 23

        3.  Pre-Class Period Consent Orders Relating To Risk Management And Internal Controls ........................................ 30

        4.  Citigroup Slashed Costs To Improve Its Efficiency Ratio Because Its Stock Price Performance Lagged Its Peers And Affected Corbat's Compensation ........................................................... 33

    B.   Class Period Allegations ...................................................... 36

        1.  The Efficiency Ratio Was A Key Metric for Management And Wall Street Analysts During The Class Period ...................... 36

        2.  Defendants Told Investors That Risk Management Was "Critical" And Of "Primary Importance" To The Company's Operations And That Risk Management And Internal Controls Satisfied Regulatory Requirements.......... 44

        3.  Wall Street Analysts Believed Citigroup Risk Management And Internal Controls Were in Compliance With Regulatory Requirements........................ 48

        4.  Citigroup Inadvertently Wires $900 Million .................... 50

        5.  Corbat Unexpectedly Resigns ........................................ 53

i

6. In September 2020 Investors Learned That Citigroup Did Not Meet Minimum Regulatory Requirements In Violation of Law .................................. 55

C. The Fed's October 7, 2020 Cease And Desist Order Establishes Violations Of Law and Regulation ................................................................. 58

D. The OCC's October 7, 2020 Consent Orders Establish Violations Of Law And Regulation ................................................................................ 61

1. The OCC Remediation Order .......................................................... 62

2. The OCC Civil Monetary Penalty Order .......................................... 72

E. After The Fed And OCC Issued The Enforcement Orders, Analysts Accused Citigroup Of Making False Statements And Criticized The Company's "Credibility" And "Lack Of Transparency" ........................................... 72

V. SUMMARY OF SCIENTER ALLEGATIONS ................................................ 76

A. Federal Regulators Directly Told Corbat And The Citigroup And Citibank Boards That The Risk Systems And Internal Controls Were Deficient, Noncompliant, Or Unsafe Or Unsound ................................................ 77

B. The $400 Million Civil Monetary Penalty Establishes Recklessness Or Knowledge ....................................................................................... 84

C. The Officer Defendants And Director Defendants (All Members Of The Audit And Risk Management Committees) Claimed To Actively Oversee Citigroup's Risk Management And Internal Controls ............................. 84

D. Defendants Had A Legal Duty To Ensure Adequate Oversight Over Risk Systems ........................................................................................... 94

E. The Deficiencies, Noncompliance With Law And Regulations, And Unsafe Or Unsound Practices Were Longstanding, Pervasive, And Remained Even After Citigroup Stated It "Dove Deeply" And Ameliorated The Issues .................. 95

F. Corbat's And Hu's Resignations Were Unexpected And Highly Suspicious ......... 96

G. Defendants' Fraud Was Motivated By Their Desire To Improve Citigroup's Efficiency Ratio ............................................................................... 98

H. Citigroup's Risk Management And Internal Control Systems Were Core Operations ...................................................................................... 100

I. Corporate Scienter ........................................................................... 101

VI. ACTIONABLE FALSE AND MISLEADING STATEMENTS AND OMMISSIONS 102

A.   Materially False And Misleading Statements ....................................................... 103

1.  Materially False And Misleading Statements In January 15, 2016 Press Release And Earnings Conference Call For 4Q 15 ......................................... 103

2.  Materially False And Misleading Statements During The January 15, 2016 Earnings Conference Call For 4Q 15 ................................................... 105

3.  Materially False And Misleading Statements In Citigroup's Form 10-K For 2015 ...................................................................................................... 108

4.  Materially False And Misleading Statements During April 26, 2016 Annual Shareholder Meeting ......................................................................... 118

5.  Materially False And Misleading Statements During The Bank Of America Future of Financials Conference On November 16, 2016 ............... 119

6.  Materially False And Misleading Statements In Citigroup's Form 10-K For 2016 ...................................................................................................... 120

7.  Materially False And Misleading Statements During The April 13, 2017 Earnings Call For 1Q 17 .................................................................................. 134

8.  Materially False And Misleading Statements During The June 1, 2017 Bernstein 2017 Strategic Decisions Conference ............................................. 135

9.  Materially False And Misleading Statements During The July 25, 2017 Citigroup Investor Day .................................................................................... 138

10.  Materially False And Misleading Statements In January 4, 2018 Wall Street Journal Article ...................................................................................... 143

11.  Materially False And Misleading Statements In Citigroup's Form 10-K For 2017 ...................................................................................................... 145

12.  Materially False And Misleading Statements In Citigroup's Form 10-K For 2018 ...................................................................................................... 158

13.  Materially False And Misleading Statements And Omissions In March 6, 2019 Proxy ..................................................................................................... 174

14.  Materially False and Misleading Statements in March 19, 2019 Press Release ...................................................................................................... 177

15.  Materially False and Misleading Statements During the July 15, 2019 Earnings Call For 2Q 19 .............................................................................. 178

16.  Materially False and Misleading Statements During the September 9, 2019 Barclays Global Financial Services Conference .................................... 180

17. Materially False And Misleading Statements In October 11, 2019 Press Statements ................................................................. 182

18. Materially False And Misleading Statements During The October 15, 2019 Earnings Call For 3Q 19 ........................................ 183

19. Materially False And Misleading Statements In January 21, 2020 Press Reports ..................................................................... 185

20. Materially False And Misleading Statements In Citigroup's Form 10-K for 2019 .................................................................... 186

20. Materially False And Misleading Statements During The April 15, 2020 Earnings Call For 1Q 20 ............................................ 200

21. Materially False And Misleading Statements In The September 10, 2020 Press Release ............................................................. 202

B. Accounting And Regulatory False And Misleading Statements And Omissions ................................................................... 205

1. Citigroup Concealed A Loss Contingency In The Range of $3.66 Billion To $4.10 Billion In Violation Of GAAP, Which Would Have Increased Citigroup's Efficiency Ratio To More Than 60% ............................... 205

2. Citigroup Violated Regulation S-K Item 303 By Concealing The Significant Underinvestment In Its Risk Systems ........................... 213

3. Citigroup's Internal Controls Were Not Effective Because They Suffered From A Material Weakness .............................................. 216

VII. LOSS CAUSATION ............................................................................ 242

A. September 14, 2020 ...................................................................... 243

B. September 15, 2020 ...................................................................... 245

C. October 8, 2020 .......................................................................... 247

D. October 13, 2020 ......................................................................... 248

VIII. INAPPLICABILITY OF STATUTORY SAFE HARBOR OR BESPEAKS CAUTION DOCTRINE ....................................................................... 251

IX. PRESUMPTION OF RELIANCE AND FRAUD ON THE MARKET DOCTRINE ... 251

X. CLASS ACTION ALLEGATIONS ...................................................... 253

XI. CLAIMS FOR RELIEF ....................................................................... 255

iv

COUNT I ................................................................................................................... 255

COUNT II .................................................................................................................. 256

XII.   JURY DEMAND AND PRAYER FOR RELIEF .......................................................... 258

## GLOSSARY OF TERMS

| Term | Definition |
| --- | --- |
| 2016 Term Loan | In 2016, Revlon took out a seven-year $1.8 billion syndicated loan for which Citibank serves as administrative agent. |
| 2020 Enforcement Orders | The October 7, 2020, Fed Cease and Desist Order; the October 2, 2020, OCC Remediation Order; and the October 2, 2020, OCC CMP Order. |
| ABTF | Asset-Based Transitional Finance, a subgroup of Citibank's Loan Operations group. |
| Anchorage or Named Plaintiff | Anchorage Police & Fire Retirement System. |
| AS | Auditing Standards. |
| BSA/AML | Bank Secrecy Act and Anti-Money Laundering regulations. |
| BSP Handbook | September 2019 OCC handbook titled "Bank Supervision Process." |
| Citibank or the Bank | Citibank National Association, a wholly owned subsidiary of Citigroup and its most important division. |
| Citigroup or the Company | Defendant Citigroup Inc. |
| Class | All persons and entities who purchased or otherwise acquired Citigroup common stock between January 15, 2016 and October 12, 2020 inclusive.  And all persons and entities that during the Class Period (i) purchased the exchanged-traded call options on Citigroup common stock listed in Exhibit A; and/or (ii) sold the exchange-traded put options on Citigroup common stock listed in Exhibit A, and were damaged thereby. |
| Class Period | January 15, 2016 through October 12, 2020, inclusive. |
| CMP | Civil Monetary Penalty. |
| COAP | The OCC Remediation Order directed Citibank to develop a Consent Order Action Plan ("COAP").  The COAP had seven sub-components needing remediation: (i) Enterprise-Wide Risk Management Program; (ii) Compliance Risk Management; (iii) Capital Planning and Reporting; (iv) Internal Controls; (v) Staffing and Technology Resource Assessment; (vi) Restrictions on Significant New Acquisitions; and (vii) Board and Management Oversight. |
| Corbat | Defendant Michael L. Corbat, CEO and Director of Citigroup from 2012 until February 26, 2021.  He also served as CEO and Director of Citibank from June 2020 to February 26, 2021. |
| COSO | Committee of Sponsoring Organizations of the Treadway Commission. |

| Term | Definition |
|---|---|
| Costello | Defendant Ellen M. Costello, Director of Citigroup since 2016. Since 2016, Costello has also served as a member of Citigroup's Audit Committee and since 2018 she has served as a member of Citigroup's Risk Management Committee.  Costello has also served as a Director of Citibank since 2016. |
| CRMP | Compliance Risk Management Plan, a comprehensive revamping of Citibank's compliance processes ordered by the OCC in the OCC Remediation Order. |
| Dailey | Defendant Grace E. Dailey, Director of Citigroup since 2019. Dailey has served as a member of the Audit Committee and Risk Management Committee since 2019.  She also served as a Director of Citibank in 2020. |
| DCP | Disclosure Controls and Procedures.  DCP are "controls and other procedures of an issuer that are designed to ensure that information required to be disclosed by the issuer in the reports that it files or submits under the [Exchange] Act . . . is recorded, processed, summarized and reported within the time period specified" by the SEC.  17 C.F.R. § 240.13a-15(e). |
| Desoer | Defendant Barbara Desoer, Director of Citigroup since 2019. Since 2019, Desoer has also served as a member of the Risk Management Committee and from 2019 to 2020 she served as a member of the Audit Committee.  Desoer has also served as a Director of Citibank since 2014 and served as CEO of Citibank from April 2014 to April 2019. |
| DGP | Data Governance Plan that the OCC Remediation Order directed Citibank to implement so that Citibank can "ensure that data, throughout its lifecycle, is accurate, consistent, timely, and complete and there is integrity in processing in order to facilitate timely and accurate management and regulatory reporting so that management can make prompt and effective decision-making during normal times and periods of stress." |
| Director Defendants | Corbat, Costello, Dailey, Desoer, Dugan, Hennes, Henry, Humer, Ireland, Jacobs, James, McQuade, O'Neill, Santomero, Turley, Wright, Wynaendts, and Zedillo. |
| Dugan | Defendant John C. Dugan, Director of Citigroup since 2017 and Chair of the Citigroup Board since 2019.  Since 2017, Dugan has served as a member of the Audit Committee and the Risk Management Committee. |
| EIC | Examiner-in-Charge. |
| ERMP | Enterprise-Wide Risk Management Program. |
| EUC | End-User Computing. |
| Exchange Act | Securities Exchange Act of 1934. |
| FASB | Financial Accounting Standards Board. |
| Fed 2013 Consent Order | March 21, 2013, consent order with the Fed based on deficiencies in Citibank's BSA/AML compliance programs. |

| Term | Definition |
|---|---|
| Fed 2015 Consent Order | May 20, 2015, consent order with the Fed based on deficiencies in the Citigroup's BSA/AML compliance programs. |
| Fed BHC Supervision Manual | February 2020 Bank Holding Company Supervision Manual published by the Federal Reserve. |
| Fed Cease and Desist Order | October 7, 2020, order from the Federal Reserve Board of Governors "identifying significant ongoing deficiencies in … [Citigroup's] risk management and internal controls, including for data quality management and regulatory reporting, compliance risk management, capital planning, and liquidity risk management." |
| Federal Reserve or Fed | The Board of Governors of the Federal Reserve System, Citigroup's primary regulator. |
| Fraser | Current Citigroup CEO Jane Fraser, who became CEO in March 2021. |
| GAAP | Generally Accepted Accounting Principles. |
| Gerspach | Defendant John C. Gerspach, Citigroup CFO from July 2009 until February 22, 2019. |
| Hennes | Defendant Duncan P. Hennes, Director of Citigroup since 2013. In 2020, Hennes served as the Chair of the Risk Management Committee and has served as a member of the Risk Management Committee since at least 2015.  Hennes has also served as a member of the Audit Committee since 2019 and has served as a Director of Citibank since 2013. |
| Henry | Defendant Peter B. Henry, Director of Citigroup since 2015. Henry has also served as a member of the Audit Committee since 2015 and served as a Citibank Director in 2015 and part of 2016. |
| Humer | Defendant Franz B. Humer, Director of Citigroup from 2012 to April 2019.  From at least 2015 through 2018, Humer served as a member of the Risk Management Committee.  Humer also served as a Director of Citibank in 2012 and 2013. |
| ICFR | Internal controls over financial reporting.  The SEC Final Rule states that ICFR include "policies and procedures" that "(1) [p]ertain to the maintenance of records that in reasonable detail accurately and fairly reflect the transactions and dispositions of the assets of the registrant;" [and] (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with [GAAP]." |
| Individual Defendants | Officer Defendants and Director Defendants. |
| Ireland | Defendant S. Leslie Ireland, Director of Citigroup since 2017. Since 2020, she has served as a member of the Risk Management Committee.  Ireland has also served as a Director of Citibank since 2017. |

| Term | Definition |
|------|------------|
| Jacobs | Defendant Lew W. Jacobs, Director of Citigroup since 2018. Since 2018, Jacobs has also served as a member of the Audit Committee and since 2020 he has served as a member of the Risk Management Committee. |
| James | Defendant Renee J. James, Director of Citigroup since 2016. Since 2016, James has served as a member of the Risk Management Committee. |
| LBS Handbook | September 2019 OCC handbook titled "Large Bank Supervision." |
| Mason | Defendant Mark A. L. Mason, Citigroup CFO since February 23, 2019. |
| McQuade | Defendant Eugene M. McQuade, Director of Citigroup from 2015 to April 2020.  From at least 2015 through 2019, McQuade served as a member of the Risk Management Committee and in 2019 he served as a member of the Audit Committee.  McQuade also served as Vice Chairman of Citigroup from 2014 to May 2015 and was CEO of Citibank from 2009 to April 2014.  McQuade also served as a Director of Citibank from 2009 to January 2020. |
| MD&A | Management's Discussion and Analysis of Financial Condition and Results of Operations, required by the SEC to be included in a public company's periodic reports to shareholders. |
| NYSE | New York Stock Exchange. |
| O'Neill | Defendant Michael E. O'Neill, Director of Citigroup from 2009 to January 2019, and Chair of the Board from 2012 to January 2019.  From 2016 to 2018, O'Neill was also a member of the Risk Management Committee, and in 2015 he served as a member of the Audit Committee.  O'Neill also served as a Director of Citibank from 2009 to 2012. |
| OCC | Office of the Comptroller of the Currency, which supervises and regulates Citibank. |
| OCC 2012 Consent Order | April 5, 2012 consent order with the OCC relating to Citibank's violations of the Bank Secrecy Act and anti-money laundering regulations and inadequate internal controls and risk management. |
| OCC CMP Order | October 2, 2020 consent order with the OCC that assessed a civil monetary penalty of $400 million against Citibank. |
| OCC Internal Control Handbook | Internal Control Comptroller's Handbook (January 2001). |
| OCC Remediation Order | October 2, 2020 consent order with the OCC that found Citibank had "failed to implement and maintain an enterprise-wide risk management and compliance risk management program, internal controls, or a data governance program commensurate with the Bank's size, complexity and risk profile." |
| Officer Defendants | Corbat, Gerspach, and Mason. |
| PCAOB | Public Company Accounting Oversight Board. |
| PSP or Lead Plaintiff | Public Sector Pension Investment Board. |

| Term | Definition |
|---|---|
| Regulation YY | Regulation YY of the Board of Governors (12 C.F.R. §252.33). |
| ROE | Report of Examination. |
| Santomero | Defendant Anthony M. Santomero, Director of Citigroup from 2009 to April 2019.  Santomero served as the Chair of the Risk Management Committee from at least 2015 through 2018.  He also served as a member of the Audit Committee from at least 2015 through 2018.  He also served as a Director of Citibank from 2009 to 2019. |
| SARs | Suspicious Activity Reports. |
| SEC | Securities and Exchange Commission. |
| SEC Final Rule | SEC Final Rule, Management's Report on Internal Control Over Financial Reporting and Certification of Disclosure in Exchange Act Periodic Reports, Release No. 33-8238. |
| SEC Release 33-8810 | 17 C.F.R. Part 241, SEC Commission Guidance Regarding Management's Report on Internal Control Over Financial Reporting Under Section 13(a) or 15(d) of the Securities Exchange Act of 1934, Release No. 33-8810. |
| SOX | The Sarbanes-Oxley Act of 2002, also known as the Public Company Accounting Reform and Investor Protection Act. |
| Turley | Defendant James S. Turley, Director of Citigroup since 2013. Since at least 2015, Turley has served as the Chair of the Audit Committee and a member of the Risk Management Committee. Turley has also served as a Director of Citibank since 2013. |
| Wright | Defendant Deborah C. Wright, Director of Citigroup since 2017. Since 2017, Wright has served as a member of the Audit Committee.  Wright has also served as a Director of Citibank since 2019. |
| Wynaendts | Defendant Alexander Wynaendts, Director of Citigroup since 2019.  Since 2019, Wynaendts has served as a member of the Risk Management Committee. |
| Zedillo | Defendant Ernesto Zedillo Ponce de Leon, Director of Citigroup since 2010.  Since at least 2015, Zedillo has served as a member of the Risk Management Committee. |

Court-appointed Lead Plaintiff Public Sector Pension Investment Board ("PSP" or "Lead Plaintiff"), and Named Plaintiff Anchorage Police & Fire Retirement System ("Anchorage") (together "Plaintiffs") by and through their counsel, bring this action asserting securities claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") on behalf of themselves and all others similarly situated who purchased or otherwise acquired Citigroup Inc. ("Citigroup" or the "Company") common stock between January 15, 2016 and October 12, 2020, inclusive (the "Class Period"), and were damaged thereby.  Plaintiffs also bring this action on behalf of those persons and entities that during the Class Period (i) purchased the exchanged-traded call options on Citigroup common stock listed in Exhibit A; and/or (ii) sold the exchange-traded put options on Citigroup common stock listed in Exhibit A, and were damaged thereby.  Excluded parties are listed in the Class Action Allegations section X.

The allegations are based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and upon information and belief as to all other matters based on the investigation conducted by and through Lead Counsel.  Lead Counsel's investigation included, among other things, a review and analysis of Citigroup's filings with the Securities and Exchange Commission ("SEC"), transcripts of Citigroup's public conference calls, press releases issued by Citigroup, news and media reports concerning the Company, research reports issued by financial analysts, governmental and regulatory sanctions and findings concerning Citigroup, and other publicly available information.  Plaintiffs believe that, after a reasonable opportunity for discovery, substantial additional evidentiary support will be available for trial that further supports the allegations in this Complaint.

## I.    NATURE OF THE ACTION

1.    Citigroup is one of only thirty global banks classified as systemically important, and within that group it is in the highest tier of importance along with only JP Morgan Chase and

HSBC.  This designation is reserved for institutions whose distress or disorderly failure, because of their size, complexity and systemic interconnectedness, would cause significant disruption to the wider financial system and economic activity.  Citigroup is thus commonly referred to as "too big to fail," with more than two trillion dollars in assets, over two-hundred million customer accounts, and operations in more than 160 countries.

2.      The *sine qua non* of banking is safety and soundness.  The Board of Governors of the Federal Reserve System (the "Federal Reserve" or "Fed") (Citigroup's primary regulator) states on its webpage that one of its main responsibilities is to supervise – monitor, inspect, and examine – certain financial institutions "to ensure that they comply with rules and regulations, and that they operate in a safe and sound manner."  The Office of the Comptroller of the Currency ("OCC") (which supervises Citigroup's primary subsidiary, Citibank, N.A. ("Citibank" or the "Bank")) likewise states on its website that its "Mission" is "To ensure that national banks [] operate in a safe and sound manner … and comply with applicable laws and regulations."

3.      To ensure safety and soundness, the Fed and OCC require that these financial institutions maintain robust risk management and internal control systems.  There is no set of systems that is more important to Citigroup than its risk management systems and internal controls, which the Company referred to as the "bedrock of banking," analogized to brakes on a car, and acknowledged that they are "critical to maintaining our license to do business."

4.      This case is about Citigroup's repeated misrepresentations regarding the safety and soundness, functioning, and legal and regulatory compliance of its risk management systems and internal controls.  Citigroup told investors throughout the Class Period that it complied with Fed and OCC mandates, was "operating above every one of our regulatory requirements," and made all the necessary investments into its risk and control infrastructure to ensure it operated

safely and soundly.  So effective were these investments, according to Citigroup, that it proclaimed itself to be a "systemically responsible" institution and touted that its "priority" was "to focus on risk management."  The Company also explained the functioning of its risk management systems in granular detail and that the Citigroup Board of Directors and senior management actively oversaw those systems, providing further assurances to investors that Citigroup acted consistently with legal and regulatory requirements.  Citigroup even cited as evidence the fact that "the dogs [*i.e.*, regulators] haven't barked," when discussing the strength of its risk management systems.

5.      That was all false.  The truth is that Citigroup flagrantly violated Fed and OCC mandates and operated in a fundamentally unsound and unsafe manner, in violation of law and regulation, for at least the last five years.  In October 2020, the OCC issued two enforcement orders against Citibank making ***formal findings of fact*** that the Bank repeatedly flouted applicable regulations, failed to meet minimum legal requirements for its risk management and internal control systems, that those systems did not function effectively, and that Citibank was anything but a systemically responsible institution.  The Federal Reserve concurrently issued a similar enforcement order against Citigroup partly predicated on its own determinations and on the OCC's enforcement orders and formal findings.  These enforcement orders laid bare the material facts that the Fed and OCC privately told Citigroup for years, but that the Company misrepresented and concealed from investors.

6.      The enforcement order issued by the Federal Reserve (the "Fed Cease and Desist Order") "identified ***significant ongoing deficiencies in … risk management and internal controls, including for data quality management and regulatory reporting, compliance risk management, capital planning, and liquidity risk management.***"  It then concluded that "Citigroup has not adequately remediated the ***longstanding*** enterprise-wide risk management and

control deficiencies **previously identified** by the Federal Reserve, including in the areas described [in the prior sentence]" and those addressed as far back as **2013.**  That Citigroup failed to effectively remediate matters previously identified by the Federal Reserve that occurred **seven years** prior to the Fed Cease and Desist Order is astonishing, particularly when viewed in the context of the Company's consistent and positive representations during the Class Period regarding the legal compliance and effective functioning of its risk management systems.

7.      The OCC in its first consent order (the "OCC Remediation Order") likewise found with respect to Citibank that **"[f]or several years,** the Bank has failed to implement and maintain an enterprise-wide risk management and compliance risk management program, internal controls, or a data governance program commensurate with the Bank's size, complexity and risk profile."  The OCC further castigated Citibank, finding that the Bank consistently and repeatedly engaged in "**unsafe or unsound practices** that were part of a **pattern of misconduct**," which "contributed to violations of law and regulation and **continuous noncompliance**" with applicable regulations.

8.      As a result of Citibank's "pattern of misconduct" and "continuous noncompliance" that persisted "[f]or several years," the OCC assessed Citibank a $400 million civil monetary penalty ("CMP") pursuant to a second consent order also issued in October 2020 (the "OCC CMP Order").[1]

9.      The $400 million penalty demonstrates that the Citibank Board (which substantially overlaps with the Citigroup Board) engaged in **"misconduct that is reckless, flagrant, willful, or knowing and that, because of its frequency or recurring nature, shows a**

---

[1] The Fed Cease and Desist Order, OCC Remediation Order, and OCC CMP Order are collectively referred to herein as the "2020 Enforcement Orders."

***general disregard for law or regulation.***"   That is the standard for assessing monetary penalties recommended by the OCC in the applicable supervisory handbook that applies to the actors that are the subject of the OCC CMP Order, the Individual Defendants, because they are the actors that engaged in the misconduct.

10.     There is no question that Defendants knew of the regulatory failures, deficiencies, and unsafe and unsound practices.  They festered for years, with regulators privately pressing Citigroup, and principally its former Chief Executive Officer Michael L. Corbat ("Corbat"), to remediate them.  In personal meetings and written documents, regulators personally and directly alerted Corbat to the deficiencies, which spanned virtually every aspect of Citigroup's risk management infrastructure.

11.     The Fed and OCC also sent direct written communications to the Citigroup and Citibank Boards that explained the deficiencies in detail, but they too largely ignored and brushed aside the regulators.  The Fed prepares an annual report provided to the Citigroup Board that "summarizes the significant findings, based on outstanding MRIAs [Matters Requiring Immediate Attention] or MRAs [Matters Requiring Attention]."  Likewise, at the end of each supervisory cycle, the OCC must provide the Citibank Board with a Report of Examination ("ROE") which "discusses deficient risk management practices, violations, and excessive risks, [and] details corrective actions to which bank management or the board has committed."   ***Each Citibank director must sign the ROE to "show[] that he or she has personally reviewed the entire ROE."***

12.     But rather than make the investments necessary to remediate the deficiencies in Citigroup's risk management systems and internal controls, Defendants made the deliberate choice to cut costs in the hopes of improving Citigroup's "efficiency ratio"—a metric that significantly influenced Corbat's compensation.  The day Corbat became CEO in 2012, he said he would be

"extraordinarily focused on our efficiency ratios and our overall expense levels."   That extraordinary focus continued throughout the Class Period with Wall Street analysts repeatedly questioning the Company on the metric.  Missing this target prompted cries to axe Corbat's bonus. Wells Fargo's analyst Mike Mayo ("Mayo")—one of the most esteemed banking analysts in the industry—wrote in a December 6, 2018 report that "[i]f Citi's top 5 named Executive Officers receive no bonus in 2018 and only base salary, we estimate that Citi could meet its efficiency target."  Mayo then reiterated the next day that Citigroup should do "whatever it takes" to meet efficiency targets.

13.     In its quest to drive expenses and the efficiency ratio down, however, Citigroup abandoned its proclaimed commitment to risk management and internal controls.  On September 15, 2020, a day after the news first broke that the regulators would issue enforcement orders, *Business Insider* reported that Citigroup's regulators "were annoyed with Citigroup's noncompliance across numerous issues and felt as if they weren't being heard."  Rather than fix the systems, ***"[t]he CEO [Corbat] who had made operating efficiency and return-on equity a hallmark of his strategy was often reluctant to spend the money or dedicate enough people to fix a problem the right way."***  This stands in stark contrast to Citigroup's peers who, according to *Business Insider*, "have spent years improving their systems" while Citigroup still maintained "a patchwork of technology systems that didn't talk to one another."

14.     And while failing to make the necessary investments, Defendants consistently and repeatedly assured investors that Citigroup had, in fact, made all necessary investments to ensure the effective functioning of the Company's risk management systems, and that Citigroup "won't change [its] commitment to safety and soundness and to making investments necessary to strengthen [its] infrastructure and control environment."  This narrative was critical to investors

given that Citigroup had previously suffered serious lapses in governance and risk management, only to falsely assure investors that it "dove deeply" and remediated the issues.

15.     The story that Citigroup presented to the public cannot be squared with the reality that regulators repeatedly told Citigroup privately for years.  Corbat abruptly announced his resignation on September 10, 2020, days before the media reported that regulators were preparing to sanction Citigroup for astounding failures in risk management and internal controls.  Citigroup attempted to publicly spin Corbat's resignation into a typical planned event. But the media later reported that Corbat's departure was the result of the upcoming regulatory actions, demonstrating that the Company has continued to be less than transparent (at best) with investors.

16.     Investors were furious about Defendants' misrepresentations.  Mayo wrote in his October 8, 2020 report that "we, like other investors, are ...*angry over their lack of transparency and why the[ regulatory issues] were allowed to fester*."  Mayo then pointedly attacked Citigroup's truthfulness: "contrary to Citi's statements from a few years ago, its restructuring was not sufficiently complete in our view" and that "accountability needs to get reinforced, both at the board and the management level.  Again, on October 13, 2020, Mayo reiterated that "[s]peaking on behalf of investors, people I speak with, there's a collective sense of extreme disappointment with technology, the new regulatory order in tech, *the root problems were not transparent to investors.*"  Morgan Stanley's analyst also specifically questioned Corbat's candor with investors on the October 13, 2020 earnings call, asking, "*this consent order might be a surprise to the street, but is it really a surprise to you*?"  An article published by *The Motley Fool* on October 16, 2020 summarized it well, *"management has known about at least some of these problems since at least 2013.  How do you not fully address issues you've known were serious for at least seven years?"*

17.     To further their fraud and conceal the material deficiencies in Citigroup's risk management systems and internal controls, Defendants engaged in accounting fraud.  Generally Accepted Accounting Principles ("GAAP") required Citigroup to accrue and/or disclose the total cost to remediate the deficiencies found by the OCC and identified by the Fed throughout the Class Period as a loss contingency.  (*See infra* section VI.B.1.)  A loss contingency must be accrued as a charge to income if it is probable that a liability has been incurred and the amount of loss can be reasonably estimated.  Here, the cost to remediate was not only probable.  It was a virtual certainty given that the deficiencies identified were required to be corrected by law and regulation.  The cost also can be reasonably estimated and is at least $3.66 billion.  This amount is based on Citigroup's statements and analyst estimates, as set forth below.  But even if the cost could not be reasonably estimated, GAAP requires a qualitative disclosure of the loss contingency if there is more than a remote but less than a likely chance that it will occur.  Citigroup did not accrue a $3.66 billion charge to income and did not otherwise disclose the loss contingency in violation of GAAP, thereby rendering its financial statements issued during the Class Period materially false and misleading.

18.     In addition, Defendants violated Item 303 of Regulation S-K, which creates an affirmative duty to disclose "any known trends or uncertainties that have had or that are reasonably likely to have a material [] unfavorable impact on . . . income from continuing operations."  In violation of this duty, Defendants failed to disclose the true extent of Citigroup's underinvestment in its risk and control systems and the material impact that fixing those systems was reasonably likely to have on Citigroup's income from continuing operations.  (*See infra* section VI.B.2.)

19.     Finally, Citigroup's (i) internal controls over financial reporting ("ICFR") and (ii) disclosure controls and procedures ("DCP") were not effective.  (*See infra* section VI.B.3.)  ICFR is not effective if there is one or more material weaknesses.  Here, the multitude of deficiencies identified by the Fed and the OCC constituted a "combination of deficiencies," which amounted to a material weakness.  The deficiencies identified by the Fed and OCC also demonstrate that, contrary to Citigroup's representations, Citigroup's DCP were not effective because they were not designed or operating to ensure that all required disclosure of information was timely recorded, processed, summarized, and reported in accordance with SEC rules.

20.     All told, the disclosures of Citigroup's misconduct wiped-out over $17 billion in Citigroup's stock market value, causing Plaintiffs and members of the Class to suffer significant damage.

## II.     JURISDICTION AND VENUE

21.     This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa).  The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)), and the rules and regulations promulgated thereunder, including SEC Rule 10b-5 (17 C.F.R. §240.10b-5).  In addition, because this is a civil action arising under the laws of the United States, this Court has jurisdiction pursuant to 28 U.S.C. § 1331.

22.     In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to the mails, interstate telephone communications, and the facilities of national securities exchanges, including the New York Stock Exchange ("NYSE").

23.     Venue is proper in this District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa).  In addition, venue is proper pursuant to 28 U.S.C. § 1391.  Many of the acts and

transactions giving rise to the violations of law complained of herein occurred in this District.  In addition, Citigroup maintained its corporate headquarters and principal executive offices in this District throughout the Class Period.

## III.    PARTIES

### A.    Plaintiffs

24.    Court-appointed Lead Plaintiff, PSP, maintains its principal place of business in Montréal, Québec and is one of the largest institutional investors in North America.  As of March 31, 2020, PSP managed approximately C$169.8 billion in net assets.  PSP's investment mandate is to manage the amounts transferred to it by the Government of Canada for the funding of benefits earned from April 1, 2000 by members of the public sector pension plans of the federal Public Service, the Canadian Forces, the Royal Canadian Mounted Police and since March 1, 2007, the Reserve Force.

25.    As set forth in the Certification attached as Exhibit B to this Complaint, PSP purchased Citigroup common stock on the NYSE during the Class Period and was damaged by Defendants' violations of the federal securities laws alleged herein.  For the shares retained, PSP owns and holds legal title to the shares that are the subject of this litigation.  For the shares sold, PSP owned and held legal title to the shares that are the subject of this litigation at all relevant times.

26.    Named Plaintiff Anchorage is a public pension fund based in Anchorage, Alaska with roughly $390 million in net assets under management.  Anchorage manages these assets for roughly 780 active and retired beneficiaries, who are primarily police officers, firefighters, and their families.

27.    As set forth in the Certification attached as Exhibit C to this Complaint, Anchorage purchased Citigroup common stock on the NYSE during the Class Period and was damaged by

Defendants' violations of the federal securities laws alleged herein.  For the shares retained, Anchorage owns and holds legal title to the shares that are the subject of this litigation.  For the shares sold, Anchorage owned and held legal title to the shares that are the subject of this litigation at all relevant times.

### B.    Defendants

#### 1.    Corporate Defendant

28.    Defendant Citigroup Inc. ("Citigroup") is incorporated in Delaware and maintains its corporate headquarters at 388 Greenwich Street, New York, New York.  Citigroup common stock trades on the NYSE under the ticker symbol "C."  As of September 30, 2020, Citigroup had 2,081,959,678 shares of common stock outstanding.

29.    Citigroup describes itself as "a global diversified financial services holding company whose businesses provide consumers, corporations, governments and institutions with a broad, yet focused, range of financial products and services, including consumer banking and credit, corporate and investment banking, securities brokerage, trade and securities services and wealth management."  The Company currently has over $2.2 trillion in total assets, approximately 200 million customer accounts, and does business in more than 160 countries and jurisdictions around the world.  Citigroup generally refers to itself as "Citi."  Citigroup expressly states in its Forms 10-K filed with the SEC that "'Citigroup,' 'Citi' and 'the Company' refer to Citigroup Inc. and its consolidated subsidiaries."

30.    The Company's most important division is its nationally chartered United States commercial bank, Citibank.  Citibank's principal products include consumer finance, mortgage lending and retail banking (including commercial banking) products and services, investment banking, cash management and trade finance, and private banking products and services.  Citibank is a wholly-owned subsidiary of Citigroup with roughly 75% of Citigroup's assets.  Citibank's

results are consolidated within Citigroup's financials and account for the vast majority of Citigroup's net income.

### 2. Officer Defendants

31.     Defendant Michael L. Corbat ("Corbat") was the Chief Executive Officer ("CEO") and a Director of Citigroup from 2012 until February 26, 2021.  Corbat also served as the CEO and a Director of Citibank from June 2020 to February 26, 2021.  Corbat joined Citigroup in 1983 and worked at the firm for nearly 40 years.  The Company describes him as having "extensive experience and expertise" in the areas of "Financial Reporting . . . Regulatory Compliance . . . and risk management."  On September 10, 2020, Corbat unexpectedly announced that he would retire in February 2021, presenting it as a typical succession, only for it later to be revealed that the true reason for the resignation was the 2020 Enforcement Orders and the regulators' identification of longstanding and unremediated deficiencies in the Company's internal controls and risk management systems.

32.     Defendant John C. Gerspach ("Gerspach") joined Citigroup in 1990 and served as the Company's Chief Financial Officer ("CFO") from July 2009 until February 22, 2019.  As CFO, Gerspach chaired or co-chaired several Citigroup management committees that, according to Citigroup, "serve as key governance and oversight forums for business activities."  As CFO, Gerspach reported directly to Corbat and was a member of senior management.

33.     Defendant Mark A. L. Mason ("Mason") joined Citigroup in 2001 and has been Citigroup's CFO since February 23, 2019.  As CFO, Mason chairs or co-chairs several Citigroup management committees that, according to Citigroup, "serve as key governance and oversight forums for business activities."  As CFO, Mason reported directly to Corbat and was a member of senior management.

34.     Defendants Corbat, Gerspach, and Mason  are collectively referred to as the "Officer Defendants." The Officer Defendants, because of their positions with the Company, and their conduct alleged herein, possessed the power and authority to approve and control the contents of Citigroup's reports to the SEC, press releases, and presentations alleged herein to be false and misleading.   The Officer Defendants were provided copies of the Company's reports, press releases, and presentations alleged in this Complaint to be false and misleading before, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.

### 3.     Director Defendants

35.     Defendant Ellen M. Costello ("Costello") has served as a Director of Citigroup since 2016.  Since 2016, Costello has also served as a member of Citigroup's Audit Committee and since 2018 she has served as a member of Citigroup's Risk Management Committee.  Costello has also served as a Director of Citibank since 2016.

36.     Defendant Grace E. Dailey ("Dailey") has served as a Director of Citigroup since 2019.  Dailey has served as a member of the Audit Committee and Risk Management Committee since 2019.  She also served as a Director of Citibank in 2020.  Prior to joining Citigroup's Board, Dailey worked at the OCC from 1983 to 2019.  Her career at the OCC culminated as Senior Deputy Comptroller for Bank Supervision Policy and Chief National Bank Examiner.  In this capacity, she directed the formulation and policies and procedures for the supervision and examination of national banks.  During her time at the OCC, she also served on the agency's Executive Committee, chaired its Committee on Bank Supervision, served as Assistant Deputy Comptroller, and served as Deputy Comptroller for Large Bank Supervision.

37.     Defendant Barbara Desoer ("Desoer") has served as a Director of Citigroup since 2019.  Since 2019, Desoer has also served as a member of the Risk Management Committee and

from 2019 to 2020 she served as a member of the Audit Committee.  Desoer has also served as a Director of Citibank since 2014 and served as CEO of Citibank from April 2014 to April 2019.

38.     Defendant John C. Dugan ("Dugan") has served as Chair of the Citigroup Board since 2019, and as a Director of Citigroup since 2017.  Since 2017, Dugan has served as a member of the Audit Committee and the Risk Management Committee.  Prior to joining the Citigroup Board, Dugan served as the Comptroller of the Currency from 2005 to 2010 and was one of the five directors of the FDIC who voted to approve financial assistance to Citigroup in November 2008 in the midst of the financial crisis.

39.     Defendant Duncan P. Hennes ("Hennes") has served as a Director of Citigroup since 2013.  In 2020, Hennes served as the Chair of the Risk Management Committee and has served as a member of the Risk Management Committee since at least 2015.  Hennes has also served as a member of the Audit Committee since 2019 and has served as a Director of Citibank since 2013.

40.     Defendant Peter B. Henry ("Henry") has served as a Director of Citigroup since 2015.  Henry has also served as a member of the Audit Committee since 2015 and served as a Citibank Director in 2015 and part of 2016.

41.     Defendant Franz B. Humer ("Humer") served as a Director of Citigroup from 2012 to April 2019.  From at least 2015 through 2018, Humer served as a member of the Risk Management Committee.  Humer also served as a Director of Citibank in 2012 and 2013.

42.     Defendant S. Leslie Ireland has served as a Director of Citigroup since 2017.  Since 2020, she has served as a member of the Risk Management Committee.  Ireland has also served as a Director of Citibank since 2017.

43.     Defendant Lew W. Jacobs, IV ("Jacobs") has served as a Director of Citigroup since 2018.  Since 2018, Jacobs has also served as a member of the Audit Committee and since 2020 he has served as a member of the Risk Management Committee.

44.     Defendant Renee J. James ("James") has served as a Director of Citigroup since 2016.  Since 2016, James has served as a member of the Risk Management Committee.

45.     Defendant Eugene M. McQuade ("McQuade") served as a Director of Citigroup from 2015 to April 2020.  From at least 2015 through 2019, McQuade served as a member of the Risk Management Committee and in 2019 he served as a member of the Audit Committee. McQuade also served as Vice Chairman of Citigroup from 2014 to May 2015 and was CEO of Citibank from 2009 to April 2014.  McQuade also served as a Director of Citibank from 2009 to January 2020.

46.     Defendant Michael E. O'Neill ("O'Neill") served as a Director of Citigroup from 2009 to January 2019, and as Chair of the Board from 2012 to January 2019.  From 2016 to 2018, O'Neill was also a member of the Risk Management Committee, and in 2015 he served as a member of the Audit Committee.  O'Neill also served as a Director of Citibank from 2009 to 2012.

47.     Defendant Anthony M. Santomero ("Santomero") served as a Director of Citigroup from 2009 to April 2019.  Santomero served as the Chair of the Risk Management Committee from at least 2015 through 2018.  He also served as a member of the Audit Committee from at least 2015 through 2018.  He also served as a Director of Citibank from 2009 to 2019.

48.     Defendant James S. Turley ("Turley") has served as a Director of Citigroup since 2013.  Since at least 2015, Turley has served as the Chair of the Audit Committee and a member of the Risk Management Committee.  Turley has also served as a Director of Citibank since 2013.

49.     Defendant Deborah C. Wright ("Wright") has served as a Director of Citigroup since 2017.  Since 2017, Wright has served as a member of the Audit Committee.  Wright has also served as a Director of Citibank since 2019.

50.     Defendant Alexander Wynaendts ("Wynaendts") has served as a Director of Citigroup since 2019.  Since 2019, Wynaendts has served as a member of the Risk Management Committee.

51.     Defendant Ernesto Zedillo Ponce de Leon ("Zedillo") has served as a Director of Citigroup since 2010.  Since at least 2015, Zedillo has served as a member of the Risk Management Committee.

52.     Defendants Corbat, Costello, Dailey, Desoer, Dugan, Hennes, Henry, Humer, Ireland, Jacobs, James, McQuade, O'Neill,  Santomero, Turley, Wright, Wynaendts, and Zedillo are collectively referred to herein as the "Director Defendants."

53.     The Director Defendants together with the Officer Defendants are referred to herein as the "Individual Defendants."

16

54.     The table below shows the years during the Class Period that Corbat and each Director Defendant served as a Director on the Citigroup Board.  It also identifies when each of these Defendants served on Citigroup's Risk Management Committee, Audit Committee, and/or the Citibank Board (designated by the letters "R," "A," and "C" respectively). ).  The word "None" indicates that the Defendant served on the Citigroup Board, but not on the Risk Management Committee, Audit Committee, or Citibank Board during that particular year.  Cells shaded black indicate that the Defendant did not serve on the Citigroup Board during that particular year.  During the Class Period, virtually every member of the Citibank Board also served on the Citigroup Board.

| Director Defendant Name | 2020 | 2019 | 2018 | 2017 | 2016 | 2015 |
|---|---|---|---|---|---|---|
| Michael L. Corbat | C | None | None | None | None | None |
| Ellen M. Costello | A, R, C | A, R, C | A, R, C | A, C | A, C | A |
| Grace E. Dailey | A, R, C | A, R | | | | |
| Barbara J. Desoer[2] | A, R, C | A, R, C | | | | |
| John C. Dugan | A, R | A, R | A, R | A, R | | |
| Duncan P. Hennes | A, R, C | A, C | R, C | R, C | R, C | R, C |
| Peter B. Henry | A | A | A | A | A | A, C |
| Franz B. Humer | | | R | R | R | R |
| S. Leslie Ireland | R, C | C | C | C | | |
| Lee W. (Jay) Jacobs, IV | A, R | A | A | | | |
| Renee J. James | R | R | R | R | R | |
| Eugene M. McQuade | | A, R, C | R, C | R, C | R, C | R, C |
| Michael E. O'Neill | | | R | R | R | A |
| Anthony M. Santomero | | | A, R, C | A, R, C | A, R, C | A, R, C |
| James S. Turley | A, R, C | A, R, C | A, R, C | A, R, C | A, R, C | A, R, C |
| Deborah C. Wright | A, C | A C | A | A | | |
| Alexander R. Wynaendts | R | R | | | | |
| Ernesto Zedillo Ponce De Leon | R | R | R | R | R | R |

---

[2] Desoer served on the Citibank Board in 2015, 2016, 2017, and 2018.  Desoer did not serve on the Citigroup Board at that time.

55.     The table below sets forth the SEC filings that this complaint alleges contains materially false and misleading statements, together with the date of filing, period covered, and Defendant signatories along with their respective positions and Board committee memberships.

| Filing | Date Filed | Period Covered[3] | Individual Defendant Signatories[4] |
|---|---|---|---|
| Form 10-K | February 26, 2016 | FY 2015 | Corbat (CEO), Gerspach (CFO), and Directors: Turley (Audit Chair, Risk, Citibank); Santomero (Risk Chair, Audit, Citibank); Costello (Audit); Hennes (Risk, Citibank); Henry (Audit, Citibank); Humer (Risk); James (Risk); McQuade (Risk, Citibank); O'Neill (Audit); and Zedillo (Risk) |
| SOX Certification[5] | February 26, 2016 | FY 2015 | Corbat (CEO) and Gerspach (CFO) |
| Form 10-Q | May 2, 2016 | 1Q 2016 | Gerspach (CFO) |
| SOX Certification | May 2, 2016 | 1Q 2016 | Corbat (CEO) and Gerspach (CFO) |
| Form 10-Q | August 1, 2016 | 2Q 2016 | Gerspach (CFO) |
| SOX Certification | August 1, 2016 | 2Q 2016 | Corbat (CEO) and Gerspach (CFO) |
| Form 10-Q | October 31, 2016 | 3Q 2016 | Gerspach (CFO) |

---

[3] Citigroup's Fiscal Year ("FY") and quarterly periods correspond to the calendar year.

[4] The Individual Defendant Signatories' membership on the Citigroup Board of Directors Audit Committee and/or Risk Management Committee during the period covered by the corresponding filing is designated by "Audit" and/or "Risk" in parentheses after their name.  Defendant Signatories who also served on the Citibank Board during the covered period are indicated by "Citibank" in parentheses.

[5] "SOX Certification" refers to Certifications signed pursuant to Sections 302 or 404 of the Sarbanes-Oxley Act of 2002.

| Filing | Date Filed | Period Covered[3] | Individual Defendant Signatories[4] |
|---|---|---|---|
| SOX Certification | October 31, 2016 | 3Q 2016 | Corbat (CEO) and Gerspach (CFO) |
| Form 10-K | February 24, 2017 | FY 2016 | Corbat (CEO), Gerspach (CFO), and Directors: Turley (Audit Chair, Risk, Citibank); Santomero (Risk Chair, Audit, Citibank); Costello (Audit, Citibank); Hennes (Risk, Citibank); Henry (Audit); Humer (Risk); James (Risk); McQuade (Risk, Citibank); O'Neill (Risk); Wright (Audit); and Zedillo (Risk) |
| SOX Certification | February 24, 2017 | FY 2016 | Corbat (CEO) and Gerspach (CFO) |
| Form 10-Q | May 1, 2017 | 1Q 2017 | Gerspach (CFO) |
| SOX Certification | May 1, 2017 | 1Q 2017 | Corbat (CEO) and Gerspach (CFO) |
| Form 10-Q | August 1, 2017 | 2Q 2017 | Gerspach (CFO) |
| SOX Certification | August 1, 2017 | 2Q 2017 | Corbat (CEO) and Gerspach (CFO) |
| Form 10-Q | October 31, 2017 | 3Q 2017 | Gerspach (CFO) |
| SOX Certification | October 31, 2017 | 3Q 2017 | Corbat (CEO) and Gerspach (CFO) |
| Form 10-K | February 23, 2018 | FY 2017 | Corbat (CEO), Gerspach (CFO), and Directors: Turley (Audit Chair, Risk, Citibank); Santomero (Risk Chair, Audit, Citibank); Costello (Audit, Citibank); Dugan (Audit, Risk); Hennes (Risk and Citibank); Henry (Audit); Humer (Risk); Ireland (Citibank); McQuade (Risk, Citibank); O'Neill (Risk); Wright (Audit); and Zedillo (Risk) |
| SOX Certification | February 23, 2018 | FY 2017 | Corbat (CEO) and Gerspach (CFO) |
| Form 10-Q | May 1, 2018 | 1Q 2018 | Gerspach (CFO) |

| Filing | Date Filed | Period Covered[3] | Individual Defendant Signatories[4] |
|---|---|---|---|
| SOX Certification | May 1, 2018 | 1Q 2018 | Corbat (CEO) and Gerspach (CFO) |
| Form 10-Q | July 31, 2018 | 2Q 2018 | Gerspach (CFO) |
| SOX Certification | July 31, 2018 | 2Q 2018 | Corbat (CEO) and Gerspach (CFO) |
| Form 10-Q | October 30, 2018 | 3Q 2018 | Gerspach (CFO) |
| SOX Certification | October 30, 2018 | 3Q 2018 | Corbat (CEO) and Gerspach (CFO) |
| Form 10-K | February 22, 2019 | FY 2018 | Corbat (CEO), Gerspach (CFO), and Directors: Turley (Audit Chair, Risk, and Citibank); Santomero (Risk Chair, Audit, Citibank); Costello (Audit, Citibank); Dugan (Audit, Risk); Hennes (Risk, Citibank); Henry (Audit); Humer (Risk); Ireland (Citibank); Jacobs (Audit); James (Risk); McQuade (Risk, Citibank); Wright (Audit); and Zedillo (Risk) |
| SOX Certification | February 22, 2019 | FY 2018 | Corbat (CEO) and Gerspach (CFO) |
| Form - 14A Proxy | March 6, 2019 | FY 2018 | Corbat (CEO) and Directors: Turley (Audit Chair, Risk, and Citibank); Santomero (Risk Chair, Audit, Citibank); Costello (Audit, Citibank); Dugan (Audit, Risk); Hennes (Risk, Citibank); Henry (Audit); Humer (Risk); Ireland (Citibank); Jacobs (Audit); James (Risk); McQuade (Risk, Citibank); Wright (Audit); and Zedillo (Risk) |
| Form 10-Q | April 30, 2019 | 1Q 2019 | Mason (CFO) |
| SOX Certification | April 30, 2019 | 1Q 2019 | Corbat (CEO) and Mason (CFO) |
| Form 10-Q | August 1, 2019 | 2Q 2019 | Mason (CFO) |
| SOX Certification | August 1, 2019 | 2Q 2019 | Corbat (CEO) and Mason (CFO) |

| Filing | Date Filed | Period Covered[3] | Individual Defendant Signatories[4] |
|---|---|---|---|
| Form 10-Q | November 1, 2019 | 3Q 2019 | Mason (CFO) |
| SOX Certification | November 1, 2019 | 3Q 2019 | Corbat (CEO) and Mason (CFO) |
| Form 10-K | February 21, 2020 | FY 2019 | Corbat (CEO), Mason (CFO), and Directors: Turley (Audit Chair, Risk, and Citibank); McQuade (Risk Chair, Audit, and Citibank); Costello (Audit, Risk, and Citibank); Dailey (Audit, Risk); Desoer (Risk, Citibank); Dugan (Audit, Risk); Hennes (Audit, Citibank); Henry (Audit); Ireland (Citibank); Jacobs (Audit); James (Risk); Wright (Audit, Citibank); Wynaendts (Risk); and Zedillo (Risk) |
| SOX Certification | February 21, 2020 | FY 2019 | Corbat (CEO) and Mason (CFO) |
| Form 10-Q | May 4, 2020 | 1Q 2020 | Mason (CFO) |
| SOX Certification | May 4, 2020 | 1Q 2020 | Corbat (CEO) and Mason (CFO) |
| Form 10-Q | August 4, 2020 | 2Q 2020 | Mason (CFO) |
| SOX Certification | August 4, 2020 | 2Q 2020 | Corbat (CEO) and Mason (CFO) |

## IV.   SUBSTANTIVE ALLEGATIONS

### A.   Relevant Background

#### 1.   Citigroup's Acquisition Spree And Uncontrolled Growth Before The Class Period

56.     Citigroup once was a traditional bank and credit card issuer.  Beginning in the 1980s, however, the Company and its predecessor entities engaged in a string of mergers and acquisitions acquiring hundreds of different banks and other financial companies.  From 1981 to 2002, they made 315 acquisitions and took a stake in 242 companies.  This includes the $70 billion

merger with insurance conglomerate Travelers Group in 1998, which itself was formed from a series of acquisitions, including the investment bank and brokerage firm Salomon Smith Barney Inc., the financial services company Primerica Financial Services, and the insurance company Travelers Life and Annuity.

57.  Citigroup's acquisition spree also included the investment banking division of Schroeder's PLC for $2.2 billion in 2000; Associates First Capital Corporation, the largest consumer finance company in the U.S. for $31.1 billion in 2000; Grupo Financiero Banamex Accival, the second-largest bank in Mexico, for $12.5 billion in 2001; the New York state-chartered European American Bank for $1.6 billion in 2001; Golden State Bancorp, the parent company of First Nationwide Mortgage and the California Federal Bank, for $5.8 billion, which included 352 branch banks and 1.5 million new customers, in 2002; the credit card business of Sears, Roebuck and Co. for $3 billion in 2003; and a 97.5% stake in Koram Bank, South Korea's sixth largest bank, for $2.6 billion in 2004.

58.  This series of acquisitions led Citigroup to become a systemically important financial institution and a veritable financial supermarket with significant operations worldwide. The Company acknowledges that it is among the "largest and most complex" firms in the world and that it has approximately 80 subsidiaries it deems "significant."  In 2008, prominent banking analyst Meredith Whitney stated that by 2003 Citigroup had become "a gobbledygook of companies that were never integrated" and that "it was never a priority of the company to invest [in integration]."  The Company's various "businesses didn't communicate with each other.  There were dozens of technology systems and dozens of financial ledgers."

59.  Regulators thus worried that this hodgepodge of subsidiaries, systems, and personnel could make the Company vulnerable to costly and potentially damaging missteps.  Even

before the financial crisis, in a January 31, 2005 letter to Citigroup, the OCC warned that the Company's "risk management practices need strengthening" and it needed to "expand risk processes to provide a more comprehensive, enterprise-wide view of risk management … [and] processes and mandate should be modified to incorporate the identification of issues that span businesses and the root causes of breakdowns."  In March 2005, the Fed imposed a moratorium on Citigroup's ability to make large acquisitions until it improved its risk management procedures.

60.    Citigroup, however, ignored the regulators' warnings, which led to a near death experience during the financial crisis when the Company was rescued by an injection of $500 billion from the federal government—the largest bank bailout in United States history.  The National Commission on the Causes of the Financial Crisis in the United States concluded in its final Inquiry Report (the "Financial Crisis Report") that "Citigroup had two key problems: a lack of effective enterprise-wide management to monitor and control risks and a lack of proper infrastructure and internal controls[.]"

## 2.    Citigroup's Regulatory Framework

61.    Citigroup, as a registered bank holding company that owns and controls Citibank and various nonbanking subsidiaries, is regulated and supervised by the Fed.  Citibank is regulated and supervised by the OCC.

### a)    The Federal Reserve

62.    The Fed's Regulation YY (Enhanced Prudential Standards), and Section 252.33 in particular (12 C.F.R. §252.33), are the Fed's key regulatory provisions at issue in this case.  Section 252.33 imposes "[r]isk-management and risk committee requirements."  Citigroup's "global risk-management framework must be commensurate with its structure, risk profile, complexity, activities, and size and must include: (i) Policies and procedures establishing risk-management governance, risk management procedures, and risk-control infrastructure for its global operations;

and (ii) Processes and systems for implementing and monitoring compliance with such policies and procedures, including:

> (A)     Processes and systems for identifying and reporting risks and risk-management deficiencies, including regarding emerging risks, and ensuring effective and timely implementation of actions to address emerging risks and risk-management deficiencies for its global operations;
>
> (B)     Processes and systems for establishing managerial and employee responsibility for risk management;
>
> (C)     Processes and systems for ensuring the independence of the risk-management function; and
>
> (D)     Processes and systems to integrate risk management and associated controls with management goals and its compensation structure for its global operations."

Section 252.33(a)(2).

63.     The Federal Reserve's examination and supervisory process applicable to Citigroup is set forth in the manual titled "Bank Holding Company Supervision Manual," dated February 2020 (the "Fed BHC Supervision Manual").

64.     According to the Fed BHC Supervision Manual, "[t]he Federal Reserve utilizes three principal processes to understand, supervise, and assess BHCs," like Citigroup—namely, "continuous monitoring activities, discovery reviews, and testing." (Fed BHC Supervision Manual § 1050.0.2.)   It further explains that "[c]ommunication of supervisory findings to the organization's board of directors is an important part of the supervision of a banking organization. While the board itself may not directly undertake the work to remediate supervisory findings as senior management is responsible for the organization's day-to-day operations, it is nevertheless important that the board be made aware of significant supervisory issues and ***ultimately be accountable*** for the safety and soundness and assurance of compliance with applicable laws and regulations of the organization." (*Id.* § 1070.1.2.)

65.     As a large BHC with total consolidated assets greater than $100 billion, Citigroup is subject to ongoing inspections in which "[r]atings (or indicative ratings) [are] assigned and communicated to [Citigroup] on at least an annual basis, and more frequently as warranted." (*Id.* § 1063.0.2.)  "The Federal Reserve provides senior management and directors … the numeric and alphabetic component ratings assigned under various supervisory rating systems" and, according to the Fed BHC Supervision Manual, "[i]n conjunction with disclosing the ratings and their components to [Citigroup], examiners or supervisory officials should clearly explain what the ratings mean to the board of directors and management." (*Id.* § 1065.0.1.)

66.     In addition, the Fed prepares "an annual roll-up report [that] summarizes the significant findings, based on outstanding MRIAs or MRAs, included in the reports of targeted reviews or other supervisory activities conducted during the supervisory cycle." (*Id.* § 1070.1.2.)

67.     Matters requiring immediate attention (MRIAs) "are matters of significant importance and urgency that the Federal Reserve requires banking organizations to address immediately and include (1) matters that have the potential to pose significant risk to the safety and soundness of the banking organization; (2) matters that represent significant non-compliance with applicable laws or regulations; (3) repeat criticisms that have escalated in importance due to insufficient attention or inaction by the banking organization; and (4) in the case of consumer compliance examinations, matters that have the potential to cause significant consumer harm." (*Id.* § 1070.1.2.1)

68.     Matters requiring attention (MRAs) "constitute matters that are important and that the Federal Reserve is expecting a banking organization to address over a reasonable period of time but when the timing need not be 'immediate.'  While issues giving rise to MRAs must be addressed to ensure the banking organization operates in a safe and sound and compliant manner,

the threat to safety and soundness is less immediate than with issues giving rise to MRIAs …. The key distinction between MRIAs and MRAs is the nature and severity of matters requiring corrective action as well as the immediacy with which the banking organization must begin and complete corrective actions. " (*Id.* § 1070.1.2.2)

69. The Fed provides the annual roll-up report that includes the outstanding MRIAs and MRAs to Citigroup to "enable the banking organization's board of directors … to understand the substance and status of outstanding MRIAs or MRAs and focus their attention on the most critical and time-sensitive issues." (*Id.* § 1070.1.2.) ***For all MRAs and MRIAs, Citigroup's "board of directors is required to respond to the Reserve Bank in writing regarding corrective action taken or planned along with a commitment to corresponding time-frames,"*** and is subject to mandatory supervisory follow-up where the Fed "must follow up on [MRAs and MRIAs] to assess progress and verify satisfactory completion." (*Id.* §§ 1070.1.2.1, 1070.1.2.2.)

### b) The OCC

70. The OCC's critical regulatory provisions relating to Citibank are the "OCC Guidelines Establishing Heightened Standards for Certain Large Insurance National Banks, Insured Federal Savings Associations and Insured Federal Branches," 12 C.F.R. Part 30, Appendix D. Appendix D "establishes minimum standards for the design and implementation of a covered bank's risk governance framework and minimum standards for the covered bank's board of directors in providing oversight to the framework's design and implementation (Guidelines)." (Art. I ¶2.)

71. The OCC examination and supervisory process applicable to Citibank is set forth in two handbooks titled "Bank Supervision Process" and "Large Bank Supervision," dated September 2019 (the "BSP Handbook" and "LBS Handbook"). The LBS Handbook "summarizes

and expands on the information in the [BSP Handbook] and should be used in conjunction with that" handbook (at 1).

72.     According to the LBS Handbook, "[t]he foundation of midsize and large bank supervision is a risk assessment framework designed to determine whether banks effectively assess risks throughout their entire enterprise, regardless of size, diversity of operations, or existence of subsidiaries and affiliates.   Under the risk-based supervision approach, examiners focus on whether banks identify and effectively manage the risks they assume." (LBS Handbook at 8.)

73.     The risk assessment framework focuses on eight categories of risk: credit, interest rate, liquidity, price, operational, compliance, strategic, and reputation. (*Id*. at 10.)  "A risk is considered effectively managed when it is identified, measured, monitored, controlled, and reported." (*Id.* at 11.)  But if a risk "is not effectively managed [examiners] ***must communicate to bank management and the board*** the need to mitigate or eliminate the unwarranted risk."  (*Id.*) And "[e]xaminers should discuss [risk assessment system] conclusions (preliminary and final) with bank management and the board during each supervisory cycle."  (*Id.*)

74.     As part of the OCC's communication with bank management and the board, the "OCC uses various supervisory actions, including MRAs, citations of violations of laws or regulations, or enforcement actions to address banks' deficiencies."  (LBS Handbook at 22.) ***"Deficiencies and excessive risks must be promptly communicated to the bank when they are identified either by sending a formal written communication to the board or by meeting with the board or management."***  (BSP Handbook at 43.)

75.      "The OCC uses MRAs to communicate concerns about a bank's deficient practices.  Examiners ***must communicate such concerns to management and the board when the concerns are discovered*** and must not defer issuing MRAs pending bank management's efforts to

address the concerns."  (BSP Handbook at 46.)  MRAs are communicated in writing (*id.* at 43)

and use the "Five Cs format," consisting of "concern, cause, consequence, corrective action and

commitment" (*id.* at 46).

(a)    "Concern describes the deficient practice and how it deviates from sound

governance, internal control, or risk management principles, or results in substantive

noncompliance with laws or regulations, enforcement actions, or conditions imposed in writing.

Unsafe or unsound practices should be specifically identified in the concern."

(b)    "Cause" describes "the root cause."  (*Id.*)

(c)    "Consequence explains how continuation of the deficient practice could

affect the bank's condition. … Management's inaction could, in certain instances, result in

violations or additional supervisory actions, such as enforcement actions (including [Civil

Monetary Penalties])."  (*Id.*)

(d)    "Corrective action" describes the actions the board or management must

take.  (*Id.*)

(e)    "Commitment" relates to the bank's action plan.  (*Id.*)

76.    "The OCC expects the ***bank's board to oversee timely and effective correction*** of

the practices described in an MRA," including "holding management accountable for the deficient

practices [and] directing management to develop and implement corrective actions."  (*Id.* at 47.)

"Examiners must impress on the board its responsibility to provide oversight of management's

corrective actions."  And "[f]ailure to correct MRAs in a timely manner could provide the basis

for an enforcement action."  (*Id.* at 48.)

77.    The OCC uses formal enforcement actions "[w]hen a bank's deficiencies are

severe, uncorrected, repeat, or unsafe or unsound, or negatively affect the bank's condition."  (*Id.*

28

at 50.)  CMPs are reserved for even more egregious conduct.  ***"Examiners should propose CMPs for serious misconduct, including misconduct that is reckless, flagrant, willful, or knowing and that, because of its frequency or recurring nature, shows a general disregard for law or regulation."***  (*Id.* at 51.)

78.     In addition to the ongoing reporting of MRAs and other deficiencies to management and the board during the supervisory process, the examiners meet with bank management and the board at the end of the examination.  Specifically, the Examiner-in-Charge ("EIC") meets with bank management at the end of the examination to discuss "OCC's findings and conclusions[,] … deficiencies and obtain bank's management's commitments for corrective action[,] [and] the areas of greatest risk to the bank."  (*Id*. at 42.)  "Examiners must convey significant decisions discussed with bank management during the exit meeting, ***when they meet with the board***, and in written correspondence."  (*Id*.)

79.     At the end of the supervisory cycle, the OCC also must provide the board with a formal report, called a Report of Examination ("ROE").  (*Id.* at 43; *see also* LBS Handbook at 27.)  The ROE "contains conclusions on … the adequacy of the bank's BSA/AML [Bank Secrecy Act/Anti-Money Laundering] compliance program[,] discusses deficient risk management practices, violations, and excessive risks, [and] details corrective actions to which bank management or the board has committed."  (LBS Handbook at 27.)  ***Each director must sign the ROE to "show[] that he or she has personally reviewed the entire ROE."***  (BSP Handbook at 62.)  A committee of the board may sign for the board, in which case "the directors who do not sign are no less responsible for the bank's safe and sound operation"  (*Id*.)

80.     The ROE has a number of mandatory sections which the OCC must complete.  The MRA section "focuses the board's attentions on deficient practices ***warranting the board's***

*immediate acknowledgment* and oversight." (*Id.*)  The section on "Compliance with Enforcement Actions" must include a table with the status of each enforcement action and a write-up for each actionable article. (*Id.* at 63.)  And the "Violations" section is required when the OCC is citing new or repeat violations. (*Id.*)

### 3. Pre-Class Period Consent Orders Relating To Risk Management And Internal Controls

81.     Citigroup has a long history of regulatory violations and consent orders relating to risk management and internal controls.  On April 5, 2012, Citibank entered into a consent order with the OCC relating to violations of the Bank Secrecy Act and anti-money laundering regulations ("BSA/AML") and inadequate internal controls and risk management (the "OCC 2012 Consent Order").  Defendants Santomero, McQuade, O'Neill, and Zedillo signed this consent order.

82.     The OCC 2012 Consent Order required, among other things, that Citibank form a compliance committee, clarify lines of responsibility for compliance, and adopt new due diligence programs. The OCC 2012 Consent Order stated, in pertinent part, as follows:

> The Bank has begun corrective action, and has committed to taking all necessary and appropriate steps to remedy the deficiencies identified by the OCC, and to enhance the Bank's BSA/AML compliance program. (at 1.)

* * *

> ***The Bank has failed to adopt and implement a compliance program that adequately covers the required BSA/AML program elements due to an inadequate system of internal controls and ineffective independent testing.*** The Bank did not develop adequate due diligence on foreign correspondent bank customers and failed to file Suspicious Activity Reports ("SARs") related to its remote deposit capture/international cash letter instrument activity in a timely manner. (Art. I ¶2.)

83.     The  OCC 2012 Consent Order also required "timely reporting" to the bank's Board (Art. III ¶2(a)), and that "corrective action be taken in a timely manner for any non-compliance" with actions directed by the Board (Art. III ¶2(c)).  It further required "senior management" to be

"accountable for effectively implementing bank policies and procedures" (Art IV ¶3), and required Citibank to "develop appropriate objectives and means to measure the effectiveness of compliance management officers and compliance management personnel within each line of business and for those with responsibilities across lines of business."  (Art. IV ¶4.)

84.    The OCC 2012 Consent Order also called for independent testing and internal auditing of the bank's compliance program.  The OCC made clear, however, that the Citibank Board "shall ensure that the Bank achieves and thereafter maintains compliance with this [Consent] Order, including, without limitation, successful implementation of the BSA/AML Action Plan," and that "the Bank achieves and maintains an effective BSA/AML compliance program, in accordance with the BSA and its implementing regulations."  (Art. III ¶2.)

85.    The newly established Compliance Committee was required to submit quarterly reports to the Citibank Board "setting forth in detail the actions taken to comply with each Article of [the OCC's] order, and the results and status of those actions."  (Art. II ¶2.)  The Citibank Board had to then forward the written reports to the OCC for review.  (Art. II ¶3.)

86.    On March 21, 2013, Citigroup entered into a separate, but similar, consent order with the Fed based upon the same conduct at issue in the OCC 2012 Consent Order (the "Fed 2013 Consent Order").  The Fed 2013 Consent Order acknowledged the OCC 2012 Consent Order and the deficiencies in the Bank's BSA/AML compliance programs and required Citigroup to take remedial action with Board oversight: "The board of directors of Citigroup shall take appropriate steps to fully utilize Citigroup's financial and managerial resources … to serve as a source of strength to [] the Bank[], including, but not limited to, taking steps to ensure [] the Bank[] complies with the [2012 OCC Consent Order]."  (¶1.)

87.     Importantly, the Fed required that the Citigroup Board submit "written progress reports" every quarter to the Fed "detailing the form and manner of all actions taken to secure compliance with this Order, a timetable and schedule to implement specific remedial actions to be taken to address the recommendation in the Report, and the results thereof."  (¶6.)  This measure guaranteed that the Board was kept well-informed and up-to-date on Citigroup's remediation efforts.

88.     On May 20, 2015, Citigroup entered into a separate consent order with the Fed (the "Fed 2015 Consent Order") based on unsafe and unsound practices related to the Company's foreign exchange ("FX") trading businesses.  The Fed 2015 Consent Order determined that:

> **Citigroup lacked adequate firm-wide governance, risk management, compliance and audit policies and procedures** to ensure that the firm's Covered FX Activities conducted at the Bank complied with safe and sound banking practices, applicable U.S. laws and regulations, including policies and procedures to prevent potential violations of the U.S. commodities, antitrust and criminal fraud laws, and applicable internal policies.  (at 3.)

* * *

> **Citigroup's deficient policies and procedures prevented Citigroup from detecting and addressing unsafe and unsound conduct.**  (at 4.)

* * *

> [T]o address the deficiencies described above, **Citigroup has made and must continue to implement additional improvements in its oversight, internal controls, compliance, risk management and audit programs** for Designated Market Activities in order to comply with Citigroup policies, safe and sound banking practices, and applicable U.S. laws and regulations.  (at 5.)

89.     The Fed 2015 Consent Order also mandated that senior management report to Citigroup's Board "on the status and results of measures taken, or to be taken, to correct identified deficiencies and to comply with this Order and to ensure the ongoing efficacy of Citigroup's overall program."  (at 6.)  And the Fed required Citigroup to submit periodic reports confirming that these measures had been implemented and were functioning effectively.  (at 6-7.)

4.   **Citigroup Slashed Costs To Improve Its Efficiency Ratio Because Its Stock Price Performance Lagged Its Peers And Affected Corbat's Compensation**

90.   After the financial crisis, Citigroup stock languished compared to its competitors. Between January 2009 and October 2012, Citigroup's stock declined approximately 44%, compared to a 36% increase for JPMorgan, a 15% increase for Wells Fargo, and a 33% decrease for Bank of America.



91.   To boost Citigroup's stock price, when Corbat took the helm on October 16, 2012, his priority was clear, to cut costs. During an investor conference call held on his first day, Corbat emphasized that he would be "extraordinarily focused on our efficiency ratios and our overall expense levels." In an article on December 5, 2012 titled "Citi's New Chief Launches First Cost-Cutting Salvo," *The Wall Street Journal* reported that the "board, led by Michael O'Neill . . . had given Mr. Corbat a mandate: make cost-cutting a priority."

92.   Following the Board's directive, Corbat repeatedly stated that Citigroup would cut costs, improve efficiency, and standardize and streamline the Company. At the same time, he and

other senior executives insisted those efforts would not come at the expense of risk management

or internal controls.  For example:

- During a January 17, 2013 conference call, Corbat stated, "we need to show expense discipline . . . improving operating efficiency needs to be [business as usual], not just an annual event."  Nevertheless, he also asserted that "Citi needs to be recognized globally as an indisputably strong and stable bank."

- During a November 12, 2013 conference call, Manuel Medina-Mora, CEO of Citigroup's Global Consumer Business, said that Citigroup would improve efficiency.  Yet, he assured investors that "we are focused on risk management."

- During an October 14, 2014 earnings call, Corbat said that "[w]hile Citigroup's expense-reduction efforts have been productive, we continue to face pressure . . . to invest in regulatory and compliance."  He then assured investors that "[w]e'll remain vigilant . . . to ensure the safety and soundness of our institution."

93.     By 2015, Citigroup told investors that the investments and efforts in risk

management and compliance were succeeding.  At the Raymond James Institutional Investors

Conference on March 2, 2015, Defendant Gerspach stated: "Today, we operate global risk, finance

and compliance functions with common standards and systems, consolidating disparate functions

from our businesses and regions and establishing a disciplined firm-wide risk appetite framework.

These centralized functions are more effective and more efficient than our prior structure."

94.     With risk management and compliance issues considered to be on a path to

resolution, Citigroup became even more laser-focused on cutting costs and reducing the

"efficiency ratio."  Citigroup calculated its efficiency ratio by dividing total operating expenses by

total revenues, such that $5 million in expenses and $10 million in revenues resulted in a 50%

efficiency ratio – the lower the better.  Thus, Citigroup's efficiency ratio was a critical metric that

measured how well it controlled expenses.  It was a particularly key metric for Citigroup and its

competitors because, in the wake of the financial crisis, large banks faced significant headwinds

growing revenue.  Tighter regulations hampered business and a low interest rate environment

naturally lowered lending margins.   The "efficiency ratio" was one of the few levers senior management had to increase profitability.

95.   Not surprisingly, Citigroup constantly discussed its efficiency ratio, and investors, analysts and the financial press focused on the Company's ability to cut costs to meet the efficiency target.  For example:

- On October 15, 2013, *The Wall Street Journal* published a blog titled "Citi: Toeing the Line on Costs?" which said, "[w]hile Citigroup made progress on cutting operating expenses in the third quarter, analysts have mixed views on whether the bank should be doing more."

- During the Company's July 14, 2014 earnings call, analyst Mike Mayo asked, "why can you still reach those efficiency targets even though revenues have been so much worse?"

- During the Goldman Sachs Financial Services Conference on December 9, 2014, an analyst raised concerns that the efficiency ratio was too high and asked, "there is obviously still a material gap relative to the [targeted] mid-50 efficiency ratio in particular.  How do you expect to bridge that gap going into 2015 and 2016?"

- During Citigroup's April 16, 2015 earnings call, an Evercore ISI analyst stated, "I like the improvement on the efficiency ratio targets and I like the commitment to the target ranges . . . I like your tone from last quarter of we're going to hit them one way or another."

- During Citigroup's October 15, 2015 earnings call, an analyst from UBS asked, "do you have the ability to pull levers and work the efficiency ratio down even further from here, or are we going to be in a waiting game until revenues come through?"

96.   By the beginning of the Class Period, Citigroup's cost-cutting efforts were paying off and Corbat reaped the rewards.  On February 18, 2016, *The New York Times* reported that Citigroup increased Corbat's pay to $16.5 million, "a 27 percent pay raise, as the big bank crossed several hurdles on its way to becoming a more profitable and stable company."

B.      **Class Period Allegations**

1.      **The Efficiency Ratio Was A Key Metric for Management And Wall Street Analysts During The Class Period**

97.     Citigroup's costs and the efficiency ratio continued to be a constant topic of discussion between the Company and the financial community throughout the Class Period, and seen as a key driver of the stock price.  Citigroup's goal was to reduce the efficiency ratio from the high 50% range to the "mid-50s range" by 2018 and then the low 50s by 2020.  As a result, Citigroup continuously touted its efficiency ratio when it dropped, principally by cutting costs, although it played fast and loose in its discussions with analysts by often mixing the very similar efficiency ratios of Citigroup (the entire company) and Citicorp (prior to 2017, Citigroup's "core" businesses).  Wall Street analysts generally pushed back pointing out that Citigroup's efforts were insufficient.

98.     On the first day of the Class Period, January 15, 2016, UBS issued a report titled "First Read Citigroup Inc."  One of the main points was the efficiency ratio. "[Global Consumer Bank] efficiency ratio missed our estimate and will likely remain the focus," adding, "[w]e expect near-term upside will be driven by management achieving its efficiency ratio."  On the earnings call that day, Corbat acknowledged that "the total efficiency ratio for Citigroup . . . was 57.3%" and that the "Citicorp efficiency ratio should remain relatively unchanged at around 57% this year before improving in 2017 and thereafter."

99.     The next quarter results were disappointing, however.  JP Morgan's April 18, 2016 report concluded that "1Q results were marked by…higher expenses and weaker efficiency ratio." On the April 15, 2016 earnings call Gerspach said, "we [] expect [Citicorp's] full year operating efficiency ratio to be higher than we had anticipated – in the range of around 58%."  Analysts pressed him on this point: "the efficiency ratio this quarter was 60%, you're guiding this year for

58% -- that implies the next three quarters should be better than 60%.  If you could just clarify that's the case."

100.     At year-end 2016, Citigroup did not meet its initial efficiency ratio target of 57% for Citicorp, reporting 58% for 2016.  On the earnings call on January 18, 2017, Gerspach said that the "target of achieving an efficiency ratio in the mid-50s range for Citicorp remains in place now for total Citigroup, and we believe we could operate within that range as early as 2018." Unmentioned on the January 2017 earnings call was the fact that Citigroup's 2016 efficiency ratio of 59% was higher than Citicorp's.  The Company pointed this out the next year, in January 2018, when it reported that Citigroup's efficiency ratio for 2017 was 57.7% to then tout an improvement from 59% in 2016.  "Total expenses remained flat, driving over 150 basis points of improvement in our efficiency ratio to just under 58%," said Corbat a year later on the January 16, 2018 earnings call.

101.     On April 16, 2018, JP Morgan's report, titled "Slow Efficiency Progress" commented that "Citi's progress towards its efficiency and hence EPS goals is slow, but it expects acceleration later in 2018 and into 2019."

102.     On July 13, 2018, S&P Global Market Intelligence published an article titled "Citi Pressed on Effort to Improve Efficiency Ratio."  S&P pointed out that on the 2Q 18 earnings call analysts questioned Citigroup's ability to reach its goal of a lower efficiency ratio.  According to S&P, "the company said its savings are mostly coming from streamlined operations, involving its data management and 'conventional initiatives' such as using lower-cost locations."

103.     Wells Fargo analyst Mayo wrote the most thorough and substantive analysis of Citigroup's efficiency ratio in a September 5, 2018 report titled "Room to Optimize."  Mayo argued that Citigroup's efficiency ratio was "worst-in-class," contrary to Citigroup's

characterization that it was among the best in the industry: "This report takes a critical view of Citi's performance versus peer. . . . We believe there's disconnect between Citi's subpar optimization and Citi's view.  This includes statements that its restructuring is done, that it has industry leading efficiency, and that Consumer's efficiency is good. . . . We disagree." It added:

> Citi, like much of the industry, highlights the efficiency ratio (expenses/revenues). That's a standard metric for bank analysts.  On this basis, Citi looks better than average (<60% industry average).  However, we think that's misleading.[6]  The ratio makes Citi look better than it should because Citi has a credit card business (1/4 of revenues) that is 3x larger than peer relative revenues.  Thus, we believe the efficiency ratio overstates how 'efficient' Citi really is.  ***Excluding cards, we estimate Citi's efficiency ratio would be around 63%, close to the worst among large banks***.

104.    Mayo's message was clear.  He was focused on Citigroup's costs and was strongly pressuring management to bring those costs down and improve the efficiency ratio.  Mayo further pressured Citigroup by effectively encouraging an activist investor to focus on the issue, writing in his report: "More intensity desired [from management on the efficiency ratio]. . . . We . . . believe that shareholders may welcome the new activist investor (ValueAct)."

105.    Mayo's drumbeat continued in his Citigroup reports throughout 2018.  His October 12, 2018 report said, "our view remains the same as described in our recent report ("Room to Optimize") given our belief that its financial targets, esp[ecially] for efficiency, do not go far enough.  And the report on December 5, 2018 added: "At a NYC presentation today, Citi's CFO indicated that Citi may miss its 2018 efficiency target by 9 or so basis points.  The issue is not the materiality (it is not much), but the on-going view that Citi lacks needed intensity.  We don't think they should miss this target by a millionth of a basis point given prior missed efficiency targets, worst-in-class efficiency (see our prior report), and a stock that trades below tangible book value."

---

[6] Mayo is not suggesting securities fraud here.  Mayo is rather stating that based on all the publicly available information, Citigroup should calculate the efficiency ratio differently.

106.     Barclays was also focused on the efficiency ratio.  The headline of its October 9, 2018 report was "3Q18 EPS Preview: Looking for Efficiency Ratio to Improve in 2H."  But Citigroup again fell short in the second half of 2018.  On December 5, 2018, *The Financial Times* wrote an article with the headline "Citi Says It Will Fall Short On Efficiency Target."  The article emphasized the analysts' disappointment.  "Resurgent market volatility has forced Citigroup to admit it will miss the 2018 efficiency target it reaffirmed just two months ago, putting the bank in the line of fire of analysts and investors wearied by previous disappointments."

107.     Having missed the efficiency ratio, Mayo called for a cut in executive compensation in a report on December 6, 2018 titled "Cut to Exec Pay Could Meet Efficiency Target:" "If Citi's top 5 named Executive Officers receive no bonus in 2018 and only base salary, we estimate that Citi could meet its efficiency target."  And the next day, on *CNBC,* Mayo re-iterated his message and said that Citigroup needed to do "whatever it takes" to cut costs to meets its efficiency target.  Mayo then called again for a cut in executive pay.  "You can reduce the bonus of the top five executives or you can reduce the bonus of the top 25 executives by 20 percent."  Mayo was thus directly linking Citigroup's efficiency ratio to the Officer Defendants' compensation.

108.     The January 14, 2019 earnings call heavily focused on the efficiency ratio.  Corbat reported in the first paragraph of his prepared remarks that Citigroup "improved [is] operating efficiency to 57% for the [2018] year," and Gerspach added, "[i]t's still our goal to get the efficiency ratio into the low 50% range.  And we believe that's the right level, given the investments we're making in digital and automation, as well as our mix of businesses."  In response to the first question, "can you get expenses down year-over-year for 2019?"  Mason, pointed to the efficiency ratio.  He then referred to a slide that showed declining efficiency for Citigroup from

59.9% in 3Q16 to 57.4% in 4Q18 to drive the point home that Citigroup was dramatically cutting costs.





109.    After a series of additional questions on efficiency from Mayo, Mason again emphasized the importance of the efficiency ratio, saying, "we are intensely focused on this [the efficiency ratio]. We're focused on not only efficiency, but on delivering the return targets that we've set."

110.    In response to the onslaught of dissatisfaction from analysts, and Mayo's public calls for a cut in compensation, Corbat pledged to cut costs. *Crain's* reported on July 15, 2019 that "Citi CEO Vows Cost-Cutting Success to Continue as Trading Slumps." According to

*Crain's*, "Citigroup's struggle to improve efficiency and earnings from consumers was a sore spot for shareholders as the year began.  Investors are paying particular attention to costs after companywide revenue climbed less than 1% in 2018.  Unable to rein in expenses fast enough, executives missed their own cost target, hurting their credibility with analysts."  Corbat responded by saying that "we're going to do everything in our power," with one caveat: Citigroup "won't end planned investments in technology or risk its efforts to improve safety and soundness."

111.    Echoing *Crain's*, *The Financial Times* published an article on July 29, 2019 titled "Citigroup: Pressure Builds For Strategic Shift."  Mayo issued a report the same day, "FT Article Reflects Pressure to Perform," remarking that the sources for the article were credible because they included "current and former managers, shareholders, and others."  *The Financial Times* article presented a scathing indictment of Corbat's tenure and placed his job squarely on the line: "The bank's shares trail its two biggest rivals, prompting calls for a change in direction.  ***But can CEO Mike Corbat deliver?"***

112.    The contrast with Bank of America pointed by the article was striking.  In 2012, Bank of America had a market value of $59 billion compared to Citigroup's $83 billion.  By 2019, Bank of America's market value had increased by $225 billon while Citigroup's had only increased $80 billion.  "[T]hat yawning gap in long-term share performance," *The Financial Times* said, "is a stark reminder of how much remains to be done at Citigroup.  A dissident group of large investors, analysts and even some inside the bank say that slow-and-steady improvement is not enough, and that Mr. Corbat and Citi's board need to be bolder in changing the bank's strategic direction."  Accordingly, "[t]he pressure on Mr. Corbat to act is intensifying … Just hitting the 2020 targets is unlikely to satisfy ValueAct" – the activist investor.  It then concluded: "next year

will be a watershed.  If the bank misses the goals it set for 2020, it will have to accept that change

is needed and if it meets them, it might gain the confidence to take the next step in its evolution."

113.    By the fall of 2019, Mayo was giving Citigroup a short time frame to right the ship.

He titled his October 7, 2019 report "Better But Not Good Enough."   And then proceeded to

recount Corbat's failures during his tenure and to encourage the activist investor ValueAct to shake

things up:

> Next Wed (10/16/19) is [Corbat's] 7 year anniversary as CEO.  During this time,
> Citi's stock underperformed the bank index (BKX) by 10% . . . Citi still has worst-
> in-class returns, ***worst-in-class efficiency*** after adjusting for cards, and worst-in-
> class stock market valuation….The activist ValueAct, seemingly the forgotten
> factor, has agreed to leave Citi management alone, but only until the year-end 2019.
> . . . At which time we would think that they'd push for Citi to reverse the ill-advised
> 2017 statement – repeated several times – that its 'restructuring is over.'"

Mayo concluded the report with an implicit call for a change in management: "To us, Citi is now

entering a critical period in front of the April 2020 annual meeting, where it either meets or exceeds

goals, ***or faces significantly greater pressure to change course*** and better reward shareholders."

114.    But 2020 quickly proved to be a different year than expected.  The onset of the

Coronavirus pandemic in February 2020 dramatically shifted the focus away from performance

issues, like the efficiency ratio, to solvency, financial stability, and credit reserves.  As Corbat said

in the July 14, 2020, earnings call: "The pandemic has a grip on the economy, and it doesn't seem

likely to loosen until vaccines are widely available."

115.    The efficiency ratio issue resurfaced with the disclosure of regulatory actions in

September 2020 and the admission that Citigroup would need to spend billions of dollars to

comply.  On September 13, 2020, *Thomson Reuters* reported, "Citi To Boost Risk and Control

Investment After Operation Error, As Regulators Plan Reprimand."  "The bank has planned $1

billion in incremental investments this year to shore up the bank's infrastructure and improve risk

management and compliance, Mason said at an investor conference."

116.    But the lingering question analysts asked was what would be total cost of complying with the Consent Order, not just in 2020.  Deutsche Bank's report on October 13, 2020 was titled "More Questions Than Answers on Costs & Strategy Given Reg Issues."  Likewise, Mayo's October 13, 2020 report titled "Tale of Two Citi's," said: "The main question for Citi is the extent that expenses will be higher than expected (as they were in 3Q20), seemingly due to actions related to the consent order even after taking into account better than expected fees."

117.    Analysts peppered the October 13, 2020 earnings call with questions on this topic, struggling to get a straight answer from management for the total increase in costs to comply with the regulators.  Mayo asked: "You're already spending $1 billion. You say some of this is a 1-year spend . . . . But should we think of $1 billion? Should we think of $2 billion? ….when we hear it's not a quick fix, it's not an easy fix, it's going to take a while….Is this $10 billion? Is it $5 billion?"  All Mason was able to substantively say was, "I can't dimension the number for you next year or the year after."

118.    The UBS analyst tried it a different way.  "So, I'm sorry, I'm going to beat a dead horse even more here with the consent order and hit some potential applications on costs…. how much [are you] going to have to spend to fix these issues and the time horizon to fix these issues?"  Mason did not specify the amount it would cost in his long response.  The Morgan Stanley analyst then tried to deduce the total costs based on other figures.  "I'm looking at  [Citigroup's] stock that's priced for effectively a 5% ROE [return on equity], okay? And if you say, 'Hey, that is right because the expenses are going to go up that much to drive a 5% ROE,' that's like a $5 billion increase in expenses."

119.    To date, Citigroup has not provided an estimate of the total cost to comply with the 2020 Enforcement Orders.  In a February 17, 2021 report, Mayo concluded: "Citi's results in prior

years would have been less favorable if it had taken the needed actions to avoid the consent order related to its back office."  Indeed, substantially less favorable results are expected in the future. Deutsche Bank issued a report on March 23, 2021 which projects that earnings per share will be reduced by 20% due principally to the cost of remediation.  The report is titled "Fixing Regulatory Issues & Strategy Refresh to Lower EPS Power 20%+" and states: "We believe regulatory issues at [Citigroup] will take longer to address than some hope for …. In the most recent 10k, [Citigroup] acknowledged that investment spend on addressing the consent order will be large and go past 2021….We expect there to be some restructuring charges as part of the strategy refresh and model a placeholder of $3 billion in FY21."

120.    On the earnings call for 1Q 21 on April 15, 2021, the incoming CEO Jane Fraser ("Fraser") acknowledged that the scale of the remediation was massive:  "[W]e are, of course, hard at work on our transformation.  We're making our next submission to the OCC this quarter. It's a massive body of work.  We continue to work closely with our regulators to meet their expectations, and we expect to submit our complete plan to both regulators no later than the third quarter."  It will thus take Citigroup nearly a full year since the Fed and OCC issued the 2020 Enforcement Orders to even have a plan in place to just "meet" the regulators' expectations.  And the plan is nothing short of a "transformation."

       **2.**    **Defendants Told Investors That Risk Management Was "Critical" And Of "Primary Importance" To The Company's Operations And That Risk Management And Internal Controls Satisfied Regulatory Requirements**

121.    Despite Citigroup's hard-court press to drive down costs, given its history of regulatory violations and the importance of complying with Fed and OCC regulations, Citigroup explicitly acknowledged in every quarterly and annual report filed throughout the Class Period that "effective risk management is of primary importance to its overall operations."  The first page

of Citigroup's 2019 Proxy Statement (after the cover page and invitation to shareholders) was a letter issued by Citigroup's Board which stated that it was "critical to the firm's success" that "[m]anagement also made progress on the regulatory front last year."

122.    Indeed, Defendant Mason stated on July 15, 2019 that sufficiently investing in the Company's risk infrastructure and controls is "critical to the long-term sustainability of the franchise."  Defendant O'Neill—Citigroup's former Chairperson—explained on April 24, 2018 that "risk management is the bedrock of banking."  And current Chairperson Dugan (who also served as Comptroller of the Currency from 2005-2010) likewise recognized on April 16, 2019 that it was "absolutely critical" that Citigroup comply with Fed and OCC regulations.

123.    Defendants also repeatedly said during the Class Period that Citigroup had addressed its prior risk-management failures by making the investments necessary to strengthen its infrastructure and control environment, and that the Company was now operating above all of its regulatory requirements.  According to Gerspach, Citigroup was "operating above every one of our regulatory requirements" (July 25, 2017 Investor Day, Financial Overview Q&A).  And according to its 2018 Proxy, Citigroup was "active in ensuring its governance practices are at the leading edge of best practices," including "maintaining full compliance with the laws, rules, and regulations that govern Citi's businesses."  The Company went so far as to characterize its risk and control infrastructure as "systemically responsible" (2018 Annual Report) and that it was a "champion of responsible finance" (2017 Annual Report).

124.    By repeating this narrative throughout the Class Period, Defendants assured investors that Citigroup was taking its obligations seriously and making all the necessary investments to ensure the proper functioning of its risk management and compliance systems and internal controls.  This was critically important given that Citigroup was driving for "efficiency

savings" and "expense discipline" to improve its efficiency ratio.  And Citigroup was adamant that even as it pared spending in other areas, it invested heavily in its risk management systems, internal controls, and its technological capabilities.

125.    For instance, on January 15, 2016, the first day of the Class Period, Corbat stated that "[w]e've also made the ***necessary*** investments in our compliance, risk, and control functions which are ***critical to maintaining our license to do business***.  Every day we work to be an indisputably strong and stable institution."  On April 26, 2016, at Citigroup's Annual Shareholder Meeting, he similarly stated: "Over the past three years, we've strengthened our core businesses, ***control functions*** and capital-base while reducing our headcount by almost 40,000, and our legal entities by over 1/3," making clear to investors that the Company's simplification and streamlining efforts did not dent the effectiveness of its risk management.  And Defendant O'Neill echoed Corbat at the same event, saying, "I thought we had ***no significant control lapses*** unlike the year before where again the pay of Mike and his direct report was adjusted downward because of those," and emphasized that Corbat "did an outstanding job" when addressing "[r]isk management[,] the improvement of relations with regulators."

126.    On July 25, 2017, Corbat echoed Dugan's comments, adding that, "[w]e have been rebuilding our credibility, our relationships with our regulators. . . . And our progress, it can be seen not just through the robustness of our business, but also through the investments that we've made in controls—to improve processes across risk, compliance and audit—which gives us our licenses to run and to grow our business."  Corbat continued, specifically assuring investors on July 25, 2017 that the Company's investments had paid dividends: "***I also hope people recognize how we've strengthened our risk management by the dogs [i.e., regulators] that haven't barked***."

127.    Defendant Dugan similarly told investors on April 16, 2019 during Citigroup's Annual Shareholders Meeting that Citigroup had moved past its troubled past.  According to Dugan, it was "absolutely critical that we keep our eyes focused on [regulatory and supervisory expectations], move forward, [and] address these regulatory and supervisory issues because we cannot afford to backslide.  And the same is true about risk.  We -- the company spends a great deal of time, the Board does and the Risk Committee in particular, on making sure that management identifies, measures, monitors and controls the key risks facing the company because again, we have to have a culture of disciplined, prudent risk-taking for which -- to achieve sustainable earnings because we can never have the company slip back to the place where we were before."

128.    Dugan further assured investors by highlighting that his views were informed by his significant "background [] on regulatory issues and risk" (as former Comptroller of the Currency) and extensive experience in promoting good governance: "I have been involved in bank regulation, policymaking and supervision and advising companies and, importantly, their Boards of Directors for almost 35 years. I think I have a very strong feel of what makes for good governance of a Board of Directors."

129.    Likewise, on January 14, 2020, Corbat explained how "[w]e continue to invest . . . in our infrastructure, in light of the enduring need to be an indisputably strong and stable institution."  Corbat then pointed out how "[y]ou'll hear us talk again about continued expense discipline.  But at the same time, you'll hear us talk about the investments in technology and technology infrastructure and those pieces which we think gives a multiple benefit to safety [and] soundness…."

130.    And then on July 14, 2020, near the end of the Class Period, Corbat reiterated that "[w]e continue to make investments in our infrastructure to enhance our safety, soundness and controls to ensure that we have an indisputably strong and stable institution."  Mason similarly stated the same day that "[w]e also have investments that we will continue to make….[i]nvestments in infrastructure and controls that ensure that we not only protect the franchise, but we're improving our efficiency in operations, and improving the quality of our data."

### 3. Wall Street Analysts Believed Citigroup Risk Management And Internal Controls Were in Compliance With Regulatory Requirements

131.    In light of Citigroup's repeated reassurances that it prioritized risk management and internal controls and that it was allocating the necessary resources, Wall Street analysts believed that Citigroup's risk management and internal controls, at a minimum, satisfied regulatory requirements.  On June 1, 2017, Bernstein analyst John McDonald asked Citigroup's executives "you've done a lot of investment spending, you've done some big projects upgrading major systems … Are you kind of at the tail end of the major big projects you set upon the last couple of years?"  Corbat replied, "[f]rom an infrastructure perspective, we've got, really if not all, certainly most of the systems or base systems that we need. . . .  [W]e've spent all the energy and effort in terms of creating these systems that have the ability to come back and communicate centrally. … So, as we look, again, I think from a regulatory perspective, major investments from a Rainbow and some of the big projects we talked about in the past and things that I think they're paying great dividends, those investments made."

132.    Analysts believed Corbat.  In a July 14, 2017 analyst report, Morning Star Equity Research stated, "we believe an overly ambitious expansion strategy created a 'too big to manage' firm before the crisis.  The company's results clearly reflect the benefits of a simplified business,"

and added, "we believe risk management at Citigroup has improved substantially over the past decade."

133.    The ratings agency Moody's also focused on Citigroup's purportedly improved risk management systems when updating its outlook for Citigroup debt.  On November 14, 2017, Moody's changed its outlook on Citigroup from stable to strong, stating, "[t]he change in outlook to positive from stable reflects Moody's view that Citigroup has largely completed its sweeping reengineering which has resulted in a more solvent institution with an improved risk-attuned management culture."  On February 21, 2019, Moody's upgraded Citigroup once again from Baa1 to A3, stating, "[t]he upgrade … reflects the successful execution of management's multiyear strategy to simplify Citigroup's operations, reduce its global consumer footprint, enhance its safety and soundness and pursue sustainable growth."  Moody's concluded,"[a]lthough Citigroup remains a large and complex organization, its risk management, risk appetite and corporate governance are significantly improved since the financial crisis and are well aligned with its strategy."

134.    An analyst report issued by Mayo at Wells Fargo on October 23, 2019 similarly praised Citigroup's "progress" concerning regulations and technology: "Over the past few years, tech has moved up the pecking order of priorities, both because *[Citigroup] put many of its past regulatory issues behind it* and given the necessity to compete … [I]t has [also] *evolved the technological architecture*, such as by decoupling the front and back offices with greater use of APIs."  On January 20, 2020, Mayo issued another analyst report that stated, "Citi should be beyond reproach with governance.  We raise this issue even while we recommend the stock because stronger oversight is one reason that Citi has improved and should continue to do so."

135.    On January 20, 2020, Wells Fargo issued another analyst report that stated, "Citi should be beyond reproach with governance.  We raise this issue even while we recommend the stock because stronger oversight is one reason that Citi has improved and should continue to do so."

136.    And according to an analyst report issued by Zacks Investment Research on August 12, 2020, "management remains focused on protecting employees and supporting customers.  And [they] continue to feel good about the investments [they] are making, particularly in [their] digital capabilities, and infrastructure and control.  Therefore, it continues to explore all opportunities to operate more efficiently to fund investments made in digital capabilities and infrastructure and control and offset headwinds induced by the pandemic."

### 4.    Citigroup Inadvertently Wires $900 Million

137.    On August 13, 2020, *The Wall Street Journal* reported that Citigroup "inadvertently" wired $900 million to lenders of cosmetics company Revlon Inc. as a result of an "operational error" and was asking that the lenders return the money.  Ten lenders refused and Citigroup was forced to sue to recover approximately $501 million of unreturned funds.  *See In Re Citibank August 11, 2020 Wire Transfers*, 20-cv-6539-JMF (S.D.N.Y.) ("*Wire Transfers*"). "Corbat was directly involved in the feud" and made "phone calls to fund managers to ask for the money back," according to a *Bloomberg* article on September 15, 2020.

138.    On August 17, 2020, *The Wall Street Journal* reported that Citigroup blamed "issues with the loan-processing system," that resulted in payments to each lender—using Citigroup's own money—that were "on average more than 100 times the interest that was actually due."  *Bloomberg* also reported on August 17, 2020 that Citigroup "has begun briefing watchdogs including the Office of the Comptroller of the Currency and the Federal Reserve about how it mistakenly misdirected so much money."  According to *Bloomberg*, the regulators' focus "will be

on making certain that any lapses at [Citigroup] can't be repeated and that they don't reveal deeper problems that pose a threat to its stability."

139.    To assure investors that Citigroup was still a safe and sound institution, Citigroup told *Bloomberg* that this was a narrow issue that had been addressed.  According to Citigroup, "[w]e have put significant, additional controls in place until the new system is operational.  . . . We take pride in the role that we play as a global leader in financial services and recognize that an operational error of this nature is unacceptable."  *Bloomberg* further reported on August 25 that "[t]he unit's planned migration to another software platform might help assuage concerns that the accidental payments signal deeper problems that still need to be addressed."

140.    On February 26, 2021, Judge Furman issued the Court's Findings of Fact and Conclusions of Law in *Wire Transfers* and found that the lenders were entitled to keep all of the roughly $501 million that the Company wrongly wired to them, in part, because it would have been "borderline irrational" to think that the payment was a mistake.  *Id.*  ECF No. 243 at 100. According to Judge Furman, "Citibank is one of the most sophisticated financial institutions in the world.  Thus, Defendants and their clients could assume—and did, in fact, assume—that the bank had effective internal controls to avoid significant mistakes."  *Id.* at 68.  However, what the defendants in *Wire Transfers* and Citigroup investors did not know was that the Company's internal controls were ineffective and failed to comply with Fed and OCC requirements.

141.    Judge Furman's explanation of how the erroneous transfers occurred demonstrates the depths of the deficiencies in Citigroup's risk management systems and internal controls.  In 2016, Revlon took out a seven-year $1.8 billion syndicated loan (the "2016 Term Loan") for which Citibank serves as administrative agent.  *Id.* at 4.  On August 11, 2020, only certain lenders exchanged their interests in the 2016 Term Loan for positions in a different Revlon credit facility.

*Id.* at 9.  This is known as a "roll-up" transaction.  *Id.* at 8-9.  When a lender rolls-up and exchanges a position in one credit facility for another, the lender is typically paid the accrued interest on the first facility (here, the 2016 Term Loan) at the time of the exchange.  *Id.* at 9.

142.    Given the technical limitations of Citibank's system for making payments, the most efficient way for Citibank to execute the transaction was to pay interim interest accrued to all lenders that held the 2016 Term Loan because paying only the rolling-up lenders would have required a "very manual process."  *Id.* at 8-10.  To that end, Revlon agreed to pay accrued interest to all 2016 Term Loan lenders to execute this roll-up transaction—even though the other lenders were not involved in the roll-up and even though an interim interest payment was not due until August 28, 2020.  *Id.* at 9-10.

143.    Citibank tasked its Asset-Based Transitional Finance ("ABTF") team, a subgroup of Citibank's Loan Operations group that processes and services asset-based loans, with executing the roll-up transaction.  ABTF used Flexcube, a software application and loan product processing program that Citibank utilizes for initiating and executing wire payments.  *Id.* at 10.  *Bloomberg* reported on August 25, 2020 that Flexcube was "arcane technology" dating back the early 1990s that had to be manually operated by employees.

144.    The only way to execute the transaction on Flexcube—to pay the roll-up lenders their share of the principal and interim interest owed as of August 11, 2020, and then to reconstitute the 2016 Term Loan with the remaining lenders—was to enter it in the system as if the loan was being paid off in its entirety, principal included, thereby triggering accrued interest payments to all lenders.  The key, however, was to direct the principal portion of the payment to a "wash account."  *Id.* at 10.  A "wash account" is an internal Citibank account that shows journal entries

used for certain Flexcube transactions to account for internal cashless fund entries and to ensure that money does not leave the bank.  *Id.* at 10.

145.    Because Flexcube was so arcane, however, the payments that were supposed to be made to the "wash account," so that the funds did not leave Citigroup, were actually wired to each of the lenders.

146.    An internal email on August 12, 2020, explained that, "[d]uring our processing and internal rebooking … we had a processing error, which lead [sic] to the full principal amount of the loan outstanding being sent via wire to all of the lenders in the deal.  Each of the 315 lenders received their pro rata share of 893,944,008.52 as of 8/11/20 of the full amount of the loan, which is incorrect.  We intended to only remit their share of interest and not the principal.  We will be contacting the lenders asking them to return their share of this erroneous payment as soon as possible."  *Id.* at 18.  Several of the lenders refused, the *Wire Transfers* litigation ensued, and the lenders were allowed to keep roughly $501 million of Citigroup's own money.  The case is on appeal.

### 5.    Corbat Unexpectedly Resigns

147.    On September 10, 2020, Corbat unexpectedly announced that he would resign effective February 2021 to be succeeded by Fraser, then Citigroup's President and CEO of its Global Consumer Banking division.  Corbat's resignation was particularly unexpected because on October 24, 2019 *The Wall Street Journal* reported that he intended to remain "for at least three more years," or until at least October 2022.

148.    An article published by *CNBC* on September 10, 2020 took note of the "weird timing of the announcement," focusing on how suddenly it came about and occurred years before Corbat indicated he considered retiring.  According to *CNBC*, even the executives who report

directly to Fraser "had no idea the news would hit," demonstrating the speed at which the transition took place.

149.    Wells Fargo banking analyst Mayo likewise issued a research report on September 10, 2020 stating that "the timing [of the resignation] seems unusual and the news is unexpected – CEOs don't typically want to leave in the middle of a crisis, esp[ecially] if upside is pending." Piper Sandler similarly noted in a September 10, 2020 analyst report that "we were surprised by Mr. Corbat's decision to retire."

150.    To quell concerns regarding the sudden and unexpected timing of the resignation, Citigroup told *CNBC* on September 10 that there was nothing unusual regarding the timing of the resignation.  Instead, Citigroup spokesperson Jennifer Lowney told *CNBC* that "[i]t has been Mike's intention to retire in 2021 since Jane [Fraser] was appointed president of Citi last year . . . . Announcing his plans now allows ample time for a smooth CEO transition, which was important to Mike given that he did not benefit from one."

151.    Citigroup further sought to assuage investors' concerns on September 10, 2020 by repeating the false refrain that Corbat's retirement and succession by Fraser, as the first woman to serve as CEO of a major U.S. financial institution, reflected the Company's successful transformation into a "stronger" institution.  According to Corbat on September 10, 2020 "[w]e completed our transformation from the financial crisis and emerged a simpler, safer and stronger institution. . . . [A]s the world's most global bank, safety and soundness always have to be a foundation of our institution.  We have launched significant investments in our infrastructure as part of our push to make strengthening our risk and control environment a strategic priority for the firm."

152.   In reality, and as would be revealed just a few days later, Citigroup knew that it was facing massive regulatory sanctions from the Fed and the OCC for allowing significant ongoing deficiencies in its risk management systems and internal controls to linger for years, and that the regulatory issues prompted Corbat's resignation.

### 6.   In September 2020 Investors Learned That Citigroup Did Not Meet Minimum Regulatory Requirements In Violation of Law

153.   On September 14, 2020, *The Wall Street Journal* published an article titled "Regulators Prepare to Reprimand Citigroup for Failing to Improve Risk Systems."  The article revealed that "[f]ederal regulators are preparing to reprimand Citigroup Inc. for failing to improve its risk-management systems – an expansive set of technology and procedures designed to detect problematic transactions, risky trades and anything else that could harm the bank."  It added that ***"[f]or years, regulators have privately pressed Citigroup and Mr. Corbat to fix the bank's risk systems,"*** demonstrating that the Company's positive representations about its risk and control environment were materially misleading, at best, and that investors had no way to know the truth.

154.   Regulators "faulted Citi's management for not giving priority to the risk-management overhaul," and cited as evidence Citigroup's "accidental $900 million payment" to creditors of Revlon.  The article further stated that "[t]he expected rebuke from the [OCC] and the Federal Reserve accelerated planning for Chief Executive Michael Corbat's retirement," conflicting with Citigroup's characterization on September 10, 2020 that it was a simple transition that had been planned for years.  The regulators' reprimands had been "in the works for several months" and "accelerated planning for Mr. Corbat's retirement," according to an article by *The Wall Street Journal* on October 7, 2020.  In fact, due to the Company's continued noncompliance with Fed and OCC demands, the regulators found it necessary to issue a public sanction.  A consent

order, the article said, would make clear that the "many tools" regulators previously used privately with Citigroup "didn't achieve the desired results."

155.   Citigroup specifically acknowledged to *The Wall Street Journal* on September 14 that its risk systems were inadequate, stating that "we recognize that we are not yet where we need to be and that has to change."   *The Wall Street Journal* further revealed that "[i]n memos to Citigroup staff Thursday [September 10, 2020], both Mr. Corbat and Ms. Fraser acknowledged that the bank needs to transform its internal systems for risk and compliance," despite lauding those very same systems for years.

156.   *Business Insider* similarly reported on September 14, 2020 that Corbat's retirement "was the culmination of months of escalating tensions with regulators" regarding Citigroup's "tech and risk systems."   That article also made public another internal memo that Corbat had sent to Company employees on August 10, 2020, in which Corbat admitted the need for improved internal controls and regulatory compliance. "In recent years, we have been working on significant remediation projects to strengthen our controls, infrastructure and governance.   While we have made progress, we have work to do to meet the standards that we must hold ourselves to."

157.   Corbat also recognized that there had been "execution challenges" in remediating its controls and risk systems and urged employees to "chang[e] our mindset" and "think about infrastructure and controls very differently.   We can't think of them as just something that is important to our regulators.   It's not about getting remediation projects done or checking boxes," suggesting that's all Citigroup did before and failed to prioritize and upgrade its risk systems as it promised investors it had done.   Indeed, Corbat asked all Citigroup employees "to embrace this change . . . by making our risk and controls a strategic priority."   In essence, Corbat admitted to

his staff that Citigroup had not put a true emphasis on meeting regulators' demands and that only now was the Company going to truly reform its past deficiencies.

158.    On September 15, 2020, *Business Insider* followed up with another article titled "The Real Reasons Behind Citigroup CEO Mike Corbat's Retirement," concluding that it resulted from longstanding and systemic failings in the Company's risk controls that Corbat failed to prioritize.  The article reported how regulators had been privately pressuring Citigroup for years to take more aggressive action to remedy its internal control and risk management failings, only to be rebuffed by Corbat: "Entering [2020], [] Citigroup had numerous outstanding compliance- and technology-related issues that had been outlined in regulatory notices known as Matters Requiring Attention and Matters Requiring Immediate Attention" and that "Citigroup had multiple ones long past due."

159.    *Business Insider* further explained that "[t]he notices are issued privately by regulators when they find controls or systems that aren't up to standards," meaning that there is no way investors could have known about them, "and they typically come with firm deadlines by which the bank is expected to fix the weaknesses or present a plan to do so."  It added how "[t]he board of directors is often included on those communications."  Citigroup's regulators, however, ***"were annoyed with Citigroup's noncompliance across numerous issues and felt as if they weren't being heard."  Rather than fix the systems, "[t]he CEO [Corbat] who had made operating efficiency and return-on equity a hallmark of his strategy was often reluctant to spend the money or dedicate enough people to fix a problem the right way."***  This stands in stark contrast to Citigroup's peers who, according to *Business Insider*, "have spent years improving their systems" while the Company still maintained "a patchwork of technology systems that didn't talk to one another."

160.    *Dealbreaker* summed it up in an article published in September 15, 2020: "Unfortunately, Citi's woeful risk management infrastructure did what it does, over and over and over again, and reminded regulators that **Citi and Corbat hadn't really done all they promised**, sotto voce, to do to fix those systems, and that maybe a highly public reminder to do so was in order."

161.    On September 16, 2020, Mayo at Wells Fargo issued a report titled "Investors Are Upset; Citi Should Consider Accelerating CEO Transition."  The report explained how "the recent mishap (Revlon) seems like a manifestation of problems from systems and processes that should have been addressed years ago via improved automation (an issue for Citi firmwide)," but had not. According to Mayo, "investors are upset because a CEO retirement/transition that was billed by the company as normal course of business seems increasingly not the case, given possible new regulatory actions."

### C.    The Fed's October 7, 2020 Cease And Desist Order Establishes Violations Of Law and Regulation

162.    On October 7, 2020, the Fed issued its Cease and Desist Order.  *See In re Citigroup Inc.,* FRB No. 019-B-HC, 2020 WL 6372793 (Oct. 7, 2020).  Citigroup's General Counsel, Rohan Weerasinghe, signed on behalf of Citigroup upon express authorization by the Citigroup Board. The Fed determined that Citigroup violated Regulation YY.

163.    The Fed Cease and Desist Order "whereas clauses" stated (at 1-2) that,

(a)    "Citigroup is required to maintain an enterprise-wide risk management program designed to identify and manage risks across the consolidated organization" that is "consistent with section 252.33(a)(2) of Regulation YY of the Board of Governors (12 C.F.R. § 252.33(a)(2));"

(b)      "the most recent supervisory assessment issued by the Federal Reserve Bank of New York … identified **significant ongoing deficiencies** in implementation and execution by Citigroup with respect to various areas of risk management and internal controls, including for data quality management and regulatory reporting, compliance risk management, capital planning, and liquidity risk management;"

(c)      "Citigroup has not adequately remediated the **longstanding enterprise-wide risk management and controls deficiencie**s previously identified by the Federal Reserve, including in the areas described above and those addressed in (i) the Consent Order issued by the Board of Governors on March 21, **2013** to remediate outstanding deficiencies in Citigroup's anti-money laundering compliance program and (ii) the Consent Order issued by the Board of Governors on May 20, **2015** to remediate outstanding deficiencies in Citigroup's compliance and control infrastructure relating to its foreign exchange program and designated market activities."

164.    In announcing the Fed Cease and Desist Order, the Fed emphasized that Citigroup was a serial offender and must correct these "several longstanding deficiencies," "enhance its firm-wide risk management and internal controls," and that Citigroup "has not taken prompt and effective actions to correct practices previously identified by the [Fed] in the areas of compliance risk management, data quality management, and internal controls."  *See* Press Release, Federal Reserve, Federal Reserve Announces Enforcement Action Against Citigroup Inc. That Requires the Firm to Correct Several Longstanding Deficiencies, (October 7, 2020).

165.    The Fed Cease and Desist Order then ordered Citigroup to take a number of remedial actions.  First, it ordered the Citigroup Board to ensure that Citibank complies with the "OCC Orders" and any other action taken by the OCC.  (¶1.)

166.    Second, it ordered the Citigroup Board to provide the Fed with a plan to oversee the matters identified, specifically explaining how the Citigroup Board will (a) "hold senior management accountable for executing effective and sustainable remediation plans by committed deadlines;" (b) "ensure senior management improves, and thereafter maintains, effective and independent enterprise-wide risk management, and that internal audit findings are effectively remediated;" (c) "ensure that senior management incentive compensation is consistent with risk management objectives and measurement standards;" and (d) "ensure effective reporting" to the Citigroup Board by management with respect to the remediation efforts.  (¶2.)

167.    Third, it ordered Citigroup to conduct a "gap analysis of its enterprise-wide risk management framework and internal controls systems … to determine the enhancements that are necessary *to meet the risk management requirements set forth in Regulation YY* … with respect to the following three items: capital planning, liquidity risk management, and compliance risk management."  (¶3.)

168.    The Fed required the gap analysis to (i) "identify where Citigroup's risk management policies, procedures, practices, processes, and internal *controls are not compliant with Regulation YY*," (ii) include "measures to ensure that Citigroup's risk management functions have the requisite stature, authority, and resources to address the Identified Gaps and to ensure that Citigroup, on an ongoing basis, maintains an enterprise-wide risk management framework that meets the risk management requirements of Regulation YY with respect to [capital planning, liquidity risk management and compliance risk management]," and (iii) identify "where staff lacks expertise or training, or roles and responsibilities are not sufficiently defined and supported with an appropriate escalation framework, in order to exercise appropriate risk management and maintain an effective control environment."  (¶¶3(a), 3(b)(i).)

169.    Fourth, the Fed required the gap analysis remediation plan to include a data quality management program that, among other things, "ensure[s] that Citigroup has an effective enterprise-wide program for data quality management that provides timely and accurate data sufficient for Citigroup's enterprise-wide risk management framework and internal controls systems regarding capital planning, liquidity risk management, and compliance risk management." (¶¶4, 4(a).)

170.    And fifth, the Fed required the gap analysis remediation plan to include a compliance risk management program that analyzed the "most material risk factors related to U.S. laws and regulations" and "assess[ed] existing controls…to ensure Citigroup's enterprise-wide operations comply with U.S. laws and regulations."  (¶¶5(a), 5(b).)  The Fed further required the compliance risk management program to include "improvements to the management information systems, data, and reports provided to Citigroup's board of directors and senior management concerning compliance risks, compliance with applicable U.S. laws and regulations, and the effectiveness and functioning of the compliance risk management program."  (¶5(d).)

171.    The Fed also required the General Counsel to have "overall responsibility for oversight of the compliance function" until the plan was completed.  (¶5(g).)

172.    In sum, the Fed Cease and Desist Order placed the responsibility for Citigroup's failures squarely on the Company's senior executives and its Board.

**D.    The OCC's October 7, 2020 Consent Orders Establish Violations Of Law And Regulation**

173.    The OCC announced on October 7, 2020 that the OCC had entered into two consent orders with Citibank, both dated October 2, 2020, due to Citibank's "***unsafe or unsound*** banking practices" and "[Citibank's] ***long-standing failure*** to establish effective risk management and data

governance programs and internal controls."  This failure resulted in violations of regulation 12 C.F.R Part 30 Appendix D.  (*See* OCC News Release 2020-132 (October 7, 2020).)

174.    The first consent order spanned 36 pages, issued formal findings of fact, and ordered an extensive and comprehensive set of remedial measures (the OCC Remediation Order). *In re Citibank, N.A.,* OCC No. AA-EC-2020-64, (Oct. 2, 2020).  The second consent order also issued findings of fact and assessed a $400 million CMP Order.  *In re Citibank, N.A.,* OCC No. AA-EC-2020-65, 2020 WL 8185094 (Oct. 2, 2020).

175.    The following seven Director Defendants who were also Citibank directors executed each one of the two OCC orders: (1) Corbat; (2) Desoer (Citibank Board Chair); (3) Costello; (4) Hennes; (5) Ireland; (6) Turley; and (7) Wright.

### 1.     The OCC Remediation Order

#### a)     The OCC's Findings

176.    The OCC Remediation Order included findings of fact detailing year-long deficiencies, unsafe or unsound practices, and violations of law.

177.    First, it found that "*[f]or several years*, the Bank has failed to implement and maintain an enterprise-wide risk management and compliance risk management program, internal controls, or a data governance program commensurate with the Bank's size, complexity, and risk profile."  (Art. II ¶1.)

178.    Second, it found "the following *deficiencies, noncompliance with 12 C.F.R. Part 30, Appendix D …, or unsafe or unsound practices* with respect to the Bank's enterprise-wide risk management and compliance risk management program: (a) failure to establish effective front-line units and independent risk-management as required by [Appendix D]; (b) failure to establish an effective risk governance framework as required by [Appendix D]; (c) failure of the Bank's enterprise-wide risk management policies, standards, and frameworks to adequately identify,

measure, monitor and control risks; and (d) failure of compensation and performance management programs to incentivize effective risk management." (Art. II ¶2.)

179.   Third, the OCC "identified *unsafe or unsound practices* with respect to the Bank's internal controls, including, among other things…*noncompliance with multiple rules and regulations*." (Art. II ¶3.)

180.   Fourth, the OCC "identified the following *deficiencies, noncompliance with [Appendix D], or unsafe or unsound practices* with respect to the Bank's data quality and data governance, including risk data aggregation and management and regulatory reporting: (a) failure to establish effective front-line units, independent risk-management, internal audit, and control functions as required by [Appendix D]; (b) inability to develop and execute on a comprehensive plan to address data governance deficiencies, including data quality errors and failure to produce timely and accurate management and regulatory reporting; and (c) inadequate reporting to the Board on the status of data quality and progress in remediating identified deficiencies." (Art. II ¶4.)

181.   Fifth, the OCC "determined that [Citibank's] Board and senior management oversight is inadequate to ensure timely, appropriate actions to correct the *serious and longstanding deficiencies and unsafe or unsound practices* in the areas of risk management, internal controls, and data governance at the Bank" and that "inadequate reporting to the Board hinders its ability to provide effective oversight." (Art. II ¶5.)

182.   Sixth, "the Bank was in noncompliance with [Appendix D], and engaged in unsafe or unsound practices that were part of *a pattern of misconduct.*" (Art. II ¶6.)

183.   Seventh, the foregoing "conduct also contributed to violations of law and regulation and *continuous noncompliance with [Appendix D]*." Further, the "Bank's deficiencies in internal

controls and compliance risk management [also] contributed to violations of laws and regulations and the OCC assessed civil money penalties" in 2019 for violations of the Fair Housing Act and the holding period for "other real estate owned" (re-possessed real estate), and in 2020 for violations of the Flood Disaster Protection Act.  (Art. II ¶7.)

### b)      The OCC's Comprehensive Action Plan

184.    In light of the OCC's findings, the OCC ordered Citibank to develop a Comprehensive Action Plan consisting of two parts: the Consent Order Action Plan ("COAP"), and the Data Governance Plan ("DGP").  (Art. IV ¶1).  It also ordered strict deadlines for presentation of the plans to the OCC, which were subject to approval, and restrictions to any changes without prior consent by the OCC.  Citibank also is required to designate "the person(s) responsible for completion of the corrective actions required by this Order" and provide quarterly reports.  (Art. IV ¶1(c).)

### i)      The Consent Order Action Plan Had Seven Subcomponents

185.    The COAP had seven sub-components: (i) Enterprise-Wide Risk Management Program; (ii) Compliance Risk Management; (iii) Capital Planning and Reporting; (iv) Internal Controls; (v) Staffing and Technology Resource Assessment; (vi) Restrictions on Significant New Acquisitions; and (vii) Board and Management Oversight.

### (1)      Enterprise-Wide Risk Management Program

186.    The OCC ordered Citibank to conduct a comprehensive revamping of its ability to "measure, monitor, aggregate, limit and control" risk through the Enterprise-Wide Risk Management Program ("ERMP").  (Art. VI ¶¶2, 2(e).)  ERMP needed to "result in," among other things, a number of deliverables.  (Art. VI ¶2.)

187.    First, ***"[a] program in each front-line unit and independent risk management unit to measure, monitor, aggregate, limit, and control risks*** consistent with the Bank's: (i) risk appetite statement and established policies relating to this statement; (ii) concentration risk limits and established policies relating to these limits; (iii) strategic, capital, and liquidity plans; (iv) stress testing; and (v) processes for new or modified product or services approval." (Art. VI ¶2(e).)

188.    Second, "a risk appetite framework that ensures: (i) For risks with a quantitative risk appetite statement, the development of metrics that align to the top risks within each key risk area, including appropriately meaningful limits that reflect [Citibank] Board's risk tolerances, which tolerances shall be tied to risk appetite metrics utilized by front-line units; (ii) Qualitative statements specify how risks will be measured; (iii) Qualitative assessments within risk appetite reporting clearly indicate whether a risk is consistent with the [Citibank] Board approved Risk Appetite Statement and that the conclusion is adequately supported and documented." (Art. VI ¶¶2(b).)

189.    Third, the "establishment and documentation of the responsibility and accountability for risk management related functions in each front-line unit and independent risk management unit including the establishment of procedures and processes that clearly define risk management related roles and responsibilities for each unit, and that ensures compliance with enterprise-wide corporate policies, and laws and regulations." (Art. VI ¶2(d).)

190.    Fourth, "[w]ritten policies and procedures to ***ensure that independent risk management promotes effective oversight and control of risks that is appropriately independent of the related line of business*** and that it has the requisite stature, authority, and resources, including sufficient staffing to provide such oversight and control. At a minimum, independent risk management shall: (i) review and enhance, as appropriate, its management structure to ensure

that it promotes effective and independent oversight and control of risks; and (ii) develop and implement effective monitoring and testing measures for risks to ensure business lines, as relevant, follow applicable laws, regulations, policies, and procedures, and properly remediate any identified deficiencies; and to ensure effective testing of design and execution of risk controls." (Art. VI ¶2(h).)

### (2)   Compliance Risk Management Plan

191.    The OCC ordered Citibank to conduct a comprehensive revamping of its ability to "assess, measure, aggregate and limit regulatory compliance exposures" through the Compliance Risk Management Plan ("CRMP").  CRMP needed to "result in," among other things, a number of deliverables:

192.    First, the "establishment of and adherence to policies, processes, and control systems within independent compliance risk management to assess, measure, aggregate, and limit regulatory compliance exposures on an ongoing basis commensurate with the risk profile and risk appetite of the Bank."  (Art. VII ¶2(c).)

193.    Second, the "establishment of and adherence to policies, processes, and control systems within front-line units to assess, measure, and limit regulatory compliance exposures on an ongoing basis commensurate with the risk profile and risk appetite of the Bank."  (Art. VII ¶2(b).)

194.    Third, an "effective, independent monitoring and testing function supported by sufficiently skilled staff and resources that provides risk-based scope and coverage to provide credible challenge and escalation of issues identified by front-line units."  (Art. VII ¶2(f).)

195.    Fourth, "[c]ompliance information systems to measure, track, and report risk." (Art. VII ¶2(i).)

196.    Fifth, "[p]rocedures and processes for identifying, reporting, escalating, and remediating significant compliance concerns, including compliance risk management concerns, and for documenting the identification, reporting, escalation, and remediation of such concerns." (Art. VII ¶2(j).)

### (3)    Internal Controls

197.    The OCC ordered Citibank with respect to Internal Controls to "ensure, at a minimum, that there are" a number of key processes, procedures and plans in place, including those set forth below.  (Art. IX ¶1.)

198.    First, "[p]rocesses that require the relevant line(s) of business or another unit of the Bank, including front-line units and independent risk management to:" (a) "perform analyses (or assess analyses previously performed) *to diagnose the root cause(s) of the underlying issues that led to internal control related concerns identified by internal audit and/or federal regulators since 2017* and during the time this Order is in effect, [including the]…evaluation of the relevant control design(s) and operating control effectiveness"; (b) "[d]evelop action plans to remediate root cause(s)"; and (c) "[a]ssess whether any identified root cause issues may affect other lines of business, products, or services…"  (Art. IX ¶¶1(a)(i),(ii),(iii).)

199.    Second, "[p]rocesses and procedures to ensure that the limit framework considers the unique aspects and complexity of the businesses and products to which the limit framework applies and adequately protects the Bank against levels of risk."  (Art. IX ¶1(b).)

200.    Third, "[p]rocesses and procedures for reassessing limits whenever there are changes to the related methodology and assumptions."  (Art. IX ¶1(c).)

201.    Fourth, "[p]olicies, processes, and procedures for improving reporting to the Board and senior management."  (Art. IX ¶1(d).)

### (4)      Capital Planning And Reporting

202.    The OCC ordered Citibank to ensure (i) "that *capital and risk-weighted assets are appropriately identified and reported*," and  (ii) "that periodic assessments of the Bank's capital calculations and management and regulatory reporting ensure the capital calculations adequately take into account the Bank's size, complexity, and overall risk profile."  (Art. VIII ¶1.)

### (5)      Staffing And Technology Resource Assessment

203.    The OCC ordered Citibank to conduct a staffing assessment ("Staffing Assessment") "for the Bank's front-line unit functions responsible for risk management, independent risk management functions, and the Bank's internal audit function to ensure the allocation of adequate resources."  (Art. X ¶1.)  The Staffing Assessment further required Citibank to "identify any gaps in those aggregate skills and/or expertise within the Bank's current staff, including the appropriateness of where the staff has more than one role across functions or business lines ('dual roles') or where staff has supervisors in more than one function or business ('matrix reporting')."  (Art X ¶1(a).)

204.    The OCC also ordered Citibank to conduct a technology resource assessment ("Technology Resource Assessment") for the control function that "identif[ies] the number and types of technology resources needed to execute and sustain a *safe and sound system of internal controls and risk management control functions* and idenfi[ies] any gaps…"  (Art. X ¶2(a).)

205.    The OCC further ordered that the Compliance Committee ensure that management corrects any deficiencies identified by the Staffing and Technology Resource Assessments on an ongoing basis.  (Art. X ¶3.)

**(6)      Restrictions On Significant New Acquisitions**

206.    The OCC ordered Citibank to submit a plan for approval by the OCC that determines if a new acquisition is significant.  Citibank is precluded from completing a significant new acquisition without prior approval by OCC.  (Art. XI.)

**(7)      Board And Management Oversight**

207.    The OCC ordered Citibank, in connection with the Board's and senior management's oversight and governance functions, to ensure that "[g]overnance processes" provide for "review and credible challenge by a senior management risk committee."  (Art. XII ¶1(a)(i).)

208.    The OCC further ordered the Citibank Board to approve the "Risk Appetite Statement, on an annual basis, after an assessment of the prior year's Board-approved Risk Appetite Statement, to ensure the quantitative metrics and limits and qualitative statements are relevant to the Bank's top risks."  (Art. XII ¶1(b).)

209.    The OCC also ordered Citibank to ensure that "[p]rior to implementing new activities, products, services, or implementing realignments or redesigns of business units, products, or services, the development and implementation of formal governance and policies, procedures, and processes" include "(i) [a]ppropriate controls and risk management systems to ensure that risks are appropriately identified, measured, monitored, and controlled [and] (ii) [a]n approval process that ensures approvals are timely, conducted by the appropriate personnel, and documented."  (Art. XII ¶1(f).)

210.    And the OCC ordered the Citibank Board and Audit Committee to each take action "to further improve its oversight of senior management, including holding senior management accountable for implementing and maintaining the corrective action required by this Order."  (Art. XII ¶1(g).)  The action required included "[p]rocedures and processes to ensure that reports to the

69

Board, the Audit Committee, and senior management are transparent and comprehensive and contain thorough and complete analysis, including thematic analysis."  (Art. XII ¶1(g)(i).)

### ii)  The Data Governance Plan

211.    The DGP required Citibank to conduct a data governance gap analysis to "identify all gaps between the Bank's current data governance state and the ongoing and planned corrective actions required to address all known data governance and EUC-related [End-User Computing] *deficiencies* identified by the Bank or the OCC."  (Art. V ¶1.)

212.    The critical issue is that Citibank's data is not reliable.  Accordingly, the DGP must "*ensure that data, throughout its lifecycle, is accurate, consistent, timely, and complete* and there is integrity in processing in order to facilitate timely and accurate management and regulatory reporting so that management can make prompt and effective decision-making during normal times and periods of stress."  (Art. V ¶2.)

213.    To achieve this, the OCC ordered Citibank to include in the DGP a comprehensive and extremely detailed set of frameworks, practices and procedures.  First, the DGP required "a comprehensive data governance framework, operating model and management oversight."  In this regard, "clear roles, responsibilities, and accountability for respective front-line units, independent risk management, internal audit, and relevant control functions" needed to be established.  "[A] program to develop, attract, and retain talent and maintain appropriate staffing levels" and "a comprehensive training program … for all personnel responsible for data quality, data aggregation, management and/or regulatory reporting" was required.  And Citibank needed to "ensure adequate financial resources to develop and implement the DGP."  On this last point the OCC did not trust that Citibank would invest enough money and required procedures for Citibank to confirm with the OCC that the funds said to be invested were ultimately "actually expended." (Art. V ¶2(b).)

214.     Second, the DGP needed to include the "***thorough redesign of data architecture,
re-engineering of processes, and modernization of system applications and information
technology infrastructure.***"   This "thorough redesign" of the "data architecture" and IT
"infrastructure" had to, among other things, (i) "simplify and consolidate applications with
common functionalities, eliminate disparate systems, and strengthen data quality controls;" (ii)
"define enterprise-data sets that are shared across sectors and business units;" and (iii) "ensure
consistent enterprise-wide adherence by all business units and third parties to standardize[]
technology solutions and minimize sector variances."  (Art. V ¶2(d).)

215.     Third, the DGP needed to provide for the "[c]omplete implementation of all
improvements for data and systems relied upon for liquidity risk management," including (a)
"[Citibank] Board-approved tolerances for internal liquidity data quality reporting metrics," and
(b) "procedures and processes to ensure that senior management reports to the Board include
significant liquidity concentrations to ensure they are within the Board's risk tolerances."  (Art. V
¶2(e).)

216.     Fourth, the DGP needed to include an End-User-Computing ("EUC") Tools
Framework that, among other things, "reduce[d] EUC tools required to achieve and maintain
complete, timely, and accurate regulatory, management and risk reporting during normal times
and during times of stress."  (Art. V ¶2(f)(i).)

### c)     Citibank Must Create A Compliance Committee

217.     The OCC Remediation Order ordered Citibank's Board to create a new compliance
committee ("Compliance Committee") composed of five independent directors.  It further ordered
the Compliance Committee to provide quarterly reports to the Citibank Board about Citibank's
progress in complying with the OCC Remediation Order.  (Art. III.)

### 2.      The OCC Civil Monetary Penalty Order

218.    The OCC CMP Order stated that the OCC intended to issue a "Notice of Assessment of a Civil Money Penalty, for deficiencies in its data governance, risk management, and internal controls that constitute unsafe or unsound practices and that contributed to violations of law."  (OCC CMP Order at 1.)

219.    Article II of the OCC CMP Order made formal findings substantially similar, if not identical, to those made in Article II of the OCC Remediation Order.

220.    The OCC CMP Order assessed a civil money penalty on Citibank of $400 million.

**E.      After The Fed And OCC Issued The Enforcement Orders, Analysts Accused Citigroup Of Making False Statements And Criticized The Company's "Credibility" And "Lack Of Transparency"**

221.    The Fed and the OCC issued the 2020 Enforcement Orders on October 7, 2020. "These come on the back of Citi's recent issues with Revlon," explained an analyst report by Evercore that day, "but it's clear from the Fed's consent order that it's broader than that as Citi failed to remediate outstanding deficiencies in their AML compliance program (a 2013 Fed consent order) and compliance & control infrastructure related to their FX program (a 2015 Fed consent order) … The OCC and Fed are working together so this is just one plan to address data, oversight and control issues."

222.    *The Wall Street Journal* also published an article that day noting that "[t]he public rebuke marks a major escalation of regulators' efforts to get Citigroup to fix its risk systems.  For years, the Fed and the OCC have privately pushed Citigroup Chief Executive Michael Corbat to give priority to an overhaul of the systems.  Their decision to issue consent orders requiring the changes indicates the pressure they were exerting behind the scenes wasn't enough.  The reprimand, in the works for several months, accelerated planning for Mr. Corbat's retirement."

223. The analysts reacted to the 2020 Enforcement Orders with anger and by concluding that Citigroup had not been truthful. One of the most vocal analysts was Mike Mayo, at Wells Fargo. His October 8, 2020 report titled "'Hangry' Investors + Reg Order = New Catalyst" said, "we, like other investors, are 'hangry' – i.e., hungry for more information on how and when the regulatory issues will get resolved and *angry over their lack of transparency and why they were allowed to fester*. . . . There are no excuses for failed systems and the recent Revlon issue."

224. Mayo then highlighted that "contrary to Citi's statements from a few years ago, its restructuring was not sufficiently complete in our view" and that "accountability needs to get reinforced, both at the board and management level." According to Mayo, "[t]he system issues are worse than realized, as if we collectively thought that Citi improved from a grade of 'F' around the global financial crisis to a 'B-/C+' but only to find out the grade is 'D' –i.e., improved but not by enough. This perspective has contributed to one of the greatest disconnects that we've seen between Citi's balance sheet and stock price value."

225. Mayo further noted that the regulatory orders brought "[t]wo decades of system issues to the fore" and "highlight a need to modernize systems (data, controls, compliance, risk). This is bad given Citi had the worst large bank performance over the past two decades with a series of mishaps. Moreover, Citi already had a series of system projects stretching from delayed acquisition integrations that stem from its modern day 1998 founding, to Project Rainbow (2011), and more recently back office initiatives (see 2017 investor day)."

226. Mayo's October 8 report similarly explained that the Fed and OCC orders were "a little bit like 'here we go again with Citi.' The bitter irony is that, if this happened at another company, the fallout might not be as large. Yet, having had a front row seat in analyzing this company for the past 22 years, we see this as fitting with the narrative that Citi can't get out of its

own way." Mayo further noted that the Company's "costs are bloated and we see its efficiency as worst-in-class."

227. JPMorgan likewise issued a scathing analyst report on October 8, 2020, explaining that "[t]here were some surprising and very disappointing comments in the [Fed and OCC] orders given that Citi has been working since the last financial crisis on improving risk management, controls, and oversight . . . The OCC stated the issues have been ongoing for several years and that the Board must fix the deficiencies, make all corrective actions, ensure changes are effective, have changes verified and validated by the OCC, and demonstrate that changes have been effective for a sufficient time period." JPMorgan specifically said Citigroup had a "credibility gap versus peers due to its much weaker profitability, and these orders will add to the pressures as it will need to add resources – inadequate staffing and technology in certain areas were explicitly mentioned in the orders."

228. According to JPMorgan's October 8 report, the "surprising" comments include that: "1) senior management and The Board had inadequate oversight of risk management and compliance for several years, and Citi's 'unsafe' and 'unsound' practices were part of a pattern of misconduct; 2) failure of compensation and performance programs to incentivize effective risk management; 3) explicitly requires adequate staffing and technology resources; 4) cites calculations of risk weighted assets and capital calculations; 5) need for improvements in liquidity risk management systems and data quality; 6) failure to establish front-line and independent risk management; 7) failure to maintain risk management, compliance risk management, internal controls, and data governance programs in line with Citi's size, complexity, and risk profile; and 8) lack of effective risk governance."

229.     JPMorgan further explained on October 8, 2020 that the "Fed and OCC's orders stated Citi must work on the following areas: 1) Board governance and oversight; 2) data quality and governance; 3) enterprise risk management; 4) compliance risk mgmt; 5) capital planning; 6) internal controls; 7) risk management staffing; 8) technology resources in control functions; and 9) timely and comprehensive review by its Project Manager Office."  Because of the regulatory issues, JPMorgan downgraded Citigroup from overweight to neutral.

230.     The sharp criticism grew louder on the earnings call on October 13, 2020.  Morgan Stanley's analyst specifically questioned Corbat's transparency, asking, "this consent order might be a surprise to The Street, but is it really a surprise to you?"  Corbat did not directly answer.

231.     Likewise, Mayo called for Corbat to step aside immediately given his lack of candor with investors: "Speaking on behalf of investors, people I speak with, there's a *collective sense* of extreme disappointment with technology, the new regulatory order in tech, *the root problems were not transparent to investors. . . . [W]hy not step aside now?"  Mayo added that "these problems didn't come out overnight that the regulators identified.  So, it's just you're on a path, and now, all of a sudden, we find out that the engine underneath the company wasn't as strong as it should be."*  "[O]bviously, disappointed with execution, strategy, controls, transparency," Mayo concluded.

232.     JPMorgan's analyst echoed his colleagues and addressed his question directly to Corbat: "Mike, on the whole regulatory issue, it's quite disappointing to read in the consent orders that the incentive comp[ensation] did not account for risk management and the comments about the practices the regulators made.  Given that, what changes should we expect in senior management incentive comp[ensation]?  And can you talk about *why you didn't prioritize risk*

*management* which is such a cornerstone since the last crisis?  And what changes should we expect in the Board as well as other senior executives as a result?"

233.    The analyst for Bank of America suggested that Citigroup's regulatory problems had risen to the level of the systemic regulatory deficiencies that had plagued Wells Fargo, asking, "why isn't Citigroup the new Wells Fargo in terms of regulatory issues?"

234.    JPMorgan published another analyst report pertaining to Citigroup dated October 14, 2020, recounting several "[k]ey points," including that "in our view, Board and further senior management changes are needed given these failures; and [] incentive compensation changes are needed, including clawbacks, given the comments by regulators."  JPMorgan further lamented how Citigroup must "go back and start with a gap analysis, even though it has been working on risk, controls, infrastructure, and data quality issues for many years."

235.    An article by *The Motley Fool* on October 16, 2020 summarized it well: ***"management has known about at least some of these problems since at least 2013.  How do you not fully address issues you've known were serious for at least seven years?"***

## V.    SUMMARY OF SCIENTER ALLEGATIONS

236.    Set forth below is a summary of the key allegations that support a strong inference of scienter.  This includes how: (1) federal regulators directly informed Corbat, Gerspach, Mason, and the Citigroup and Citibank Boards that Citigroup's and Citibank's risk systems and internal controls were deficient, noncompliant, or unsafe or unsound; (2) Defendants, as senior management or as members of Citigroup's Audit and Risk Management Committees, had a duty to oversee (and stated that they oversaw) risk management and internal controls and, therefore, knew of the deficiencies, noncompliance, or unsafe or unsound practices; (3) Defendants had a legal duty to monitor compliance with federal regulations and prior consent orders issued by the Fed and OCC; (4) the deficiencies, noncompliance, or unsound or unsafe practices were

longstanding, ongoing, continuous, pervasive, and remained even after Citigroup stated it "dove deeply" and ameliorated the issues; (5) Corbat's and Brad Hu's (Citigroup's Chief Risk Officer) resignations were unexpected and highly suspicious; (6) Defendants' fraud was motivated by their desire to improve Citigroup's efficiency ratio; (7) Citigroup's risk and control systems constituted core operations of the Company; and (8) corporate scienter is established by imputing to Citigroup the knowledge of the Individual Defendants as well as particularized allegations of scienter by other senior officers and directors.

### A. Federal Regulators Directly Told Corbat And The Citigroup And Citibank Boards That The Risk Systems And Internal Controls Were Deficient, Noncompliant, Or Unsafe Or Unsound

237.   Throughout the Class Period, federal regulators repeatedly pressured Corbat as well as the Citigroup Board to address longstanding deficiencies in the Company's risk systems and internal controls, and repeatedly provided Defendants with knowledge of facts or access to information that directly contradicted their public statements. *The Wall Street Journal* reported on September 14, 2020 that "[f]or years, regulators have privately pressed Citigroup and Mr. Corbat to fix the bank's risk systems." *Business Insider* likewise reported on September 15, 2020 that Citigroup had received numerous warnings from federal regulators in the form of MRAs and MRIAs which are "privately issued by regulators when they find controls or systems that aren't up to standards."

238.   Despite having been warned directly by the Company's primary regulators that Citigroup's risk and control infrastructure was noncompliant with regulatory standards and legal obligations, Defendants made the deliberate choice to let the deficiencies linger for years to keep costs down and make the Company's efficiency ratio appear more favorable than it otherwise would have been.  According to *Business Insider's* September 15, 2020 report, rather than address the issues, Citigroup had "multiple [MRAs and MRIAs] long past due."  The regulators "were

annoyed with Citigroup's noncompliance across numerous issues and felt as if they weren't being heard."  But rather than fix the systems, "[t]he CEO [Corbat] who had made operating efficiency and return-on equity a hallmark of his strategy was often reluctant to spend the money or dedicate enough people to fix a problem the right way."

239.    The "private[] press[ure]" that regulators applied directly to "Citigroup and Mr. Corbat to fix [Citigroup's] risk systems" cannot be squared with Citigroup's and Corbat's public representations that Citigroup had "made the necessary investments in our compliance, risk, and control functions," that Citigroup was "operating above every one of our regulatory requirements," and that investors should recognize the strength of the Company's risk management because "dogs [*i.e.*, regulators] haven't barked."  That Defendants made these public proclamations while the Company's regulators were privately telling Corbat and the Citigroup and Citibank Boards the opposite is the definition of scienter.

240.    The findings and remedial actions ordered by the 2020 Enforcement Orders issued by the Fed and the OCC further demonstrate that Defendants knew of the deficiencies.  The Fed explicitly stated that "Citigroup has not adequately remediated the longstanding enterprise-wide risk management and controls deficiencies ***previously identified*** by the Federal Reserve," including deficiencies dating back to at least 2013 and 2015.  (Fed Cease and Desist Order at 2.) The Fed further described how the Citigroup Board failed to take appropriate remedial action regarding the "previously identified" deficiencies.  Specifically, the Fed ordered that Citigroup explain the "actions that the board of directors will take to hold senior management accountable for executing effective and sustainable remediation plans by committed deadlines" and "to ensure senior management improves, and thereafter maintains, effective and independent enterprise-wide risk management."  (*Id.* ¶¶2(a)-(c).)  This means that Citigroup's "board of directors" and "senior

management" had not been "executing effective and sustainable remediation plans by committed deadlines" or "maintain[ing] effective and independent enterprise-wide risk management" despite being aware of the issues throughout the Class Period.

241.    The OCC likewise found that "[f]or several years, [Citibank] has failed to implement and maintain an enterprise-wide risk management and compliance risk management program, internal controls, or a data governance program commensurate with the Bank's size, complexity, and risk profile."  (OCC Remediation Order Art. II ¶1.)  With respect to Citibank's internal controls, the OCC stated that Citibank still had not even "diagnose[d] the root cause(s) of the underlying issues that led to internal control related concerns *identified* by internal audit and/or federal regulators since 2017."  (*Id*. Art IX ¶1(a)(i).)  That the OCC found that Citibank had failed to sufficiently diagnose the "root cause(s)" of internal control issues "identified by [] federal regulators since 2017" constitutes, at least, severe recklessness.

242.    What's more, there is no question that the Fed and OCC previously communicated the deficiencies again raised in the 2020 Enforcement Orders to the Citigroup and Citibank Boards when the regulators identified the deficiencies, including for matters raised as early as 2012 (OCC) and 2013 (Fed), and continued to reiterate these same deficiencies in meetings and formal reports to the Citigroup and Citibank Boards throughout the Class Period.  The Fed and OCC supervisory processes require as much.

243.    Specifically, Fed and OCC guidelines require the regulators to provide the Citigroup and Citibank Boards with constant communication and formal written reports concerning identified deficiencies.  The Fed supervision manual requires that Citigroup undergo "continuous monitoring activities" in a number of areas, including "primary firmwide risk-management or control function."  (Fed BHC Supervision Manual § 1050.1.3.1.2.)  For such

supervisory activities, the Fed manual instructs that "[c]ommunication of supervisory findings to the organization's board of directors is an important part of the supervision of a banking organization" and that "the board be made aware of significant supervisory issues." (*Id.* § 1070.1.2.) "Federal Reserve examiners are expected to … communicate" both MRAs and MRIAs "to the board of directors." (*Id*. § 1070.1.2.2.)

244.    Similarly, the Fed conducted inspections of Citigroup and "assigned and communicated" ratings to Citigroup "on at least an annual basis, and more frequently as warranted," and provided these ratings and their components to Citigroup's "senior management and directors." (*Id.* §§ 1063.0.2, 1065.0.1.) Further, "[i]n conjunction with disclosing the ratings and their components to a holding company, examiners or supervisory officials," Fed officials "clearly explain[ed] what the ratings mean to the board of directors and management." (*Id*. § 1065.0.1.)

245.    In addition, to "enable the banking organization's board of directors … to understand the substance and status of outstanding MRIAs or MRAs," the Fed sent an 'annual roll-up report [that] summarizes the significant findings, based on outstanding MRIAs or MRAs, included in the reports of targeted reviews or other supervisory activities." (*Id.* § 1070.1.2.) For all MRAs and MRIAs, Citigroup's "board of directors is required to respond to the Reserve Bank in writing regarding corrective action taken or planned along with a commitment to corresponding time-frames," and is subject to mandatory supervisory follow-up where the Fed "must follow up on [MRAs and MRIAs] to assess progress and verify satisfactory completion." (*Id*. §§ 1070.1.2.1, 1070.1.2.2.)

246.    Like the Fed, OCC Guidelines require that "[t]he OCC maintain communication with boards throughout the supervisory cycle to discuss OCC examination results and other

matters."  "Deficiencies and excessive risks must be promptly communicated to the bank when they are identified either by sending a formal written communication to the board or by meeting with the board or management."  (BSP Handbook at 43.)  In the case of an MRA, the ***OCC "must communicate such concerns to management and the board when the concerns are discovered," which means the OCC must send a "formal written communication to the board," when "issuing an MRA*.*"***  (*Id*. at 43, 46-47.)

247.    At the end of each supervisory cycle, the OCC prepared an ROE that "summarizes supervisory activities, conclusions, and findings during the supervisory cycle."  (BSP Handbook at 43.)  The ROE "contains conclusions on … the adequacy of the BSA/AML compliance program," "discusses deficient risk management practices, violations, and excessive risks," and "details corrective actions to which bank management or the board has committed."  (LBS Handbook at 27.)  It also includes a specific section titled "Matters Requiring Attention" that describes "new MRAs and status updates for previously issued MRAs" and is intended to "focus[] the board's attention on deficient practices warranting the board's immediate acknowledgment and oversight."  (BSP Handbook at 62.)  OCC Guidelines require that ***"[t]he OCC must provide an ROE to the board at least once during each supervisory cycle."***  (*Id.* at 43.)  And the OCC expects that every director on Citibank's Board "should thoroughly review" every ROE and ***sign the ROE "to show[] that he or she has personally reviewed the entire ROE."***  (*Id.* at 60, 62.)  The OCC further expects that, "if the board is not in substantial agreement with the contents and conclusions" of the ROE, the board should request a meeting with the OCC that includes senior management. (*Id.* at 60.)

248.    In addition to written documents, Fed and OCC examiners are required to personally meet with Citigroup and Citibank senior management and Boards for every

examination and directly convey their findings.  The OCC requires that a large national bank like Citibank "must receive a full-scope, on-site examination" every twelve months.  (*Id.* at 12-13.) "Because of the vast—and in some cases global—operating scope of large banks, the OCC assigns examiners to work full time at the largest and most complex banks.  This enables the OCC to maintain an ongoing program of risk assessment, monitoring, and communications with bank management and directors.  An examiner-in-charge (EIC) is assigned full time to each midsize and large bank to provide day-to-day supervision with the help of teams of examiners."  (LBS Handbook at 2.)  In Citibank's case, based on information and belief, the OCC examiners are physically present at Citibank's headquarters where they have permanent offices and are able to walk into senior management's offices without warning.

249.    More formally, however, each year, the EIC met with the Citibank Board and management to discuss "OCC's findings and conclusions, deficiencies and obtain bank's management's commitments for corrective action, [and] areas of greatest risk to the bank."  (BSP Handbook at 42*.*)  ***"Examiners must convey any significant decisions discussed with bank management during the exit meeting, when they meet with the board, and in written correspondence."*** (*Id.*)

250.    Similarly, following each inspection, the Fed also held an "exit meeting" with Citigroup's "management or management and board of directors" to "discuss key overall inspection findings, including preliminary composite and component numeric ratings."  (Fed BHC Supervision Manual § 1065.0.1; *see also* § 1045.0.6 n.7.)

251.    Given the robust communication mechanisms that the Fed and OCC utilize to alert supervised companies to deficiencies in their risk and control systems, Wells Fargo analyst Mike Mayo recognized on Citigroup's earnings call held on October 13, 2020 that "these problems

didn't come out overnight that the regulators identified."  Likewise, a Morgan Stanley analyst specifically probed Corbat's knowledge on the October 13, 2020 call, asking "this consent order might be a surprise to the street, but is it really a surprise to you?"  Corbat did not directly answer.

252.   This is because the 2020 Enforcement Orders were anything but a surprise to Corbat (and the other Defendants), as described above.  Corbat personally met with regulators at least dozens (and likely hundreds) of times during the Class Period, as reflected in the Company's Proxy Statements.  This includes "regular bank supervisory meetings" (as set forth in the Company's 2018 Proxy) as well as "89 meetings with regulators, central bankers, and government officials from the U.S. and other countries" in 2016; 47 such meetings in 2017; and 56 such meetings in 2018.  Corbat also personally visited the Company's "hub for our anti-money laundering efforts" in 2016, as he acknowledged during Citigroup's Annual Shareholder meeting held on April 26, 2016.  And Corbat remained personally involved in all aspect of Citigroup's and Citibank's risk management and control systems throughout the Class Period, even making personal phone calls to the lenders that refused to return the erroneous payments that Citigroup made with respect to the Revlon loan.

253.   Accordingly, the Fed and OCC consistently alerted Corbat and the rest of the Citigroup and Citibank Boards to the Company's longstanding deficiencies, noncompliance, or unsafe or unsound practices in formal reports and personal meetings that clearly explained regulators' findings and determinations.  That Defendants were acutely aware of the deficiencies— and Citibank Board members (many of which were also on the Citigroup Board, ¶¶54-55), "thoroughly review[ed]" and signed ROEs that detailed Citibank's "deficient risk management practices"—but continued to assure investors of the strength and functioning of the Company's risk management systems and internal controls, contributes to a strong inference of scienter.

### B. The $400 Million Civil Monetary Penalty Establishes Recklessness Or Knowledge

254.    The OCC assesses civil monetary penalties when the conduct is effectively intentional.  The OCC BSP Handbook states that *"[e]xaminers should propose CMPs for serious misconduct, including misconduct that is reckless, flagrant, willful, or knowing and that, because of its frequency or recurring nature, shows a general disregard for law or regulation."* (BSP Handbook at 51.)   Accordingly, the $400 million penalty supports a strong inference of scienter.

### C. The Officer Defendants And Director Defendants (All Members Of The Audit And Risk Management Committees) Claimed To Actively Oversee Citigroup's Risk Management And Internal Controls

255.    Throughout the Class Period, Citigroup repeatedly emphasized the Citigroup Board's and the Officer Defendants' duty and responsibility to oversee risk management, risk compliance, and internal controls.  Citigroup represented in its 2019 Annual Report that "Citigroup's Board of Directors actively oversees Citi's risk-taking activities and holds management accountable for adhering to the risk governance framework."

256.    Citigroup's Proxy Statements likewise discussed the Citigroup Board's purported oversight over the Company's risk management and internal controls.  The 2019 Proxy stated that "*[t]he Board and our Risk Committee engage deeply in the oversight of risk management practices* … always recognizing that, while Citi is in the business of taking risk, these risks must be understood, measured, monitored, and controlled."  Citigroup's Proxy Statements further stated that throughout the Class Period the *Citigroup Board "has an important oversight function with respect to compliance with applicable [legal] requirements"* and was "responsible for shaping corporate governance policies and practices, including adopting the corporate governance guidelines applicable to the Company and monitoring the Company's compliance with governance

policies and the guidelines."   These corporate governance policies and guidelines specifically include "maintaining compliance with the laws, rules, and regulations that govern the Company's businesses."

257.    The Citigroup Board was specifically attuned to the Company's prior regulatory failures and remediation efforts, while failing to take the necessary and appropriate actions to address the problems.  Citigroup explained in its 2020 Proxy Statement that "the ***Board remains deeply focused*** on Citi making substantial progress towards the termination of outstanding enforcement orders and on other remediation projects, recognizing and expecting that this progress will continue to require a substantial commitment of time and resources."

258.    The Director Defendants, through their "active[] overs[ight]" over Citigroup's risk governance framework and "deep[] focus" on addressing "outstanding enforcement orders and on other remediation projects," knew, or were severely reckless in not knowing, the risk management and internal control deficiencies that regulators had repeatedly identified and communicated to the Citigroup and Citibank Boards, including through consent orders, since 2013.

259.    The Citigroup Board also established a Risk Management Committee and Audit Committee that provided Defendants with even greater knowledge of the Company's risk management and control deficiencies.

260.    The Risk Management Committee's charter requires that it review and approve Citigroup's Risk Governance Framework.  According to Citigroup's 2017 Annual Report, Citigroup's Risk Governance Framework "consists of the policies, procedures, and processes through which Citi identifies, measures, manages, monitors, reports and controls risks across the Company."   The charter further requires the Risk Management Committee to "[e]valuate the adequacy of the Risk Management function" and "review its independence and authority."

Additionally, the Risk Management Committee has the responsibility to "[r]eview the adequacy and frequency of risk reporting to the [Citigroup] Board." Further, "[i]n consultation with the Audit Committee," the Risk Management Committee is responsible for "review[ing] and discuss[ing] with Management, at least annually: the key guidelines and policies governing Citigroup's significant processes for risk assessment and risk management."

261. Significantly, according to Citigroup's 2020 Proxy, the Risk Management Committee established a Data Quality Subcommittee in 2016 to actively oversee "data governance, data quality, and data integrity." The Data Quality Subcommittee existed from its establishment in 2016 throughout the remainder of the Class Period and met seven times in 2016, ten times in 2017, nine times in 2018, twelve times in 2019, and twelve times in 2020.

262. Through these oversight and reporting mechanisms, the Risk Management Committee had actual knowledge of, or with severe recklessness disregarded, Citigroup's risk management and internal control deficiencies. The Fed Cease and Desist Order identified "significant ongoing deficiencies in implementation and execution by Citigroup with respect to various areas of risk management and internal controls, including for data quality management" (at 1). These are the precise areas for which the Risk Management Committee stated it was responsible and reviewed and evaluated annually.

263. The OCC Remediation Order likewise found that Citibank had "longstanding deficiencies and unsafe or unsound practices in the areas of risk management, internal controls, and data governance" (Art. II ¶5), including "data quality" and "risk data aggregation and management and regulatory reporting" (Art. II ¶4). It also found that "[f]or several years" Citibank "fail[ed] to establish an effective risk governance framework" and its "enterprise-wide

risk management policies, standards, and frameworks" "fail[ed]" to "adequately identify, measure, monitor, and control risks." (Art. II ¶2(b)-(c).)

264.    In addition, the OCC Remediation Order found that Citibank's "risk governance framework" and "enterprise-wide risk management policies, standards, and frameworks" were "deficient," "noncomplian[t]," or "unsafe or unsound" "[f]or several years." (Art. II ¶¶1 and 2, 2(b)-(c).)  It further found that these failures "contributed to violations of law and regulation and continuous noncompliance with [Appendix D]," including the "violations of laws and regulations and the OCC assessed civil money penalties in 2019 based specifically on violations of the Fair Housing Act . . . and in 2020 based specifically on violations of the Flood Disaster Protection Act." (Art. II ¶7.)  That the Risk Management Committee was specifically tasked with reviewing and approving the Company's Risk Governance Framework that the Fed and OCC deemed unsafe or unsound and to suffer from "significant" and "ongoing" deficiencies that "contributed to violations of law" for a period of "several years" supports a strong inference of scienter.

265.    With respect to the Audit Committee, its charter requires it to oversee the Company's "Risk Assessment and Risk Management."   "In consultation with the Risk Management Committee," the Audit Committee is responsible for "review[ing] and discuss[ing] with management, at least annually: the key guidelines and policies governing Citigroup's significant processes for risk assessment and risk management."  The Audit Committee is also responsible "[w]ith respect to operational risk, [for] review[ing] with management matters related to the effectiveness of Citigroup's control environment and the status of corrective actions."

266.    The Audit Committee also possesses "Compliance and Regulatory Oversight Responsibilities."  According to its charter, it is responsible for "[r]eview[ing] and discuss[ing] with management, at least annually, the implementation and effectiveness of each of the

Company's compliance … programs" including "the effectiveness of the Company's anti-money laundering compliance program."  Significantly, the charter explains that the Audit Committee receives regular reports or briefings on: (a) "the schedule and results of significant regulatory examinations … including the nature and status of corrective actions;" (b) "significant issues that potentially create regulatory attention, including briefings on business decisions or significant issues that arise in areas on which the regulators are focused or that otherwise generate regulatory scrutiny or actions;" (c) "the key controls and processes in specific business or functional areas, in particular with respect to areas that are the subject of regulatory concern;" and (d) "compliance with regulatory internal control and compliance reporting requirements."

267.   Further, the Audit Committee is responsible for "[o]versee[ing] and receiv[ing] reports on ongoing regulatory projects, including regular updates on significant long-term projects being implemented in response to particular regulatory issues or concerns."  The charter also requires the Audit Committee to ensure "that appropriate actions and other measures are taken when compliance failures are identified, including disciplinary actions for serious compliance failures."  And the Audit Committee is required to "[a]nnually review and approve management's evaluation of the effectiveness of Citigroup's systems and processes used to calculate risk-based capital requirements."

268.   Through these oversight and reporting mechanisms, the Audit Committee had actual knowledge of, or with severe recklessness, disregarded Citigroup's risk management, compliance risk, and internal control deficiencies.  The Fed Cease and Desist Order "identified significant ongoing deficiencies in implementation and execution by Citigroup with respect to various areas of risk management and internal controls, including for data quality management and regulatory reporting, compliance risk management, capital planning, and liquidity risk

management," which is precisely what the Audit Committee is required to oversee and review, and for which it received regular reports and updates (at 1).

269.    Despite the Audit Committee's purported oversight over these areas, the Fed Cease and Desist Order specifically determined that "Citigroup has not adequately remediated the longstanding enterprise-wide risk management and controls deficiencies previously identified by the Federal Reserve, including in the areas … addressed in (i) the Consent Order issued by the Board of Governors on March 21, 2013 to remediate outstanding deficiencies in Citigroup's anti-money laundering compliance program; and (ii) the Consent Order issued by the Board of Governors on May 20, 2015 to remediate outstanding deficiencies in Citigroup's compliance and control infrastructure relating to its foreign exchange program and designated market activities" (at 2).

270.    The OCC Remediation Order likewise found that Citibank had "longstanding deficiencies and unsafe or unsound practices in the areas of risk management, [and] internal controls," and that "[f]or several years" Citibank "failed to implement and maintain an enterprise wide risk management and compliance risk management program … commensurate with the Bank's size, complexity, and risk profile." (Art. II ¶¶1, 2(b)-(c) and 5.)  What's more, the OCC Remediation Order "determined that Board and senior management oversight is inadequate to ensure timely, appropriate actions to correct the serious and longstanding deficiencies and unsafe or unsound practices in the areas of risk management, internal controls, and data governance at the Bank." (Art. II ¶5.)

271.    The OCC Remediation Order further found that Citibank's "risk governance framework" and "enterprise-wide risk management policies, standards, and frameworks" were "deficient[t]," "noncompliant[t]," or "unsafe or unsound" "[f]or several years."  (Art. II ¶¶1 and 2,

2(b)-(c)).  And it found that these failures "contributed to violations of law and regulation and continuous noncompliance with [Appendix D]," including the "violations of laws and regulations and the OCC assessed civil money penalties in 2019 based specifically on violations of the Fair Housing Act . . . and in 2020 based specifically on violations of the Flood Disaster Protection Act" (Art. II ¶7).

272.    That the Audit Committee is specifically tasked with "reviewing … at least annually, the implementation and effectiveness of each of the Company's compliance programs," including specifically "the effectiveness of the Company's anti-money laundering program," which the Fed Cease and Desist Order stated had been deficient since 2013, supports a strong inference of scienter.  Further, that the Audit Committee is tasked with ensuring "that appropriate actions and other measures are taken when compliance failures are identified, including disciplinary actions for serious compliance failures," further supports a strong inference of scienter in view of the OCC Remediation Order's determination "that Board and senior management oversight is inadequate to ensure timely, appropriate actions to correct the serious and longstanding deficiencies and unsafe or unsound practices in the areas of risk management, internal controls, and data governance at the Bank"  (Art. II ¶5).  And that the 2020 Enforcement Orders identified multiple other consent orders that Citigroup and Citibank failed to adequately address, together with the longstanding, ongoing, and pervasive deficiencies across Citigroup's entire risk management, internal control, and compliance framework, provides even additional support for a strong inference of scienter.

273.    In addition to the Risk Management and Audit Committees, Citigroup's Board received detailed information from other units concerning the risk management and internal control failures addressed by the 2020 Enforcement Orders.  According to Citigroup's 2018

Annual Report, Citigroup directors also "review reports prepared by" Citigroup's "Independent Compliance Risk Management" organization and "Internal Audit" function.

274.    The Company's Internal Audit function was intended to "provide[] independent assurance to the Citigroup Board of Directors, the Audit Committee of the Board, senior management and regulators regarding the effectiveness of Citi's governance and controls designed to mitigate Citi's exposure to risks and to enhance Citi's culture of compliance and control." (2018 10-K at 61, *see also* 2019 10-K at 60.)  Relatedly, the "Chief Auditor reports functionally to the Chairman of the Citigroup Audit Committee and administratively to the CEO of Citigroup," and "Internal Audit's responsibilities are carried out independently under the oversight of the Audit Committee." (2018 10-K at 61, 2019 10-K at 60.)

275.    Critically, the OCC Remediation Order stated that Citibank must ensure that there are "internal controls," "[p]rocesses" in place to "[p]erform analyses (or assess analyses previously performed) to diagnose the root cause(s) of the underlying issues that led to internal control related concerns identified by internal audit and/or federal regulators since 2017." (Art. IX ¶1(a)(1).) That neither Citigroup nor Citibank had even "diagnose[d] the root cause(s)" of the problems that federal regulators and/or internal audit "identified …since 2017" demonstrates a severe degree of recklessness and supports a strong inference of scienter.

276.    With respect to "Independent Compliance," Citigroup's Independent Compliance Risk Management Program reported directly to "the Citigroup Board of Directors … on the effectiveness of the processes and standards implemented to manage compliance risk." (2017 10-K at 116.)

277.    Citigroup also explained that the Citigroup Board received specific reports from Citigroup's Chief Risk Officer concerning risk management and compliance risks.  Citigroup's

Proxy Statements stated that the Citigroup Board received a "risk report from the Chief Risk Officer" at "each regularly scheduled Board meeting" with respect to "the Company's approach to management of major risks, including management's risk mitigation efforts." At all relevant times, Citigroup's Chief Risk Officer reported to Corbat and the Company's Risk Management Committee. According to Citigroup's 2018 Annual Report, "[t]he Chief Risk Officer ha[d] regular and unrestricted access to the Risk Management Committee … and also to the Citigroup Board of Directors to address risks and issues identified through Risk's activities."

278. The types of information the Chief Risk Officer, as well as Independent Compliance and Internal Audit, prepared for and disseminated to the Citigroup Board are directly related to the longstanding and serious deficiencies in Citigroup's risk management and internal controls that the Fed and OCC raised in the 2020 Enforcement Orders (and previously raised years ago), further supporting a strong inference of scienter.

279. The CFO (Gerspach and Mason) "chairs or co-chairs several management committees that serve as key governance and oversight forums for business activities." The CFO also leads "Finance and Risk Infrastructure," which is "a Citi global function that was formed in April 2016" to "globally implement common data and data standards, common processes and integrated technology platforms as well as integrate infrastructure activities across both Finance and Risk." The CFO also leads Citigroup's "Finance" function which is responsible for the Company's "capital planning processes."

280. With respect to Gerspach, Citigroup's 2018 Proxy stated that he "continues to lead advances . . . with Citi's Risk Management function and systems that monitor risk." Likewise, the Company's 2020 Proxy stated with respect to Mason that he "led elements of the continuous company-wide efforts to upgrade infrastructure and controls." That Gerspach and Mason were

directly involved in leading purported "advances" and "upgrade[s]" to Citigroup's risk management and internal controls while the Fed and OCC were directly communicating to Citigroup and Citibank that those same systems failed to satisfy legal requirements contributes to a strong inference of scienter.  And that Gerspach and Mason were responsible for Citigroup's capital planning process when the Fed identified in its 2020 consent order "significant ongoing deficiencies in implementation and execution by Citigroup with respect to various areas of . . . capital planning," and that the Company had not "adequately remediated the longstanding deficiencies previously identified by the Federal Reserve, including in the areas described above" (which includes "capital planning"), further supports an inference of scienter.

281.    Citigroup's 2018 Annual Report likewise stated that the Company's CFO reports directly to the CEO and "has regular and unrestricted access to the full Citigroup Board of Directors as well as to the Audit Committee of the Board of Directors."  Further, the CFO "is responsible for establishing a strong control environment over Citi's financial reporting processes consistent with [COSO]."  The CFO evaluates and certifies the effectiveness of Citigroup's DCP for each quarterly and annual reporting period.  And the CFO reports to the auditors and Audit Committee "[a]ll significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting."  That the Fed identified "significant ongoing deficiencies" "in risk management and internal controls" and that, either those were significant deficiencies (i) in DCP or ICFR, or (ii) substantially overlap with DCP or ICFR further supports a strong inference of scienter for Gerspach and Mason.  As discussed below (*see infra* section VI.B.3), Citigroup's ICFR and DCP were not effective because the multitude of deficiencies identified by the Fed and the OCC constituted a "combination of deficiencies," which amounts to a material weakness.

**D.** **Defendants Had A Legal Duty To Ensure Adequate Oversight Over Risk Systems**

282.     Fed and OCC regulations, as well as the prior consent orders issued by the Fed and OCC, obligated Defendants to oversee the effective functioning of Citigroup's and Citibank's risk management framework.  The Fed's Regulation YY (Enhanced Prudential Standards), and Section 252.33 in particular (12 C.F.R. §252.33) obligated Citigroup to implement an effective "risk-management framework" and establish and maintain a "risk committee" with "a formal written charter that is approved by the bank holding company's board of directors."  Regulation YY further required that the "risk committee" have "responsibility for the risk-management policies of the bank holding company's global operations and oversight of the operation of the bank holding company's global risk-management framework," and "[r]eport directly to the bank holding company's board of directors."

283.     With respect to Citibank, Appendix D obligated the Citibank Board to oversee Citibank's risk governance framework.  Specifically, Appendix D states that "[e]ach member of a covered bank's board of directors should oversee the covered bank's compliance with safe and sound banking practices.  The board of directors should also require management to establish and implement an effective risk governance framework that meets the minimum standards described in these Guidelines."  Appendix D further states that "[a] covered bank's board of directors should actively oversee the covered bank's risk-taking activities and hold management accountable for adhering to the risk governance framework."

284.     Defendants were also obligated to oversee the remediation of the violations that the Fed and OCC raised in prior consent orders.  For instance, the Fed 2013 Consent Order issued against Citigroup with respect to AML deficiencies required that the Citigroup Board submit written progress reports every quarter to the Fed "detailing the form and manner of all actions

taken to secure compliance" with that consent order, demonstrating that the Citigroup Board was responsible for remaining apprised of the remediation efforts and overseeing the remediation efforts itself.  Likewise, the Fed 2015 Consent Order issued against Citigroup with respect to the Company's FX trading businesses required that senior management report to the Citigroup Board "on the status and results of measures taken, or to be taken, to correct identified deficiencies and to comply with this Order and to ensure the ongoing efficacy of Citigroup's overall program."

285.    That the Citigroup and Citibank Boards had a legal duty to oversee the effective functioning of Citigroup's and Citibank's risk management framework and the effective remediation of prior consent orders but failed to do so for years contributes to a strong inference of scienter.

### E.    The Deficiencies, Noncompliance With Law And Regulations, And Unsafe Or Unsound Practices Were Longstanding, Pervasive, And Remained Even After Citigroup Stated It "Dove Deeply" And Ameliorated The Issues

286.    As described above, the Fed and the OCC sanctioned Citigroup and Citibank for failing to remedy pervasive risk management and internal control deficiencies that existed since at least as early as 2013, that were the subject of prior consent orders, and which Corbat, Gerspach, Mason and the Citigroup Board had a legal obligation to monitor.

287.    As also described above, Citigroup described how its "Board of Directors actively oversees Citi's risk taking activities," that "prudent risk management was top of mind for both management and the Board" and how "[t]he Board and our Risk Committee engage deeply in the oversight of risk management practices."  What's more, when regulators issued consent orders during the Class Period, the Company assured investors that it was remediating the issues, was making the necessary investments in its risk and control infrastructure, and strengthening the processes that led to the lapses.  Indeed, Citigroup specifically represented in a letter signed by its Board of Directors in the 2019 Proxy that "[o]ur three lines of defense – the business lines, the

control functions, and internal audit – dove deeply and, where necessary, took proactive steps in critical risk areas."

288.     That such serious and pervasive deficiencies, noncompliance, or unsafe or unsound practices could remain for such an extended period of time—even after Citigroup purportedly "dove deeply" and was "actively oversee[ing] Citi's risk taking activities"— contributes to a strong inference that Defendants knew of the deficiencies, unsafe or unsound practices, and violations of law.  The Fed characterized the deficiencies as "significant" and "ongoing" with respect to "implementation and execution by Citigroup" and that the Company "has not adequately remediated the longstanding . . . deficiencies previously identified by the Federal Reserve" in the 2013 and 2015 consent orders.  The OCC likewise found that Citibank engaged in "violations of law and regulation and [was in] continuous noncompliance with 12 C.F.R. Part 30, Appendix D" and that "Board and senior management" failed to "correct the serious and longstanding deficiencies and unsafe or unsound practices in the areas of risk management, internal controls, and data governance at the Bank" that had been ongoing "[f]or several years."

### F.     Corbat's And Hu's Resignations Were Unexpected And Highly Suspicious

289.     The timing and circumstances of Corbat's and Hu's departure further supports a strong inference of scienter.  With respect to Corbat, his resignation announced in September 2020 was particularly unexpected because on October 24, 2019, *The Wall Street Journal* reported that he intended to remain in the CEO role "for at least three more years," or until at least October 2022.

290.     So suspicious were the timing and circumstances of Corbat's resignation that Citigroup attempted to obfuscate (at best) the true reasons for the departure—that Corbat was being forced to resign because of expected rebukes from the Fed and OCC—only for media outlets later to report the truth.

291.    Specifically, on September 10, 2020, approximately one month after Citigroup's accidental $900 million payment to lenders of Revlon, the Company unexpectedly announced that Corbat would resign effective February 2021.  Citigroup attempted to publicly spin the resignation into a typical planned event by telling *CNBC* that "[i]t has been Mike's intention to retire in 2021 since Jane was appointed president of Citi last year … Announcing his plans now allows ample time for a smooth CEO transition, which was important to Mike given that he did not benefit from one."

292.    Despite this message, media outlets and Wall Street analysts were surprised by the nature and timing of Corbat's resignation.  For instance, on the day of the announcement of Corbat's resignation, *CNBC* published an article describing the timing as "weird" and reported that "[e]xecutives who reported directly to Fraser had no idea the news would hit."  Similarly, Wells Fargo analyst Mike Mayo observed in a report published on September 10, 2020 that "the timing seems unusual and the news is unexpected - CEOs don't typically want to leave in the middle of a crisis, esp[ecially] if upside is pending."  And Piper Sandler analysts said that they were "surprised" by the announcement in a September 10, 2020 report.

293.    Then, just four days after Citigroup told investors that "[i]t has been Mike's intention to retire in 2021," on September 14, 2020, *The Wall Street Journal* reported that the OCC and the Fed were "preparing to reprimand Citigroup … for failing to improve its risk-management systems" and revealed that the "expected rebuke" "accelerated planning" for Corbat's departure.

294.    That Corbat resigned suddenly, unexpectedly, and well before October 2022 (as Corbat previously stated)—and that Citigroup obfuscated the true reasons for the resignation—contributes to a strong inference of scienter.

295. Hu's resignation further contributes to an inference of scienter. Hu became Citigroup's Chief Risk Officer in January 2013 and had been with the Company for 12 years. Citigroup announced his resignation on November 2, 2020, in the wake of the Fed and OCC consent orders issued on October 7, 2020.

296. Throughout the Class Period, Hu was responsible for overseeing and managing Citigroup's risk management and internal controls. He reported directly to Corbat and Citigroup's Risk Management Committee and had "regular and unrestricted access" to the Board of Directors and Risk Management Committee "to address risks and issues identified through Risk's activities." Further, in advance of every regularly scheduled Citigroup Board meeting, Hu drafted and disseminated to the Board a "risk report" that described "the Company's approach to management of major risks, including management's risk mitigation efforts." As such, Hu's management responsibilities and the information he prepared for and provided to the Citigroup Board were directly related to the significant and longstanding deficiencies that the OCC and Fed raised in the 2020 Enforcement Orders. That Hu resigned less than a month after the Fed and OCC rebuke contributes to a strong inference of scienter.

### G. Defendants' Fraud Was Motivated By Their Desire To Improve Citigroup's Efficiency Ratio

297. Defendants had a clear motive to violate the laws and regulations set forth in the OCC Remediation and the Fed Cease and Desist Orders: to slash costs and investments in risk management and regulatory compliance to reduce Citigroup's efficiency ratio, thereby increasing profitability and the Company's stock price and their compensation. *Business Insider* reported on September 15, 2020 that Corbat failed to prioritize fixing Citigroup's longstanding and systemic failings in the Company's risk controls despite significant pressure from regulators because he

"had made operating efficiency and return-on equity a hallmark of his strategy [and] was often reluctant to spend the money or dedicate enough people to fix a problem the right way."

298.    Corbat personally profited through increases in compensation due to increased profitability largely predicated on slashed costs that caused regulatory deficiencies, noncompliance, or unsound and unsafe practices.  On the first day that Corbat joined Citigroup in 2012, he proclaimed that he would be "extraordinarily focused on our efficiency ratios and our overall expense levels" given that Citigroup's stock price had lagged its peers for years.  The Company continued to repeat this same refrain for years leading up to and throughout the Class Period while insisting that those efforts would not come at the expense of Citigroup's risk management systems or internal controls.

299.    Analysts repeatedly focused on Citigroup's efficiency ratio, asked management questions about the Company's ability to meet efficiency ratio targets, and called for cuts to executive compensation when Citigroup missed the targets.  For instance, when Citigroup missed its efficiency ratio target for 2018, Wells Fargo analyst Mayo called for a cut in executive compensation.  In his report dated December 6, 2018 and titled "Cut to Exec Pay Could Meet Efficiency Target," he said: "If Citi's top 5 named Executive Officers receive no bonus in 2018 and only base salary, we estimate that Citi could meet its efficiency target."

300.    Mayo re-iterated his views on *CNBC* the next day and said that Citigroup needed to do "whatever it takes" to cut costs to meets its efficiency target. . . . Maybe that means reducing compensation, reducing the number of Ubers that they use, reducing travel, reducing holiday parties."  Mayo then called again for a cut in executive pay.  "You can reduce the bonus of the top five executives or you can reduce the bonus of the top 25 executives by 20 percent."

301.    Citigroup's motivation to improve its efficiency ratio by cutting costs so deeply that it impaired the effective functioning of the Company's risk and control systems—which is the precise opposite of how Citigroup stated it was prioritizing and making the necessary investments into those systems—further contributes to a strong inference of scienter.

### H.    Citigroup's Risk Management And Internal Control Systems Were Core Operations

302.    Citigroup's risk management systems and internal controls constituted core operations of the Company.  There is no set of systems that is more important to Citigroup than its risk management systems and internal controls.  Defendants repeatedly spoke throughout the Class Period about the importance of maintaining effective risk management and internal controls for Citigroup.

303.    In an internal memo to Citigroup staff dated August 10, 2020, Corbat analogized the Company's "controls and stronger infrastructure" to brakes on a car and how "it's the brakes that let you control the car."  Without the brakes, Citigroup would inevitably crash.  Maintaining effective risk management and internal control systems is critical for Citigroup's survival as well as the safety of the financial system as a whole, which is precisely why the Company is subject to strict Fed and OCC supervision.  On January 15, 2016, Corbat stated that "[w]e've also made the necessary investments in our compliance, risk, and control functions which are ***critical to maintaining our license to do business,"*** further demonstrating those functions' central roles in the Company's operations and their necessity to Citigroup's survival.

304.    What's more, Citigroup explicitly acknowledged in its Annual Reports throughout the Class Period that for both Citigroup and Citibank, "effective risk management is of primary importance to its overall operations."  The first page of Citigroup's 2019 Proxy (after the cover page and invitation to shareholders) was a letter issued by Citigroup's Board of Directors which

stated that it was "critical to the firm's success" that "[m]anagement also made progress on the regulatory front last year."  Defendant Mason stated on July 15, 2019 that sufficiently investing in the Company's risk infrastructure and controls is "critical to the long-term sustainability of the franchise."  Defendant O'Neill, Citigroup's former Chairperson, explained on April 24, 2018 that "risk management is the bedrock of banking."  And current Chairperson John C. Dugan (who also served as Comptroller of the Currency from 2005-2010) likewise recognized on April 16, 2019 that it was "absolutely critical" that Citigroup comply with Fed and OCC regulations.

305.    Given the importance of effective risk management and internal controls (and complying with the Fed and OCC regulations) to Citigroup's business, they constitute core operations and further support a strong inference of scienter.

I.    **Corporate Scienter**

306.    Citigroup possessed scienter for two independent reasons.  First, the Individual Defendants were senior executives and/or directors of Citigroup with binding authority over the Company and acted within the scope of their apparent authority.  The scienter of the Individual Defendants is imputed to the Company.

307.    Second, and independently, certain allegations herein establish Citigroup's corporate scienter based on (i) the state of mind of senior executives (other than the Individual Defendants) whose intent can be imputed to the Company, and/or on (ii) the knowledge of senior executives who approved the statements alleged herein despite knowing the statements' false and misleading nature.  Given the significance of Citigroup's risk management and internal controls to Citigroup's business, and the necessary involvement of numerous Citigroup departments and personnel—including risk, audit, and compliance personnel—additional executives unknown at this time and sufficiently senior to impute their scienter to Citigroup also knew of the fraudulent

scheme alleged herein.  Accordingly, it can be strongly inferred that senior executives at Citigroup possessed scienter such that their intent can be imputed to the Company.

308.    As-yet unidentified Citigroup senior executives also approved the false statements despite knowing of their false and misleading nature.  As alleged above, federal regulators had been pressuring Citigroup on a regular basis for years to fix the Company's deficient risk and control systems.  Federal regulators also exercised continuous supervision with examiners always on- site, engaged in ongoing discussions with senior management and the Boards, issued an annual Report of Examination, were required by regulation to report MRAs and MRIAs immediately, and held exit meetings all throughout the Class Period.  From this, it can be strongly inferred that senior executives at Citigroup approved the false and misleading statements in the Company's annual and quarterly SEC filings concerning the strength and functioning of Citigroup's risk and control systems, the effectiveness of Citigroup's DCP and ICFR (*see infra* section VI.B.3), the propriety of the Company's accounting under GAAP and Accounting Standards Codification ("ASC") 450 (*see infra* section VI.B.1.), and the completeness of Citigroup's disclosures under Item 303 (*see infra* section VI.B.2.), while knowing that those statements were materially false and misleading.

## VI.   ACTIONABLE FALSE AND MISLEADING STATEMENTS AND OMMISSIONS

309.    For the avoidance of doubt, all the statements and omissions alleged to be actionably false and misleading are included in this section titled "Actionable False And Misleading Statements And Omissions."  Plaintiffs are not alleging that any statements or omissions excluded from this section are actionably false and misleading.

A.      **Materially False And Misleading Statements**

1.      **Materially False And Misleading Statements In January 15, 2016 Press Release And Earnings Conference Call For 4Q 15**

310.    The Class Period begins on January 15, 2016.  Before the market opened on that day, Citigroup issued a press release announcing earnings for 4Q 15 in which Defendant Corbat stated that:

> *We have made sustainable investments not only in our capital planning process but also in the risk, control and compliance functions, which are critical to maintaining our license to do business. We have undoubtedly become a simpler, smaller, safer and stronger institution[.]"*

311.    The statement set forth in the immediately preceding paragraph was materially false and misleading because Citigroup had not "undoubtedly become a simpler, smaller, safer and stronger institution" and was not making "sustainable investments" in its "capital planning process [and] also in the risk, control and compliance functions" because,

(a)      According to the OCC Remediation Order:

i.      "for several years, the Bank has failed to implement and maintain an enterprise-wide risk management and compliance risk management program … commensurate with the Bank's size, complexity, and risk profile" (Art. II ¶1);

ii.      Citibank "fail[ed] to establish … independent risk management" and "fail[ed] … to adequately identify, measure, monitor, and control risks," as required by [Appendix D]," which constituted "deficiencies, noncompliance with [Appendix D], or unsafe or unsound practices with respect to the Bank's enterprise-wide risk management and compliance risk management program" (Art. II ¶2(a));

iii.      Citibank "fail[ed] to establish … independent risk management … as required by [Appendix D]," which constituted "deficiencies, noncompliance with [Appendix

D], or unsafe or unsound practices with respect to the Bank's data quality and data governance, including risk aggregation and management and regulatory reporting" (Art. II ¶4(a), (c));

           iv.      "Board and senior management oversight is inadequate to ensure timely, appropriate actions to correct the serious and longstanding deficiencies and unsafe or unsound practices in the areas of risk management" (Art. II ¶5);

           v.      Citibank had not provided adequate staffing and technology resources "to execute and sustain a safe and sound system of internal controls and risk management" (Art. X ¶1(a));

        (b)      The Fed Cease and Desist Order (i) "identified significant ongoing deficiencies in implementation and execution by Citigroup with respect to various areas of risk management and internal controls, including for data quality management and regulatory reporting, compliance risk management, capital planning, and liquidity risk management" (at 1); (ii) determined that "Citigroup has not adequately remediated the longstanding enterprise-wide risk management and controls deficiencies previously identified by the Federal Reserve, including in the areas described above and those addressed" in consent orders in 2013 and 2015 (at 2); (iii) ordered Citigroup "to determine the enhancements that are necessary to meet the risk management requirements set forth in Regulation YY … with respect to the following three items: capital planning, liquidity risk management, and compliance risk management" (¶ 3); and (iv) ordered Citigroup "to enhance its compliance risk management program" pursuant to a "written plan" acceptable to the Fed (¶5);

        (c)      as set forth in the article published by *Business Insider* on September 15, 2020, titled "The Real Reasons Behind Citigroup CEO Mike Corbat's Retirement," Citigroup "seldom took the time to harmonize technology systems" and instead relied on "a patchwork of

technology systems that didn't talk to one another;" and, in contrast to "many banks [that] have spent years improving their systems," Corbat "was often reluctant to spend the money or dedicate enough people to fix a problem the right way.

> **2.    Materially False And Misleading Statements During The January 15, 2016 Earnings Conference Call For 4Q 15**

312.    Also on January 15, 2016, Citigroup held its earnings conference call for 4Q 15 during which Defendant Corbat stated that:

> ***We've also made the necessary investments in our compliance, risk, and control functions which are critical to maintaining our license to do business.***

313.    The statement set forth in the immediately preceding paragraph was materially false and misleading because Citigroup had not "made the necessary investments in [its] compliance, risk, and control functions which are critical to maintaining [its] license to do business."

(a)    The "necessary investments," at a minimum, had to be sufficient to avoid the findings in Article II of the OCC Remediation Order, including that:

i.    "[f]or several years, the Bank has failed to implement and maintain an enterprise-wide risk management and compliance risk management program [and] internal controls…commensurate with the Bank's size, complexity, and risk profile" (Art. II ¶1);

ii.    the OCC identified "deficiencies, noncompliance with [Appendix D], or unsafe or unsound practices with respect to the Bank's enterprise-wide risk management and compliance risk management program" (Art. II ¶2);

iii.    the OCC identified "unsafe or unsound practices with respect to the Bank's internal controls, including, among other things, an absence of clearly defined roles and responsibilities and noncompliance with multiple laws and regulations" (Art. II ¶3);

iv.    Citibank had "serious and longstanding deficiencies and unsafe or unsound practices in the areas of risk management [and] internal controls" (Art. II ¶5);

> v.      the "Bank was in noncompliance with [Appendix D], and engaged in unsafe or unsound practices that were part of a pattern of misconduct" (Art. II ¶6);

> vi.      Citibank's "conduct also contributed to violations of law and regulation and continuous noncompliance with [Appendix D]" (Art. II ¶7).

(b)      The "necessary investments," at a minimum, had to be sufficient to avoid the "remedial actions" ordered in Article IV to "achieve compliance" with Articles VI through XII of the OCC Remediation Order, including that:

> i.      Citibank take "the actions that are necessary and appropriate to achieve compliance" with the Enterprise-Wide Risk Management Program, including, among other things, a "program in each front-line unit and independent risk management unit to measure, monitor, aggregate, limit and control risks consistent" with certain of the Bank's risk policies (Art. VI ¶¶1, 2(e));

> ii.      Citibank take "the actions that are necessary and appropriate to achieve compliance" with the Compliance Risk Management Plan, including, among other things, the "establishment of and adherence to policies, processes, and control systems within independent compliance risk management to assess, measure, aggregate, and limit regulatory compliance exposures on an ongoing basis commensurate with the risk profile and risk appetite of the Bank" (Art. VII ¶¶1, 2(c));

> iii.      Citibank "identify the number of staff along with the aggregate skill and expertise needed to execute and sustain a safe and sound system of internal controls and risk management," and "[e]nsure a robust staffing model that provides for ongoing monitoring of the Bank's aggregate staffing for the risk management related functions" (Art. X ¶¶1(a) & (d));

iv.      Citibank "[i]dentify the number and types of technology resources needed to execute and sustain a safe and sound system of internal controls and risk management for control functions," and "[e]nsure a robust resource model that provides for ongoing monitoring of the Bank's allocation of technology resources for control functions" (Art. X ¶¶2(a) & (c));

(c)      The "necessary investments," at a minimum, had to be sufficient to avoid the Fed Cease and Desist Order's determination that:

i.      "the most recent supervisory assessment issued by the Federal Reserve Bank of New York … identified significant ongoing deficiencies in implementation and execution by Citigroup with respect to various areas of risk management and internal controls, including for data quality management and regulatory reporting, compliance risk management, capital planning, and liquidity risk management" (at 1);

ii.      "Citigroup has not adequately remediated the longstanding enterprise-wide risk management and controls deficiencies previously identified by the Federal Reserve, including in the areas described above [in (i)] and those addressed in (i) the Consent Order issued by the Board of Governors on March 21, 2013 to remediate outstanding deficiencies in Citigroup's anti-money laundering compliance program and (ii) the Consent Order issued by the Board of Governors on May 20, 2015 to remediate outstanding deficiencies in Citigroup's compliance and control infrastructure relating to its foreign exchange program and designated market activities" (at 2).

(d)      The "necessary investments," at a minimum, had to be sufficient to avoid the Fed Cease and Desist Order which ordered Citigroup, with respect to risk management and internal controls, "to determine the enhancements that are necessary to meet the risk management

requirements set forth in Regulation YY … with respect to the following three items: capital planning, liquidity risk management, and compliance risk management" (¶3);

(e)     The "necessary investments," at a minimum, had to be sufficient to avoid the $400 million penalty assessed by the OCC CMP Order.

(f)     According to an article on September 14, 2020, in *The Wall Street Journal* titled "Regulators Prepare to Reprimand Citigroup for Failing to Improve Risk Systems," "[f]or years, regulators have privately pressed Citigroup and Mr. Corbat to fix the bank's risk systems," and "faulted Citi's management for not giving priority to the risk-management overhaul."  And according to an article in *Business Insider* on September 15, 2020 titled "The Real Reasons Behind Citigroup CEO Mike Corbat's Retirement," "[Corbat] who had made operating efficiency and return-on equity a hallmark of his strategy was often reluctant to spend the money or dedicate enough people to fix a problem the right way."

### 3.    Materially False And Misleading Statements In Citigroup's Form 10-K For 2015

314.    On February 26, 2016, Citigroup filed its Annual Report for 2015 on Form 10-K with the SEC ("2015 Annual Report").  The Individual Defendants who signed the 2015 Annual Report and made the misrepresentations are set forth in the chart in ¶55.  The 2015 Annual Report (at 2) stated that "[t]hroughout this report, 'Citigroup,' 'Citi' and 'the Company' refer to Citigroup Inc. and its consolidated subsidiaries," which includes Citibank.

315.    The 2015 Annual Report (at 65) stated that:

> ***Citi manages its risks through each of its three lines of defense: (i) business management, (ii) independent control functions and (iii) Internal Audit.  The three lines of defense collaborate with each other in structured forums and processes*** to bring various perspectives together and ***to steer the organization toward outcomes that*** are in clients' interests, create economic value and ***are systemically responsible.***

316.    The statements in bold in the paragraph immediately above were materially false and misleading (the non-bolded portions are provided for context) because,

(a)    the statement that "Citi manages its risks through each of its three lines of defense: (i) business management, (ii) independent control functions and (iii) Internal Audit," failed to disclose that, according to the OCC Remediation Order:

i.    Citibank "fail[ed] to establish effective front-line units and independent risk management as required by [Appendix D]," which constituted "deficiencies, noncompliance with [Appendix D], or unsafe or unsound practices with respect to the Bank's enterprise-wide risk management and compliance risk management program" (Art. II ¶2(a));

ii.    Citibank "fail[ed] to establish effective front-line units, independent risk management, internal audit, and control functions as required by [Appendix D]," which constituted "deficiencies, noncompliance with [Appendix D], or unsafe or unsound practices with respect to the Bank's data quality and data governance, including risk aggregation and management and regulatory reporting" (Art. II ¶4(a));

iii.    the failure to establish effective lines of defense contributed to "unsafe or unsound practices that were part of a pattern of misconduct" and "to violations of law and regulation and continuous noncompliance with [Appendix D]" (Art. II ¶¶6, 7).

(b)    "the three lines of defense" did not "collaborate with each other in structured forums and processes…to steer the organization toward outcomes that … are systemically responsible," but rather toward outcomes that were unsafe or unsound.  According to the OCC Remediation Order:

i.    the three lines of defense failed to be effective (Art. II ¶¶2(a), 4(a)), contributing to "unsafe or unsound practices that were part of a pattern of misconduct" and "to

violations of law and regulation and continuous noncompliance with [Appendix D]" (Art. II ¶¶6, 7);

> ii.      independent risk management was not "appropriately independent" (Art. VI ¶2(h)), such that the three lines of defense did not "collaborate with each other in structured forms or processes."

317.    The 2015 Annual Report (at 66) stated that Citigroup's:

> ***Compliance organization is designed to protect Citi not only by managing adherence to applicable laws, regulations***, and other standards of conduct, but also by promoting business behavior that is consistent with Citi's mission and value proposition, the principle of reasonable finance and Citi's compliance risk appetite.

318.    The statements in bold in the paragraph immediately above were materially false and misleading (the non-bolded portions are provided for context) because,

> (a)      the "Compliance organization" was not "designed to protect Citi … by managing adherence to applicable laws, regulations" according to the OCC Remediation Order and the Fed Cease and Desist Order, specifically:

> i.      Article VII of the OCC Remediation Order, addressing the remediation plan for Compliance Risk Management, required Citibank to "establish" the following policies, procedures and control systems (*i.e.*, they had not been established yet, rendering the "design" deficient, noncompliant with [Appendix D], or unsafe or unsound):

> 1.      "policies, processes, and control systems within front-line units to assess, measure, and limit regulatory compliance exposures on an ongoing basis commensurate with the risk profile and risk appetite of the Bank" (Art. VII ¶2(b));

> 2.      "policies, processes, and control systems within independent compliance risk management to assess, measure, aggregate, and limit regulatory compliance

exposures on an ongoing basis commensurate with the risk profile and risk appetite of the Bank"
(Art. VII ¶2(c));

3.      "procedures and processes designed to result in compliance
with laws, regulations, and Enterprise-wide corporate policies" (Art. VII ¶2(d));

4.      "procedures and processes to ensure that Enterprise-wide
corporate policies are timely updated on a periodic and as-needed basis to address changes in
applicable laws and regulations and to ensure the policies comply with the effective date of such
laws and regulations" (Art VII ¶2(e)).

ii.      The Fed Cease and Desist Order required Citigroup to "enhance its
compliance risk management program" and "submit a written plan" to the Fed that "shall include
the following seven items," (¶5), including the following five components:

1.      "a detailed analysis of the most material risk factors related
to U.S. laws and regulations applicable to Citigroup's operations and legal entities" (¶5(a));

2.      "an assessment of existing controls, including business line
controls and testing processes, to ensure Citigroup's enterprise-wide operations comply with U.S.
laws and regulations in the areas associated with the risk factors identified in subsection ([1])
above" (¶5(b));

3.      "measures to improve and maintain such controls in any area
where the assessment in subsection ([2]) above identifies deficiencies" (¶5(c));

4.      "improvements to the management information systems,
data, and reports provided to Citigroup's board of directors and senior management concerning
compliance risks, compliance with applicable U.S. laws and regulations, and the effectiveness and
functioning of the compliance risk management program" (¶5(d));

5.      "measures for managing and controlling Citigroup's compliance risks until the plan is implemented in full" (¶5(f));

(b)      the statements did not disclose that:

i.      Citigroup's "compliance risk management" program suffered from "significant ongoing deficiencies in implementation and execution by Citigroup," including with respect to "longstanding enterprise-wide risk management and controls deficiencies previously identified by the Federal Reserve" that "Citigroup has not adequately remediated" (Fed Cease and Desist Order at 1-2);

ii.      Citibank had "fail[ed] to establish effective … independent risk management … and control functions as required by [Appendix D]," (OCC Remediation Order Art. II ¶4(a)), which constituted "deficiencies, noncompliance with [Appendix D], or unsafe or unsound practices with respect to the Bank's enterprise-wide risk management and compliance risk management program" (*id*. Art. II ¶2(b));

iii.      "[f]or several years, the Bank has failed to implement and maintain [a] compliance risk management program … commensurate with the Bank's size, complexity, and risk profile" (*id*. Art. II ¶1);

iv.      the "OCC identified … deficiencies, noncompliance with [Appendix D], or unsafe or unsound practices with respect to the Bank's … compliance risk management system" (*id*. Art. II ¶2).

319.    The 2015 Annual Report stated (at 67) that:

Citi's Internal Audit function independently reviews activities of the first two lines of defense based on a risk-based audit plan and methodology approved by the Audit Committee of the Citigroup Board of Directors. ***Internal Audit also provides independent assurance to the Citigroup Board of Directors, the Audit Committee of the Board, senior management and regulators regarding the effectiveness of***

*Citi's governance and controls designed to mitigate Citi's exposure to risks and to enhance Citi's culture of compliance and control.*

320.     The statement in bold in the paragraph immediately above was materially false and misleading (the non-bolded portions are provided for context) because,

(a)     the audit function did not "provide[] independent assurance to the Citigroup Board of Directors, the Audit Committee of the Board, senior management and regulators regarding the effectiveness of Citi's governance and controls designed to mitigate Citi's exposure to risks and to enhance Citi's culture of compliance and control" because:

i.     according to the OCC Remediation Order, "inadequate reporting to the [Citibank] Board hinders its ability to provide effective oversight," and Citibank "Board and senior management oversight is inadequate to ensure timely, appropriate actions to correct the serious and longstanding deficiencies and unsafe or unsound practices in the areas of risk management, internal controls, and data governance at the Bank" (Art. II ¶5);

ii.     the OCC Remediation Order ordered Citibank to "perform analyses (or assess analyses previously performed) to diagnose the root cause(s) of the underlying issues that led to internal controls related concerns identified by internal audit and/or federal regulators since 2017" (Art. IX ¶1(a)(i));

iii.     according to the Fed Cease and Desist Order, the Citigroup Board needed to take actions "to execute its oversight," including actions to "ensure … internal audit findings are effectively remediated" (¶¶2, 2(b)).

(b)     the statements failed to disclose that "with respect to the Bank's data quality and data governance" Citibank "fail[ed] to establish effective … internal audit … functions as required by [Appendix D]," which constituted "deficiencies, noncompliance with [Appendix D],

or unsafe or unsound practices with respect to the Bank's enterprise-wide risk management and compliance risk management program" (OCC Remediation Order Art. II ¶4(a)).

321.    The 2015 Annual Report stated (at 68) that:

**Citigroup's Board of Directors oversees Citi's risk-taking activities.  To do so, directors review risk assessments and reports prepared by Risk, Compliance, Human Resources, Legal, Finance and Internal Audit and exercise independent judgment to question, challenge, and when necessary, oppose recommendations and decisions made by senior management that could cause Citi's risk profile to exceed its risk appetite or jeopardize the safety and soundness of the firm.**

322.    The statements in the paragraph immediately above were materially false and misleading because,

(a)    the statement that "Citigroup's Board of Directors oversees Citi's risk-taking activities" failed to disclose that the Citigroup Board of Directors did not adequately or effectively oversee Citigroup's risk-taking activities, specifically:

i.    according to the Fed Cease and Desist Order, the Citigroup Board needed to take actions "to execute its oversight," including actions to "ensure effective reporting to the board of directors that will enable it to oversee management's execution of the matters identified in this Order." (¶¶2, 2(d).)  The "matters identified in this Order" included "significant ongoing deficiencies in implementation and execution by Citigroup with respect to various areas of risk management and internal controls" and "longstanding enterprise-wide risk management and controls deficiencies."  (*Id.* at 1-2.);

ii.    according to the OCC Remediation Order, "inadequate reporting to the Bank's Board hinders its ability to provide effective oversight," and Citibank "Board and senior management oversight is inadequate to ensure timely, appropriate actions to correct the serious and longstanding deficiencies and unsafe or unsound practices in the areas of risk management, internal controls, and data governance at the Bank."  (Art. II ¶5.)

114

(b)      the statement that, "directors review reports prepared by Risk, Compliance, Human Resources, Legal, Finance and Internal Audit and exercise independent judgment to question, challenge, and when necessary, oppose recommendations and decisions made by senior management that could cause Citi's risk profile to exceed its risk appetite or jeopardize the safety and soundness of the firm," failed to disclose that:

i.      the Citigroup Board needed to take actions "to execute its oversight," including actions "to hold senior management accountable for executing effective and sustainable remediation plans by committed deadlines" and "ensure effective reporting to the board of directors that will enable it to oversee management's execution of the matters identified in this Order."  (Fed Cease and Desist Order ¶¶2, 2(a), 2(d).)  The matters identified in the Fed Cease and Desist Order included "significant ongoing deficiencies in implementation and execution by Citigroup with respect to various areas of risk management and internal controls" and "longstanding enterprise-wide risk management and control deficiencies." (*Id.* at 1-2.);

ii.      "inadequate reporting to the [Citibank] Board hinders its ability to provide effective oversight," and Citibank "Board and senior management oversight is inadequate to ensure timely, appropriate actions to correct the serious and longstanding deficiencies and unsafe or unsound practices in the areas of risk management, internal controls, and data governance at the Bank" (OCC Remediation Order Art. II ¶5);

iii.      "the [Citibank] Board and Audit Committee" needed to "describe" the actions they "will each take to further improve its oversight of senior management, including holding senior management accountable for implementing and maintaining the corrective action required by this Order," which further included "ensur[ing] that reports to the Board, the Audit

Committee, and senior management are transparent and comprehensive and contain thorough and complete analysis, including thematic analysis." (*Id.*, Art. XII ¶1(g)).

323.    The 2015 Annual Report (at 118-119) stated that:

*Citi manages adherence to its compliance risk appetite through the execution of its compliance program*, which includes governance arrangements, a policy framework, customer onboarding and maintenance processes, product development processes, transaction and communication surveillance processes, conduct- and culture-related programs, monitoring regulatory changes, and new products, services and complex transactions approval processes.

324.    The statement in bold in the paragraph immediately above was materially false and misleading (the non-bolded portions are provided for context) because,

(a)    it failed to disclose that Citigroup's "compliance risk management" program suffered from "significant ongoing deficiencies in implementation and execution by Citigroup," including with respect to "longstanding enterprise-wide risk management and controls deficiencies previously identified by the Federal Reserve" that "Citigroup has not adequately remediated" (Fed Cease and Desist Order at 1-2);

(b)    it failed to disclose that "[f]or several years, the Bank has failed to implement and maintain …[a] compliance risk management program … commensurate with the Bank's size, complexity and risk profile," and "the compliance risk management program" had a number of deficiencies, unsafe or unsound practices, or was not in compliance with Appendix D (OCC Remediation Order Art. II ¶¶1, 2);

(c)    it failed to disclose that the OCC Remediation Order set forth four sets of policies, standards and procedures that Citibank needed to "establish" and "adhere" to, which it had not, to meet compliance risk management requirements (Art. VII ¶¶2(b)-(e)).

325.    The 2015 Annual Report (at 62) stated that:

*Extensive compliance requirements can result in increased reputational and legal risks, as failure to comply with regulations and requirements, or failure to comply as expected, can result in enforcement and/or regulatory proceedings.*

\* \* \*

*Citi is Subject to Extensive Legal and Regulatory Proceedings, Investigations and Inquiries That Could Result in Significant Penalties and Other Negative Impacts on Citi, Its Business and Results and Operations.*

326.     The statements in the paragraph immediately above were materially false and misleading because either the risks identified and described as conditional or potential ("can result," "could result") were not conditional or potential, but instead had come to pass and were actual and existing as set forth in the OCC Remediation Order and the Fed Cease and Desist Order specifically below, or failed to disclose that,

(a)     the OCC Remediation Order found that:

i.     "[f]or several years, the Bank has failed to implement and maintain an enterprise-wide risk management and compliance risk management program [and] internal controls … commensurate with the Bank's size, complexity, and risk profile" (Art. II ¶1);

ii.     Citibank had "serious and longstanding deficiencies and unsafe or unsound practices in the areas of risk management [and] internal controls" (Art. II ¶5);

iii.     the "Bank was in noncompliance with [Appendix D] and engaged in unsafe or unsound practices that were part of a pattern of misconduct" (Art. II ¶6);

iv.     the "foregoing conduct [Article II ¶¶1-6] also contributed to violations of law and regulations and continuous noncompliance with [Appendix D]" (Art. II ¶7).

(b)     the Fed Cease and Desist Order determined that:

i.     the Fed "identified significant ongoing deficiencies in implementation and execution by Citigroup with respect to various areas of risk management and

internal controls, including data quality management and regulatory reporting, compliance risk management, capital planning, and liquidity risk management" (at 1);

ii.      "Citigroup has not adequately remediated longstanding enterprise-wide risk management and controls deficiencies previously identified by the Federal Reserve, including in the areas described above and those addressed" in consent orders in 2013 and 2015 (at 2).

(c)      According to an article published on September 14, 2020, in *The Wall Street Journal* titled "Regulators Prepare to Reprimand Citigroup for Failing to Improve Risk Systems," "[f]or years, regulators have privately pressed Citigroup and Mr. Corbat to fix the bank's risk systems," and "faulted Citi's management for not giving priority to the risk-management overhaul."  And according to an article in *Business Insider* on September 15, 2020 titled "The Real Reasons Behind Citigroup CEO Mike Corbat's Retirement,"  "[Corbat] who had made operating efficiency and return-on equity a hallmark of his strategy was often reluctant to spend the money or dedicate enough people to fix a problem the right way."

### 4.      Materially False And Misleading Statements During April 26, 2016 Annual Shareholder Meeting

327.     On April 26, 2016, Citigroup held its Annual Shareholder Meeting for 2016. During that meeting, Defendant O'Neill stated that:

> *I thought we had no significant control lapses unlike the year before where again the pay of Mike and his direct report was adjusted downward because of those.*

328.     The statement in the paragraph immediately above was materially false and misleading because Citigroup had experienced and was experiencing "significant control lapses" just like "the year before" according to:

(a)      the Fed Cease and Desist Order, which "identified significant ongoing deficiencies … with respect to various areas of risk management and internal controls," and

determined that "Citigroup has not adequately remediated the longstanding enterprise-wide risk management and controls deficiencies previously identified by the Federal Reserve," including those addressed in consent orders issued in 2013 and 2015 (at 1-2);

(b)     the findings set forth in Article II of the OCC Remediation Order, including, among others, that (i) "[f]or several years, the Bank has failed to implement and maintain an enterprise-wide risk management and compliance risk management program, [and] internal controls … commensurate with the Bank's size, complexity, and risk profile" (¶1); (ii) the OCC identified numerous "deficiencies, [instances of] noncompliance with [Appendix D], or unsafe or unsound practices with respect to the Bank's enterprise-wide risk management and compliance risk management program" (¶2); (iii) "the Board and senior management oversight is inadequate to ensure timely, appropriate actions to correct the serious and longstanding deficiencies and unsafe or unsound practices in the areas of risk management, internal controls, and data governance at the Bank" (¶5); (iv) "the Bank was in noncompliance with [Appendix D] and engaged in unsafe or unsound practices that were part of a pattern of misconduct" (¶6); and (v) the "foregoing conduct also contributed to violations of law and regulation and continuous noncompliance with [Appendix D]" (¶7).

### 5.     Materially False And Misleading Statements During The Bank Of America Future of Financials Conference On November 16, 2016

329.    On November 16, 2016, Defendant Gerspach presented at the Bank of America Future of Financials Conference where an analyst asked him the following question:

> ERIKA NAJARIAN: So, just to follow-up on that.  John, a few big bank management teams are asked this question. As you're thinking about budgeting for 2017 and the budget that is for risk and compliance, is it too early to ratchet back that budget?

330.    In response, Gerspach stated:

JOHN GERSPACH: *No. I'd say, we're very, I think Jamie captured it well. Which is that what we're seeing now is a plateauing of the budget that's going into risk and compliance. So, you're not seeing that same rate of growth.* But similar to what Jamie was talking about, now as we think about what's the next phase, the next phase isn't necessarily just wholesale, pull the expenses out, it's actually taking some of those technology budgets and then figuring out, and also doing some process reengineering, and figuring out how to lower the cost that we have. Still do the same things, but at a lower cost.

331.    The statements in bold by Defendant Gerspach in the paragraph immediately above were materially false and misleading (the non-bolded portions are provided for context) because they failed to disclose that the budget "for risk and compliance" was "plateauing" and "not seeing that same rate of growth" because, as set forth in the OCC Remediation Order, (i) Citibank was not investing the financial resources necessary to "implement and maintain an enterprise-wide risk management and compliance risk management program, internal controls, or data governance program commensurate with the Bank's size, complexity, and risk profile" (Art. II ¶1); (ii) the financial resources dedicated by Citibank were so woefully inadequate that the OCC ordered Citibank to develop a DGP and report any discrepancies between the "financial resources allocated" and the "financial resources actually expended" (Art. V ¶2(b)(iii)); (iii) the Bank was not taking "timely, appropriate actions to correct the serious and longstanding deficiencies and unsafe or unsound practices in the areas of risk management, internal controls, and data governance" (Art. II ¶5); and (iv) the "system applications and information technology infrastructure" were so woefully deficient that the OCC ordered a "thorough redesign of data architecture, re-engineering of processes and modernization of system applications and information technology infrastructure" (Art. V ¶2(d)).

### 6.    Materially False And Misleading Statements In Citigroup's Form 10-K For 2016

332.    On February 24, 2017, Citigroup filed its Annual Report for 2016 on Form 10-K with the SEC ("2016 Annual Report"). The Individual Defendants who signed the 2016 Annual

Report and made the misrepresentations are set forth in the chart in ¶55.  The 2016 Annual Report (at 2) stated that "[t]hroughout this report, 'Citigroup,' 'Citi' and 'the Company' refer to Citigroup Inc. and its consolidated subsidiaries," which includes Citibank.

333.    The 2016 Annual Report (at 64) stated that:

> ***Citi's firm-wide Risk Governance Framework consists of the policies, procedures, and processes through which Citi identifies, measures, manages, monitors, reports, and controls risks across the firm.***

334.    The statements in the paragraph immediately above were materially false and misleading because, "Citi's firm-wide Risk Governance Framework" did not "identif[y]… measure[]…monitor[] … and control[] risks across the firm," and the risk governance framework was not effective, according to the OCC Remediation Order and the Fed Cease and Desist Order, specifically,

(a)    Citibank "fail[ed] to establish an effective risk governance framework as required by [Appendix D]," which constituted "deficiencies, noncompliance with [Appendix D], or unsafe or unsound practices with respect to the Bank's enterprise-wide risk management and compliance risk management program" (OCC Remediation Order Art. II ¶¶2, 2(b));

(b)    the "Bank's enterprise-wide risk management policies, standards, and frameworks" "fail[ed]" to "adequately identify, measure, monitor, and control risks" (*id*. Art. II ¶2(c));

(c)    "[f]or several years, the Bank has failed to implement and maintain an enterprise-wide risk management and compliance risk management program … commensurate with the Bank's size, complexity, and risk profile" (*id*. Art. II ¶1);

(d)    "the Bank was in noncompliance with [Appendix D] and engaged in unsafe or unsound practices that were part of a pattern of misconduct" (*id.* Art. II ¶6);

(e)      "Citigroup has not adequately remediated the longstanding enterprise-wide risk management … deficiencies previously identified by the Federal Reserve," "with respect to … capital planning, liquidity risk management and compliance risk management" as required by Regulation YY.  (Fed Cease and Desist Order at 2 & ¶3).

335.    The 2016 Annual Report (at 64) stated that:

*The Risk Governance Framework has been developed in alignment with the expectations of the Office of the Comptroller of the Currency (OCC) Heightened Standards.  It is also aligned with the relevant components … of the Federal Reserve's Enhanced Prudential Standards for Bank Holding Companies and Foreign Banking Organizations.*

336.    The statements in the paragraph immediately above were materially false and misleading because,

(a)      according to the OCC Remediation Order, the "Risk Governance Framework" was not "developed in alignment with the expectations of the Office of the Comptroller of the Currency (OCC) Heightened Standards [Appendix D]," specifically:

i.      Citibank "fail[ed] to establish an effective risk governance framework as required by [Appendix D], which constituted "deficiencies, noncompliance with [Appendix D], or unsafe or unsound practices with respect to the Bank's enterprise-wide risk management and compliance risk management program" (Art. II ¶¶2, 2(b));

ii.      "[f]or several years, the Bank has failed to implement and maintain an enterprise-wide risk management and compliance risk management program…commensurate with the Bank's size, complexity, and risk profile" (Art. II ¶1);

iii.      Citibank "was in noncompliance with [Appendix D] and engaged in unsafe or unsound practices that were part of a pattern of misconduct" (Art. II ¶6);

iv.      "The foregoing conduct also contributed to violations of law and regulation and continuous noncompliance with [Appendix D]" (Art. II ¶7).

(b)      according to the Fed Cease and Desist Order, the "Risk Governance Framework" was not "aligned with the relevant components … of the Federal Reserve's Enhanced Prudential Standards for Bank Holding Companies [Regulation YY, 12 C.F.R. §252.33]," which sets forth the "[r]isk management and risk committee requirements," because:

i.      the Fed "identified significant ongoing deficiencies in implementation and execution by Citigroup with respect to various areas of risk management and internal controls, including for data quality management and regulatory reporting, compliance risk management, capital planning, and liquidity risk management" (at 1);

ii.      "Citigroup has not adequately remediated longstanding enterprise-wide risk management and controls deficiencies previously identified by the Federal Reserve, including in the areas described above [in "i"] and those addressed" in consent orders in 2013 and 2015 (at 2);

iii.      the Fed ordered Citigroup to "conduct a gap analysis … to determine the enhancements that are necessary to meet the risk management requirements set forth in Regulation YY … with respect to the following three items: capital planning, liquidity risk management, and compliance risk management," and instructed that "[t]he Gap Analysis shall identify where Citigroup's risk management policies, procedures, practices, processes, and internal controls are not compliant with Regulation YY with regard to the[se] areas" (¶¶3, 3(a));

iv.      "consistent with section 252.33(a) of Regulation YY…Citigroup is required to maintain an enterprise-wide risk management program designed to identify and manage risks across the consolidated organization" (at 1).

337.    The 2016 Annual Report (at 65) stated that:

***Citi manages its risks through each of its three lines of defense: (i) business management, (ii) independent control functions and (iii) Internal Audit.  The***

***three lines of defense collaborate with each other in structured forums and processes*** to bring various perspectives together and ***to steer the organization toward outcomes that*** are in clients' interests, create economic value and ***are systemically responsible.***

338.     The statements in bold in the paragraph immediately above were materially false and misleading (the non-bolded portions are provided for context) because,

(a)     the statement that "Citi manages its risks through each of its three lines of defense: (i) business management, (ii) independent control functions and (iii) Internal Audit," failed to disclose that, according to the OCC Remediation Order:

i.     Citibank "fail[ed] to establish effective front-line units and independent risk management as required by [Appendix D]," which constituted "deficiencies, noncompliance with [Appendix D], or unsafe or unsound practices with respect to the Bank's enterprise-wide risk management and compliance risk management program" (Art. II ¶2(a));

ii.     Citibank "fail[ed] to establish effective front-line units, independent risk management, internal audit, and control functions as required by [Appendix D]," which constituted "deficiencies, noncompliance with [Appendix D], or unsafe or unsound practices with respect to the Bank's data quality and data governance, including risk aggregation and management and regulatory reporting" (Art. II ¶¶4, 4(a));

iii.     the failure to establish effective lines of defense contributed to "unsafe or unsound practices that were part of a pattern of misconduct" and "to violations of law and regulation and continuous noncompliance with [Appendix D]." (Art. II ¶¶6, 7.)

(b)     "the three lines of defense" did not "collaborate with each other in structured forums and processes … to steer the organization toward outcomes that … are systemically responsible," but rather toward outcomes that were unsafe or unsound.  According to the OCC Remediation Order, specifically:

i.        the three lines of defense failed to be effective (Art. II ¶¶2(a), 4(a)), contributing to "unsafe or unsound practices that were part of a pattern of misconduct" and "to violations of law and regulation and continuous noncompliance with [Appendix D]" (Art. II ¶¶6, 7);

ii.        independent risk management was not "appropriately independent" (Art. VI ¶2(h)), such that the three lines of defense did not "collaborate with each other in structured forms or processes."

339.    The 2016 Annual Report (at 65) stated that Citigroup's

***Compliance organization is designed to protect Citi not only by managing adherence to applicable laws, regulations***, and other standards of conduct, but also by promoting business behavior that is consistent with Citi's mission and value proposition, the principle of responsible finance and Citi's compliance risk appetite.

340.    The statement in bold in the paragraph immediately above was materially false and misleading (the non-bolded portions are provided for context) because,

(a)    the "Compliance organization" was not "designed to protect Citi … by managing adherence to applicable laws, regulations" according to the OCC Remediation Order and the Fed Cease and Desist Order, specifically:

i.        Article VII of the OCC Remediation Order, addressing the remediation plan for Compliance Risk Management, required Citibank to "establish" the following policies, procedures and control systems (*i.e.*, they had not been established yet, rendering the "design" deficient, noncompliant with [Appendix D], or unsafe or unsound):

1.     "policies, processes, and control systems within front-line units to assess, measure, and limit regulatory compliance exposures on an ongoing basis commensurate with the risk profile and risk appetite of the Bank" (¶2(b));

2.      "policies, processes, and control systems within independent compliance risk management to assess, measure, aggregate, and limit regulatory compliance exposures on an ongoing basis commensurate with the risk profile and risk appetite of the Bank" (¶2(c));

3.      "procedures and processes designed to result in compliance with laws, regulations, and Enterprise-wide corporate policies" (Art. ¶2(d));

4.      "procedures and processes to ensure that Enterprise-wide corporate policies are timely updated on a periodic and as-needed basis to address changes in applicable laws and regulations and to ensure the policies comply with the effective date of such laws and regulations" (Art. VII ¶2(e)).

ii.      The Fed Cease and Desist Order required Citigroup to "enhance its compliance risk management program" and "submit a written plan" to the Fed that "shall include the following seven items," including the following five components (¶5):

1.      "a detailed analysis of the most material risk factors related to U.S. laws and regulations applicable to Citigroup's operations and legal entities" (¶5(a));

2.      "an assessment of existing controls, including business line controls and testing processes, to ensure Citigroup's enterprise-wide operations comply with U.S. laws and regulations in the areas associated with the risk factors identified in subsection ([1]) above" (¶5(b));

3.      "measures to improve and maintain such controls in any area where the assessment in subsection ([2]) above identifies deficiencies" (¶5(c));

4.      "improvements to the management information systems, data, and reports provided to Citigroup's board of directors and senior management concerning

compliance risks, compliance with applicable U.S. laws and regulations, and the effectiveness and functioning of the compliance risk management program" (¶5(d));

        5.    "measures for managing and controlling Citigroup's compliance risks until the plan is implemented in full" (¶5(f)).

    (b)    the statements did not disclose that:

       i.    Citigroup's "compliance risk management" program suffered from "significant ongoing deficiencies in implementation and execution by Citigroup," including with respect to "longstanding enterprise-wide risk management and controls deficiencies previously identified by the Federal Reserve" that "Citigroup has not adequately remediated" (Fed Cease and Desist Order at 1-2);

       ii.    Citibank had "fail[ed] to establish effective … independent risk management … and control functions as required by [Appendix D]" (OCC Remediation Order Art. II ¶4(a)), which constituted "deficiencies, noncompliance with [Appendix D], or unsafe or unsound practices with respect to the Bank's enterprise-wide risk management and compliance risk management program" (*id*. Art. II ¶2(b));

       iii.    "[f]or several years, the Bank has failed to implement and maintain [a] compliance risk management program … commensurate with [Citibank's] size, complexity, and risk profile" (*id.* Art. II ¶1);

       iv.    the "OCC has identified … deficiencies, noncompliance with [Appendix D], or unsafe or unsound practices with respect to the Bank's … compliance risk management program" (*id*. Art. II ¶2).

    341.    The 2016 Annual Report stated (at 66) that:

Citi's Internal Audit function independently reviews activities of the first two lines of defense based on a risk-based audit plan and methodology approved by the Audit

Committee of the Citigroup Board of Directors. ***Internal Audit also provides independent assurance to the Citigroup Board of Directors, the Audit Committee of the Board, senior management and regulators regarding the effectiveness of Citi's governance and controls designed to mitigate Citi's exposure to risks and to enhance Citi's culture of compliance and control.***

342.   The statements in bold in the paragraph immediately above were materially false and misleading (the non-bolded portions are provided for context) because,

(a)   the statements failed to disclose that Citibank "fail[ed] to establish effective internal audit … functions as required by [Appendix D]," (OCC Remediation Order Art. II ¶4(a)), with respect to data quality and data governance, which constituted "deficiencies, noncompliance with [Appendix D], or unsafe or unsound practices with respect to the Bank's enterprise-wide risk management and compliance risk management program" (*id.* Art. II ¶4);

(b)   the audit function did not "provide[] independent assurance to the Citigroup Board of Directors, the Audit Committee of the Board, senior management and regulators regarding the effectiveness of Citi's governance and controls designed to mitigate Citi's exposure to risks and to enhance Citi's culture of compliance and control" because:

i.   according to the OCC Remediation Order, "inadequate reporting to the [Citibank] Board hinders its ability to provide effective oversight," and the Citibank "Board and senior management oversight is inadequate to ensure timely, appropriate actions to correct the serious and longstanding deficiencies and unsafe or unsound practices in the areas of risk management, internal controls, and data governance at the Bank" (Art. II ¶5);

ii.   the OCC Remediation Order ordered Citibank to "perform analyses (or assess analyses previously performed) to diagnose the root cause(s) of the underlying issues that led to internal controls related concerns identified by internal audit and/or federal regulators since 2017" (Art. IX ¶1(a)(i));

iii.       according to the Fed Cease and Desist Order, the Citigroup Board needed to take actions "to execute its oversight," including actions to "ensure … internal audit findings are effectively remediated" (Fed Cease and Desist Order ¶¶2, 2(b)).

343.    The 2016 Annual Report stated (at 62) that:

> **Citigroup's Board of Directors oversees Citi's risk-taking activities.  To do so, directors review risk assessments and reports prepared by Risk, Compliance, Human Resources, Legal, Finance and Internal Audit and exercise independent judgment to question, challenge, and when necessary, oppose recommendations and decisions made by senior management that could cause Citi's risk profile to exceed its risk appetite or jeopardize the safety and soundness of the firm.**

344.    The statements in the paragraph immediately above were materially false and misleading because,

(a)       the statement that "Citigroup's Board of Directors oversees Citi's risk-taking activities" failed to disclose that the Citigroup Board of Directors did not adequately or effectively oversee Citigroup's risk-taking activities, specifically:

i.       according to the Fed Cease and Desist Order, the Citigroup Board needed to take actions "to execute its oversight," including actions to "ensure effective reporting to the board of directors that will enable it to oversee management's execution of the matters identified in this Order."  (¶¶2, 2(d).)  The "matters identified in this Order" included "significant ongoing deficiencies in implementation and execution by Citigroup with respect to various areas of risk management and internal controls" and "longstanding enterprise-wide risk management and controls deficiencies."  (*Id.* at 1-2.);

ii.       according to the OCC Remediation Order, "inadequate reporting to the [Citibank] Board hinders its ability to provide effective oversight," and the Citibank "Board and senior management oversight is inadequate to ensure timely, appropriate actions to correct the

serious and longstanding deficiencies and unsafe or unsound practices in the areas of risk management, internal controls, and data governance at the Bank."  (Art. II ¶5.);

       (b)     the statement that, "directors review risk assessments and reports prepared by Risk, Compliance, Human Resources, Legal, Finance and Internal Audit and exercise independent judgment to question, challenge, and when necessary, oppose recommendations and decisions made by senior management that could cause Citi's risk profile to exceed its risk appetite or jeopardize the safety and soundness of the firm," failed to disclose that:

       i.     according to the Fed Cease and Desist Order, the Citigroup Board needed to take actions "to execute its oversight," including actions "to hold senior management accountable for executing effective and sustainable remediation plans by the committed deadlines" and "ensure effective reporting to the board of directors that will enable it to oversee management's execution of the matters identified in this Order."  (¶¶2, 2(a) (2d).)  The "matters identified in this Order" included "significant ongoing deficiencies in implementation and execution by Citigroup with respect to various areas of risk management and internal controls" and "longstanding enterprise-wide risk management and controls deficiencies."  (at 1-2.);

       ii.     according to the OCC Remediation Order, "inadequate reporting to the Bank's Board hinders its ability to provide effective oversight," and the Citibank "Board and senior management oversight is inadequate to ensure timely, appropriate actions to correct the serious and longstanding deficiencies and unsafe or unsound practices in the areas of risk management, internal controls, and data governance at the Bank" (Art. II ¶5);

       iii.     according to the OCC Remediation Order, "the Bank's Board and Audit Committee" needed to describe the actions they "will each take to further improve its oversight of senior management, including holding senior management accountable for

implementing and maintaining the corrective action required by this Order," which further included "ensur[ing] that reports to the Board, the Audit Committee, and senior management are transparent and comprehensive and contain thorough and complete analysis, including thematic analysis" (Art. XII ¶1(g)).

345.  The 2016 Annual Report stated (at 113) that:

***To anticipate, mitigate and control operational risk, Citi has established policies and a global framework for assessing, monitoring and communicating operational risks and the overall operating effectiveness of the internal control environment across Citigroup.***

346.  The statements in the paragraph immediately above were materially false and misleading because they failed to disclose that,

(a)  the OCC Remediation Order found that: (i) "[f]or several years, [Citibank] has failed to implement and maintain an enterprise-wide risk management and compliance risk management program, internal controls, or a data governance program commensurate with the [Citibank's] size, complexity, and risk profile;" (ii) Citibank "fail[ed] to establish an effective risk governance framework as required by [Appendix D]," (iii) "the Bank's enterprise-wide risk management policies, standards, and frameworks [failed] to adequately identify, measure, monitor and control risks," and internal controls were unsafe or unsound (Art. II ¶¶1, 2(b), (c), 3);

(b)  the Fed Cease and Desist Order determined that "Citigroup has not adequately remediated the longstanding enterprise-wide risk management and controls deficiencies previously identified by the Federal Reserve," as required by Regulation YY (at 1-2);

(c)  the Fed Cease and Desist Order ordered Citigroup to "conduct a gap analysis of its enterprise-wide risk management framework and internal controls systems … to determine the enhancements that are necessary to meet the risk management requirements set forth in Regulation YY … with respect to the following three items: capital planning, liquidity risk

management, and compliance risk management," and instructed that "[t]he Gap Analysis shall identify where Citigroup's risk management policies, procedures, practices processes, and internal controls are not compliant with Regulation YY with regard to the[se] areas" (¶¶3, 3(a));

(d)     as set forth in the article published by *Business Insider* on September 15, 2020, titled "The Real Reasons Behind Citigroup CEO Mike Corbat's Retirement," Citigroup "seldom took the time to harmonize technology systems" and instead relied on "a patchwork of technology systems that didn't talk to one another," and, in contrast to "many banks [that] have spent years improving their systems," Corbat "was often reluctant to spend the money or dedicate enough people to fix a problem the right way."

347.     The 2016 Annual Report (at 113-114) stated that:

> ***Citi manages adherence to its compliance risk appetite through the execution of its compliance program,*** which includes governance arrangements, a policy framework, customer onboarding and maintenance processes, product development processes, transaction and communication surveillance processes, conduct- and culture-related programs, monitoring regulatory changes, new products, services and complex transactions approval processes and training.

348.     The statement in bold in the paragraph immediately above was materially false and misleading (the non-bolded portions are provided for context) because,

(a)     it failed to disclose that according to the Fed Cease and Desist Order, Citigroup's "compliance risk management" program suffered from "significant ongoing deficiencies in implementation and execution by Citigroup," including with respect to "longstanding enterprise-wide risk management and controls deficiencies previously identified by the Federal Reserve" that "Citigroup has not adequately remediated" (at 1-2);

(b)     it failed to disclose that according to the OCC Remediation Order, "[f]or several years, the Bank has failed to implement and maintain … [a] compliance risk management program … commensurate with the Bank's size, complexity and risk profile," and "the compliance

risk management program" had a number of deficiencies, unsafe or unsound practices, or was not in compliance with Appendix D (Art. II ¶¶1, 2);

(c)      it failed to disclose that the OCC Remediation Order set forth four sets of policies, standards and procedures that Citibank needed to "establish" and "adhere" to, which it had not, to meet risk management requirements (Art. VII ¶¶2(b)-(e)).

349.   The 2016 Annual Report (at 61) stated that:

*Extensive compliance requirements can result in increased reputational and legal risks, as failure to comply with regulations and requirements, or failure to comply as expected, can result in enforcement and/or regulatory proceedings.*

\* \* \*

*Citi is Subject to Extensive Legal and Regulatory Proceedings, Investigations and Inquiries That Could Result in Significant Penalties and Other Negative Impacts on Citi, Its Business and Results and Operations.*

350.   The statements in the paragraph immediately above were materially false and misleading because either the risks identified and described as conditional or potential ("can result," "could result") were not conditional or potential, but instead had come to pass and were actual and existing as set forth in the OCC Remediation Order and the Fed Cease and Desist Order specifically below, or failed to disclose that,

(a)      the OCC Remediation Order found that:

i.      "for several years, the Bank has failed to implement and maintain an enterprise-wide risk management and compliance risk management program [and] internal controls…commensurate with the Bank's size, complexity, and risk profile" (Art. II ¶1);

ii.      Citibank had "serious and longstanding deficiencies and unsafe or unsound practices in the areas of risk management [and] internal controls" (Art. II ¶5);

iii.      the "Bank was in noncompliance with [Appendix D] and engaged in unsafe or unsound practice that were part of a pattern of misconduct" (Art. II ¶6);

iv.      the "foregoing conduct [Art. II ¶¶1-6] also contributed to violations of law and regulations and continuous noncompliance with [Appendix D]" (Art. II ¶7).

(b)      the Fed Cease and Desist Order determined that:

i.      the Fed "identified significant ongoing deficiencies in implementation and execution by Citigroup with respect to various areas of risk management and internal controls, including data quality management and regulatory reporting, compliance risk management, capital planning, and liquidity risk management" (at 1);

ii.      "Citigroup has not adequately remediated longstanding enterprise-wide risk management and controls deficiencies previously identified by the Federal Reserve, including in the areas described above and those addressed" in consent orders in 2013 and 2015 (at 2).

(c)      According to an article published on September 14, 2020, in *The Wall Street Journal* titled "Regulators Prepare to Reprimand Citigroup for Failing to Improve Risk Systems," "[f]or years, regulators have privately pressed Citigroup and Mr. Corbat to fix the bank's risk systems," and "faulted Citi's management for not giving priority to the risk-management overhaul."  And according to an article in *Business Insider* on September 15, 2020 titled "The Real Reasons Behind Citigroup CEO Mike Corbat's Retirement,"  "[Corbat] who had made operating efficiency and return-on equity a hallmark of his strategy was often reluctant to spend the money or dedicate enough people to fix a problem the right way."

### 7.      Materially False And Misleading Statements During The April 13, 2017 Earnings Call For 1Q 17

351.    On April 13, 2017, Citigroup held its earnings call for 1Q 17.  During that call, a Guggenheim analyst and Gerspach engaged in the following exchange:

ERIC WASSERSTROM: But in terms of the cost associated with complying with the changes and the regulatory environment there, has that diminished at all?

JOHN GERSPACH: Well, when we talked about regulatory costs in the past, it wasn't necessarily focused on Asia, it was more focused globally with a lot of it here in the U.S. ***And I'd say that cost is still running high, but it's plateaued. And that's given us now the opportunity to shift some of the investment more away from just doing regulatory work and put investment dollars towards supporting the businesses which has been great.***

352.    The statements in bold in the paragraph immediately above were materially false and misleading (the non-bolded portions are provided for context) because they failed to disclose that the "regulatory cost" "plateaued" because, as set forth in the OCC Remediation Order, (i) Citibank was not investing the financial resources necessary to "implement and maintain an enterprise-wide risk management and compliance risk management program, internal controls, or data governance program commensurate with the Bank's size, complexity, and risk profile" (Art. II ¶1); (ii) the financial resources dedicated by Citibank were so woefully inadequate that the OCC ordered Citibank to develop a DGP and report any discrepancies between the "financial resources allocated" and the "financial resources actually expended" (Art. V ¶2(b)(iii)); (iii) the Bank was not taking "timely, appropriate actions to correct the serious and longstanding deficiencies and unsafe or unsound practices in the areas of risk management, internal controls, and data governance" (Art. II ¶5); and (iv) the "system applications and information technology infrastructure" were so woefully deficient that the OCC ordered a "thorough redesign of data architecture, re-engineering of processes and modernization of system applications and information technology infrastructure" (Art. V ¶2(d)).

### 8.    Materially False And Misleading Statements During The June 1, 2017 Bernstein 2017 Strategic Decisions Conference

353.    On June 1, 2017, Citigroup presented at the Bernstein 2017 Strategic Decisions conference where Bernstein analyst John McDonald and Defendant Corbat engaged in the following exchange:

JOHN MCDONALD: And just wrapping up the conversation about efficiency, you've done a lot of investment spending, you've done some big projects upgrading major systems in the Investment Bank, the Global Consumer Bank, and currently investing $1 billion in Mexico. Where are you on kind of these big projects? Are you kind of at the tail end of the major big projects you set upon the last couple of years? Where are you in that cycle of spend?

CORBAT: *From an infrastructure perspective, we've got, really if not all, certainly most of the systems or base systems that we need. . . . But again, we've spent all the energy and effort in terms of creating these systems that have the ability to come back and communicate centrally. . . .*

354.    The statements by Defendant Corbat in the paragraph immediately above were materially false and misleading because,

(a)    "from an infrastructure perspective" Citibank did not have "really if not all, certainly most of the systems or base systems that we need" because:

i.    according to the OCC Remediation Order, "with respect to the Bank's data quality and data governance, including risk data aggregation and management and regulatory reporting," Citibank (1) "fail[ed] to establish effective front-line units, independent risk management, internal audit and control functions as required by [Appendix D];" (2) was "[unable] to develop and execute on a comprehensive plan to address data governance deficiencies, including data quality errors and failure to produce timely and accurate management and regulatory reporting;" and (3) "inadequate[ly] report[ed] to the Board on the status of data quality and progress in remediating identified deficiencies," all three of which constituted "deficiencies, noncompliance with [Appendix D], or unsound or unsafe practices" (Art. II ¶4);

ii.    the OCC Remediation Order ordered Citibank to develop the DGP, which required that Citibank prepare a Data Governance Gap Analysis Report that identified the existing deficiencies, (Art V ¶1), and include a "thorough redesign of data architecture, re-engineering of processes and modernization of system applications and information technology infrastructure" (Art. V ¶2(d));

iii.      the Fed Cease and Desist Order "identified significant ongoing deficiencies" in "data quality management" (at 1) and ordered Citigroup to take "measures to ensure that Citigroup has an effective enterprise-wide program for data quality management that provides timely and accurate data sufficient for Citigroup's enterprise-wide risk management framework and internal controls systems regarding capital planning, liquidity risk management, and compliance risk management" (¶4(a)).

(b)      "these systems" did not "have the ability to come back and communicate centrally" because the OCC Remediation Order ordered Citibank to develop a DGP which required the "thorough redesign of data architecture, re-engineering of processes, and modernization of system applications and information technology infrastructure," specifically that Citibank (i) "maximize straight-through processing and minimize manual inputting and adjustments;" (ii) "simplify and consolidate applications with common functionalities, eliminate disparate systems, and strengthen data quality controls;" (iii) "ensure that ledger and reporting systems are standardized to the fullest extent possible;" (iv) "ensure consistent adoption of authoritative data sources, reference data sets, enterprise-data sets; and those ledger and reporting systems that are standardized;" (v) "define enterprise-data sets that are shared across sectors and business units;" (vi) "establish inventory control over authoritative data sources and reference data; and (vii) "ensure consistent enterprise-wide adherence by all business units and third parties to standardized technology solutions and minimize sector variances." (Art. V ¶2(d).)

(c)      "these systems" also did not "have the ability to come back and communicate centrally" because as set forth in the article published by *Business Insider* on September 15, 2020, titled "The Real Reasons Behind Citigroup CEO Mike Corbat's Retirement," Citigroup "seldom took the time to harmonize technology systems" and instead relied on "a

patchwork of technology systems that didn't talk to one another;" and, in contrast to "many banks [that] have spent years improving their systems," Corbat "was often reluctant to spend the money or dedicate enough people to fix a problem the right way."

> **9.      Materially False And Misleading Statements During The July 25, 2017 Citigroup Investor Day**

355.      On July 25, 2017, Citigroup held an Investor Day conference at which Corbat stated:

> When I think of Citi, the word that comes to my mind is "pride." I have to tell you how proud I am of the progress we've made and how we've executed through tough decisions in terms of our capital, our balance sheet and our business model. *We have been rebuilding our credibility, our relationships with our regulators* and, very importantly, a culture that's based on ethics and execution. *And our progress, it can be seen* not just through the robustness of our businesses, but also *through the investments that we've made in controls – to improve processes across risk, compliance and audit* – which gives us our licenses to run and to grow our business.
>
> * * *
>
> *I also hope people recognize how we've strengthened our risk management by the dogs that haven't barked.*

356.      The statements in bold by Defendant Corbat in the paragraph immediately above were materially false and misleading (the non-bolded portions are provided for context) because,

(a)      "Citi" had not "been rebuilding [its] credibility, [its] relationships with [its] regulators" because:

i.      the OCC Remediation Order found that (1) "[f]or several years, the Bank has failed to implement and maintain an enterprise-wide risk management and compliance risk management program [and] internal controls … commensurate with the Bank's size, complexity, and risk profile;" (2) there had been "serious and longstanding deficiencies and unsafe or unsound practices in the areas of risk management, internal controls and data governance;" (3) "the Bank was in noncompliance with [Appendix D] and engaged in unsafe or unsound practices

that were part of a pattern of misconduct;" and "[t]he foregoing conduct also contributed to violations of law and regulation and continuous noncompliance with [Appendix D]" (Art. II ¶¶1, 5, 6, 7);

        ii.     the OCC Remediation Order ordered that Citibank "perform analyses (or assess analyses previously performed) to diagnose the root cause(s) of the underlying issues that led to internal controls related concerns identified by internal audit and/or federal regulators since 2017" (Art. IX ¶1(a)(I));

        iii.    the Fed Cease and Desist Order determined that "Citigroup has not adequately remediated the longstanding enterprise-wide risk management and controls deficiencies previously identified by the Federal Reserve, including in the areas [of risk management and internal controls, including for data quality management and regulatory reporting, compliance risk management, capital planning, and liquidity risk management] and those addressed in" consent orders issued in 2013 and 2015 (at 1-2);

        iv.    On September 14, 2020, *The Wall Street Journal* published an article titled "Regulators Prepare to Reprimand Citigroup for Failing to Improve Risk Systems," which revealed that "[f]or years, regulators have privately pressed Citigroup and Mr. Corbat to fix the bank's risk systems."

        (b)     the statement "our progress, it can be seen … through the investments that we've made in controls – to improve processes across risk, compliance and audit," failed to disclose that, as set forth in the OCC Remediation Order: (i) Citigroup was not investing the financial resources to "implement and maintain an enterprise-wide risk management and compliance risk management program, internal controls, or data governance program commensurate with the Bank's size, complexity, and risk profile" (Art. II ¶1); (ii) the financial

resources dedicated by Citibank were so woefully inadequate that the OCC ordered Citibank to develop a DGP and report any discrepancies between the "financial resources allocated" and the "financial resources actually expended" (Art. V ¶2(b)(iii)); (iii) the Bank was not taking "timely, appropriate actions to correct the serious and longstanding deficiencies and unsafe or unsound practices in the areas of risk management, internal controls, and data governance" (Art. II ¶5); and (iv) the "system applications and information technology infrastructure" were so woefully deficient that the OCC ordered a "thorough redesign of data architecture, re-engineering of processes and modernization of system applications and information technology infrastructure" (Art. V ¶2(d)).

(c)     as set forth in the article published by *Business Insider* on September 15, 2020, titled "The Real Reasons Behind Citigroup CEO Mike Corbat's Retirement," in contrast to "many banks [that] have spent years improving their systems," Corbat "was often reluctant to spend the money or dedicate enough people to fix a problem the right way."

(d)     the statement that "I also hope people recognize how we've strengthened our risk management by the dogs that haven't barked" failed to disclose that, as set forth in the OCC Remediation Order, (i) "[f]or several years, the Bank has failed to implement and maintain an enterprise-wide risk management and compliance risk management program [and] internal controls … commensurate with the Bank's size, complexity, and risk profile" (Art. II ¶1); (ii) the OCC identified "deficiencies, noncompliance with [Appendix D], or unsafe or unsound practices with respect to the Bank's enterprise-wide risk management and compliance risk management program" (Art. II ¶1); (iii) Citibank had "serious and longstanding deficiencies and unsafe or unsound practices in the areas of risk management [and] internal controls" (Art. II ¶5); (iv) the "Bank was in noncompliance with [Appendix D] and engaged in unsafe or unsound practices that

were part of a pattern of misconduct" (Art. II ¶6); and Citibank's "conduct also contributed to violations of law and regulation and continuous noncompliance with [Appendix D]" (Art. II ¶7).

357.    Defendant Gerspach stated during the July 25, 2017 investor day that:

> ***Our efficiency ratio at 59% is at, or better, than each of our peer institutions***. Our ROA remains somewhat below the group. Our growth in tangible book value per share is fairly comparable. We exceeded our nearest banking peers in payout ratio at 86% and we are poised to continue leading the way over the next 12 months with a capital return plan equal to nearly 130% of consensus income expectations. ***We've generated these results while operating above every one of our regulatory requirements.***

358.    The statement in bold by Defendant Gerspach in the paragraph immediately above,

(a)      that "[o]ur efficiency ratio at 59% is at, or better, than each of our peer institutions," was materially false and misleading (the non-bolded portions are provided for context) because:

i.      as set forth in the OCC Remediation Order, the statement failed to disclose that Citibank had been materially underinvesting in "data quality and data governance, including risk data aggregation and management and regulatory reporting" (Art. II ¶4), which caused "deficiencies, noncompliance with [Appendix D], or unsafe or unsound practices" and the OCC to order Citibank to develop the DGP (Art. II ¶2).  The DGP ordered Citibank to "ensure [it devoted] adequate financial resources to develop and implement the DGP" and "notify[] the OCC of any material changes … between the amount of financial resources actually expended in connection with the DGP versus the amount allocated in the DGP" previously approved by the OCC (Art. V. ¶2(b)(iii));

ii.      the statement failed to disclose that, as set forth in the article published by *Business Insider* on September 15, 2020 titled "The Real Reasons Behind Citigroup CEO Mike Corbat's Retirement," in contrast to "many banks [that] have spent years improving their systems," Corbat "was often reluctant to spend the money or dedicate enough people to fix a

problem the right way."  Rather, "[f]or years, regulators have privately pressed Citigroup and Mr. Corbat to fix the bank's risk systems."

(b)      that "we've generated these results while operating above every one of our regulatory requirements," was materially false and misleading (the non-bolded portions are provided for context) because Citigroup was not "operating above every one of our regulatory requirements," specifically:

i.      the OCC Remediation Order found that (1) "[f]or several years, the Bank has failed to implement and maintain an enterprise-wide risk management and compliance risk management program [and] internal controls … commensurate with the Bank's size, complexity, and risk profile;" (2) the OCC identified numerous "deficiencies, [instances of] noncompliance with [Appendix D], or unsafe or unsound practices with respect to the Bank's enterprise-wide risk management and compliance risk management program;" (3) there had been "serious and longstanding deficiencies and unsafe or unsound practices in the areas of risk management, internal controls and data governance;" and (4) "the Bank was in noncompliance with [Appendix D] and engaged in unsafe or unsound practices that were part of a pattern of misconduct" (Art. II ¶¶1, 2, 5, 6);

ii.      The OCC Remediation Order ordered that Citibank "perform analyses (or assess analyses previously performed) to diagnose the root cause(s) of the underlying issues that led to internal controls related concerns identified by internal audit and/or federal regulators since 2017" (Art. IX ¶1(a)(i));

iii.      the Fed Cease and Desist Order determined that "Citigroup has not adequately remediated the longstanding enterprise-wide risk management and controls deficiencies previously identified by the Federal Reserve, including in the areas [of risk

management and internal controls, including for data quality management and regulatory reporting, compliance risk management, capital planning, and liquidity risk management] and those addressed in" consent orders issued in 2013 and 2015 (at 1-2).

### 10.     Materially False And Misleading Statements In January 4, 2018 Wall Street Journal Article

359.    On January 4, 2018, *The Wall Street Journal* published an article, titled "Citi Fined for Failing to Fix Money-Laundering Controls," reporting that the OCC had found that Citibank had failed to comply with the 2012 Consent Order and had issued a $70 million penalty.  The article quoted a Citi spokesman, who falsely assured investors of Citibank's purported commitment to the necessary remedies, as follows:

> *'Citi is committed to taking all necessary and appropriate steps to remedy the concerns identified by the OCC,' a spokesman said.  'We have made substantial investments to enhance our [anti-money-laundering] programs and we maintain a commitment to developing an industry-leading program to help to protect the integrity of the financial system.'*

360.    The statements in the paragraph immediately above were materially false and misleading because "Citi" was not "committed to taking all necessary and appropriate steps to remedy the concerns identified by the OCC," and the Company's purported "substantial investments to enhance [its AML] programs" were woefully deficient because the same AML deficiencies had been identified in 2012 and 2013 and "Citi [did not] tak[e] all the necessary and appropriate steps to remedy the concerns identified by the OCC," specifically,

(a)     in 2020, the Fed Cease and Desist Order determined that "Citigroup has not adequately remediated the longstanding enterprise-wide risk management and controls deficiencies previously identified by the Federal Reserve, including in the areas … addressed in … the Consent Order issued by the Board of Governors on March 21, 2013 to remediate outstanding deficiencies in Citigroup's anti-money laundering compliance program." (at 2.)

i.      The Fed 2013 Consent Order (1) determined that "Citigroup lacked effective systems of governance and internal controls to adequately oversee the activities of the Banks [Citibank and Banamex USA] with respect to legal, compliance, and reputational risk related to the Banks' respective [Bank Secrecy Act and Anti-Money Laundering] compliance programs," "as evidenced by the deficiencies in the Banks' BSA/AML compliance programs identified by their respective banking agency supervisors that led to the issuance of the OCC and FDIC Consent Orders;" and (2) ordered that, with "Board Oversight" (¶2), Citigroup submit a plan "to improve the governance, structure, and operations of the compliance risk management program with regard to BSA/AML requirements" (¶3), and "complete a review of the effectiveness of Citigroup's firmwide BSA/AML compliance program" (¶4).

ii.      The OCC 2012 Consent Order similarly found "that [Citibank] has deficiencies in its BSA/AML compliance program.   These deficiencies have resulted in a BSA/AML compliance program violation under 12 U.S.C. § 1818(s) and its implementing regulation. … The Bank has failed to adopt and implement a compliance program that adequately covers the required BSA/AML program elements due to an inadequate system of internal controls and ineffective independent testing."  (Art. I ¶¶1, 2).  The OCC 2012 Consent Order further ordered Board oversight of a "Comprehensive BSA/AML Action Plan," and the Board was required to "ensure that the Bank achieves and thereafter maintains compliance with this Order, including, without limitation, successful implementation of the BSA/AML Action Plan." (Art. III ¶¶1, 2.)

(b)      the OCC Remediation Order found that (i) "[f]or several years, the Bank has failed to implement and maintain an enterprise-wide risk management and compliance risk management program [and] internal controls … commensurate with the Bank's size, complexity, and risk profile;" and (ii) "Board and senior management oversight is inadequate to ensure timely,

appropriate actions to correct the serious and longstanding deficiencies and unsafe or unsound practices in the areas of risk management, internal controls, and data governance at the Bank." (Art. II ¶¶1, 5.)

(c)     *The Wall Street Journal* article on September 14, 2020, titled "Regulators Prepare to Reprimand Citigroup for Failing to Improve Risk Systems" said that the regulators "faulted Citi's management for not giving priority to the risk-management overhaul."

### 11.     Materially False And Misleading Statements In Citigroup's Form 10-K For 2017

361.     On February 23, 2018, Citigroup filed its Annual Report for 2017 on Form 10-K with the SEC ("2017 Annual Report").  The Individual Defendants who signed the 2017 Annual Report and made the misrepresentations are set forth in the chart in ¶55.  The 2017 Annual Report (at 4) stated that "[t]hroughout this report, 'Citigroup,' 'Citi' and 'the Company' refer to Citigroup Inc. and its consolidated subsidiaries," which includes Citibank.

362.     The 2017 Annual Report (at 66) stated that:

> ***Citi's Company-wide risk governance framework consists of the policies, procedures, and processes through which Citi identifies, measures, manages, monitors, reports and controls risks across the Company.***

363.     The statements in the paragraph immediately above were materially false and misleading because, "Citi's Company-wide risk governance framework" did not "identif[y] … measure[] … monitor[] … and control[] risks across the Company," and the risk governance framework was not effective, according to the OCC Remediation Order and the Fed Cease and Desist Order, specifically,

(a)     Citibank "fail[ed] to establish an effective risk governance framework as required by [Appendix D]," which constituted "deficiencies, noncompliance with [Appendix D],

or unsafe or unsound practices with respect to the Bank's enterprise-wide risk management and compliance risk management program" (OCC Remediation Order Art. II ¶¶2, 2(b));

(b)     the "Bank's enterprise-wide risk management policies, standards, and frameworks" "fail[ed]" to "adequately identify, measure, monitor, and control risks" (*id.* at Art. II ¶2(c));

(c)     "[f]or several years, the Bank has failed to implement and maintain an enterprise-wide risk management and compliance risk management program … commensurate with [Citibank's] size, complexity, and risk profile" (*id*. Art. II ¶1);

(d)     "the Bank was in noncompliance with [Appendix D] and engaged in unsafe or unsound practices that were part of a pattern of misconduct" (*id.* Art. II ¶6);

(e)     "Citigroup has not adequately remediated the longstanding enterprise-wide risk management … deficiencies previously identified by the Federal Reserve," "with respect to [] capital planning, liquidity risk management and compliance risk management" as required by Regulation YY  (Fed Cease and Desist Order at 2 & ¶3).

364.     The 2017 Annual Report (at 66) stated that:

> *The risk governance framework has been developed in alignment with the expectations of the Office of the Comptroller of the Currency (OCC) Heightened Standards. It is also aligned with the relevant components … of the Federal Reserve's Enhanced Prudential Standards for Bank Holding Companies and Foreign Banking Organizations.*

365.     The statements in the paragraph immediately above were materially false and misleading because,

(a)     according to the OCC Remediation Order, the "risk governance framework" was not "developed in alignment with the expectations of the Office of the Comptroller of the Currency (OCC) Heightened Standards [Appendix D]," specifically:

           i.        Citibank "fail[ed] to establish an effective risk governance framework as required by [Appendix D], which constituted "deficiencies, noncompliance with [Appendix D], or unsafe or unsound practices with respect to the Bank's enterprise-wide risk management and compliance risk management program" (Art. II ¶2(b));

           ii.      "[f]or several years, the Bank has failed to implement and maintain an enterprise-wide risk management and compliance risk management program … commensurate with the Bank's size, complexity, and risk profile" (Art. II ¶1);

           iii.     Citibank "was in noncompliance with [Appendix D] and engaged in unsafe or unsound practices that were part of a pattern of misconduct" (Art. II ¶6);

           iv.      "The foregoing conduct contributed to violations of law and regulation and continuous noncompliance with [Appendix D]" (Art. II ¶7).

        (b)      according to the Fed Cease and Desist Order, the "risk governance framework" was not "aligned with the relevant components … of the Federal Reserve's Enhanced Prudential Standards for Bank Holding Companies [Regulation YY 12 C.F.R. §252.33]," which sets forth the "[r]isk management and risk committee requirements," because:

           i.        the Fed "identified significant ongoing deficiencies in implementation and execution by Citigroup with respect to various areas of risk management and internal controls, including data quality management and regulatory reporting, compliance risk management, capital planning, and liquidity risk management" (at 1);

           ii.      "Citigroup has not adequately remediated longstanding enterprise-wide risk management and controls deficiencies previously identified by the Federal Reserve, including in the areas described above and those addressed" in consent orders in 2013 and 2015 (at 2);

iii. the Fed ordered Citigroup to "conduct a gap analysis … to determine the enhancements that are necessary to meet the risk management requirements set forth in Regulation YY … with respect to the following three items: capital planning, liquidity risk management, and compliance management," and instructed that "[t]he Gap Analysis shall identify where Citigroup's risk management policies, procedures, practices processes, and internal controls are not compliant with Regulation YY with regard to the[se] areas" (¶¶3, 3(a));

iv. "consistent with section 252.33(a) of Regulation YY … Citigroup is required to maintain an enterprise-wide risk management program designed to identify and manage risks across the consolidated organization" (at 1).

366. The 2017 Annual Report (at 67) stated that:

> ***Citi manages its risks through each of its three lines of defense: (i) business management, (ii) independent control functions and (iii) internal audit. The three lines of defense collaborate with each other in structured forums and processes*** to bring various perspectives together and ***to lead the organization toward outcomes*** that are in clients' interests, create economic value ***and are systemically responsible.***

367. The statements in bold in the paragraph immediately above were materially false and misleading (the non-bolded portions are provided for context) because,

(a) the statement that, "Citi manages its risks through each of its three lines of defense: (i) business management, (ii) independent control functions and (iii) internal audit," failed to disclose that according to the OCC Remediation Order:

i. Citibank "fail[ed] to establish effective front-line units and independent risk management as required by [Appendix D]," which constituted "deficiencies, noncompliance with [Appendix D], or unsafe or unsound practices with respect to the Bank's enterprise-wide risk management and compliance risk management program" (Art. II ¶2(a));

ii. Citibank "fail[ed] to establish effective front-line units, independent risk management, internal audit, and control functions as required by [Appendix D]," which constituted "deficiencies, noncompliance with [Appendix D], or unsafe or unsound practices with respect to the Bank's data quality and data governance, including risk aggregation and management and regulatory reporting" (Art. II ¶¶4, 4(a));

iii. the failure to establish effective lines of defense contributed to "unsafe or unsound practices that were part of a pattern of misconduct" and "to violations of law and regulation and continuous noncompliance with [Appendix D]"  (Art. II ¶¶6, 7).

(b) "the three lines of defense" did not "collaborate with each other in structured forums and processes … to lead the organization toward outcomes that … are systemically responsible," but rather to outcomes that were unsafe or unsound.  According to the OCC Remediation Order, specifically:

i. the three lines of defense failed to be effective (Art. II ¶¶2(a), 4(a)), contributing to "unsafe or unsound practices that were part of a pattern of misconduct" and "to violations of law and regulation and continuous noncompliance with [Appendix D]" (Art. II ¶¶6, 7);

ii. independent risk management was not "appropriately independent" (Art. VI ¶2(h)), such that the three lines of defense did not "collaborate with each other in structured forms or processes."

368. The 2017 Annual Report (at 67) stated that Citigroup's:

> ***Independent Compliance Risk Management (ICRM) organization is designed to protect Citi by overseeing senior management, the businesses, and other control functions in managing compliance risk,*** as well as promoting business conduct and activity that is consistent with Citi's mission and value proposition.

369.    The statements in bold in the paragraph immediately above were materially false and misleading (the non-bolded portions are provided for context) because,

(a)    the "Independent Compliance Risk Management (ICRM) organization" was not "designed to protect Citi by overseeing senior management, the businesses and other control functions in managing compliance risk" according to the OCC Remediation Order and the Fed Cease and Desist Order, specifically:

i.    "Independent Compliance Risk Management" did not have an "effective, independent monitoring and testing function supported by sufficiently skilled staff and resources that provide risk-based scope and coverage to provide credible challenge and escalation of issues identified by front-line units" (OCC Remediation Order Art. VII ¶2(f));

ii.    the OCC remediation plan for Compliance Risk Management, required Citibank to "establish" the following policies, procedures and control systems (*i.e.*, they had not been established yet, rendering the "design" deficient, noncompliant with [Appendix D], or unsafe or unsound):

1.    "policies, processes, and control systems within front-line units to assess, measure, and limit regulatory compliance exposures on an ongoing basis commensurate with the risk profile and risk appetite of the Bank" (Art. VII ¶2(b));

2.    "policies, processes, and control systems within independent compliance risk management to assess, measure, aggregate, and limit regulatory compliance exposures on an ongoing basis commensurate with the risk profile and risk appetite of the Bank" (Art. VII ¶2(c));

3.    "procedures and processes designed to result in compliance with laws, regulations, and Enterprise-wide corporate policies" (Art. VII ¶2(d));

4.      "procedures and processes to ensure that Enterprise-wide corporate policies are timely updated on a periodic and as-needed basis to address changes in applicable laws and regulations and to ensure the policies comply with the effective date of such laws and regulations" (Art. VII ¶2(e)).

iii.      The Fed Cease and Desist Order required Citigroup to "enhance its compliance risk management program" and "submit a written plan" to the Fed that "shall include the following seven items," (¶5), including the following five components:

1.      "a detailed analysis of the most material risk factors related to U.S. laws and regulations applicable to Citigroup's operations and legal entities" (¶5(a));

2.      "an assessment of existing controls, including business line controls and testing processes, to ensure Citigroup's enterprise-wide operations comply with U.S. laws and regulations in the areas associated with the risk factors identified in subsection ([1]) above" (¶5(b));

3.      "measures to improve and maintain such controls in any area where the assessment in subsection ([2]) above identifies deficiencies" (¶5(c));

4.      "improvements to the management information systems, data, and reports provided to Citigroup's board of directors and senior management concerning compliance risks, compliance with applicable U.S. laws and regulations, and the effectiveness and functioning of the compliance risk management program" (¶5(d));

5.      "measures for managing and controlling Citigroup's compliance risks until the plan is implemented in full" (¶5(f)).

(b)      the statements did not disclose that:

        i.       Citigroup's "compliance risk management" program suffered from "significant ongoing deficiencies in implementation and execution by Citigroup," including with respect to "longstanding enterprise-wide risk management and controls deficiencies previously identified by the Federal Reserve" that "Citigroup has not adequately remediated" (Fed Cease and Desist Order at 1-2);

        ii.      Citibank had "fail[ed] to establish effective … independent risk management … and control functions as required by [Appendix D]" with respect to data quality and data governance, (OCC Remediation Order Art. II ¶4(a)), which constituted "deficiencies, noncompliance with [Appendix D], or unsafe or unsound practices with respect to the Bank's data quality and data governance" (*id*. Art. II ¶4);

        iii.     "[f]or several years, the Bank has failed to implement and maintain [a] compliance risk management program … commensurate with the [Citibank's] size, complexity, and risk profile" (*id*. Art. II ¶1);

        iv.     the OCC "identified … deficiencies, noncompliance with [Appendix D], or unsafe or unsound practices with respect to the Bank's … compliance risk management program" (*id*. Art. II ¶2).

370.    The 2017 Annual Report stated (at 68) that:

Citi's Internal Audit function independently reviews activities of the first two lines of defense based on a risk-based audit plan and methodology approved by the Audit Committee of the Citigroup Board of Directors. ***Internal Audit also provides independent assurance to the Citigroup Board of Directors, the Audit Committee of the Board, senior management and regulators regarding the effectiveness of Citi's governance and controls designed to mitigate Citi's exposure to risks and to enhance Citi's culture of compliance and control.***

371.    The statements in bold in the paragraph immediately above were materially false and misleading (the non-bolded portions are provided for context) because,

(a)      the statements failed to disclose that Citibank "fail[ed] to establish effective internal audit … functions as required by [Appendix D]," (OCC Remediation Order Art. II ¶4(a)), with respect to data quality and data governance, which constituted "deficiencies, noncompliance with [Appendix D], or unsafe or unsound practices with respect to the Bank's enterprise-wide risk management and compliance risk management program" (*id.* Art. II ¶4);

(b)      the audit function did not "provide[] independent assurance to the Citigroup Board of Directors, the Audit Committee of the Board, senior management and regulators regarding the effectiveness of Citi's governance and controls designed to mitigate Citi's exposure to risks and to enhance Citi's culture of compliance and control" because:

i.      according to the OCC Remediation Order, "inadequate reporting to the [Citibank] Board hinders its ability to provide effective oversight," and Citibank "Board and senior management oversight is inadequate to ensure timely, appropriate actions to correct the serious and longstanding deficiencies and unsafe or unsound practices in the areas of risk management, internal controls, and data governance at the Bank" (Art. II ¶5);

ii.      the OCC Remediation Order ordered Citibank to "perform analyses (or assess analyses previously performed) to diagnose the root cause(s) of the underlying issues that led to internal controls related concerns identified by internal audit and/or federal regulators since 2017" (Art. IX ¶1(a)(i));

iii.      according to the Fed Cease and Desist Order, the Citigroup Board needed to take actions "to execute its oversight," including actions to "ensure … internal audit findings are effectively remediated" (Fed Cease and Desist Order ¶¶2, 2(b)).

372.    The 2017 Annual Report stated (at 69) that the:

*Citigroup's Board of Directors oversees Citi's risk-taking activities and holds management accountable for adhering to the risk governance framework.  To do*

*so, directors review reports prepared by the businesses, Risk, Independent Compliance Risk Management, Internal Audit and others, and exercise sound independent judgment to question, probe and challenge recommendations and decisions made by management.*

373.    The statements in the paragraph immediately above were materially false and misleading because,

(a)    the statements that "Citigroup's Board of Directors oversees Citi's risk-taking activities," and that "directors review reports prepared by the businesses, Risk, Independent Compliance Risk Management, Internal Audit and others, and exercise sound independent judgment to question, probe and challenge recommendations and decisions made by management," failed to disclose that Citigroup's Board of Directors did not effectively oversee Citigroup's risk-taking activities, specifically:

i.    according to the Fed Cease and Desist Order, the Citigroup Board needed to take actions "to execute its oversight," including actions to "ensure effective reporting to the board of directors that will enable it to oversee management's execution of the matters identified in this Order."  (¶¶2, 2(d).)  The "matters identified in this Order" included "significant ongoing deficiencies in implementation and execution by Citigroup with respect to various areas of risk management and internal controls" and "longstanding enterprise-wide risk management and controls deficiencies" (at 1-2);

ii.    according to the OCC Remediation Order, "inadequate reporting to the [Citibank] Board hinders its ability to provide effective oversight," and Citibank "Board and senior management oversight is inadequate to ensure timely, appropriate actions to correct the serious and longstanding deficiencies and unsafe or unsound practices in the areas of risk management, internal controls, and data governance at the Bank" (Art. II ¶5);

(b)     the Citigroup Board did not "hold[] management accountable for adhering to the risk governance framework" because:

i.     according to the Fed Cease and Desist Order, the Citigroup Board needed to take actions "to execute its oversight," including actions "to hold senior management accountable for executing effective and sustainable remediation plans by the committed deadlines" and "ensure effective reporting to the board of directors that will enable it to oversee management's execution of the matters identified in this Order." (¶¶2, 2(a), 2(d).)  The "matters identified in this Order" included "significant ongoing deficiencies in implementation and execution by Citigroup with respect to various areas of risk management and internal controls" and "longstanding enterprise-wide risk management and controls deficiencies."  (*Id.* at 1-2.);

ii.     according to the OCC Remediation Order, "inadequate reporting to the [Citibank] Board hinders its ability to provide effective oversight," and the Citibank "Board and senior management oversight is inadequate to ensure timely, appropriate actions to correct the serious and longstanding deficiencies and unsafe or unsound practices in the areas of risk management, internal controls, and data governance at the Bank" (Art. II ¶5);

iii.     according to the OCC Remediation Order, "the [Citibank] Board and Audit Committee" needed to describe the actions they "will each take to further improve its oversight of senior management, including holding senior management accountable for implementing and maintaining the corrective action required by this Order," which further included "ensur[ing] that reports to the Board, the Audit Committee, and senior management are transparent and comprehensive and contain thorough and complete analysis, including thematic analysis" (Art. XII ¶1(g)).

374.     The 2017 Annual Report stated (at 115) that:

> *To anticipate, mitigate and control operational risk, Citi has established policies and a global framework for assessing, monitoring and communicating operational risks and the overall operating effectiveness of the internal control environment across Citigroup.*

375.    The statements in the paragraph immediately above were materially false and misleading because they failed to disclose that,

(a)    the OCC Remediation Order found that: (i) "[f]or several years, [Citibank] has failed to implement and maintain an enterprise-wide risk management and compliance risk management program, internal controls, or a data governance program commensurate with [Citibank's] size, complexity, and risk profile;" (ii) Citibank "fail[ed] to establish an effective risk governance framework as required by [Appendix D]," (iii) "the Bank's enterprise-wide risk management policies, standards and frameworks [failed] to adequately identify, measure, monitor and control risks," and internal controls were unsafe or unsound (Art. II ¶¶1, 2(b) & (c), 3).

(b)    the Fed Cease and Desist Order determined that "Citigroup has not adequately remediated the longstanding enterprise-wide risk management and controls deficiencies previously identified by the Federal Reserve," as required by Regulation YY (at 1-2);

(c)    the Fed Cease and Desist Order ordered Citigroup to "conduct a gap analysis of its enterprise-wide risk management framework and internal controls systems … to determine the enhancements that are necessary to meet the risk management requirements set forth in Regulation YY … with respect to the following three items: capital planning, liquidity risk management, and compliance risk management," and instructed that "[t]he Gap Analysis shall identify where Citigroup's risk management policies, procedures, practices processes, and internal controls are not compliant with Regulation YY with regard to the[se] areas" (¶¶3, 3(a));

(d)    as set forth in the article published by *Business Insider* on September 15, 2020, titled "The Real Reasons Behind Citigroup CEO Mike Corbat's Retirement," Citigroup

"seldom took the time to harmonize technology systems" and instead relied on "a patchwork of technology systems that didn't talk to one another;" and, in contrast to "many banks [that] have spent years improving their systems," Corbat "was often reluctant to spend the money or dedicate enough people to fix a problem the right way."

376.    The 2017 Annual Report (at 63) stated that:

***Extensive compliance requirements can result in increased reputational and legal risks, as failure to comply with regulations and requirements, or failure to comply as expected, can result in enforcement and/or regulatory proceedings.***

*** * * ***

***Citi is Subject to Extensive Legal and Regulatory Proceedings, Investigations and Inquiries That Could Result in Significant Penalties and Other Negative Impacts on Citi, Its Business and Results and Operations.***

377.    The statements in the paragraph immediately above were materially false and misleading because either the risks identified and described as conditional or potential ("can result," "could result") were not conditional or potential, but instead had come to pass and were actual and existing as set forth in the OCC Remediation Order and the Fed Cease and Desist Order specifically below, or failed to disclose that,

(a)    the OCC Remediation Order found that:

i.    "for several years, the Bank has failed to implement and maintain an enterprise-wide risk management and compliance risk management program [and] internal controls…commensurate with the Bank's size, complexity, and risk profile" (Art. II ¶1);

ii.    Citibank had "serious and longstanding deficiencies and unsafe or unsound practices in the areas of risk management [and] internal controls" (Art. II ¶5);

iii.    the "Bank was in noncompliance with [Appendix D] and engaged in unsafe or unsound practice that were part of a pattern of misconduct" (Art. II ¶6);

iv.     the "foregoing conduct [Article II ¶¶1-6] also contributed to violations of law and regulations and continuous noncompliance with [Appendix D]" (Art. II ¶7).

(b)     the Fed Cease and Desist Order determined that:

i.     the Fed "identified significant ongoing deficiencies in implementation and execution by Citigroup with respect to various areas of risk management and internal controls, including data quality management and regulatory reporting, compliance risk management, capital planning, and liquidity risk management" (at 1);

ii.     "Citigroup has not adequately remediated longstanding enterprise-wide risk management and controls deficiencies previously identified by the Federal Reserve, including in the areas described above and those addressed" in consent orders in 2013 and 2015 (at 2).

(c)     According to an article published on September 14, 2020, in *The Wall Street Journal* titled "Regulators Prepare to Reprimand Citigroup for Failing to Improve Risk Systems," "[f]or years, regulators have privately pressed Citigroup and Mr. Corbat to fix the bank's risk systems," and "faulted Citi's management for not giving priority to the risk-management overhaul."  And according to an article in *Business Insider* on September 15, 2020 titled "The Real Reasons Behind Citigroup CEO Mike Corbat's Retirement,"  "[Corbat] who had made operating efficiency and return-on equity a hallmark of his strategy was often reluctant to spend the money or dedicate enough people to fix a problem the right way."

## 12.     Materially False And Misleading Statements In Citigroup's Form 10-K For 2018

378.     On February 22, 2019, Citigroup filed its Annual Report for 2018 on Form 10-K with the SEC ("2018 Annual Report").  The Individual Defendants who signed the 2018 Annual Report and made the misrepresentations are set forth in the chart in ¶55.  The 2018 Annual Report

(at 4) stated that "[t]hroughout this report, 'Citigroup,' 'Citi' and 'the Company' refer to Citigroup Inc. and its consolidated subsidiaries," which includes Citibank.

379.    The 2018 Annual Report (at 59) stated that:

> **Citi's Company-wide risk governance framework consists of the policies, standards, procedures and processes through which Citi identifies, assesses, measures, manages, monitors, reports and controls risks across the Company.**

380.    The statement in the paragraph immediately above was materially false and misleading because it failed to disclose that "Citi's Company-wide risk governance framework" did not adequately "identif[y]… measure[]…monitor[]… and control" risks across the Company," and the risk governance framework was not effective, according to the OCC Remediation Order and the Fed Cease and Desist Order, specifically,

(a)    the "Bank's enterprise-wide risk management policies, standards, and frameworks" "fail[ed]" to "adequately identify, measure, monitor, and control risks" across the Company (OCC Remediation Order Art. II ¶2(c));

(b)    Citibank "fail[ed] to establish an effective risk governance framework as required by [Appendix D]," which constituted "deficiencies, noncompliance with [Appendix D], or unsafe or unsound practices with respect to the Bank's enterprise-wide risk management and compliance risk management program" (*id*. Art. II ¶¶2, 2(b));

(c)    "[f]or several years, the Bank has failed to implement and maintain an enterprise-wide risk management and compliance risk management program … commensurate with [Citibank's] size, complexity, and risk profile" (*id*. Art. II ¶1);

(d)    "the Bank was in noncompliance with [Appendix D] and engaged in unsafe or unsound practices that were part of a pattern of misconduct (*id*. Art. II ¶6);

(e)    "Citigroup has not adequately remediated the longstanding enterprise-wide risk management … deficiencies previously identified by the Federal Reserve," "with respect to []

capital planning, liquidity risk management and compliance risk management" as required by

Regulation YY (Fed Cease and Desist Order at 2 & ¶3).

381.    The 2018 Annual Report (at 59) stated that:

> ***The risk governance framework has been developed in alignment with the expectations of the Office of the Comptroller of the Currency (OCC) Heightened Standards. It is also aligned with the relevant components … of the Federal Reserve's Enhanced Prudential Standards for Bank Holding Companies and Foreign Banking Organizations.***

382.    The statements in the paragraph immediately above were materially false and

misleading because,

(a)    according to the OCC Remediation Order, the "risk governance framework"

was not "developed in alignment with the expectations of the Office of the Comptroller of the

Currency (OCC) Heightened Standards [Appendix D]," specifically,

i.    Citibank "fail[ed] to establish an effective risk governance

framework as required by [Appendix D], which constituted "deficiencies, noncompliance with

[Appendix D], or unsafe or unsound practices with respect to the Bank's enterprise-wide risk

management and compliance risk management program" (Art. II ¶¶2, 2(b));

ii.    "[f]or several years, the Bank has failed to implement and maintain

an enterprise-wide risk management and compliance risk management program … commensurate

with the Bank's size, complexity, and risk profile" (Art. II ¶1);

iii.    Citibank "was in noncompliance with [Appendix D] and engaged in

unsafe or unsound practices that were part of a pattern of misconduct" (Art. II ¶6);

iv.    "The foregoing conduct [] contributed to violations of law and

regulation and continuous noncompliance with [Appendix D]" (Art. II ¶7).

(b)    according to the Fed Cease and Desist Order, the "risk governance

framework" was not "aligned with the relevant components … of the Federal Reserve's Enhanced

Prudential Standards for Bank Holding Companies [Regulation YY 12 C.F.R. §252.33]," which

sets forth the "[r]isk management and risk committee requirements," because:

      i.     the Fed "identified significant ongoing deficiencies in

implementation and execution by Citigroup with respect to various areas of risk management and

internal controls, including data quality management and regulatory reporting, compliance risk

management, capital planning, and liquidity risk management" (at 1);

      ii.     "Citigroup has not adequately remediated longstanding enterprise-

wide risk management and controls deficiencies previously identified by the Federal Reserve,

including in the areas described above and those addressed" in consent orders in 2013 and 2015

(at 2);

      iii.     the Fed ordered Citigroup to "conduct a gap analysis of its

enterprise-wide risk management framework and internal controls systems … to determine the

enhancements that are necessary to meet the risk management requirements set forth in Regulation

YY … with respect to the following three items: capital planning, liquidity risk management, and

compliance risk management," and instructed that "[t]he Gap Analysis shall identify where

Citigroup's risk management policies, procedures, practices processes, and internal controls are

not compliant with Regulation YY with regard to the[se] areas" (¶¶3, 3(a));

      iv.     "consistent with section 252.33(a) of Regulation YY … Citigroup

is required to maintain an enterprise-wide risk management program designed to identify and

manage risks across the consolidated organization" (at 1).

383.    The 2018 Annual Report (at 60) stated that:

> ***Citi manages its risks through each of its three lines of defense: (i) business
> management, (ii) independent control functions, and (iii) internal audit.  The
> three lines of defense collaborate with each other in structured forums and
> processes*** to bring various perspectives together and ***to lead the organization***

*toward outcomes that* are in clients' interests, create economic value and *are systemically responsible.*

384. The statements in bold in the paragraph immediately above were materially false and misleading (the non-bolded portions are provided for context) because,

(a) the statement that, "Citi manages its risks through each of its three lines of defense: (i) business management, (ii) independent control functions, and (iii) internal audit," failed to disclose that, according to the OCC Remediation Order:

i. Citibank "fail[ed] to establish effective front-line units and independent risk management as required by [Appendix D]," which constituted "deficiencies, noncompliance with [Appendix D], or unsafe or unsound practices with respect to the Bank's enterprise-wide risk management and compliance risk management program" (Art. II ¶¶2, 2(a));

ii. Citibank "fail[ed] to establish effective front-line units, independent risk management, internal audit, and control functions as required by [Appendix D]," which constituted "deficiencies, noncompliance with [Appendix D], or unsafe or unsound practices with respect to the Bank's data quality and data governance, including risk aggregation and management and regulatory reporting" (Art. II ¶4, 4(a));

iii. the failure to establish effective lines of defense contributed to "unsafe or unsound practices that were part of a pattern of misconduct" and "to violations of law and regulation and continuous noncompliance with [Appendix D]" (Art. II ¶¶6, 7).

(b) "the three lines of defense" did not "collaborate with each other in structured forums and processes … to lead the organization toward outcomes that … are systemically responsible," but rather toward outcomes that were unsafe or unsound. According to the OCC Remediation Order, specifically,

i.        the three lines of defense failed to be effective (Art. II ¶¶2(a), 4(a)), contributing to "unsafe or unsound practices that were part of a pattern of misconduct" and "to violations of law and regulation and continuous noncompliance with [Appendix D]"  (Art. II ¶¶6, 7);

ii.       independent risk management was not "appropriately independent" (Art. VI ¶2(h)), such that the three lines of defense did not "collaborate with each other in structured forms or processes.

385.    The 2018 Annual Report (at 60) stated that Citigroup's:

*Independent Compliance Risk Management (ICRM) organization is designed to protect Citi by overseeing senior management, the businesses and other control functions in managing compliance risk*, as well as promoting business conduct and activity that is consistent with Citi's mission and value proposition.

386.    The statements in bold in the paragraph immediately above were materially false and misleading (the non-bolded portions are provided for context) because,

(a)      the "Independent Compliance Risk Management (ICRM) organization" was not "designed to protect Citi by overseeing senior management, the businesses and other control functions in managing compliance risk" according to the OCC Remediation Order and the Fed Cease and Desist Order, because,

i.        "Independent Compliance Risk Management" did not have an "effective, independent monitoring and testing function supported by sufficiently skilled staff and resources that provide risk-based scope and coverage to provide credible challenge and escalation of issues identified by front-line units" (Art. VII ¶2(f));

ii.       Article VII of the OCC Remediation Order, addressing the remediation plan for Compliance Risk Management, required Citibank to "establish" the following

policies, procedures and control systems (*i.e.*, they had not been established yet, rendering the "design" deficient, noncompliant with [Appendix D], or unsafe or unsound):

    1.    "policies, processes, and control systems within front-line units to assess, measure, and limit regulatory compliance exposures on an ongoing basis commensurate with the risk profile and risk appetite of the Bank" (Art. VII ¶2(b));

    2.    "policies, processes, and control systems within independent compliance risk management to assess, measure, aggregate, and limit regulatory compliance exposures on an ongoing basis commensurate with the risk profile and risk appetite of the Bank" (Art. VII ¶2(c));

    3.    "procedures and processes designed to result in compliance with laws, regulations, and Enterprise-wide corporate policies" (Art. VII ¶2(d));

    4.    "procedures and processes to ensure that Enterprise-wide corporate policies are timely updated on a periodic and as-needed basis to address changes in applicable laws and regulations and to ensure the policies comply with the effective date of such laws and regulations" (Art. VII ¶2(e)).

    iii.    The Fed Cease and Desist Order required Citigroup to "enhance its compliance risk management program" and "submit a written plan" to the Fed that "shall include the following seven items," (¶5), including the following five components:

    1.    "a detailed analysis of the most material risk factors related to U.S. laws and regulations applicable to Citigroup's operations and legal entities" (¶5(a));

    2.    "an assessment of existing controls, including business line controls and testing processes, to ensure Citigroup's enterprise-wide operations comply with U.S.

laws and regulations in the areas associated with the risk factors identified in subsection ([1])
above" (¶5(b));

        3.     measures to improve and maintain such controls in any area
where the assessment in subsection ([2]) above identifies deficiencies" (¶5(c));

        4.     "improvements to the management information systems,
data, and reports provided to Citigroup's board of directors and senior management concerning
compliance risks, compliance with applicable U.S. laws and regulations, and the effectiveness and
functioning of the compliance risk management program" (¶5(d));

        5.     "measures for managing and controlling Citigroup's
compliance risks until the plan is implemented in full" (¶5(f)).

     (b)    the statements did not disclose that:

        i.     Citigroup's "compliance risk management" program suffered from
"significant ongoing deficiencies in implementation and execution by Citigroup," including with
respect to "longstanding enterprise-wide risk management and controls deficiencies previously
identified by the Federal Reserve" that "Citigroup has not adequately remediated" (Fed Cease and
Desist Order at 1-2);

        ii.     Citibank had "fail[ed] to establish effective … independent risk
management … and control functions as required by [Appendix D]" with respect to data quality
and data governance, (OCC Remediation Order Art. II ¶4(a)), which constituted "deficiencies,
noncompliance with [Appendix D], or unsafe or unsound practices with respect to the Bank's data
quality and data governance" (OCC Remediation Order Art. II ¶4);

iii.    "[f]or several years, the Bank has failed to implement and maintain [a] compliance risk management program … commensurate with [Citibank's] size, complexity, and risk profile" (*id*. Art. II ¶1);

iv.    the OCC "identified … deficiencies, noncompliance with [Appendix D], or unsafe or unsound practices with respect to the Bank's ….compliance risk management program" (*id*. Art. II ¶2).

387.    The 2018 Annual Report stated (at 61) that:

Citi's Internal Audit function independently reviews activities of the first two lines of defense based on a risk-based audit plan and methodology approved by the Audit Committee of the Citigroup Board of Directors. ***Internal Audit also provides independent assurance to the Citigroup Board of Directors, the Audit Committee of the Board, senior management and regulators regarding the effectiveness of Citi's governance and controls designed to mitigate Citi's exposure to risks and to enhance Citi's culture of compliance and control.***

388.    The statements in bold in the paragraph immediately above were materially false and misleading (the non-bolded portions are provided for context) because,

(a)    the statements failed to disclose that Citibank "fail[ed] to establish effective internal audit … functions as required by [Appendix D]," (OCC Remediation Order Art. II ¶4(a)), with respect to data quality and data governance, which constituted "deficiencies, noncompliance with [Appendix D], or unsafe or unsound practices with respect to the Bank's enterprise-wide risk management and compliance risk management program" (*id.* Art. II ¶4);

(b)    the audit function did not "provide[] independent assurance to the Citigroup Board of Directors, the Audit Committee of the Board, senior management and regulators regarding the effectiveness of Citi's governance and controls designed to mitigate Citi's exposure to risks and to enhance Citi's culture of compliance and control" because:

i.    according to the OCC Remediation Order, "inadequate reporting to the [Citibank] Board hinders its ability to provide effective oversight," and Citibank "Board and

senior management oversight is inadequate to ensure timely, appropriate actions to correct the serious and longstanding deficiencies and unsafe or unsound practices in the areas of risk management, internal controls, and data governance at the Bank" (Art. II ¶5);

ii.     the OCC Remediation Order ordered Citibank to "perform analyses (or assess analyses previously performed) to diagnose the root cause(s) of the underlying issues that led to internal controls related concerns identified by internal audit and/or federal regulators since 2017" (Art. IX ¶1(a)(i));

iii.     according to the Fed Cease and Desist Order, the Citigroup Board needed to take actions "to execute its oversight," including actions to "ensure … internal audit findings are effectively remediated" (¶¶2, 2(b)).

389.     The 2018 Annual Report stated (at 62) that the

> *Citigroup Board of Directors oversees Citi's risk-taking activities and holds management accountable for adhering to the risk governance framework.  To do so, directors review reports prepared by the business, Risk, Independent Compliance Risk Management, Internal Audit and others, and exercise sound independent judgment to question, probe and challenge recommendations and decisions made by management.*

390.     The statements in the paragraph immediately above were materially false and misleading because,

(a)     the statements that "Citigroup's Board of Directors oversees Citi's risk-taking activities," and that "directors review reports prepared by the business, Risk, Independent Compliance Risk Management, Internal Audit and others, and exercise sound independent judgment to question, probe and challenge recommendations and decisions made by management," failed to disclose that the Citigroup Board did not effectively oversee Citigroup's risk-taking activities, specifically:

> i.      according to the Fed Cease and Desist Order, the Citigroup Board needed to take actions "to execute its oversight," including actions to "ensure effective reporting to the board of directors that will enable it to oversee management's execution of the matters identified in this Order." (Fed Cease and Desist Order ¶¶2, 2(b)). The "matters identified in this Order" included "significant ongoing deficiencies in implementation and execution by Citigroup with respect to various areas of risk management and internal controls" and "longstanding enterprise-wide risk management and controls deficiencies" (*Id.* at 1-2);

> ii.      according to the OCC Remediation Order, "inadequate reporting to the [Citibank] Board hinders its ability to provide effective oversight," and the Citibank "Board and senior management oversight is inadequate to ensure timely, appropriate actions to correct the serious and longstanding deficiencies and unsafe or unsound practices in the areas of risk management, internal controls, and data governance at the Bank" (Art. II ¶5);

> (b)      the Citigroup Board did not "hold[] management accountable for adhering to the risk governance framework" because:

> i.      according to the Fed Cease and Desist Order, the Citigroup Board needed to take actions "to execute its oversight," including actions "to hold senior management accountable for executing effective and sustainable remediation plans by the committed deadlines" and "ensure effective reporting to the board of directors that will enable it to oversee management's execution of the matters identified in this Order." (¶¶2, 2(a), 2(d).) The "matters identified in this Order" included "significant ongoing deficiencies in implementation and execution by Citigroup with respect to various areas of risk management and internal controls" and "longstanding enterprise-wide risk management and controls deficiencies" (*id.* at 1-2);

ii.        according to the OCC Remediation Order, "inadequate reporting to the [Citibank] Board hinders its ability to provide effective oversight," and the Citibank "Board and senior management oversight is inadequate to ensure timely, appropriate actions to correct the serious and longstanding deficiencies and unsafe or unsound practices in the areas of risk management, internal controls, and data governance at the Bank" (Art. II ¶5);

iii.        according to the OCC Remediation Order, "the [Citibank] Board and Audit Committee" needed to describe the actions they "will each take to further improve its oversight of senior management, including holding senior management accountable for implementing and maintaining the corrective action required by this Order," which further included "ensur[ing] that reports to the Board, the Audit Committee, and senior management are transparent and comprehensive and contain thorough and complete analysis, including thematic analysis" (Art. XII ¶¶1(g), 1(g)(i)).

391.    The 2018 Annual Report stated (at 106) that:

> *To anticipate, mitigate and control operational risk, Citi has established policies and a global framework for assessing, monitoring and communicating operational risks and the overall operating effectiveness of the internal control environment across Citigroup.*

392.    The statements in the paragraph immediately above were materially false and misleading because they failed to disclose that,

(a)        the OCC Remediation Order found that: (i) "[f]or several years, [Citibank] has failed to implement and maintain an enterprise-wide risk management and compliance risk management program, internal controls, or a data governance program commensurate with [Citibank's] size, complexity, and risk profile;" (ii) Citibank "fail[ed] to establish an effective risk governance framework as required by [Appendix D]," (iii) "the Bank's enterprise-wide risk

management policies, standards and frameworks [failed] to adequately identify, measure, monitor and control risks," and internal controls were unsafe or unsound  (Art. II ¶¶1, 2(b) & (c), 3);

(b)      the Fed Cease and Desist Order (at 1-2) stated that "Citigroup has not adequately remediated the longstanding enterprise-wide risk management and controls deficiencies previously identified by the Federal Reserve," as required by Regulation YY;

(c)      the Fed Cease and Desist Order ordered Citigroup to "conduct a gap analysis of its enterprise-wide risk management framework and internal controls systems … to determine the enhancements that are necessary to meet the risk management requirements set forth in Regulation YY … with respect to the following three items: capital planning, liquidity risk management, and compliance risk management," and instructed that "[t]he Gap Analysis shall identify where Citigroup's risk management policies, procedures, practices processes, and internal controls are not compliant with Regulation YY with regard to the[se] areas" (¶¶3, 3(a));

(d)      as set forth in the article published by *Business Insider* on September 15, 2020, titled "The Real Reasons Behind Citigroup CEO Mike Corbat's Retirement," Citigroup "seldom took the time to harmonize technology systems" and instead relied on "a patchwork of technology systems that didn't talk to one another"; and, in contrast to "many banks [that] have spent years improving their systems," Corbat "was often reluctant to spend the money or dedicate enough people to fix a problem the right way."

393.    The 2018 Annual Report (at 107-108) stated that:

*Citi follows the following CRM [Compliance Risk Management] Framework process steps: Establishing, maintaining and adhering to policies, standards and procedures for the management of compliance risk, in accordance with policy governance requirements; Developing and providing training to support the effective execution of roles and responsibilities related to the identification, control, reporting and escalation of matters related to compliance risks….; Independently testing and monitoring that Citi is operating within the Compliance Risk Appetite; Identifying instances of non-conformance with Laws,*

*regulations, rules and breaches of internal policies; Escalating through the appropriate channels, which may include governance forums, the results of monitoring, testing, reporting or other oversight activities that may represent a violation of law, regulation, policy or other significant compliance risk and take reasonable action to see that the matter is appropriately identified, tracked and resolved, including through the issuance of corrective action plans against the first line of defense.*

394.    The statements in the paragraph immediately above were materially false and misleading because,

(a)    they failed to disclose that according to the OCC Remediation Order, "[f]or several years, the Bank has failed to implement and maintain …[a] compliance risk management program … commensurate with the Bank's size, complexity and risk profile," and "the compliance risk management program" had a number of deficiencies, unsafe or unsound practices, or was not in compliance with Appendix D  (Art. II ¶¶1, 2);

(b)    the Fed Cease and Desist Order (i) "identified significant ongoing deficiencies in implementation and execution by Citigroup with respect to various areas of risk management and internal controls, including for data quality management and regulatory reporting, compliance risk management, capital planning, and liquidity risk management" (at 1); (ii) stated that "Citigroup has not adequately remediated the longstanding enterprise-wide risk management and controls deficiencies previously identified by the Federal Reserve," including those addressed in consent orders issued in 2013 and 2015 (at 2); and (iii) required "improvements to the management information systems, data, and reports provided to Citigroup's board of directors and senior management concerning compliance risks, compliance with applicable U.S. laws and regulations, and the effectiveness and functioning of the compliance risk management program" (¶5(d)).

(c)    the statement that "Citi follows the following CRM Framework process steps: … [e]stablish[], maintain[] and adher[e] to policies, standards and procedures for the

management of compliance risk, in accordance with policy governance requirements," also failed

to disclose that the OCC Remediation Order set forth four sets of policies, standards and

procedures, (Art. VII ¶¶2(b)-(e)), that Citibank needed to "establish" and "adhere" to, which it had

not, to meet compliance risk management requirements;

(d)     the statement that "Citi follows the following CRM [Compliance Risk

Management] Framework process steps:  … Escalating through the appropriate channels, which

may include governance forums, the results of monitoring, testing, reporting or other oversight

activities that may represent a violation of law, regulation, policy or other significant compliance

risk and take reasonable action to see that the matter is appropriately identified, tracked and

resolved, including through the issuance of corrective action plans against the first line of defense,"

failed to disclose that, the OCC Remediation Order found that the "Board and senior management

oversight is inadequate to ensure timely, appropriate actions to correct the serious and longstanding

deficiencies and unsafe or unsound practices in the areas of risk management, internal controls,

and data governance at the Bank" which was hindered by "inadequate reporting to the Board,"

which further constituted noncompliance with Appendix D (Art. II ¶5).

395.    The 2018 Annual Report (at 56) stated that:

*A failure to resolve any identified deficiencies could result in increased regulatory oversight and restrictions.*

\* \* \*

*Extensive compliance requirements can result in increased reputational and legal risks, as failure to comply with regulations and requirements, or failure to comply as expected, can result in enforcement and/or regulatory proceedings.*

\* \* \*

*Citi is Subject to Extensive Legal and Regulatory Proceedings, Investigations and Inquiries That Could Result in Significant Penalties and Other Negative Impacts on Citi, Its Business and Results and Operations.*

396.    The statements in the paragraph immediately above were false and misleading because either the risks identified and described as conditional or potential ("could result," "can result," "could result") were not conditional or potential, but instead had come to pass and were actual and existing as set forth in the OCC Remediation Order and the Fed Cease and Desist Order specifically below, or failed to disclose that,

(a)    the OCC Remediation Order found that:

i.    "for several years, the Bank has failed to implement and maintain an enterprise-wide risk management and compliance risk management program [and] internal controls…commensurate with the Bank's size, complexity, and risk profile" (Art. II ¶1);

ii.    Citibank had "serious and longstanding deficiencies and unsafe or unsound practices in the areas of risk management [and] internal controls" (Art. II ¶5);

iii.    the "Bank was in noncompliance with [Appendix D] and engaged in unsafe or unsound practice that were part of a pattern of misconduct" (Art. II ¶6);

iv.    the "foregoing conduct [Article II ¶¶1-6] also contributed to violations of law and regulations and continuous noncompliance with [Appendix D]" (Art. II ¶7).

(b)    the Fed Cease and Desist Order determined that:

i.    Citigroup has "significant ongoing deficiencies in implementation and execution by Citigroup with respect to various areas of risk management and internal controls, including for data quality management and regulatory reporting, compliance risk management, capital planning, and liquidity risk management" (at 1);

ii.    "Citigroup has not adequately remediated longstanding enterprise-wide risk management and controls deficiencies previously identified by the Federal Reserve,

including in the areas described above and those addressed" in consent orders in 2013 and 2015 (at 2).

(c)      According to an article published on September 14, 2020, in *The Wall Street Journal* titled "Regulators Prepare to Reprimand Citigroup for Failing to Improve Risk Systems," "[f]or years, regulators have privately pressed Citigroup and Mr. Corbat to fix the bank's risk systems," and "faulted Citi's management for not giving priority to the risk-management overhaul."  And according to an article in *Business Insider* on September 15, 2020 titled "The Real Reasons Behind Citigroup CEO Mike Corbat's Retirement,"  "[Corbat] who had made operating efficiency and return-on equity a hallmark of his strategy was often reluctant to spend the money or dedicate enough people to fix a problem the right way."

### 13.      Materially False And Misleading Statements And Omissions In March 6, 2019 Proxy

397.    On March 6, 2019, Citigroup filed its 2019 Proxy Statement on Form 14A with the SEC (the "2019 Proxy"), which included a "Letter from the Board of Directors to our Shareholders" (the "Letter") containing false and misleading statements.   The Individual Defendants who signed the Letter and made the misrepresentations are set forth in the chart in ¶55.

398.    The Letter stated, in part:

> ***Management also made progress on the regulatory front last year***, which we believe is critical to the firm's success. . . . In addition, ***Citi made headway on a range of heightened regulatory requirements*** that all large banks have faced in the wake of the financial crisis. Nevertheless, ***your Board will continue to pay close attention to – and expect management to make continued progress on – regulatory matters in 2019 and beyond***.

> As it should be for a global firm like Citi, ***prudent risk management was top of mind for both management and the Board in 2018***. Our three lines of defense – the business lines, the control functions, and internal audit – dove deeply and, where necessary, took proactive steps in critical risk areas . . . ***The Board and our Risk Committee engage deeply in the oversight of risk management practices*** in these and other areas, always recognizing that, while Citi is in the business of taking risk, these risks must be understood, measured, monitored, and controlled.

399. The statements in bold in the paragraph immediately above were materially false and misleading (the non-bolded portions are provided for context) because,

(a) the statements that "[m]anagement also made progress on the regulatory front last year" and "Citi made headway on a range of heightened regulatory requirements" failed to disclose that:

i. "for several years, the Bank has failed to implement and maintain an enterprise-wide risk management and compliance risk management program [and] internal controls … commensurate with the Bank's size, complexity, and risk profile" (OCC Remediation Order Art. II ¶1);

ii. the OCC identified "deficiencies, noncompliance with [Appendix D], or unsafe or unsound practices with respect to the Bank's enterprise-wide risk management and compliance risk management program" (Art. II ¶2);

iii. the OCC identified "unsafe or unsound practices with respect to the Bank's internal controls, including, among other things, an absence of clearly defined roles and responsibilities with multiple laws and regulations" (Art. II ¶3);

iv. the OCC identified "deficiencies, noncompliance with [Appendix D], or unsafe or unsound practices with respect to the Bank's data quality and data governance" (Art. II ¶4);

v. Citibank had "serious and longstanding deficiencies and unsafe or unsound practices in the areas of risk management [and] internal controls" (Art. II ¶5);

vi. the "Bank was in noncompliance with [Appendix D] and engaged in unsafe or unsound practice that were part of a pattern of misconduct" (Art. II ¶6);

vii.     Citibank's "conduct also contributed to violations of law and regulation and continuous noncompliance with [Appendix D]" (Art. II ¶7);

viii.     The Fed Cease and Desist Order stated that "the most recent supervisory assessment issued by the Federal Reserve Bank of New York … identified significant ongoing deficiencies in implementation and execution by Citigroup with respect to various areas of risk management and internal controls, including for data quality management and regulatory reporting, compliance risk management, capital planning, and liquidity risk management" (at 1);

ix.     The Fed Cease and Desist Order stated that "Citigroup has not adequately remediated the longstanding enterprise-wide risk management and controls deficiencies previously identified by the Federal Reserve, including in the areas described above and those addressed in (i) the Consent Order issued by the Board of Governors on March 21, 2013 to remediate outstanding deficiencies in Citigroup's anti-money laundering compliance program and (ii) the Consent Order issued by Board of Governors on May 20, 2015 to remediate outstanding deficiencies in Citigroup's compliance and control infrastructure relating to its foreign exchange program and designated market activities."  (at 2).

(b)     The statements that "your Board will continue to pay close attention to – and expect management to make continued progress on – regulatory matters in 2019 and beyond," "prudent risk management was top of mind for both management and the Board in 2018," and the "Board and our Risk Committee engage deeply in the oversight of risk management practices," were false because the Board did not pay close attention to regulatory matters, prudent risk management was not top of mind for management, and the Board did not engage deeply in risk management practices, as set forth in the OCC Remediation Order and the Fed Cease and Desist Order, specifically,

    i.  "Board and senior management oversight is inadequate to ensure timely, appropriate actions to correct the serious and longstanding and unsafe or unsound practices in the areas of risk management, internal controls, and data governance at the Bank" (OCC Remediation Order Art. II ¶5);

    ii.  Article XII of the OCC Remediation Order is titled "Board and Management Oversight" and included a comprehensive list of remedial measures necessary to address the inadequate oversight by the Board and senior management, including "[p]rocedures and processes to ensure that reports to the Board, the Audit Committee, and senior management are transparent and comprehensive and contain thorough and complete analysis, including thematic analysis" (Art. XII ¶1(g)(i));

    iii.  according to the Fed Cease and Desist Order, the Citigroup Board needed to take actions "to execute its oversight," including actions to "ensure effective reporting to the board of directors that will enable it to oversee management's execution of the matters identified in this Order."  (¶¶2, 2(d).)  The "matters identified in this Order" included "significant ongoing deficiencies in implementation and execution by Citigroup with respect to various areas of risk management and internal controls" and "longstanding enterprise-wide risk management and controls deficiencies." (at 1-2.)

   **14.**  **Materially False and Misleading Statements in March 19, 2019 Press Release**

   400. On March 19, 2019, Citigroup issued a press release titled "Citi Resolves Regulatory Review of Mortgage Program Implementation" in response to reports of a $25 million fine imposed on Citibank for violations of the Fair Housing Act for discriminating against borrowers based on gender, race and ethnicity.  In that press release, Citigroup assured investors

that it had conducted a "comprehensive" review and "[s]trengthened processes and controls to help ensure correct implementation going forward."

401.    The Citigroup statement in the paragraph immediately above was materially false and misleading because Citigroup had not "strengthened processes and controls to help ensure correct implementation going forward" because, according to the OCC Remediation Order, Citibank had been in "continuous noncompliance" through October 2020 based on, "[a]mong other things, the Bank's deficiencies in internal controls and compliance risk management" that "contributed to violations of laws and regulations and the OCC assessed civil money penalties in 2019 based specifically on violations of the Fair Housing Act" (Art. II ¶7).

### 15.    Materially False and Misleading Statements During the July 15, 2019 Earnings Call For 2Q 19

402.    On July 15, 2019, Citigroup held its earnings call for 2Q 19 in which Defendant Corbat stated that "***we won't change our commitment to safety and soundness and to making investments necessary to strengthen our infrastructure and control environment***." During that call, Defendant Mason also stated that, "[l]ooking ahead, we will maintain this expense discipline relative to the revenue environment ***while continuing to make essential investments in the franchise, including investments in infrastructure and controls***, but we do expect expenses to be lower on a sequential basis from the first half to the second half of the year."

403.    The statements in bold in the paragraph immediately above were materially false and misleading (the non-bolded portions are provided for context) because the Citigroup Board and senior management had not "commit[ted] to safety and soundness and to making investments necessary to strengthen [its] infrastructure and control environment," and Citigroup was not "mak[ing] essential investments … in infrastructure and controls" because,

(a)     the OCC Remediation Order found that "Board and senior management oversight is inadequate to ensure timely, appropriate actions to correct the serious and longstanding and unsafe or unsound practices of risk management, internal controls, and data governance at the Bank" (Art. II ¶5);

(b)     the OCC Remediation Order included Article XII, titled "Board and Management Oversight," which set forth a comprehensive list of remedial measures necessary to address the inadequate oversight by the Board and senior management;

(c)     the OCC Remediation Order included a number of additional technology-related remedial measures that showed that Citibank had not made the "necessary" or "essential" investments in its infrastructure and control environment, specifically, (i) ordering the DGP, which included a "thorough redesign of data architecture, re-engineering of processes, and modernization of system applications and information technology infrastructure," (Art. V ¶2(d)), and a requirement that Citibank "notif[y] the OCC of any material changes … between the amount of financial resources actually expended in connection with the DGP versus the amount allocated in the DGP," (Art. V ¶2(b)(iii)), and (ii) ordering the Technology Resource Assessment which required Citibank to "[i]dentify the number and types of technology resources needed to execute and sustain a safe and sound system of internal controls and risk management for control functions and identify any gaps, in the number and/or types of resources currently allocated to control functions," (Art. X ¶2(a)), and "[e]nsure a robust resource model that provides for ongoing monitoring of the Bank's allocation of technology resources for control functions, including addressing gaps in the number and types of resources as identified" (Art. X ¶2(c));

(d)     The Fed Cease and Desist Order "identified significant ongoing deficiencies in implementation and execution by Citigroup with respect to various areas of risk management

and internal controls, including for data management," (at 1), and required Citigroup to develop and implement a data quality management program that takes "measures to ensure that Citigroup has an effective enterprise-wide program for data quality management that provides timely and accurate data sufficient for Citigroup's enterprise-wide risk management framework and internal controls systems regarding capital planning, liquidity risk management, and compliance risk management" (¶4(a));

(e)     as set forth in the article published by *Business Insider* on September 15, 2020, titled "The Real Reasons Behind Citigroup CEO Mike Corbat's Retirement," in contrast to "many banks [that] have spent years improving their systems," Corbat "was often reluctant to spend the money or dedicate enough people to fix a problem the right way;"

(f)     *The Wall Street Journal* article on September 14, 2020 titled "Regulators Prepare to Reprimand Citigroup for Failing to Improve Risk Systems" said that the regulators "faulted Citi's management for not giving priority to the risk-management overhaul."

### 16.   Materially False and Misleading Statements During the September 9, 2019 Barclays Global Financial Services Conference

404.   On September 9, 2019, Mason presented at the Barclays Global Financial Services Conference, at which Mason said that "one thing that I want to reiterate is that we cannot compromise investing in core parts of our franchise that allow for us to have a competitive advantage. . . . ***we can't compromise the investments that are required in our infrastructure and in our controls to ensure safety and soundness***."

405.   The statement in bold in the paragraph immediately above was materially false and misleading (the non-bolded portions are provided for context) because Citigroup had already compromised the investments required in infrastructure and controls to ensure safety and soundness.  Specifically,

(a)    the OCC Remediation Order found "deficiencies, noncompliance with [Appendix D], or unsafe or unsound practices with respect to the Bank's data quality and data governance, including risk data aggregation and management and regulatory reporting" (Art. II ¶4);

(b)    the OCC Remediation Order included a number of technology-related remedial measures, specifically, (i) ordering the DGP, which included a "thorough redesign of data architecture, re-engineering of processes, and modernization of system applications and information technology infrastructure," (Art. V ¶2(d)), and a requirement that Citibank "notif[y] the OCC of any material changes … between the amount of financial resources actually expended in connection with the DGP versus the amount allocated in the DGP," (Art. V ¶2(b)(iii)), and (ii) ordering the Technology Resource Assessment which required Citibank to "[i]dentify the number and types of technology resources needed to execute and sustain a safe and sound system of internal controls and risk management for control functions and identify any gaps, in the number and/or types of resources currently allocated to control functions," (Art. X ¶2(a)), and "[e]nsure a robust resource model that provides for ongoing monitoring of the Bank's allocation of technology resources for control functions, including addressing gaps in the number and types of resources as identified" (Art. X ¶2(c));

(c)    The Fed Cease and Desist Order (i) "identified significant ongoing deficiencies in implementation and execution by Citigroup with respect to various areas of risk management and internal controls, including for data management" (at 1); (ii) ordered Citigroup "to determine the enhancements that are necessary to meet the risk management requirements set forth in Regulation YY … with respect to … capital planning, liquidity risk management, and compliance risk management" and "to ensure that Citigroup, on an ongoing basis, maintains an

enterprise-wide risk management framework that meets the risk management requirements of Regulation YY" (¶3); (iii) required Citigroup to develop and implement a data quality management program that "that provides timely and accurate data sufficient for Citigroup's enterprise-wide risk management framework and internal controls systems regarding capital planning, liquidity risk management, and compliance risk management" (¶4(a)); and (iv) required "improvements to the management information systems, data, and reports provided to Citigroup's board of directors and senior management concerning compliance risks, compliance with applicable U.S. laws and regulations, and the effectiveness and functioning of the compliance risk management program" (at ¶5(d));

(d)     as set forth in the article published by *Business Insider* on September 15, 2020 titled "The Real Reasons Behind Citigroup CEO Mike Corbat's Retirement," in contrast to "many banks [that] have spent years improving their systems," Corbat "was often reluctant to spend the money or dedicate enough people to fix a problem the right way;"

(e)     *The Wall Street Journal* article on September 14, 2020 titled "Regulators Prepare to Reprimand Citigroup for Failing to Improve Risk Systems" said that the regulators "faulted Citi's management for not giving priority to the risk-management overhaul."

### 17. Materially False And Misleading Statements In October 11, 2019 Press Statements

406.    On October 11, 2019, following the OCC's $30 million fine issued to Citibank for its "deficient processes and controls" related to violations of the other real estate owned holding period, Citi released a statement published in media reports (including *Reuters*) stating that, "[s]ince identifying the issue, we have strengthened controls, processes and procedures to ensure the timely disposition of these assets."

407.    The statement in the paragraph immediately above was materially false and misleading because Citibank had not "strengthened controls, processes and procedures to ensure timely disposition of the assets" because, according to the OCC Remediation Order, Citibank had been in "continuous noncompliance" through October 2020 based on, "[a]mong other things, the Bank's deficiencies in internal controls and compliance risk management" that "contributed to violations of laws and regulations and the OCC assessed civil money penalties in 2019 based specifically on … violations of the holding period for other real estate owned" (Art. II ¶7).

### 18.    Materially False And Misleading Statements During The October 15, 2019 Earnings Call For 3Q 19

408.    On October 15, 2019, Citigroup held its earnings call for 3Q 19.  On that call, Defendant Corbat represented that "***we remain committed to investing*** in the products in which we see the best growth opportunities as well as ***in our own infrastructure for the purpose of safety and soundness***."

409.    The statements in bold in the paragraph immediately above were materially false and misleading (the non-bolded portions are provided for context) because the Board and senior management did not "remain committed to investing … in our own infrastructure for the purpose of safety and soundness" because,

(a)    the OCC Remediation Order included a number of technology-related remedial measures that showed that Citibank had not made the necessary investments in its infrastructure for the purpose of safety and soundness, specifically, (i) ordering the DGP, which included a "thorough redesign of data architecture, re-engineering of processes, and modernization of system applications and information technology infrastructure," (Art. V ¶2(d)), and a requirement that Citibank "notif[y] the OCC of any material changes … between the amount of financial resources actually expended in connection with the DGP versus the amount allocated in

the DGP;" (Art. V ¶2(b)(iii)), and (ii) ordering the Technology Resource Assessment requiring Citibank to "[i]dentify the number and types of technology resources needed to execute and sustain a safe and sound system of internal controls and risk management for control functions and identify any gaps, in the number and/or types of resources currently allocated to control functions," (Art. X ¶2(a)), and "[e]nsure a robust resource model that provides for ongoing monitoring of the Bank's allocation of technology resources for control functions, including addressing gaps in the number and types of resources as identified" (Art. X ¶2(c));

(b)      the OCC Remediation Order found that "Board and senior management oversight is inadequate to ensure timely, appropriate actions to correct the serious and longstanding and unsafe or unsound practices of risk management, internal controls, and data governance at the Bank" (Art. II ¶5);

(c)      the OCC Remediation Order included Article XII, titled "Board and Management Oversight," which set forth a comprehensive list of remedial measures necessary to address the inadequate oversight by the Board and senior management;

(d)      The Fed Cease and Desist Order (i) "identified significant ongoing deficiencies in implementation and execution by Citigroup with respect to various areas of risk management and internal controls, including for data management" (at 1); (ii) ordered Citigroup "to determine the enhancements that are necessary to meet the risk management requirements set forth in Regulation YY … with respect to … capital planning, liquidity risk management, and compliance risk management" and "to ensure that Citigroup, on an ongoing basis, maintains an enterprise-wide risk management framework that meets the risk management requirements of Regulation YY" (¶3); (iii) required Citigroup to develop and implement a data quality management program "that provides timely and accurate data sufficient for Citigroup's enterprise-wide risk

management framework and internal controls systems regarding capital planning, liquidity risk management, and compliance risk management" (¶4(a)); and (iv) required "improvements to the management information systems, data, and reports provided to Citigroup's board of directors and senior management concerning compliance risks, compliance with applicable U.S. laws and regulations, and the effectiveness and functioning of the compliance risk management program" (¶5(d));

(e)     as set forth in the article published by *Business Insider* on September 15, 2020 titled "The Real Reasons Behind Citigroup CEO Mike Corbat's Retirement," in contrast to "many banks [that] have spent years improving their systems," Corbat "was often reluctant to spend the money or dedicate enough people to fix a problem the right way;"

(f)     *The Wall Street Journal* article on September 14, 2020 titled "Regulators Prepare to Reprimand Citigroup for Failing to Improve Risk Systems" said that the regulators "faulted Citi's management for not giving priority to the risk-management overhaul."

### 19.   Materially False And Misleading Statements In January 21, 2020 Press Reports

410.    On January 21, 2020, the OCC imposed a nearly $18 million civil monetary penalty on Citibank because the Bank had failed to buy flood insurance for borrowers in high-risk flood areas as required by the Flood Disaster Protection Act.  The lapses dated to 2014.  *American Banker* published an article that day titled "Citibank Fined Nearly $18 Million For Flood Insurance Violations," which stated that "a Citi spokesman said the company was 'pleased to have the matter resolved.'"

411.    The statement by the Citi spokesman in the paragraph immediately above was materially false and misleading because Citi had not "resolved" the matter because, according to the OCC Remediation Order, Citibank had been in "continuous noncompliance" through October

2020 based on, "[a]mong other things, the Bank's deficiencies in internal controls and compliance risk management" that "contributed to violations of laws and regulations and the OCC assessed civil money penalties … in 2020 based specifically on violations of the Flood Disaster Protection Act."  (Art. II ¶7.)

> **20.    Materially False And Misleading Statements In Citigroup's Form 10-K for 2019**

412.    On February 21, 2020, Citigroup filed its Annual Report for 2019 on Form 10-K with the SEC ("2019 Annual Report").  The Individual Defendants who signed the 2019 Annual Report and made the misrepresentations are set forth in the chart above (*see supra* ¶55).  The 2019 Annual Report (at 4) stated that "[t]hroughout this report, 'Citigroup,' 'Citi' and 'the Company' refer to Citigroup Inc. and its consolidated subsidiaries," which includes Citibank.

413.    The 2019 Annual Report (at 58) stated that:

> *Citi's Company-wide risk governance framework consists of the key policies, standards and processes through which Citi identifies, assesses, measures, monitors and controls risks across the Company.*

414.    The statements in the paragraph immediately above were materially false and misleading because, "Citi's Company-wide risk governance framework" did not "identif[y]… measure[]… monitor[] … and control[] risks across the Company," and the risk governance framework was not effective, according to the OCC Remediation Order and the Fed Cease and Desist Order, specifically,

(a)    Citibank "fail[ed] to establish an effective risk governance framework as required by [Appendix D]," which constituted "deficiencies, noncompliance with [Appendix D], or unsafe or unsound practices with respect to the Bank's enterprise-wide risk management and compliance risk management program" (OCC Remediation Order Art. II ¶¶2, 2(b));

(b)      the "Bank's enterprise-wide risk management policies, standards, and frameworks" "fail[ed]" to "adequately identify, measure, monitor, and control risks" across the Company (OCC Remediation Order Art. II ¶2(c));

(c)      "[f]or several years, the Bank has failed to implement and maintain an enterprise-wide risk management and compliance risk management program … commensurate with the [Citibank's] size, complexity, and risk profile" (OCC Remediation Order Art. II ¶1);

(d)      "the Bank was in noncompliance with [Appendix D] and engaged in unsafe or unsound practices that were part of a pattern of misconduct" (OCC Remediation Order Art. II ¶6);

(e)      "Citigroup has not adequately remediated the longstanding enterprise-wide risk management … deficiencies previously identified by the Federal Reserve," "with respect to [] capital planning, liquidity risk management and compliance risk management" as required by Regulation YY (Fed Cease and Desist Order at 2 & ¶3).

415.    The 2019 Annual Report (at 59) stated that:

> ***Citi manages its risks through a 'three lines of defense' model: (i) business management; (ii) Independent Risk Management and Independent Compliance Risk Management and other control functions; and (iii) Internal Audit.  The three lines of defense collaborate with each other in structured forums and processes*** to bring together various perspectives and ***to lead the organization toward outcomes*** that are in clients' interests, create economic value and ***that are systemically responsible.***

416.    The statements in bold in the paragraph immediately above were materially false and misleading (the non-bolded portions are provided for context) because,

(a)      the statement that, "Citi manages its risks through a 'three lines of defense' model: (i) business management, (ii) Independent Risk Management and Independent Compliance Risk Management and other control functions, and (iii) Internal Audit," failed to disclose that, according to the OCC Remediation Order:

        i.        Citibank "fail[ed] to establish effective front-line units and independent risk management as required by [Appendix D]," which constituted "deficiencies, noncompliance with [Appendix D], or unsafe or unsound practices with respect to the Bank's enterprise-wide risk management and compliance risk management program" (Art. II ¶¶2, 2(a));

        ii.        Citibank "fail[ed] to establish effective front-line units, independent risk management, internal audit, and control functions as required by [Appendix D]," which constituted "deficiencies, noncompliance with [Appendix D], or unsafe or unsound practices with respect to the Bank's data quality and data governance, including risk aggregation and management and regulatory reporting" (Art. II ¶¶4, 4(a));

        iii.        the failure to establish effective lines of defense contributed to "unsafe or unsound practices that were part of a pattern of misconduct" and "to violations of law and regulation and continuous noncompliance with [Appendix D]" (Art. II ¶¶6, 7);

        (b)        "the three lines of defense" did not "collaborate with each other in structured forums and processes … to lead the organization toward outcomes that … are systemically responsible," but rather toward outcomes that were unsafe or unsound.  According to the OCC Remediation Order, specifically:

        i.        the three lines of defense failed to be effective (Art. II ¶¶2(a), 4(a)), contributing to "unsafe or unsound practices that were part of a pattern of misconduct" and "to violations of law and regulation and continuous noncompliance with [Appendix D]"  (Art. II ¶¶6, 7); and

        ii.        independent risk management was not "appropriately independent" (Art. VI ¶2(h)), such that the three lines of defense did not "collaborate with each other in structured forms or processes."

417.    The 2019 Annual Report (at 59) stated that Citigroup's:

***Independent Compliance Risk Management organization is an independent risk management function that is designed to oversee and credibly challenge products, functions, jurisdictional activities and legal entities in managing compliance risk,*** as well as promoting business conduct and activity that is consistent with Citi's mission and value proposition and the compliance risk appetite.

418.    The statements in bold in the paragraph immediately above were materially false and misleading (the non-bolded portions are provided for context) because,

(a)     the "Independent Compliance Risk Management organization" was not "designed to oversee and credibly challenge products, functions, jurisdictional activities and legal entities in managing compliance risk" according to the OCC Remediation Order, because,

i.     "Independent Compliance Risk Management" did not have an "effective, independent monitoring and testing function supported by sufficiently skilled staff and resources that provide risk-based scope and coverage to provide credible challenge and escalation of issues identified by front-line units" (Art. VII ¶2(f));

ii.     Article VII, addressing the remediation plan for Compliance Risk Management, required Citibank to "establish" the following policies, procedures and control systems (*i.e.*, they had not been established yet, rendering the "design" deficient, noncompliant with [Appendix D], or unsafe or unsound):

1.     "policies, processes, and control systems within front-line units to assess, measure, and limit regulatory compliance exposures on an ongoing basis commensurate with the risk profile and risk appetite of the Bank" (Art. VII ¶2(b));

2.     "policies, processes, and control systems within independent compliance risk management to assess, measure, aggregate, and limit regulatory compliance

exposures on an ongoing basis commensurate with the risk profile and risk appetite of the Bank"
(Art. VII ¶2(c));

      3.    "procedures and processes designed to result in compliance
with laws, regulations, and Enterprise-wide corporate policies" (Art. VII ¶2(d));

      4.    "procedures and processes to ensure that Enterprise-wide
corporate policies are timely updated on a periodic and as-needed basis to address changes in
applicable laws and regulations and to ensure the policies comply with the effective date of such
laws and regulations" (Art. VII ¶2(e)).

      iii.    The Fed Cease and Desist Order required Citigroup to "enhance its
compliance risk management program" and "submit a written plan" to the Fed that "shall include
the following seven items," (¶5), including the following five components:

      1.    "a detailed analysis of the most material risk factors related
to U.S. laws and regulations applicable to Citigroup's operations and legal entities" (¶5(a));

      2.    "an assessment of existing controls, including business line
controls and testing processes, to ensure Citigroup's enterprise-wide operations comply with U.S.
laws and regulations in the areas associated with the risk factors identified in subsection ([1])
above" (¶5(b));

      3.    measures to improve and maintain such controls in any area
where the assessment in subsection ([2]) above identifies deficiencies" (¶5(c));

      4.    "improvements to the management information systems,
data, and reports provided to Citigroup's board of directors and senior management concerning
compliance risks, compliance with applicable U.S. laws and regulations, and the effectiveness and
functioning of the compliance risk management program" (¶5(d));

5.    "measures for managing and controlling Citigroup's compliance risks until the plan is implemented in full" (¶5(f)).

(b)    the statements did not disclose that:

i.    Citigroup's "compliance risk management" program suffered from "significant ongoing deficiencies in implementation and execution by Citigroup," including with respect to "longstanding enterprise-wide risk management and controls deficiencies previously identified by the Federal Reserve" that "Citigroup has not adequately remediated" (Fed Cease and Desist Order at 1-2);

ii.    Citibank had "fail[ed] to establish effective … independent risk management … and control functions as required by [Appendix D]," with respect to data quality and data governance, (OCC Remediation Order Art. II ¶4(a)), which constituted "deficiencies, noncompliance with [Appendix D], or unsafe or unsound practices with respect to the Bank's data quality and data governance" (OCC Remediation Order Art. II ¶4);

iii.    "[f]or several years, the Bank has failed to implement and maintain [a] compliance risk management program … commensurate with the [Citibank's] size, complexity, and risk profile" (OCC Remediation Order Art. II ¶1);

iv.    the OCC "identified … deficiencies, noncompliance with [Appendix D], or unsafe or unsound practices with respect to the Bank's ….compliance risk management program" (OCC Remediation Order Art. II ¶2).

419.    The 2019 Annual Report stated (at 60) that:

*The role of Internal Audit is to provide independent and timely assurance to the Citigroup and Citibank Boards, the Audit Committees of the Boards, senior management and regulators regarding the effectiveness of governance, risk management and controls that mitigate current and evolving risks and enhance the control culture within Citi.*

420.   The statement in the paragraph immediately above was materially false and misleading because it failed to disclose that,

(a)     Citibank "fail[ed] to establish effective … internal audit … functions as required by [Appendix D]," with respect to data quality and data governance, (OCC Remediation Order Art. II ¶4(a)), which constituted "deficiencies, noncompliance with [Appendix D], or unsafe or unsound practices with respect to the Bank's enterprise-wide risk management and compliance risk management program." (OCC Remediation Order Art. II ¶4);

(b)     the audit function did not "provide independent and timely assurance to the Citigroup and Citibank Boards, the Audit Committees of the Boards, senior management and regulators regarding the effectiveness of governance, risk management and controls that mitigate current and evolving risks and enhance the control culture within Citi" because:

i.      according to the OCC Remediation Order, "inadequate reporting to the [Citibank] Board hinders its ability to provide effective oversight," and the Citibank "Board and senior management oversight is inadequate to ensure timely, appropriate actions to correct the serious and longstanding deficiencies and unsafe or unsound practices in the areas of risk management, internal controls, and data governance at the Bank" (Art. II ¶5);

ii.     the OCC Remediation Order ordered Citibank to "perform analyses (or assess analyses previously performed) to diagnose the root cause(s) of the underlying issues that led to internal controls related concerns identified by internal audit and/or federal regulators since 2017" (Art. IX ¶1(a)(i));

iii.    according to the Fed Cease and Desist Order, the Citigroup Board needed to take actions "to execute its oversight," including actions to "ensure … internal audit findings are effectively remediated."  (Fed Cease and Desist Order ¶¶2, 2(b).)

421.    The 2019 Annual Report stated (at 60) that:

*Citigroup's Board of Directors actively oversees Citi's risk-taking activities and holds management accountable for adhering to the risk governance framework. Directors review reports prepared by and receive presentations from management, and exercise independent judgment to question, probe and challenge recommendations and decisions made by management.*

422.    The statements in the paragraph immediately above were materially false and misleading because,

(a)    the statements that "Citigroup's Board of Directors actively oversees Citi's risk-taking activities" and that "Directors review reports prepared by and receive presentations from management, and exercise independent judgment to question, probe and challenge recommendations and decisions made by management," failed to disclose that the Citigroup Board of Directors did not adequately oversee Citigroup's risk-taking activities, specifically:

i.    according to the Fed Cease and Desist Order, the Citigroup Board needed to take actions "to execute its oversight," including actions to "ensure effective reporting to the board of directors that will enable it to oversee management's execution of the matters identified in this Order."  (¶¶2, 2(d).)  The "matters identified in this Order" included "significant ongoing deficiencies in implementation and execution by Citigroup with respect to various areas of risk management and internal controls" and "longstanding enterprise-wide risk management and controls deficiencies" (at 1-2);

ii.    according to the OCC Remediation Order, "inadequate reporting to the [Citibank] Board hinders its ability to provide effective oversight," and the Citibank "Board and senior management oversight is inadequate to ensure timely, appropriate actions to correct the serious and longstanding deficiencies and unsafe or unsound practices in the areas of risk management, internal controls, and data governance at the Bank" (OCC Remediation Order Art. II ¶5).

(b)      the Citigroup Board did not "hold[] management accountable for adhering to the risk governance framework" because:

i.      according to the Fed Cease and Desist Order, the Citigroup Board needed to take actions "to execute its oversight," including actions "to hold senior management accountable for executing effective and sustainable remediation plans by the committed deadlines" and "ensure effective reporting to the board of directors that will enable it to oversee management's execution of the matters identified in this Order."  (¶¶2(a),(b).)  The "matters identified in this Order" included "significant ongoing deficiencies in implementation and execution by Citigroup with respect to various areas of risk management and internal controls" and "longstanding enterprise-wide risk management and controls deficiencies" (at 1-2);

ii.      according to the OCC Remediation Order, "inadequate reporting to the [Citibank] Board hinders its ability to provide effective oversight," and the Citibank "Board and senior management oversight is inadequate to ensure timely, appropriate actions to correct the serious and longstanding deficiencies and unsafe or unsound practices in the areas of risk management, internal controls, and data governance at the Bank" (OCC Remediation Order Art. II ¶5);

iii.      according to the OCC Remediation Order, "the [Citibank] Board and Audit Committee" needed to describe the actions they "will each take to further improve its oversight of senior management, including holding senior management accountable for implementing and maintaining the corrective action required by this Order," which further included "ensur[ing] that reports to the Board, the Audit Committee, and senior management are transparent and comprehensive and contain thorough and complete analysis, including thematic analysis" (Art. XII ¶1(g)).

423.    The 2019 Annual Report stated (at 104) that:

***To anticipate, mitigate and control operational risk, Citi has established policies and a global framework for assessing, monitoring and communicating operational risks and the overall operating effectiveness of the internal control environment across Citigroup.***

424.    The statements in the paragraph immediately above were materially false and misleading because they failed to disclose that,

(a)    the OCC Remediation Order found that: (i) "[f]or several years, the Bank has failed to implement and maintain an enterprise-wide risk management and compliance risk management program, internal controls, or a data governance program commensurate with the Bank's size, complexity, and risk profile;" (ii) Citibank "fail[ed] to establish an effective risk governance framework as required by [Appendix D]," (iii) "the Bank's enterprise-wide risk management policies, standards and frameworks [failed] to adequately identify, measure, monitor and control risks," and internal controls were unsafe or unsound  (Art. II ¶¶1, 2(b) & (c), 3);

(b)    the Fed Cease and Desist Order (at 1-2) determined that "Citigroup has not adequately remediated the longstanding enterprise-wide risk management and controls deficiencies previously identified by the Federal Reserve," as required by Regulation YY;

(c)    the Fed Cease and Desist Order ordered Citigroup to "conduct a gap analysis of its enterprise-wide risk management framework and internal controls systems … to determine the enhancements that are necessary to meet the risk management requirements set forth in Regulation YY … with respect to the following three items: capital planning, liquidity risk management, and compliance risk management," and instructed that "[t]he Gap Analysis shall identify where Citigroup's risk management policies, procedures, practices processes, and internal controls are not compliant with Regulation YY with regard to the[se] areas" (¶¶3, 3(a));

(d)      as set forth in the article published by *Business Insider* on September 15, 2020, titled "The Real Reasons Behind Citigroup CEO Mike Corbat's Retirement," Citigroup "seldom took the time to harmonize technology systems" and instead relied on "a patchwork of technology systems that didn't talk to one another;" and, in contrast to "many banks [that] have spent years improving their systems," Corbat "was often reluctant to spend the money or dedicate enough people to fix a problem the right way."

425.     The 2019 Annual Report (at 105-106) stated that:

***Citi follows these CRM [Compliance Risk Management] Policy process steps: Establishing, maintaining and adhering to policies, standards and procedures for the management of compliance risk, in accordance with policy governance requirements; Developing and providing training to support the effective execution of roles and responsibilities related to the identification, control, reporting and escalation of matters related to compliance risks….; Independently testing and monitoring that Citi is operating within the Compliance Risk Appetite; Identifying instances of non-conformance with laws, regulations, rules and breaches of internal policies; Escalating through the appropriate channels, which may include governance forums, the results of monitoring, testing, reporting or other oversight activities that may represent a violation of law, regulation, policy or other significant compliance risk and take reasonable action to see that the matter is appropriately identified, tracked and resolved, including through the issuance of corrective action plans against the first line of defense.***

426.     The statements in the paragraph immediately above were materially false and misleading because,

(a)      they failed to disclose that according to the OCC Remediation Order, "[f]or several years, the Bank has failed to implement and maintain …[a] compliance risk management program … commensurate with the Bank's size, complexity and risk profile," and "the compliance risk management program" had a number of deficiencies, unsafe or unsound practices, or was not in compliance with Appendix D (Art. II ¶¶1, 2);

(b)      the Fed Cease and Desist Order (i) "identified significant ongoing deficiencies in implementation and execution by Citigroup with respect to various areas of risk

management and internal controls, including for data quality management and regulatory reporting, compliance risk management, capital planning, and liquidity risk management" (at 1); (ii) stated that "Citigroup has not adequately remediated the longstanding enterprise-wide risk management and controls deficiencies previously identified by the Federal Reserve," including those addressed in consent orders issued in 2013 and 2015 (at 2); and (iii) required "improvements to the management information systems, data, and reports provided to Citigroup's board of directors and senior management concerning compliance risks, compliance with applicable U.S. laws and regulations, and the effectiveness and functioning of the compliance risk management program" (at ¶5(d));

      (c)    the statement that "Citi follows these CRM Policy process steps: … [e]stablish[], maintain[] and adher[e] to policies, standards and procedures for the management of compliance risk, in accordance with policy governance requirements," also failed to disclose that the OCC Remediation Order set forth four sets of policies, standards and procedures, (at Art. VII ¶¶2(b)-(e)), that Citibank needed to "establish" and "adhere" to meet compliance risk management requirements, which Citi had not "established" or "adhere" and therefore did not meet the compliance risk management requirements;

      (d)    the statement that "Citi follows these CRM [Compliance Risk Management] Policy process steps: … Escalating through the appropriate channels, which may include governance forums, the results of monitoring, testing, reporting or other oversight activities that may represent a violation of law, regulation, policy or other significant compliance risk and take reasonable action to see that the matter is appropriately identified, tracked and resolved, including through the issuance of corrective action plans against the first line of defense," failed to disclose that, the OCC Remediation Order found that the "Board and senior management

oversight is inadequate to ensure timely, appropriate actions to correct the serious and longstanding deficiencies and unsafe or unsound practices in the areas of risk management, internal controls, and data governance at the Bank" which was hindered by "inadequate reporting to the Board," which further constituted noncompliance with Appendix D  (Art. II ¶5).

427.    The 2019 Annual Report (at 54-55) stated that:

*[T]here are heightened regulatory scrutiny and expectations in the U.S. and globally for large financial institutions, as well as their employees and agents, with respect to, among other things, governance, risk management practices and controls.  A failure to comply with these requirements and expectations or resolve any identified deficiencies could result in increased regulatory oversight and restrictions.*

\* \* \*

*Extensive and changing compliance requirements can also result in increased reputational and legal risks for Citi, as failure to comply with regulations and requirements, or failure to comply with regulatory expectations, can result in enforcement and/or regulatory proceedings.*

\* \* \*

*Citi is Subject to Extensive Legal and Regulatory Proceedings, Examinations, Investigations and Inquiries That Could Result in Significant Penalties and Other Negative Impacts on Citi, Its Business and Results and Operations.*

428.    The statements in the paragraph immediately above were false and misleading because either the risks identified and described as conditional or potential ("could result," "can result," "could result") were not conditional or potential, but instead had come to pass and were actual and existing as set forth in the OCC Remediation Order and the Fed Cease and Desist Order specifically below, or failed to disclose that,

(a)    the OCC Remediation Order found that:

i.    "for several years, the Bank has failed to implement and maintain an enterprise-wide risk management and compliance risk management program [and] internal controls…commensurate with the Bank's size, complexity, and risk profile" (Art. II ¶1);

ii.     Citibank had "serious and longstanding deficiencies and unsafe or unsound practices in the areas of risk management [and] internal controls" (Art. II ¶5);

iii.    the "Bank was in noncompliance with [Appendix D] and engaged in unsafe or unsound practice that were part of a pattern of misconduct" (Art. II ¶6);

iv.     the "foregoing conduct [Article II ¶¶1-6] also contributed to violations of law and regulations and continuous noncompliance with [Appendix D]" (Art. II ¶7).

(b)     the Cease and Desist Order determined that:

i.      the Fed "identified significant ongoing deficiencies in implementation and execution by Citigroup with respect to various areas of risk management and internal controls, including data quality management and regulatory reporting, compliance risk management, capital planning, and liquidity risk management" (at 1);

ii.     "Citigroup has not adequately remediated longstanding enterprise-wide risk management and controls deficiencies previously identified by the Federal Reserve, including in the areas described above and those addressed" in consent orders in 2013 and 2015 (at 2).

(c)     According to an article published on September 14, 2020, in *The Wall Street Journal* titled "Regulators Prepare to Reprimand Citigroup for Failing to Improve Risk Systems," "[f]or years, regulators have privately pressed Citigroup and Mr. Corbat to fix the bank's risk systems," and "faulted Citi's management for not giving priority to the risk-management overhaul."  And according to an article in *Business Insider* on September 15, 2020 titled "The Real Reasons Behind Citigroup CEO Mike Corbat's Retirement,"  "[Corbat] who had made operating efficiency and return-on equity a hallmark of his strategy was often reluctant to spend the money or dedicate enough people to fix a problem the right way."

20.     **Materially False And Misleading Statements During The April 15, 2020 Earnings Call For 1Q 20**

429.     On April 15, 2020, Citigroup reported earnings for 1Q 20 and posted a presentation to the Company's website titled "First Quarter 2020 Earnings Review," stating that "[d]espite a challenging environment, ***[Citigroup] delivered … strong risk management***," and that Citigroup's ***"Priorities" were to "Focus on risk management*** and building a stronger company for the future."

430.     The statements in bold in the paragraph immediately above were materially false and misleading (the non-bolded portions are provided for context) because the Board and senior management did not deliver strong risk management nor prioritize a focus on risk management because,

    (a)     according to the OCC Remediation Order:

        i.     "for several years, the Bank has failed to implement and maintain an enterprise-wide risk management and compliance risk management program … commensurate with the Bank's size, complexity, and risk profile" (Art. II ¶1);

        ii.     Citibank "fail[ed] to establish … independent risk management" and "fail[ed] … to adequately identify, measure, monitor, and control risks," as required by [Appendix D]," which constituted "deficiencies, noncompliance with [Appendix D], or unsafe or unsound practices with respect to the Bank's enterprise-wide risk management and compliance risk management program" (Art. II ¶2(a));

        iii.     Citibank "fail[ed] to establish … independent risk management … as required by [Appendix D]," which constituted "deficiencies, noncompliance with [Appendix D], or unsafe or unsound practices with respect to the Bank's data quality and data governance, including risk aggregation and management and regulatory reporting" (Art. II ¶4(a), (c));

iv. "Board and senior management oversight is inadequate to ensure timely, appropriate actions to correct the serious and longstanding deficiencies and unsafe or unsound practices in the areas of risk management" (Art. II ¶5);

v. Citibank had been in "continuous noncompliance" through October 2020 based on, "[a]mong other things, the Bank's deficiencies in internal controls and compliance risk management" that "contributed to violations of laws and regulations and the OCC assessed civil money penalties in 2019 based specifically on violations of the Fair Housing Act" and other federal laws and regulations (Art. II ¶7);

vi. Citibank had not provided adequate staffing and technology resources "to execute and sustain a safe and sound system of internal controls and risk management" (Art. X ¶1(a));

(b) The Fed Cease and Desist Order (i) "identified significant ongoing deficiencies in implementation and execution by Citigroup with respect to various areas of risk management and internal controls, including for data quality management and regulatory reporting, compliance risk management, capital planning, and liquidity risk management" (at 1); (ii) determined that "Citigroup has not adequately remediated the longstanding enterprise-wide risk management and controls deficiencies previously identified by the Federal Reserve," including in the areas described above and those addressed" in consent orders in 2013 and 2015 (at 2); (iii) ordered Citigroup "to determine the enhancements that are necessary to meet the risk management requirements set forth in Regulation YY … with respect to the following three items: capital planning, liquidity risk management, and compliance risk management" (¶3); and (iv) ordered Citigroup "to enhance its compliance risk management program" pursuant to a "written plan" acceptable to the Fed (¶5);

(c)     as set forth in the article published by *Business Insider* on September 15, 2020 titled "The Real Reasons Behind Citigroup CEO Mike Corbat's Retirement," in contrast to "many banks [that] have spent years improving their systems," Corbat "was often reluctant to spend the money or dedicate enough people to fix a problem the right way;"

(d)     *The Wall Street Journal* article on September 14, 2020 titled "Regulators Prepare to Reprimand Citigroup for Failing to Improve Risk Systems" said that the regulators "faulted Citi's management for not giving priority to the risk-management overhaul."

### 21.     Materially False And Misleading Statements In The September 10, 2020 Press Release

431.     On September 10, 2020, Citigroup issued a press release titled "Citi CEO Michael Corbat Announces Plans to Retire in February 2021" in which Corbat said that **"*[w]e completed our transformation from the financial crisis and emerged* a simpler, *safer and stronger institution*. … As the world's most global bank, safety and soundness always have to be a foundation of our institution.  We have launched significant investments in our infrastructure as part of our push *to make strengthening our risk and control environment a strategic priority for the firm***."

432.     The statements in bold in the paragraph immediately above were materially false and misleading (the non-bolded portions are provided for context) because Citigroup had not "completed [its] transformation from the financial crisis and emerged a … safer and stronger institution" and Citigroup did not "make strengthening our risk and control environment a strategic priority for the firm" because,

(a)     the OCC Remediation Order found that:

i. "for several years, the Bank has failed to implement and maintain an enterprise-wide risk management and compliance risk management program [and internal controls] … commensurate with the Bank's size, complexity, and risk profile" (Art. II ¶1);

ii. Citibank "fail[ed] to establish … independent risk management" and "fail[ed] … to adequately identify, measure, monitor, and control risks," as required by [Appendix D]," which constituted "deficiencies, noncompliance with [Appendix D], or unsafe or unsound practices with respect to the Bank's enterprise-wide risk management and compliance risk management program" (Art. II ¶2(a), (c));

iii. Citibank "fail[ed] to establish … independent risk management … and control functions as required by [Appendix D]," which constituted "deficiencies, noncompliance with [Appendix D], or unsafe or unsound practices with respect to the Bank's data quality and data governance, including risk aggregation and management and regulatory reporting" (Art. II ¶4(a));

iv. "Board and senior management oversight is inadequate to ensure timely, appropriate actions to correct the serious and longstanding deficiencies and unsafe or unsound practices in the areas of risk management [and] internal controls" (Art. II ¶5);

v. Citibank had been in "continuous noncompliance" through October 2020 based on, "[a]mong other things, the Bank's deficiencies in internal controls and compliance risk management" that "contributed to violations of laws and regulations and the OCC assessed civil money penalties in 2019 based specifically on violations of the Fair Housing Act" and other federal laws and regulations (Art. II ¶7);

vi.      Citibank had not provided adequate staffing and technology resources "to execute and sustain a safe and sound system of internal controls and risk management" (Art. X ¶1(a));

(b)      The Fed Cease and Desist Order (i) "identified significant ongoing deficiencies in implementation and execution by Citigroup with respect to various areas of risk management and internal controls, including for data quality management and regulatory reporting, compliance risk management, capital planning, and liquidity risk management" (at 1); (ii) determined that "Citigroup has not adequately remediated the longstanding enterprise-wide risk management and controls deficiencies previously identified by the Federal Reserve," including in the areas described above and those addressed" in consent orders in 2013 and 2015 (at 2); (iii) ordered Citigroup "to determine the enhancements that are necessary to meet the risk management requirements set forth in Regulation YY … with respect to the following three items: capital planning, liquidity risk management, and compliance risk management" (¶3); (iv) ordered Citigroup to submit a Gap Analysis Remediation Plan to address the gaps necessary to "exercise appropriate risk management and maintain an effective control environment" (¶3); and (v) ordered Citigroup "to enhance its compliance risk management program" pursuant to a "written plan" acceptable to the Fed (¶5);

(c)      as set forth in the article published by *Business Insider* on September 15, 2020, titled "The Real Reasons Behind Citigroup CEO Mike Corbat's Retirement," Citigroup "seldom took the time to harmonize technology systems" and instead relied on "a patchwork of technology systems that didn't talk to one another;" and, in contrast to "many banks [that] have spent years improving their systems," Corbat "was often reluctant to spend the money or dedicate enough people to fix a problem the right way;

(d)    *The Wall Street Journal* article on September 14, 2020 titled "Regulators Prepare to Reprimand Citigroup for Failing to Improve Risk Systems" said that the regulators "faulted Citi's management for not giving priority to the risk-management overhaul."

**B.    Accounting And Regulatory False And Misleading Statements And Omissions**

**1.    Citigroup Concealed A Loss Contingency In The Range of $3.66 Billion To $4.10 Billion In Violation Of GAAP, Which Would Have Increased Citigroup's Efficiency Ratio To More Than 60%**

433.    As a U.S. publicly traded company, Citigroup is required to prepare its financial statements in accordance with GAAP.  GAAP is a common set of accounting principles, standards and procedures issued by the Financial Accounting Standards Board ("FASB").  It is recognized by the accounting profession and the SEC as the uniform rules, conventions, and procedures necessary to define and reflect accepted accounting practices at a particular time.

434.    Pursuant to SEC Regulation S-X, which applies to Citigroup, financial statements "filed with the [SEC] which are not prepared in accordance with [GAAP] will be presumed to be misleading or inaccurate."  *See* 17 C.F.R. § 210.4-01(a)(1).

435.    Citigroup's financial statements during the Class Period, however, violated GAAP. Specifically, Citigroup's accounting obligations included compliance with Accounting Standards Codification ("ASC") Topic 450, which governs when a company is required to recognize and/or disclose a "loss contingency."  Defendants misrepresented and concealed a loss contingency of between $3.66 billion and $4.1 billion at the start of and during the Class Period.

436.    A loss contingency is any "existing condition, situation, or set of circumstances involving uncertainty as to possible loss to an entity that will ultimately be resolved when one or more future events occur or fail to occur."  ASC 450-20-20.  "T[h]e term 'loss' is used for convenience to include many charges against income that are commonly referred to as expenses." ASC 450-20-25-1.

437.    ASC 450 describes when a loss contingency must be accrued and when, if not accrued, it must still be disclosed.  According to the SEC, "[v]ague or overly broad disclosures that speak merely to litigation, tax, or other risks in general, without providing any information about the specific loss contingencies being evaluated are not sufficient."  (SEC Staff, Remarks at the University of Southern California Leventhal School of Accounting SEC and Financial Reporting Conference (May 27, 2004).)

438.    ASC 450 requires specificity.  Under ASC 450, a loss contingency must be accrued as a charge to income if information available before the financial statements are issued indicates that: (1) "it is probable that an asset had been impaired or a liability had been incurred at the date of the financial statements . . . It is implicit in this condition that it must be probable that one or more future events will occur confirming the fact of the loss;" and (2) "[t]he amount of loss can be reasonably estimated."  ASC 450-20-25-2.

439.    The threshold for determining that a loss contingency is "probable" is not high.  A future event is "probable" if it is simply "likely to occur."  ASC 450-20-20.  GAAP specifically states that the term "probable" is "not intended to be so rigid" as to "require virtual certainty before a loss is accrued."  ASC 450-20-25-3.  GAAP is also clear that whether the reporting entity actually estimated the amount of loss is irrelevant because the standard is only whether the loss "can be reasonably estimated."  ASC 450-20-25-2.

440.    If the loss cannot be reasonably estimated, ASC 450 still requires disclosure of the contingency "if there is at least a reasonable possibility that a loss or an additional loss may have been incurred."  ASC 450-20-50-3.  "Reasonably possible" means that the chance of the occurrence is "more than remote but less than likely."  ASC 450-20-20.  "Remote" means that the chance of the future event occurring is "slight."  ASC 450-20-20.  In other words, ASC 450

requires specific disclosure of a loss contingency if there is more than a "slight" chance that a loss or additional loss may have been incurred.  ASC 450-20-20; ASC 450-20-50-3.

441.    When there is "at least a reasonable possibility [*i.e.*, more than a "slight" chance] that a loss . . . may have been incurred" (ASC 450-20-50-3), ASC 450-20-50-4 requires disclosure of "[t]he nature of the contingency" and an "estimate of the possible loss or range of loss or a statement that such an estimate cannot be made."  Notably, GAAP states that the requirement that a loss be reasonably estimable "shall not delay accrual of a loss until only a single amount can be reasonably estimated."  ASC 450-20-25-25-5.  "To the contrary, when . . . information available indicates that the estimated amount of loss is within a range of amounts, it follows that some amount of loss has occurred and can be reasonably estimated."  ASC 450-20-25-5.

442.    When accruing for a loss contingency, a company is required to charge such accrual against income either by (a) estimating the loss, or (b) if the loss is a range, then by either (i) the amount within the range that appears to be the better estimate than any other amount in the range, or (ii) the minimum amount in the range, if there is no amount in the range that is a better estimate than any other amount.  ASC 450-20-30-1.  When a loss contingency is accrued, a period expense is recorded, thereby reducing a company's income for the period.

443.    The SEC has instructed that a company should update its disclosures about a loss contingency as additional information becomes available, and that "[w]ith the passage of time, there is a greater presumption that it would be possible for the company to provide quantitative information."  (Center for Audit Quality, SEC Regulations Committee – Joint Meeting with SEC Staff SEC Offices – Washington D.C., at 3 (June 24, 2010).)  SEC staff have further noted that "the recording of a material accrual for a contingent liability related to an event that occurred several years before should not be the first disclosure regarding that contingency. Rather,

disclosures regarding the nature of the contingency and the amounts at stake should generally have already been provided under [the predecessor to ASC 450] when the loss became reasonably possible."  (SEC Staff, Remarks at the University of Southern California Leventhal School of Accounting SEC and Financial Reporting Conference (May 27, 2004).)

444.   Throughout the Class Period, Citigroup filed annual and interim financial statements with the SEC on Forms 10-K and 10-Q that purported to comply with GAAP and ASC 450.   More specifically, in each of Citigroup's Forms 10-K filed during the Class Period, Defendants specifically represented that the Company's "Consolidated Financial Statements include the accounts of Citigroup and its subsidiaries prepared in accordance with U.S. generally accepted accounting principles (GAAP)."  In certifications attached to each of Citigroup's Forms 10-K and 10-Q filed during the Class Period, the Officer Defendants certified to investors that Citigroup complied with GAAP and ASC 450, stating that Citigroup's financial statements "fairly present in all material respects the financial condition."

445.   Defendants further represented that Citigroup complied with ASC 450 in each of the Company's Forms 10-K and 10-Q filed during the Class Period:

> In accordance with ASC 450, Citigroup establishes accruals for contingencies . . . when Citigroup believes it is probable that a loss has been incurred and the amount of the loss can be reasonably estimated.  When the reasonable estimate of the loss is within a range of amounts, the minimum amount of the range is accrued, unless some higher amount within the range is a better estimate than any other amount within the range.  Once established, accruals are adjusted from time to time, as appropriate, in light of additional information. …

> In accordance with ASC 450, if Citigroup has not accrued for a matter because Citigroup believes that a loss is reasonably possible but not probable, or that a loss is probable but not reasonably estimable, and the matter thus does not meet the criteria for accrual, and the reasonably possible loss is material, it discloses the loss contingency.  In addition, Citigroup discloses matters for which it has accrued if it believes a reasonably possible exposure to material loss exists in excess of the amount accrued. In accordance with ASC 450, Citigroup's disclosure includes an estimate of the reasonably possible loss or range of loss for those matters as to

which an estimate can be made.  ASC 450 does not require disclosure of an estimate
of the reasonably possible loss or range of loss where an estimate cannot be made.

The Individual Defendants that signed the respective SEC filings and made the misrepresentations are set forth in ¶55.

446.    Contrary to the statements in the two immediately preceding paragraphs, and in violation of GAAP and ASC 450, Citigroup made no accrual in the Forms 10-Q and 10-K it filed during the Class Period for its present obligations relating to the investments it knew it needed to make into its risk and control systems to bring those systems into compliance with applicable legal and regulatory requirements.  Even if GAAP and ASC 450 did not require an accrual (assuming the loss was not "probable" or "estimable," which it was), the loss was certainly "reasonably possible" and Citigroup failed to disclose the nature of the contingency or provide a range of the possible loss or a statement that an estimate could not be made, in violation of GAAP and ASC 450.

447.    As set forth in greater detail below, each of the requirements for recognition of an accrual under ASC 450 was met at all relevant times by Citigroup.  Citigroup's deficient risk management and control systems violated applicable legal and regulatory requirements and regulators had privately pressured Citigroup, and Corbat specifically, for years to fix the systems. Prior to January 15, 2016 the first day of the Class Period, Citigroup's and Citibank's regulators— the entities charged with overseeing that the Company's risk and control systems comply with prevailing legal and regulatory standards – provided Corbat as well as the Citigroup and Citibank Boards with detailed descriptions of the shortfalls as set forth in the 2020 Enforcement Orders. Defendants failed to make the necessary upgrades in order to cut costs and make the Company's efficiency ratio appear more favorable than it really was.

448.    Accordingly, at the start of and throughout the Class Period, it was "probable" (*i.e.*, "likely to occur") that Citigroup had incurred a loss associated with making the necessary upgrades to its risk management systems and internal controls to meet minimum required regulatory and legal standards.  ASC 450-20-25-3.  While GAAP is clear that "probable" simply means "likely to occur" and does not mean "virtual certainty" (ASC 450-20-25-3), here, that Citigroup was required to upgrade its deficient risk and control systems was, in fact, a "virtual certainty" given the applicable legal and regulatory requirements.  Consistent with these requirements, regulators had for years demanded that Citigroup implement substantial and material improvements to its risk and control systems.  As such, that Citigroup had incurred a loss was at least probable at all relevant times.

449.    The second prong of ASC 450 is also satisfied because the costs that Citigroup needed to incur to fix the risk systems was "reasonably estimable."  The OCC Remediation Order required Citigroup to develop and provide a Consent Order Action Plan and Data Governance Plan "detailing the remedial actions necessary to achieve compliance" (Art. IV ¶1) within 120 days of the issuance of that order (Art V-VII, X ¶1).  The Fed Cease and Desist Order similarly required Citigroup to submit a Gap Analysis Remediation Plan to address the gaps necessary to "maintain an effective control environment" (¶¶3, 2(a).)  Citigroup is complying with those instructions. Accordingly, Citigroup had the capability to develop those plans and "reasonably estimate" the costs at all times throughout the Class Period.

450.    Indeed, Citigroup announced on September 14, 2020, that it would need to spend an additional $1 billion in "infrastructure and controls" for 2020 alone "to ensure that we operate in a safe and sound manner."  On January 15, 2021, Citigroup stated on its 4Q 20 earnings call that expenses would increase by 2-3% year-over-year so that the Company could bring its systems into

compliance.  This amounts to an additional $860 million to $1.3 billion in expenses in 2021 compared to 2020.  Deutsche Bank stated that Citigroup will spend an additional $1.8 billion in expenses in 2022 compared to 2020 so that the Company could bring its systems in compliance with the Fed and the OCC orders, according to its report dated October 13, 2020 (*see supra* ¶116).[7] Altogether ($1 billion + ($860 million or $1.3 billion) + $1.8 billion) this amounts to an additional $3.66 billion or $4.1 billion in expenses.  That Citigroup and analysts in fact estimated the amounts that the Company was required to spend to bring its risk and control systems into legal and regulatory compliance so quickly further demonstrates that the amounts "can be reasonably estimated" and that Citigroup could have made the same reasonable estimates during the Class Period.  ASC 450-20-25-2.

451.    While ASC 450 required Citigroup to record an accrual, even assuming that the cost was not "reasonably estimable" (which it was) ASC 450 at least required Citigroup to disclose the contingency and provide an "estimate of the possible loss or range of loss or a statement that such an estimate cannot be made" because there was at least a "reasonable possibility" (*i.e.*, more than a "slight" chance) "that a loss … may have been incurred."   In other words, even if not reasonably estimable, ASC 450 required Citigroup to disclose that its internal controls and risk management systems required significant and material investments to meet minimum regulations and legal obligations.  ASC 450-20-50-4 & 5.

---

[7] Specifically, Deutsche Bank wrote that it "assume[s] a $3b increase in related costs in 2022 vs. 2019" and the "material ramp up in costs" is due to Citigroup's "longstanding failure to establish effective risk management and data governance programs and internal controls."  Citigroup incurred $42 billion in operating expenses in 2019.  Thus, Deutsche Bank's analysis concluded that Citigroup would spend $45 billion in expenses in 2022, which is $1.8 billion more than Citigroup's operating expenses of $43.2 billion in 2020.

452.    Contrary to GAAP and ASC 450, Defendants recorded no accrual for the billions in contingent liabilities Citigroup had incurred let alone describe the nature of the contingency and did not provide an estimate of the possible loss, or even a range of loss, or a statement that such an estimate could not be made.  No subjective judgment was required for Citigroup to disclose the fact that the contingency existed or that it needed to spend billions to remediate its deficient risk and control systems because the Fed and the OCC had informed Defendants repeatedly during the Class Period of that fact.  Defendants' ASC 450 violations thus concealed a loss contingency of between $3.66 billion and $4.1 billion.

453.    Had Citigroup actually made "the necessary investments in [] compliance, risk, and control functions" during the Class Period that the regulators insisted that the Company was required to make, Citigroup's efficiency ratio would have increased dramatically.  As illustrated in the chart below, had Citigroup charged to income at year end for each year of the Class Period the $3.66 billion it would need to invest in risk management and internal controls, the Company's efficiency ratio would have exceeded 61% on a yearly basis.

212

**Citigroup Efficiency Ratio Sensitivity Analysis**

| ($ Millions) | Annual Analysis | | | | |
| --- | --- | --- | --- | --- | --- |
| | YE 2016 | YE 2017 | YE 2018 | YE 2019 | YE 2020 |
| Efficiency Ratio (*as reported in Forms 10-K*) | 59% | 58% | 57.4% | 56.5% | 58.1% |
| **As Reported:** | | | | | |
| Total Operating Expenses | 41,416 | 41,237 | 41,841 | 42,002 | 42,171[8] |
| Total Revenues, Net | 69,875 | 71,449 | 72,854 | 74,286 | 74,298 |
| Efficiency Ratio (*Calculated*) | 59.3% | 57.7% | 57.4% | 56.5% | 56.8% |
| **Illustrated Impact of ASC 450 Loss Contingency Accrual** | YE 2016 | YE 2017 | YE 2018 | YE 2019 | YE 2020 |
| Recognition of ASC 450 Loss Contingency Accrual | 3,660 | 3,660 | 3,660 | 3,660 | 3,660 |
| Total Operating Expenses (Including Loss Contingency): | 45,076 | 44,897 | 45,501 | 45,662 | 45,831 |
| Total Revenues: | 69,875 | 71,449 | 72,854 | 74,286 | 74,298 |
| **Updated Efficiency Ratio** | **64.5%** | **62.8%** | **62.5%** | **61.5%** | **61.7%** |

454.    Recognizing the accrual would have made Citigroup among the worst performers in terms of efficiency ratio among all of its peers, an outcome Citigroup was desperate to avoid.

**2.    Citigroup Violated Regulation S-K Item 303 By Concealing The Significant Underinvestment In Its Risk Systems**

455.    Item 303 of Regulation S-K (17 C.F.R. § 229.303), Management's Discussion and Analysis of Financial Condition and Results of Operations ("MD&A"), requires the disclosure of certain material information in Items 2 and 7 of Forms 10-Q and 10-K, respectively.  Item 303 thus establishes an affirmative duty on a reporting entity to provide a specific description of "any known trends or uncertainties that have had or that are reasonably likely to have a material

---

[8] "As Reported Total Operating Expenses" for YE 2020 is reduced by $1 billion because that $1 billion is already included in the Recognition of Loss Contingency Accrual of $3.66 billion.

favorable or unfavorable impact on net sales or revenues or income from continuing operations."
17 C.F.R. § 229.303(b)(2)(ii).

456.   The objective of Item 303 "is to provide material information relevant to an assessment of the financial condition and results of operations" for a reporting entity and "must focus specifically on material events and uncertainties known to management that are reasonably likely to cause reported financial information not to be necessarily indicative of future operating results or of future financial condition." §303(a).  This specific focus "includes descriptions and amounts of matters that have had a material impact on reported operations, as well as matters that are reasonably likely based on management's assessment to have a material impact on future operations" *Id.*

457.   On December 19, 2003, the SEC issued an interpretive release to Item 303 reiterating that the purpose of MD&A is to provide investors with information necessary to reach an understanding of a company's results of operations, including the identification and disclosure of "known trends, events, demands, commitments and uncertainties that are reasonably likely to have a material effect on [a company's] financial condition or operating performance." (Guidance Regarding MD&A, Securities Act Release No. 33-8350, Exchange Act Release No. 34-48960 (Dec. 19, 2003)).  The 2003 interpretive release also states that disclosure is mandated for known trends or uncertainties "unless a company is able to conclude either that it is not reasonably likely that the trend, uncertainty, or other event will occur or come to fruition, or that a material effect on the company's liquidity, capital resources or results of operations is not reasonably likely to occur." *Id*.  The 2003 interpretative release stated that "[i]n identifying known material trends and uncertainties, companies should consider the substantial amount of financial and non-financial

information available to them, and whether or not the available information itself is required to be disclosed."

458.    The 2003 interpretative release further provides that "MD&A requires not only a 'discussion' but also an 'analysis' of known material trends, events, demands, commitments and uncertainties." *Id.* Indeed, "[w]hether favorable or unfavorable conditions constitute or give rise to the material trends, demands, commitments, events or uncertainties being discussed, the analysis should consist of material substantive information and present a balanced view of the underlying dynamics of the business." *Id.* The 2003 interpretative release specifically reiterated that a company must disclose, to the extent material, "the existence and timing of commitments for capital expenditures and other known or reasonably likely cash requirements . . . Merely stating that a company has adequate resources to meet its short-term and/or long-term cash requirements is insufficient." *Id.*

459.    In violation of Item 303's disclosure obligations, Defendants failed to disclose the true extent of Citigroup's underinvestment in its risk and control systems and the material impact that upgrading those systems to meet minimum legal requirements would have on Citigroup's "income from continuing operations," which deducts expenses.  17 C.F.R. § 229.303(b)(2)(ii). Citigroup's failure to sufficiently invest in its risk and control systems was a "known trend[] or uncertaint[y]." 17 C.F.R. § 229.303(b)(2)(ii). The Fed and OCC had been privately pressuring Citigroup for years to upgrade Citigroup's risk and control systems, but Citigroup failed to do so and prioritized costs over meeting minimum legal and regulatory requirements.

460.    This trend or uncertainty was also "reasonably likely to have a material [] unfavorable impact on . . . income from continuing operations." 17 C.F.R. § 229.303(b)(2)(ii). As alleged above (¶¶450, 453), Citigroup needs to spend between $3.66 billion and $4.1 billion to

upgrade its risk and control systems between 2020 and 2022, which amounts to between 11% and 12% of Citigroup's income from continuing operations for three years based on extrapolating the 2020 result of $11.1 billion, which is a material amount.  Corbat specifically admitted the materiality of the investments on October 13, 2020, stating that the upgrades to the Company's risk and control systems would be a significant, "multiyear transformation" that "won't be a quick or easy fix."

### 3. Citigroup's Internal Controls Were Not Effective Because They Suffered From A Material Weakness

#### a) Background Relating To Internal Controls

461.    The federal securities laws and SEC regulations require that public companies such as Citigroup maintain robust internal controls over their public disclosures and financial reporting. These "internal controls" are internal processes and standards that ensure that the information about a public company's business operations and financial results in its public filings is complete and accurate.

462.    The OCC states in its Internal Control Comptroller's Handbook (January 2001) ("OCC Internal Control Handbook") that "[e]ffective internal controls are the foundation of safe and sound banking.  A properly designed and consistently enforced system of operational and financial internal control helps a bank's board of directors and management safeguard the bank's resources, produce reliable financial reports, and comply with laws and regulations.  Effective internal control also reduces the possibility of significant errors and irregularities and assists in their timely detection when they do occur."  (at 1.)

463.    Public companies like Citigroup are required to design and implement two kinds of control systems to ensure that their representations to investors—both financial and non-

financial—are accurate: (1) "disclosure controls and procedures" ("DCP") and (2) "internal controls over financial reporting" ("ICFR").

464.    DCP ensure that information required to be disclosed is communicated to management and the board sufficiently in advance of the company's filing dates to allow them ample time to consider it and disclose it to investors.  *See* 17 C.F.R. § 240.13a-15(e).  The Exchange Act defines DCP to mean "controls and other procedures of an issuer that are designed to ensure that information required to be disclosed by the issuer in the reports that it files or submits under the [Exchange] Act . . . is recorded, processed, summarized and reported within the time period specified" by the SEC.  17 C.F.R. § 240.13a-15(e).  These DCP include, for example, components meant to provide reasonable assurances that the Company's MD&A includes all known trends and uncertainties that have had, or are reasonably likely to have, a material favorable or unfavorable impact on income from continuing operations in accordance with Item 303.  (*See supra* section VI.B.2.)

465.    Similarly, the SEC defines ICFR as "[a] process designed by, or under the supervision of, the registrant's principal executive and principal financial officers . . . to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with [GAAP]."  (SEC Final Rule, Management's Report on Internal Control Over Financial Reporting and Certification of Disclosure in Exchange Act Periodic Reports, Release No. 33-8238 ("SEC Final Rule").)

466.    The SEC Final Rule states that ICFR specifically includes "policies and procedures" that "(1) [p]ertain to the maintenance of records that in reasonable detail accurately and fairly reflect the transactions and dispositions of the assets of the registrant;" [and] (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial

statements in accordance with [GAAP], and that receipts and expenditures of the registrant are being made only in accordance with authorizations of management and directors of the registrant." Company management is required to review and evaluate these controls quarterly to determine their effectiveness.

467.   ***A company's ICFR cannot be considered effective under SEC Regulations if one or more "material weakness" exists.***   *See* Item 308 of Regulation S-K, 17 C.F.R. § 229.308(a)(3). The SEC Final Rule incorporates by reference the Public Company Accounting Oversight Board's ("PCAOB") Auditing Standards ("AS") definition of a "material weakness" in ICFR.  A "material weakness" in ICFR "is a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the company's annual or interim financial statements will not be prevented or detected on a timely basis."  AS 2201 ¶a7.  The deficiencies identified by the Fed and OCC also demonstrate that, contrary to Citigroup's representations,  its DCP were not effective because they were not designed or operating to ensure that all required disclosure of information was timely recorded, processed, summarized, and reported in accordance with SEC rules.  *See* 17 C.F.R. § 240.13a-15(e).

468.   The SEC has described the assessment of ICFR as "a top-down, risk-based approach [] including the role of entity-level controls in assessing financial reporting risks and the adequacy of controls."  (17 C.F.R. Part 241, SEC Commission Guidance Regarding Management's Report on Internal Control Over Financial Reporting Under Section 13(a) or 15(d) of the Securities Exchange Act of 1934, Release No. 33-8810 ("SEC Release 33-8810").)  According to the SEC, an "evaluation of ICFR . . . will depend on management's existing financial reporting risk assessment and control monitoring activities."  *Id.*  The SEC further stated that "[i]n determining

whether a deficiency or a combination of deficiencies represents a material weakness, management considers all relevant information."  (*Id.*)

469.    The SEC identified four specific situations as indicators of a material weakness, one of which is the presence of "[i]neffective oversight of the company's external financial reporting and internal control over financial reporting by the company's audit committee."  (*Id.*)

470.    According to the SEC, "[t]he evaluation of the severity of a control deficiency should include both quantitative and qualitative factors."  (*Id.*)  "The severity of a deficiency does not depend on whether a misstatement actually has occurred but rather on whether there is a reasonable possibility that the company's controls will fail to prevent or detect a misstatement." AS 2201 ¶64.  "If management determines that the deficiency, or combination of deficiencies, might prevent prudent officials in the conduct of their own affairs from concluding that they have reasonable assurance that transactions are recorded as necessary to permit the preparation of financial statements in conformity with GAAP, then management should treat the deficiency, or combination of deficiencies, as an indicator of a material weakness."  17 C.F.R. § 240.13a-15(e).

471.    Citigroup's auditor, KPMG, adopted the SEC's interpretation and has stated that one of the four "specific indicators of material weaknesses" is "[i]nneffective oversight of the entity's financial reporting and [ICFR] by those charged with governance." (*see* KPMG ICOFR Reference Guide, at 252 [11.4.50] (2016).)  According to KPMG, "[i]f a deficiency consistent with one of these four indicators is identified, ordinarily the deficiency is a material weakness."  (*Id.* at [11.4.60].)  "However, just because one of these four factors is absent does not mean the deficiency is not a material weakness."  (*Id.* at [11.4.70].)

472.    Several statutes and regulations require Defendants to maintain adequate DCP and ICFR procedures, and to either publicly certify to investors that the controls they had in place were adequate and effective or to disclose any material weaknesses.

473.    First, SOX Section 302 requires that Citigroup's CEO and CFO certify the Company's quarterly and annual reports filed with the SEC and the procedures established by the Company to prepare its financial statements and its disclosures generally.  Section 302 is meant to ensure that the CEO and CFO take a proactive role in their company's public disclosures and give investors confidence in the accuracy, quality, and reliability of a company's SEC reports.  It thus requires that the CEO and CFO address in their quarterly and annual SEC filings: (1) the material accuracy and fair presentation of the report's disclosures; (2) the effectiveness of the "disclosure controls and procedures;" and (3) any material changes to the company's ICFR.

474.    The CEO and CFO must certify that: (1) they have reviewed the periodic report; (2) it does not contain any untrue statement of material fact or omit to state a material fact necessary to make any statements made not misleading; (3) based on their knowledge, the financial statements and other financial information fairly present the financial condition and operations of the company; (4) they have maintained disclosure controls and internal controls and have designed such controls to ensure that all material information is made known to them and to provide reasonable assurance regarding the reliability of financial information; and (5) they have disclosed to the audit committee and auditors all significant deficiencies and material weaknesses in the design or operation of internal controls.  These certifications communicate to investors that all material information required to be disclosed is contained in the report.

475.    Second, Section 404 of SOX, 15 U.S.C. § 7262, requires that management of a public company annually evaluate the effectiveness of the company's internal controls over

financial reporting and disclose the conclusion, including any material weaknesses, to investors. Specifically, Section 404 reiterates the need for public company management to establish and maintain a system of internal controls relating to, among other things, financial reporting, and to document, test, and maintain those controls and procedures to ensure their effectiveness, as well as to assess and report on the design and operating effectiveness of internal controls over financial reporting on an annual basis.

476.     Section 404 of SOX was "intended to bring information about material weaknesses in [internal controls] into public view."  SEC Release 33-8810.  Under Item 308 of Regulation S-K, 17 CFR § 229.308(a)(3), "[m]anagement is not permitted to conclude that the registrant's internal control over financial reporting is effective if there are one or more material weaknesses in the registrant's internal control over financial reporting."  A statement that ICFR are effective is, therefore, an assertion by management that there are no material weaknesses in such internal controls.

477.     Section 404 of SOX requires management of public companies to select an internal control framework and then assess and report on the design and operating effectiveness of those internal controls on an annual basis.  Citigroup adopted a framework published by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO") to report on its ICFR in compliance with SOX.

478.     **The COSO Framework.**  The COSO Framework states: "[i]nternal control is a process, effected by an entity's board of directors, management, and other personnel, designed to provide reasonable assurance regarding the achievement of objectives" relating to three categories: (i) effectiveness and efficiency of operations; (ii) reliability of financial reporting; and (iii) compliance with applicable laws and regulations.

479.     Supporting the Company in its efforts to achieve these objectives, COSO identifies five interrelated components of internal control: (i) control environment; (ii) risk assessment; (iii) control activities; (iv) information and communication; and (v) monitoring activities.   Under COSO, the five interrelated components can overlap and can impact one another.   Citigroup's internal controls lacked each of the five COSO components.

480.     COSO identifies that all three categories and five components are necessary to ensure effective ICFR.   COSO states that "[a]n effective system of internal control reduces, to an acceptable level, the risk of not achieving an objective relating to one, two, or all three categories. It requires that: [e]ach of the five components of internal control and relevant principles is present and functioning [and that] [t]he five components are operating together in an integrated manner." COSO also identifies that these components are relevant to an entire entity and to the entity level, its subsidiaries, divisions, or any of its individual operating units or functions.

481.     COSO states that the "control environment" is "the set of standards, processes, and structures that provide the basis for carrying out internal control across the organization" and recognizes that "[t]he board of directors and senior management establish the tone at the top regarding the importance of internal control and expected standards of conduct."   With respect to the "control environment," COSO requires that "[t]he board of directors demonstrate[] independence from management and exercise[] oversight of the development and performance of internal control," and that "management establishes, with board oversight, structures, reporting lines, and appropriate authorities and responsibilities in the pursuit of objectives."   The "control environment" also requires that the "organization holds individuals accountable for their internal control responsibilities in the pursuit of objectives."

482.     The "risk assessment" component requires that the Company "identifies risks to the achievement of its objectives across the entity and analyzes risks as a basis for determining how the risks should be managed."  It also requires that "[t]he organization identifies and assesses changes that could significantly impact the system of internal control."

483.     The "information and communication" component requires that an "organization obtains or generates and uses relevant, quality information to support the functioning of internal control;" "internally communicates information, including objectives and responsibilities for internal control, necessary to support the functioning of internal control;" and "communicates with external parties regarding matters affecting the functioning of internal control."

484.     The "control activities" component requires that an "organization selects and develops control activities that contribute to the mitigation of risks to the achievement of objectives to acceptable levels;" "selects and develops general control activities over technology to support the achievement of objectives;" and "deploys control activities through policies that establish what is expected and procedures that put policies into action."

485.     The "monitoring activities" component requires that an "organization selects, develops, and performs ongoing and/or separate evaluations to ascertain whether the components of internal control are present and functioning;" and "evaluates and communicates internal control deficiencies in a timely manner to those parties responsible for taking corrective action, including senior management and the board of directors, as appropriate."

486.     Not only did Citigroup adopt the COSO framework; the OCC Internal Control Handbook specifically identified the required COSO "Internal Control Components:" (1) "a control environment" reflecting the "board of directors' and management's commitment to internal control;" (2) "Risk assessment" reflecting the "identification, measurement and analysis of risks,

both internal and external, controllable and uncontrollable;" (3) "Control activities" which "help ensure that the board and management act to control risks that could prevent a bank from obtaining its objectives;" (4) "Accounting information, and communication systems" which "capture and impart pertinent and timely information in a form that enables the board, management, and employees to carry out their responsibilities;" and (5) "Self-assessment or monitoring" which is the "bank's own oversight of the control system's performance."

487.    The effectiveness of Citigroup's internal controls was particularly important to investors during the Class Period.  As alleged above, Citigroup has a history of lapses and control deficiencies that led to significant violations of law, fines, and penalties.  Citigroup specifically stated that effective risk management, a component of a company's internal controls, was of primary importance to the Company's overall operations.  Investors and analysts focused on whether Citigroup had, in fact, remedied the deficiencies and turned the corner on its troubled past. A material weakness in DCP or ICFR would cause investors to lose faith in Citigroup's ability to operate in a safe and sound manner and consistent with applicable regulations, as the Company consistently stated that it was.

> **b)** **Citigroup's Internal Controls Over Financial Reporting And Disclosure Controls And Procedures Suffered From A Material Weakness**

488.    Defendants asserted in every annual report filed throughout the Class Period that:

Citi's management is responsible for establishing and maintaining adequate internal control over financial reporting. ***Citi's internal control over financial reporting is designed to provide reasonable assurance regarding the reliability of its financial reporting and the preparation of financial statements for external reporting purposes in accordance with U.S. generally accepted accounting principles. Citi's internal control over financial reporting includes those policies and procedures that (i) pertain to the maintenance of records that in reasonable detail accurately and fairly reflect the transactions and dispositions of Citi's assets; (ii) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles and that Citi's receipts and***

*expenditures are made only in accordance with authorizations of Citi's management and directors; and (iii) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of Citi's assets that could have a material effect on its financial statements.*

\* \* \*

Citi's management assessed the effectiveness of Citigroup's internal control over financial reporting as of [the end of the reporting period] based on the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission (COSO) in Internal Control-Integrated Framework (2013). Based on this assessment, management believes that, *as of [the end of the reporting period], Citi's internal control over financial reporting was effective. In addition, there were no changes in Citi's internal control over financial reporting during the [end of the reporting period] that materially affected, or are reasonably likely to materially affect, Citi's internal control over financial reporting*.

The Defendants that signed the Company's Annual Reports and made the false statements are set forth in the chart above (*see supra* ¶55).

489.    Defendants Corbat, Mason, and Gerspach likewise certified pursuant to SOX with respect to the Company's Annual Reports filed on Form 10-K and Quarterly Reports filed on 10-Q during the Class Period that they had "*[d]esigned such internal control over financial reporting . . . to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements . . . in accordance with [GAAP].*"

490.    Defendants Corbat, Mason, and Gerspach also certified pursuant to SOX with respect to the Company's Annual Reports filed on Form 10-K and Quarterly Reports filed on 10-Q during the Class Period that there had been *no changes to its "internal control over financial reporting [during the reporting period] … that has materially affected, or is reasonably likely to materially affect, [its] internal control over financial reporting*."  The dates of the certifications to which Corbat, and Mason or Gerspach attested, and the reporting periods to which the certifications relate, are set forth in the chart in ¶55.

491.     The statements in bold in the three immediately preceding paragraphs were materially false and misleading (the non-bolded portions are provided for context).  In truth, Citigroup's ICFR suffered from material weaknesses rendering them inadequate and ineffective throughout the Class Period.  The assertion that "there were no [material] changes in [Citigroup's] internal control" is materially false and misleading because the Company's internal controls suffered from undisclosed material weaknesses at the time, and to the extent that there were "no changes" in the Company's internal controls, the material weaknesses persisted.

492.     The Fed and OCC's specific determinations and findings in the 2020 Enforcement Orders demonstrate that Citigroup's ICFR suffered from a material weakness.  The Fed and OCC determinations and findings span all five COSO components—the specific framework that Citigroup adopted to determine the effectiveness of its ICFR—and determined that the Company needed to overhaul its entire internal control system, including components critical for the maintenance of effective ICFR.  Corbat stated in an internal memo dated August 10, 2020 that the Company needed to "chang[e] our mindset" and "think about infrastructure and controls very differently.  We can't think of them as just something that is important to our regulators.  It's not about getting remediation projects done or checking boxes."

493.     The Fed and OCC determinations and findings taken together with Corbat's statement that the Company was simply "checking boxes" while failing to remediate the persistent and longstanding issues in Citigroup's internal controls, including ICFR components, despite regulator pressure, demonstrate that there was a reasonable possibility that a material misstatement of the Company's annual or interim financial statements will not be prevented or detected on a timely basis.  AS 2201 ¶a7; *see also* SEC Release 33-8810 ("To allow appropriate flexibility, the

guidance does not provide a checklist of steps management should perform in completing its evaluation").

494.    The Fed Cease and Desist Order stated that Citigroup suffered from "significant ongoing deficiencies in implementation and execution [] with respect to various areas of risk management and internal controls, including for data quality management and regulatory reporting, compliance risk management, capital planning, and liquidity risk management" (at 1). The Fed further determined that "Citigroup has not adequately remediated the longstanding enterprise-wide risk management and controls deficiencies previously identified by the Federal Reserve" (at 2. And the Fed ordered Citigroup to conduct a gap analysis that "shall identify where Citigroup's risk management policies, procedures, practices, processes and internal controls are not compliant with Regulation YY [with respect to capital planning, liquidity risk management, and compliance risk management] … in order to … maintain an effective control environment in those areas" (¶3(a)).  The Fed thus concluded that Citigroup suffered from a myriad of significant deficiencies and that there were gaps that needed to be closed for Citigroup's control environment to be effective.

495.    The OCC likewise found in the OCC Remediation Order that the Citibank "Board and senior management oversight is inadequate to ensure timely, appropriate actions to correct the serious and longstanding deficiencies and unsafe or unsound practices in the areas of risk management, internal controls, and data governance at [Citibank]."  (Art. II ¶5.)  What's more, the OCC found that "[f]or several years, the Bank has failed to implement and maintain an enterprise-wide risk management and compliance risk management program, internal controls, or a data governance program commensurate with the Bank's size, complexity, and risk profile" (Art. II ¶1).  The OCC stated that these deficiencies "contributed to violations of law and regulation and

continuous noncompliance with [Appendix D]" (Art. II ¶¶2, 5).  In addition, the OCC found that "inadequate reporting to the Board hinders its ability to provide effective oversight."

496.    The Fed likewise determined Citigroup's board and senior management oversight to be inadequate.  The Fed Cease and Desist Order required Citigroup to submit a plan that describes the "(a) actions that the board of directors will take to hold senior management accountable for executing effective and sustainable remediation plans by committed deadlines; (b) actions the board of directors will take to ensure senior management improves, and thereafter maintains, effective and independent enterprise-wide risk management, and that internal audit findings are effectively remediated; (c) actions that the board of directors will take to ensure that senior management incentive compensation is consistent with risk management objectives and measurement standards; and (d) actions that the board of directors will take to ensure effective reporting to the board of directors that will enable it to oversee management's execution of the matters identified in this [2020 Consent] Order." (¶2.)

497.    These deficiencies directly implicate the Company's ability to timely detect and prevent material misstatements of the Company's annual or interim financial statements.  The adequate functioning of Citigroup's risk management, capital planning, liquidity risk management, and data governance programs is necessary to allow Citigroup's ICFR to timely prevent or detect a material misstatement in the Company's annual or interim financial statements.  The adequate functioning of these programs is necessary for Citigroup to even assess the effectiveness of its ICFR.  That Citigroup's entire internal control and risk management framework failed to fulfill basic regulatory requirements for a longstanding period of time—and that regulators determined that board and senior management oversight was insufficient to remediate the issues (which are ongoing)—demonstrates at least a reasonable possibility that the Company would not be able to

timely detect and prevent material misstatements of the Company's annual or interim financial statements.

498.    **Enterprise Wide and Compliance Risk Management.**   With respect to Citibank's enterprise-wide risk management and compliance risk management program, the OCC Remediation Order found that Citibank engaged in "unsafe or unsound practices" and failed to comply with Appendix D with respect to the following items: (1) "failure to establish effective front-line units and independent risk management;" (2) "failure to establish an effective risk governance framework;" (3) "failure of Citibank's enterprise-wide risk management policies, standards, and frameworks to adequately identify, measure, monitor, and control risks;" and (4) "failure of compensation and performance management programs to incentivize effective risk management" (Art. II ¶2(a)-(d)).

499.    The OCC Remediation Order further found with respect to the enterprise-wide risk management system that Citibank must implement a plan that results in: "[t]he establishment and documentation of the responsibility and accountability for risk management related functions in each front-line unit and independent risk management unit" (Art. VI ¶2(d)); "a program in each front-line unit and independent risk management unit to measure, monitor, aggregate, limit, and control risks consistent with [Citibank's] … concentration risk limits ... strategic, capital, and liquidity plans, [and] stress testing" (Art. VI ¶2(e)); "[w]ritten policies and procedures to ensure that independent risk management promotes effective oversight and control of risks that is appropriately independent of the related line of business and that it has the requisite stature, authority, and resources, including sufficient staffing to provide such oversight and control" (Art. VI ¶2(h)); as well as "[p]rocedures and processes for identifying, reporting, escalating, and remediating limit breaches, significant compliance concerns, and significant risk management

concerns and for documenting the identification, reporting, escalation, and remediation of such concerns" (Art. VI ¶2(j)).

500.    The OCC Remediation Order also found that as to compliance risk management Citibank must implement a plan that results in: "[a]n effective compliance risk governance framework that establishes the roles, responsibilities, and accountability for respective front-line units and independent compliance risk management" (Art. VII ¶2(a)); "the establishment of and adherence to policies, processes, and control systems within front-line units to assess, measure, and limit regulatory compliance exposures on an ongoing basis commensurate with the risk profile and risk appetite of [Citibank]" (Art. VII ¶2(b)); "the establishment of and adherence to policies, processes, and control systems within independent compliance risk management to assess, measure, aggregate and limit regulatory compliance exposures on an ongoing basis commensurate with the risk profile and risk appetite of [Citibank]" (Art. VII ¶2(c)); "[a]n effective, independent monitoring and testing function supported by sufficiently skilled staff and resources that provides risk-based scope and coverage to provide credible challenge and escalation of issues identified by front-line units" (Art. VII ¶2(f)); and "[c]ompliance information systems to measure, track, and report risk" (Art. VII ¶2(i)).

501.    And as noted above, the Fed Cease and Desist Order likewise determined as to Citigroup that the Company "has not adequately remediated the longstanding enterprise-wide risk management and controls deficiencies previously identified by the Federal Reserve, including in the areas" of "risk management and internal controls, including for data quality management, regulatory reporting, compliance risk management, capital planning, and liquidity risk management," (at 2), and that these were "significant ongoing deficiencies"  (at 1).

502.     In addition, the Fed Cease and Desist Order determined that Citigroup must "ensure that Citigroup's risk management functions have the requisite stature, authority, and resources" as well as "clearly defined roles and responsibilities to ensure an appropriate enterprise-wide internal control environment" (¶3(b)(i)).  The Fed Cease and Desist Order further determined with respect to "[c]ompliance [r]isk [m]anagement" that Citigroup must implement "improvements to the management of information systems, data, and reports provided to Citigroup's board of directors and senior management concerning compliance risks, compliance with applicable U.S. laws and regulations, and the effectiveness and functioning of the compliance risk management program" (¶5(d)).

503.     These deficiencies in enterprise-wide and compliance risk management set forth in the paragraphs immediately above directly implicate the Company's ability to timely detect and prevent material misstatements of the Company's annual or interim financial statements.  The adequate functioning of Citigroup's enterprise-wide risk management and compliance risk management programs is necessary to allow Citigroup's ICFR to timely prevent or detect a material misstatement in the Company's annual or interim financial statements.  The adequate functioning of these programs is necessary for Citigroup to even assess the effectiveness of its ICFR.  The Fed Cease and Desist Order specifically determined Citigroup's enterprise-wide and compliance risk management programs to be inadequate with respect "to the management information systems, data, and reports provided to Citigroup's board of directors and senior management" (¶5(d)).

504.     The OCC Remediation Order found that Citibank's enterprise-wide risk management system failed to "adequately identify, measure, monitor, and control risks" which constituted "unsafe or unsound practices" (Art. II ¶2(c)).  It likewise stated that Citibank lacked a

sufficient program to "measure, monitor, aggregate, limit, and control risks consistent with [Citibank's] ... concentration risk limits . . . strategic, capital, and liquidity plans, [and] stress testing" (Art. VI ¶2(e)(ii)-(iv)); that Citibank's enterprise-wide risk management and compliance risk management programs failed to satisfy basic regulatory requirements that constituted "unsafe or unsound practices" (Art. II ¶2); and that Citibank's board and senior management oversight was inadequate (Art. II ¶5).  These deficiencies demonstrate at least a reasonable possibility that the Company would not be able to timely detect and prevent material misstatements of the Company's annual or interim financial statements.

505.    **Internal Controls.**  With respect to Citigroup's internal controls, the Fed Cease and Desist Order identified "longstanding" and "significant ongoing deficiencies" (at 1-2) including "risk management functions" that lacked "the requisite stature, authority, and resources . . . to ensure that Citigroup, on an ongoing basis, maintains and enterprise-wide risk management framework that meets the requirements of Regulation YY" (¶3(b)(i)).  It likewise stated that Citigroup's internal controls lacked "clearly defined roles and responsibilities to ensure an enterprise-wide internal control environment" (¶3(b)(ii)).

506.    As to Citibank, the OCC Remediation Order stated that Citibank's "deficiencies in internal controls and compliance risk management have contributed to violations of laws and regulations" (Art. II ¶7).  It also identified "unsafe or unsound practices . . . including, among other things, an absence of clearly defined roles and responsibilities and noncompliance with multiple laws and regulations"  (Art. II ¶3).

507.    The OCC Remediation Order required Citibank to remediate its internal controls to ensure that Citibank can "perform analyses (or assess analyses previously performed) to diagnose the root cause(s) of the underlying issues that led to internal control related concerns identified by

internal audit and/or federal regulators since 2017," (Art. IX ¶1(a)(i)), and set forth, "control gaps, potential exposures and escalation issues," (Art. IX ¶1(a)(i)(1)), and assess whether those root causes "may affect other lines of business, products, or services" (Art. IX ¶1(a)(iii)).  The OCC Remediation Order further required Citibank with respect to its internal controls to "improv[e] reporting to the Board and senior management" to "capture significant enterprise-level concentrations, exposures, and limit breaches" and "include relevant underlying analysis of current and emerging risks, growth trends, and geographical concentrations" (Art. IX ¶1(d)).

508.    These deficiencies in internal controls set forth in the paragraphs immediately above directly implicate the Company's ability to timely detect and prevent material misstatements of the Company's annual or interim financial statements.  The adequate functioning of Citigroup's internal controls is necessary to allow Citigroup's ICFR to timely prevent or detect a material misstatement in the Company's annual or interim financial statements.  The adequate functioning of the Company's internal controls is necessary for Citigroup to even assess the effectiveness of its ICFR.  Yet the OCC Remediation Order found that Citibank must improve "reporting to the Board and senior management" including with respect to "enterprise-level concentrations, exposures, and limit breaches" (Art. IX ¶1(d)).  The OCC Remediation Order further found that Citibank's deficient internal controls precipitated violations of multiple laws and regulations (Art. II).  And the Fed identified "longstanding" and "serious ongoing deficiencies" in Citigroup's internal controls (at 1-2). That Citigroup's internal controls were plagued by such deficiencies demonstrates at least a reasonable possibility that the Company would not be able to timely detect and prevent material misstatements of the Company's annual or interim financial statements.

509.    **Data Quality And Data Governance.**  With respect to Citigroup's data quality and data governance, including risk data aggregation and management and regulatory reporting,

the OCC found that Citibank engaged in "unsafe or unsound practices" and failed to comply with Appendix D with respect to the following items: (1) "failure to establish effective front-line units and independent risk management as required;" (2) "inability to develop and execute on a comprehensive plan to address data governance deficiencies, including data quality errors and failure to produce timely and accurate management and regulatory reporting;" and (3) "inadequate reporting to the Board on the status of data quality and progress in remediating identified deficiencies" (Art. II ¶4).  The Fed Cease and Desist Order likewise identified "longstanding" and "serious ongoing deficiencies" in Citigroup's "data quality management" (at 1-2).

510.    So deficient was Citibank's data quality and data governance that the OCC required Citibank to undertake a "thorough redesign of data architecture, re-engineering of processes, and modernization of system applications and information technology infrastructure" (Art. V ¶2(d)). This redesign required Citibank to, among other things, "strengthen data quality controls," "ensure that ledger and reporting systems are standardized to the fullest extent possible," "ensure consistent adoption of authoritative data sources, reference data sets, enterprise-data sets, and those ledger and reporting systems that are standardized," and "define enterprise-data sets that are shared across sectors and business units" (Art. V ¶2(d)(ii)-(v)).  It likewise required Citibank to improve "data and systems relied upon for liquidity risk management" including "Board-approved tolerances for internal liquidity data quality reporting metrics," "systems and reporting being produced in accordance with timeframes needed by management to make decisions,"  "procedures and testing requirements for validation of system(s) data that feeds into liquidity reporting," and "procedures and processes to ensure that senior management reports to the Board include significant liquidity concentrations to ensure they are within the Board's risk tolerances" (Art. V ¶2(e)).

511.    The Fed Cease and Desist Order also required Citigroup to "enhance its data quality management program, including data governance" including "measures to ensure that Citigroup has an effective enterprise-wide program for data quality management that provides timely and accurate data sufficient for Citigroup's enterprise-wide risk management framework and internal controls systems regarding capital planning, liquidity risk management and compliance risk management" (¶4(a)).

512.    These deficiencies in data quality and data governance set forth in the paragraphs immediately above directly implicate the Company's ability to timely detect and prevent material misstatements of the Company's annual or interim financial statements.  Without adequate data quality or data governance systems, there is a significant risk that the Company's ICFR would fail to timely detect or prevent material misstatements of the Company's annual or interim financial statements.  What's more, the proper functioning of Citigroup's data quality and data governance systems is necessary for the Company to even assess the effectiveness of its ICFR.  That the OCC Remediation Order found "unsafe or unsound practices with respect to [Citibank's] data quality and data governance, including risk data aggregation and management and regulatory reporting," (Art. II ¶4)—and specifically stated that Citibank must improve "systems and reporting being produced in accordance with timeframes needed by management to make decisions" (Art. V ¶2(e)(ii))—demonstrates at least a reasonable possibility that the Company would not be able to timely detect and prevent material misstatements of the Company's annual or interim financial statements.  And that the Fed Cease and Desist Order identified "longstanding" and "serious ongoing deficiencies" in Citigroup's "data quality management" further bolsters that conclusion (at 1-2).

513.    **Capital Planning And Reporting.**    As to Citigroup's capital planning and reporting, the Fed Cease and Desist Order identified "longstanding" and "serious ongoing deficiencies" in the Company's "capital planning" (at 1-2).  The OCC Remediation Order likewise found that Citibank must improve its capital planning and reporting processes and must at a minimum ensure "the development of and adherence to effective governance over capital planning and calculations;" "that capital and risk-weighted assets are appropriately identified and reported;" and "that periodic assessments of the [Citibank's] capital calculations and management and regulatory reporting ensure the capital calculations adequately take into account [Citibank's] size, complexity, and overall risk profile" (Art. VIII ¶1).

514.    These deficiencies in capital planning and reporting set forth in the paragraph immediately above directly implicate the Company's ability to timely detect and prevent material misstatements of the Company's annual or interim financial statements.  The OCC Remediation Order found that Citibank lacked sufficient internal controls to ensure effective governance over capital "calculations" and was unable to ensure that capital and risk weighed assets "are appropriately identified and reported" (Art. VIII ¶1(b)).  It likewise stated that Citibank was unable to ensure that assessments of its "capital calculations and management and reporting" adequately accounted for Citibank's size, complexity and overall risk profile (Art. VIII ¶1(c)).  And the Fed Cease and Desist Order identified "longstanding" and "serious ongoing deficiencies" in Citigroup's "capital planning" (at 1-2).  These deficiencies further demonstrate that there is at least a reasonable possibility that the Company would not be able to timely detect and prevent material misstatements of the Company's annual or interim financial statements.

515.    The failures in Citigroup's enterprise-wide and compliance risk management systems, internal controls, data quality and data governance, capital planning and reporting

implicate all COSO components: (1) Control Environment (failure to establish tone at the top regarding the importance of internal control, failure to establish and exercise oversight of the development and performance of internal control, failure to hold individuals accountable for their internal control responsibilities, and failure to establish structures, reporting lines, and appropriate authorities); (2) Risk Assessment (failure to identify risks across the entity); (3) Information and Communication (failure to obtain or generate quality information, failure to effectively communicate internally and externally information regarding matters affecting the functioning of internal control); (4) Control Activities (failure to hold individuals accountable, and failure to select and develop control activities that contribute to the mitigation of risks to acceptable levels); and (5) Monitoring Activities (failure to evaluate and ascertain whether the components of internal control are present and functioning, failure to take corrective action after communicating deficiencies to those responsible, including senior management and the relevant Board, and failure to evaluate and communicate internal control deficiencies in a timely manner).

516.   These failures demonstrate "[i]nneffective oversight of the entity's financial reporting and [ICFR] by those charged with governance" and constitute a material weakness because there is at least a reasonable possibility that the Company would not be able to timely detect and prevent material misstatements of the Company's annual or interim financial statements. *See* KPMG ICOFR Reference Guide, at 252 [11.4.50] (2016).

517.   The ineffectiveness of Citigroup's ICFR during the Class Period is manifest by Citigroup's failure to timely detect or prevent the Company's violation of GAAP, and specifically ASC 450, by misrepresenting and concealing a material loss contingency of $3.66 billion and $4.1 billion.  (*See supra* VI.B.I.)

### i)   Disclosure Controls And Procedures

518.   In every quarterly and annual report filed with the SEC throughout the Class Period, Citigroup represented the following with respect to the Company's DCP:

> Citi's management, with the participation of its CEO and CFO, has evaluated the effectiveness of Citigroup's disclosure controls and procedures (as defined in Rule 13a-15(e) under the Securities Exchange Act of 1934) as of [the end of the reporting period] and, **based on that evaluation, the CEO and CFO have concluded that at that date, Citigroup's disclosure controls and procedures were effective**.

The Officer Defendants who signed the respective quarterly and annual reports and made the misrepresentations with respect to DCP are set forth in the chart in ¶55.

519.   The Officer Defendants likewise certified in the Company's Class Period quarterly and annual reports that they had ***"[e]valuated the effectiveness of the registrant's disclosure controls and procedures"*** and ***"designed such disclosure controls and procedures . . . to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us."*** The dates of the certifications to which each Officer Defendant attested, and the reporting periods to which the certifications relate, are set forth in the chart in ¶55.

520.   The statements in bold set forth above in the two immediately preceding paragraphs pertaining to the effectiveness of Citigroup's DCP were materially false and misleading (the non-bolded portions are provided for context).   In truth, Citigroup's DCP were inadequate and ineffective throughout the Class Period.   The Fed and OCC's specific determinations and findings in the 2020 Enforcement Orders demonstrate that the DCP were ineffective and that there is a reasonable possibility that Citigroup would be unable to timely prevent or detect a material misstatement in a public disclosure.

521.   The OCC specifically required Citibank with respect to its internal controls to "improv[e] reporting to the Board and senior management" such that the reporting would "capture significant enterprise-level concentrations, exposures, and limit breaches" and "include relevant

underlying analysis of current and emerging risks, growth trends, and geographical concentrations." (OCC Remediation Order Art. IX ¶1(d).) The OCC further required Citibank to "enhance" its internal controls by "[p]erform[ing] analyses (or assess analyses previously performed) to diagnose the root cause(s) of the underlying issues that led to internal control related concerns identified by internal audit and/or federal regulators since 2017." These analyses also had to include the "identification of control gaps, potential exposures, and escalation issues." (Art. IX ¶1(a)(i).) Significantly, the OCC found that Citibank's internal controls had been deficient "for several years" and were "unsafe or unsound," due to, among other things, "an absence of clearly defined roles and responsibilities and noncompliance with multiple laws and regulations." (Art. II ¶¶1-3.)

522. Further, the OCC found that Citibank's "data quality and data governance, including risk data aggregation and management and regulatory reporting" was so deficient that they constituted "unsafe or unsound practices" and were "noncomplian[t] with [Appendix D]." (Art. II ¶4.) The OCC specifically discussed Citibank's "inability to develop and execute on a comprehensive plan to address data governance deficiencies, including data quality errors and failure to produce timely and accurate management and regulatory reporting" and "inadequate reporting to the Board on the status of data quality and progress in remediating deficiencies." (Art. II ¶4(b)-(c).)

523. Because of these failures, the OCC stated that Citibank "engaged in unsafe or unsound practices that were part of a pattern of misconduct" and that the "conduct also contributed to violations of law and regulation and continuous noncompliance with [Appendix D]." (Art. II ¶¶6-7.)

524.     To remedy the deficiencies, the OCC required Citibank to submit a plan to the OCC to "ensure that data, throughout its lifecycle, is accurate, consistent, timely, and complete and there is integrity in processing in order to facilitate timely and accurate management and regulatory reporting so that management can make prompt and effective decision-making during normal times and periods of stress."  (Art. V ¶2.)

525.     More specifically, the OCC required Citibank to undertake a "thorough redesign of data architecture, re-engineering of processes, and modernization of system applications and information technology infrastructure."  This redesign required Citibank to, among other things, "strengthen data quality controls," "ensure that ledger and reporting systems are standardized to the fullest extent possible," "ensure consistent adoption of authoritative data sources, reference data sets, enterprise-data sets; and those ledger and reporting systems that are standardized," and "define enterprise-data sets that are shared across sectors and business units."  (Art. V ¶2(d).)

526.     The OCC further required Citibank to improve "data and systems relied upon for liquidity risk management" including "Board-approved tolerances for internal liquidity data quality reporting metrics," "systems and reporting being produced in accordance with timeframes needed by management to make decisions," "procedures and testing requirements for validation of system(s) data that feeds into liquidity reporting," and "procedures and processes to ensure that senior management reports to the Board include significant liquidity concentrations to ensure they are within the Board's risk tolerances."  (Art. V ¶2(e).)

527.     Likewise, the Fed "identified significant ongoing deficiencies in implementation and execution by Citigroup with respect to various areas of . . . internal controls, including for data quality management and regulatory reporting, compliance risk management, capital planning, and liquidity risk management."  (Fed Cease and Desist Order at 1.)  The Fed required Citigroup to

"enhance its data quality management program, including data governance," and required Citigroup to enact "measures to ensure that Citigroup has an effective enterprise-wide program for data quality management that provides timely and accurate data sufficient for Citigroup's enterprise-wide risk management framework and internal controls systems regarding capital planning, liquidity risk management, and compliance risk management."  (¶¶4, 4(a).).

528.    The Fed further required Citigroup to "enhance its data quality management program" by demonstrating that "the program is producing timely and accurate data for decision making and reporting."  (¶¶4, 4(b).)   In addition, the Fed required Citigroup to "enhance its compliance risk management program" and submit a plan that includes "improvements to the management information systems, data, reports provided to Citigroup's board of directors and senior management concerning compliance risks, compliance will applicable U.S. laws and regulators, and the effectiveness and functioning of the compliance risk management program." (at ¶¶5, 5(d).)

529.    That the OCC specifically found that Citibank must "improv[e] reporting to the Board and senior management," (OCC Remediation Order Art. IX ¶¶1(d)), so that "management can make prompt and effective decision-making during normal times and periods of stress," (Art. V ¶2), required a complete overhaul of Citibank's data architecture to ensure "reporting [was] produced in accordance with timeframes needed by management to make decisions," (Art. V ¶2(e)(ii)), and that Citibank lacked "clearly defined roles and responsibilities" with respect to internal controls, (Art. II ¶(3)), demonstrates that there is a reasonable possibility that Citigroup would be unable to timely prevent or detect a material misstatement in a public disclosure.  And that the Fed similarly required Citigroup to overhaul its data quality management program to improve reporting to senior management and "enhance its compliance risk management program"

and submit a plan that includes "improvements to the management information systems, data, reports provided to Citigroup's board of directors and senior management concerning compliance risks, compliance with applicable U.S. laws and regulations, and the effectiveness and functioning of the compliance risk management program," further bolsters the conclusion.  (Fed Cease and Desist Order at ¶¶5, 5(d).)

530.    Indeed, the OCC specifically found that Citibank still had not yet identified "the root cause(s) of the underlying issues that led to internal control related concerns identified by internal audit and/or federal regulators since 2017." (OCC Remediation Order at Art. IX ¶(1)(a)(i).) Without accurate data, timely reporting, and without even conducting the analysis necessary to identify the root causes of the issues that federal regulators identified over three years ago, there is at least a reasonable possibility that Citigroup would be unable to timely prevent or detect a material misstatement in a public disclosure.

531.    The ineffectiveness of Citigroup's DCP during the Class Period is also manifest by Citigroup's violation of Item 303 by concealing the significant underinvestment in its risk and control systems, and the numerous other materially false and misleading statements concerning those same systems in the Company's annual and quarterly reports filed with the SEC.  (*See supra* ¶459.)

## VII.    LOSS CAUSATION

532.    Defendants' fraudulent conduct directly and proximately caused Plaintiffs and the Class to suffer substantial losses as a result of Plaintiffs' and the Class' purchases of Citigroup common stock and/or exchange-traded call options on Citigroup common stock at artificially inflated prices during the Class Period.  Defendants' fraudulent conduct also directly and proximately caused the Class to suffer substantial losses as a result of the Class' sales of exchange-

traded put options on Citigroup common stock at artificially deflated prices during the Class Period.

533.    When the false and misleading nature of Defendants' statements became known to the market, beginning on September 14, 2020 and continuing on the remaining disclosure dates identified below (September 15, 2020, October 8, 2020, and October 13, 2020), the price of Citigroup common stock substantially declined.

534.    The prices for Citigroup exchange-traded options were artificially inflated or deflated, as applicable, during the Class Period on account of the artificially inflated price of Citigroup common stock. The price of Citigroup exchange-traded call options suffered significant declines and put options suffered significant increases, when Defendants' false and misleading statements, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, and/or the risks that had been fraudulently concealed by Defendants materialized, causing substantial damage to members of the Class who purchased exchange-traded call options and/or sold exchange-traded put options on Citigroup common stock during the Class Period.

535.    No single disclosure was sufficient to fully negate the: (i) artificial inflation present in the prices of Citigroup common stock or exchange-traded call options on Citigroup common stock; or (ii) artificial deflation present in put options on Citigroup common stock, because each single disclosure only partially revealed the truth concerning the misrepresentations at issue in this case.

**A.    September 14, 2020**

536.    On September 14, 2020, *The Wall Street Journal* published an article during trading hours titled "Regulators Prepare to Reprimand Citigroup for Failing to Improve Risk Systems." The article revealed that "[f]ederal regulators are preparing to reprimand Citigroup Inc. for failing

to improve its risk-management systems – an expansive set of technology and procedures designed to detect problematic transactions, risky trades and anything else that could harm the bank."  It added that "[f]or years, regulators have privately pressed Citigroup and [CEO] Corbat to fix the bank's risk systems" and that "[r]egulators have faulted Citi's management for not giving priority to the risk-management overhaul," demonstrating that the Company's positive representations about its risk and control environment were baseless.  The article further stated that "[t]he expected rebuke from the [OCC] and the Federal Reserve accelerated planning for [] Corbat's retirement," conflicting with Citigroup's characterization on September 1, 2020 that it was a simple transition that had been planned for years.

537.    The news of the expected regulatory sanctions caused the price of Citigroup common stock to decline from $51.00 per share on September 11, 2020 (the closing price on the prior Friday) to $48.15 per share on September 14, 2020 (the next trading day), or nearly 6%.

538.    A later version of the same *Wall Street Journal* September 14 article reported that "Citigroup's shares closed down 5.6% to $48.15 after *The Wall Street Journal* reported the expected regulatory action. The KBW Nasdaq Bank Index rose 1.8%."  Citigroup's stock performance was the worst in the 66-company S&P 500 Financials Index.  *Reuters* likewise reported during trading hours on September 14, 2020 that "Citigroup slips after media report of regulatory reprimand . . .  Shares of U.S. bank C [] down 4% at $48.92 after media report that Federal regulators are preparing to reprimand co[mpany] for failing to improve its risk-management systems."

539.    UBS issued an analyst report later that day also reporting that "Citigroup shares fell 5.6% on a day when bank stocks rallied (BKX was up 1.8%).  The shares began lagging when CFO Mark Mason gave updated financial guidance at an investor conference and the declines

accelerated with news reports this afternoon that the Fed and the OCC may issue consent orders related to risk control deficiencies and that this accelerated CEO Mike Corbat's decision to retire."

540.     Wolfe Research likewise issued an analyst report on September 14, 2020 titled "Consent is Sexy; Consent Orders Are Not," explaining how it may be "Too Soon to Buy the Dip" after "several news articles were published suggesting regulators could take action over Citi's deficiencies in risk and control functions and may issue a consent order (following Revlon loan error)."  According to Wolfe Research, "Citi's underperformance (-6% vs. S&P Fins. +1%) may be overdone.  However, it is much too soon to tell given lack of details.  History shows that when consent orders are issued, they tend to be outstanding for a duration of four years, suggesting shares may be in limbo for quite some time."

541.     And Morgan Stanley issued a research report on September 15, 2020 stating that "C was down 6% yesterday after a WSJ article suggested that regulators are preparing to issue a consent order requiring Citi to fix its risk management systems, after a manual error resulted in an accidental $900M payment recently."  Morgan Stanley further identified the "Consent order [as a downside risk because it] drives significantly higher expenses."

**B.     September 15, 2020**

542.     The price of Citigroup stock declined further on September 15, 2020.  Investors continued to digest the information regarding the anticipated consent orders and news after the close of trading on September 14 provided further details about Citigroup's risk management and internal controls shortcomings.  Specifically, after the market closed on September 14, 2020, *Business Insider* made public the internal memo that Corbat had sent to Company employees on August 10, 2020.  Corbat admitted in the memo the need for improved internal controls and regulatory compliance:  "In recent years, we have been working on significant remediation projects to strengthen our controls, infrastructure and governance.  While we have made progress, we have

work to do to meet the standards that we must hold ourselves to."  Corbat also noted "execution challenges" in remediating Citigroup's controls and risk systems and urged employees to "chang[e] our mindset" and "think about infrastructure and controls very differently.  We can't think of them as just something that is important to our regulators.  It's not about getting remediation projects done or checking boxes," suggesting that's all Citigroup did before and failed to prioritize and upgrade its risk systems as it promised investors it had done.

543.  *Business Insider* then published another article before the market opened on September 15, 2020 titled "The Real Reasons Behind Citigroup CEO Mike Corbat's Retirement." It linked Corbat's retirement to his failure to prioritize fixing the longstanding and systemic failings in the Company's risk controls despite significant pressure from regulators.  "[T]he fines and lack of progress were a testament to Corbat's focus on cost controls," the article said.  Corbat "had made operating efficiency and return-on equity a hallmark of his strategy [and] was often reluctant to spend the money or dedicate enough people to fix a problem the right way."  The *Business Insider* article also revealed that "Entering [2020], [] Citigroup had numerous outstanding compliance- and technology-related issues that had been outlined in regulatory notices known as Matters Requiring Attention and Matters Requiring Immediate Attention," and that "Citigroup had multiple ones long past due."

544.  On this news, the price of Citigroup common stock declined from $48.15 per share on September 14, 2020 to $44.81 per share on September 15, 2020, a decline of roughly 7%.

545.  Reporting on the falling stock price, *Dow Jones* published an article on September 15, 2020 noting that "Citigroup investors have had a lot to digest over the last few weeks but while the stock has sold off aggressively, analysts remain hopeful.  Shares of Citigroup (ticker: C) were down 3.8% in midday trading Tuesday, following a nearly 6% drop on Monday after *The Wall*

*Street Journal* reported that the bank could face a consent order from the Federal Reserve and the [OCC] for inadequate risk management controls."

546.    The same day, September 15, 2020, Piper Sandler issued an analyst report titled "Potential Regulatory Action Drives What We Believe To Be An Overdone Sell-off."  The report said, "We believe yesterday's afternoon sell-off was primarily driven by regulatory headlines …. C's share price declined meaningfully yesterday after the Wall Street Journal reported that C faces a potential consent order from the OCC and Federal Reserve for failing to adequately improve its risk management systems."

547.    An article published by *Investopedia* on September 16, 2020 likewise noted how "Citigroup Inc. (C) stock has sold off more than 15% in two days after *The Wall Street Journal* alleged that the banking giant could get reprimanded by regulators for failing to improve risk management systems."

### C.    October 8, 2020

548.    After the market closed on October 7, 2020, the Fed and the OCC released the 2020 Enforcement Orders.  The specific disclosures in the enforcement orders, including the fact that Citigroup is required to seek the OCC's approval before making a significant new acquisition and the $400 million penalty, caused the price of Citigroup common stock to decline from $44.84 per share on October 7, 2020 to $44.72 per share on October 8, 2020, or roughly 0.3%.  The S&P 500 Index rose about 0.8% and the KBW Nasdaq Bank Index rose 1.5% on October 8, 2020.

549.    *Marketwatch* reported on October 8, how "The [OCC] assessed a $400 million civil money penalty against Citibank, N.A., and said the bank is required to seek OCC approval before making new acquisitions, and the OCC reserved the right to implement business restrictions and require senior management changes."  The *Marketwatch* article further described how the J.P. Morgan analyst (Vivek Juneja) wrote in a note to clients that "Citi has a credibility gap versus

peers due to its much weaker profitability, and these orders will add to the pressures as it will need to add resources—inadequate staffing and technology in certain areas were explicitly mentioned in the orders. . . . This will be an overhang on Citi and the new CEO, with timing unknown."

550.   Likewise, *Barron's* published an article on October 8, 2020 explaining that "[w]hile the regulators' moves were largely expected in light of recent reporting, Citigroup's shares fell 1.2% in after-hours trades, but was up 0.1% at 10:14 a.m. Thursday."  This compares to "[s]hares of JPMorgan Chase (JPM) and Bank of America (BAC) [which] rose 1.5% and 0.7% Thursday morning."

### D.   October 13, 2020

551.   Before the market opened on October 13, 2020, Citigroup reported earnings for 3Q 2020.  Citigroup reported that the $400 million fine negatively impacted the Company's earnings by $0.19 per share and partially caused the Company's expenses to increase 5% in 3Q 2020 (to nearly $11 billion) compared to the prior year due to Citigroup's investments in "infrastructure supporting our risk and control environment."  Citigroup further reported that its net income had declined 34% in 3Q 20 compared to the prior year, driven in part by "an increase in expenses," including the $400 million civil money penalty.

552.   During the earnings call that day, Corbat admitted that the Company had not even calculated the total cost to fix its deficient risk and control systems, only that it will be a significant, "multiyear transformation" that "won't be a quick or easy fix," even though Citigroup had purportedly already implemented improvements in its risk and control systems for years to meet legal and regulatory requirements.  Analysts also seriously criticized the Company's credibility on the October 13 earnings call (¶¶16, 251).

553.   The news of the $400 million fine's impact on Citigroup's earnings, the significance of the steps Citigroup still needed to take to remediate issues, and how the Company

had not even estimated how much it would cost, or how long it would take, caused the price of Citigroup common stock to decline from $45.88 per share on October 12, 2020 to $43.68 per share on October 13, 2020, a decline of an additional 5%.

554.    Credit Suisse issued an analyst report on October 13, 2020 titled "Solid Results Overshadowed by the Cost of Consent Orders; TP Reduced to $65."  The report stated that "Citi's shares were down another 5%, with underperformance evidencing frustration with Consent Orders, both the issues they cover and the related costs to remedy.  Resolution will take time; sustained share price outperformance will require both clarity on the path to resolution and a clearly articulated longer term plan from incoming CEO Jane Fraser."

555.    Deutsche Bank likewise issued a report on October 13, 2020 titled "3Q20: More Questions Than Answers on Costs & Strategy Given Reg Issues" and stated that "Citigroup reported solid 3Q results [], but the focus was on the recently announced OCC consent order and the potential related impact on costs, revenue and long term strategy. . . . there were enough comments on the earnings call that raise the concern expenses could rise meaningfully and that there could be significant changes to the business model."  In a separate analyst report that Deutsche Bank issued on October 13 titled "2022 Consensus EPS May Come Down by 20-25%," Deutsche Bank noted that "The biggest change is to our 2022e EPS--which we reduced by 16% (and are now 23% below consensus) due to likely higher than previously expected regulatory driven costs.  Our 2022 goes to $6.50 from $7.71 (and consensus of $8.48).  It's unclear how much expenses will rise, but the tone on today's earnings call seemed to imply that a lot of spend could be needed to address regulatory issues."

556.    Barclays also issued an analyst report on October 13, 2020 titled "3Q20 EPS Review: Uncertainty around Costs, Consent Orders Weigh" that stated that "we are lowering our

2021 estimate [of EPS] to $6.00 (-$0.75) as our EPS estimate now includes a higher expense base to compile [sic] with its Consent Orders," and that the "reduced multiple reflects the increased uncertainty created by its recent Consent Orders."

557. JPMorgan similarly published an analyst report on October 14, 2020 titled "Mixed 3Q: Consent Orders – Board, Management, Comp Changes Needed; Further Costs Unknown" that stated the "recent surprise consent orders . . . led us to downgrade the stock and move to the sidelines," and that "in our view, Board and further senior management changes are needed given these failures" and "incentive compensation changes are needed, including clawbacks, given the comments by regulators."

558. Oppenheimer also issued an analyst report on October 14, 2020 titled Citigroup "Solidly Beats Consensus but Stock Weighed Down by Ritual Flogging of Management Over Consent Order."  According to Oppenheimer, "Citi reported 3Q20 EPS of $1.40, well above consensus' $0.91E and close to our street-high $1.54 economic earnings estimate. . . . Despite that, the stock is down 4.8% at this writing, vs. down 2.9% for the BKX and 0.6% for the S&P. . . . [W]e suspect Citi was in particular depressed by concern about the recent consent order."

559. And Piper Sandler published an analyst report on October 14, 2020 that noted "C's share price meaningfully underperformed the bank stock peer group yesterday despite reporting solid results that included some notable positives (e.g. better than expected credit trends).  We primarily attribute the underperformance to increased uncertainty about the outlook for PPNR [pre-provision net revenue] in 2021 given a lack of clarity about the level of investment spending required to improve consent order related risk controls."

## VIII.  INAPPLICABILITY OF STATUTORY SAFE HARBOR OR BESPEAKS CAUTION DOCTRINE

560.    The statutory safe harbor and bespeaks caution doctrine applicable to forward-looking statements under certain circumstances does not apply to any of the false or misleading statements and omissions alleged herein.  The statements and omissions complained of herein concerned then-present or historical facts or conditions that existed at the time the statements were made.

561.    To the extent any of the untrue or misleading statements alleged herein can be construed as forward-looking, (a) they were not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statements, and the generalized risk disclosures Citigroup or other Defendants made were not sufficient to shield Defendants from liability, and (b) the person who made each such statement knew that the statement was untrue or misleading when made, or each such statement was approved by an executive officer of Citigroup who knew that the statement was untrue or misleading when made.

## IX.  PRESUMPTION OF RELIANCE AND FRAUD ON THE MARKET DOCTRINE

562.    Plaintiffs are entitled to a presumption of reliance on Defendants' material misrepresentations and omissions pursuant to the fraud-on-the-market doctrine.  At all relevant times, the market for Citigroup common stock and exchange-traded call and put options was efficient for the following reasons, among others:

(a)     Citigroup's common stock met the requirements for listing, and was listed and actively traded, on the NYSE;

(b)     The average weekly trading volume of Citigroup's common stock was significant and amounted to 90,715,173 shares during the Class Period;

(c)    As a regulated issuer, Citigroup filed public reports with the SEC and NYSE;

(d)    Citigroup was eligible to file simplified SEC filings;

(e)    Citigroup regularly communicated with the public through established market communication channels, including through the regular dissemination of news releases through major newswire services, communications with the financial press, and other wide-ranging public disclosures;

(f)    Numerous securities and credit analysts followed Citigroup and wrote reports that were published, distributed, and entered the public domain;

(g)    The market reacted promptly to public information disseminated by Citigroup;

(h)    Citigroup exchange-traded call and put options were listed and actively traded on national exchanges;

(i)    The material misrepresentations and omission alleged herein would tend to induce a reasonable investor to incorrectly value Citigroup common stock and exchange-traded options; and

(j)    Without knowledge of the misrepresented or omitted material facts alleged herein, Plaintiffs and other members of the Class purchased Citigroup common stock and/or exchange-traded call options, and/or sold exchange-traded put options, between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed.

563.    Accordingly, the market for Citigroup common stock and exchange-traded call and put options promptly digested current information regarding the Company from all publicly available sources and reflected such information in the price of such securities. Under these circumstances, all purchasers of Citigroup common stock and/or exchange-traded call options during the Class Period suffered similar injury through their purchases at artificially inflated prices, and a presumption of reliance applies. Likewise, all sellers of Citigroup exchange-traded put options during the Class Period suffered similar injury through their sales at artificially deflated prices, and a presumption of reliance applies.

564.     In addition, or in the alternative, Plaintiffs are entitled to a presumption of reliance

pursuant to *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), and its progeny,

because the claims asserted herein are predicated in part upon omissions of material fact that

Defendants had a duty to disclose.

## X.     CLASS ACTION ALLEGATIONS

565.     Plaintiffs bring this action as a class action pursuant to Rule 23(a) and (b)(3) of the

Federal Rules of Civil Procedure, on behalf of themselves and all others similarly situated who

purchased or otherwise acquired Citigroup common stock between January 15, 2016 and October

12, 2020, inclusive (the "Class Period"), and were damaged thereby.  Plaintiffs also bring this

action on behalf of those persons and entities that during the Class Period (i) purchased the

exchanged-traded call options on Citigroup common stock listed in Exhibit A; and/or (ii) sold the

exchange-traded put options on Citigroup common stock listed in Exhibit A, and were damaged

thereby.

566.     Each series of exchange-traded options that was damaged and included in the Class

is listed in Exhibit A.  Any series not included in the list is excluded from the Class.

567.     Also excluded from the Class are: (i) Defendants and any affiliates or subsidiaries

thereof; (ii) present and former officers and directors of Citigroup and their immediate family

members (as defined in Item 404 of SEC Regulation S-K, 17 C.F.R. § 229.404, Instructions

(1)(a)(iii) & (1)(b)(ii)); (iii) Defendants' liability insurance carriers, and any affiliates or

subsidiaries thereof; (iv) any entity in which any Defendant had or has had a controlling interest;

(v) Citigroup's employee retirement and benefit plan(s); and (vi) the legal representatives, heirs,

estates, agents, successors, or assigns of any person or entity in the preceding categories.

568.     The Class is so numerous that joinder of all members is impracticable.  Plaintiffs

believe that the Class members number at least in the thousands.  Throughout the Class Period,

Citigroup common stock had an average daily volume on the NYSE of approximately 18,830,126 shares.  As of September 30, 2020, Citigroup had 2,081,959,678 shares outstanding.

569.    Plaintiffs' claims are typical of the claims of Class members.  All Class members are similarly situated in that they sustained damages as a result of transacting in Citigroup common stock and/or exchange-traded options at prices that were artificially inflated or deflated, as applicable, by the wrongful conduct complained of herein.

570.    Plaintiffs will fairly and adequately protect the interests of the Class.  Plaintiffs have retained counsel competent and experienced in class and securities litigation.  Plaintiffs have no interests that conflict with those of the Class.

571.    Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members.  The questions of law and fact common to the Class include, but are not limited to, the following:

(a)    Whether Defendants' conduct violated the federal securities laws, as alleged herein;

(b)    Whether Defendants made any untrue statements of material fact or omitted to state any material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(c)    Whether Defendants acted with scienter under Section 10(b) of the Exchange Act;

(d)    Whether the Officer Defendants were controlling persons of Citigroup under Section 20(a) of the Exchange Act;

(e)    Whether and to what extent the prices of Citigroup common stock and exchange-traded call options were artificially inflated during the Class Period due to the misstatements and omissions complained of herein;

(f)    Whether and to what extent the prices of Citigroup exchange-traded put options were artificially deflated during the Class Period due to the misstatements and omissions complained of herein;

(g)    Whether reliance may be presumed under the fraud-on-the-market doctrine;

(h) Whether Defendants' conduct caused the members of the Class to sustain damages; and

(i) Whether and to what extent Class members have sustained damages as a result of the conduct complained of herein and, if so, the proper measure of damages.

572. A class action is superior to other available methods for the fair and efficient adjudication of this controversy because joinder of all Class members is impracticable. Additionally, the damages suffered by some individual Class members may be small relative to the burden and expense of individual litigation, making it practically impossible for such members to redress individually the wrongs done to them.

573. There will be no difficulty in the management of this action as a class action.

574. Class members may be identified from records maintained by the Company or its transfer agent(s), or by other means, and may be notified of the pendency of this action by mail and by publication, using a form of notice similar to that customarily used in securities class actions.

## XI. CLAIMS FOR RELIEF

### COUNT I
### For Violation Of Section 10(b) Of The Exchange Act And Rule 10b-5
### Against All Defendants

575. Plaintiffs incorporate all paragraphs above by reference as if fully set forth herein.

576. During the Class Period, Defendants made, disseminated or approved the false and misleading statements specified above, which they knew or recklessly disregarded were false and misleading in that the statements contained material misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

577. Defendants violated § 10(b) of the Exchange Act and Rule 10b-5 in that they:

(a) Employed devices, schemed, and artifices to defraud;

(b) Made untrue statements of material fact or omitted to state materials facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or

(c) Engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiffs and others similarly situated in connection with their transactions in Citigroup common stock and exchange-traded options during the Class Period.

578. Plaintiffs and other members of the Class suffered damages in connection with their purchases of Citigroup common stock and exchange-traded call options, and sales of Citigroup put options during the Class Period. In reliance on the integrity of the market, Plaintiffs and the Class transacted in Citigroup common stock and/or exchange-traded options and experienced losses when the artificial inflation was removed from the common stock and exchange-traded call options and the prices of those securities declined, and the artificial deflation was removed from the exchange-traded put options and the prices rose. Plaintiffs and the Class would not have purchased Citigroup's common stock and exchange-traded call options at the prices they paid, or at all, or sold Citigroup's exchange-traded put options at the prices they sold, or at all, if they had been aware that the market prices of those securities had been artificially inflated or deflated, as applicable, by Defendants' misleading statements.

579. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the Class suffered damages in connection with their transactions of Citigroup common stock and/or exchange-traded options during the Class Period.

## COUNT II
### For Violation Of Section 20(a) Of The Exchange Act
### Against The Officer Defendants

580. Plaintiffs incorporate all paragraphs above by reference as if fully set forth herein.

581.    During the Class Period, the Officer Defendants acted as controlling persons of Citigroup within the meaning of § 20(a) of the Exchange Act.  By reason of their positions of control and authority as officers of Citigroup, the Officer Defendants had the power and authority to direct the management, policies, and activities of the Company and its employees, including its decision-making process, and to cause the Company to engage in the wrongful conduct complained of herein.  The Officer Defendants were able to and did influence and control, directly and indirectly, the content of the public statements made by Citigroup during the Class Period, including its materially false and misleading statements and omissions concerning the strength and functioning of the Company's risk management systems and internal controls, thereby causing the dissemination of the false and misleading statements and omission of material facts as alleged herein.

582.    In their capacity as senior corporate officers of Citigroup, the Officer Defendants had direct involvement in the day-to-day operations and oversight of the Company.  Each of the Officer Defendants signed certain of the Company's SEC filings during the Class Period and the Officer Defendants were directly involved in providing false information and certifying and approving the false statements disseminated by Citigroup during the Class Period.

583.    Given the Officer Defendants' senior executive positions at Citigroup and involvement in its day-to-day operations and key strategic decisions, and access to material non-public information regarding the Company, the Officer Defendants acted as controlling persons of Citigroup and influenced and controlled its decision-making process.  As a result of the foregoing, the Officer Defendants are controlling persons of Citigroup within the meaning of Section 20(a) of the Exchange Act.

584. As set forth above, Citigroup violated Section 10(b) of the Exchange Act by its acts and omissions as alleged in this Complaint.

585. By virtue of their positions as controlling persons of Citigroup and as a result of their aforementioned conduct, the Officer Defendants are liable pursuant to Section 20(a) of the Exchange Act, jointly and severally with, and to the same extent as, the Company is liable under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, to Plaintiffs and the other members of the Class.

586. As a direct and proximate result of the Officer Defendants' conduct, Plaintiffs and the other members of the Class suffered damages in connection with their transactions in Citigroup common stock and/or exchange-traded options.

## XII. JURY DEMAND AND PRAYER FOR RELIEF

587. Plaintiffs, on behalf of themselves and the Class, hereby demand a trial by jury.

588. WHEREFORE, Plaintiffs pray for relief and judgment as follows:

(a) Declaring this action to be a proper class action pursuant to Rule 23 of the Federal Rules of Civil Procedure;

(b) Awarding Plaintiffs and the Class damages, including interest;

(c) Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and experts' fees; and

(d) Granting such other and further relief as the Court may deem just and proper.

Dated: April 20, 2021

Respectfully submitted,

**BLEICHMAR FONTI & AULD LLP**

 */s/ Javier Bleichmar*
Javier Bleichmar
Joseph A. Fonti
Erin H. Woods
Ross Shikowitz
Benjamin F. Burry

7 Times Square, 27th Floor
New York, New York 10036
Telephone: (212) 789-1340
Facsimile: (212) 205-3960
jbleichmar@bfalaw.com
jfonti@bfalaw.com
ewoods@bfalaw.com
rshikowitz@bfalaw.com
bburry@bfalaw.com

*Counsel for Lead Plaintiff PSP, Named Plaintiff Anchorage, and Lead Counsel for the Putative Class*