**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

<table>
<tr>
<td>

IN RE CITIGROUP SECURITIES
LITIGATION

</td>
<td>

Case No. 1:20-cv-09132-AJN

**CLASS ACTION**

</td>
</tr>
</table>

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS**

# TABLE OF CONTENTS

I.     PRELIMINARY STATEMENT ................................................................. 1

II.    STATEMENT OF FACTS ....................................................................... 4

    A.    Risk Management And Internal Controls Were A Critical Area Of Concern And Focus Prior To And During The Class Period ................................... 4

    B.    Summary of False Statements.................................................................. 6

        1.    False Statements About Legal Compliance of Risk Systems ............................ 6

        2.    False Statements Regarding Functioning of Risk Management And Board Oversight.................................................................................. 7

        3.    False Statements About Investments In Risk Management................................ 8

        4.    Citigroup Violated GAAP And Item 303 Of Regulation S-K ............................ 9

        5.    Citigroup's (i) Internal Controls Over Financial Reporting, And (ii) Disclosure Controls and Procedures Were Not Effective................................. 10

    C.    The Board and Senior Management Were Informed About The Deficiencies........ 11

    D.    Corbat's Resignation And The Enforcement Orders Led Analysts And The Financial Press To Conclude They Had Been Misled ................................. 12

III.    ARGUMENT ....................................................................................... 13

    A.    Plaintiffs Raise A Strong Inference of Scienter ....................................... 13

        1.    Regulators Told Defendants During The Class Period That Citigroup's Risk Management And Internal Controls Were Deficient................................. 14

        2.    Plaintiffs' Additional Allegations of Recklessness, When Viewed Holistically, Raise A Strong Inference ................................................. 18

        3.    Defendants Had Motive To Mislead Investors ................................................. 21

        4.    Scienter Is The Only Cogent Inference.......................................................... 21

    B.    Defendants' Materiality Challenge Fails ................................................. 22

    C.    Plaintiffs Adequately Plead False And Misleading Statements or Omissions ........ 27

        1.    False And Misleading Statements About Risk Management Systems .............. 27

i

2.   Defendants Falsely Stated That Defendants' Risk Governance Framework Was Aligned With Appendix D and Regulation YY ........................................... 31

3.   Defendants' False and Misleading Statements About Citigroup's Investment In Risk Management and Internal Controls .................................... 33

4.   Defendants' Risk Warnings Were False And Misleading ................................ 35

5.   Citigroup's False And Misleading Statements About The Effectiveness of ICFR And DCP ............................................................................................... 35

6.   Statements Are Not Opinions Or Are Actionable Under *Omnicare*................. 36

7.   None Of Defendants' Statements Were Forward Looking................................ 37

8.   Defendants Violated Their Affirmative Duty to Disclose Pursuant to GAAP And Item 303 ...................................................................................... 38

D.   The Complaint Adequately Pleads Loss Causation .................................................. 39

E.   The Complaint Adequately Pleads A Control Person Claim.................................... 40

IV.   CONCLUSION.................................................................................................................... 40

## **TABLE OF AUTHORITIES**

### **Cases**

*Burr v. Equity Bancshares, Inc.*, 2020 WL 6063558 (S.D.N.Y. Oct. 14, 2020) ......................... 27

*Caiola v. Citibank, N.A.*, 295 F.3d 312 (2d Cir. 2002) ............................................. 3, 39

*Carpenters Pens. Tr. Fund of St. Louis, v. Barclays PLC*,
    56 F.Supp.3d 549 (S.D.N.Y. 2014) ....................................................... 21

*City of Pontiac v. Lockheed Martin*, 875 F.Supp.2d 359 (S.D.N.Y. 2012) ................................... 22

*Das v. Rio Tinto PLC*, 332 F.Supp.3d 786 (S.D.N.Y. 2018) ............................................. 37

*Dobina v. Weatherford Int'l Ltd.*, 909 F.Supp.2d 228 (S.D.N.Y. 2012) ...................................... 19

*Dura Pharm., Inc. v. Broudo*, 544 U.S. 336 (2005) .................................................... 39

*ECA v. JP Morgan Chase Co.*, 553 F.3d 187 (2d Cir. 2009) ............................................. 27

*Fed. Hous. Fin. Age v. Nomura*, 104 F.Supp.3d 441 (S.D.N.Y. 2015) ..................................... 32

*Freudenberg v. E*Trade Fin. Corp.*, 712 F.Supp.2d 171 (S.D.N.Y. 2010) ............................... 22, 28

*Ganino v. Citizens Utilities Co.*, 228 F.3d 154 (2d Cir. 2000) ............................................. 22, 23

*Green v. Deutsche Bank*, 2019 WL 4805804 (S.D.N.Y. Sept. 30, 2019) ...................................... 36

*Hawaii Str. Iron. Pen. Tr. Fund v. AMC Ent. Hold., Inc.*,
    422 F.Supp.3d 821 (S.D.N.Y. 2019) ................................................ 19, 24, 39

*In re Ambac Financial Group, Inc. Sec. Litig.*,
    693 F.Supp.2d 241 (S.D.N.Y. 2010) ...................................................... 17, 24

*In re Australia and New Zealand Banking Group Ltd. Sec. Litig.*,
    2009 WL 4823923 (S.D.N.Y. Dec. 14, 2009) ................................................ 27

*In re Avon Sec. Litig.*, 2019 WL 6115349 (S.D.N.Y. Nov. 18, 2019) .............................. 18, 23, 34

*In re BHP Billiton Ltd. Sec. Litig.*, 276 F.Supp.3d 65 (S.D.N.Y. 2017) .................... 15, 23, 24, 25

*In re Bioscrip, Inc. Sec. Litig.*, 95 F.Supp.3d 711 (S.D.N.Y. 2015) .......................... 27, 29, 35, 37

*In re Bofi Hold. Inc. Sec. Litig.*, 2017 WL 2257980 (S.D. Cal. May 23, 2017) .......................... 34

*In re Bristol-Myers Squibb Sec. Litig.*, 586 F.Supp.2d 148 (S.D.N.Y. 2008) .......................... 21

*In re Flag Telecom. Ltd., Sec. Litig.*, 352 F.Supp.2d 429 (S.D.N.Y. 2005) .......................... 17

*In re HEXO Corp. Sec. Litig.*, 2021 WL 878589 (S.D.N.Y. Mar. 8, 2021) ................................ 20

*In re Lehman Bros.*, 799 F.Supp.2d 258 (S.D.N.Y. 2011) ............................................................. 28

*In re MF Global Holdings Ltd. Sec. Litig.*, 982 F.Supp.2d 277 (S.D.N.Y. 2013) ....................... 29

*In re Mylan N.V. Sec. Litig.*, 2018 WL 1595985 (S.D.N.Y. Mar. 28, 2018) ............................... 35

*In re Perrigo Co. PLC Sec. Litig.*, 435 F.Supp.3d 571 (S.D.N.Y. 2020) ..................................... 38

*In re Petrobras Sec. Litig.*, 116 F.Supp.3d 368 (S.D.N.Y. 2015) ........................................... 23, 24

*In re Regeneron Pharm., Sec. Litig.*, 2005 WL 225288 (S.D.N.Y. Feb. 1, 2005) ....................... 26

*In re Salix Pharm., Ltd.*, 2016 WL 1629341 (S.D.N.Y. Apr. 22, 2016) ................................. 20, 37

*In re Scholastic Sec. Litig.*, 252 F.3d 63 (2d Cir. 2001) ............................................................. 26

*In re Signet Jewelers Ltd. Sec. Litig.*,
    2018 WL 6167889 (S.D.N.Y. Nov. 26, 2018) ..................................................... 19, 23, 24, 26

*In re Signet Jewelers Sec. Litig.*, 389 F.Supp.3d 221 (S.D.N.Y. 2019) ............................. 3, 23, 26

*In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223 (2d Cir. 2016) ................................................. 33, 39

*Lapin v. Goldman Sachs, Inc.*, 506 F.Supp.2d 221 (S.D.N.Y. 2006) ........................................... 23

*Lentell v. Merrill Lynch*, 396 F.3d 161 (2d Cir. 2005) ................................................................. 39

*Loreley Fin. v. Wells Fargo*, 797 F.3d 160 (2d Cir. 2015) ........................................................... 39

*Menaldi v. Och-Ziff Capital Mgmt Group LLC*,
    277 F.Supp.3d 500 (S.D.N.Y. 2017) ..................................................................................... 30

*Mendell v. Greenberg*, 927 F.2d 667 (2d Cir. 1990) ................................................................... 22

*Meyer v. Jinkosolar Holdings, Co. Ltd.*, 761 F.3d 245 (2d Cir. 2014) ................................. passim

*New Orleans Emps. Ret. Sys. v. Celestica, Inc.*, 455 F. App'x 10 (2d Cir. 2011) ....................... 17

*Novak v. Kasaks*, 216 F.3d 300 (2d Cir. 2000) .................................................................... passim

*Oklahoma Fire. Pen. & Ret. Sys. v. Corbat*,
    2017 WL 6452240 (Del. Ch. Dec. 18, 2017) ....................................................................... 17

*Omnicare v. Laborers Pension Fund*, 575 U.S. 175 (2015) ............................................... 4, 36, 37

*Pennsylvania Publ. Sch. Ret. Sys. v. Bank of America*,
    874 F.Supp.2d 341 (S.D.N.Y. 2012) ..................................................................................... 22

*Pirnik v. Fiat Chrysler Automobiles, N.V.*,
   2016 WL 5818590 (S.D.N.Y. Oct. 5, 2016) ........................................................ 19, 31

*Richman v. Goldman Sachs Group. Inc.*, 868 F.Supp.2d 261 (S.D.N.Y. 2012) .................... 24, 31

*S.E.C. v. Gabelli*, 653 F.3d 49 (2d Cir. 2011) ............................................................ 27

*S.E.C. v. Mayhew*, 121 F.3d 44 (2d Cir. 1997) ......................................................... 23

*Setzer v. Omega Healthcare Inv., Inc.*, 968 F.3d 204 (2d Cir. 2020) ............................ 14, 18, 27

*Sfiraiala v. Deutsche Bank*, 729 F. App'x 55 (2d Cir. 2018) ........................................ 18

*Sharette v. Credit Suisse Int'l.*, 127 F.Supp.3d 60 (S.D.N.Y. 2015) .............................. 21

*Singh v. Cigna*, 918 F.3d 57 (2d Cir. 2019) ............................................................. 25, 26

*Stratte-McClure v. Morgan Stanley*, 776 F. 3d 94 (2d Cir. 2015) ................................. 38

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007) ............................... 14

*Tongue v. Sanofi*, 816 F.3d 199 (2d Cir. 2016) ......................................................... 36

## I.     PRELIMINARY STATEMENT

Defendants in this case did exactly what the Second Circuit prohibits: "[o]ne cannot, for example, disclose in a securities offering a business's peculiar risk of fire, the installation of a comprehensive sprinkler system to reduce fire danger, and omit the fact that the system has been found to be inoperable, without misleading investors." *Meyer v. Jinkosolar Holdings, Co. Ltd.*, 761 F.3d 245, 251 (2d Cir. 2014). Replace "sprinkler system" with "risk management and internal controls," and Defendants' statements here squarely violate the Exchange Act.

Risk management and internal controls have been front-and-center at Citigroup for over a decade. The National Commission on the 2008 financial crisis concluded that "Citigroup had two key problems: a lack of effective enterprise-wide management to monitor and control risks and a lack of proper infrastructure and internal controls." ¶60.[1] Citigroup has since described these systems as "critical to the long-term sustainability of the franchise," "of primary importance," and "a strategic priority." ¶¶122, 121, 431. Defendants also told investors that the risk management systems were aligned with specific regulatory provisions (Appendix D and Regulation YY), explained how they functioned, and stated that Defendants made all necessary investments. ¶¶335, 379, 383. Investors relied on those statements. Analysts upgraded and recommended Citigroup stock because its "risk management [] and corporate governance are significantly improved since the financial crisis" and "Citigroup put many of its past regulatory issues behind it." ¶131-36.

