20-3231
<u>Plumbers & Steamfitters Local v. Danske Bank</u>

# United States Court of Appeals
# for the Second Circuit

AUGUST TERM 2020
No. 20-3231

PLUMBER & STEAMFITTERS LOCAL 773 PENSION FUND, BOSTON RETIREMENT SYSTEM, TEAMSTERS LOCAL 237 ADDITIONAL SECURITY BENEFIT FUND AND TEAMSTERS LOCAL 237 SUPPLEMENTAL FUND FOR HOUSING AUTHORITY EMPLOYEES, individually and behalf of all others similarly situated,
<u>Plaintiffs-Appellants</u>,

<u>v.</u>

DANSKE BANK A/S, THOMAS F. BORGEN, HENRIK RAMLAU-HANSEN, JACOB AARUP-ANDERSEN, ESTATE OF OLE ANDERSEN,
<u>Defendants-Appellees</u>.

ARGUED: MAY 17, 2021
DECIDED: AUGUST 25, 2021

Before:    LIVINGSTON, <u>Chief Judge</u>, JACOBS, and MENASHI, <u>Circuit Judges</u>.

Three pension funds bring this putative securities class action on behalf of

themselves and all others who purchased Danske Bank American Depositary

Receipts (ADRs) between January 9, 2014 and April 29, 2019.   The Funds allege

1

that Danske Bank and several of its corporate officers made materially misleading statements about a money laundering scandal that was perpetrated through the Bank's branch in Estonia.    The United States District Court for the Southern District of New York (Caproni, I.) dismissed the Funds' claims pursuant to Federal Rule of Civil Procedure 12(b)(6) for, inter alia, failure to plead actionable misstatements or omissions.    We **AFFIRM**.

_____

> CAROL C. VILLEGAS (Alec T. Coquin, Christine M. Fox, on the brief), Labaton Sucharow LLP, New York, NY, for Plaintiffs-Appellants.
>
> Samuel H. Rudman, David A. Rosenfeld, William Geddish, Robbins Geller Rudman & Dowd LLP, Melville, NY (on the brief), for Plaintiffs-Appellants.
>
> BRIAN T. FRAWLEY (Katherine Bagley, Amanda Shami, on the brief), Sullivan & Cromwell LLP, New York, NY, for Defendants-Appellees Danske Bank A/S and Jacob Aarup-Andersen.
>
> Bruce E. Yannett, Helen V. Cantwell, Debevoise & Plimpton LLP, New York, NY and Jonathan R. Tuttle, Debevoise & Plimpton LLP, Washington, DC (on the brief), for Defendant-Appellee Ole Andersen.

> Edmund Polubinski III, Patrick W. Blakemore, Davis Polk & Wardwell LLP, New York, NY (on the brief), for Defendant-Appellee Thomas F. Borgen.
>
> Daniel J. Kramer, Shane Avidan, Katherine Warren Gadsden, Paul, Weiss, Rifkind, Wharton & Garrison LLP, New York, NY (on the brief), for Defendant-Appellee Henrik Ramlau-Hansen.

DENNIS JACOBS, Circuit Judge:

This securities fraud class action, brought by three pension funds (collectively, "the Funds") against Danske Bank ("Danske" or "the Bank") and four of its former executives, principally alleges that the Bank covered up a money-laundering scandal.   Between 2007 and 2015, a failure to follow anti-money laundering (AML) protocols in the Bank's Estonian Branch allowed suspicious transactions of approximately $230 billion to flow through that branch.   News of the scandal first broke in 2016 when the Danish Financial Supervisory Authority (DFSA) reprimanded and later fined Danske Bank for compliance shortcomings.   But it became clear over the next two years that the amount of money laundered through the Estonian Branch was far greater than originally thought.   As the scope of the scandal came to light, the price of Danske Bank securities declined.

In 2018—well after news of the Estonian Branch's AML issues became public, but before its full breadth was revealed—the Funds purchased Danske Bank American Depositary Receipts (ADRs) and now seek to represent a class of ADR investors who purchased between January 9, 2014 and April 29, 2019.   The Funds claim that the Bank failed to supervise the Estonian Branch, reacted slowly once it became aware of the AML issues, and made a series of misstatements and omissions along the way.   During the relevant time period, Defendant Thomas Borgen was Danske's CEO, Defendants Henrik Ramlau-Hansen and Jacob Aarup-Andersen both served as its Chief Financial Officer, and Defendant Ole Andersen was the Chairman of its Board of Directors.

