**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| IN RE CITIGROUP SECURITIES LITIGATION | Case No. 1:20-cv-09132-LAP<br><br>**CLASS ACTION** |
|---|---|

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR LEAVE TO AMEND**

**BLEICHMAR FONTI & AULD LLP**
Javier Bleichmar
Joseph A. Fonti
Erin H. Woods
Benjamin F. Burry

7 Times Square, 27th Floor
New York, New York 10036
Telephone: (212) 789-1340
Facsimile: (212) 205-3960
jbleichmar@bfalaw.com
jfonti@bfalaw.com
ewoods@bfalaw.com
bburry@bfalaw.com

*Counsel for Lead Plaintiff Public Sector Pension Investment Board and Named Plaintiff Anchorage Police & Fire Retirement System, and Lead Counsel for the Putative Class*

# TABLE OF CONTENTS


I. INTRODUCTION .......... 1

II. LEGAL STANDARD .......... 4

III. THE COMPLAINT ADDRESSES THE COURT'S CONCERNS AND PLAUSIBLY PLEADS ALL OF THE REQUIRED ELEMENTS .......... 5

A. The Complaint Includes Extensive New Facts About the True Condition of Citi's Risk Management During the Class Period .......... 5

1. The Complaint Includes Extensive Newly-Pled Allegations Demonstrating Contemporaneous Falsity .......... 5

2. The Complaint Includes Extensive Newly-Pled Allegations Supporting Materiality .......... 9

3. The Complaint Includes Extensive Newly-Pled Allegations Supporting a Strong Inference of Scienter .......... 12

B. There Are No Adequate Grounds for Denying Leave to Amend .......... 14

1. The Complaint Alleges that Defendants Made Material Misrepresentations and Omissions .......... 15

2. The Complaint Alleges a Strong Inference of Scienter .......... 19

IV. CONCLUSION .......... 20

# TABLE OF AUTHORITIES

## Cases

*ATSI Commn's, Inc. v. Shaar Fund, Ltd.*,
493 F.3d 87 (2d Cir. 2007) .......... 4, 5, 14, 15

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) .......... 14

*City of Providence, R.I. v. Bats Global Markets, Inc.*,
878 F.3d 36 (2d Cir. 2017) .......... 14

*Foman v. Davis*,
371 U.S. 178 (1962) .......... 4

*Francisco v. Abengoa, S.A.*,
559 F. Supp. 3d 286 (S.D.N.Y. 2021) .......... 4

*Freundenberg v. E*Trade Fin. Corp.*,
712 F. Supp. 2d 171 (S.D.N.Y. 2010) .......... 18

*Ganino v. Citizens Utilities Co.*,
228 F.3d 154 (2d Cir. 2000) .......... 18

*In re Vivendi, S.A. Sec. Litig.*,
838 F.3d 223 (2d Cir. 2016) .......... 16, 18

*Luce v. Edelstein*,
802 F.2d 49 (2d Cir. 1986) .......... 4

*Matrixx Initiatives, Inc. v. Siracusano*,
563 U.S. 27 (2011) .......... 14, 18

*McCarthy v Dun & Bradstreet Corp.*,
482 F.3d 184 (2d Cir. 2007) .......... 4

*Mendell v. Greenberg*,
927 F.2d 667 (2d Cir. 1990) .......... 18

*Operating Local 649 Annuity Trust Fund v. Smith Barney Fund Mgmt. LLC*,
595 F.3d 86 (2d Cir. 2010) .......... 15

*Panther Partners Inc. v. Ikanos Commn's, Inc.*,
681 F.3d 114 (2d Cir. 2012) .......... 14

*Pasternak v. Shrader*,
863 F.3d 162 (2d Cir. 2017) .......... 4

*Pehlivanian v. China Gerui Advanced Materials Grp., Ltd.*,
No. 14 CIV. 9443 (ER), 2016 WL 2859622 (S.D.N.Y. May 16, 2016) .................................... 4

*Rombach v. Chang*,
355 F.3d 164 (2d Cir. 2004) .................................................................................... 18

*Ronzani v. Sanofi S.A.*,
899 F.2d 195 (2d Cir. 1990) ...................................................................................... 4

*S.E.C. v. Gabelli*,
653 F.3d 49 (2d Cir. 2011) ...................................................................................... 16

*Setzer v. Omega Healthcare Inv., Inc.*,
968 F.3d 204 (2d Cir. 2020) .................................................................................... 19

*Special Situations Fund III QP, L.P. v. Deloitte Touche Tohmatsu CPA, Ltd.*,
33 F. Supp. 3d 401 (S.D.N.Y. 2014) ............................................................................ 5

*Stratte-McClure v. Morgan Stanley*,
776 F.3d 94 (2d Cir. 2015) ...................................................................................... 15

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007) ........................................................................................ 19, 20

**Statutes**

17 C.F.R. §229.303 .................................................................................................. 15

**Rules**

Fed. R. Civ. P. 12 ..................................................................................................... 14

Fed. R. Civ. P. 15 ................................................................................................. 4, 20

Fed. R. Civ. P. 9 ....................................................................................................... 14

## I. INTRODUCTION

The proposed amended complaint (the "Complaint") addresses the Court's earlier concerns and exceeds the pleading requirements.[1] The Complaint pleads new, extensive, and detailed contemporaneous facts that plausibly establish: (i) that Citi did not have effective enterprise-wide risk management (ERM), despite repeated statements to the contrary (including in response to direct questions from analysts); (ii) that Defendants knew—or recklessly disregarded—these facts at the time they made their statements; and (iii) that the deficiencies that existed during the Class Period were the focus of regulators and were exactly consistent with the deficiencies identified in the 2020 Enforcement Orders. These facts are based substantially on the personal knowledge of 12 high-level Former Employees who were at Citi during the Class Period. Additionally, Plaintiffs have narrowed the Complaint; it now alleges eight affirmative misrepresentations (three of which the Court has not previously considered), names only three individual defendants (CEO Corbat, CFO Gerspach (through February 2019), and CFO Mason), and shortens the Class Period to begin in February 2017, rather than January 2016.