This was a mirage. In October 2020, Citigroup's primary regulators, the OCC and the Fed, issued three orders revealing that they had insisted for years that Citigroup's risk management and internal controls did not meet minimum regulatory requirements and needed a massive overhaul.

---

[1] All references to "¶__" are to the Amended Complaint (the "Complaint"). ECF No. 72. All references to "Mot. __" are to Defendants' brief in support of their motion to dismiss. ECF No. 116. All references to "Ex.__" are to the exhibits attached to the Declaration of Javier Bleichmar in support of this brief. All undefined capitalized terms have the same meaning ascribed to them in the Complaint and its glossary. And all emphasis is supplied unless otherwise noted.

¶¶162-220; Exs. A-C. According to the Fed: "Citigroup has not adequately remediated the longstanding enterprise-wide risk management and control deficiencies previously identified by the Federal Reserve," including deficiencies dating back to 2013. ¶163(c). And the OCC found that "internal control related concerns [were] identified by internal audit and/or federal regulators since 2017," (¶198), and yet, "for several years the Bank has failed to implement and maintain an [effective] enterprise-wide risk management and risk compliance management program, [or] internal controls," "in a *pattern of misconduct*" that "contributed to violations of law and regulations and *continuous noncompliance*." ¶¶177, 182-83.

As required by their guidelines, the regulators informed the Board and management as soon as they identified the deficiencies and issued a formal report to them at least once a year. ¶¶66, 67, 75, 79. The Fed then required the Board to respond in writing, while the OCC report had to be signed by each Citibank Board member to document that she or he read it. ¶¶69, 79. But Defendants failed to act. *The Wall Street Journal* and *Business Insider* reported that "[f]or years, regulators have privately pressed Citigroup and Corbat [the CEO] to fix the bank's risk systems," but Corbat "who had made operating efficiency [] a hallmark of his strategy was often reluctant to spend the money or dedicate enough people to fix a problem the right way." ¶¶153, 159.

The OCC also assessed a $400 million civil monetary penalty ("CMP"). CMPs are recommended for "serious misconduct, including misconduct that is reckless, flagrant, willful, or knowing and that, because of its frequency or recurring nature, shows a general disregard for law or regulation." ¶254. Corbat resigned in the midst of the scandal, and investors were furious. Wells Fargo said: "we, like other investors, are…angry over their lack of transparency and why the [regulatory issues] were allowed to fester." ¶16. An analyst asked Corbat, "this consent order might be a surprise to [Wall] Street, but is it really a surprise to you?" *Id.* And *The Motley Fool* wrote:

"management has known about at least some of these problems since at least 2013. How do you not fully address issues you've known were serious for at least seven years?" *Id*.

Defendants' arguments are meritless and fundamentally misconstrue the Complaint. On scienter, Defendants claim that Plaintiffs plead fraud by hindsight because Defendants did not know about the deficiencies during the Class Period, which they "came to learn" after the fact in late 2020. (Mot. 1, 28). But those are alternative facts that contradict the Complaint, which alleges that the Fed and OCC told each Defendant at the time they made the false statements.

On materiality, Defendants again misconstrue the allegations as "general," "aspirational," or too "vague," and claim they are puffery. (Mot. 20). Far from it, Citigroup's Annual Reports included a litany of meticulously detailed descriptions of its risk management and internal controls that are well-within the specificity required by Second Circuit law. Defendants also ignore that their constant repetition of the false statements, the context in which they were made, and the critical importance they ascribed to risk management and controls, further render the statements material. *In re Signet Jewelers Sec. Litig.*, 389 F.Supp.3d 221, 226 (S.D.N.Y. 2019).

On falsity, Defendants argue that the detailed descriptions of the risk management and internal controls procedures are not actionable because the systems "exist." (Mot. 12). *Jinkosolar* disagreed: it is misleading to claim that systems exist without disclosing that they do not work. And to the extent Defendants argue that Plaintiffs do not allege that the systems were "misdescribed," (Mot. 12), Plaintiffs do: having chosen to affirmatively describe risk management and internal controls, Defendants had a duty to do so "accurately" and "completely" by disclosing the true state of those systems.[2] Further, not one of the alleged false statements is forward looking

---

[2] *Caiola v. Citibank, N.A.*, 295 F.3d 312, 331 (2d Cir. 2002) ("Once Citibank chose to discuss its hedging strategy, it had a duty to be both accurate and complete").

and Defendants fail to explain otherwise. (Mot. 16). Nor are the opinion statements inactionable under *Omnicare v. Laborers Pension Fund*, 575 U.S. 175 (2015).

Finally, Defendants' loss causation argument is baseless. (Mot. 34-35). Loss causation here is irrefutable: on four discrete days there were new facts revealed about the fraud, the stock price dropped from roughly $51 to $43 causing investors to lose over $17 billion, and the financial press and analysts explicitly tied each price drop to the revelations. ¶¶20, 532-559. In sum, the Complaint is long because it is meticulous and thorough while the fraud is vast. Plaintiffs more than sufficiently plead the elements of a securities claim and Defendants' motion should be denied.

## II.   STATEMENT OF FACTS

### A.   Risk Management And Internal Controls Were A Critical Area Of Concern And Focus Prior To And During The Class Period

In the years that followed the financial crisis and immediately preceding the Class Period, Company officials repeatedly said they were focused on risk management and internal controls: "we are focused on risk management" (2013), "[w]e'll remain vigilant…to ensure the safety and soundness of our institution" (2014). ¶92. And by 2015, Defendant Gerspach said that these efforts were succeeding: "Today, we operate global risk, finance and compliance functions with common standards and systems…establishing a disciplined firm-wide risk appetite framework." ¶93.

Accordingly, by the start of the Class Period in January 2016, Citigroup celebrated that it had remediated past issues while promising to remain vigilant. ¶¶121-30. Defendant Dugan acknowledged in 2019 that "we cannot afford to backslide" with respect to "regulatory and supervisory issues," and that "we can never have the company slip back to the place where we were before" with respect to "risks." ¶127. Defendants also repeatedly said that "effective risk management is of primary importance to its overall operations" in every quarterly and annual report during the Class Period (¶121), and emphasized that (i) "strengthening our risk and control

4

environment [is] a strategic priority" (¶431); (ii) investing in risk infrastructure and controls is "critical to the long-term sustainability of the franchise" (¶122); (iii) it is "absolutely critical" to comply with regulations (*id*.); and (iv) we "made the necessary investments in our compliance, risk, and control functions which are critical to maintaining our license to do business." ¶125.

Investors and analysts relied on, and believed in, the critical importance Citigroup ascribed to risk management and internal controls. In 2017, Morningstar said, "we believe risk management at Citigroup has improved substantially over the past decade." ¶132. Moody's "change[d its] outlook to positive from stable," and concluded that Citigroup's "risk management, risk appetite and corporate governance are significantly improved since the financial crisis." ¶133. And Wells Fargo reached the same conclusion: "tech[nology] has moved up the pecking order of priorities…because [Citigroup] put many of its past regulatory issues behind it." ¶134.

Risk management and internal controls were so critical that Citigroup repeatedly claimed (falsely) that they were carved out from its priority to slash costs and improve its efficiency ratio (expenses/revenues), Corbat's signature projects. ¶¶110, 124, 129. On his first day as CEO in 2012, Corbat said he would be "extraordinarily focused on our efficiency ratios and our overall expense levels" because that was the Board's mandate. ¶91. Defendant Mason reiterated in 2019 that "we are intensely focused on [the efficiency ratio]." ¶109. Yet, Citigroup failed time-and-time again to meet its efficiency targets, and analysts and the press incessantly castigated Corbat. ¶¶99-113. S&P titled a report in 2018 "Citi Pressed On Effort To Improve Efficiency Ratio." ¶102. Wells Fargo dedicated a lengthy analysis exclusively to Citigroup's efficiency ratio calling it "worst-in-class." ¶103. And *The Financial Times* reported in an article titled "Citi Says It Will Fall Short On Efficiency Target" that "Citigroup [] admit[ed] it will miss the 2018 efficiency target…putting the bank in the line of fire of analysts and investors wearied by previous disappointments." ¶106.

By 2019, *The Financial Times* wrote a scathing indictment of Corbat's tenure and placed his job squarely on the line: "The pressure on Mr. Corbat to act is intensifying….next year will be a watershed. If the bank misses the goals it set for 2020, it will have to accept that change is needed." ¶112. Corbat reacted by vowing "to do everything in our power" to rein in expenses. ¶110. But again, despite the pressure to lower costs, Defendants repeatedly emphasized (falsely) that investments in risk management and internal controls were the exception and would not be impacted by the relentless drive to lower the efficiency ratio. ¶¶121-130, 402, 404, 408.

### B.   Summary of False Statements

#### 1.   False Statements About Legal Compliance of Risk Systems

The sheer volume of actionable statements alleged here reflects Defendants' unrelenting drumbeat that gave investors comfort about the compliance of Citigroup's risk management. ¶124. One of the most blatant falsehoods was repeated in the Annual Reports from 2016 to 2018 that the "Risk Governance Framework" was in alignment or aligned with Appendix D and Regulation YY:

> The **Risk Governance Framework** has been developed **in alignment with** the expectations of the Office of the Comptroller of the Currency (OCC) Heightened Standards *[Appendix D]*. **It is also aligned with** the relevant components…of the Federal Reserve's Enhanced Prudential Standards for Bank Holding Companies and Foreign Bank Organizations *[Regulation YY]*. ¶¶335, 364, 381.

The OCC Remediation Order said the opposite: "for several years" there had been a "***failure*** to establish an effective ***risk governance framework*** as required by *[Appendix D]*." ¶¶177-78, 336, 365, 382. As did the Fed Order, which stated that Citigroup must "determine the enhancements that are necessary ***to meet the risk management requirements set forth in Regulation YY***," and "identify where Citigroup's risk management policies, procedures, practices, processes and internal controls ***are not compliant with Regulation YY***." ¶¶167-68.

2. **False Statements Regarding Functioning of Risk Management And Board Oversight**

Citigroup also falsely and misleadingly detailed the specific components of its risk governance framework and insisted in its Annual Reports from 2016 to 2019 that,

> Citi's firm-wide Risk Governance Framework consists of the policies, procedures, and processes through which Citi identifies, measures, manages, monitors, reports, and controls risks across the firm. ¶¶333, 362, 379, 413.

Far from it, the OCC Remediation Order found that Citibank's "enterprise-wide risk management policies, standards and frameworks" "fail[ed]" to "adequately identify, measure, monitor and control risks." ¶¶178(c), 334(b), 363(b), 380(b), 414(a).

Citigroup further falsely and misleadingly said in Annual Reports from 2016 to 2019 that:

> To anticipate, mitigate and control operational risk, Citi has established policies and a global framework for assessing, monitoring and communicating operations risks and the overall operating effectiveness of the internal control environment across Citigroup. ¶¶345, 374, 391, 423.

But the OCC instead found (in addition to the findings mentioned above) that "[f]or several years, [Citibank] has failed to implement and maintain an enterprise-wide risk management and compliance risk management program, internal controls, or a data governance program commensurate with [its] size, complexity, and risk profile." ¶¶346(a), 375(a), 392(a), 424(a).

Equally false and misleading was the statement in each Annual Report that,

> Citi manages its risks through each of its three lines of defense: (i) business management, (ii) independent control functions, and (iii) Internal Audit. The three lines of defense collaborate with each other in structured forums and processes…to steer the organization toward outcomes that … are systemically responsible. ¶¶315, 337, 366, 383, 415.