We conclude that none of the misstatements or omissions identified by the Funds are actionable.   One of the Funds' misstatement theories improperly faults the Bank for its nondisclosure of "uncharged, unadjudicated wrongdoing." See City of Pontiac Policemen's and Firemen's Ret. Sys. v. UBS AG, 752 F.3d 173, 184 (2d Cir. 2014).   Two more fail in light of the Funds' reliance on statements that were made more than three years *before* their first purchase of ADRs and that—in light of intervening events—cannot reasonably be said to have

4

significantly altered the mix of information available to reasonable investors at that later date.   Another statement, conversely, is not actionable because it was made well *after* the Funds last purchased ADRs.   See Denny v. Barber, 576 F.2d 465, 468–69 (2d Cir. 1978).   And the remaining statements are too generic to induce reliance.

All told, the allegations do not move the claims outside the realm of corporate mismanagement and into the realm of securities fraud.   See Acito v. IMCERA Grp., Inc., 47 F.3d 47, 53 (2d Cir. 1995) ("It is well settled that section 10(b) was not designed to regulate corporate mismanagement." (internal quotation marks omitted)).   Accordingly, we **AFFIRM** the district court's dismissal of this action.

## BACKGROUND

**A.    The Estonian Branch**

Danske Bank, the largest financial institution in Denmark, acquired its Estonian Branch by way of a 2006 merger with Sampo Bank.   Problems soon emerged.   In 2009, the Estonian Financial Supervisory Authority (EFSA) censured the branch for failing to comply with Know Your Customer (KYC)

rules, which, <u>inter alia</u>, obligate banks to verify the identity of a customer before opening an account.   An internal audit conducted in 2012 reported that branch personnel sometimes failed to screen incoming payments.   That same year, the DFSA approached Danske about "serious AML . . . issues in the Estonian branch."   App'x at 49.   The Funds allege that, despite these cautions, Danske failed to strengthen compliance measures at the branch that would have impaired profitability.

Central to the Estonian Branch's AML issues was its Non-Resident Portfolio ("NRP"), which it inherited from Sampo.   The NRP was managed by a designated group of employees and was composed of 3,000 to 4,000 foreign clients at any given time, most of them corporate entities based in Russia, the United Kingdom, and the British Virgin Islands, with little apparent reason for doing their banking in Estonia.   Although just 2–4 percent of the branch's customers were part of the NRP, the portfolio accounted for an average of 56 percent of the branch's pre-tax profits between 2011 and 2015.

The Funds allege that many NRP customers were intermediaries who used the branch to launder money.   Many of them should have set off alarms.   Some

6

shared addresses with other NRP customers; others processed transactions incommensurate with their purported size.   But Estonian Branch employees tended not to ask questions about their clients' financial motives.

In late 2013, a whistleblower named Howard Wilkinson emailed four of his superiors in Copenhagen to report "a near total process failure" at the Estonian Branch, accusing branch employees of "knowingly dealing with criminals."   App'x at 94–95.   Following an investigation, many of Wilkinson's allegations were substantiated by the Bank's Internal Audit Group, which found (inter alia) that branch employees were lax when inquiring into new NRP clients, apparently to avoid "caus[ing] problems" for them.   App'x at 54.   CEO Borgen was informed of these findings in early 2014 and recommended "an immediate stop of all new business and a controlled winding-down of all existing business" within the NRP.   App'x at 372.   Around that same time, the EFSA censured the branch for its AML shortcomings, and Danske informed the regulator of its plan to shut down the NRP completely in the coming months.

Wilkinson's allegations prompted changes.   Danske ceased opening new NRP accounts, terminated all accounts suspected of being operated by an

7

intermediary, hired an independent consultant to assess AML policy in Estonia, and began considering the outright sale of the branch.   One board member recommended getting out of Estonia immediately, but Borgen expressed concern that a precipitate exit could negatively impact the sales price of the branch.

In December 2014, Danske reported a goodwill impairment related to its operations in Estonia amounting to DKK 2.1 billion (about $326 million) alongside substantial impairments in Finland and Northern Ireland.[1]   The Bank explained that these write-downs were "based on long-term assessments" as opposed to "short-term developments at the individual business units."   App'x 118.   Ramlau-Hansen stressed that the write-down "will not affect [the Bank's] ongoing business or the strategy for the involved units."   App'x 58.

Over the next few months, the NRP was gradually shut down.   The branch sent termination notices to 2,261 NRP customers in 2015, and anticipated that by late that year, 77 percent of NRP accounts would be closed. The NRP was

---

[1] If a company purchases assets at more than fair market value, it can record the difference as goodwill on its balance sheet.   But if the value of the assets subsequently declines, the company may be required to record a goodwill impairment.

completely dissolved by early 2016.