As the Complaint alleges, Defendants misled the public to believe that Citi's fundamental risk management failures—which led to its near collapse and taxpayers' $500 billion bailout during the 2008 Financial Crisis—were remediated and its ERM was effective. Neither was true. The Complaint now includes contemporaneous facts detailing that, in the place of effective ERM, Citi ran thousands of siloed data systems, all operating independently without any integration. This "patchwork" of systems could not "talk to each other." For example, the data pulled from Citi's risk management system was not validated, and there was no sure way to know whether data

[1] The Complaint is attached as Exhibit A to the Declaration of Javier Bleichmar in Support of Plaintiffs' Motion for Leave to Amend. All undefined capitalized terms have the same meaning ascribed to them in the Complaint and its Glossary of Terms. All internal citations and quotation marks are omitted. Emphasis has been added, unless otherwise noted.

and information Citi relied upon for operational risk was accurate. Similarly, Citi lacked an effective system to track and report currency transactions in compliance with Bank Secrecy Act/Anti-Money Laundering and Anti-Terrorism legal requirements. Instead, Citi performed these functions manually, effectively using the equivalent of "duct tape and bailing wire."

After the Financial Crisis, Defendants touted Citi's so-called Project Rainbow that promised to systematically integrate Citi's ERM systems. During the Class Period, Defendants declared that Project Rainbow was completed successfully. In truth, unbeknownst to the public, Project Rainbow was a "total disaster" and Citi scrapped it in 2017. Consequently, during the Class Period, Citi remained ineffective at identifying, quantifying, or managing—much less remediating—the risks that had plagued it for years.

The Complaint alleges that Citi's systemic deficiencies (i) were documented in numerous monthly and quarterly reports that went directly to CEO Corbat and his senior executive team and (ii) were the subject of regular meetings that Corbat and his team attended. For example, Corbat used so-called Executive Scorecards to track ERM-related deficiencies, including the ones regulators identified. Moreover, Defendants Corbat, Gerspach, Mason and other senior leadership met regularly to discuss Citi's noncompliance and other regulatory concerns. The Board and Citi's executives were contemporaneously aware of these deficiencies and regulators' concerns, which were communicated through dozens of MRAs and MRIAs. Notwithstanding their detailed knowledge, Defendants failed to remediate Citi's continuing deficiencies. At the same time, they consistently concealed the truth from the public, while still promoting the effectiveness of Citi's risk governance and alignment with regulations. The analyst and investing community took Defendants at their word, praising Citi's efforts.

This veneer of compliance was abruptly wiped away in September and October 2020 when investors began to learn the truth that Citi had suffered from years of unremediated ERM deficiencies and regulatory criticism. Both the OCC and the Fed issued Enforcement Actions against Citi, and the OCC assessed a $400 million penalty—the third largest in OCC history.

As the previously undisclosed truth began to emerge, analysts asked Defendants "why you didn't prioritize risk management which is such a cornerstone since the last crisis?" They had no answer. Corbat and other senior executives abruptly exited, Citi's share price declined over 14%, and Citi has already spent approximately $6 billion and added 30,000 employees to remediate the ERM deficiencies that Defendants had told investors were long-ago resolved.

Importantly, the 2020 Enforcement Orders were for exactly what was in the MRAs and MRIAs since 2017, as former high-level Citi employees confirmed. Moreover, in a recent declaration filed in another unrelated action, the OCC Examiner-in-Charge of Citi during the Class Period corroborated this fact. Reflecting back on the 2020 Enforcement Orders, he stated: "[m]any of the supervisory concerns addressed by the 2020 Orders were identified by the OCC and communicated to the bank several years prior to" July 2019. Citi's current Chair of the Board provided further corroboration; in April 2021, he admitted: "I and the Board did recognize the remediation shortfalls before the consent order" and that, in truth, the remediation was only just beginning.

Taken together, these allegations establish that Citi's risk management systems were deficient throughout the Class Period, that Defendants concealed these material facts, and that they knew—or at least recklessly disregarded—that the risk management systems were so deficient that their statements, descriptions, and omission of the material truth was misleading.

## II. LEGAL STANDARD

Federal Rule of Civil Procedure 15(a)(2) provides that a party may amend its pleading with the opposing party's written consent or the court's leave, and that "[t]he court should freely give leave when justice so requires." Absent "any apparent or declared reason—such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.—the leave sought should, as the rules require, be 'freely given.'" *Foman v. Davis*, 371 U.S. 178, 182 (1962); *see also McCarthy v Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007).