But according to the OCC, Citibank "fail[ed] to establish effective front line units and independent risk management as required by [Appendix D]," and with respect to "data quality and data governance" Citibank "fail[ed] to establish effective front line units, independent risk management, internal audit and control functions as required by [Appendix D]." ¶¶178(a), 180(a),

and *see, e.g.* ¶316(a)(i)-(ii).

The Annual Report from 2015-2019 also listed specific Board oversight functions that the Board supposedly carried out, which the Fed and OCC subsequently revealed were misleading:

> Citigroup's Board of Directors oversees Citi's risk taking activities. To do so, directors review risk assessments and reports prepared by Risk, Compliance…and Internal Audit and exercise independent judgment to question, challenge, and when necessary, oppose recommendations and decisions made by senior management that could cause Citi's risk profile to exceed its risk appetite or jeopardize the safety and soundness of the firm. ¶¶321, 343, 372, 389, 421.

The OCC, however, "determined that [Citibank's] Board and senior management oversight is inadequate to ensure timely, appropriate actions to correct the serious and longstanding deficiencies and unsafe or unsound practices in the areas of risk management, internal controls, and data governance." ¶¶181, 320(a)(1), 322(a)(ii).

### 3.    False Statements About Investments In Risk Management

Defendants also made numerous false and misleading statements claiming that Citigroup made the requisite investments in risk management: (i) "[w]e've also made the necessary investments in our compliance, risk, and control functions which are critical to maintaining our license to do business" (¶312); (ii) "we won't change our commitment to safety and soundness and to making investments necessary to strengthen our infrastructure and control environment" (¶402); and (iii) "we can't compromise the investments that are required in our infrastructure and in our controls to ensure safety and soundness." ¶404; *see also* ¶¶310, 329, 351, 353, 408.

These statements were false and misleading because Citigroup's investment in the risk, compliance, and control functions was woefully inadequate. ¶¶311, 313, 330, 352, 354, 403, 405. The technology infrastructure was so precarious, and based on so many disparate systems that could not communicate with each other, that the OCC ordered a complete overhaul and a "thorough redesign of data architecture, re-engineering of processes, and modernization of system application

and information technology infrastructure," at a cost of $3.66-$4.1 billion. ¶¶214, 403(c)(i), 435.[3]

The 2020 Enforcement Orders thus described in granular detail part of what the press had reported weeks earlier. On September 15, *Business Insider* reported that "[e]ntering [2020], [] Citigroup had numerous compliance and technology-related issues that had been outlined in regulatory notices known as Matters Requiring Attention [MRAs] and Matters Requiring Immediate Attention [MRIAs]" and that "Citigroup had multiple ones long past due." ¶158. Citigroup's regulators, however, "were annoyed with Citigroup's noncompliance across numerous issues and felt as if they weren't being heard." ¶159. Rather than fix the systems, "[Corbat] who had made operating efficiency and return-on equity a hallmark of his strategy was often reluctant to spend the money or dedicate enough people to fix a problem the right way." *Id*. And *The Wall Street Journal* similarly reported on September 14, 2020 that "[f]or years, regulators have privately pressed Citigroup and Mr. Corbat to fix the bank's risk systems," and "faulted Citi's management for not giving priority to the risk-management overhaul."[4] ¶¶153-54.

### 4.  Citigroup Violated GAAP And Item 303 Of Regulation S-K

GAAP provision ASC 450 requires Citigroup to accrue a charge to income if an expense is "likely" and can be "reasonably estimated." ¶¶438-39; *see generally* ¶¶433-54. Here, the current estimated cost to remediate the deficiencies ($3.66 billion to $4.1 billion, ¶450) was not only likely, but a virtual certainty, because the regulators had been demanding the infrastructure overhaul years before 2020. ¶448. The expense also could be reasonably estimated as demonstrated by the fact that it quickly was. ¶450. Even if the expense could not be estimated (which it could), ASC 450

---

[3] Having failed to make the "necessary investment" for years, the OCC did not trust Citibank to do so now. It ordered Citibank to inform the OCC of the amount allocated to implement the infrastructure overhaul and of any discrepancy between the amount allocated and "actually expended" – the equivalent of asking for receipts. ¶¶213, 404(c)(i).

[4] Contrary to the strained and combative relationship with the regulators, Defendants misleadingly said it was positive: "We have been rebuilding our credibility, our relationships with our regulators." ¶355; "Management also made progress on the regulatory front last year" ¶397; "I thought we had no significant control lapses unlike the year before" ¶327.

required that if there is a "slight" chance (more than "remote") that the expense will occur, Citigroup had to disclose the "nature of the contingency" and explain it could not estimate the cost. ¶¶440-43. Citigroup did none of this. If it had, according to a Wells Fargo report in 2021, Citigroup's "results in prior years would have been less favorable." ¶119. Citigroup's representations that its financial statements were prepared "in accordance with ASC 450" were thus false. ¶¶444-45. Likewise, Citigroup's SEC filings violated Item 303 of Regulation S-K. ¶¶455-60. Item 303 creates an affirmative duty to disclose "any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on…income from continuing operations." ¶455. In violation of Item 303, Citigroup failed to disclose the negative material impact that upgrading those systems to meet minimum regulatory requirements would have on Citigroup's "income from continuing operations." ¶459.

### 5.      Citigroup's (i) Internal Controls Over Financial Reporting, And (ii) Disclosure Controls and Procedures Were Not Effective

Citigroup is required to implement two separate internal control systems – internal controls over financial reporting ("ICFR") and disclosure controls and procedures ("DCP"). ¶¶461-87. The Complaint rigorously distinguishes the two (¶463) and alleges that Citigroup falsely represented, for different reasons, that both control systems were effective. ¶¶488-90, 518-19. ICFR is not effective if there is a "material weakness," which GAAP defines as "a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the company's annual or interim financial statements will not be prevented or detected on a timely basis." ¶467. There does not need to be an actual material misstatement. A reasonable possibility suffices. The deficiencies identified by the Fed and OCC along with the specificity and longevity of those deficiencies establish that Citigroup's ICFR was plagued by at least one material weakness. ¶492. Plaintiffs allege with excruciating

particularity how each deficiency, alone and in combination, rises to a material weakness by setting forth the components that constitute ICFR (¶¶477-87), and showing precisely how each finding by the Fed and OCC renders each ICFR component ineffective. ¶¶492-517. The ineffectiveness of ICFR is also manifest by the violation of ASC 450. ¶517. DCP were also ineffective (¶¶518-31) and Defendants do not contend otherwise. (Mot. 18-19).

### C.    The Board and Senior Management Were Informed About The Deficiencies

The Fed and OCC were required to, and did, inform the Board and senior management throughout the Class Period of the longstanding and ongoing failures in risk management and internal controls. ¶¶61-80. The key provisions of the Fed's guidelines (¶63) are:

- It is "important that the board be made aware of significant supervisory issues and ultimately be accountable for the safety and soundness and assurance of compliance with applicable laws and regulations of the organization." ¶64.

- MRIAs "are matters of significant importance and urgency that the Federal Reserve requires banking organizations to address immediately and include (1) matters that have the potential to pose significant risks to the safety and soundness of the banking organization; (2) matters that represent significant non-compliance with applicable laws and regulations; (3) repeat criticisms that have escalated in importance due to insufficient attention or inaction…." ¶67.

- The Fed provides "an annual roll-up report [that] *summarizes the significant findings, based on outstanding MRIAs and MRAs"* (¶66) to "enable the banking organization's board of directors...to understand the substance and status of outstanding MRIAs and MRA's…." ¶69.

- *For all MRIAs and MRAs, Citigroup's "board of directors is required to respond to the Reserve Bank in writing regarding corrective action taken or planned along with a commitment to corresponding time-frames."* ¶69.

The critical provisions of the OCC guidelines (¶71) are the following:

- "A risk is considered effectively managed when it is identified, measured, monitored, controlled, and reported." If a risk "is not effectively managed [examiners] must communicate [it] to bank management and the board…." ¶73.

- "The OCC uses MRAs to communicate concerns about a bank's deficient practices. *Examiners must communicate such concerns to management and the board*

> ***when the concerns are discovered*** and must not defer issuing MRAs pending bank management's efforts to address the concerns." ¶75.

- At the end of the supervisory cycle, the OCC also must provide the board with a Report of Examination ("ROE"). The ROE "discusses deficient management practices, violations, and excessive risks, [and] details corrective actions to which bank management or the board must be committed." ¶79.

- The ROE has a number of mandatory sections. The MRA section "focuses the board's attention on deficient practices warranting the board's immediate acknowledgment and oversight." ¶80. ***Each director must sign the ROE to "show[] that he or she has personally reviewed the entire ROE."*** ¶79.

The Fed and OCC turn to enforcement if the Board and management do not take corrective action. The OCC undertakes enforcement "[w]hen…deficiencies are severe, uncorrected, repeat, or unsafe or unsound, or negatively affect a bank's condition." ¶77. And the OCC guidelines state that "[e]xaminers should propose CMPs for serious misconduct, including misconduct that is reckless, flagrant, willful, or knowing and that, because of the frequency or recurring nature, shows a general disregard for law or regulation." *Id.* The definition of misconduct is "intentional or wanton wrongful but usually not criminal behavior." *Misconduct*, Merriam-Webster.com Dictionary, *available at* https://www.merriam-webster.com/dictionary/misconduct (last visited July 18, 2021).

### D. Corbat's Resignation And The Enforcement Orders Led Analysts And The Financial Press To Conclude They Had Been Misled

On September 10, 2020, Corbat unexpectedly announced his resignation after previously saying he would not retire until 2022. ¶147. Citigroup, however, tried to spin it, saying it had been Corbat's intention to retire before 2022 all along. ¶150. *CNBC* noted the "weird timing of the announcement" and that Citigroup senior executives "had no idea the news would hit." ¶148. The truth was that Corbat had been forced to step down. On September 14, 2020, *The Wall Street Journal* reported in an article titled "Regulators Prepare to Reprimand Citigroup for Failing to Improve Risk Systems" that "for years regulators have privately pressed Citigroup and Mr. Corbat to fix the bank's risk systems." ¶153. "The expected rebuke from the [regulators] accelerated

planning for [] Corbat's retirement," refuting the spin that Corbat's exit had been long planned. *Id.* On November 2, the Chief Risk Officer since 2013, Brad Hu, also resigned. ¶¶295-96.

The clumsy attempt to conceal why Corbat resigned, together with the 2020 Enforcement Orders and $400 million CMP, angered Wall Street, which concluded that Citigroup had been deceitful. ¶¶221-35. Wells Fargo said: "we, like other investors, are 'hangry' – i.e., hungry for more information on how and when the regulatory issues will get resolved and ***angry over their lack of transparency and why they were allowed to fester*.*" ¶223. It then added: "contrary to Citi's statement from a few years ago, its restructuring was not sufficiently complete…[t]he system issues are worse than realized, as if we collectively thought that Citi improved from a grade 'F' around the global financial crisis to a 'B-/C+' only to find out the grade is 'D'." ¶224.

On the earnings call on October 13, 2020, the analysts again sharply criticized Defendants' deceptive conduct. One pointedly asked Corbat, "[t]his consent order might be a surprise to The Street, but is it really a surprise to you?" Corbat did not answer. ¶230. Another added: "***Speaking on behalf of investors***, people I speak with, there's a collective sense of extreme disappointment with technology, the new regulatory order in tech, ***the root problems were not transparent to investors*.*" ¶231. He concluded, "these problems didn't come out overnight that the regulators identified. So…now, all of a sudden, we find out…." *Id*. And a third asked, "can you talk about why you didn't prioritize risk management which is such a cornerstone since the last crisis?" ¶232.

## III.   ARGUMENT

On a motion to dismiss, the Court must "accept[] all factual allegations [in the complaint] as true and draw[] all reasonable inferences in favor of the plaintiff." *Jinkosolar*, 761 F.3d at 249.