### B.    The scandal becomes public

News of the Estonian Branch's AML violations emerged over the next few years.   In March 2016, the DFSA publicly reprimanded and fined the Bank for failing "to identify material money laundering risks at its branch in Estonia" and for not implementing "risk-mitigating measures."   App'x at 68.   A year later, *Berlingske*, a Copenhagen newspaper, detailed how $20 billion was laundered out of Russia between 2011 and 2014 via several banks, including $1.2 billion through Danske.   A few months later, *Berlingske* reported that four UK-based shell companies controlled by Azerbaijani elites had used Danske's Estonian Branch to launder $2.9 billion.

These news stories provoked further scrutiny from Danish and French regulators.   Danske responded with a September 2017 press release acknowledging that significant sums had been laundered through its Estonian Branch due to that branch's "major deficiencies in controls and governance." App'x at 322.   Around that same time, the Bank hired Bruun & Hjejle (B&H), a Copenhagen law firm, to conduct an independent investigation.

The bad press continued unabated, however.   Bloomberg reported in mid-2018 that Danish authorities sought to investigate $8 billion that had allegedly been laundered through the Estonian Branch between 2007–2015. Two weeks later, Danske voluntarily promised to renounce its profits from all illegal transactions from the Estonian Branch.   Nevertheless, the Bank assured investors in July 2018 that it "does not expect . . . the dialogue with public authorities or the inspection of compliance with anti[-]mon[e]y laundering legislation to have any material effect on its financial position."   App'x at 83.

In September 2018, Danske released the B&H Report, which observed that the scandal was much larger than initially anticipated and reported for the first time that over $200 billion worth of branch transactions were suspect.   The B&H Report faulted the Bank for its "manifestly insufficient and inadequate" AML procedures in Estonia but concluded that "[t]he main responsibility for these shortcomings lies with the first line of defence at the Estonian branch."   App'x at 397.   Borgen resigned as CEO that day, notwithstanding B&H's finding that he had breached no legal obligation.   As the bad news accumulated, the price of Danske Bank's securities sank.

10

### C.    Procedural History

The Funds, which purchased Danske Bank ADRs amid the AML fallout between March and June of 2018, commenced this action in January 2019—seeking to represent a class of ADR investors who purchased between January 9, 2014 and April 29, 2019—and were appointed lead plaintiffs.   The operative pleading (the Third Amended Complaint) asserts claims under: (1) Section 10 of the Exchange Act and Rule 10b-5(b); (2) Rule 10b-5(a) and (c); and (3) Section 20(a) of the Exchange Act.

After several amended pleadings, the district court granted Defendants' motion to dismiss with prejudice, concluding, inter alia, that the Funds failed to sufficiently allege any materially misleading statements or omissions.[2]   This appeal followed.

### DISCUSSION

The core claim is brought under Section 10(b) of the Securities Exchange

---

[2]  The district court also concluded that the operative pleading failed to state a claim because it did not sufficiently allege fraud with particularity or scienter. Because we agree that the Funds failed to plead actionable misstatements or omissions, we do not consider these alternate grounds for dismissal.

Act of 1934, 15 U.S.C. § 78j(b), and its implementing regulation, Rule 10b-5(b), 17 C.F.R. § 240.10b–5(b).   To state a claim under those provisions, a plaintiff must plead six familiar elements: (1) a misstatement or omission of material fact; (2) scienter; (3) a connection with the purchase or sale of securities; (4) reliance; (5) economic loss; and (6) loss causation.   Kleinman v. Elan Corp., plc, 706 F.3d 145, 152 (2d Cir. 2013).

This appeal turns on the first element: whether the Funds sufficiently alleged that Danske made actionable misstatements or omissions.   Though the 144-page Third Amended Complaint recounts in fulsome detail all that went wrong at the Estonian Branch over an eight-year period, the Exchange Act claim is premised on five particular categories of alleged misstatements and omissions: (1) the Bank's 2013–2015 financial statements, which allegedly incorporated revenue from illegal transactions; (2) statements surrounding the 2014 goodwill impairment; (3) a 2015 statement regarding the Bank's new anonymous whistleblower reporting system; (4) corporate governance statements discussing the Bank's compliance with AML; and (5) the Bank's assertion that it did not expect the AML scandal to materially impact its financial position.   None of the

challenged statements are actionable by the Funds.[3]

### A. The Financial Statements

Danske Bank routinely released financial results throughout the class period, each time summarizing its year-over-year net profits and revenues. The Funds observe that, in all these reports, the allegedly ill-gotten profits from the Estonian Branch were baked into the bank-wide numbers. They go on to argue that it was misleading for Danske to release those numbers without simultaneously disclosing what it knew about possible money laundering at the branch. We disagree.