Thus, "[w]hen a motion to dismiss is granted, the usual practice is to grant leave to amend the complaint." *Ronzani v. Sanofi S.A.*, 899 F.2d 195, 198 (2d Cir. 1990). This is especially true with respect to dismissal under Federal Rule of Civil Procedure 9(b), such as here. "Complaints dismissed under Rule 9(b) are 'almost always' dismissed with leave to amend." *Pasternak v. Shrader*, 863 F.3d 162, 175 (2d Cir. 2017) (quoting *Luce v. Edelstein*, 802 F.2d 49, 56 (2d Cir. 1986)); *see ATSI Commn's, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 108 (2d Cir. 2007) ("District Courts typically grant plaintiffs at least one opportunity to plead fraud with greater specificity when they dismiss under Rule 9(b).").

Finally, leave to amend is routinely granted in complaints alleging violations of securities laws where the amendment includes new facts or allegations. *See, e.g.*, *Francisco v. Abengoa, S.A.*, 559 F. Supp. 3d 286, 312 (S.D.N.Y. 2021) (granting leave to file a third amended complaint where plaintiffs alleged new facts, even where those facts could have been uncovered prior to filing the previous complaint); *Pehlivanian v. China Gerui Advanced Materials Grp., Ltd.*, No. 14 CIV. 9443 (ER), 2016 WL 2859622, at *13 (S.D.N.Y. May 16, 2016) (granting leave to file a third amended complaint to "supplement [the] pleading with new information discovered since filing

the" prior complaint); *Special Situations Fund III QP, L.P. v. Deloitte Touche Tohmatsu CPA, Ltd.*, 33 F. Supp. 3d 401, 447 (S.D.N.Y. 2014) (granting leave to file a second amended complaint because, "as a result of the ongoing nature of the [] investigation, [plaintiffs] have incrementally gained access to documents and . . . multiple facts absent from the" first amended complaint).

## III. THE COMPLAINT ADDRESSES THE COURT'S CONCERNS AND PLAUSIBLY PLEADS ALL OF THE REQUIRED ELEMENTS

The Complaint pleads the elements of securities fraud with specificity and meets (if not exceeds) the Second Circuit's long-settled standards. Amendment is thus not futile and should be permitted. *ATSI Commn's*, 493 F.3d at 108.

### A. The Complaint Includes Extensive New Facts About the True Condition of Citi's Enterprise-Wide Risk Management During the Class Period

#### 1. The Complaint Includes Extensive Newly-Pled Allegations Demonstrating Contemporaneous Falsity

The Complaint alleges new contemporaneous facts, based on the personal knowledge of high-level Former Employees, that establish the falsity of Defendants' public statements.

Citi did not have an effective ERM system at any time during the Class Period, as detailed in §IV.B.1 of the Complaint. The policies, procedures, and processes that did exist to identify, measure, manage, monitor, report, and control risks did not operate enterprise wide, were ineffective, and were not aligned with regulatory standards. By practical analogy, using Citi's tools for compliance and reporting was like going into a garage of boxes that were not labeled or organized so that finding something specific required opening and going through each box one-by-one. Regulators had identified these functions as deficient and were frustrated by Citi's inability to fix them and bring itself into compliance with regulatory standards.

Citi's data governance and data quality were fundamentally deficient throughout the Class Period, as detailed in §IV.B.2 of the Complaint. Citi used thousands of legacy systems and

databases that operated independently and lacked the ability to communicate with one another, and Citi had ineffective data lineage controls to address the changes that occurred to data when it moved from one system to another. For example:

- Citi's framework for surveillance was "completely flawed" and "non-sensical," because the training data to run the algorithms was not available and/or could not be found, and the data feeds did not work. *Id.*, §V.C; *see also* §IVB.2. This "crude" approach gave erroneous values and the methodology was "not robust, not accurate, and not repeatable." §V.C; *see also* §IVB.2.

- Much of Citi's data was not vetted, making the records unreliable. Data quality was poor and impossible to verify because there was no single source that accurately provided relevant information about a Citi customer, client, or resource.

- The mess of antiquated and disconnected systems interfered with effective risk management. Citi had issues with "mis-mapping" and "gaps in data" as a result of the vast array of systems that had not been integrated. §V.D; *see also* §IVB.2. In fact, simply tracking down information was a "huge task unto itself," and sometimes impossible. §V.D; *see also* §IVB.2.

- In addition, before August 2020, Citi's operational risk and controls team had identified a problem with wire transfers. Efforts to resolve the problem were not progressing. The problem ultimately led to the erroneous $900 million payment to Revlon's creditors.

<u>Internal audits conducted during the Class Period identified ineffective and dysfunctional technology</u>, as detailed in §§IV.B.2 and IV.D.1 of the Complaint. Citi's technology was so poor that it was "always" a key operational risk—and Citi "knew it." Because Citi was running thousands of complex legacy systems with different data, data structures, and technology stacks, major miscalculations were common and Citi repeatedly failed internal audits. Instead of remediating technological deficiencies and investing in ERM, Citi's senior management and Board suppressed the internal audit team. For example:

- Audits and assessments concluded that, among others, Citi's technology was "unsatisfactory"; its ability to identify and manage bank-wide risks was "not effective"; its Anti-Money Laundering program was "high risk"; its internal Finance Integrated Audit was plagued by "errors" and deficient

"algorithms and math"; and its internal Financial Systems Audit "need[ed] improvement."