### A.    Plaintiffs Raise A Strong Inference of Scienter

The inference of scienter here is overwhelmingly strong. The analysis is whether "all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any

individual allegation, scrutinized in isolation, meets that standard." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 310 (2007). The inference "need not be irrefutable...or even the most plausible," or require a "smoking-gun." *Id*. at 324-26. It is "strong" when "a reasonable person would deem the inference of scienter cogent and at least as compelling as any plausible opposing inference" of non-fraudulent intent. *Id*. at 310. In this Circuit, Plaintiffs must allege facts (1) "showing that the defendants had both motive and opportunity to commit the fraud," or (2) "constituting strong circumstantial evidence of conscious misbehavior or recklessness." *Setzer v. Omega Healthcare Inv., Inc.*, 968 F.3d 204, 212 & 215 (2d Cir. 2020) (recklessness satisfied when complaint pleads "access to information contradicting [] public statements").

### 1. Regulators Told Defendants During The Class Period That Citigroup's Risk Management And Internal Controls Were Deficient

Citigroup is subject to a robust regulatory framework that establishes that Defendants knew, or had access to information showing, that risk management and internal controls were deficient. The OCC "maintain[s] communication[s] with boards throughout the supervisory cycle to discuss OCC examination results." ¶246. "Deficiencies and excessive risks must be promptly communicated to the bank when they are identified" in "a formal written communication to the board or by meeting with the board or management." *Id*. At the end of each supervisory cycle, "[t]he OCC must provide [the ROE] to the board," including a section on MRAs that "focuses the board's attention on deficient practices warranting the board's immediate acknowledgment and oversight." ¶247. And each Board member must sign the ROE to "show[] that he or she has personally reviewed the entire ROE." *Id*. The Fed also communicates directly with Defendants, sending an "annual roll-up report summarizing the significant findings, based on outstanding MRIAs or MRAs." ¶245. The "board of directors is required to respond…in writing regarding corrective action taken or planned along with a commitment to corresponding time-frames." *Id*.

Consistent with this regulatory oversight, the 2020 Enforcement Orders confirm that regulators told Defendants about the deficiencies during the Class Period. The OCC Remediation Order directed them "to diagnose the root cause(s) of the underlying issues that led to internal control related concerns identified by internal audit and/or federal regulators since 2017" ¶198. In other words, Citigroup and/or the regulators identified concerns about internal controls since 2017 – *during the Class Period* – but Defendants did nothing. The OCC also confirmed that these issues had festered "for several years" (¶177) and resulted in a "pattern of misconduct" (¶182) and "continuous noncompliance." ¶183. Likewise, the Fed specified that the deficiencies had been "ongoing" (¶163), and that "Citigroup has not adequately remediated the longstanding enterprise-wide risk management and control deficiencies *previously identified* by the Federal Reserve, including in the areas described above [compliance, risk management, data quality management and internal controls] and those addressed in [the 2013/2015 Consent Orders]."[5] ¶163(c). Plaintiffs thus raise a strong inference that Defendants "knew facts or had access to information suggesting that their public statements were not accurate." *Novak v. Kasaks*, 216 F.3d 300, 311 (2d Cir. 2000).

*The Wall Street Journal* and *Business Insider* further corroborated that Defendants knew. As they reported, "[f]or years, regulators have *privately pressed Citigroup and Mr. Corbat* to fix the bank's systems;" Citigroup had "multiple [MRAs and MRIAs] long past due;" regulators "were annoyed with Citigroup's noncompliance across numerous issues and felt as if they weren't being heard;" and Corbat was "reluctant to spend the money or dedicate enough people to fix a problem the right way." ¶¶237-38. *See In re BHP Billiton Ltd. Sec. Litig.*, 276 F.Supp.3d 65, 91 (S.D.N.Y. 2017) (inferring scienter from news reports that law enforcement concluded that directors knew).

---

[5] Contrary to Defendants' contention (Mot. 29 n.13), the "previously identified...areas described above" are separate and distinct from "those addressed in" the 2013 and 2015 prior Consent Orders, even further confirming that the regulators raised the deficiencies during the Class Period.

Defendants' arguments ignore these allegations, misconstrue the Complaint, and betray a fundamental misunderstanding of the pleading standard. While Defendants concede that the "regulators periodically or even frequently communicate with officers and directors," they argue that that "***does not mean*** that the regulators communicated the specific deficiencies identified in the 2020 Consent Orders years or months earlier." (Mot. 29). They suggest that Defendants "came to learn" of the deficiencies in 2020, after the fact, and not when "the allegedly misleading statements were made." (Mot. 28). But the Complaint unequivocally alleges that Defendants knew at the time. *See, e.g.*, ¶¶237-53. That is precisely what the regulators say happened: they told Defendants for years about the specific deficiencies that they raised again in 2020 and that Citigroup had not fixed. ¶¶153-61. And that is a key reason the regulators issued the 2020 Enforcement Orders: they were "annoyed" at being ignored. ¶¶153-54, 158-161. Far from a "hypothesi[s] based on vague media reports" (Mot. 29), Plaintiffs' allegations are based on the 2020 Enforcement Orders, on which the Complaint spends no less than 58 paragraphs. ¶¶162-220.

Defendants' contention, that even though the regulators were required to tell Defendants at the time of the specific deficiencies it "does not mean" that that happened, is also baseless. The suggestion that the regulators violated their own guidelines by never raising serious longstanding deficiencies is implausible, and so far-fetched and contrary to any known or alleged fact, that it is all but impossible. The stronger, if not the only plausible, inference is that the regulators followed the guidelines by promptly raising deficiencies identified during the Class Period with the Board and management in the many reports and meetings required throughout the supervisory process.[6]

---

[6] This argument is also belied by Defendant Dugan's admission at the Annual Meeting on June 16, 2021, after the Complaint was filed: "I and the Board did recognize the remediation shortfalls before the consent order. And we did spend a great deal of time overseeing a number of different remediation projects in the last several years." Ex. D at 6.

Defendants make the corollary argument that Plaintiffs never "identify a specific contemporaneous document" concerning what the regulators told Citigroup. (Mot. 28). But they do not cite any authority because that is not the law. "Even with the heightened pleading standard under Rule 9(b) and the Securities Reform Act, [courts] do not require the pleading of detailed evidentiary matter in securities litigation." *New Orleans Emps. Ret. Sys. v. Celestica, Inc*., 455 F. App'x 10, 15 (2d Cir. 2011). A "plaintiff need not plead dates, times, and places with absolute precision." *In re Flag Telecom. Ltd., Sec. Litig.*, 352 F.Supp.2d 429, 467 (S.D.N.Y. 2005). Yet, Plaintiffs **do** allege with particularity by not only setting out (in painstaking detail) the regulatory regime requiring notification to management and the Board, but also setting forth the regulators' statements about what Citigroup knew and when, along with corroborating press reports.[7]

The Director Defendants argue that Plaintiffs allege scienter by "group pleading." (Mot. 33). Not so, each Director Defendant is liable because each one was informed by the regulators of the "continuous noncompliance" and "pattern of misconduct" (¶¶182-83), and each one of them independently made false statements when each signed the SEC filings.[8]

At a minimum, these allegations – that the Fed and OCC told Defendants of the deficiencies – leads to a strong inference that Defendants "failed to review or check information that they had

---

[7] *See also In re Ambac Financial Group, Inc. Sec. Litig.*, 693 F.Supp.2d 241, 269 (S.D.N.Y. 2010) (general description of internal reports without identifying a specific one suffices; "Form 10–K describes the preparation of an 'adversely classified credit listing' 'reported to management'").

[8] The Director Defendants' argument that the Delaware Court of Chancery did not find "that the directors acted in bad faith" in a derivative case, decided four years ago, fundamentally confuses derivative and securities claims. (Mot. 7, 33 (citing *Oklahoma Fire, Pen. & Ret. Sys. v. Corbat*, 2017 WL 6452240 (Del. Ch. Dec. 18, 2017)). That case supports scienter here because it shows that Defendants knew Citigroup violated regulations before the Class Period, including with respect to the 2013 and 2015 consent orders now referenced in the 2020 Enforcement Orders. The Chancery Court simply determined that the demand futility allegations were insufficient because the "board took action" in response to the deficiencies even though that action failed to fix them. *Id.*, 2017 WL 6452240, at *5, 6, 20, 21. Here, that the Director Defendants knew about the deficiencies even prior to the Class Period (because they took action) supports an inference of scienter during the Class Period given that the violations of the 2013 and 2015 consent orders persist and those consent orders required the Director Defendants to monitor remediation. ¶¶81-89, 163(c).

a duty to monitor, or ignored obvious signs of fraud." *Novak*, 216 F.3d at 308.[9]

### 2. Plaintiffs' Additional Allegations of Recklessness, When Viewed Holistically, Raise A Strong Inference

***First,*** the OCC's $400 million CMP raises a strong inference of scienter. ¶254. The OCC examiners propose CMPs for "serious misconduct, including misconduct that is reckless, flagrant, willful, or knowing and [] because of its frequency or recurring nature, shows a general disregard for law or regulation." *Id*. Defendants, however, accuse Plaintiffs of misreading this provision and argue that the 2020 Enforcement Orders "are not reserved for only knowing or reckless conduct." (Mot. 30). They are wrong. The definition of misconduct is "intentional or wanton wrongful but usually not criminal behavior." *Supra* at 12. Defendants' reading, that the $400 million fine here could conceivably have been issued for non-reckless misconduct, is torturously strained and contradicts the Complaint. Defendants also claim that the 2020 Enforcement Orders "do not use language regarding intent, knowledge or recklessness." (Mot. 30). Yes, they do: "the Bank was in noncompliance with [Appendix D], and engaged in unsafe or unsound practices that were a ***pattern of misconduct***" (¶182); "Citigroup has not adequately remediated the ***longstanding*** enterprise-wide risk management and control deficiencies ***previously identified***" (¶163(c)); and failed to even "diagnose the root causes…of internal controls related ***concerns identified by internal audit and/or federal regulators since 2017***." ¶198. Finally, Defendants argue without any authority that the requisite state of mind for regulatory violations does not establish the knowledge necessary to support scienter. (Mot. 30). But the OCC's above-referenced guidance on the state of mind for CMPs falls squarely within the scienter standard. *Omega*, 968 F.3d at 213.

---

[9] *See also In re Avon Sec. Litig.*, 2019 WL 6115349, at *20 (S.D.N.Y. Nov. 18, 2019) (because defendants "had touted the new training program….this Court can reasonably conclude either that Defendants [had] access to information regarding th[e lack of training], or that defendants were recklessly indifferent to the truth or falsity of their training statements and never bothered to investigate"). Defendants' reliance on *Sfiraiala v. Deutsche Bank*, 729 F. App'x 55 (2d Cir. 2018) (Mot. 30) is misplaced because the consent order there said: "no concerns relevant to the suspicious trading activities were ever escalated out of Moscow," the region where the issues materialized. *Id.* at 58.

**Second**, the Individual Defendants repeatedly said that they had intimate knowledge of, and were involved in, all aspects of risk management and internal controls, and emphasized that those procedures were critical and of primary importance. ¶¶255-81. *See, e.g.*, "Board [] engage[s] deeply in oversight of risk management" ¶256; "Board remains deeply focused" (¶257); risk and controls were "top of mind" (¶287); "critical to maintaining our license" (¶312); "of primary importance" (¶121); "a strategic priority" (¶431). "Where a statement is made repeatedly regarding an issue of specific personal interest to the officers, the allegations will more readily give rise to the requisite strong inference of scienter." *Dobina v. Weatherford Int'l Ltd.*, 909 F.Supp.2d 228, 246 (S.D.N.Y. 2012). This Court has agreed. It found scienter concerning the omission of underinvestment in movie theaters based on "several" statements (such as "we're going to commit to renovate…a significant number of [acquired] theaters"), because "in order to speak so knowledgeably regarding [the acquired theaters, Defendant] must have educated himself regarding the condition of these theaters presumably by reviewing data given to him [] and by performing his own due diligence." *Hawaii Str. Iron. Pen. Tr. Fund v. AMC Ent. Hold., Inc.*, 422 F.Supp.3d 821, 850 (S.D.N.Y. 2019).[10] The Individual Defendants are thus wrong to argue that the allegations here are based on their high-level positions without more (Mot. 30); the allegations are also based on their own statements admitting their "deep" involvement in risk and internal controls.