Generally speaking, "disclosure is not a rite of confession," so "companies do not have a duty to disclose uncharged, unadjudicated wrongdoing." City of Pontiac, 752 F.3d at 184 (internal quotation marks, citations, and alteration omitted). As a corollary of that rule, accurately reported financial statements do not automatically become misleading by virtue of the company's nondisclosure of suspected misconduct that may have contributed to the financial results. As

---

[3] The failure to sufficiently plead actionable misstatements or omissions is fatal to the Funds' § 10(b) claim. Because their § 20(a) claim depends on a viable § 10(b) claim, the § 20(a) claim fails as well.

the Sixth Circuit concluded in a related context, "[i]t is clear that a violation of federal securities law cannot be premised upon a company's disclosure of accurate historical data."   In re Sofamor Danek Grp., Inc., 123 F.3d 394, 401 n.3 (6th Cir. 1997); cf. City of Pontiac, 752 F.3d at 184 (rejecting the contention that the defendant bank was required to disclose in offering materials its suspicion that some employees were involved in a tax evasion scheme).

Critically, the Funds do not allege that the financial numbers Danske disclosed were manipulated in any way—just that they failed to simultaneously disclose the AML issues in Estonia.   But because Danske was under no obligation to self-report its growing suspicions regarding those issues, its "disclosure of accurate historical data," standing alone, is not actionable.   See Sofamor, 123 F.3d at 401 n.3; see also Fogel v. Vega, 759 F. App'x 18, 24 (2d Cir. 2018) (accurate financial statements do not "become actionable simply because companies do not simultaneously disclose some wrongdoing that may have contributed to the company's financial performance").   Otherwise, every company whose quarterly financial reports include revenue from transactions that violated AML regulations could be sued for securities fraud.   Such a rule

14

would "bring within the sweep of federal securities laws many routine representations made by [companies]."    ECA & Loc. 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co., 553 F.3d 187, 206 (2d Cir. 2009).

Relatedly, the Funds allege that Danske Bank's financial reports were per se misleading by reason of their alleged noncompliance with standards promulgated by the International Accounting Standards Board (IASB). According to the Funds, the International Financial Reporting Standards (IFRS) permit contract revenue to be reported only if the underlying contract creates "enforceable rights and obligations."    App'x at 40 (citing IFRS 15).    So, the Funds say, Danske violated those standards by including revenue derived from unenforceable contracts with NRP clients who were using the branch to launder money.

When a securities fraud claim is premised on the defendant's predicate violations of law or accounting standards, the facts of that underlying violation must be pled with particularity.    See Gamm v. Sanderson Farms, Inc., 944 F.3d 455, 464 (2d Cir. 2019); see also City of Sterling Heights Police & Fire Ret. Sys. v. Vodafone Grp. Pub. Ltd. Co., 655 F. Supp. 2d 262, 270 (S.D.N.Y. 2009) (dismissing

15

securities fraud claim premised on accounting violations when the plaintiff did not "plead with particularity that [the defendant] fraudulently violated accounting standards"). In other words, the plaintiff must specify *what* law or standard the defendant violated and *how* the alleged violation occurred. See ECA, 553 F.3d at 199–200 (agreeing that plaintiff sufficiently alleged GAAP violation with particularity).

The operative pleading does not satisfy this heightened pleading requirement. The Funds baldly state that the challenged deposit contracts are unenforceable because some of the NRP clients were illegally laundering money through the Branch. This claim conflates the distinct concepts of illegality and unenforceability. As the district court pointed out, whether the deposit contracts are actually *unenforceable* turns on foreign contract law. But the Funds identify no law or contractual provision that would render the deposit contracts unenforceable. Instead, they posit that "it is reasonable to infer that illicit transactions do not give rise to enforceable rights." Reply Br. at 4–5. But under the applicable heightened pleading requirement, the Funds must come forth with more than a generality with surface appeal. See 15 U.S.C. § 78u-

16

4(b)(1); <u>In re Fannie Mae 2008 Sec. Litig.</u>, 742 F. Supp. 2d 382, 408 (S.D.N.Y. 2010) (dismissing claims premised on alleged GAAP violations because the plaintiffs failed to plead "facts sufficient to identify any violations of GAAP").

### B.  The Goodwill Impairment

Danske Bank announced the results of its annual goodwill impairment testing in late 2014.   The Bank disclosed that it was taking a write-down of approximately DKK 9 billion (approximately $1.4 billion) on its assets in Finland, Northern Ireland, and Estonia due to "assumptions about weaker long-term macroeconomic developments."   App'x at 59.   Ramlau-Hansen explained on a conference call that "this is primarily a technical accounting exercise," that "[t]he goodwill calculation is not related to expected short-term performance of the affected business areas," and that the write-down "will not affect Danske Bank's ongoing business or the strategy for the involved units."   App'x at 58.