- Instead of improving its technology, Citi gutted the internal audit function, ignored failed audits, and silenced auditors who raised technology failures to senior management and the Board.

- Citi addressed technology failures by patching over deficiencies with *ad hoc* workarounds and "armies" of low-cost contractors to manually correct the errors and discrepancies in data and reporting generated by the thousands of legacy systems.

Citi was subject to MRAs and MRIAs throughout the Class Period for the exact risk and control deficiencies that the OCC and Fed later identified in the 2020 Enforcement Order. *Id.*, §IV.B.4. By the start of the Class Period, Citi was operating under at least 50 MRAs and MRIAs.

- The 2020 Enforcement Orders were "exactly what" was in MRAs and MRIAs since 2017, and the 2020 Enforcement Orders were "exactly consistent" with the requirements of the MRAs and MRIAs to fix these longstanding deficiencies. *Id.*, §V.A; *see also* §IV.B.4.

- Instead of remediating the issues identified in the MRAs and MRIAs, Citi "got rid" of key people to "show body count" to try to convince regulators that those executives had been responsible for Citi's failure to make strides in improving data and control. In fact, Citi knew remediation was impossible without a large investment in a complete "reconstruction." *Id.*, §V.A; *see also* §IV.B.4.

- It was clear that the regulators "were not happy with [Citi's] progress" because Citi failed to meet their requirements as to technology, data, and enterprise-wide systems.

- By 2017, Citi already knew it would ultimately be subject to an Enforcement Action unless it fixed its longstanding data quality deficiencies, and those actions became inevitable in 2019.

- Citi's compliance team was frequently called into "fire drills" due to Citi's lack of automated processes, and addressing these outstanding MRAs and MRIAs was never among Citi's priorities or goals. *Id.*, §V.D; *see also* §IV.B.4.

Starting before the Class Period and continuing throughout, Citi's risk governance had not operated firm wide, was ineffective, and was not aligned with regulatory requirements, as detailed in §IV.B.5 of the Complaint. Citi was unwilling to provide the budget or resources to develop an

effective, real-time risk management system, and did not have the capability to access financial data in the ways necessary to manage risks.

- The policies, procedures, and processes Citi had to identify, measure, manage, report, and control risks did not operate firm wide, were ineffective, and were not aligned with regulatory requirements.

- Citi did not develop a full, real-time risk management system. Such a system must have real-time financial data coming in to effectively manage risks associated with market conditions. Real-time data was critically important to effectively monitor foreign exchange, yields, interest rates, and credit, as well as to hedge the underlying portfolio, derivatives, and other financial assets. Incorporation of real-time data was also critical to effectively managing compliance in areas like insider trading. Citi's risk management did not effectively incorporate real-time data and Citi was unwilling to provide the budget or resources to develop it.

- The data pulled from CitiRisk was not validated, which was supposed to be Citi's system of record for top-level risk reporting. The data required to report on operational risks came from different groups and all of these functions were managed differently, with no standardization or integration. Data had to be manually entered into CitiRisk and there was no way for operational risk personnel to review or challenge the data, or compare it with the data in the systems that first line or second line teams were using. Risk aggregation was a manual process performed using spreadsheets, without the benefit of automation or technology.

- Bank Secrecy Act/Anti-Money Laundering and anti-terrorism laws required Citi to track and report transactions totaling more than $10,000 during any business day conducted by a single person. Citi lacked an integrated system or automated process for tracking and reporting such transactions, and instead used tools analogous to "duct tape and bailing wire."

<u>Citi abandoned "Project Rainbow" in 2017</u>, as detailed in §IV.C.2 of the Complaint. For years, including during the Class Period, Citi led investors to believe it was achieving effective ERM through its so-called Project Rainbow, which was a purported effort to build a harmonious, unified platform to replace its existing patchwork of systems. Citi insiders were waiting on Project Rainbow as "the promised land" or the "silver bullet" to solve the "tech debt" that had built up before the Class Period. It was a "magical platform that was supposed to happen" but did not—

Defendants abandoned Project Rainbow and never remediated Citi's ERM deficiencies. More specifically:

- Citi's attempt to roll out Project Rainbow in the Asia Pacific region was a "total disaster" and by 2017, Citi declared the new platform a "no go." In 2017, Citi scrapped the project entirely.

- Without Project Rainbow, Citi was forced to use obsolete and clunky distributed systems that did not work in tandem with one another and necessitated manual data searching prone to errors because Citi did not automate controls in its systems.

- With unwarranted anticipation of Project Rainbow, Citi pushed off other necessary technological work, resulting in a pile-up of gaps and risk and control deficiencies.

- As "the stack of MRAs and MRIAs" grew, without a planned solution to fix the identified deficiencies, Defendants misled regulators by scapegoating and firing executives to create a "body count" and by creating "work arounds" and "cheap hack[s]" to create a "veneer" of compliance.

These and other newly pled contemporaneous facts plausibly establish the true but undisclosed circumstances that existed during the Class Period.

**2. The Complaint Includes Newly-Pled Allegations Establishing Materiality**

The Complaint also alleges newly-pled facts that Defendants' false and misleading statements, and the truths they omitted, were material to a reasonable investor.