**Third**, core operations provides "supplemental support for allegations of scienter." *AMC*, 422 F.Supp.3d at 852. Core operations applies here because of the same allegations just discussed regarding Defendants' "deep focus" on risk management and internal controls, Defendants'

---

[10] *See also In re Signet Jewelers Ltd. Sec. Litig.*, 2018 WL 6167889, at *15 (S.D.N.Y. Nov. 26, 2018) (scienter regarding omission of negative credit exposure when defendants had said "we fully understand the credit risk," "we watch it closely," "we have every confidence in the way we manage our credit portfolio," "management monitors credit exposure"); *Pirnik v. Fiat Chrysler Automobiles, N.V.*, 2016 WL 5818590, at *7 (S.D.N.Y. Oct. 5, 2016) (scienter when "Defendants 'frequently' discussed 'regulatory compliance in press releases, earnings calls and SEC filings'….").

repeated statements about their "critical" and "strategic importance," and the analysts' watchful following of the issue. ¶¶302-05. Defendants argue that the "doctrine only bolsters the strength of the inference of scienter when the plaintiff has already adequately alleged facts indicating that defendants *might have known* their statements were false." (Mot. 31). Plaintiffs have done that, and more, because they allege that Defendants ***actually*** knew. Defendants' other point, that risk management and internal controls did not "constitute nearly all" of the business, also fails. *Id.* They admitted that the "compliance, risk, and control functions…are critical to maintaining our license to do business." ¶125. The license affects ***all*** of Citigroup's business.

*Fourth,* the highly unusual and suspicious resignations (¶¶289-96) support a strong inference of scienter when, like here, "independent facts indicate that the resignation was somehow tied to the fraud." *In re Salix Pharm., Ltd.*, 2016 WL 1629341, *15 (S.D.N.Y. Apr. 22, 2016). In *Salix*, the CFO resigned the day of the revelation and the CEO two months later. *Id.* Here, Corbat announced his resignation four days before the first revelation of the then-upcoming enforcement orders. ¶¶147-52, 289-96. It was also described as "weird" by *CNBC* (¶148) and "unusual" by Wells Fargo (¶149), contrary to Corbat's prior public commitment to stay on until 2022 (¶289), and directly tied to the fraud by the *Business Insider*. (¶158; *see also* ¶¶154-56). Citigroup's attempt to obfuscate the reasons behind the resignation further makes it highly unusual and suspicious. ¶¶147-52. And Hu's resignation on November 2, less than two months after September 14, further supports a strong inference (¶¶295-96). Defendants do not claim that the resignations were not suspicious or unusual, or that they were due to innocent reasons.[11] (Mot. 30).

---

[11] Defendants' cite to *In re HEXO Corp. Sec. Litig.*, 2021 WL 878589, at *21 (S.D.N.Y. Mar. 8, 2021) is inapposite because it says that resignations at a "nascent company" are not suspicious because nascent companies are "especially prone to turnover." Citigroup is not a nascent company.

### 3.     Defendants Had Motive To Mislead Investors

Plaintiffs also allege that the Individual Defendants had motive – and more than just a "motive to increase profitability and boost stock price and compensation," as Defendants wrongly suggest. (Mot. 27). Plaintiffs rather allege that disclosing the "noncompliance" of Citigroup's risk management and controls would have revealed that Citigroup had not made the necessary investments in its infrastructure and that the much touted efficiency ratio was misleading. ¶¶97-120; 297-301. The efficiency ratio was the *sine qua non* of Corbat's tenure and a source of enormous pressure. On the first day of the Class Period, he said he would be "extraordinarily focused on our efficiency ratios," which was a direct mandate from the Board. ¶91; s*ee also* ¶¶97-115. The motive to counter negative perceptions about Citigroup's efficiency ratio – which was *the* core business strategy – is a valid motive. *Carpenters Pens. Tr. Fund of St. Louis, v. Barclays PLC*, 56 F.Supp.3d 549, 555 (S.D.N.Y. 2014) ("the Complaint also plausibly alleges Barclays's motive—to counter negative perceptions about its borrowing costs and, more generally, its financial condition").[12] Defendants then argue that motive is far-fetched because they were closely watched by regulators who would know about the false statements. (Mot. 27-28). This point is nonsensical given that Defendants ignored regulators "for several years" in a "pattern of misconduct." It is also not the Fed's or OCC's purview to regulate Citigroup's disclosures.

### 4.     Scienter Is The Only Cogent Inference

Holistically, the stronger inference is that Defendants acted with scienter. The periodic reporting by regulators to senior management and the Board, and the 2020 Enforcement Orders'

---

[12] *See also Sharette v. Credit Suisse Int'l.*, 127 F.Supp.3d 60, 95 (S.D.N.Y. 2015) (motive to "strengthen [Credit Suisse's] brand name in the lucrative hedge fund brokerage fee market" based on scheme to drive down a specific company's stock price to favor hedge fund clients shorting that same stock); *In re Bristol-Myers Squibb Sec. Litig.*, 586 F.Supp.2d 148, 168 (S.D.N.Y. 2008) (motive in "maintaining" "critical" patent "exclusivity" in pay-for-delay scheme with generic drug manufacturer).

and media reports' explicit statements that the deficiencies had been previously raised with Defendants, raise a strong inference. As does the evidence on motive. When the additional evidence is added to the mix (the $400 million CMP, the Individual Defendants' statements, core operations, and the suspicious resignations), the inference is overwhelming. Defendants' alternative theory is counterfactual: that "regulators [] determined, years or months later, that the[] systems and controls were insufficient," while Defendants made "good-faith general statements regarding Citigroup's risk management." (Mot. 32). But for this to be true the Court has to suspend disbelief and accept, contrary to any known fact, that the regulators failed for years to comply with their own protocols to report deficiencies to Defendants and that the 2020 Enforcement Orders' references to "previously identified" deficiencies were false. That is not plausible, let alone more compelling than the inference of scienter. And even if this were a close call, a "tie on scienter goes to the plaintiffs."[13] *City of Pontiac v. Lockheed Martin*, 875 F.Supp.2d 359, 372 (S.D.N.Y. 2012).

## B.    Defendants' Materiality Challenge Fails

Materiality is a fact-specific inquiry and an alleged misstatement may not be dismissed as "puffery" unless it is "so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *Ganino v. Citizens Utilities Co.*, 228 F.3d 154, 162 (2d Cir. 2000). "The materiality requirement poses a very low burden," *Freudenberg v. E*Trade Fin. Corp.*, 712 F.Supp.2d 171, 181 (S.D.N.Y. 2010), and is rarely a basis for dismissal because "it is a question especially well-suited for jury determination." *Mendell v. Greenberg*, 927 F.2d 667, 673 (2d Cir. 1990). Here, having emphasized time-and-time again that risk management and internal controls were "critical to maintaining our license to do business" (¶125), "critical to the…sustainability of the franchise" (¶122), "critical to the firm's success" (¶121), "of primary

---

[13] Defendants do not challenge Plaintiffs' allegations of corporate (a/k/a collective) scienter. ¶¶306-08. *See Pennsylvania Publ. Sch. Ret. Sys. v. Bank of America*, 874 F.Supp.2d 341, 362 (S.D.N.Y. 2012).

importance" (¶121), and "a strategic priority" (¶431), Defendants now claim that not a single one of the false statements ever mattered or that any reasonable investor ever relied on them. (Mot. 20). That argument is not plausible and contrary to Second Circuit law because Plaintiffs plausibly allege that the statements were ***not*** "so obviously unimportant." *Ganino*, 228 F.3d at 162.

Defendants' emphasis on the critical import of risk management and controls matters in this case because "a major factor in determining whether information was material is the importance attached to it by those who knew about it." *S.E.C. v. Mayhew*, 121 F.3d 44, 52 (2d Cir. 1997). And "[w]hether a representation constitutes mere puffery depends, in part, on the context in which it was made." *Signet*, 2018 WL 6167889, at *11. Accordingly, Defendants' explicit public recognition of the critical importance of risk management and controls makes their statements material. *See also Lapin v. Goldman Sachs, Inc.*, 506 F.Supp.2d 221, 241 (S.D.N.Y. 2006) ("[I]t defies logic to suggest that, for example, an investor would not reasonably rely on a statement…that recognized Goldman's dedication to complying with the letter and spirit of the laws and that Goldman's success depended on such adherence"); *see also In re Petrobras Sec. Litig.*, 116 F.Supp.3d 368, 380 (S.D.N.Y. 2015); *Signet*, 389 F.Supp.3d at 226.

Defendants' incessant repetition of their statements also establish materiality because "a court is neither required nor permitted to view such statements in isolation." *Avon*, 2019 WL 6115349, at *16. "While certain statements 'viewed in isolation, may be mere puffery,' when the statements are 'made repeatedly in an effort to reassure the investing public' about matters particularly important to the company and investors, those statements may become material to investors." *BHP*, 276 F.Supp.3d at 79. In *BHP*, "safety was obviously a major concern to BHP and investors, as indicated by defendants' extensive, frequent and prominent discussions of the topic." *Id.* at 80. The court thus could "not ignore the fact that defendants allegedly made these

representations about BHP's commitment to safety over and over and over," including "25 such misstatements." *Id.* The 35 false statements here fit precisely within this paradigm of repetition.[14]

The alleged statements also are not puffery because, as this Court has held, "courts will not insulate relatively general positive statements from liability if they are 'misrepresentations of existing facts.'" *AMC*, 422 F.Supp.3d at 845 (quoting *Novak*, 216 F.3d at 315 (statements that inventory was "in good shape" or "under control" are not puffery when defendants "allegedly knew that the contrary was true")).[15] Even statements normally considered puffery (*i.e.,* code of conduct) are actionable when, like here, the statements are so at odds with the alleged conduct. *Signet*, 2018 WL 61678898, at *17 ("statements contained in a code of conduct are actionable [and not puffery] where they are directly at odds with the conduct alleged").

Many other facts establish materiality, including: (1) the concrete descriptions about the functioning of risk management that "contain quite specific representations or guarantees of 'some concrete fact or outcome,'" *BHP*, 276 F.Supp.3d at 79-80; *see supra* Sec. II.B.2; (2) the measurable, verifiable and objectively false statements about alignment with Regulation YY and Appendix D (¶¶335, 364, 381), and "the necessary investments in our compliance, risk, and control functions" (¶312); *Ambac*, 693 F.Supp.2d at 272 (material when statements convey something "concrete and measurable"); *see also AMC*, 422 F.Supp.3d at 845-46; and (3) Citigroup's generic cautionary warnings that adverse regulatory action could have significant negative impact, *BHP*,

---

[14] *See also Petrobras*, 116 F.Supp.3d at 381 (sustaining statement company was "fully committed" when "statements were made repeatedly"); *Signet*, 2018 WL 6167889 at *11-12 (sustaining statements that "credit portfolio" was "strong" and "minimize[d] risk" due to "dogged insistence"); *Richman v. Goldman Sachs Group. Inc.*, 868 F.Supp.2d 261, 280-81 (S.D.N.Y. 2012) (defendant "must not be allowed to pass off its repeated assertions that it complies with the letter and spirit of the law...as mere puffery").