The Funds allege that it was materially misleading to characterize the write-down as "purely technical" and unrelated to short-term strategy because the goodwill impairment in Estonia was the direct consequence of the Bank's decision to eliminate the NRP.

17

Insofar as Ramlau-Hansen advised that *the impairment* "will not affect

Danske Bank's . . . strategy for the involved units," App'x at 58, the Funds have

not alleged that those "factual assertions . . . were false when the statements were

made."   See In re Time Warner Inc. Sec. Litig., 9 F.3d 259, 266 (2d Cir. 1993).   To

the contrary, the Funds' theory (that the strategic winding down of the NRP

prompted the impairment) depends on the opposite causal relationship: that the

Bank had *already* decided to wind down the NRP before announcing the

goodwill impairment.   If that is so, the impairment could not have "affected"

strategy in Estonia; the strategic change had already been implemented.

Ramlau-Hansen's statement that the impairment "is not related to

expected short-term performance" of the affected areas raises a different issue.

App'x at 58.   The Funds argue that because the decision to wind down the NRP

prompted the write-down, it was inaccurate and misleading to characterize the

two events as unrelated.   Danske Bank, meanwhile, maintains that that write-

down had nothing to do with the NRP but was instead caused by

macroeconomic factors, modest growth projections, low short-term interest rates,

and deflationary pressures in the Eurozone.   The Bank's annual report, which

18

was released less than two months after the goodwill impairment and explained

that the impairment was the result of "a worsening of the long-term economic

outlook in Estonia and the planned repositioning of the personal banking

business in 2015" lends support to the Bank's contention.   App'x at 122–23, 681.

Nonetheless, this dispute is inconsequential.   Even if the Funds could show that

the planned NRP closure prompted the write-down, that fact would still not be

material to a reasonable investor who purchased ADRs when the Funds did.

Whether a misstatement is material "depends on whether there is a

substantial likelihood that a reasonable shareholder would consider it important

in deciding how to act."   ECA, 553 F.3d at 197 (internal quotation marks

omitted).   To be material, "a statement must, in the view of a reasonable

investor, have 'significantly altered the total mix of information made

available.'"   Singh v. Cigna Corp., 918 F.3d 57, 63 (2d Cir. 2019) (footnotes and

internal quotation marks omitted) (quoting Basic Inc. v. Levinson, 485 U.S. 224,

231–32 (1988)).   Because materiality involves a "fact-specific inquiry," Basic, 485

U.S. at 240, it can be decided on a motion to dismiss only if "reasonable minds

19

cannot differ on the question of materiality," TSC Indus. Inc. v. Northway, Inc., 426 U.S. 438, 450 (1976) (citation omitted).

"[L]ogic compels the conclusion that time may render statements immaterial."  Ross v. A. H. Robins Co., Inc., 465 F. Supp. 904, 908 (S.D.N.Y. 1979), rev'd on other grounds, 607 F.2d 545 (2d Cir. 1979).  Old information tends to become less salient to a prospective purchaser as the market is influenced by new information that is related or of overriding impact.  Cf. In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1432 (3d Cir. 1997) (recognizing that there is no duty to update unless a factual representation "remain[s] alive in the minds of investors" (internal quotation marks omitted)). And the further in time a purchase is removed from a misstatement and the more that updated related information reaches the market, the less likely it is that—in the view of a reasonable investor—the misstatement will alter the total mix of relevant information available at the time of the purchase.  The misstatement will have been superseded or rendered stale by intervening events, not to mention memory.  In other words, materiality can have a half-life.

20

Here, almost 39 months intervened between the 2014 announcement of the goodwill impairment and the Funds' 2018 purchases of Danske ADRs. Over that time, the Estonian Branch was the subject of intervening events and disclosures. Twenty-seven months after the impairment announcement, in March 2017, Danske admitted that AML processes at its Estonian Branch were "insufficient to ensure that we could not be used for money laundering." App'x at 68. Six months after that, in September 2017, Danske disclosed the broad scope of the problem, admitting in a press release that "several major deficiencies" rendered the Bank unable to prevent money laundering "in the period from 2007 to 2015." App'x at 70. Around that same time—but still well before the Funds decided to invest—a Danish newspaper reported that Danske was enmeshed in a "gigantic money-laundering scandal" involving more than DKK 7 billion. App'x at 68–69. Meanwhile, numerous financial regulators (Danish, French, Estonian) publicly launched investigations into the Estonian Branch; and the DFSA levied a substantial fine. In response, Danske admitted that the NRP was principally responsible for its AML shortcomings and disclosed that the portfolio had since been terminated.