Citi's near catastrophic collapse due to a long-standing history of ERM violations was ever-present to analysts and investors. The National Commission on the 2008 Financial Crisis concluded that "Citigroup had two key problems: a lack of effective enterprise-wide management to monitor and control risks and a lack of proper infrastructure and internal controls." In 2012, 2013, and 2015, Citi continued to be the subject of new regulatory enforcement actions for various ERM deficiencies. *Id.*, §IV.A.2.a.

To reassure investors that Citi was on a new path, Defendants repeatedly and specifically emphasized the importance of risk management, which Citi's Board Chair described during the Class Period as "the bedrock of banking." *Id.*, §IV.D.2. Citi's Class Period Annual Reports repeatedly emphasized that "effective risk management is of primary importance to [Citi's] overall operations." *Id.*, §VI.K. Citi's 2019 "Letter from the Board of Directors to Our Shareholders" stated that "[t]he Board and our Risk Committee engage deeply in the oversight of risk management practices in these and other areas, always recognizing that, while Citi is in the business of taking risk, these risks must be understood, measured, monitored, and controlled." *Id.*, §§IV.E.2, VII.C.1. In addition, later that year, a senior executive acknowledged that investing sufficient resources in the Company's risk structure and controls was "critical to the long-term sustainability of the franchise," and Citi's then-Board Chair told investors it was "absolutely critical that we keep our eyes focused on" regulatory and supervisory expectations and reassured that "the company spends a great deal of time . . . making sure that management identifies, measures, monitors and controls the key risks facing the company." *Id.*, §VI.E.2.

In view of Citi's unique history, analysts and investors were continuously focused on Citigroup's risk management and its purported remediation in valuing the Company and its future. For example, a July 2017 Morning Star Equity Research analyst report stated its expectation that "risk management at Citigroup has improved substantially over the past decade." *Id.*, §IV.C.1. Similarly, Moody's upgraded Citi in November 2017 based on its "view that Citigroup has largely completed its sweeping reengineering which has resulted in . . . an improved risk-attuned management culture." *Id.* In January 2020, Wells Fargo issued a report stating that, "Citi should be beyond reproach with governance" as a result of purported ERM remediation. *Id.*, §IV.E.2.

Then, as the undisclosed truth began to emerge, analysts and industry journalists were surprised and angered by Defendants' misrepresentations. Beginning on September 14, 2020, *Business Insider* reported that regulators would soon issue enforcement actions regarding Citi's "tech and risk systems." In a follow-up article on September 15, 2020, *Business Insider* reported that regulators "were annoyed with Citigroup's noncompliance across numerous issues," including that it still maintained "a patchwork of technology systems that didn't talk to one another." *Id.*, §IV.F. Also on September 15, 2020, *Dealbreaker* reported that "[u]nfortunately, Citi's woeful risk management infrastructure did what it does, over and over again, and reminded regulators that Citi and Corbat hadn't really done all they promised, *sotto voce*, to do to fix those systems." *Id.*

Once the OCC and the Fed issued the anticipated 2020 Enforcement Orders, a Wells Fargo analyst report summed up analysts' and investors' reaction: "we, like other investors, are 'hangry'—*i.e.*, hungry for more information on how and when the regulatory issues will get resolved and angry over their lack of transparency and why they were allowed to fester." *Id.*, §IV.H. During an earnings call at the end of the Class Period, the same Wells Fargo analyst reflected investors' disappointment with the news: "Speaking on behalf of investors, people I speak with, there's a collective sense of extreme disappointment . . . the root problems were not transparent to investors." *Id.* A JPMorgan analyst followed up by asking, "[C]an you talk about why you didn't prioritize risk management which is such a cornerstone since the last crisis?" *Id.*

Finally, the concealed costs of remediating Citi's data, control, and risk management systems were material. Defendants knew during the Class Period that to remediate Citi's ERM deficiencies and tech debt would cost billions of dollars and require tens of thousands of employees over many years. *Id.*, §VIII.B. Through the end of 2022, Citi had spent between $5.7 and

$6.2 billion. *Id.* Using conservative assumptions, Citi will likely incur costs in excess of $9 billion to remediate these deficiencies. *Id.*

**3. The Complaint Includes Extensive Newly-Pled Allegations Supporting a Strong Inference of Scienter**

Based on the personal knowledge of twelve high-level Former Employees and post-Class Period events, the Complaint also includes new, particularized facts that support a strong inference of scienter. They include:

- Citi consistently failed internal audits and assessments as to its ERM systems, data governance, controls, and regulatory compliance. Throughout the Class Period, Citi regularly conducted internal audits and assessments such a Capital Analysis and Review (CCAR), BCBS 239 Audit, AML Technology Audit, Continuity of Business Audit, Finance Integrated Audit and Financial Reporting Systems Audit. These failed audits and assessments were escalated to Citi's Board of Directors and were reviewed by the Board's Audit Committee. Indeed, the leader for a business segment with an unsatisfactory or failed audit was required to make a presentation to the Audit Committee. *Id.*, §VI.A.

- The Individual Defendants and the Board reviewed and used regular internal reports reflecting Citi's ineffective risk management and controls. For example, CEO Corbat used Executive Scorecards to evaluate executives' performance. These scorecards specifically included progress (or lack thereof) as to outstanding regulatory MRAs and MRIAs, Audits, and Action Plans. There were nearly another half-dozen reoccurring reports reviewed by senior executives, which identified "all the key issues" later cited in the 2020 Enforcement Orders. *Id.*, §VI.B.