[15] *AMC* found actionable the statement that "[t]here have literally been no operational snafus of any note," *Id.*, which renders actionable the statements here that, "we are "operating above every one of our regulatory requirements" (¶357), and "I thought we had no significant control lapses unlike the year before" (even if it is an opinion for the reasons opinion statements are actionable, *see infra* III.C.6; ¶327), particularly because Defendants actually knew these statements were false.

276 F.Supp.3d at 80 (statements material when "own disclosures" said that "safety of its operations…have the potential to lead to material adverse impacts on our operations").

These facts starkly distinguish this case from *Singh v. Cigna*, 918 F.3d 57 (2d Cir. 2019), relied on heavily by Defendants. In *Cigna*, the statements were "simple and generic assertions about having policies and procedures." *Id.* at 64. In contrast, *Cigna* acknowledged that, like here, a company's statements are actionable if it "described its compliance mechanisms in confident detail." *Id. Cigna* then pointed to *Jinkosolar* as the guidepost for the necessary detail. *Id.* And the statements in this case are far more detailed, or at least equally detailed. Compare the two key statements that established materiality in *Jinkosolar* with only three of the many alleged here:

> *Jinkosolar*: "We have installed **pollution abatement equipment** at our facilities to **process, reduce, treat, and where feasible, recycle the waste materials** before disposal, and we treat the waste water, gaseous and liquid waste and other industrial waste produced during the manufacturing process before discharge." *Cigna*, 918 F.3d at 63 (quoting *Jinkosolar*, 761 F.3d at 247).

> Citigroup: "Citi's firmwide **Risk Governance Framework** consists of the policies, procedures, and processes **through which** Citi **identifies, measures, manages, monitors, reports and controls risk across the firm**." ¶¶333, 362, 379, 413.

> Citigroup: "To **anticipate, mitigate and control** operational risk, Citi has **established policies and a global framework** for **assessing, monitoring and communicating operational risks** and the overall operating effectiveness of the internal control environment **across Citigroup**." ¶¶345, 374, 391, 423.

Also compare:

> *Jinkosolar*: "We also maintain **environmental teams** at each of our manufacturing facilities to monitor waste treatment and **ensure** [these] waste emissions comply with [] environmental standards." *Cigna*, 918 F.3d at 63-64 (quoting *Jinkosolar*, 761 F.3d at 247).

> Citigroup: "**Internal Audit** also provides **independent assurance** to the Citigroup [Board], the Audit Committee…senior management and regulators **regarding the effectiveness of Citi's governance and controls** designed to mitigate Citi's exposure to risks and to enhance Citi's culture of compliance and control." ¶¶319, 341, 370, 387. *See additional detailed statements* ¶¶370, 372, 425.

*Cigna* is also inapposite for the reasons that Judge McMahon, in a lengthy analysis of *Cigna*, rejected the same points Defendants make here: "Defendants' interpretation of *Cigna* asks this Court to…ignore all context [and] not consider whether they comport (or contradict) the company's other disclosures and conduct." *Signet*, 389 F.Supp.3d at 230. Rejecting such an approach, but still well-within Second Circuit law on puffery, *Signet* sustained "corporate polic[y]" statements "affirming the company's commitment" against sexual harassment because "[it] sought to reassure the investing public that [it] did not...have a toxic workplace." *Id.* at 231. Here, too, Citigroup sought to reassure investors about risk management making those statements actionable.

What's more, *Cigna* found that the statements there did "not invite reasonable reliance" (*Cigna*, 918 F.3d at 60), while here Plaintiffs allege that analysts relied on the representations. Analysts asked questions about infrastructure and regulatory compliance to which Citigroup provided misleading responses. ¶¶329-31, 351-54; *Signet*, 2018 WL 6167889, at *12 (materiality when "statements...were made in response to direct questions"). Analysts touted Citigroup's purportedly improved risk management and recommended that investors buy its stock, including because Citigroup "put many of its past regulatory issues behind it." ¶¶131-36; *In re Regeneron Pharm., Sec. Litig.*, 2005 WL 225288, at *21 (S.D.N.Y. Feb. 1, 2005) (analyst coverage shows materiality). And once the truth was revealed, analysts accused Defendants of deceit: "investors [are] angry over their lack of transparency." ¶¶223-235; *In re Scholastic Sec. Litig.*, 252 F.3d 63, 76 (2d Cir. 2001) ("sharp criticism from industry analysts after [fraud was revealed] further indicates the weight given to information"). These facts show that Citigroup's longstanding deficiencies juxtaposed against its public statements "would have been viewed by the reasonable investor as having significantly altered the total mix of information." *In re Bioscrip, Inc. Sec. Litig.*,

95 F.Supp.3d 711, 732 (S.D.N.Y. 2015) (Nathan, J.).[16]

### C.   Plaintiffs Adequately Plead False And Misleading Statements or Omissions

The "veracity of a statement or omission is measured not by its literal truth, but by its ability to accurately inform rather than mislead prospective buyers." *BioScrip,* 95 F.Supp.3d at 727. "The law is well settled...that so-called half-truths—literally true statements that create a materially misleading impression—will support claims for securities fraud." *S.E.C. v. Gabelli*, 653 F.3d 49, 57 (2d Cir. 2011) *rev'd on other grounds*, 568 U.S. 442 (2013). And "[e]ven when there is no existing independent duty to disclose information, once a company speaks on an issue or topic, there is a duty to tell the whole truth." *Setzer*, 968 F.3d at 214 n.15. Plaintiffs need only plead facts "sufficient to support a reasonable belief as to the misleading nature of the statement or omission." *Novak*, 216 F.3d at 314 n.1. The alleged statements readily satisfy this standard because they "**gave comfort** to investors that reasonably effective steps were being taken to comply with applicable [] regulations." *Jinkosolar*, 761 F.3d at 251.

### 1.   False And Misleading Statements About Risk Management Systems

Under the Second Circuit decision in *Jinkosolar*, 761 F.3d at 251, Defendants' statements about risk management and controls are false and misleading. Those statements repeatedly described Citigroup's risk management systems (*i.e.*, the installation), but never disclosed that regulators had determined for years that those systems suffered significant deficiencies, which constituted "continuous noncompliance" (*i.e.*, they were inoperable). ¶¶163-64, 176-83. *E*Trade,

---

[16] *ECA* v. *JP Morgan Chase Co.*, 553 F.3d 187, 205-06 (2d Cir. 2009) is distinguishable because the statements at issue were far less specific than here, such as "highly disciplined" risk management and the bank's "reputation for integrity" so that "[n]o investor would take such statements seriously in assessing a potential investment." ¶¶131-36, 223-25. *Burr v. Equity Bancshares, Inc.*, 2020 WL 6063558 (S.D.N.Y. Oct. 14, 2020) fares no better because the complaint simply alleged that the company's general representations regarding "responsible" lending practices were false because two loans defaulted. *In re Australia and New Zealand Banking Group Ltd. Sec. Litig.*, 2009 WL 4823923, at *6 n.8, 14 (S.D.N.Y. Dec. 14, 2009) is distinguishable because it is stripped from the context of this case and Citigroup's history of consent orders and regulatory violations, analysts' focus here on risk management, and the regulators' findings there did "not concern the alleged misrepresentations made by the defendants."

712 F.Supp.2d at 176-77, 187, 190 ("statements touting risk management," that defendants "consistently monitored [assets] in a disciplined, focused fashion" actionable when "juxtaposed against detailed factual descriptions of [] woefully inadequate or non-existent [] procedures").

Citigroup said in every Annual Report that its Board "oversees Citi's risk-taking activities and holds management accountable for ***adhering*** to the risk governance framework" and that directors "review risk assessments and reports...to question, challenge, and when necessary, oppose recommendations and decisions made by senior management." ¶¶321, 343, 372, 389, 421. This was false and misleading. The Fed determined that Citigroup's Board failed to adequately oversee risk management activities, lacked effective reporting mechanisms, and failed to "hold senior management accountable" for remediating "longstanding enterprise-wide risk management and control deficiencies." ¶¶322, 344, 373, 390, 422; *see In re Lehman Bros.*, 799 F.Supp.2d 258, 284 (S.D.N.Y. 2011) (misleading to state that firm "oversees compliance with [risk] policies" and "enforce[d] ***adherence***," "while failing to disclose that it 'routinely' alters [the policies]").

Citigroup further described in its Annual Reports that it managed risk utilizing its "Risk Governance Framework...through which Citi identifies, measures, manages, monitors, reports and controls risk across the firm" (¶¶333, 362, 379, 413), and that the Company maintained a "global framework for assessing, monitoring and communicating operational risks...across Citigroup." ¶¶345, 374, 391, 423. This too was false and misleading. The OCC found that Citibank's "enterprise-wide risk management policies, standards, and frameworks" "fail[ed]" to "adequately identify, measure, monitor, and control risks" and Citibank "fail[ed] to establish an effective risk governance framework as required by [Appendix D]." ¶¶334, 346, 363, 375, 380, 414. The Fed

further determined that "Citigroup has not adequately remediated the longstanding enterprise-wide risk management…deficiencies previously identified by the Federal Reserve."[17] *Id*.

Even more specifically, the Company told investors that it "manages its risks through each of its three lines of defense" which include "(i) business management, (ii) independent control functions and (iii) Internal Audit."[18] ¶¶315, 337, 366, 383, 415. And according to a letter attached to Citigroup's 2019 Proxy, "[o]ur three lines of defense–the business lines, the control functions, and internal audit–dove deeply and, where necessary, took proactive steps in critical risk areas... The Board and our Risk Committee engage deeply in the oversight of risk management practices."[19] ¶398. This description cannot be squared with the regulators' finding that (i) Citibank "fail[ed] to establish effective front-line units and independent risk management as required by [Appendix D], which contributed to "unsafe or unsound practices that were part of a pattern of misconduct" and "to violations of law and regulation and continuous noncompliance with [Appendix D];" and (ii) that the Citigroup Board lacked effective reporting with respect to "various areas of risk management and internal controls." ¶¶316, 338, 367, 384, 399; *Bioscrip*, 95 F. Supp.3d at 728 (statement "[w]e believe we have procedures in place to ensure the accuracy of our claims" was actionable when company was part of "kickback scheme" and under investigation).

---

[17] *See In re MF Global Holdings Ltd. Sec. Litig.*, 982 F.Supp.2d 277, 297-98, 317 (S.D.N.Y. 2013) (holding "actionable misstatements [describing] [] risk controls" as "robust," "effective," "adequate," and "designed to monitor, evaluate, and manage the risks" because complaint "pleads contrary information...undermin[ing] the accuracy of those disclosures," including that company's "risk management" suffered from "[t]echnological concerns and limitations," and "numerous and significant gaps between the policy and existing practices").

[18] Defendants misconstrue this statement to suggest that Citigroup simply "ask[e]d employees to follow these processes." (Mot. 10). But the reference to employees appears a full page before Citigroup's statement that it "manages its risks through each of its three lines of defense" and has nothing to do with employees following processes. ECF No. 117-12 at 66-7. Defendants improperly conflate the two statements.

[19] Defendants wrongly accuse Plaintiffs of "omit[ting], through an ellipsis, that Defendants explained that the specific 'progress on the regulatory front' [] was in reference to 'a successful result' in a particular Federal Reserve 'stress test.'" (Mot. 14). That reading is not supported by the document. The paragraph's thesis sentence is that "management also made progress on the regulatory front last year," and includes the "stress test" as one example. It then says that "in addition, Citi made headway on a range of heightened regulatory requirements." ECF No. 117-14 at 4.