21

In light of these intervening revelations, it is implausible that the fine points of a technical accounting exercise conducted back in 2014 "significantly altered the total mix of information" available to the Funds in 2018.   See TSC Indus., 426 U.S. at 449 (internal quotation marks omitted).   And for the purposes of adjudicating the Bank's motion to dismiss, it does not matter that the Funds seek to represent a class of ADR purchasers dating back to January 2014. As the Funds conceded at oral argument, a plaintiff must state a claim in its own right to survive a motion to dismiss.   See Vanskike v. Peters, 974 F.2d 806, 813 (7th Cir. 1992) ("[A] class representative must have a cause of action in his own right in order to bring a class action."); Britt v. McKenney, 529 F.2d 44, 45 (1st Cir. 1976) ("If none of the named plaintiffs may maintain this action on their own behalf, they may not seek such relief on behalf of a class."); In re Initial Pub. Offering Sec. Litig., 214 F.R.D. 117, 122 (S.D.N.Y. 2002) ("If the *named* plaintiffs have no cause of action in their own right, their complaint must be dismissed, even though the facts set forth in the complaint may show that others might have a valid claim." (quoting Goldberger v. Bear, Stearns & Co., Inc., 2000 WL 1886605, at *1 (S.D.N.Y. Dec. 28, 2000)).

Obviously, not all statements become immaterial after a similar or set length of time.   Whether the influence of a misstatement or omission survives will depend on its nature and the intervening load of information on the subject, and on other developments affecting the market and the enterprise.   In this case, the outpouring of information about the Estonian Branch between 2016 and 2018 compels the conclusion that 2014 statements about the goodwill impairment were too remote in time to have "assumed actual significance in the deliberations" of a purchaser in 2018.   See Folger Adam Co. v. PMI Indus., Inc., 938 F.2d 1529, 1533 (2d Cir. 1991) (internal quotation marks omitted); In re Time Warner Inc. Sec. Litig., 794 F. Supp. 1252, 1260 (S.D.N.Y. 1992), aff'd in part, rev'd in part on other grounds, 9 F.3d 259 (2d Cir. 1993) (determining that a statement made ten months before the plaintiff's purchase, "even if utterly false and fraudulently made, cannot have formed a basis for plaintiffs' expectations" because "innumerable intervening factors could have changed the company's value" in the interim); Rand v. Cullinet Software, Inc., 847 F. Supp. 200, 210 (D. Mass. 1994) (reasoning that allegedly misleading statements had "lost any possible materiality" by the time the plaintiff purchased stock seven months later

given the "intervening time" and new "information . . . enter[ing] the market"). Accordingly, the challenged statements were stale and immaterial to a reasonable investor in the Funds' position by the time they invested in Danske Bank in 2018.

### C.  The Whistleblower Comment

The Funds next challenge the following statement from the Bank's 2015 Corporate Responsibility Report: "In 2014, three cases were reported in the whistleblower system.   All the cases were concluded, and the appropriate actions were implemented."   App'x at 121.   According to the Funds, this statement was materially misleading because the B&H Report concluded years later that the whistleblower report made by Wilkinson was handled improperly.

The challenged statement is unfairly abstracted from the Corporate Responsibility Report.   Read in context, nothing in that statement is false.   The paragraph in which it appears discusses *only* the Bank's new reporting system for anonymous whistleblowing.   It explains: "[i]n 2013, [Danske] implemented a new reporting system that enables employees to report such information online anonymously," and that in 2014, "three cases were reported" through that new

24

anonymous system.   App'x at 121.   The paragraph goes on to say that *those three cases* "were concluded, and the appropriate actions were implemented." App'x at 121.

It therefore matters that Wilkinson did not report his concerns about the Estonian Branch through the new anonymous system discussed in the Corporate Responsibility Report.   He emailed the executives directly.   The finding that *Wilkinson's* allegations had not been handled appropriately therefore does not render the Corporate Responsibility Report—which discussed a distinct subset of whistleblower complaints—false when made.   See <u>In re Time Warner</u>, 9 F.3d at 266 (agreeing that no affirmative misrepresentation was alleged where the factual assertions were not false when made).

In an attempt to circumvent this defect, the Funds recast this claim as one of misstatement by omission.   Under that theory, Danske misled investors by touting its new anonymous whistleblower system while failing to simultaneously discuss the issues raised by Wilkinson's allegations.   Even assuming that this statement was misleading by omission, it cannot support the

25

Funds' claims for the same reason as the goodwill impairment.[4]    The Bank

issued this statement in 2015, three years before the Funds purchased any ADRs.