- Senior executives, including CEO Corbat, attended regular internal meetings during which Citi's ineffective ERM and regulatory failures were routinely discussed. These included: (i) Risk Committee Meetings, where the numerous MRAs and MRIAs outlining Citi's regulatory deficiencies were discussed; (ii) Executive Operational Committee Meetings held by CEO Corbat to discuss with senior leadership Citi's outstanding regulatory deficiencies as well as the status of Citi's responses to regulators (iii) Advisory Board Committee Meetings, which focused on outstanding MAPs granularly describing Citi's regulatory problems; (iv) Business Risk and Controls Committee meetings held by CEO Corbat, CFO Gerspach/Mason, and other top senior leadership to discuss with Business CEOs Citi's risk and control deficiencies; (v) Regulatory Noncompliance Meetings, during which senior executives reviewed all outstanding regulatory noncompliance issues and Citi's responses; and (vi) Data

Governance Stakeholder Meetings, which were focused on data governance remediation. *Id.*, §VI.C.

- Senior executives ignored employee concerns about Citi's broken technology, regulatory noncompliance, and ineffective and unsustainable infrastructure. Several former employees recount instances where they raised concerns about Citi's deficiencies and failures to comply with regulatory requirements and made constructive suggestions to address Citi's "gigantic mess" of legacy systems that "did not talk to each other." These concerns and suggestions did not gain any traction and "fell on deaf ears." Members of the senior leadership team made clear they were unwilling to implement new enterprise-wide systems. *Id.*, §VI.D.

- A declaration submitted by the OCC's Examiner-in-Charge in another action states that the OCC had communicated the concerns in the 2020 Enforcement Orders long before the Orders were issued. In a False Claims Act case involving the OCC, Greg Sullivan (Examiner-in-Charge at Citi during the Class Period) submitted a declaration stating that "many of the supervisory concerns addressed by the 2020 Orders were identified by the OCC and communicated to the bank several years prior to" July 3, 2019 (the filing date for the FCA action). This declaration corroborates the Complaint's well-pled and contemporaneous factual allegations. *Id.*, §VI.E.

- Chair Dugan acknowledged that the underlying deficiencies enumerated in the 2020 Enforcement Orders were previously known. At Citigroup's April 2021 Annual Meeting following the end of the Class Period, Board Chair John Dugan was asked: "How can investors reconcile that Chair John Dugan remains in his position . . . it appears that from an outsider's perspective, the Board did not recognize the seriousness of Citi's shortfalls until there was a formal regulatory consent order?" His response admitted that the issues were well known before the 2020 Consent Orders. Dugan: "I and the Board did recognize the remediation shortfalls before the consent order. . . . [W]e came to realize that a more fundamental, holistic and systemic change was required, what we now call the transformation. More specifically, we became fully focused on the need for Citi to fundamentally change its risk and control environment." *Id.*, §VI.F.

Given the true state of affairs at Citi, the mood was somber when the OCC and Fed issued the 2020 Enforcement Orders in October 2020, but employees were not surprised. They knew something was coming based on prior communications from regulators, among other things. *Id.*, §V.E. Taken holistically, these facts establish a strong inference of scienter.

### B. There Are No Adequate Grounds for Denying Leave to Amend

*Foman* identifies five circumstances where good cause may exist to deny leave to amend. Here, the Court indicated only the possibility that amendment may be futile. As demonstrated by the substantial and detailed newly-pled facts summarized above, the proposed amended complaint is not futile and the Court should grant Plaintiffs' motion for leave.

"Futility is a determination, as a matter of law, that proposed amendments would fail to cure prior deficiencies or to state a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure." *Panther Partners Inc. v. Ikanos Commn's, Inc.*, 681 F.3d 114, 119 (2d Cir. 2012). When evaluating a complaint on a Rule 12(b)(6) motion to dismiss, the Court must "accept[] as true all factual allegations in the complaint and draw[] all reasonable inferences in favor of the non-moving party." *City of Providence, R.I. v. Bats Global Markets, Inc.*, 878 F.3d 36, 48 (2d Cir. 2017). The allegations and reasonable inferences must "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

Plaintiffs bring claims under §§10(b) and 20(a) of the Exchange Act and SEC Rule 10b-5. To state a claim under §10(b) and Rule 10b-5, Plaintiffs must sufficiently allege: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37-38 (2011). "'The circumstances constituting fraud . . . shall be stated with particularity.'" *ATSI Commn's*, 493 F.3d at 99 (quoting Fed. R. Civ. P. 9(b)).

In its dismissal order, the Court found that the prior complaint failed to adequately allege (1) a plausible inference of a material misrepresentation or omission by Defendants and (2) a

strong inference of scienter. The allegations in the proposed amended complaint meet the pleading standards for those elements, as well as the remaining elements, of a §10(b)/Rule 10b-5 claim.[2]

### 1. The Complaint Alleges that Defendants Made Material Misrepresentations and Omissions

Plaintiffs allege three categories of falsity: (1) affirmatively false statements; (2) violations of Item 303; and (3) omissions that rendered Defendants' statements false and misleading.

In order to allege a false statement or omission, "the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information or belief, the complaint shall state with particularity all facts on which that belief is formed." *ATSI Commn's*, 493 F.3d at 99. The "veracity of a statement or omission is measured not by its literal truth, but by its ability to accurately inform rather than mislead prospective buyers." *Operating Local 649 Annuity Trust Fund v. Smith Barney Fund Mgmt. LLC*, 595 F.3d 86, 92 (2d Cir. 2010).