Citigroup even described in meticulous detail the specific "process steps" that it "[e]stablish[ed]" and "adher[ed]" to for "compliance risk management," which included,

> [i]ndependently testing and monitoring that Citi is operating within the Compliance Risk Appetite; [i]dentifying instances of non-conformance with Laws, regulations, rules and breaches of internal policies; [e]scalating...the results of monitoring, testing, reporting or other significant compliance risk and take reasonable action to see that the matter is appropriately identified, tracked and resolved, including through the issuance of corrective action plans… ¶¶393, 425.[20]

But according to the OCC, "[f]or several years, the Bank has failed to implement and maintain…[a] compliance risk management program" consistent with Appendix D. ¶¶394, 426. The Fed likewise "identified significant ongoing deficiencies in implementation and execution by Citigroup with respect to various areas of...compliance risk management," determined that Citigroup failed to "adequately remediate[] the longstanding enterprise-wide risk management and controls deficiencies," and required "improvements to the management information systems, data, and reports provided to Citigroup's board [] and senior management concerning compliance risks, compliance with applicable U.S. laws and regulations, and the effectiveness and functioning of the compliance risk management program." ¶¶394, 426. *Jinkosolar*, 761 F.3d at 251.

Defendants' response, that the Complaint does not "allege that the designs and procedures Defendants described did not exist or were misdescribed" (Mot. 12), is wrong and amounts to arguing that the statements were "literally true." That fails as a matter of law. And while the designs and procedures arguably may have existed in some form (*i.e.*, they were installed), the descriptions created a misleading impression because they did not meet minimum regulatory requirements. *Jinkosolar*, 761 F.3d at 251. Finally, the assertion that Plaintiffs fail to plead that the

---

[20] This specificity distinguishes this case from *Menaldi v. Och-Ziff Capital Mgmt Group LLC*, 277 F.Supp.3d 500, 513-14 (S.D.N.Y. 2017), which dismissed statements describing a "global compliance program," "comprehensive policies and supervisory procedures," "mandatory compliance training," and "strong relationships with a global network of local attorneys" as not specific enough, unlike those in *Jinkosolar* and in this case.

statements were false when made because the "regulators later identified deficiencies" (Mot. 11-12) contradicts the allegations of contemporaneous falsity. At the very least, the Complaint "support[s] a reasonable belief" of falsity at the time. *Novak*, 216 F.3d at 314 n.1.

### 2.   Defendants Falsely Stated That Defendants' Risk Governance Framework Was Aligned With Appendix D and Regulation YY

The Annual Reports from 2016 to 2018 made the following two-sentence statement: "The Risk Governance Framework has been developed in alignment with the expectations of [Appendix D]. It is also aligned with the relevant components...of [Regulation YY]." ¶¶335, 364, 381. Both sentences were false, as discussed above. *See supra* Sec. II.B.1; *see also* ¶¶336(b)(iii), 365, 382. Defendants all but ignore the second sentence, and instead focus on the first one that said "***developed*** in alignment" with Appendix D. (Mot. 12). Defendants then claim that the Complaint fails to allege that the "'risk governance framework' was ***not developed*** according to the expectations of [Appendix D]." *Id*. Defendants are wrong. The Complaint alleges that the OCC found that "for several years" Citibank "***fail[ed] to establish*** an effective risk governance framework as required by [Appendix D]," in "a pattern of misconduct" that "contributed to...***continuous noncompliance with [Appendix D]***." ¶¶177-78, 336(a)(i)-(iv), 365, 382. If Defendants' point is that there is a difference between "develop" and "establish," the Court should reject the argument not only because they are synonyms (*see* Ex. E), but because the securities laws are not so toothless to allow issuers to escape liability through semantic games.[21]

And even if Defendants had "developed" the risk governance framework in alignment with Appendix D, the subsequent failure to "establish" the supposedly "developed" framework makes the statements misleading under *Jinkosolar*. *See also Goldman*, 868 F.Supp.2d at 277-80

---

[21] *See Fiat*, 2016 WL 5818590, at *5 ("easily" finding statements actionable when company said it was "substantially in compliance...[but] was allegedly not 'substantially in compliance'").

(statement that "we have extensive procedures and controls that are *designed* to...address conflicts of interest" misleading when systems failed). And what's more, the second sentence says that the risk governance framework "is *also* in alignment" with Regulation YY, clearly implying that the risk governance framework in the first sentence *also* was in alignment with Appendix D.

The Complaint alleges numerous additional false and misleading statements that further gave comfort to investors that Citigroup's risk governance framework met minimum requirements. Gerspach stated in 2017 that the Company was "operating above every one of our regulatory requirements."[22] ¶357. Corbat responded to an analyst's question in 2017 that "[f]rom an infrastructure perspective, we've got really if not all, certainly most of the systems or base systems that we need...these systems [] have the ability to come back and communicate centrally."[23] ¶353. And in response to fines levied for risk management failures, Defendants said they had "resolved" past lapses (¶410), "strengthened controls," (¶406), "made substantial investments to enhance our [anti-money-laundering] programs," and were "committed to taking all necessary and appropriate steps to remedy the concerns." ¶359. These repeated representations juxtaposed against the allegations of pervasive non-compliance "could be found by a trier of fact to be an omission that renders misleading the comforting statements...about compliance measures." *Jinkosolar*, 761 F.3d at 251. *See also Fed. Hous. Fin. Age v. Nomura*, 104 F.Supp.3d 441, 563 (S.D.N.Y. 2015)

---

[22] Defendants wrongly characterize Gerspach's statement as "refer[ing] to Citigroup operating above minimum regulatory *capital* requirements." (Mot. 9-10 emphasis in original). Aside from being a question of fact, Defendants' argument is a-textual. That is not what Gerspach said; his statement was unqualified during a scripted portion of a conference call. Plaintiffs' reading is plausible and Defendants cannot inject words into a statement that are not there. And even if Defendants' reading was accurate, the contention ignores that the Fed "identified significant ongoing deficiencies in implementation and execution by Citigroup with respect to…capital planning," which Defendants do not contest is relevant to "*capital*' requirements." ¶¶163, 358.

[23] Defendants' contention that Corbat's statement occurred "before a discussion of specific branch and ATM investments in Mexico" is misleading. (Mot. 3 n.7). The statement has nothing to do with that, but rather, was in response to an analyst question regarding "efficiency" and "upgrading major systems in the Investment Bank, the Global Consumer Bank." ECF No. 117-9 at 3.

(statements of "general compliance" misleading because they "indicated that certain immaterial exceptions might exist," not that significant violations existed).

Defendants' argument that they "provided no assurance to investors" that "procedures would be sufficient to guarantee compliance," and thus that the statements are not false, misses the point and is counter to *Jinkosolar*. (Mot. 11-12). The falsity was not the "guarantee" (a word Plaintiffs do not use with respect to any actionable statement) because the false statements "did not guarantee 100% compliance." *Jinkosolar*, 761 F.3d at 251. However, like in *Jinkosolar*, the false statements about risk management "***gave comfort*** to investors that reasonably effective steps were being taken to comply with applicable [] regulations," which was misleading when those steps "were then failing to prevent substantial violations of [] regulations."[24] *Id.*

### 3.    Defendants' False and Misleading Statements About Citigroup's Investment In Risk Management and Internal Controls

"Where a company seeks fraudulently to hide a particularly large problem with multiple contributing factors, it is quite probable that the company will have to lie about a number of related topics in order successfully to conceal the larger issue." *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223 (2d Cir. 2016) ("disseminating network of interrelated lies" to conceal lack of cash and high risk of bankruptcy). This is such a case. To hide the pervasive deficiencies, Defendants also had to falsely claim that Citigroup made the requisite investments in risk management and internal controls and that cost cutting would not come at the expense of those key areas. *See supra* Sec. II.B.3. These statements created a misleading impression that the Company had sufficiently invested in its risk management and internal controls to meet regulatory requirements. But the Fed and OCC confirmed that Citigroup had not, and that it now needs to invest massively by

---

[24] After reviewing Defendants' arguments, Plaintiffs no longer challenge the following portion of Corbat's statement in ¶355: "I also hope people recognize how we've strengthened our risk management by the dogs that haven't barked."

overhauling its data architecture (¶213) and beefing up staffing and technology "to sustain a safe and sound system of internal controls and risk management." ¶¶204, 311(a)(v), (c), 313, 403(c), (e), (f), 405(b)-(e), 409(a), (d)-(f). Citigroup had cut costs at the expense of risk management to misleadingly improve efficiency at Corbat's direction, who "was often reluctant to spend the money or dedicate enough people to fix a problem the right way." ¶¶311, 313, 403, 405, 414; *Avon*, 2019 WL 611539, at *14 ("each time Defendants touted their recruitment efforts [] without revealing their new, aggressive hiring strategy, they were concealing material information").

What's more, in direct response to analyst questions with respect to Citigroup's "budget [] for risk and compliance" (¶329) and "cost associated with complying with the changes and the regulatory environment" (¶351), Gerspach stated that the cost "is [] plateauing" (¶329) or "plateaued." ¶351. But Defendants had a duty to disclose the whole truth, that costs had plateaued, in substantial part, because Citigroup failed to make the necessary investments in its risk infrastructure. *See In re Bofi Hold. Inc. Sec. Litig.*, 2017 WL 2257980, at *10 (S.D. Cal. May 23, 2017) (statements that company "made significant investments in our overall compliance infrastructure" and told "investors that [it] valued internal controls so much that it invested heavily in upgrades and new personnel" were false when internal controls were "understaffed").

Defendants' argument that "Plaintiffs do not contend that Citigroup failed to make these investments" (Mot. 13) is wrong; that is precisely what Plaintiffs allege (¶¶119, 159, 213, 311(a)(v),(c), 313, 403(c)(e)(f), 405(b)-(e), 409(a),(d)-(f)).[25] And if Defendants are arguing the literal truth because some investment was made and was not zero, that is not the standard.

---

[25] Defendants' similar point that the Complaint fails to allege that Citigroup stated that it "had, in fact, made all necessary investments to ensure the effective functioning of the Company's risk management systems" (Mot. 11) fails for the same reason. The Complaint says that Citigroup had not made the necessary investments. *Id.*

### 4.      Defendants' Risk Warnings Were False And Misleading

"[T]o warn that the untoward may occur when the event is contingent is prudent; to caution that it is only possible for the unfavorable events to happen when they have already occurred is deceit." *In re Mylan N.V. Sec. Litig.*, 2018 WL 1595985, at *10 (S.D.N.Y. Mar. 28, 2018). Here, Defendants said in every Annual Report that Citigroup was subject to "extensive compliance requirements" that "can result" in "enforcement and/or regulatory proceedings," and/or "Could Result in...Other Negative Impacts on Citi." ¶¶325, 349, 376, 395, 427. In 2018, Citigroup added that "failure to resolve any identified deficiencies could result in increased regulatory oversight and restrictions." ¶395. And Defendants also repeatedly attempt to graft onto the Complaint additional purported disclaimers, such as Corbat's statement that he was "pleased but not satisfied in terms of where we are, and we've got more work to do," or "there is always more to do" (Mot. 6, 13, 15). But Corbat's statement is not even about risk management; it pertains to geographically repositioning Citigroup's businesses. ECF No. 117-3 at 12-13. Regardless, these disclaimers materially understated the actual risks that had already come to pass; investors did not know that Citigroup's risk management and controls failed to meet minimum regulatory requirements.[26]

### 5.      Citigroup's False And Misleading Statements About The Effectiveness of ICFR And DCP

The Complaint also pleads with particularity that Citigroup's ICFR and DCP were ineffective, which is directly contrary to Citigroup's statements. ¶¶461-531. ICFR was ineffective because it suffered a multitude of significant deficiencies that together constituted a material weakness. ¶467. Defendants only challenge the ICFR statements (not DCP) by arguing that Plaintiffs "conflate the kind of controls at issue in the 2020 Consent Orders with the financial

---

[26] *See BioScrip*, 95 F.Supp.3d at 726-27 (finding company's risk warnings to be false and misleading because they "could…be reasonably read as assuring the investor that no such threat existed at that precise moment").