Whatever impact this statement might have had on an investor at that time,

intervening events made it such that no "reasonable" investor contemplating

purchasing Danske ADRs in 2018 "would consider it important in deciding how

to act."    ECA, 553 F.3d at 197 (internal quotation marks omitted).    No

reasonable investor would discount all of the more recent news about AML

failures at the Estonian branch on the basis of this years-old boast about three

whistleblower complaints handled through the Bank's anonymous reporting

system.

### D.  The Corporate Responsibility Statements

The Funds allege that certain statements made in Danske's 2013 and 2014

Corporate Responsibility Reports were misleading given the state of things then

---

[4]  On its merits, the Funds' omission-based theory is strained because the connection between the topic Danske chose to discuss (a new anonymous reporting system) and the allegedly omitted information (Wilkinson's allegations) is fairly attenuated.    See In re Morgan Stanley Info. Fund Sec. Litig., 592 F.3d 347, 365–66 (2d Cir. 2010) (making one statement about a topic "did not trigger a generalized duty requiring defendants to disclose the entire corpus of their knowledge regarding" that topic).

prevailing in the Estonian Branch.

First, they allege that Danske misled them by claiming that it "strive[s] to conduct our business in accordance with internationally recognised principles in the area[] of . . . anti-corruption." App'x at 113. But "[n]o investor would take such statements seriously in assessing a potential investment" because "almost every . . . bank makes these statements." ECA, 553 F.3d at 206. "General declarations about the importance of acting lawfully and with integrity" are inactionable puffery, especially when expressed in aspirational terms. See Singh, 918 F.3d at 63. Danske's bromides about being good and upright are plainly puffery.

The Funds next take aim at the Bank's assertions that it "condemns . . . money laundering," "takes the steps necessary to comply with internationally recognised standards, including Know Your Customer procedures," and has procedures for "customer due diligence, reporting, . . . and communications." App'x at 113. These vague statements are similarly unactionable. Assertions of satisfactory regulatory compliance can be materially misleading if "the descriptions of compliance efforts" are "detailed" and "specific." Singh, 918

27

F.3d at 63.   For example, in <u>Meyer v. Jinkosolar Holdings</u>, a company touted its environmental compliance efforts in an SEC filing by referencing specific pollution-abatement equipment, 24-hour monitoring teams, and the fact that it had never been fined for regulatory violations.   <u>See</u> 761 F.3d 245, 247–48 (2d Cir. 2014).   We held that in light of these detailed disclosures, it was misleading for the company to omit the existence of "serious ongoing pollution problems" at the plant.   <u>Id.</u> at 250.

By contrast, in <u>ECA</u>, we held that the defendant's averment that it had "risk management processes [that] are highly disciplined" and "set the standard for integrity" were too general to induce reliance.   <u>See</u> 553 F.3d at 205–06 (internal quotation marks omitted).   We came to the same conclusion in <u>Singh</u> when confronted with a corporation's statement that it "established policies and procedures to comply with applicable requirements" mandated by specific federal and state regulations.   918 F.3d at 60, 63.   Danske's statements are of the same order.   Although Danske averred that it took steps to comply with AML protocols and vaguely recited some AML buzzwords, it claimed no particular acts of compliance.   No reasonable investor—especially one who purchased

28

ADRs more than *three years* after the Reports were published and was well aware of a gigantic AML scandal at the Estonian Branch—would weigh these generic statements in its investment calculus.

### E.  The 2018 Contingencies Footnote

Finally, the Funds challenge a footnote contained in the Bank's 2018 second quarter financial results.   The footnote, which was first published on July 18, 2018, states: "[Danske Bank] does not expect the outcomes of pending lawsuits and disputes, the dialogue with public authorities or the inspection of compliance with anti[-]mon[e]y laundering legislation to have any material effect on its financial position."[5]   App'x at 83.   The Funds contend that this statement was misleading because the Bank then knew that the scope of the scandal far

---

[5]  Although the Funds argue in their brief that Borgen made misleading statements about Danske's potential liability during a July 2018 earnings call, these statements do not appear in the operative pleading and therefore cannot form the basis of an actionable misstatement.   See Brass v. Am. Film Techs., Inc., 987 F.2d 142, 150 (2d Cir. 1993).   The Funds argue that the conversation was incorporated into the pleading by reference but fail to specify which of the pleading's 349 paragraphs accomplished this incorporation.

29

exceeded what had been publicly reported and was therefore likely to materially undermine its financial position.