Additionally, Item 303 imposed an affirmative duty to disclose "any known trends or uncertainties that have had or that [an issuer] reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." 17 C.F.R. §229.303(a)(3)(ii) (as effective during the Class Period). If a company "knows of events that will cause a material change in the relationship between costs and revenues (such as known future increases in costs of labor[)] . . . , the change in the relationship shall be disclosed." *Id.* "Item 303's affirmative duty to disclose . . . can serve as the basis for a securities fraud claim under Section 10(b)." *Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 101 (2d Cir. 2015).

[2] Though the Court's dismissal order did not address loss causation, the Complaint also bolsters those allegations. Ex. A, §IX. In addition, the Complaint asserts a claim under Section 20(a), which provides for control person liability for violations of §10(b). *Id.*, §XIII.

Finally, the law is well-settled that a statement is actionable when it is "either untrue outright or misleading by virtue of what it omits to state." *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 239 (2d Cir. 2016). "[H]alf-truths—literally true statements that create a materially misleading impression—will support claims for securities fraud." *Id.* at 240 (quoting *S.E.C. v. Gabelli*, 653 F.3d 49, 57 (2d Cir. 2011)). Selective disclosure of "only favorable matters" while simultaneously omitting "all reference to unfavorable matters" is "as much a false representation as if all the facts stated were untrue." *Id.* Thus, the question "is not whether the statement is misleading in and of itself, but whether the defendants' representations, ***taken together and in context***, would have misled a reasonable investor." *Id.* at 250 (emphasis in original).

As to affirmatively false and misleading statements, the Complaint pleads eight public statements that are contradicted by known, contemporaneous facts. For example:

- Contrary to Citi's repeated representations that its risk governance framework had been developed in alignment with the requirements of the OCC's and Fed's heightened standards, the Complaint alleges a plethora of facts showing that Citi's risk governance framework, assuming it had one at all, was not in alignment with regulatory standards. Ex. A, §§VIII.A.1, VIII.A.3, VIII.A.5. Moreover, two former Citi employees (the Managing Director, Data Governance Technology Audit for Global Functions and the Senior Vice President, Senior Compliance Officer for Surveillance at Citigroup) specifically reported that these representations were not accurate. *Id.*, §§V.B-C.

- Contrary to Citi's June 2017 representation that its infrastructure has "most of the base systems that we need" to "have the ability to come back and communicate centrally," Citi did not have in place the required systems it needed to communicate centrally. *Id.*, §VIII.A.2. The Former Employees consistently reported that Citi did not have the required systems in place, and instead retained thousands of separate, siloed systems that could not communicate with each other. *See id.*, §V. For example, rather than invest in upgraded systems to implement a functioning, integrated infrastructure, Citi relied on a flawed patchwork of different systems and "*ad hoc* work arounds." *Id.*, §§IV.D.1, V.A, V.C.

- Contrary to representations in May and October 2018 that "investments [] made in Rainbow" gave Citi "the ability to see you"—its clients—"and think of you and present to you from a holistic view," "giv[ing] us the ability

to . . . track[] everything globally," *Id.*, §VIII.A.4, Citi had scrapped Project Rainbow as a "total disaster" in 2017 and lacked the infrastructure and ability to view customers "holistically." *Id.*, §IV.C.2. Again, the Former Employees reported that Citi refused to make the necessary investments to implement a functioning, integrated infrastructure. *Id.*, §§V.A-D, V.I.

- Contrary to Corbat's September 2020 representation that Citi had "completed [its] transformation from the financial crisis and emerged a . . . safer and stronger institution," Citi had not even begun, much less completed, its transformation. *Id.*, §VIII.A.6. Four days later, the *Wall Street* Journal reported that the OCC and Fed were preparing to issue Enforcement Orders for its "fail[ure] to improve its risk-management systems" over a period of "years," and, shortly thereafter, the OCC would impose a $400 million civil money penalty based on Citi's unsafe or unsound practices. *Id.* §§VIII.A.6, IX.C.

The Complaint also alleges that, in violation of Item 303 of SEC Regulation S-K, Defendants failed to disclose the material known trends and uncertainties associated with its deficient risk management in Citi's Forms 10-K. These deficiencies created the known uncertainty of operating in an unsafe and unsound manner and of the need to spend billions of dollars on developing adequate technology to ensure true enterprise-wide risk management. *Id.*, §VIII.B. Even today, having spent billions of dollars on the effort already, Citi is years and billions of dollars away from having effective ERM. *See id.* (Citi has spent roughly $6 billion, and is likely to spend in excess of $9 billion total, on remediation required under the 2020 Enforcement Orders).

Finally, the Complaint alleges that Defendants made statements that were materially misleading because of the true information they omitted. For example, Defendants made repeated and extensive representations concerning many details of its risk management, giving investors the materially false impression that the Company maintained a cohesive and effective system of managing its risk. *Id.*, §VIII.C. Each of Citi's Class Period Forms 10-K included a section titled "Managing Global Risk" that was more than 50 pages long—and over 200 pages in total over the Class Period—and purported to warn generally of regulatory risks. *Id.*, §VIII.C.1. Having chosen to speak on the issue of its management of global risk, let alone at such length and consistency,

and repeatedly warned of risk associated with regulatory oversight, Defendants had the "duty to tell the whole truth." *Vivendi*, 838 F.3d at 258.