reporting controls at issue in SOX certifications." *Id.* The Complaint conflates nothing. *See supra*
Sec. II.B.5. It contains 20 pages of allegations specifically describing how ICFR were not effective
by showing that the deficiencies identified by the Fed and OCC rendered the internal controls
ineffective under the COSO Framework – the specific framework that Citigroup adopted to
determine ICFR effectiveness. ¶¶461-517. *Green v. Deutsche Bank*, 2019 WL 4805804, at *2
(S.D.N.Y. Sept. 30, 2019), is inapposite. Here, compared to there, the "Complaint [] explains why
these alleged deficiencies support the idea that the bank's management failed to find the internal
controls over financial reporting effective under the COSO framework."[27] *Id.*

### 6.     Statements Are Not Opinions Or Are Actionable Under *Omnicare*

Defendants' opinion argument fails for two reasons. (Mot. 17-18). First, they
mischaracterize the majority of the statements as opinions when they are not. Defendants do not
explain how the statements they list as opinions in their improperly argumentative Exhibit 1 are
such, given that they were not qualified with "we believe," "we think," or the like.[28] Slapping the
moniker "opinion" next to statements in an exhibit does not make it so. (Mot. 17 n.9). For instance,
without explanation, Defendants claim that the statement, "we've got, really if not all, ***certainly***
most of the systems or base systems that we need" (*id.*), was an opinion. But the statement reflected
certainty. *Omnicare*, 575 U.S. at 183 ("a statement of fact ('the coffee is hot') expresses certainty
about a thing, whereas a statement of opinion ('I think the coffee is hot') does not").[29]

---

[27] Defendants' other point that certifications about internal controls are not false when a material weakness "was later
discovered" (Mot. 19) is again wrong because Plaintiffs allege the material weaknesses existed at the time. And even
if these statements are opinions, they are still actionable for the reasons regarding opinion statements discussed below.

[28] The Court should not consider Defendants' 17-page Exhibit 1 because it contains argument. It is an improper
expansion of the page limit agreed to by the parties and allowed by the Court's Order, ECF No. 113.

[29] *Tongue v. Sanofi*, 816 F.3d 199, 212 (2d Cir. 2016) is not persuasive. (Mot. 18). There, the court found a company
need not disclose "FDA feedback merely because it tended to cut against [company's optimistic projections]." *Id.*
Here, the Complaint alleges Citigroup's statements of fact about its risk management and internal controls (not
projections) were directly contradicted by the regulators' contemporaneous findings. Defendants' other point, that
Plaintiffs "fail to allege any undisclosed adverse regulatory feedback at the time of the challenged opinions," is wrong.
(Mot. 18). Plaintiffs do. *See supra* Sec. III.A.

Second, even if a few statements are opinions, they are actionable under *Omnicare*. "[I]f a parties' statement of opinion 'omits material facts about the [party's] inquiry into or knowledge concerning a statement of opinion, and if those facts conflict with what a reasonable investor would take from the statement itself,' liability may accrue." *BioScrip*, 95 F.Supp.3d at 729-30 (citing *Omnicare*). This Court specifically sustained opinion statements in similar circumstances, where the "speaker expresses an opinion yet proceeds 'with knowledge that the Federal Government was taking the opposite view.'" *Id.* at 731 (citing *Omnicare*, 575 U.S. at 188). For instance, Defendant O'Neill made the statement that "I thought we had no significant control lapses unlike the year before" (¶327) while knowing "that the Federal Government was taking the opposite view." For these same reasons, all other statements that Defendants argue are opinions are also actionable.[30]

### 7.    None Of Defendants' Statements Were Forward Looking

In similar boilerplate fashion, Defendants wrongly assert that Plaintiffs allege "multiple forward-looking statements" without specifying in their brief which ones or explaining why they are forward-looking. (Mot. 16). This is because the statements are not forward looking, but rather, are either all statements of present fact or are mixed statements of fact to which the present-tense assertions are not entitled to heightened protection.[31] *Salix*, 2016 WL 1629341, at *9 (safe harbor provision "does not apply to any 'allegedly false statement [that] has both a forward-looking aspect and an aspect that encompasses a representation of present fact'").

---

[30] Defendants Corbat, Mason, and Gerspach's statement in their SOX certifications that that they had "[d]esigned such internal control over financial reporting...in accordance with [GAAP]" (¶489) was not qualified with the language "[b]ased on his knowledge." As such, it was a statement of existing fact (not an opinion). Defendants' reliance on *Das v. Rio Tinto PLC*, 332 F.Supp.3d 786, 812 (S.D.N.Y. 2018) is therefore inapposite. (Mot. 19).

[31] Even the two examples that Defendants cite as forward-looking (Mot. 16 n.8) demonstrate the point. The statement that the Board "will continue to pay close attention to—and expect management to make continued progress on—regulatory matters in 2019 and beyond" is false because "continue" and "continued" implies that that action had taken place. The same is true for the other statement, that we "won't change our commitment to safety and soundness and to making investments necessary to strengthen our infrastructure and control environment." "[W]on't change our commitment" is false because Plaintiffs allege that there had been no commitment in the past or present. ¶403.

8.     **Defendants Violated Their Affirmative Duty to Disclose Pursuant to GAAP And Item 303**

Defendants do not dispute that ASC 450 required an accrual or disclosure of a loss contingency relating to the costs to fix risk management and internal controls. Instead, they claim that the contingency arose from "future enforcement costs" that they could not have known at the time. (Mot. 25). But the Complaint alleges that Citigroup was required to accrue the costs at the start of the Class Period because the Fed and OCC told Citigroup to fix the deficiencies at the time and the Company failed to do so.[32] ¶¶433-54. *See In re Perrigo Co. PLC Sec. Litig.*, 435 F.Supp.3d 571, 586-87 (S.D.N.Y. 2020) (company "required to disclose a reasonable estimate of the possible loss" under ASC 450 when "figure was reasonably calculable"). Likewise, Item 303 affirmatively obligated Citigroup to disclose "any known trends or uncertainties that have had or that are reasonably likely to have a material [] impact on [] income from continuing operations." ¶455. *Stratte-McClure v. Morgan Stanley*, 776 F. 3d 94, 101-02 (2d Cir. 2015) ("Item 303 imposes the type of duty to speak"). Defendants wrongly contend that the Complaint "assume[s]" (Mot. 26) that Defendants knew of the adverse trends or uncertainties; the Complaint in fact alleges that they knew. *See supra* Sec. III.B. Defendants' only other point is that they warned about the risk that regulators could potentially find that the risk systems were inadequate. (Mot. 26). But the cautionary statements themselves were false and misleading. *See supra* Sec. III.C.4.

Finally, the Complaint does not allege, as Defendants argue, that despite the "absen[ce] of a duty to disclose" Citigroup was required "to accuse itself of control deficiencies or to volunteer predictions of the adverse action its regulators could take in the future." (Mot. 24). Quite to the contrary, Plaintiffs allege that Defendants had a duty to disclose because they made affirmative

---

[32] Defendants' contention that the Complaint fails to allege "the precise date on which [the Company] could have estimated its loss" (Mot. 25 n.11) ignores the Complaint. ¶435.

statements and chose to put the topics in play which then required that Defendants be accurate and complete. *See Jinkosolar*, 761 F.3d at 250 ("Once Citibank chose to discuss its hedging strategy, it had a duty to be both accurate and complete") (quoting *Caiola*, 295 F.3d at 331).[33]

### D.     The Complaint Adequately Pleads Loss Causation

To plead loss causation all that is required is "some indication of the loss and the causal connection." *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 347 (2005). Plaintiffs' "burden is not a heavy one." *Loreley Fin. v. Wells Fargo*, 797 F.3d 160, 187 (2d Cir. 2015). Here, Plaintiffs meet this low standard based on four corrective disclosures, all of which were reported by the financial press or analysts to be the cause of the stock price drops. ¶¶537-41 (drop from $51.00 to $48.15), ¶¶544-47 ($48.15 to $44.81), ¶¶548-50 ($44.84 to $44.72), ¶¶553-59 ($45.88 to $43.68); *see generally* ¶¶532-61. *AMC*, 422 F.Supp.3d at 855 (loss causation where "stock price drop occurred immediately after" corrective disclosures).[34]

Defendants' arguments entirely miss the mark. First, their conclusory assertion that "nothing alleged to have been revealed on the purported corrective disclosure dates...revealed that prior general statements regarding the existence and design of Citigroup's risk management systems actually was false" (Mot. 34) is just a repetition of their failed arguments on falsity.[35] *See supra* Sec. III.C. Second, Defendants contend that parts of certain disclosures on September 15

---

[33] Defendants also claim that they were prohibited from disclosing the truth because communications with regulators are confidential. (Mot. 24-25). But they fail to cite any authority for this proposition that effectively asks this Court to exempt compliance with the securities laws because of banking regulations. What's more, Defendants' argument rings hollow given that they chose to selectively discuss, in positive terms, a myriad of regulatory information contained in the false statements. Having chosen to speak, they had a duty to speak accurately and completely.

[34] Because Citigroup has more than two billion shares outstanding (¶568), the drop from $44.84 to $44.72 on October 8, 2020 caused a market capitalization loss to investors of approximately $240 million. Citigroup's stock decline that day was an outlier because the KBW Nasdaq Bank Index rose 1.5% and the S&P 500 Index rose 0.8%, showing that the Company-specific revelations caused the price drop. ¶550.

[35] If Defendants' cryptic argument is that there was no mirror image corrective disclosure, they are wrong. The disclosures were corrective, and to the extent they were not, they were materializations of the risk. *See Vivendi,* 838 F.3d at 260; *see also Lentell v. Merrill Lynch*, 396 F.3d 161 (2d Cir. 2005).

and October 13 expand upon information that appeared earlier in corrective disclosures on September 14 and October 8, respectively. (Mot. 34-35). That argument also fails because they ignore that those disclosures included information that was not previously known to the market—such as, for September 15, that Citigroup had "multiple" MRIAs and MRAs "long past due," revealing to investors that the safety and soundness of the bank had been compromised (¶¶542-43); for October 13, Citigroup disclosed on its earnings call the severe impact of the 2020 Enforcement Orders on the bottom line, leading Deutsche Bank to recast its estimate of earnings per share down by 20-25% (¶555 ("there were enough comments on the [Citigroup] earnings call that raise the concern expenses could rise meaningfully")), which was further confirmed by Corbat's emphasis that it "won't be a quick or easy fix." ¶¶551-52. Defendants do not argue (let alone establish) that all corrective information was fully known to the market prior to these dates or that the stock price declined for other reasons.

### E.   The Complaint Adequately Pleads A Control Person Claim

Because Defendants do not dispute that the Officer Defendants were controlling persons within the meaning of Section 20(a), (Mot. 35), and the Complaint adequately pleads a predicate 10(b) violation, the Section 20(a) claims should be sustained.

## IV.   CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss should be denied in its entirety. Should the Court grant dismissal in whole or in part, Plaintiffs respectfully request leave to amend.

Dated: July 19, 2021                    Respectfully submitted,

                                        **BLEICHMAR FONTI & AULD LLP**

                                         _/s/ Javier Bleichmar_
                                        Javier Bleichmar
                                        Joseph A. Fonti
                                        Erin H. Woods
                                        Ross Shikowitz

George N. Bauer
Benjamin F. Burry

7 Times Square, 27th Floor
New York, New York 10036
Telephone: (212) 789-1340
Facsimile: (212) 205-3960
jbleichmar@bfalaw.com
jfonti@bfalaw.com
ewoods@bfalaw.com
rshikowitz@bfalaw.com
gbauer@bfalaw.com
bburry@bfalaw.com

*Counsel for Lead Plaintiff PSP, Named Plaintiff Anchorage, and Lead Counsel for the Putative Class*