The timing of the Funds' purchase frustrates this claim as well.   The Funds last purchased Danske Bank ADRs in late June 2018, about three weeks before the challenged statement was made.   Plaintiffs alleging that they were damaged by purchasing securities at an inflated price cannot maintain a securities fraud claim premised exclusively on statements made *after* the plaintiff's final purchase of securities.   See Denny v. Barber, 576 F.2d 465, 468 (2d Cir. 1978).   The plaintiff in Denny challenged a series of statements, some made before his purchase, some after.   See id.   We reasoned that "the complaint must be dismissed if it did not adequately allege the issuance of fraudulent misleading statements prior to [the plaintiff's] purchase," given that he "cannot share in any recovery" based solely on statements made after the date of purchase.   See id. at 468–69.   We went on to affirm the dismissal of the complaint, considering only those statements made prior to purchase.   Id.

The self-evident principle in Denny controls the result here.   The Funds allege that Danske's misstatements caused them to pay an inflated price for their

ADRs.    App'x at 159.    However, the Funds have failed to make actionable

claims regarding statements made before their purchase of ADRs.    They

therefore cannot rely on the challenged footnote, which could not have

influenced the price of a purchase that had already been made.    See Gross v.

Summa Four, Inc., 93 F.3d 987, 993 (1st Cir. 1996) ("[B]ecause [the defendant]

issued the letter after [the plaintiff] had purchased his stock, the statements in the

letter could not possibly have inflated the market price that he paid for those

shares.").    Accordingly, the Funds cannot premise a Rule 10b-5(b) claim on the

alleged misstatement in the footnote.

### F.    The Scheme Liability Claim

The Funds add a claim under subsections (a) and (c) of Rule 10b-5, which

prohibit (respectively) "employ[ing] any device, scheme, or artifice to defraud,"

and "engag[ing] in any act, practice, or course of business which operates or

would operate as a fraud or deceit."    17 C.F.R. § 240.10b–5.    Unlike the better-

known subsection (b), these subsections do not require the defendant to make a

misstatement or omission; they require only deceptive conduct.    See Lorenzo v.

31

SEC, 139 S. Ct. 1094, 1098, 1102 (2019).[6]    To state a scheme liability claim, a

plaintiff must show: "(1) that the defendant committed a deceptive or

manipulative act, (2) in furtherance of the alleged scheme to defraud, (3) with

scienter, and (4) reliance."    In re Mindbody, Inc. Sec. Litig., 489 F. Supp. 3d 188,

216 (S.D.N.Y. 2020) (quoting Menaldi v. Och-Ziff Cap. Mgmt. Grp. LLC, 164 F.

Supp. 3d 568, 577 (S.D.N.Y. 2016)).    And, of course, the deceptive or fraudulent

scheme or activity must have occurred "in connection with the purchase or sale

of a[] security."    17 C.F.R. § 240.10b–5.    Because scheme claims sound in fraud,

they are subject to the heightened pleading requirements of Federal Rule of Civil

Procedure 9(b).    To maintain a 10b–5(a) or (c) claim, a plaintiff must specify

"what deceptive or manipulative acts were performed, which defendants

---

[6] The Funds argue that Lorenzo requires us to reexamine our precedents insofar as they require scheme claims to be premised on deceptive acts that are distinct from misstatements and omissions that underlie an accompanying Rule 10b-5(b) claim.    See, e.g., Lentell v. Merrill Lynch & Co., Inc., 396 F.3d 161, 177 (2d Cir. 2005) (dismissing scheme liability claims "where the sole basis for such claims is alleged misrepresentations or omissions").    Several district courts have adopted this interpretation of Lorenzo.    See Puddu v. 6D Glob. Techs., Inc., 2021 WL 1198566, at *10–11 (S.D.N.Y. Mar. 30, 2021); SEC v. SeeThruEquity, LLC, 2019 WL 1998027, at *5 (S.D.N.Y. Apr. 26, 2019).    We need not address that issue here, however, because the scheme claim is deficient for a more fundamental reason.

32

performed them, when the acts were performed, and the effect the scheme had on investors in the securities at issue."   In re Parmalat Sec. Litig., 383 F. Supp. 2d 616, 622 (S.D.N.Y. 2005).

The Funds fail to surmount this heightened pleading standard.   At no point do they articulate with precision the contours of an alleged scheme to defraud investors, or which specific acts were conducted in furtherance of it. Instead, the claim rests upon the incorporation of the previous 140 pages of the pleading paired with the conclusory assertion that "Defendants carried out a common plan, scheme, and unlawful course of conduct that was intended to . . . deceive the investing public" and "artificially inflate the market price of Danske Bank ADRs."   App'x at 160.   Money-laundering at a single branch in Estonia cannot alone establish that Danske Bank itself carried out a deceptive scheme to defraud investors.   Absent some sort of enumeration of which specific acts constituted an alleged scheme in connection with the purchase or sale of securities, the Funds' claim does not comply with the applicable heightened

pleading standard and cannot go forward.

## CONCLUSION

For the reasons stated above, the district court's dismissal of this action is

**AFFIRMED.**