The true facts, summarized above and alleged specifically in the Complaint, demonstrate that Citigroup had ineffective enterprise-wide risk management and was subject to longstanding MRAs and MRIAs for exactly what the regulators later identified in the 2020 Consent Orders but never remediated. "[D]efendants' representations, taken together and in context, would have misled a reasonable investor," and are therefore actionably misleading. *Id.* at 250 (quoting *Rombach v. Chang*, 355 F.3d 164, 172 n.7 (2d Cir. 2004)).

These false and misleading statements and omissions were material because there is "a substantial likelihood that the disclosure of the omitted fact[s] would have been viewed by the reasonable investor as having significantly altered the total mix of information made available." *Matrixx*, 563 U.S. at 38. Because materiality is a fact-specific inquiry, an alleged misstatement may not be dismissed as "puffery" unless it is "so obviously unimportant that a reasonable investor that reasonable minds cannot differ on the question of [its] importance." *Ganino v. Citizens Utilities Co.*, 228 F.3d 154, 162 (2d Cir. 2000). As such, "[t]he materiality requirement poses a very low burden," *Freundenberg v. E*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 181 (S.D.N.Y. 2010), and, as "a question especially well-suited for jury determination," is rarely a basis for dismissal, *Mendell v. Greenberg*, 927 F.2d 667, 673 (2d Cir. 1990).

As summarized above, Defendants, industry analysts, and ratings agencies all considered risk management to be crucially important. *Supra*, §III.A.2. For that reason, the OCC and Fed scrutinize large bank risk management carefully and the investment community focuses intently on risk management failures and accomplishments, adjusting bank ratings in response.

**2. The Complaint Alleges a Strong Inference of Scienter**

A complaint pleads scienter when "all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 310 (2007). The inference "need not be irrefutable . . . or even the most plausible," and does not require a "smoking-gun." *Id.* at 324-326. Rather, it is sufficient if "a reasonable person would deem the inference of scienter cogent and ***at least*** as compelling as any plausible opposing inference" of non-fraudulent intent. *Id.* at 310. Plaintiffs may show this by alleging facts "constituting strong circumstantial evidence of conscious misbehavior or recklessness," and recklessness is shown where specific allegations show "defendants' knowledge of facts or access to information contradicting their public statements." *Setzer v. Omega Healthcare Inv., Inc.*, 968 F.3d 204, 212 (2d Cir. 2020).

Here, the Complaint alleges a myriad of facts supporting a strong inference of scienter: (a) Citi consistently failed internal audits and assessments of ERM; (b) senior executives regularly received at least six different reports detailing ineffective risk management and controls and other regulatory failures, including outstanding MRAs and MRIAs; (c) senior executives regularly attended at least four different types of meetings at which Citi's regulatory noncompliance and systemic deficiencies were discussed; (d) senior executives ignored employee concerns regarding regulatory noncompliance and unsustainable infrastructure; (e) the OCC Examiner-in-Charge at Citi during the Class Period made clear that the supervisory concerns underpinning the 2020 Enforcement Orders were "communicated to the bank several years prior to" July of 2019; (f) Board Chair Dugan admitted his and the Board's prior knowledge of the remediation shortfalls; (g) news articles and analyst coverage reporting that the regulatory concerns articulated in the 2020 Enforcement Orders had knowingly persisted for years; (h) the OCC and Fed made findings in the 2020 Enforcement Orders that "for several years," Citi had failed to implement and maintain an

enterprise-wide risk management and compliance risk management program, internal controls, or a data governance program commensurate with the Bank's size, complexity, and risk profile; (i) the regulatory requirements that the OCC and Fed provide Citi with continuous communication, verbal and written, concerning identified deficiencies (and the size of the $400 million civil monetary penalty the OCC assessed further supports scienter); (j) the timing and circumstances of CEO Corbat's abrupt departure; (k) the core operations nature of Citi's risk management and other compliance systems; and (l) the many facts establishing corporate scienter. Ex. A, §VI.

Taken holistically, the Complaint's facts establish a strong inference that Defendants knew, or recklessly disregarded, that Citi's risk management systems and controls were inadequate at the time they made their statements and omitted material facts. It is certainly not ***more likely***, as the law requires, that Defendants did not know these facts. *Tellabs*, 551 U.S. at 310.

## IV. CONCLUSION

For the reasons set forth above, the Court should grant Plaintiffs' motion, made pursuant to Rule 15(a)(2), and permit them to file the proposed amended complaint.

Dated: May 24, 2023

Respectfully submitted,

**BLEICHMAR FONTI & AULD LLP**

*/s/ Javier Bleichmar*

Javier Bleichmar
Joseph A. Fonti
Erin H. Woods
Benjamin F. Burry

7 Times Square, 27th Floor
New York, New York 10036
Telephone: (212) 789-1340
Facsimile: (212) 205-3960
jbleichmar@bfalaw.com
jfonti@bfalaw.com
ewoods@bfalaw.com
bburry@bfalaw.com

*Counsel for Lead Plaintiff Public Sector Pension Investment Board and Named Plaintiff Anchorage Police & Fire Retirement System, and Lead Counsel for the Putative Class*