# Exhibit A

## Second Consolidated Amended Class Action Complaint for Violations of the Federal Securities Laws

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| IN RE CITIGROUP SECURITIES LITIGATION | Case No. 1:20-cv-09132-LAP<br><br>**CLASS ACTION**<br><br>**<u>JURY TRIAL DEMANDED</u>** |

**<u>SECOND CONSOLIDATED AMENDED CLASS ACTION COMPLAINT</u>**
**<u>FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS</u>**

**BLEICHMAR FONTI & AULD LLP**
Javier Bleichmar
Joseph A. Fonti
Erin H. Woods
Benjamin F. Burry

7 Times Square, 27th Floor
New York, New York 10036
Telephone: (212) 789-1340
Facsimile: (212) 205-3960
jbleichmar@bfalaw.com
jfonti@bfalaw.com
ewoods@bfalaw.com
bburry@bfalaw.com

*Counsel for Lead Plaintiff Public Sector*
*Pension Investment Board and*
*Named Plaintiff Anchorage Police & Fire*
*Retirement System, and Lead Counsel for the*
*Putative Class*

**TABLE OF CONTENTS**

GLOSSARY OF TERMS ............................................................................................ vii

I.      NATURE OF THE ACTION ........................................................................... 2

II.     JURISDICTION AND VENUE ..................................................................... 12

III.    PARTIES ...................................................................................................... 13

        A.    Plaintiffs ............................................................................................. 13

        B.    Defendants ......................................................................................... 14

              1.   Corporate Defendant ................................................................ 14

              2.   Individual Defendants .............................................................. 15

IV.     FACTUAL ALLEGATIONS ......................................................................... 16

        A.    Pre-Class Period ................................................................................ 17

              1.   Citigroup's Acquisition Spree Led to a Hodgepodge of Thousands of
                   Disconnected Systems Before the Class Period ................................. 17

              2.   2012-2016:  Citigroup Led Analysts and Investors to Believe that It Had
                   Fixed Its Risk Management and Compliance Problems; In Reality and
                   Unbeknownst to Investors, It Had Not ............................................. 19

              3.   Unbeknownst to Investors, in 2016, Citi Axed Projects to Create
                   Infrastructure, Puts a "Freeze" on Investment in Compliance, and Gutted
                   Its Internal Audit Team ................................................................ 21

        B.    2017:  Citi's Concealed Substantive Deficiencies at the  Start of the Class
              Period ................................................................................................. 22

              1.   Citi Lacked Effective Enterprise-Wide Risk Management (ERM) .................. 22

              2.   Citi's Data Governance and Data Quality Were Fundamentally Deficient ....... 25

              3.   Internal Audits Identified Ineffective and Dysfunctional Technology but
                   Senior Management and Citi's Board of Directors Suppressed the
                   Internal Audit Team Rather than Remediate These Deficiencies .................... 27

              4.   Citi Was Subject to MRAs and MRIAs for the Exact Risk and Controls
                   Deficiencies that the OCC and Fed Later Identified in the 2020
                   Enforcement Orders ..................................................................... 28

i

5. Citi's Risk Governance Did Not Operate "Firm Wide," Was Ineffective, and Was Not Aligned with Regulatory Requirements ........................................ 30

C. February 24, 2017:  Class Period Begins .................................................................. 31

1. Despite the Known Deficiencies and Lack of Effective ERM, Citi Misrepresented to Investors It Has a "Firm-Wide Risk Governance Framework" that is "In Alignment" with OCC Heightened Standards ............ 31

2. In 2017, Citi Abandoned Its "Project Rainbow" Initiative to Create an Enterprise-Wide Risk Management System, but Told Investors the Opposite ............................................................................................................ 33

D. During the Class Period, Citi Failed Internal Audits, Regulators Lost Patience with Citi's Noncompliance and Forced the Resignations of C-Suite Executives; Yet Citi Continued to Represent It Was in Alignment with OCC and Fed Regulations ................................................................................................ 37

1. Despite Failed Internal Audits, Direct Objections to Senior Management, Directives from Regulators to Improve Data Governance, and Regulators' Mounting Frustration, Citi Still Refused to Invest in ERM ..................................................................................................................... 37

2. Despite Widespread Technology Failures and Regulators' Findings to the Contrary, Defendants Continued to Tell Investors that Citi Was Aligned with OCC Heightened Standards ............................................................ 43

E. By 2019, Citi Could No Longer Maintain Its "Veneer" of Compliance and the 2020 Enforcement Orders Against Citi Became Inevitable ............................... 43

1. Unbeknownst to Investors, in 2019, the OCC and Fed Enforcement Actions Had Become Inevitable ....................................................................... 43

2. February 2019 to September 2020:  Defendants Continued to Falsely Tell Investors that Citi Was Aligned with Regulators ....................................... 45

3. August 2020 to September 10, 2020:  Though the Cause Was Concealed from Investors, Citi's Lack of Effective ERM and Compliance Resulted in a $900 Million Error and Corbat's Early Resignation ................................... 48

F. September 14 and 15, 2020:  the Truth Began to Emerge as Investors Learned of the Impending 2020 Enforcement Orders, Revealing that Citi Did Not Meet Minimum Regulatory Requirements ................................................. 50

G. October 7, 2020:  The 2020 Enforcement Orders Established Violations of Law and Regulation and the OCC Imposed the Third-Largest Penalty Since 2000 .................................................................................................................. 53

H.   After the OCC and Fed Issued the 2020 Enforcement Orders, Citi
     Announced the Present and Expected Financial Impact, and Analysts
     Accused Citigroup of Making False Statements and Criticized the
     Company's "Credibility" and "Lack of Transparency" ............................................ 55

I.   As Defendants Knew During the Class Period, Citi's Remediation Will
     Require Billions in Expenditures, Years of Investment, and Tens of
     Thousands of New Hires to Effectuate ...................................................... 60

V.   FORMER EMPLOYEE ALLEGATIONS ...................................................... 63

A.   Former Employee 1:  Citi Director of Data Strategy and Governance, U.S.
     Consumer and Citi Retail Services ...................................................... 63

B.   Former Employee 2:  Managing Director, Data Governance Technology
     Audit for Global Functions ...................................................... 72

C.   Former Employee 3:  Senior Vice President, Senior Compliance Officer for
     Surveillance ...................................................... 81

D.   Former Employee 4:  Vice President in the Institutional Clients Group (ICG)
     for Strategic Data Solutions (SDS) ...................................................... 84

E.   Former Employee 5:  Senior Vice President, Chief of Staff to Head of
     Technology, Global Consumer Bank, and
     Technology Transformation Leader ...................................................... 87

F.   Former Employee 6:  Director of Enterprise Compliance Risk ...................................................... 90

G.   Former Employee 7:  Director of Regulatory Enforcement
     Action Management ...................................................... 91

H.   Former Employee 8:  Senior Vice President of Operational Risk for the
     Global Consumer Bank ...................................................... 93

I.   Former Employee 9:  Director, Enterprise Operations and Technology, IT
     Function Head; then Managing Director, Enterprise Operations and
     Technology, Senior IT Function Head ...................................................... 94

J.   Former Employee 10:  Director of Risk Management in Citi's Operations &
     Technology Division ...................................................... 96

K.   Former Employee 11:  Managing Director ...................................................... 97

L.   Former Employee 12:  Senior Risk Metrics Specialist for the
     Americas Region ...................................................... 97

VI.     ADDITIONAL ALLEGATIONS OF SCIENTER ............................................ 98

    A.     Citi's Failed Internal Audits and Assessments of ERM Support a Strong
           Inference Of Scienter ................................................................................ 99

    B.     Regular Internal Reports that Reflected the Ineffective Risk Management
           and Controls Further Support a Strong Inference of Scienter............................ 100

           1.    Executive Scorecards Were Used by Corbat to Track Executives'
                 Progress on MRAs and MRIAs ........................................................ 101

           2.    Global BDQRs Reported ERM Problems, Data Quality Management
                 Failures, and Regulatory Deficiencies to Corbat, Gerspach, and Mason ........ 101

           3.    MAPs, CAPs, DQM Reports, and IMRs Were Also Sent to Corbat,
                 Citi's Board, or Both...................................................................... 102

    C.     Regular Internal Meetings During Which Citi's Ineffective ERM and
           Regulatory Failures Were Routinely Discussed Support a Strong Inference
           of Scienter ................................................................................................ 104

           1.    Corbat and/or Citi's Board Of Directors Held (i) Risk Committee
                 Meetings, (ii) Advisory Board Committee Meetings, (iii) BRCC
                 Meetings, and (iv) Executive Operational Committee Meetings.................... 104

           2.    CFO Gerspach Also Attended Quarterly Regulatory Noncompliance
                 Meetings and Data Governance Stakeholder Meetings................................. 106

           3.    Corbat's Direct Reports Also Held Weekly Meetings on Regulatory
                 Non-Compliance and Failed Remediation.............................................. 108

    D.     Objections to Citi's Broken Technology, Regulatory Non-Compliance, and
           Ineffective and Unsustainable Infrastructure Communicated to Senior
           Management Support a Strong Inference of Scienter ............................................. 108

    E.     Sworn Declaration by OCC Examiner-in-Charge Greg Sullivan that the
           OCC Communicated the Supervisory Concerns in the 2020 Enforcement
           Orders Several Years Prior to July 2019 Supports a Strong Inference of
           Scienter ................................................................................................... 111

    F.     Post-Class Period Admission by Director Dugan that the Board Recognized
           the Remediation Shortfalls Before the 2020 Enforcement Orders Supports a
           Strong Inference of Scienter ........................................................................ 111

    G.     News Articles and Analyst Coverage Reported that Regulatory Concerns
           Over Citi's Ineffective Risk Management Persisted for Years, Supporting a
           Strong Inference of Scienter ........................................................................ 112

H.   The 2020 Enforcement Orders Findings that "For Several Years" Citi Had Failed to Implement and Maintain Enterprise-Wide Risk Management Supports a Strong Inference of Scienter .................................................. 113

I.   The Governing Regulatory Process, Particularly the Required Reporting from Regulators to the Boards, Further Supports a Strong Inference of Scienter ................................................................................................. 116

1.   The Amount of the $400 Million Civil Money Penalty Supports a Strong Inference of Scienter ...................................................... 118

J.   Corbat's Resignation Immediately After the Revlon Incident and Before the 2020 Enforcement Orders Were Announced Supports a Strong Inference of Scienter ................................................................................................. 119

K.   Citigroup's Risk Management Systems Were Core Operations that Were the Constant Focus of the Individual Defendants, Thereby Supporting a Strong Inference of Scienter .......................................................................... 120

L.   Corporate Scienter ..................................................................................... 121

VII.   THE RELEVANT OCC AND FED REGULATORY FRAMEWOK FOR CITIGROUP AND CITIBANK ................................................................... 125

A.   The Relevant OCC Regulatory Framework .............................................. 125

B.   The Relevant Fed Regulatory Framework ................................................ 131

VIII.   ACTIONABLE FALSE AND MISLEADING STATEMENTS AND OMMISSIONS ...................................................................................... 135

A.   Defendants' Class Period Statements Were Materially False and Misleading When Made ............................................................................................. 138

1.   Materially False and Misleading Statements in  Citigroup's Form 10-K for 2016 ................................................................................... 138

2.   Materially False and Misleading Statements During the June 1, 2017 Bernstein 2017 Strategic Decisions Conference .............................. 139

3.   Materially False and Misleading Statements in  Citigroup's Form 10-K for 2017 ................................................................................... 140

4.   Materially False and Misleading Statements Regarding Project Rainbow at the May 30, 2018 Bernstein 2018 Strategic Decisions Conference and in Citigroup's 2018 Q3 Earnings Call .......................................... 141

5.   Materially False and Misleading Statements in  Citigroup's Form 10-K for 2018 ............................................................................................ 143

6.   Materially False and Misleading Statements in the September 10, 2020 Press Release ............................................................................................ 144

B.   Defendants' Omissions in Citi's Management Discussion and Analysis Violated SEC Item 303 Disclosure Obligations ..................................... 145

C.   Defendants Omitted the Material Truth from Their Class Period Statements ....... 151

1.   Defendants Extensively and Repeatedly Stated that Citi's Risk Management Was Effective and Central to Citi's Business ........................... 151

2.   Defendants' Class Period Statements, Taken Together and in Context, Omitted the Truth and Are Therefore Actionable ............................................ 158

IX.   LOSS CAUSATION .......................................................................................... 159

A.   September 14, 2020 ................................................................................. 161

B.   September 15, 2020 ................................................................................. 163

C.   October 8, 2020 ...................................................................................... 165

D.   October 13, 2020 .................................................................................... 167

X.   INAPPLICABILITY OF STATUTORY SAFE HARBOR OR BESPEAKS CAUTION DOCTRINE ....................................................................................... 170

XI.   PRESUMPTION OF RELIANCE AND FRAUD ON THE MARKET DOCTRINE ........................................................................................................ 170

XII.   CLASS ACTION ALLEGATIONS .................................................................. 172

XIII.   CLAIMS FOR RELIEF .................................................................................... 174

COUNT I ............................................................................................................. 174

COUNT II ............................................................................................................ 176

XIV.   JURY DEMAND AND PRAYER FOR RELIEF ......................................... 177

### GLOSSARY OF TERMS

| Term | Definition |
|---|---|
| 2020 Enforcement Orders | The three Enforcement Actions issued on October 7, 2020: (1) the OCC CMP Order, which issued a $400 million civil money penalty; (2) the OCC Remediation Order; and (3) the Fed Cease and Desist Order. |
| Action Plan | Citi tracked its regulatory deficiencies in documents called Action Plans—which took the form of Management Action Plans (MAPs) and Corrective Action Plans (CAPs).  Both MAPs and CAPs identified the instances of regulatory noncompliance, but MAPs were at a higher level and a single MAP may comprise many CAPs. |
| Advisory Board Committee Meetings | Quarterly meetings before a subcommittee of Citigroup's Board of Directors held at a conference room at Citigroup's New York headquarters concerning regulatory Enforcement Action management. |
| Anchorage | Named Plaintiff Anchorage Police & Fire Retirement System, a public pension fund based in Anchorage, Alaska with roughly $410 million in net assets under management.  Anchorage manages these assets for roughly 700 active and retired beneficiaries, who are primarily police officers, firefighters, and their families. |
| Anti-Money Laundering ("AML") Audit | AML refers to laws and regulations intended to stop criminals from disguising illegally obtained funds as legitimate income.  According to the OCC, it conducts regular examinations of national banks to review Bank Secrecy Act and AML risk assessment and compliance, including the review of enterprise-wide compliance programs.  Among other things, a BSA/AML audit "entails an analysis of the information obtained when identifying specific risk categories," which can "involve evaluating transaction data pertaining to the bank's activities. . . .  A detailed analysis is important." |
| Asset-Based Transitional Finance ("ABTF") | A team within Citibank's Loan Operations Group that processes and services asset-based loans. |
| Bank Secrecy Act ("BSA") | The Bank Secrecy Act of 1970 is a law requiring financial institutions to assist U.S. government agencies in detecting and preventing money laundering.  *See* AML. |
| Bank Supervision Process | *Comptroller's Handbook, Examination Process: Bank Supervision Process*, the central reference for the OCC's bank supervision policy, which explains the OCC's risk-based bank supervision approach, and discusses the general supervisory process, for all types of OCC-supervised banks. |

| Term | Definition |
|---|---|
| Basel Committee on Banking Supervision ("BCBS") 239 Audit | Citigroup's internal audit to ensure compliance with BCBS 239. According to the Basel Committee on Banking Supervision, BCBS 239 was enacted in the wake of the global financial crisis that began in 2007, which showed "that banks' information technology . . . and data architectures were inadequate to support the broad management of financial risks." Thus, the BCBS 239 audit is conducted to "enhance banks' ability to identify and manage bank-wide risks. In particular, the Committee emphasized that a sound risk management system should have appropriate management information systems . . . at the business and bank-wide level" and further references "data aggregation as part of its guidance on corporate governance." As Citigroup's auditor KPMG describes, "BCBS 239 defines concrete requirements for data storage, data transfer and risk reporting systems at banks." |
| Bird | Stephen Bird, who served as CEO of Citigroup Global Consumer Bank from October 1998 to October 2019. As CEO of Citigroup Global Consumer Bank, Bird reported directly to Corbat. |
| Business Risk and Control Committee ("BRCC") | Business Risk and Control Committee meetings. BRCC meetings, which addressed operational risk, were held monthly at three different hierarchical levels within Citigroup: (1) at the Citigroup level, which were attended by its senior executives including CEO Corbat and the CFO (Gerspach, then Mason); (2) at the Business level (*i.e.*, GCB and ICG) and attended by, among others, the Business CEO; and (3) at the level of the constituent businesses that made up each Business. |
| Burke | Frank Burke, who served as Citigroup's Chief Data Officer from March 2015 to June 2018. |
| Business CEO | The Chief Executive Officer of one of Citigroup's Businesses. |
| Business Data Quality Reports ("BDQRs") | Reports aggregating CAPs, DQMs, IMRs, and deficiencies identified by regulators. Global BDQRs, prepared by a team led by Burke, were issued on a quarterly basis to Citigroup's executives, including the Individual Defendants. |
| Callahan | Daniel "Don" Callahan, who served as Citigroup's Global Head of ONT from October 2007 through December 2018. As Global Head of ONT, Callahan reported directly to CEO Corbat. |
| Carawan | Mark Carawan, who served as Citigroup's Chief Compliance Officer from February 2017 to June 2020. As CCO, Carawan reported directly to CEO Corbat. |
| Chief Executive Officer ("CEO") | The CEO is the highest-ranking executive in a company. Citigroup also had CEOs for each Business within the Company. |

| Term | Definition |
|---|---|
| Citibank | Citigroup's nationally chartered United States commercial bank and its most important division.  Citibank's principal products include consumer finance, mortgage lending and retail banking (including commercial banking) products and services, investment banking, cash management and trade finance, and private banking products and services. |
| Citigroup | Defendant Citigroup Inc. is incorporated in Delaware and maintains its corporate headquarters at 388 Greenwich Street, New York, New York.  Citigroup common stock trades on the NYSE under the ticker symbol "C." |
| Citigroup Businesses | Citigroup's operating segments.  For management reporting purposes, Citigroup maintains two primary business segments: Global Consumer Banking (GCB) and Institutional Clients Group (ICG).  Citigroup's remaining operations are included in a third segment, called Corporate/Other. |
| CitiRisk | Citigroup's system of record for top-level risk reporting for all divisions across its two businesses, Global Consumer Bank and Institutional Clients Group.  The CitiRisk system was not integrated, but rather involved each division using different systems and processes to arrive at values for key risk indicators. |
| Class Period | The time period between February 24, 2017 and October 12, 2020, inclusive. |
| Comprehensive Capital Analysis and Review ("CCAR") | CCAR is a United States regulatory framework introduced by the Federal Reserve to assess, regulate, and supervise large banks and financial institutions.  The assessment is conducted annually and comprises two related programs: (1) Comprehensive Capital Analysis and Review, and (2) Dodd–Frank Act supervisory stress testing.  The core part of the program assesses whether: (1) Citigroup possesses adequate capital; (2) Citigroup's capital structure is stable given various stress-test scenarios; and (3) planned capital distributions, such as dividends and share repurchases, are viable and acceptable in relation to regulatory minimum capital requirements.  The assessment is performed on both qualitative and quantitative bases.  The Federal Reserve may order banks to suspend their planned capital distributions to shareholders until the target capital balance is restored.  In a 2014 speech, Fed. Governor Daniel K. Tarullo stated that emphasized that CCAR was developed to "build[] out a regulatory framework that is more . . . data-driven than pre-crisis practice." |

| Term | Definition |
|---|---|
| Continuity of Business Audit (also known as a Business Continuity Plan Audit) | A business continuity plan audit is a formalized method for evaluating how business continuity processes are being managed. The goal of an audit is to determine whether the plan is effective and in line with the organization's objectives.  According to the OCC, Business Continuity Management "consider[s] market- and enterprise-wide stresses and idiosyncratic risks that can imperil the continuity of a firm's critical operations and core business lines or otherwise have a broader impact on the financial system."  Among other things, Business Continuity Management concerns "the ability of a firm's IT systems to deliver minimum service capacity to critical operations and core business lines" and whether "[t]he firm's recovery or resolution planning, if applicable, is integrated into its governance and operating processes . . . including firm-wide risk management processes." |
| Corbat | Defendant Michael L. Corbat, the Chief Executive Officer ("CEO") and a Director of Citigroup from 2012 until February 26, 2021.  Corbat also served as the CEO and a Director of Citibank from June 2020 to February 26, 2021. |
| Corrective Action Plan ("CAP") | Citigroup used CAPs to track regulatory deficiencies, including as to risk management, compliance, and controls.  The appropriate Business CEO had to sign off when a CAP was opened and when a CAP was closed, which kept senior leadership informed of all risk management deficiencies at the Company. |
| Data Governance Stakeholder Meetings | Quarterly meetings focusing on data governance and remediation of data quality issues across Citigroup, attended by Corbat's direct reports, and their direct reports, and held at a conference room at Citigroup's New York headquarters.  Attendees included Gerspach, Callahan, Burke, D'Onofrio, and the heads of Citigroup's Businesses. |
| Defendants | Citigroup, Corbat, Gerspach, and Mason. |
| Desoer | Barbara Desoer, who served as CEO of Citibank from April 2014 through April 2019.  Since 2019, Desoer has served as Director of Citigroup and Chair of Citibank.  As CEO of Citibank, Desoer reported directly to CEO Corbat. |
| D'Onofrio | John D'Onofrio, who worked for Citigroup for 34 years.  D'Onofrio's most recent position was as Citigroup's Chief Technology Officer from June 2006 to February 2019. |
| Data Quality Management ("DQM") report | The data quality of each business was monitored in a monthly Data Quality Measurement ("DQM") report.  The DQM reports tracked metrics and provided a data quality score.  DQM reports were rolled up to the top of the company. |

| Term | Definition |
|---|---|
| Enforcement Action | An action initiated by the OCC and Fed for violations of laws, rules, or regulations; unsafe or unsound practices; breaches of fiduciary duties; and other deficient practices or violations.  Formal Enforcement Actions are judicially enforceable, and include consent orders, cease-and-desist orders, and civil money penalties.  The OCC CMP Order, OCC Remediation Order, and Fed Cease and Desist Order are formal Enforcement Actions. |
| Enterprise Risk Management/ Enterprise-Wide Risk Management ("ERM") | As explained by the OCC: "Risks may arise from bank activities or activities of subsidiaries, affiliates, counterparties, or third-party relationships.  Any product, service, or activity may expose the bank to multiple risks.  These risks may be interdependent—an increase in one category of risk may cause an increase in others.  Because of the interrelationship of the bank's risks and the potential impact on its earnings, capital, and strategic objectives, the risks should be assessed, evaluated, and managed enterprise-wide.  This concept is commonly referred to as enterprise risk management (ERM).  ERM helps the board and management view the bank's risks in a comprehensive and integrated manner." The term Enterprise-Wide Risk Management is synonymous with Enterprise Risk Management. |
| Executive Scorecards | Quarterly documents used by Corbat to evaluate the performance of his direct reports on outstanding MRAs and MRIAs, outstanding CAPs, an assessment of how the businesses under the direct report's purview performed regarding risk and data quality deficiencies, and how each direct report performed against revenue goals, among other issues. |
| Farley | Mary Sue Farley was Citigroup's Global Data Aggregation and Reporting Program Director from May 2016 to June 2019 and CBNA Executive PMO/ Citi CAO Office Transformation Program Manager from June 2019 to August 2021.  As Global Data Aggregation and Reporting Program Director, Farley led Quarterly Regulatory Noncompliance Meetings, attended by the most senior executives, including CFO Gerspach, Citibank CEO Desoer, Global Heald of ONT Callahan, and the Citi business heads, to review all outstanding issues of regulatory noncompliance.  Farley also reported monthly to Board of Directors subcommittee dedicated to oversight of the program. |
| Fed Cease and Desist Order | The October 7, 2020 "Cease and Desist Order Issued Upon Consent Pursuant to the Federal Deposit Insurance Act, as amended," issued by the Fed in *In the Matter of Citigroup Inc.*, Docket No. 20-019-B-HC, "identifying significant ongoing deficiencies in . . . [Citigroup's] risk management and internal controls, including for data quality management and regulatory reporting, compliance risk management, capital planning, and liquidity risk management." |

| Term | Definition |
|---|---|
| Federal Reserve ("Fed") | The Board of Governors of the Federal Reserve System, also called the Federal Reserve or the Fed, is the primary federal supervisor of state-chartered banks that have chosen to join the Federal Reserve System, and it shares supervisory and regulatory responsibility for domestic banks with the OCC and the FDIC at the federal level, and with individual state banking departments at the state level.  As relevant here, the Fed is the consolidated supervisor for bank holding companies like Citigroup. |
| Finance Integrated Audit (or an Integrated Audit) | In a Finance Integrated Audit, also known as an Integrated Audit, an internal or external auditor expresses an opinion on the fair presentation of a company's financial statements and the design and operating effectiveness of a company's internal controls. Public companies that are large, accelerated filers or accelerated filers are required to perform an integrated audit.  Sarbanes-Oxley Act §404(b) is commonly associated with an integrated audit; it requires the company's auditor to attest to, and report on, management's assessment of its internal controls. |
| Financial Reporting Systems Audit | An internal audit of Citigroup's systems used for financial reporting. |
| Former Employee ("FE") | Former Employees of Citi who are referenced herein and identified as FE- |
| Gerspach | Defendant John C. Gerspach.  Gerspach joined Citigroup in 1990 and served as the Company's Chief Financial Officer ("CFO") from July 2009 until February 22, 2019.  As CFO, Gerspach chaired or co-chaired several Citigroup management committees that, according to Citigroup, "serve as key governance and oversight forums for business activities."  As CFO, Gerspach reported directly to Corbat and was a member of senior management. |
| Global Consumer Banking ("GCB") | One of two primary Business segments at Citigroup.  According to Citigroup, GCB includes a global, full-service consumer franchise delivering a wide array of banking, credit card, lending, and investment services through a network of local branches, offices, and electronic delivery systems.  There are three GCB Businesses: North America, Latin America, and Asia.  GCB was responsible for 48% of Citigroup's $68.4 billion in net revenues in 2017; 48% of Citigroup's $70.8 billion in net revenues in 2018, 45% of Citigroup's $72.3 billion in net revenues in 2019, and 40% of Citigroup's $74.2 billion in net revenues in 2020. |
| Hu | Bradford Hu, who served as Chief Risk Officer from January 2013 through December 2020.  As CRO, Hu reported directly to CEO Corbat. |
| ICAPs | CAPs were maintained in the ICAPs information system.  Once a risk management issue was identified and tracked via a CAP, it was required that the issue be logged into the ICAPs system. |

| Term | Definition |
|---|---|
| Independent Compliance Risk Management ("ICRM") | A component of what Citigroup identified as its second line of defense in its risk governance framework.  According to Citigroup's public filings, the ICRM was designed to protect Citigroup by overseeing senior management, the businesses, and other control functions in managing compliance risk, as well as promoting business conduct and activity that is consistent with Citigroup's mission and value proposition.  Through this line of defense, Citigroup's Chief Risk Officer Hu, Chief Compliance Officer Carawan, Head of Human Resources, General Counsel, and CFOs Gerspach and Mason reported directly to Citigroup CEO Corbat. |
| Institutional Clients Group ("ICG") | One of two primary business segments at Citigroup.  According to Citigroup, ICG consists of banking, markets, and securities services, and provides corporate, institutional, public sector, and high-net-worth clients in 96 countries and jurisdictions with a broad range of banking and financial products and services. |
| Issue Management Resolution ("IMR") | Citigroup used IMRs to track data quality deficiencies. |
| Individual Defendants | Defendants Corbat, Gerspach, and Mason. |
| Integrated Audit | *See* Finance Integrated Audit. |
| Know Your Customer ("KYC") | Know Your Customer (also sometimes referred to as Know Your Client) refers to guidelines and regulations in the financial sector that require professionals and firms to verify the identity of and risks involved with customers or clients.  As Citi's auditor KPMG explains: "Failing to adhere to Anti-Money Laundering regulatory requirements or falling short of the expected standards in Know Your Customer (KYC)/Customer Due Diligence (CDD) can result in large fines and reputational damages for financial institutions." |
| Large Bank Supervision | *Comptroller's Handbook, Examination Process: Large Bank Supervision*, the reference used by OCC examiners in their supervision of banks in the OCC's midsize, large, or international banking supervision programs. |
| Management Action Plan ("MAP") | The protocol Citigroup used for defining, tracking, and reporting on issues identified by the regulators.  MAPs were reviewed by Citi's Board of Directors and senior management in Advisory Board Committee Meetings, held quarterly.  Information about outstanding MAPs was also provided to regulators. |
| Matter Requiring Attention ("MRA") | The OCC and Fed issue MRAs to specifically identify and communicate concerns about matters that are important and which the regulators expect to be timely and effectively corrected.  The OCC communicates MRAs to the bank's management and the board of directors.  The Fed communicates MRAs to the bank holding company's board of directors.  A bank's failure to timely or effectively address the practices identified in an MRA can result in and Enforcement Action. |

| Term | Definition |
|---|---|
| Matter Requiring Immediate Attention ("MRIA") | An MRIA is a variant of an MRA that is unique to the Fed and is considered to be more urgent than an MRA. The Fed communicates MRIAs in writing to the bank holding company's board of directors, which is required to respond in writing. A bank holding company's failure to timely or effectively address the practices identified in an MRIA can result in an Enforcement Action. |
| Mason | Defendant Mark A. L. Mason, who joined Citigroup in 2001 and has been Citigroup's CFO since February 23, 2019. As CFO, Mason chairs or co-chairs several Citigroup management committees that, according to Citigroup, "serve as key governance and oversight forums for business activities." As CFO, Mason reported directly to Corbat and was a member of senior management. |
| Nappi | Anthony Nappi served as Global Head of Operational Risk and Control for the Consumer Bank (CBORC) from November 2015 to September 2019. Nappi led CBORC for the Global Consumer Bank and, in that capacity, reported to Bird. |
| NYSE | The New York Stock Exchange. Citigroup's common stock trades on the NYSE under the ticker symbol "C." |
| Office of the Comptroller of the Currency ("OCC") | The Office of the Comptroller of the Currency, or OCC, is the primary regulator for banks chartered under the National Bank Act. Its main purpose is to supervise, regulate, and provide charters to banks operating in the U.S. to ensure the soundness of the U.S. banking system. The OCC had supervisory authority over Citibank and examined Citibank pursuant to the authority conferred by 12 U.S.C. §1481. |
| OCC CMP Order | The October 7, 2020 Consent Order issued by the OCC in *In the Matter of: Citibank, N.A.*, AA-EC-2020-65, #2020-057. The OCC CMP Order required Citibank to make payment of a $400 million civil money penalty for the same reasons as those identified in the OCC Remediation Order. According to information publicly available on the OCC's website, this is the third-largest civil money penalty issued by the OCC. The OCC CMP Order is one of two related Consent Orders issued by the OCC on October 7, 2020. The other is the OCC Remediation Order. |
| OCC Remediation Order | The October 7, 2020 Consent Order issued by the OCC in *In the Matter of: Citibank, N.A.*, AA-EC-2020-64, #2020-056, issued Oct. 7, 2020. This is one of two related Consent Orders issued by the OCC on October 7, 2020. The other is the OCC CMP Order. |
| ONT | Citigroup's shorthand for "Operations and Technology." |
| Padmanabhan | Sriram Padmanabhan served as Chief Technology Auditor and Managing Director from May 2017 to September 2020, after serving as Chief Auditor for ICG Technology and Operations from April 2016 to April 2017. |

| Term | Definition |
|---|---|
| Project Rainbow | A post-2008 Financial Crisis initiative that promised to overhaul Citi's infrastructure and technology and would align Citi with regulatory requirements.  In truth, in 2017, Defendants had scrapped Project Rainbow as a "total disaster," unbeknownst to the public. |
| PSP | Court-appointed Lead Plaintiff Public Sector Pension Investment Board. |
| Regulatory Noncompliance Meetings | Quarterly meetings started in 2016 that reviewed all outstanding issues of regulatory noncompliance and the status of Citigroup's responses to each deficiency.  These meetings were helmed by Global Data Aggregation and Reporting Program Director Mary Sue Farley and attended by most of Citigroup's senior executives, including Gerspach, Desoer, Callahan, and Citigroup's Business leads. |
| Ricci | Paul Ricci served as Chief Auditor of Risk Management and Managing Director from December 2012 to December 2019. |
| Risk Management/Risk Governance | Risk Management, also known as Risk Governance, is the process of identifying, assessing and controlling financial, legal, strategic and security risks to an organization's capital and earnings. |
| Romano | Ray Romano served as Chief Risk Officer for U.S. Consumer, Commercial, and Mortgage Banking from September 2014 to March 2017 and Chief Administrative Officer (CAO), Latin America from March 2017 to December 2022. |
| Satter | Beth Satter served as Managing Director, Operational Risk from June 2013 to July 2019, after holding the position Chief Administrative Officer, Regulatory Relationship Management from September 2010 to June 2013. |
| Surveillance | Surveillance is the use of various systems to ensure that products and services on the market conform to applicable laws and regulations, such as monitoring the flow of money to prevent money laundering or monitoring for foreign exchange market manipulation.  According to a job posting at Citi, surveillance refers to systems designed to detect behaviors that may violate regulatory rules or internal policies and procedure. |

| Term | Definition |
|---|---|
| Technology Debt | Technology debt (also known as technical debt or tech debt) is a term of art referenced by FE-1.  The term is widely used and understood with the ERM context as the cost inherent in technology decisions and/or maintain the *status quo* arising from future costs of improvement and remediation.  For example, IBM's Global Chief Technology Officer for Financial Services explains that tech debt "arises when we create expenses in the future by the poor or suboptimal [technological] architectural decisions that we make today. For example, if I engineer code with hard-coded values—something we'd never do by modern coding standards—I would need to address that in the future. But addressing that issue has definite costs." <br><br> J.P. Morgan/Chase explains tech debt as "[t]he additional future costs and loss of flexibility that a company incurs resulting from a suboptimal system architecture previously implemented as a means to save time or money."  J.P. Morgan/Chase further identifies two sources of tech debt.  First are "[y]esterday's decisions": "In the past, businesses implemented technology systems on a standalone basis because the process was faster and solved specific tasks. Finance decisionmakers typically didn't have a full line of sight into the 'why' and 'how' of tech decisions, which often led to unforeseen impacts," resulting in problems because "[l]egacy systems can't always automate processes or work with other systems."  Second are "[u]rgent purchases or systems inherited in acquisitions":  "Different lines of business may have lobbied for one or more tech systems to address an urgent need without considering a long-term solution. Similarly, two companies involved in a merger or acquisition may each keep their own systems and processes for collections, payments and reconciliation functions," resulting in problems because "[b]usiness units may not communicate with each other to uncover personnel and system redundancies." |
| Whitaker | Mike Whitaker has served as Citigroup's Head of Enterprise Infrastructure, Operations and Technology (EIO&T) since November 2018.  According to Citigroup's annual report, as Head of EIO&T Whitaker "is considered part of the first line of defense" and "reports to the Citigroup CEO." |

Court-appointed Lead Plaintiff Public Sector Pension Investment Board ("PSP" or "Lead Plaintiff"), and Named Plaintiff Anchorage Police & Fire Retirement System ("Anchorage") (together "Plaintiffs") by and through their counsel, bring this action asserting securities claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") on behalf of themselves and all others similarly situated who purchased or otherwise acquired Citigroup Inc. ("Citigroup" or the "Company") common stock between February 24, 2017 and October 12, 2020, inclusive (the "Class Period"), and were damaged thereby.[1]  Plaintiffs also bring this action on behalf of those persons and entities that during the Class Period (i) purchased the exchanged-traded call options on Citigroup common stock listed in Exhibit A; and/or (ii) sold the exchange-traded put options on Citigroup common stock listed in Exhibit A, and were damaged thereby.  Excluded parties are listed in the Class Action Allegations, Section XII.

The allegations are based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and upon information and belief as to all other matters based on the investigation conducted by and through Lead Counsel.  Lead Counsel's investigation included, among other things, a review and analysis of Citigroup's filings with the Securities and Exchange Commission ("SEC"), transcripts of Citigroup's public conference calls, press releases issued by Citigroup, news and media reports concerning the Company, research reports issued by financial analysts, governmental and regulatory sanctions and findings concerning Citigroup, other publicly available information, and interviews with Former Employees of Citigroup conducted in Lead Counsel's investigation.  Plaintiffs believe that, after a reasonable opportunity for discovery, substantial

---

[1] Capitalized terms not otherwise defined herein have the meaning ascribed in the Glossary of Terms provided herein.

additional evidentiary support will be available for trial that further supports the allegations in this Complaint.

## I.     NATURE OF THE ACTION

1.     This case arises from Defendants' claims that Citi's fundamental risk management failures, which led to taxpayers' $500 billion bailout during the 2008 Financial Crisis, had been remediated and its enterprise-wide risk management (ERM) was effective.  Neither was true.  In the place of effective ERM, Citi maintained thousands of siloed data systems that were incompatible and outdated legacies of hundreds of acquisitions over decades.  Defendants touted as successful the so-called Project Rainbow, an initiative following the Financial Crisis to overhaul Citi's infrastructure and technology that promised to align Citi with regulatory requirements.  In truth, in 2017, Defendants had scrapped Project Rainbow as a "total disaster," unbeknownst to the public.  Defendants had also ordered a "freeze" on investment in compliance.  They went as far as to degrade and suppress Citi's internal audit function, including retaliating against internal auditors who reported Citi's regulatory failures to the Board of Directors.  As a result of its systemic deficiencies, Citi was ineffective at identifying, managing, monitoring, reporting, or controlling— much less remediating—the ERM deficiencies that it had faced for years.

2.     These systemic deficiencies (detailed herein) were documented in monthly and quarterly reports that went directly to CEO Corbat and his senior executive team.  Throughout the Class Period, the ERM deficiencies were the subject of numerous MRAs (Matters Requiring Attention) and MRIAs (Matters Requiring Immediate Attention) from both of Citi's regulators (the OCC and the Fed).  These MRAs and MRIAs were predictive of the deficiencies Citi needed to fix to avoid an Enforcement Action, and Corbat used Executive Scorecards to personally track these MRAs and MRIAs.  Yet time and again, as detailed herein, Defendants refused to remediate Citi's known deficiencies.

3.     Notwithstanding Defendants' detailed knowledge, they consistently reassured investors, analysts, and ratings agencies that Citi had effective risk management and was aligned with regulatory requirements.  The analyst and investing community took Defendants at their word, praising Citi's efforts and twice upgrading its credit rating during the Class Period.

4.     The veneer of compliance could not last, however.  It was abruptly wiped away in September and October 2020 when investors learned the truth that Citi had suffered from years of longstanding ERM deficiencies and regulatory criticism.  Both the OCC and the Fed initiated Enforcement Actions against Citi, including the imposition of a $400 million penalty—the third largest in OCC history.  Much to investors' surprise and chagrin, Citi in fact had failed to remediate its ineffective ERM, data governance deficiencies, and broken technology.

5.     Importantly, these 2020 Enforcement Orders were exactly consistent with what regulators had previously identified in the MRAs and MRIAs *since 2017*, as former high-level Citi employees confirmed.  A declaration by the OCC Examiner in Chief (filed months after the close of the Class Period in an unrelated action) corroborates this fact:  "[m]any of the supervisory concerns addressed by the 2020 Orders were identified by the OCC and communicated to the bank several years prior to" July 2019.  Similarly, Citi's current Chair of the Board admitted in April 2021 that "I and the Board did recognize the remediation shortfalls before the consent order" and that in truth the remediation was then just beginning.

6.     These facts—amplified in greater detail below—are derived from the personal knowledge of a dozen former high-level employees and form a strong basis for alleging the elements of securities fraud.

*                    *                    *

7.      Defendants acclaimed Citi as the world's "most global bank"; with over $2 trillion of assets, over two hundred million customer accounts, and operations in more than 160 countries.

8.      Defendants claimed in each of its Class Period Annual Reports that "effective risk management is of primary importance to [Citi's] overall operations."  They explained that Citi's risk management systems and controls were meant to allow Defendants to identify, measure, manage, monitor, report, and control risks across Citi's vast interrelated financial operations. These systems were also essential for compliance with anti-money laundering and anti-terrorism statutes and regulations.

9.      For Citi, the need to maintain effective risk management systems was uniquely important.  During the 2008 Financial Crisis, Citi's deeply rooted risk management failures nearly doomed the bank.  The National Commission on the 2008 Financial Crisis concluded that "Citigroup had two key problems: a lack of effective enterprise-wide management to monitor and control risks and a lack of proper infrastructure and internal controls."  Citi was saved only by the largest taxpayer bailout in history—$500 billion.

10.     With a true debt to the taxpaying public and its own shareholders, Citi promised to transform itself.  In particular, during the Class Period, Defendants led the public to believe that Citi's transformation was "complete"; that Citi's enterprise-wide risk management, data governance, and controls were effective; and that these systems were "aligned" with regulatory standards.  For instance, Defendants pointed to Citi's so-called Project Rainbow, which got underway after the 2008 Financial Crisis, as the means to build out Citi's risk management infrastructure so as to give Defendants new "holistic" capabilities, which would enable them to now "track[] everything globally."  In 2017, Defendants claimed that Project Rainbow was a success from both an "infrastructure perspective" and "from a regulatory perspective," and was

"paying great dividends."  By 2018, Defendants declared that Citi had "work[ed] through" its risk management problems, and that those issues were behind the Company.

11.     The public believed Defendants.  For example, the independent rating agency Moody's upgraded Citi twice during the Class Period due to perceived improvements in risk management.  In November 2017, Moody's changed its outlook on Citigroup from "stable" to "strong," stating, "[t]he change in outlook to positive from stable reflects Moody's view that Citigroup has **largely completed its sweeping reengineering** which has resulted in a more solvent institution with an improved risk-attuned management culture."  Eighteen months later, in early 2019, Moody's again upgraded Citigroup, concluding, "Although Citigroup remains a large and complex organization, its risk management, risk appetite and corporate governance are significantly improved since the financial crisis and are well aligned with its strategy."

12.     Wall Street Analysts were likewise impressed with Citi's purported achievements.  For example, praising Citigroup's "progress" concerning regulatory compliance and technology, one analyst wrote: "Over the past few years, tech has moved up the pecking order of priorities, both because **[Citigroup] put many of its past regulatory issues behind it** and given the necessity to compete . . . . [i]t has [also] evolved the technological architecture."[2]  (Wells Fargo, October 23, 2019.)  Morning Star Equity Research praised that "the bank is finally on the road to rehabilitation" and "Citigroup investors should be able to sleep more soundly over the next decade," adding that Citigroup is a "restructured company" and "risk management at Citigroup has improved substantially over the past decade."  (February 8, 2017 and July 14, 2017 analyst reports.)  Similarly, as the end of the Class Period neared, another analyst concluded that Citi's "management remains focused on protecting employees and supporting customers.  And [they]

---

[2] All emphasis provided unless otherwise stated.

continue to feel good about the investments [they] are making, particularly in [Citi's] digital capabilities, and infrastructure and control. . . .  [Citi] continues to explore all opportunities to operate more efficiently to fund investments made in digital capabilities and infrastructure and control." (Zacks Investment Research, August 12, 2020.)

13.    As detailed herein, the truth was the opposite of what Defendants publicly stated. Rather than having an integrated enterprise-wide system that rival institutions like JPMorgan and Bank of America possessed, Citi had thousands of disconnected legacy systems and databases that did not, and could not communicate with one another.  Project Rainbow, which was supposed to result in a new, enterprise-wide infrastructure, was secretly scrapped in 2017 after its roll-out in the Asia Pacific region had been a "total disaster."  This left Citi with no planned solution to fix systems that regulators had deemed ineffective, leaving key operational risks and regulatory noncompliance.

14.    Citi Former Employees involved in risk management, data quality, and internal audit recounted a vast number of regulatory deficiencies and problems that existed during the Class Period.  Illustrative examples include:

- <u>Internal Audit Findings Were Ignored and Overridden</u>:  Citi's Internal Audit Department was described in its Annual Report as a critical "line of defense" in managing risk.  Yet, when Citi consistently failed internal audits and assessments as to its risk management, data, controls, and regulatory compliance, these findings were ignored or suppressed.  These failed audits were sent to Citi's Board of Directors, and the audit reports prepared by Citi's Managing Director for Data Governance Technology Audit for Global Functions were reviewed by the Board's Audit Committee.  Still, Citi refused to remediate its failed technology.

- <u>Lack of Enterprise-Wide Infrastructure Made Effective Data Governance and Managing Credit Risk Impossible</u>:  Citi's data and records were unreliable, inaccessible, and impossible to verify.  Rather than a "golden record" that accurately provides reliable relevant information about a customer, client, or

6

resource, Citi's data was scattered across thousands of legacy systems, each its own crude repository, siloed off, and impenetrable to enterprise-wide search and automation. Multiple Former Employees explained that this meant that, for example, Citi was unable to get a holistic view of its relationship with—or exposure to—a particular business or customer.

- <u>Lack of An Effective Real-Time Risk Management System Left Citi Vulnerable to Market Risks and Insider Trading</u>: Citi did not develop a full, real-time risk management system. Such a system must have real-time financial data coming in to effectively manage risks associated with market conditions. Real-time data was critically important to effectively monitor foreign exchange, yields, interest rates, and credit, as well as to hedge the underlying portfolio, derivatives, and other financial assets. Incorporation of real-time data was also critical to effectively managing compliance in areas like insider trading. Citi's risk management did not effectively incorporate real-time data and Citi was unwilling to provide the budget or resources to develop it.

- <u>Risk Management Failures Made Compliance With "Know Your Customer" (KYC) Anti-Money Laundering and Anti-Terrorism Requirements Impossible</u>: Citi was unwilling and unable to comply with a longstanding MRA directing it to create a global KYC system—an essential part of risk management and compliance in terms of BSA/AML requirements, among others. As explained by Citi's former VP for ICG Strategic Data Solutions, whose analytics team was central to regulatory reporting, Citi's data quality and technology were so deficient that the data necessary for KYC could not be automated, and in some cases was "literally on scraps of paper." Further, Citi's sales head was inexplicably unwilling to provide the information and data required for Citi to create a compliant KYC system. Rather than perform the long overdue overhaul of risk management, data, controls, and technology needed for proper KYC procedures, Citi instructed its compliance teams to dramatically reduce the scope of their work to such an extent that it was impossible to create the functioning global KYC system required by Citi's federal regulator.

15.     Citi's risk management shortcomings were an ongoing focus of regulators' communications with Defendants. Regulators use MRAs and MRIAs to communicate concerns regarding a bank's deficient practices, such as deficiencies that (i) deviate from sound governance,

internal control, and risk management principles, and have the potential to adversely affect the bank's condition, including its financial performance or risk profile; or (ii) result in substantive non-compliance with laws and regulations, Enforcement Actions, or conditions imposed in writing in connection with the approval of any application or other request by the bank.

16.     During the Class Period, Citi was operating under at least 50 or more outstanding MRAs and MRIAs from regulators.  As a Former Employee with personal contemporaneous knowledge explained, the Individual Defendants and Citi's Board received these MRAs and MRIAs and knew that they were not being remediated.  Importantly, as the former Citigroup Director of Data Strategy and Governance, U.S. Consumer and Citi Retail Services from August 2015 to August 2020 explained, the MRAs and MRIAs outstanding as early as 2017 were predictive of the deficiencies Citi needed to fix to avoid an Enforcement Action.

17.     The Individual Defendants—CEO Corbat, CFO Gerspach (until February 22, 2019), and CFO Mason—knew these facts contemporaneously through reports and personal attendance at meetings.  Corbat personally received an Executive Scorecard every quarter for each of his direct reports (including Gerspach and Mason) to evaluate (i) their performance and progress on outstanding MRAs and MRIAs, (ii) the status of outstanding CAPs, (iii) an assessment of how the businesses in that executive's purview performed regarding risk and data quality, and (iv) performance against revenue goals, among other areas.  Executive Scorecards also were the basis for Corbat to evaluate each direct report on how well they scored with respect to Audits and Action Plans which, among other things, had long identified  Citi's lack of effective ERM, including "all the key issues" later cited in the 2020 Enforcement Orders.

18.     Additionally, each of the Individual Defendants received the Global Business Data Quality Report (BDQR) on a quarterly basis during the Class Period.  The Global BDQR, prepared

by Citi's Chief Data Officer and accompanied by signed attestations executed by each business-level CEO certifying its accuracy, apprised Individual Defendants of Citi's (i) enterprise-wide risk management problems, (ii) concerns about Citi's ability to handle and effectively manage risk across the enterprise, and (iii) data quality management shortcomings.  The Global BDQR summarized outstanding Corrective Action Plans (CAPs), Data Quality Management Reports (DQMs), Issue Management Resolutions (IMRs) used to track regulatory noncompliance, data quality issues, and risk management deficiencies.  Finally, the BDQRs included issues that regulators identified as requiring attention.

19.    CEO Corbat and CFOs Gerspach and Mason held monthly Business Risk and Control Committee (BRCC) Meetings to discuss the Global BDQRs, and Corbat personally corresponded with the relevant parties with respect to issues identified in Global BDQRs.  Corbat and CFOs Gerspach and Mason (during their respective tenures) also could see where there were data governance or other regulatory issues that were colored red, signaling matters that required remediation.

20.    In addition to the BRCC meetings, numerous other meetings were held monthly and quarterly to discuss the ongoing deficiencies and the need to remediate Citi's ineffective risk management, including Risk Committee Meetings, Advisory Board Committee Meetings, and Regulatory Noncompliance Meetings.  Citi's senior executives (including CEO Corbat, CFO Gerspach/Mason, and Citibank CEO Desoer) regularly attended these meetings and reviewed all outstanding issues of regulatory noncompliance.

21.    The truth eventually caught up to Citi.  Defendants had a "sweep it under the rug mentality," with Citi "painting over" its failed technology, rather than fixing its underlying problems.  As the years went on, Citi's failure to remediate these MRAs and MRIAs resulted in

the regulators losing confidence in Citi's executive team.  To avoid the long and expensive road needed to address "the stack of MRAs and MRIAs," Citi instead tried firing executives as scapegoats to create a "body count" to pacify the regulators, and used "work arounds" and "cheap hack[s]" to create a "veneer" of compliance.

22.     Because "Citi never really addressed the problem," the situation grew increasingly problematic.  In August 2020, Citi erroneously wired $900 million to lenders of cosmetics company Revlon.  Spun by Defendants as nothing more than a "clerical error," unbeknownst to investors, this was a consequence of Citi's lack of effective ERM, as would later be proven.  Within a month, Corbat announced his resignation, while claiming that he had "***completed our transformation from the financial crisis***."

23.     Stunningly, just four days after Corbat's announcement, on Monday, September 14, 2020, reports of Citi's longstanding regulatory non-compliance due to ineffective ERM and looming OCC and Fed Enforcement Actions came to light.  That day, *The Wall Street Journal* reported that "[f]ederal regulators are preparing to reprimand Citigroup Inc. for failing to improve its risk-management system" and that, "[f]or years, regulators have privately pressed Citigroup and Mr. Corbat to fix the bank's risk systems," demonstrating that the Company's positive representations about its risk and control environment were false or, at best, materially misleading.  On September 15, 2020, *Business Insider* followed up, reporting that "[e]ntering [2020], [] Citigroup had numerous outstanding compliance- and technology-related issues that had been outlined in regulatory notices known as [MRAs] and [MRIAs]" and that "Citigroup had multiple ones long past due."  *Business Insider* further reported that Citigroup's regulators "were annoyed with Citigroup's noncompliance across numerous issues and felt as if they weren't being heard."  Rather than fix the systems, "[t]he CEO [Corbat] who had made operating efficiency and

return-on equity a hallmark of his strategy was often reluctant to spend the money or dedicate enough people to fix a problem the right way."

24.     On October 7, 2020, the OCC and Fed issued the anticipated 2020 Enforcement Orders, establishing Citi's violations of law and regulations, and the OCC imposed a $400 million Civil Money Penalty—its third largest in history.  The OCC Remediation Order—to which Citi consented—confirmed that Citi's "fail[ure] to implement and maintain an enterprise-wide management" program was in violation of the same OCC "Heightened Standards."  The OCC further found that the Board's and senior management's oversight was "inadequate to ensure timely, appropriate actions to correct the *serious and longstanding deficiencies and unsafe or unsound practices in the areas of risk management, internal controls, and data governance at the bank*."  (*Id.* Art. II ¶5.)  Perhaps most distressing was the OCC's finding that Citibank still had not even "diagnose[d] the root cause(s) of the underlying issues that led to internal control related concerns *identified by internal audit and/or federal regulators <u>since 2017</u>*."  (*Id*. Art IX ¶1(a)(i).)

25.     Analysts were angry, as one specifically explained: "angry over [Citi's] lack of transparency" and that "contrary to Citi's statements from a few years ago, its restructuring was not sufficiently complete"; another demanded to know, "[h]ow do you not fully address issues you've known were serious for at least seven years?"  Citi's share prices declined precipitously as investors learned the true condition of Citi's enterprise-wide risk management, data governance programs, and controls, ultimately dropping 14.4% between September 14, 2020 and October 13, 2020.

26.     Knowing full well that their enterprise-wide risk management system, data governance programs and controls were, at best, ineffective and, in truth, complete failures, Defendants consistently made affirmative representations touting their efficacy.   These

representations were misleading and/or flatly false.  Defendants also violated their affirmative disclosure requirements under Item 303 of SEC Regulation S-K by failing to disclose the known uncertainty of their ineffective risk management.  As Chair Dugan admitted in 2021, coming into regulatory compliance, resolving the regulators' numerous concerns, and remediating the underlying, long-standing deficiencies has required a complete "transformation."  The cost of doing so has been and will continue to be substantial.  By the end of 2022, Citi had already spent at least $5.7 billion to $6.2 billion on transformation expenses, and had added 30,000 employees to work on the transformation.  Significantly, Citi is not even close to finished.  The Company has already admitted that it expects transformation-related costs to continue to be a primary driver of expense growth in 2023, and it will continue into 2024 at a minimum.  Altogether, Citi will spend a minimum of $9 billion on a transformation Defendants led investors to believe they had already completed—and paid for—years ago.  Finally, although going on and on for over 200 pages about "Risk Management" in Citi's 2016-2019 Annual Reports filed with SEC during the Class Period, Defendants always omitted the negative material contemporaneous facts alleged herein that rendered their statements and omissions actionable.

27.    Based on all the particularized contemporaneous facts alleged herein, this Complaint states a cause of action against Defendants under Section 10(b) and 20(a), and Rule 10b-5 of the Exchange Act of 1934.

## II.    JURISDICTION AND VENUE

28.    This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act (15 U.S.C. §78aa).  The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)), and the rules and regulations promulgated thereunder, including SEC Rule 10b-5 (17 C.F.R. §240.10b-5).  In addition, because

this is a civil action arising under the laws of the United States, this Court has jurisdiction pursuant to 28 U.S.C. §1331.

29.    In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to the mails, interstate telephone communications, and the facilities of national securities exchanges, including the New York Stock Exchange ("NYSE").

30.    Venue is proper in this District pursuant to Section 27 of the Exchange Act (15 U.S.C. §78aa).  In addition, venue is proper pursuant to 28 U.S.C. §1391.  Many of the acts and transactions giving rise to the violations of law complained of herein occurred in this District.  In addition, Citigroup maintained its corporate headquarters and principal executive offices in this District throughout the Class Period.

## III.    PARTIES

### A.    Plaintiffs

31.    Court-appointed Lead Plaintiff, PSP, maintains its principal place of business in Montréal, Québec and is one of Canada's largest pension investors.  As of March 31, 2022, PSP managed approximately C$230.5 billion in net assets.  PSP's investment mandate is to manage the amounts transferred to it by the Government of Canada for the funding of benefits earned from April 1, 2000 by members of the public sector pension plans of the federal Public Service, the Canadian Forces, the Royal Canadian Mounted Police and since March 1, 2007, the Reserve Force.

32.    As set forth in the Certification attached as Exhibit B to this Complaint, PSP purchased Citigroup common stock on the NYSE during the Class Period and was damaged by Defendants' violations of the federal securities laws alleged herein.  For the shares retained, PSP owns and holds legal title to the shares that are the subject of this litigation.  For the shares sold,

PSP owned and held legal title to the shares that are the subject of this litigation at all relevant times.

33.     Named Plaintiff Anchorage is a public pension fund based in Anchorage, Alaska with roughly $410 million in net assets under management.  Anchorage manages these assets for roughly 700 active and retired beneficiaries, who are primarily police officers, firefighters, and their families.

34.     As set forth in the Certification attached as Exhibit C to this Complaint, Anchorage purchased Citigroup common stock on the NYSE during the Class Period and was damaged by Defendants' violations of the federal securities laws alleged herein.  For the shares retained, Anchorage owns and holds legal title to the shares that are the subject of this litigation.  For the shares sold, Anchorage owned and held legal title to the shares that are the subject of this litigation at all relevant times.

**B.     Defendants**

**1.     Corporate Defendant**

35.     Defendant Citigroup Inc. ("Citigroup") is incorporated in Delaware and maintains its corporate headquarters at 388 Greenwich Street, New York, New York.  Citigroup common stock trades on the NYSE under the ticker symbol "C."  As of March 31, 2023, Citigroup had 1,946,751,837 shares of common stock outstanding.

36.     Citigroup describes itself as "a global diversified financial services holding company whose businesses provide consumers, corporations, governments and institutions with a broad, yet focused, range of financial products and services, including consumer banking and credit, corporate and investment banking, securities brokerage, trade and securities services and wealth management."  The Company currently has over $2.4 trillion in total assets, approximately 200 million customer accounts, and does business in more than 160 countries and jurisdictions

around the world.  Citigroup generally refers to itself as "Citi."  Citigroup expressly states in its Forms 10-K filed with the SEC that "'Citigroup,' 'Citi' and 'the Company' refer to Citigroup Inc. and its consolidated subsidiaries."

37.     The Company's most important division is its nationally chartered United States commercial bank, Citibank.  Citibank's principal products include consumer finance, mortgage lending and retail banking (including commercial banking) products and services, investment banking, cash management and trade finance, and private banking products and services.  Citibank is a wholly-owned subsidiary of Citigroup with roughly 75% of Citigroup's assets.  Citibank's results are consolidated within Citigroup's financials and account for the vast majority of Citigroup's net income.

### 2.     Individual Defendants

38.     Defendant Michael L. Corbat ("Corbat") was the Chief Executive Officer ("CEO") and a Director of Citigroup from 2012 until February 26, 2021.  Corbat also served as the CEO and a Director of Citibank from June 2020 to February 26, 2021.  Corbat joined Citigroup in 1983 and worked at the firm for nearly 40 years.  The Company describes him as having "extensive experience and expertise" in the areas of "Financial Reporting . . . Regulatory Compliance . . . and Risk Management."  On September 10, 2020, Corbat announced that he would retire in February 2021, presenting it as a typical succession, only for it later to be revealed that his resignation was accelerated due to the impending, yet undisclosed, 2020 Enforcement Orders and the regulators' identification of longstanding and unremediated deficiencies in the Company's controls and risk management systems.

39.     Defendant John C. Gerspach ("Gerspach") joined Citigroup in 1990 and served as the Company's Chief Financial Officer ("CFO") from July 2009 until February 22, 2019.  As CFO, Gerspach chaired or co-chaired several Citigroup management committees that, according to

Citigroup, "serve as key governance and oversight forums for business activities."  As CFO, Gerspach reported directly to Corbat and was a member of senior management.

40.     Defendant Mark A. L. Mason ("Mason") joined Citigroup in 2001 and has been Citigroup's CFO since February 23, 2019.  As CFO, Mason chairs or co-chairs several Citigroup management committees that, according to Citigroup, "serve as key governance and oversight forums for business activities."  As CFO, Mason reported directly to Corbat and was a member of senior management.

41.     Defendants Corbat, Gerspach, and Mason are collectively referred to as the "Individual Defendants."  The Individual Defendants, because of their positions with the Company, and their conduct alleged herein, possessed the power and authority to approve and control the contents of Citigroup's reports to the SEC, press releases, and presentations alleged herein to be false and misleading.  The Individual Defendants were provided copies of the Company's reports, press releases, and presentations alleged in this Complaint to be false and misleading before, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.

## IV.    FACTUAL ALLEGATIONS

42.     The allegations herein are based on Lead Counsel's investigation, which included interviews with Former Employees of Citigroup conducted in Lead Counsel's investigation. Several former Citi employees have provided information demonstrating that Defendants' Class Period statements were false and misleading, and that Defendants knew or recklessly disregarded the false or misleading nature of the statements.  The Former Employees identified herein provided information on a confidential basis and are specifically described in Section V by job description and responsibility, and duration of employment, thereby providing sufficient details to establish their reliability and personal knowledge.  The "Former Employee" (or "FE") Allegations attributed

16

to a particular Former Employee are designated as such by reference to their "FE-__" designation or job description.

A.   **Pre-Class Period**

1.   **Citigroup's Acquisition Spree Led to a Hodgepodge of Thousands of Disconnected Systems Before the Class Period**

43.   Citigroup once was a traditional bank and credit card issuer.  Beginning in the 1980s, however, the Company and its predecessor entities engaged in a string of mergers and acquisitions, acquiring hundreds of different banks and other financial companies.  From 1981 to 2002, they made 315 acquisitions and took a stake in 242 companies.  This includes the $70 billion merger with insurance conglomerate Travelers Group in 1998, which itself was formed from a series of acquisitions, including the investment bank and brokerage firm Salomon Smith Barney Inc., the financial services company Primerica Financial Services, and the insurance company Travelers Life and Annuity.

44.   Citigroup's acquisition spree also included the investment banking division of Schroeder's PLC for $2.2 billion in 2000; Associates First Capital Corporation, the largest consumer finance company in the U.S. for $31.1 billion in 2000; Grupo Financiero Banamex Accival, the second-largest bank in Mexico, for $12.5 billion in 2001; the New York state-chartered European American Bank for $1.6 billion in 2001; Golden State Bancorp, the parent company of First Nationwide Mortgage and the California Federal Bank, for $5.8 billion, which included 352 branch banks and 1.5 million new customers, in 2002; the credit card business of Sears, Roebuck and Co. for $3 billion in 2003; and a 97.5% stake in Koram Bank, South Korea's sixth largest bank, for $2.6 billion in 2004.

45.   This series of acquisitions led Citigroup to become a systemically important financial institution and a veritable financial supermarket with significant operations worldwide.

The Company acknowledges that it is among the "largest and most complex" firms in the world and that it has approximately 80 subsidiaries it deems "significant."

46.     Citi's technology structure originated with the philosophy of former Chief Executive Officer and Chair Sanford "Sandy" Weill.  Weill's philosophy in growing through acquisition was that he was buying a string of pearls and that at any given time, one of the pearls could be plucked and sold.  Therefore, Citi's technology had to be loosely integrated (or not integrated at all), so as not to make any one element unsellable.

47.     While Citi's competitors also acquired companies, they also brought the newly acquired companies onto a common platform.  (FE-1.)  By contrast, Citi had no common platform.  (FE-1, FE-2, FE-3, FE-4, FE-5.)  Citi instead "tossed an electrical cord over the fence" for the acquired entities to continue to run on whatever information technology the entities had in place at the time of the acquisition.   (FE-1.)   Over time, Citi's approach led to significant risk management, control, data governance, and data quality failures, and Citi's compliance fell behind minimum regulatory requirements.

48.     Citi's haphazard approach meant that there were thousands of data systems and repositories siloed off from one another, with each running on incompatible and outdated technology.  (FE-1, FE-2, FE-4, FE-5.)  Put differently, Citi's growth through the merger and acquisition of hundreds of companies resulted in a "gigantic mess of the legacy systems that did not talk to each other." (FE-3.)  The information systems from acquired entities were left as "crude repositories" of unverified data, leading to incompatible recordkeeping that was, at best, accessible only by cumbersome manual processes.  (*See* FE-2, FE-4.)  Citi personnel charged with critical responsibilities overseeing data governance, risk management, and internal audits were forced to work by "manual data searching" because Citi did not have a way to automate controls in its

systems. (FE-4.) There was insufficient automation or controls in place to make sure the data was accurate, and simply tracking down underlying data was a "huge task unto itself" and in many cases impossible due to Citi's lack of an effective enterprise-wide risk management system. (*See* FE-1, FE-4.) As one of Citi's Senior Compliance Officers put it, Citigroup was operating "in the world of electric cars, but making horse carriages." (FE-3.)

> **2.    2012-2016: Citigroup Led Analysts and Investors to Believe that It Had Fixed Its Risk Management and Compliance Problems; In Reality and Unbeknownst to Investors, It Had Not**

>> **a)    Pre-Class Period Consent Orders Relating to Risk Management and Controls**

49.     Citigroup has a long history of regulatory violations and consent orders relating to risk management and controls. This included an April 5, 2012 consent order with the OCC relating to violations of the Bank Secrecy Act and anti-money laundering regulations ("BSA/AML") and inadequate controls and risk management (the "OCC 2012 Consent Order"), a March 21, 2013 consent order with the Fed based upon the same conduct at issue in the OCC 2012 Consent Order (the "Fed 2013 Consent Order"), and a May 20, 2015 consent order with the Fed based on unsafe and unsound practices related to the Company's foreign exchange ("FX") trading businesses (the "Fed 2015 Consent Order").

>> **b)    Recognizing the Importance of Regulatory Compliance to Investors, Defendants Consistently Assured Them that Citi Satisfied Regulatory Requirements**

50.     Given its history of regulatory violations and the importance of complying with OCC and Fed regulations, there was a consistent dialogue between Wall Street and Citigroup about Citigroup's risk management failures before and throughout the Class Period. At the start of the Class Period in February 2017, Citigroup explicitly acknowledged that "effective risk management is of primary importance to its overall operations" and reassured investors that it was "aligned

with" regulatory compliance requirements.   Analysts plainly understood from Defendants'
representations that Citigroup had completed its remediation.   For example, in a 2017 report
Moody's upgraded Citigroup stock on the grounds "that Citigroup has largely completed its
sweeping reengineering which has resulted in a more solvent institution with an improved risk-
attuned management culture."   By repeating this narrative throughout the Class Period, Defendants
assured investors that Citigroup was taking its obligations seriously and making the necessary
investments to ensure the proper functioning of its risk management and compliance systems, and
its controls.

51.    In light of these repeated reassurances, Wall Street analysts believed that
Citigroup's risk management and controls, at a minimum, satisfied regulatory requirements.

52.    By 2015, Citigroup was telling investors that the investments and efforts in risk
management and compliance were succeeding.   At the Raymond James Institutional Investors
Conference on March 2, 2015, Defendant Gerspach stated: "Today, we operate global risk, finance
and compliance functions with common standards and systems, consolidating disparate functions
from our businesses and regions and establishing a disciplined firm-wide risk appetite framework.
These centralized functions are more effective and more efficient than our prior structure."

53.    Throughout 2016, Defendants continued to reassure investors that Citi was in
compliance.   As early as January 15, 2016, Corbat stated that "[w]e've also made the ***necessary***
investments in our compliance, risk, and control functions which are ***critical to maintaining our
license to do business***.   Every day we work to be an indisputably strong and stable institution."

54.    On April 26, 2016, at Citigroup's Annual Shareholder Meeting, he similarly stated:
"Over the past three years, we've strengthened our core businesses, ***control functions*** and capital-
base while reducing our headcount by almost 40,000, and our legal entities by over 1/3," making

20

clear to investors that the Company's simplification and streamlining efforts did not dent the effectiveness of its risk management.

55.     O'Neill echoed Corbat at the same (April 26, 2016) event, saying, "I thought we had ***no significant control lapses*** unlike the year before where again the pay of Mike and his direct report was adjusted downward because of those," and emphasizing that Corbat "did an outstanding job" when addressing "[r]isk management[, and] the improvement of relations with regulators."

### 3.     Unbeknownst to Investors, in 2016, Citi Axed Projects to Create Infrastructure, Puts a "Freeze" on Investment in Compliance, and Gutted Its Internal Audit Team

56.     Despite these outward projections of confidence and investment in compliance and controls, internally, Citi was aggressively cutting costs and gutting these functions.

57.     Since 2016, Citi had been decreasing the effectiveness of internal audits by severely cutting the size of its audit team and limiting new hires (if any) to underqualified, low-cost workers in overseas locations, who lacked the acumen to handle the complex tasks required of Citi's internal audit team.   (FE-2.)   As recounted by Citi's Managing Director, Data Governance Technology Audit for Global Functions, Citi also prevented meaningful internal audits by severely limiting the amount of manpower for the task, so that the understaffed team assigned to the audits had to work 20-hour days under "excruciating" conditions to churn out a report by an unrealistic deadline.   (FE-2.)   The pressure was so intense that one Managing Director in Internal Audit had a heart attack during the spring 2017 audit.   (FE-2.)   Though FE-2 raised concerns directly with Global Head of ONT Don Callahan, CDO Burke, CTO D'Onofrio, Chief Technology Auditor Padmanabhan, and Chief Auditor of Risk Management Ricci and proposed solutions, such as more training or management oversight, "no one was willing to make those investments."   (FE-2.)

58.     Citigroup also scrapped projects to overhaul its infrastructure, surveillance systems, and technology, including a system for trade surveillance necessary for Citi to comply with

minimum regulatory requirements (for example, surveillance to monitor the possibility of insider trading or money laundering activity).  (FE-3.).  Citi hired FE-3 as Senior Vice President, Senior Compliance Officer for Surveillance to lead these projects.  Yet within one day of FE-3 joining Citigroup, these projects were "axed," "a freeze [was] put on compliance," and the staff was reallocated "trivial" and "nonsensical" programming projects that could have been handled by "some high school student" and could not "actually flag the anomalies" needed for compliance. (FE-3.)

### B.    2017: Citi's Concealed Substantive Deficiencies at the Start of the Class Period

#### 1.    Citi Lacked Effective Enterprise-Wide Risk Management (ERM)

59.    The result of this lack of investment and cost-cutting was that Citi lacked effective ERM.  (FE-1, FE-2, FE-3, FE-4.)  This lack of effective ERM, concealed throughout the Class Period, underpinned Citi's erroneous $900 million payment to Revlon creditors and 2020 Enforcement Orders issued against Citi.  Among Citi's regulatory reporting and compliance groups, Citi's lack of effective ERM was always at the forefront of discussions due to the team's constant frustration in dealing with thousands of non-integrated data systems and "crude repositories" of unreliable records.  (FE-4.)  Similarly, even though there was a general agreement at Citi that this was something that was needed, FE-5's proposal to implement ERM capabilities at IT Leadership Meetings never gained any traction prior to the 2020 Enforcement Orders. (FE-5.)  The lack of an integrated, effective enterprise-wide infrastructure and systems that could communicate with one another was a failure at the highest level.  (FE-1, FE-2.)

**a)        Citi's Operational Risk Management Was Ineffective**

60.      Lack of effective ERM created serious problems for managing operational risk. Citi's tools to manage operational risk were underdeveloped and inadequate for a bank of its size and complexity.  (FE-8.)

61.      An information system called "CitiRisk" was supposed to be Citi's "system of record" for top level risk reporting for all of the divisions across the Global Consumer Bank and the Institutional Clients Group.  (FE-8.)  But CitiRisk was not integrated and instead relied on a challenging and cumbersome process where each division used different systems and processes to arrive at values for key risk indicators.  (FE-8.)  The types of data required to report on an operational risk—like risk metrics, scenarios, issues, audits, and examinations—each came from a different group and all of these functions were managed differently, with no standardization. (FE-8.)

62.      The data pulled from CitiRisk was not validated, and therefore there was no way for anyone to know whether the information Citi relied upon for operational risk was accurate. (FE-8.)  Operational risk personnel were forced to use manual processes without the benefit of automation or technology, which meant there was no way for operational risk personnel to review or challenge the data or compare it with the data in the systems that first line (business management) or second line (independent control functions) teams were using.  (FE-8.)  To make matters worse, Citi's compliance leadership, including the Managing Director to whom FE-8 reported, had little experience with operational risk and did not know how to improve practices to mitigate risk.  (FE-8.)  Making the necessary improvements in the risk management tools "would have been like trying to turn the Titanic."  (FE-8.)

**b)** **Citi's Compliance Risk Management Was Ineffective**

63.     At the start of the Class Period, it was common knowledge among Citi executives that the Company suffered from obsolete and ineffective infrastructure, management reporting, and surveillance tools, and was not in compliance with regulatory standards.  (FE-1, FE-2, FE-3, FE-4, FE-5.)  But due to Citi's massive cost cutting and desire to avoid making compliance so strong that it hobbled the profit-making machine, Citi scrapped its modernization projects and  put a "freeze" on efforts to implement infrastructure that worked across the institution. (*See* FE-3; FE-2.)

64.     Similar to operational risk personnel, Citi's compliance personnel also struggled because they were forced to use antiquated technology and manual processes because Citi was unable to automate controls in its systems.  (FE-1, FE-2, FE-4.)  For example, pursuant to Bank Secrecy Act/Anti-Money Laundering  requirements, Citi was required to track and report currency transactions totaling more than $10,000 during any business day conducted by or on behalf of a person.  (FE-1.)  But, without an integrated system or automated processes, Citi expended enormous effort trying to keep up manually, effectively using "duct tape and bailing wire."  (FE-1.)

65.     Due to Citi's ineffective and unsustainable compliance infrastructure, senior personnel recommended that Citi institute an ERM system that worked across the institution. (FE-2, FE-3.)  But internal calls for Citi to invest in a unified system for risk and an enterprise risk management and integrated compliance risk system that works across equities, foreign exchange, and fixed income were ignored or flatly rejected.  (FE-3.)

66.     Citi refused to improve this failing infrastructure for two reasons.  First, in the midst of Citi's massive cost cutting, it had no appetite to make the large up-front expenditure to bring Citi into compliance.  (FE-3.)  While FE-3 and others urged leadership to incur the cost to bring Citi into compliance by implementing effective systems and controls rather than pay that same

amount of money in fines over the years, Citi's management disagreed.  (FE-3.)  Second,

management exerted significant internal pressure to keep compliance "sufficiently weak" to avoid

any impediment to Citi making money.  (FE-3.)  Compliance was not a profit center.  (FE-3.)  It

was common knowledge at Citigroup that its compliance technology was incompetent and

deficient, but management wanted to avoid making compliance so strong that it hobbled the profit-

making machine.  (FE-3.)

68.  In contrast to the systems of Bank of New York Mellon and UBS, where FE-12 had

worked for more than 20 years, Citigroup's infrastructure was not comprehensive and its

surveillance and management reporting tools were not effective.  (FE-12.)  These tools were stuck

in separate silos without the ability to report across the group.  (FE-12.)  As Citi's Senior Risk

Metrics Specialist explained, using Citi's tools for compliance and reporting was like going into a

garage of boxes that were not labeled or organized so that finding something specific required

opening and going through each box one-by-one.  (FE-12.)

### 2.  Citi's Data Governance and Data Quality Were Fundamentally Deficient

68.  Citi suffered from ineffective enterprise-wide data governance and data quality

deficiencies that were well documented in regular reports and meetings.  For example:

    a.  Quarterly Executive Scorecards that Corbat used to evaluate the performance of his direct reports on outstanding MRAs and MRIAs and other deficiencies (FE-1, FE-2, FE-5, FE-6, FE-9);

    b.  Quarterly Global BDQRs issued to CEO Corbat, CFO Gerspach or Mason, and other C-suite executives that identified Citi's ERM problems, unremediated deficiencies identified by regulators, and Citi's data quality management shortcomings against the enterprise standards (FE-1);

    c.  Quarterly Regulatory Noncompliance Meetings where CFO Gerspach, Citibank CEO Desoer, Global Heald of ONT Callahan, and other senior executives reviewed all outstanding issues of regulatory noncompliance and rejected solutions to implement effective enterprise-wide risk management,

replace antiquated technology, and integrate Citi's thousands of disparate systems (FE-2);

d.   Dozens of Risk Committee Meetings where CEO Corbat, CFO Gerspach or Mason, CCO Carawan were presented with a Dashboard presentation of the outstanding MRAs and MRIAs (FE-6);

e.   Quarterly Advisory Board Committee Meetings where Citi's Board Members were shown PowerPoint slides describing the problems identified by Citi's regulators, including the OCC, at a granular level (FE-7);

f.   Monthly BRCC Meetings held by CEO Corbat and CFO Gerspach or Mason with business CEOs to discuss the risks and controls deficiencies rolled up from each business (FE-1, FE-8);

g.   Quarterly Executive Operational Committee Meetings where Citi's Technology and Data executives presented CEO Corbat and other senior leadership with outstanding regulatory deficiencies (FE-9); and

h.   Data Governance Stakeholder Meetings held by CFO Gerspach, Global Heald of ONT Callahan, CDO Burke, CTO John D'Onofrio, and the heads of GCB and ICG to discuss reports and hundreds of pages of slides detailing data quality scores, data quality deficiencies, and findings showing that Citi needed to improve the strength of controls that measured data quality from the transaction level (FE-2).

69.   Notwithstanding their knowledge of Citi's numerous and longstanding systemic deficiencies, Citi senior management refused to modernize and perform the "reconstruction" of Citi's data governance that they knew was necessary for effective data governance and minimum regulatory compliance.  (FE-1.)

70.   Three such fundamental problems that Citi refused to "reconstruct" included:

a.   Citi ran thousands of antiquated systems and databases all operating independently without any integration or ability to communicate with one another.  (FE-1, FE-2, FE-4.)  There was insufficient automation or controls in place to make sure the data was accurate and Citi was not funding what was needed to fix it.  (FE-1, FE-2, FE-4, FE-8.)

b.   Data quality was extremely poor and impossible to verify because there was no "golden record," or data point that accurately provided relevant information about a customer, client, or resource, and Citi never adopted a data quality platform.  (FE-1.)  A lot of the data was not vetted, making the

records unreliable, with information systems from entities acquired by Citi languishing as "crude repositories." (FE-4.)

c. Citi had ineffective data lineage controls to address the changes that occur when data moves from one system to another and to ensure data matched going all the way back to the source system from which it originated. (FE-1.)

### 3. Internal Audits Identified Ineffective and Dysfunctional Technology but Senior Management and Citi's Board of Directors Suppressed the Internal Audit Team Rather than Remediate These Deficiencies

71.     After years of neglect, by 2017, Citi's technology was so antiquated, obsolete, and ineffective that Citi had an insurmountable "technology debt"—the implicit cost of fixing the technology—that could only be cured by scrapping the thousands of incompatible systems and replacing them with an integrated enterprise-wide system. (FE-1, FE-2.) Citi's technology was so poor that it was "always" a key operational risk, and Citi "knew it." (FE-5.) Citi was running incredibly complex, acquired and legacy systems, with thousands of systems with different data, different data structures, and different technology stacks. (FE-5.) These deficiencies made major miscalculations common, which impacted clients. (FE-5.) Rather than fix its broken technology, Citi gutted its internal auditing, ignored numerous instances of failed internal audits, and silenced auditors who escalated technology failures to senior management and the Board of Directors. (FE-1, FE-2.)

72.     Though FE-2 (Managing Director, Data Governance Technology Audit for Global Functions) raised these concerns directly with Global Head of ONT Callahan, CDO Burke, CTO D'Onofrio, Chief Technology Auditor Padmanabhan, and Chief Auditor of Risk Management Ricci and proposed solutions such as more training or management oversight, "no one was willing to make those investments." (FE-2.) Or, as FE-1 put it, internally, everyone knew the technology at Citi had to be fixed and it would be a long and expensive road, but Citi did not want to spend the money on it. (FE-1.) Instead, Citi tried to patch things with *ad hoc* "work arounds." (FE-1.)

       **4.**    **Citi Was Subject to MRAs and MRIAs for the Exact Risk and Controls Deficiencies that the OCC and Fed Later Identified in the 2020 Enforcement Orders**

73.    By the start of the Class Period in 2017, Citi was operating under at least 50 MRAs and MRIAs, including MRAs and MRIAs for its risk and control failures, but never remediated them.  (FE-1, FE-4.)

74.    It was clear that Citi's regulators "were not happy with the progress" and were dissatisfied because Citi failed to meet the regulators' requirements in terms of technology, data, and enterprise-wide systems.  (FE-1, FE-2.)  Whereas competitors like JPM, BOA, and Wells Fargo had big platforms already and had command and control of data across systems, by 2017, Citi knew that it would ultimately receive a consent order unless it fixed its longstanding data quality deficiencies.  (FE-1.)

75.    The 2020 Enforcement Orders were "exactly consistent" with what regulators had previously identified in the MRAs and MRIAs *since 2017* concerning Citi's lack of ERM capabilities, data governance deficiencies, and failed technology.  (FE-1, FE-2.)  These MRAs and MRIAs were predictive of the deficiencies Citi needed to fix to avoid an Enforcement Action. (FE-1.)

76.    MRAs and MRIAs issued to the Company were well known to Individual Defendants Corbat, Gerspach, and Mason.  In the ordinary course, the details of the MRAs and MRIAs issued to Citi were all communicated, director-level and above (*i.e.*, directors, managing directors, and their superiors).  (FE-1, FE-6.)  Corbat tracked progress on all outstanding MRAs and MRIAs for each business with Executive Scorecards, which were used to measure the job performance of his direct reports.  (FE-1, FE-6.)  MRAs and MRIAs were also a central topic of discussion at dozens of Citigroup Risk Committee Meetings, which were attended by CEO Corbat, CFO Gerspach and later CFO Mason, as well as CCO Carawan, members of the leadership council,

and personnel from all lines of defense (*see* Glossary of Terms, *supra*, and Section VII.C.1, *infra*), including the business leaders and representatives of internal audit and compliance.  (FE-6.)

77.     Further, the governing regulations confirm that, as part of Citi's senior management and/or Board or Directors, Defendants were personally informed of these MRAs and MRIAs, including because Citigroup's CEO and Board are required to acknowledge in writing warnings issued by these agencies that the bank is not in compliance with their requirements. (*See* Section VII, *infra*.)

78.     Citi's inability to implement an effective and functioning know-your-customer (KYC) system is illustrative.  Regulators like the OCC require an effective KYC system, including as part of risk management and compliance risk management, to meet the requirements of anti-money laundering (AML) regulations, among others.  By the start of the Class Period, the data Citi needed for proper KYC procedures was inaccessible and inconsistent.  (FE-4.)  Moreover, Citi's process was not automated and did not have global reach.  (FE-4.)  As VP for ICG for Strategic Data Solutions, FE-4 was the project lead on the "analytics" side and worked extensively with the compliance team to try to remediate these deficiencies and create a functioning global KYC system.  (FE-4.)  Citi was subject to an MRA directing it to create a global KYC system.  (FE-4.) This MRA was outstanding at the start of the Class Period in February 2017, as FE-4 recounted that it occurred before Mark Carawan was named Chief Compliance Officer (FE-4), which Carawan's LinkedIn profile marks as February 2017.

79.     Citi was unwilling and unable to create the required global KYC system for several reasons.  For one, Citi's data quality and technology were so deficient that the data necessary to create the automated KYC system required by regulators was in a format that could not be automated.  (FE-4.)  For example, Citi's client data in Japan was "literally on scraps of paper."

Another problem was that Citi's sales head was inexplicably unwilling to provide the information and data required to create a KYC system.  (FE-4.)  Rather than overcome these obstacles, Citi instructed its compliance teams to dramatically reduce the scope of their work to such an extent that it was impossible to create the functioning global KYC system required by Citi's federal regulator.  (FE-4.)  FE-4 recounted that data quality and technology limitations at Citi prevented things from working the way they should and Citi was not following good data management and organization processes.  (FE-4.)

> **5.   Citi's Risk Governance Did Not Operate "Firm Wide," Was Ineffective, and Was Not Aligned with Regulatory Requirements**

80.   Since at least 2016, and throughout the Class Period, Citi did not have effective data governance, technology, surveillance, or enterprise-wide risk management in compliance with regulatory standards.  (FE-3.)  The policies, procedures, and processes Citi had to try to identify, measure, manage, monitor, report, and control risks did not operate "firm wide," were ineffective, and were not aligned with regulatory requirements.  (FE-2.)

81.   Citi did not develop a full, real-time risk management system.  (FE-3.)  Such a system must have real-time financial data coming in to effectively manage risks associated with market conditions.  (FE-3.)  Real-time data was critically important to effectively monitor foreign exchange, yields, interest rates, and credit, as well as to hedge the underlying portfolio, derivatives, and other financial assets.  (FE-3.)  Incorporation of real-time data was also critical to effectively managing compliance in areas like insider trading.  (FE-3.)  Citi's risk management did not effectively incorporate real-time data and Citi was unwilling to provide the budget or resources to develop it.  (FE-3.)

C.      **February 24, 2017:  Class Period Begins**

1.      **Despite the Known Deficiencies and Lack of Effective ERM, Citi Misrepresented to Investors It Has a "Firm-Wide Risk Governance Framework" that is "In Alignment" with OCC Heightened Standards**

82.      On February 24, 2017, Citigroup filed its Annual Report for 2016 on Form 10-K with the SEC ("2016 Annual Report").  In the 2016 Annual Report, Defendants made extensive representations to investors to assure them that Citigroup was in regulatory compliance and comprehensively managing its risk systems.  The Report first gave an overview of the Board's role in independently ensuring that Citigroup was compliant:

> Citigroup's Board of Directors oversees Citi's risk-taking activities. To do so, directors review risk assessments and reports prepared by Risk, Compliance, Human Resources, Legal, Finance and Internal Audit and exercise independent judgment to question, challenge, and when necessary, oppose recommendations and decisions made by senior management that could cause Citi's risk profile to exceed its risk appetite or jeopardize the safety and soundness of the firm. (p.62)

83.      The 2016 Annual Report went on to say:

> ***Citi's firm-wide Risk Governance Framework*** consists of the policies, procedures, and processes through which Citi identifies, measures, manages, monitors, reports, and ***controls risks across the firm. . . . The Risk Governance Framework has been developed in alignment with the expectations of the Office of the Comptroller of the Currency (OCC) Heightened Standards.  It is also aligned with the relevant components . . . of the Federal Reserve's Enhanced Prudential Standards for Bank Holding Companies and Foreign Banking Organizations***.  (at 64)

> Citi manages its risks through each of its three lines of defense: (i) business management, (ii) independent control functions and (iii) Internal Audit.  The three lines of defense collaborate with each other in structured forums and processes to bring various perspectives together and to steer the organization toward outcomes that are in clients' interests, create economic value and are systemically responsible. (at 65)

> Citi's Internal Audit function independently reviews activities of the first two lines of defense based on a risk-based audit plan and

methodology approved by the Audit Committee of the Citigroup Board of Directors.   Internal Audit also provides independent assurance to the Citigroup Board of Directors, the Audit Committee of the Board, senior management and regulators regarding the effectiveness of Citi's governance and controls designed to mitigate Citi's exposure to risks and to enhance Citi's culture of compliance and control (at 66)

84.     According to FE-2, who led the team that audited, globally, Citigroup's technology that underpinned processes and controls for operational risk management, and FE-3, a Senior Compliance Officer, Citi's statement to investors was not accurate.   (FE-2, FE-3.)   As FE-2 explained, Citi's policies, procedures, and processes to try to identify, measure, manage, monitor, report, and control risks did not operate "firm wide," were ineffective, and were not aligned with these regulatory standards.   (FE-2.)   As FE-3 put it, Citi's compliance was "exceptionally bad," and FE-3 could "not believe a major bank was running a show like this."   (FE-3.)   Citi did not have effective data governance, technology, surveillance, or enterprise-wide risk management, and was not in compliance with regulatory standards.   (FE-3.)   FE-2 explained that a more accurate or complete statement would have involved telling investors that "we still have a lot of work to do" because "a lot of manual work" is required in Citi's processes, that there were "insufficiencies of the controls themselves," and that Citi lacked a "sustainable set of systems."   (FE-2.)

85.     By February 2017, regulators had identified these functions as deficient and were frustrated by Citi's inability to fix them and bring itself into compliance with regulatory standards. (FE-2.)

86.     Yet, at the time, analysts believed Defendants.   In a February 8, 2017 analyst report, Morning Star Equity Research summarized its investment thesis: "Over the past few decades, Citigroup has teetered on the edge more than once," but "the bank is finally on the road to rehabilitation" and "Citigroup investors should be able to sleep more soundly over the next decade."   In its July 14, 2017 analyst report, Morning Star Equity Research reiterated its

expectation that Citigroup is a "restructured company" and that "risk management at Citigroup has improved substantially over the past decade."

87.     On July 25, 2017, at an Investor Day Conference, CEO Corbat reassured investors that "[w]e have been rebuilding our credibility, our relationships with our regulators . . . . And our progress, it can be seen not just through the robustness of our business, but also through the investments that we've made in controls—to improve processes across risk, compliance and audit—which gives us our licenses to run and to grow our business."  Corbat continued, "There is no doubt that we've become a simpler, smaller, safer and stronger institution over the last several years. . . .  *As I've said, our restructuring is over*. . . .  We're competing from a position of strength in terms of regulatory infrastructure, capital and liquidity."

88.     The ratings agency Moody's also focused on Citigroup's purportedly improved risk management systems when updating its outlook for Citigroup debt.  On November 14, 2017, Moody's changed its outlook on Citigroup from stable to strong, stating, "[t]he change in outlook to positive from stable reflects Moody's view that Citigroup has largely completed its sweeping reengineering which has resulted in a more solvent institution with an improved risk-attuned management culture."

> **2.     In 2017, Citi Abandoned Its "Project Rainbow" Initiative to Create an Enterprise-Wide Risk Management System, but Told Investors the Opposite**
>
>> **a)     Citi Abandoned "Project Rainbow," Leaving It with Ineffective ERM and Insurmountable "Tech Debt"**

89.     Citi had long recognized it needed effective ERM to run an efficient, modern bank and to comply with regulatory requirements.  For years, Citi led investors to believe it was achieving this through its so-called "Project Rainbow."  CTO John D'Onofrio led the Project Rainbow initiative and sought to create a modern-day platform that would have allowed Citi to put

automated risk and controls around data. (FE-1.) This represented a strategic decision by Citi to get everyone on one platform. (FE-1.) Or, as another longtime Citi executive put it, Citi had acquired so many banking networks and regional banks that the Company needed to build a harmonious platform to replace its existing patchwork of systems. (FE-7.)

90.     In 2015 and 2016, there was such tremendous reliance on Project Rainbow that Citi deferred work and let technological gaps and risk and control deficiencies pile up, justifying its inaction on the grounds that once Project Rainbow was released it would fix everything. (FE-1.) For example, at BRCC meetings FE-1 attended in 2016, Citi documented decisions to defer projects due to Project Rainbow's supposedly pending implementation. (FE-1.) Everyone was waiting for Project Rainbow as "the promised land," or the "silver bullet," to solve the "tech debt" that had built up. (FE-1.) Project Rainbow was the "magical platform that was supposed to happen," but it was "like Big Foot"—that is, "everyone talked about it, but no one had seen it." (FE-1.)

91.     Citi first tried to roll out this developing platform in the Asia Pacific region and it was a "total disaster." (FE-1.) In 2017, Citi declared the new platform was a "no go." (FE-1.) Despite heavy expenditures, Citi did not get anywhere with the project. (FE-7.) Citi's erratic leadership did not provide the necessary guidance on what was needed for a unified platform to function properly and to meet the needs of the business, causing Project Rainbow to be a spectacular failure. (FE-7.)

92.     Following this failure, Global Consumer Bank CEO Bird, who had worked in the Asia Pacific region and witnessed the failure, no longer sought to get everything on one platform. (FE-1.) Citi pulled the plug on trying to achieve effective enterprise-wide risk management and

controls, and was simply not willing to provide the funding needed to fix the complex problems Citi had.  (FE-1.)

93.     But because Citi had "bet all the chips" on Project Rainbow and had been deferring all Citi's technology debt, the abrupt cancellation of Project Rainbow created a hopeless situation. (FE-1.)  Citi had put too much reliance on Project Rainbow to fix its systems that caused the MRAs and MRIAs in the first place.  (FE-1.)

94.     After scrapping Project Rainbow, in 2017, Citi was left with antiquated mainframes and clunky distributed systems that did not work in tandem with one another and necessitated flawed manual data searching because Citi did not have a way to automate controls in its systems. (FE-1.)  Moreover, Citi did not have a planned solution to fix the systems that were deemed problematic by the regulators in the MRAs and MRIAs even though Citi knew that an Enforcement Order was forthcoming if Citi did not fix these longstanding deficiencies.  (FE-1.)  To avoid the long and expensive road needed to address "the stack of MRAs and MRIAs," Citi instead mislead regulators by firing executives as scapegoats and using "work arounds" and "cheap hack[s]" to create a "veneer" of compliance.  (*See* FE-1, FE-2, FE-3.)

> **b)     Citi Misled Analysts and Investors by Proclaiming Project Rainbow Was a Success that Was "Paying Great Dividends" and Gave Citi "A Holistic View" Whereby Citi Was Now "Tracking Everything Globally"**

95.     On June 1, 2017, Bernstein analyst John McDonald asked Citigroup's executives, "you've done a lot of investment spending, you've done some big projects upgrading major systems . . . . Are you kind of at the tail end of the major big projects you set upon the last couple of years?"  Corbat replied,

> [f]rom an ***infrastructure perspective***, we've got, really if not all, certainly most of the systems or base systems that we need. . . . [W]e've spent all the energy and effort in terms of creating these ***systems that have the ability to come back and communicate***

> *centrally*. . . . So, as we look, again, I think *from a regulatory perspective*, major investments from a Rainbow and some of the big projects we talked about in the past and things that I think they're *paying great dividends*, those investments made.

96.    On May 30, 2018, when asked by that same analyst, "what did you learn in Asia that made it successful that you can bring here," Corbat again touted Project Rainbow as a successful project that "gave us the ability to have a holistic view," and led investors to believe that Citi had successfully implemented the holistic capabilities that the Company had privately abandoned:

> *If you remember some of the investments we made in Rainbow that gave us the ability to have a holistic view*.  So, if you go back not that far in time, and as you covered our company, it was Citi Cards, it was CitiMortgage, it was vertical or silos, as we call them, of product-driven interactions.  Technology today here in the U.S. gives us the ability to have a holistic view. So, you're a Cards client, you're a Retail Bank client, you're Wealth, you're Citigold, you're Citi Blue, *we have the ability to see you and think of you and present to you from a holistic view*.

97.    On October 12, 2018, on Citi's Q3 Earnings call, long after Citi had scrapped Project Rainbow as a costly failure, Corbat again falsely claimed Project Rainbow as a successful infrastructure project that gave Citi new "holistic[]" capabilities, stating:  "I think the work that was done in terms of Rainbow and other technology implementations *now gives us the ability to view the client holistically*."

98.    Analysts took Corbat at his word.  For example, Wells Fargo analyst Mike Mayo asked a "follow-up," about Citi "hav[ing] a lot more capability internally, given what you've done with Project Rainbow," based on his understanding that Project Rainbow had successfully consolidated Citi's legacy systems from its earlier acquisitions, to which CFO Gerspach responded by falsely confirming Citi's enterprise-wide capabilities:

> MIKE MAYO:  Or it could relate to more digital banking disclosure, how you're doing with products and customers.  Or you have a lot

36

more capability internally, given what you've done with Project Rainbow. And I thought that was a good reference like a decade or two to consolidate all the retail system after all those earlier acquisitions. So now that you have these capabilities to serve customers, maybe you can provide us with more information on any incremental success you're having.

JOHN GERSPACH: Yeah. I mean, we've taken a first stab of that. If you take a look at slide 24 in the appendix, maybe in the future, we can do a little bit more of this on a regional basis. ***Right now, we're tracking everything globally***. So we'll see how we build this into something else.

MIKE MAYO: All right. Thank you.

**D.    During the Class Period, Citi Failed Internal Audits, Regulators Lost Patience with Citi's Noncompliance and Forced the Resignations of C-Suite Executives; Yet Citi Continued to Represent It Was in Alignment with OCC and Fed Regulations**

**1.    Despite Failed Internal Audits, Direct Objections to Senior Management, Directives from Regulators to Improve Data Governance, and Regulators' Mounting Frustration, Citi Still Refused to Invest in ERM**

**a)    Citi Failed Multiple Internal Audits**

99.    In the wake of Citi's "freeze" on compliance investments, axing its modernization initiatives, and scrapping the Project Rainbow enterprise-wide infrastructure initiative Citi's technology debt was insurmountable.

100.    As a result of its non-compliant and deficient technology and data quality, Citi consistently failed internal audits and assessments. In one notable example, in Spring 2017, Citi's technology was designated "unsatisfactory" in its annual Comprehensive Capital Analysis and Review (CCAR). (FE-2.) After looking at the controls and systems that the business was using to do capital reporting, the internal audit team working under FE-2 found such significant errors and problems in how the controls were being handled that they were forced to assign Citi an audit rating of "unsatisfactory." (FE-2.) Ignoring the audit team's rating and reported concerns, Citi

rated its CCAR as "Effective or Mostly Effective."  (FE-2.)  This self-rating was "not authentic" because technology was the "fundamental, critical component of everything else that comprised the audit," and with its "broken" underlying technology the CCAR could not "produce a sustainable and believable outcome."  (FE-2.)

101.    This was not the only failed audit.  At this same time, Citi also failed its BCBS 239 Audit, with the entire program deemed "not effective."  (FE-2.)  And Citi failed its AML Technology Audit which auditors designated "high risk" because of at least four separate technology failures, including that Citi was using "ineffective algorithms" that were incapable of consistently performing basic calculations.  (FE-2.)  Citi also failed its Continuity of Business Audit because it had at least fifteen deficient issues, and additionally, issues that had been previously identified had never been fixed.  (FE-2.)

102.    Further, Citi failed its internal Finance Integrated Audit due to deficiencies with the "algorithms and math," and "errors" in the calculations used for Citi's financial reports.  (FE-2.)  Moreover, the software developed for Citi's financial reporting did not follow procedure, and there were gaps in executing of the procedure that led to errors in financial calculations.  (FE-2.)  Rather than upgrade its technology to ensure accurate financial reporting—and meet minimum regulatory requirements—Citi outsourced the review of its financials to offshore employees in Poland and elsewhere to try to manually correct the inaccurate financial reporting generated by Citi's ineffective systems.  (FE-2.)

103.    Separately, in a Financial Reporting Systems Audit, FE-2 issued an audit finding of "needs improvement."  (FE-2.)  Rather than improve Citi's deficient financial reporting, David Rafalovsky, the executive overseeing the deficient financial reporting, "berated" the entire audit team for "30 minutes" because not passing the audit would hurt Rafalovsky's performance

evaluation.  (FE-2.)  FE-2 escalated this to CTO D'Onofrio, who understood the deficiencies.  (FE-2.)  Nonetheless, Citi took no corrective action and the deficiencies were not remediated.  (FE-2.)

104.    These failed audits were sent to Citi's Board of Directors, and the audit reports written by FE-2 and FE-2's team detailing the failures were reviewed by the Board's Audit Committee.  (FE-2.)  Still, Citi refused to invest in technology, and each department was ordered to try to maintain the "veneer" of compliance using the technology already in place.  (FE-2.)

105.    Citi's technology was "broken" and the Company's internal strategy was to try to plug the holes in its "broken" technology by hiring "armies" of low-cost offshore labor in places like Warsaw and Costa Rica to "clean and cleanse the data to make it work"—it was "not automated in any sense."  (FE-2.)  The "armies" worked long hours to try to manually correct the errors and discrepancies in the data and reporting generated by Citi's antiquated systems.  (FE-2.)  It was a losing battle and failure was "inevitable."  (FE-2.)  Errors continued to pile up and each year Citi's technology fell further behind as the banking system became increasingly complex.  (FE-2.)

106.    Citi's approach was not "sustainable."  (FE-2.)  Citi's automated systems had failed and, rather than fix them, Citi was injecting hundreds if not thousands of people to scrub and "clean" data to try to present "a facade of being good."  (FE-2.)  But if the automated systems had been functioning, none of these manual processes would have been necessary.  (FE-2.)  And, as FE-2 explained, "system fixes do well consistently," whereas "manual fixes have a tendency not to work the way you want."  (FE-2.)

107.    This approach of trying to patch failures in existing technology without actually upgrading Citi's infrastructure was akin to "changing the engine on an airplane during flight—you

cannot just rip it out and the business goes on hold while you do what you need to." (FE-2.) In other words, unless Citi actually created new "systems" that worked enterprise-wide, it could never modernize or meet the regulators' requirements. (FE-2.) Citi's secret behind-the-scenes manual cleanup process was inefficient and did not comply with minimum regulatory requirements. (FE-2.) Citi, however, was not willing to make those investments, and efforts of FE-2 and others to push for enterprise-wide systems failed because senior leadership, including CCO Carawan, CTO D'Onofrio, and Chief Auditor of Risk Management Ricci all made clear they were not willing to entertain it. (FE-2; *see also* FE-1.)

> b) **Citi's Senior Management Ignored Objections, Refused to Invest in Enterprise-Wide Risk Management, and Doubled-Down on Citi's Deficient Infrastructure**

108.    As Citi's Senior Vice President and Chief of Staff to the Head of Technology for GCB and Technology Transformation Leader explained, poor technology and legacy systems created a key operational risk for Citi—"always and they knew it"—and there was general agreement that regulatory compliance was not achievable unless Citi implemented a proper ERM infrastructure. (FE-5.) Yet, when FE-5 brought up this ERM proposal in meetings across IT leadership, it did not gain any traction and Citi was not willing to prioritize it. (FE-5.)

109.    FE-5 was not alone. Frustrated with Citi's refusal to remediate its failed data infrastructure and "gigantic mess of the legacy systems that did not talk to each other," FE-3 (Senior Vice President, Senior Compliance Officer for Surveillance) memorialized these concerns to senior leadership in a "ten-point email" sent in August 2018. (FE-3.) FE-3's email identified problems with Citi's culture, technology, and lack of regulatory compliance, and detailed why Citi's compliance infrastructure was ineffective and unsustainable. (FE-3.) To ensure it was seen

by all senior leadership, FE-3 sent the email to the heads of human resources, legal, and copied many compliance colleagues who shared FE-3's concerns.  (FE-3.)

110.    Following the 2018 email, FE-3 received private assurances from colleagues agreeing with the assessments and complaints.  (FE-3.)  But instead of taking action to improve the culture of regulatory non-compliance and make headway to remediate its ineffective compliance risk management, Citigroup retaliated against FE-3, eventually forcing FE-3 out of the Company a few months later.  (FE-3.)

111.    Similarly, FE-3's recommendation to senior managers and colleagues alike that Citi needed a unified system for risk and an integrated ERM and compliance risk system that works across equities, foreign exchange, and fixed income.  (FE-3.)  But these suggestions were ignored or flatly rejected.  (FE-3.)

112.    Separately, FE-2 took head on Citi's longstanding failure to comply with regulatory requirements.  (FE-2.)  Multiple times, FE-2 met with management and challenged Citi's lack of remediation, advising that Citi was not on the right path to remediation, and providing constructive criticism of plans written to address outstanding MRAs.  (FE-2.)  But, like FE-3, FE-2's challenges and recommendations also "fell on deaf ears."  (FE-2.)

113.    Likewise, FE-1 consistently raised objections to Citi's risk management, technology, and data quality deficiencies, but FE-1's concerns were ignored, and FE-1's compensation suffered for raising them.  (FE-1.)

> c)    **Regulators Lost Confidence in Citi's Management and CDO Burke, CTO D'Onofrio, and Global Head of ONT Callahan All Left in Quick Succession**

114.    CDO Burke, CTO D'Onofrio, and Global Head of ONT Callahan were all long time Citi executives who had held a number of roles at the Company, understood its deficiencies

very well, and were actively involved with discussions with the OCC and other regulators. (FE-2.) But their understood their instructions from senior executives were that improving the technology was a non-starter, and the goal was to find a way to keep the bank going using existing infrastructure. (FE-2.) In other words, Citi had a "sweep it under the rug mentality." (FE-2.)

115.    OCC staff began to lose confidence in management. (FE-2.) Although Citi would declare "victory" to the regulators, something would inevitably break because Citi was "painting over" its failed technology rather than fixing its underlying problems. (FE-2.) There was "constant frustration" coming from the regulators about why Citi's compliance failures had not been fixed and they wanted to know "when management was actually going to do what they said they were going to do." (FE-2.) When each deadline arrived for what management had "committed to do," there was "always some caveat" that "got in the way" of completing and "remediating the issue to the degree the regulators believed it was going to be remediated." (FE-2.) The frustration by regulators had been building since at least 2013, when FE-2 started at Citi, due to Citi's continued failures and either offering excuses or "kicking the can down the road all the time." (FE-2.) Over time, Citi's noncompliance with basic technology became increasingly difficult to hide. (FE-2.) "It only got worse" because "Citi never really addressed the problem" and the "veneer of what had been said was good eventually show[ed] itself for what it was." (FE-2.)

116.    As a result, the regulators lost trust in D'Onofrio, Burke, and Callahan and their ability to lead the change required at the Company. (FE-2.) In the regulators' view, they were "not up to the task of what needed to be done." (FE-2.) Finally, frustrated with these issues and things not getting fixed, in one of their regular meetings, regulators told Callahan that he "should not be at Citi." (FE-2.) Then, in quick succession, from June 2018 to February 2019, Burke, D'Onofrio, and Callahan all left Citi. (FE-2.)

2.    **Despite Widespread Technology Failures and Regulators' Findings to the Contrary, Defendants Continued to Tell Investors that Citi Was Aligned with OCC Heightened Standards**

117.    On February 23, 2018, Citigroup filed its Annual Report for 2017 on Form 10-K with the SEC ("2017 Annual Report").  Citi assured investors that it was a "champion of responsible finance" (*id.* at 115).

118.    Citigroup also made the same statements set forth in Paragraph 83 that (i) Citi's risk governance framework was in alignment with its compliance obligations; (ii) Citi manages its risk through three lines of defense; and (iii) Citi's Internal Audit function provides independent assurance to the Citigroup Board of Directors, the Audit Committee of the Board, senior management and regulators regarding the effectiveness of Citi's governance and controls.  (2017 Annual Report at 66-68).

119.    On April 24, 2018, O'Neill—Citigroup's former Chair—again misrepresented to investors that Citi had "work[ed] through" its risk management problems, and that those issues were behind the Company, stating, "***risk management is the bedrock of banking***, and that we certainly had not done as good a job in the past.  And that the outcome was rather unfortunate, as we all know.  ***It's taken quite a while to work through that problem***.  I've already talked about how ***we've done that.  I think we made great progress***."

E.    **By 2019, Citi Could No Longer Maintain Its "Veneer" of Compliance and the 2020 Enforcement Orders Against Citi Became Inevitable**

1.    **Unbeknownst to Investors, in 2019, the OCC and Fed Enforcement Actions Had Become Inevitable**

120.    Regulators were a constant presence at Citi.  (FE-2.)  OCC staff could come and go from Citi's New York City office as they pleased, and phoned or approached Citi employees in person, without notice, to ask questions and gain information.  (FE-2.)  Citi had a longstanding

stack of MRAs and MRIAs but was simply not willing to provide the funding needed to fix the complex problems Citi had.  (FE-1.)  As another Citi executive put it, Citi's refusal to devote resources to addressing the MRAs and MRIAs and creating an enterprise-wide risk management system was so frustrating that it became a "running joke" that the compliance team was simply "doing the best we can with what we have."  (FE-4.)  One Citi Managing Director put it more bluntly, stating Citi had done next to nothing to fix its problems; most of the money that was spent was spent terribly on all the wrong people; and no one cared what the government thought. (FE-11.)

121.   With the abrupt departures of CDO Burke, CTO D'Onofrio, and Global Head of ONT Callahan, Citi could no longer maintain its "veneer" of compliance.  (FE-2.)  Burke, D'Onofrio, and Callahan were the most experienced technical people at Citi; they knew the Company's technology intimately, and were seasoned professionals.  (FE-2.)

122.   As FE-2 (Managing Director, Data Governance Technology Audit for Global Functions) explained, in effect, under the leadership of these senior executives, Citi had been demonstrating a prototype of a vehicle and convincing regulators the vehicle functioned properly. (FE-2.)  However, the technology did not function, and under the hood, it was manual labor of outsourced offshore workers running with their feet on the ground to make it look like the vehicle moved.  (FE-2.)  Once these senior executives left, the regulators could pop the hood and see the reality that they had been misled and the vehicle did not function at all.  (FE-2.)

123.   With Citi's "work arounds" exposed and its "veneer" of compliance gone, by February 2019, Citi's failure to implement effective ERM or address longstanding MRAs and MRIAs was laid bare for regulators.  Again, the 2020 Enforcement Orders were "exactly consistent" with what regulators had previously identified in the MRAs and MRIAs *since 2017*

concerning Citi's lack of ERM capabilities, data governance deficiencies, and failed technology. (FE-1, FE-2.)  This fact is corroborated by the declaration filed in another case by the OCC Examiner-In-Charge Greg Sullivan, who declared that "[m]any of the supervisory concerns addressed by the 2020 Orders were identified by the OCC and **communicated to the bank several years prior to . . . July 3, 2019**."  (Sullivan Decl. ¶27; *see id.* ¶¶3, 11.)

### 2. February 2019 to September 2020:  Defendants Continued to Falsely Tell Investors that Citi Was Aligned with Regulators

124.    Even in the face of its substantial and severe systemic deficiencies, Citi made every effort to keep up the false front.

125.    According to its 2019 Proxy, filed with the SEC on March 6, 2019 ( the "2019 Proxy") and incorporated by by reference in Citi's Annual Report for 2018 on Form 10-K filed with the SEC on February 22, 2019 ("2018 Annual Report"), Citigroup was "active in ensuring its governance practices are at the leading edge of best practices," including "maintaining full compliance with the laws, rules, and regulations that govern Citi's businesses."  (2019 Proxy at 22.)  The Company went so far as to characterize its risk and control infrastructure as "systemically responsible" (2018 Annual Report at 59).

126.    Indeed, Citigroup again reassured investors that its risk governance framework was in "alignment" with its compliance obligations and that it managed its risk through three lines of defense (2018 Annual Report at 59-60).

127.    On February 21, 2019, Moody's again upgraded Citigroup, this time raising its rating of Citi's long-term debt from Baa1 to A3, stating, "[t]he upgrade . . . reflects the successful execution of management's multiyear strategy to simplify Citigroup's operations, reduce its global consumer footprint, enhance its safety and soundness and pursue sustainable growth."  Moody's concluded, "[a]lthough Citigroup remains a large and complex organization, its risk management,

risk appetite and corporate governance are significantly improved since the financial crisis and are well aligned with its strategy."

128.    On March 6, 2019, Citigroup filed its 2019 Proxy, which included a "Letter from the Board of Directors to our Shareholders" (the "Letter").  The Letter assured investors that Citi had "made headway on a range of heightened regulatory requirements that all large banks have faced in the wake of the financial crisis;" and "prudent risk management was top of mind for both management and the Board in 2018."  (Letter at 4.)

129.    Current Chair Dugan (who also served as Comptroller of the Currency from 2005-2010) likewise recognized at the April 16, 2019 Annual Shareholders Meeting that it was "absolutely critical" that Citigroup comply with OCC and Fed regulations.  He went so far as to assure investors that Citigroup had moved past its troubled past.  According to Dugan, it was:

> absolutely critical that we keep our eyes focused on [regulatory and supervisory expectations], move forward, [and] address these regulatory and supervisory issues because we cannot afford to backslide.  And the same is true about risk.  We -- *the company spends a great deal of time, the Board does and the Risk Committee in particular, on making sure that management identifies, measures, monitors and controls the key risks facing the company* because again, we have to have a culture of disciplined, prudent risk-taking for which -- to achieve sustainable earnings because we can never have the company slip back to the place where we were before.

130.    Defendant CFO Mason stated on July 15, 2019 that sufficiently investing in the Company's risk infrastructure and controls is "critical to the long-term sustainability of the franchise."

131.    An analyst report by Mike Mayo at Wells Fargo on October 23, 2019 praised Citigroup's "progress" concerning regulatory compliance and technology: "Over the past few years, tech has moved up the pecking order of priorities, both because *[Citigroup] put many of its*

*past regulatory issues behind it* and given the necessity to compete . . . [I]t has [also] *evolved the*

*technological architecture*."

132.    On January 20, 2020, Wells Fargo (Mike Mayo) issued another analyst report that

stated, "Citi should be beyond reproach with governance.  We raise this issue even while we

recommend the stock because stronger oversight is one reason that Citi has improved and should

continue to do so."

133.    On April 15, 2020, Citigroup reported earnings for 1Q 20 and posted a presentation

to the Company's website titled "First Quarter 2020 Earnings Review," stating that "[d]espite a

challenging environment, *[Citigroup] delivered . . . strong risk management*."

134.    And then on July 14, 2020, near the end of the Class Period, Corbat reiterated:

> We'll keep managing through this with a sharp emphasis on our risk
> management.   We continue to make investments in our
> infrastructure to enhance our safety, soundness and controls to
> ensure that we have an indisputably strong and stable institution.

135.    Mason similarly stated the same day that:

> We also have investments that we will continue to make:
> investments in technology; investments in enhancing our digital
> capabilities. . . .  Investment in infrastructure and controls that ensure
> that we not only protect the franchise, but we're improving our
> efficiency in operations, and improving the quality of our data.

136.    According to an analyst report issued by Zacks Investment Research on August 12,

2020, "management remains focused on protecting employees and supporting customers.  And

[they] continue to feel good about the investments [they] are making, particularly in [their] digital

capabilities, and infrastructure and control.  Therefore, it continues to explore all opportunities to

operate more efficiently to fund investments made in digital capabilities and infrastructure and

control and offset headwinds induced by the pandemic."

**3.** **August 2020 to September 10, 2020:  Though the Cause Was Concealed from Investors, Citi's Lack of Effective ERM and Compliance Resulted in a $900 Million Error and Corbat's Early Resignation**

**a)** **August 2020:  Citigroup's $900 Million Error**

137.    On August 13, 2020, *The Wall Street Journal* reported that Citigroup "inadvertently" wired $900 million to lenders of cosmetics company Revlon Inc. as a result of an "operational error."  The next day, *Bloomberg* reported that Citi was asking "for the money to be returned, citing a clerical error."

138.    On August 17, 2020, *The Wall Street Journal* reported that Citigroup blamed "issues with the loan-processing system."  On August 24, 2020, *Bloomberg* reported that Citi had "determined that the mistaken payments resulted from human error," specifically, that "a Citigroup employee did not manually select the correct system options—allowing the loan to be paid back in full with interest."

139.    To assure investors, Citigroup told *Bloomberg* that this was a narrow issue that had been addressed.  According to Citigroup, "[w]e have put significant, additional controls in place until the new system is operational. . . . We take pride in the role that we play as a global leader in financial services and recognize that an operational error of this nature is unacceptable."  *Bloomberg* further reported on August 25 that "[t]he unit's planned migration to another software platform might help assuage concerns that the accidental payments signal deeper problems that still need to be addressed."  These statements temporarily assuaged investor concerns, concealing the reality of Citi's ineffective enterprise-wide risk management, data governance, and controls.

140.    Certain lenders refused to pay back the money, and Citigroup was forced to sue to recover approximately $501 million of unreturned funds.  *See In Re Citibank August 11, 2020 Wire Transfers*, 20-cv-6539-JMF (S.D.N.Y.) ("*Wire Transfers*").  Months later, it was determined that

48

the deficiencies that caused the Revlon error were indeed the result of risk management shortcomings that existed throughout the Class Period.  *See Wire Transfers*, 520 F. Supp. 3d 390 (S.D.N.Y. 2021), *vacated and remanded on other grounds sub nom. Citibank, N.A. v. Brigade Cap. Mgmt., LP*, 49 F.4th 42 (2d Cir. 2022).

### b)       September 10, 2020:  Corbat Resigned

141.   On September 10, 2020, Corbat announced that he would resign effective February 2021 to be succeeded by Fraser, then Citigroup's President and CEO of its Global Consumer Banking division.  Citi cast the retirement as ordinary succession planning.  On September 10, 2020, Citigroup spokesperson Jennifer Lowney told *CNBC* that "[i]t has been Mike's intention to retire in 2021 since Jane [Fraser] was appointed president of Citi last year . . . . Announcing his plans now allows ample time for a smooth CEO transition, which was important to Mike given that he did not benefit from one."

142.   To preempt investor concerns about the timing of his retirement and in an effort to maintain the fraud, Corbat further stated in a September 10, 2020 press release: "*[w]e completed our transformation from the financial crisis and emerged a simpler, safer and stronger institution*. . . . [A]s the world's most global bank, safety and soundness always have to be a foundation of our institution.  We have launched significant investments in our infrastructure as part of our push to make strengthening our risk and control environment a strategic priority for the firm."  This materially false and misleading statement conveyed that Corbat's retirement had nothing to do with Citi's ERM deficiencies and that Citi had resolved regulators' concerns, and, at least temporarily, concealed Defendants' fraud.

143.   Despite Corbat's efforts, only four days later, news of the impending 2020 Enforcement Orders would begin to reveal the truth to investors:  Citi had not even begun a transformation, much less completed it, and Defendants knew that Citi was facing massive

regulatory sanctions for allowing significant ongoing deficiencies in its enterprise-wide risk management, data governance, and controls to linger for years.

### F.   September 14 and 15, 2020:  the Truth Began to Emerge as Investors Learned of the Impending 2020 Enforcement Orders, Revealing that Citi Did Not Meet Minimum Regulatory Requirements

144.   On September 14, 2020, *The Wall Street Journal* published an article titled "Regulators Prepare to Reprimand Citigroup for Failing to Improve Risk Systems."  The article revealed that "[f]ederal regulators are preparing to reprimand Citigroup Inc. for failing to improve its risk-management systems—an expansive set of technology and procedures designed to detect problematic transactions, risky trades and anything else that could harm the bank."  It added that "[f]or years, regulators have privately pressed Citigroup and Mr. Corbat to fix the bank's risk systems," demonstrating that the Company's positive representations about its risk and control environment were materially misleading, at best, and that investors had no way to know the truth.

145.    Regulators "faulted Citi's management for not giving priority to the risk-management overhaul," and cited as evidence Citigroup's "accidental $900 million payment" to creditors of Revlon.  The article further stated that "[t]he expected rebuke from the [OCC] and the Federal Reserve accelerated planning for Chief Executive Michael Corbat's retirement," exposing Citigroup's mischaracterization on September 10, 2020 that it was a simple transition that had been planned for years.

146.   Citigroup specifically acknowledged to *The Wall Street Journal* on September 14 that its risk systems were inadequate, stating that "we recognize that we are not yet where we need to be and that has to change."  *The Wall Street Journal* further revealed that "[i]n memos to Citigroup staff Thursday [September 10, 2020], both Mr. Corbat and Ms. Fraser acknowledged

that the bank needs to transform its internal systems for risk and compliance," despite lauding those very same systems for years, and indeed only a few days earlier.

147.   *Business Insider* similarly reported on September 14, 2020 that Corbat's retirement "was the culmination of months of escalating tensions with regulators" regarding Citigroup's "tech and risk systems."   That article also made public another internal memo that Corbat had sent to Company employees on August 10, 2020, in which Corbat admitted the need for improved controls and regulatory compliance.   Corbat himself recognized that there had been "execution challenges" in remediating Citi's controls and risk systems and urged employees to "chang[e] our mindset" and "think about infrastructure and controls very differently.   We can't think of them as just something that is important to our regulators.   It's not about getting remediation projects done or checking boxes," suggesting that is all Citi did to that point and that it failed to prioritize and upgrade its risk systems as it promised investors and regulators it had done.   Indeed, Corbat asked all Citigroup employees "to embrace this change . . . by making our risk and controls a strategic priority."   In essence, Corbat acknowledged (at least internally) that Citigroup had not put a true emphasis on meeting regulators' demands and that only now was the Company going to truly reform its past deficiencies.

148.   On September 15, 2020, *Business Insider* followed up with another article entitled "The Real Reasons Behind Citigroup CEO Mike Corbat's Retirement," concluding that the "retirement" resulted from longstanding and systemic failings in the Company's risk controls that Corbat failed to prioritize.   The article reported how regulators had been privately pressuring Citigroup for years to take more aggressive action to remedy its control and risk management failings, only to be rebuffed by Corbat: "Entering [2020], [] Citigroup had numerous outstanding compliance- and technology-related issues that had been outlined in regulatory notices known as

Matters Requiring Attention [MRAs] and Matters Requiring Immediate Attention [MRIAs]" and that "Citigroup had multiple ones long past due."

149.    *Business Insider* further explained that "[t]he notices are issued privately by regulators when they find controls or systems that aren't up to standards," meaning that there is no way investors could have known about them, "and they typically come with firm deadlines by which the bank is expected to fix the weaknesses or present a plan to do so."  It added that "[t]he board of directors is often included on those communications."  Citigroup's regulators, however, "were annoyed with Citigroup's noncompliance across numerous issues and felt as if they weren't being heard."  Rather than fix the systems, "[t]he CEO [Corbat] who had made operating efficiency and return-on equity a hallmark of his strategy was often reluctant to spend the money or dedicate enough people to fix a problem the right way."  This stands in stark contrast to Citigroup's peers who, according to *Business Insider*, "have spent years improving their systems" while the Company still maintained "a patchwork of technology systems that didn't talk to one another."

150.    *Dealbreaker* summed it up in an article published on September 15, 2020: "Unfortunately, Citi's woeful risk management infrastructure did what it does, over and over and over again, and reminded regulators that ***Citi and Corbat hadn't really done all they promised***, sotto voce, to do to fix those systems, and that maybe a highly public reminder to do so was in order."

151.    Analysts acknowledged the inevitability of the impending 2020 Enforcement Orders and reported that Citi's stock price reflected that impact.  For example, a September 15, 2020 Morgan Stanley report stated, "Possible consent order would take investment spend higher over the next 2-3 years," as Citi would be required to invest billions of dollars and thousands of employees over many years to remediate Citi's deficiencies.  Wells Fargo issued a report that same

day, writing that in light of the reporting "that Citi would likely receive a consent order from the Fed and OCC for weaknesses in risk management processes and systems," Wells Fargo had lowered its price target "reflecting the likely overhang from greater regulatory oversight."

152.    On September 16, 2020, Wells Fargo issued another report titled "Investors Are Upset; Citi Should Consider Accelerating CEO Transition."  The report explained how "the recent mishap (Revlon) seems like a manifestation of problems from systems and processes that should have been addressed years ago via improved automation (an issue for Citi firmwide)," but had not. According to Mayo, "investors are upset because a CEO retirement/transition that was billed by the company as normal course of business seems increasingly not the case, given possible new regulatory actions."

### G.    October 7, 2020:  The 2020 Enforcement Orders Established Violations of Law and Regulation and the OCC Imposed the Third-Largest Penalty Since 2000

153.    As was widely expected in the prior reporting, on October 7, the OCC and the Fed issued the 2020 Enforcement Orders.  Given the true state of affairs at Citi, the mood was somber when the OCC and Fed issued the 2020 Enforcement Orders in October 2020, but employees were not surprised.  (FE-5.)  They knew something was coming based on prior communications from regulators, among other things.  (FE-5.)

154.    In summary, the OCC cited Citibank's "***long-standing*** failure to establish effective risk management and data governance programs and internal controls," and found Citibank had "unsafe or unsound banking practices."   (OCC News Release 2020-132 (October 7, 2020).) Further Citi consented to the OCC's findings that these failures violated the OCC Heightened Standards, 12 C.F.R Part 30 Appendix D, which was executed by Corbat and the Citibank Board. (*See id.*; OCC Remediation Order at 36.)  That is, Citi's "fail[ure] to implement and maintain an enterprise-wide management" program was in violation of the same OCC "Heightened Standards"

(*id.*) with which Defendants had told Class Period investors it had a "firm-wide Risk Governance Framework . . . developed in alignment."

155.     The OCC issued a second consent order assessing a $400 million Civil Money Penalty (CMP) "for deficiencies in its data governance, risk management, and internal controls that constitute unsafe or unsound practices and that contributed to violations of law."  (OCC CMP Order at 1.)

156.     The OCC CMP Order and OCC Remediation Order were signed personally by the Citigroup Board.

157.     Similarly, On October 7, 2020, the Fed issued its Cease and Desist Order.  *See In re Citigroup Inc.,* FRB No. 019-B-HC, 2020 WL 6372793 (Oct. 7, 2020).  Citigroup's General Counsel, Rohan Weerasinghe, signed on behalf of Citigroup upon express authorization by the Citigroup Board.  The Fed determined that Citigroup had violated its Enhanced Prudential Standards (Regulation YY).  These are the same Enhanced Prudential Standards with which Defendants falsely told investors Citi had been "aligned" during the Class Period (*see* Section VII.A.1, VII.A.3, and VII.A.5).

158.     The Fed stated that  "the most recent supervisory assessment of Citigroup issued by the Federal Reserve Bank of New York . . . identified ***significant ongoing deficiencies*** in implementation and execution by Citigroup with respect to various areas of risk management and internal controls" and that "Citigroup has not adequately remediated the ***longstanding enterprise-wide risk management and controls deficiencie***s previously identified by the Federal Reserve, including in the areas described above and those addressed in" the 2013 and 2015 Consent Orders.

159.     In announcing the Fed Cease and Desist Order, the Fed emphasized that Citi was a serial offender and must correct these "several longstanding deficiencies," "enhance its firm-wide

risk management and internal controls," and that Citi "has not taken prompt and effective actions to correct practices previously identified by the [Fed] in the areas of compliance risk management, data quality management, and internal controls."  *See* Press Release, Federal Reserve, Federal Reserve Announces Enforcement Action Against Citigroup Inc. That Requires the Firm to Correct Several Longstanding Deficiencies, (October 7, 2020).

**H.      After the OCC and Fed Issued the 2020 Enforcement Orders, Citi Announced the Present and Expected Financial Impact, and Analysts Accused Citigroup of Making False Statements and Criticized the Company's "Credibility" and "Lack of Transparency"**

160.    With the previously expected 2020 Enforcement Orders in hand, reports amplified the coverage of Citi's longstanding deficiencies and regulators' repeated calls to remediate them. "These come on the back of Citi's recent issues with Revlon," explained an analyst report by Evercore on October 7, 2020, "but it's clear from the Fed's consent order that it's broader than that as Citi failed to remediate outstanding deficiencies in their AML compliance program (a 2013 Fed consent order) and compliance & control infrastructure related to their FX program (a 2015 Fed consent order) . . . . The OCC and Fed are working together so this is just one plan to address data, oversight and control issues."

161.    *The Wall Street Journal* also published an article that day noting that "[t]he public rebuke marks a major escalation of regulators' efforts to get Citigroup to fix its risk systems.  For years, the OCC and the Fed have privately pushed Citigroup Chief Executive Michael Corbat to give priority to an overhaul of the systems.  Their decision to issue consent orders requiring the changes indicates the pressure they were exerting behind the scenes wasn't enough.   The reprimand, in the works for several months, accelerated planning for Mr. Corbat's retirement."

162.    Analyst anger was palpable; not only was the continued failure of Citigroup to adequately remediate its risk management and controls deficiencies a concern, but analysts' anger

was also pointedly directed at Citigroup's failure to be truthful.  In Wells Fargo's October 8, 2020 report titled "'Hangry' Investors + Reg Order = New Catalyst," the analyst, Mike Mayo wrote, "we, like other investors, are 'hangry' – *i.e.*, hungry for more information on how and when the regulatory issues will get resolved and ***angry over their lack of transparency and why they were allowed to fester***.  . . . There are no excuses for failed systems and the recent Revlon issue."

163.     Mayo then highlighted that "***contrary to Citi's statements from a few years ago***, its restructuring was not sufficiently complete in our view" and that "accountability needs to get reinforced, both at the board and management level."  According to Mayo, "[t]he system issues are worse than realized, as if we collectively thought that Citi improved from a grade of 'F' around the global financial crisis to a 'B-/C+' but only to find out the grade is 'D' –*i.e.*, improved but not by enough.  This perspective has contributed to one of the greatest disconnects that we've seen between Citi's balance sheet and stock price value."

164.     Mayo further noted that the regulatory orders brought "[t]wo decades of system issues to the fore" and "highlight a need to modernize systems (data, controls, compliance, risk).  This is bad given Citi had the worst large bank performance over the past two decades with a series of mishaps.  Moreover, Citi already had a series of system projects stretching from delayed acquisition integrations that stem from its modern day 1998 founding, to Project Rainbow (2011), and more recently back office initiatives (see 2017 investor day)."

165.     Mayo's October 8 report similarly explained that the OCC and Fed orders were "a little bit like 'here we go again with Citi.'  The bitter irony is that, if this happened at another company, the fallout might not be as large.  Yet, having had a front row seat in analyzing this company for the past 22 years, we see this as fitting with the narrative that Citi can't get out of its

own way."  Mayo further noted that the Company's "costs are bloated and we see its efficiency as worst-in-class."

166.    JPMorgan likewise issued a scathing analyst report on October 8, 2020, explaining that there were "very disappointing comments in the [OCC and Fed] orders given that Citi has been working since the last financial crisis on improving risk management, controls, and oversight . . . The OCC stated the issues have been ongoing for several years and that the Board must fix the deficiencies, make all corrective actions, ensure changes are effective, have changes verified and validated by the OCC, and demonstrate that changes have been effective for a sufficient time period."  JPMorgan specifically said Citigroup had a "credibility gap versus peers due to its much weaker profitability, and these orders add to the pressures as it will need to add resources – inadequate staffing and technology in certain areas were explicitly mentioned in the orders."

167.    According to JPMorgan's October 8 report, such comments included that: "1) senior management and The Board had inadequate oversight of risk management and compliance for several years, and Citi's 'unsafe' and 'unsound' practices were part of a pattern of misconduct; 2) failure of compensation and performance programs to incentivize effective risk management; 3) explicitly requires adequate staffing and technology resources; 4) cites calculations of risk weighted assets and capital calculations; 5) need for improvements in liquidity risk management systems and data quality; 6) failure to establish front-line and independent risk management; 7) failure to maintain risk management, compliance risk management, internal controls, and data governance programs in line with Citi's size, complexity, and risk profile; and 8) lack of effective risk governance."

168.    JPMorgan further explained on October 8, 2020 that the "Fed and OCC's orders stated Citi must work on the following areas: 1) Board governance and oversight; 2) data quality

and governance; 3) enterprise risk management; 4) compliance risk mgmt; 5) capital planning; 6) internal controls; 7) risk management staffing; 8) technology resources in control functions; and 9) timely and comprehensive review by its Project Manager Office."  Because of the regulatory issues, JPMorgan downgraded Citigroup from overweight to neutral.

169.   On October 13, 2020, Citi reported 3Q 2020 earnings, revealing the billions of dollars and thousands of employees that would be required to resolve the deficiencies over many years.  In its press release announcing the results, Citi reported that the $400 million fine and "investments in infrastructure, risk management and controls" contributed to a 5% year-over-year increase in expenses.  Citi further reported a 34% year-over-year decrease in net income, driven in part by "the higher expenses," including the $400 million fine.  Defendants participated in an earning call that same day, during which Mason stated that Citi had already incurred "about $1 billion" in 2020 "that has gone towards infrastructure, risk and controls," and that Citi would spend that amount again in 2021.  Corbat also stated that Citi had "added thousands of people" to work on remediating Citi's deficiencies and warned that it would be a "multiyear transformation" that "won't be a quick or easy fix."

170.   With the financial implication of the remediation coming to light, analysts' sharp criticism grew even louder on the earnings call on October 13, 2020.  Morgan Stanley's analyst specifically questioned Corbat's transparency, asking, "this consent order might be a surprise to The Street, but is it really a surprise to you?"  Corbat did not directly answer.

171.   Likewise, Mayo called for Corbat to step aside immediately given his lack of candor with investors: "Speaking on behalf of investors, people I speak with, there's a **_collective sense_** of extreme disappointment with technology, the new regulatory order in tech, **_the root problems were not transparent to investors_**. . . . [W]hy not step aside now?"  **_Mayo added that_**

*"these problems didn't come out overnight that the regulators identified.  So, it's just you're on a path, and now, all of a sudden, we find out that the engine underneath the company wasn't as strong as it should be."*   "[O]bviously, disappointed with execution, strategy, controls, transparency," Mayo concluded.

172.    JPMorgan's analyst echoed his colleagues and addressed his question directly to Corbat: "Mike, on the whole regulatory issue, it's quite disappointing to read in the consent orders that the incentive comp[ensation] did not account for risk management and the comments about the practices the regulators made.  Given that, what changes should we expect in senior management incentive comp[ensation]?  And can you talk about *why you didn't prioritize risk management* which is such a cornerstone since the last crisis?  And what changes should we expect in the Board as well as other senior executives as a result?"  Corbat dodged the question about failing to prioritize risk management, instead speaking to the need to "create proper balance and proper accountability" for executives whose responsibilities included both regulatory work and other duties at Citi.

173.    The analyst for Bank of America suggested that Citigroup's regulatory problems had risen to the level of the systemic regulatory deficiencies that had plagued Wells Fargo, asking, "why isn't Citigroup the new Wells Fargo in terms of regulatory issues?"

174.    JPMorgan published another analyst report pertaining to Citigroup dated October 14, 2020, recounting several "[k]ey points," including that "in our view, Board and further senior management changes are needed given these failures; and [] incentive compensation changes are needed, including clawbacks, given the comments by regulators."  JPMorgan further lamented how Citigroup must "go back and start with a gap analysis, even though it has been working on risk, controls, infrastructure, and data quality issues for many years."

175.    An article by *The Motley Fool* on October 16, 2020 summarized it well:

**"*management has known about at least some of these problems since at least 2013.  How do you not fully address issues you've known were serious for at least seven years?*"**

176.    Finally, eight months after the Orders, Dugan, Chair of the Citigroup Board of Directors stated at the June 16, 2021 Annual Meeting that "I and the Board did recognize the remediation shortfalls before the consent order.  And we did spend a great deal of time overseeing a number of different remediation projects in the last several years."  Dugan had been Chair since 2019, and a Director of Citigroup since 2017.  Importantly, he had also served as a member of the Audit Committee and the Risk Management Committee since 2017.  Dugan's admission further confirms that the Board was well aware of Citi's regulatory violations for "several years" during the Class Period, prior to the 2020 Enforcement Orders.

### I.    As Defendants Knew During the Class Period, Citi's Remediation Will Require Billions in Expenditures, Years of Investment, and Tens of Thousands of New Hires to Effectuate

177.    Since the Class Period, the 2020 Enforcement Orders have forced Citi to incur the costs of the remediation it falsely told Class Period investors had already been completed.  And Citi still has not completed the remediation, requiring ongoing investments.  Through the end of 2022, Citi has spent at least $5.7 billion to $6.2 billion on remediation expenses and added 30,000 employees to perform the remediation required by the 2020 Enforcement Orders, and Citi is not even close to finished.  Citi expects those remediation-related investments to continue to be a primary driver of expense growth in 2023 and that these investments will continue into 2024.  Altogether, the cost is trending towards in excess of $9 billion, conservatively assuming that Citi will need to spend an additional $1.5 billion in each of 2023 and 2024.

178.    More specifically, during Citi's 4Q 2020 earnings call on January 15, 2021, Defendant Mason stated that "already we spent $1 billion this year," *i.e.*, in 2020, in expenses

related to Citi's deficient systems (including the $400 million fine).  He further indicated that Citi expected to incur an additional $850 million to $1.28 billion on remedial measures in 2021.

179.    On March 2, 2022, Citi held its 2022 Investor Day.  In her statements to kick off the day, CEO Jane Fraser openly admitted, "[W]e simply did not invest enough in elements of our operating model and technology and in the associated risk and controls nor did we address the complexities of our organizational structure.  And we felt the consequences of both as a result."

180.    Defendant Mason delivered a presentation regarding Citi's 2021 expenses, which stated that roughly $1.7 billion of Citi's 2021 $40 billion in expenses (net of divestiture-related impacts) were devoted to Citi's "Transformation" efforts, *i.e.*, to the "Enforcement Orders" and "Enterprise-wide investments" in remedial measures.  That presentation further indicated that Citi expected to incur an additional $3-$3.5 billion in remediation-related expenses in 2022, and that Citi had already spent $0.6 billion in 2020 (or $1.0 billion including the $400 million fine), and $1.7 billion in 2021 on remediation-related expenses.  Much of the expense was attributed to "Compensation," referring to the costs of adding additional employees devoted to regulatory efforts, which costs will continue to be incurred throughout their employment.



Citi 2022 Investor Day Financial Overview Presentation at 14.

181.    During the presentation, Defendant Mason acknowledged, "[W]e've taken our consent orders and the requirements associated with them and made them the heart of our broader transformation program."

182.    On September 14, 2022, *The Wall Street Journal* reported that although Ms. Fraser had told staff in a recent memo that Citi had "added 30,000 employees to teams involved in fixing the problems," Citi remained far from completing the remediation.  Indeed, the article reported that regulators were still "frustrated with the progress Citigroup Inc. has made in the two years since they reprimanded the bank for problems with the systems it has in place to prevent costly mistakes," demonstrating the monumental expense and effort that was, and is still, needed to remediate Citi's deficiencies.  Per Citi's 2022 Form 10-K, the Company had approximately 240,000 employees as of December 31, 2022, meaning 12.5% of all Citi employees were involved in Citi's remediation efforts.

183.    On January 13, 2023, Citi's FY 2022 earnings call presentation indicated that an additional approximately $1 billion in 2022 (or roughly 25% of Citi's total expense growth) was devoted to remediation-related investments, including "Improving Risk & Control environment," "Data Governance & Remediation," "Designing risk reducing technology solutions," and "[o]ver 11,000 staff dedicated to transformation."  Citi also expected expenses to increase by an additional 5%, or $3.4 billion, in 2023, with the "Transformation to address Consent Orders and modernize infrastructure" listed as the first among the drivers of the increase.

184.    Thus, through the end of 2022, Citi has spent at least $5.7 billion to $6.2 billion on remediation expenses and the related 2020 Enforcement Orders, based on the 2022 expense range disclosed during the 2022 Investors Day.  And Citi expects those remediation-related investments to continue to be a primary driver of expense growth in 2023 and to continue into 2024, per the Company's FY 2022 earnings call presentation.

## V.    FORMER EMPLOYEE ALLEGATIONS

185.    Together with the allegations attributed to the FEs herein, this section provides an overview of the basis for the FEs' personal knowledge and the basis for the allegations herein.

### A.    Former Employee 1:  Citi Director of Data Strategy and Governance, U.S. Consumer and Citi Retail Services

186.    **FE-1** served as Citi Director of Data Strategy and Governance, U.S. Consumer and Citi Retail Services from August 2015 to August 2020.  FE-1 worked in and reported into the Citi Operational Risk and Controls (CBORC) organization, and FE-1's main responsibility was to provide service to the Global Consumer Bank (GCB) to put controls around the risk the businesses have.  FE-1 has several advanced degrees, including a PhD, specializing in Information Systems and Technology (DM/IST) and decades of experience executing global data management, data

strategy, and data governance solutions and objectives for large publicly traded companies.  In 2015, Citi hired FE-1 specifically to remediate data governance issues.

    a.   <u>Citigroup Lacked an Effective Enterprise-Wide Program for Data Quality Management That Provides Timely and Accurate Data</u>:

        i.   Citi's problems were at the higher level—enterprise wide—and there was insufficient automation or controls in place to make sure the data was accurate.  Further, Citi was not funding what was needed to fix it, especially in data aggregation at the top.

        ii.   FE-1 highlighted three such fundamental problems with Citi's data governance and quality management:

            1.   Citi ran thousands of antiquated systems and databases all operating independently without any integration, in contrast to Citi's competitors which had company-wide platforms and brought newly acquired companies onto that common platform.

            2.   Data quality was extremely poor and impossible to verify because there was no "golden record" and Citi never adopted a data quality platform.  As such, data did not stay whole from the source and it was impossible to detect when a piece of code unintentionally changed the data.  For example, the same client or customer may be identified as "Bob Jones" in one system, "Robert Jones" in another, and "Robert S. Jones" in a third, with conflicting data and no way to locate this person across systems or know which conflicting data associated with the person is accurate.

            3.   Citi had ineffective data lineage.  Citi did not have controls to detect or remediate the changes that occur when data moves from one system to another, or to ensure that data matched going all the way back to the source system from which it originated.  Over the course of five, six, or seven years Citi was not moving fast enough, to address this problem.  In FE-1's experience, no other company would have waited that long for remediation.

    b.   <u>Citi Refused to Integrate Its Antiquated Systems or Remediate Data Governance and Data Quality Deficiencies</u>:  One of the central tasks FE-1 was assigned during FE-1's tenure at Citi was to remediate, at the direction of Chief Risk Officer, U.S. Consumer, Commercial and Mortgage Banking Ray Romano, the data governance and data quality deficiencies in Citi's consumer and retail businesses.  FE-1's efforts to remediate these areas were thwarted by Citi's policies and priorities from senior management.

  i. FE-1 eventually resigned in August 2020 because, despite years of work and pushing harder and harder, and knowing what needed to be accomplished within the GCB at Citigroup to resolve data governance and quality issues, FE-1's remediation efforts were frustrated by Citi senior management.  Citi senior management refused to modernize and integrate the thousands of antiquated systems and perform the "reconstruction" of Citi's data governance that senior management knew was necessary for effective data governance and minimum regulatory compliance.  In FE-1's words, it was like hitting "your head into a wall," and FE-1 resigned because it was clear remediation was impossible under Citi's management.

c. <u>The 2020 Enforcement Orders Fined Citi for "Exactly What" Regulators Had Identified to Citi as Noncompliance and Data Quality Deficiencies Since 2017</u>: Since 2017, and for years preceding the 2020 Enforcement Orders, regulators had directed Citi to fix its longstanding deficiencies, and Citi understood that if it did not do so, it would be the subject of an enforcement order.

  i. It was clear that Citi's regulators "were not happy with the progress" and were dissatisfied because Citi failed to meet the regulators' requirements in terms of technology, data, and enterprise-wide systems.  By contrast, competitors like JPM, BOA, and Wells Fargo had big platforms already and had command and control of data across systems.  The regulators were able to visit these Citi competitors and see that different systems could be and were organized on one platform, so the regulators were not very happy when Citi could not achieve the same end.

    1. While Citi's competitors also acquired other companies, they did so by bringing the acquired company onto the bank's common platform, whereas Citi "tossed an electrical cord over the fence" and allowed the acquired entities to continue to run on whatever information technology was in place at the time of the acquisition.

  ii. The details of the MRAs and MRIAs issued to Citi were all communicated, director-level and above (*i.e.*, directors, managing directors, and their superiors).

  iii. For years, these data quality deficiencies were set out in the Data Quality Measurement ("DQM") reports (discussed further below) that were bright red, indicating unremediated deficiencies, and there were thousands of these reports.

  iv. Citi brought people in to resolve the data issues, but "they would not let us do the work."  That is, Citi refused to let FE-1 and others tackle the tangle of so many systems that were obsolete and unreliable by eliminating the "bad" systems and upgrading technology.  Citi instead took a short-term view regarding significant problems.  Internally, everyone knew the technology at Citi had to be fixed and it would be a long and expensive road,

but Citi did not want to spend the money on it.  Instead, Citi tried to patch things with *ad hoc* "work arounds."

v.  In the 2020 Enforcement Orders, Citi was fined for exactly what regulators had previously identified in the MRAs and MRIAs.  Prior to that, Citi had a stack of MRAs and MRIAs from regulators.  These MRAs and MRIAs were predictive of the deficiencies Citi needed to fix in order to avoid an Enforcement Action.  The 2020 Enforcement Orders were for "exactly what" was in the MRAs and MRIAs, and the 2020 Enforcement Orders were "exactly consistent" with the requirements of the MRAs and MRIAs to fix these longstanding deficiencies.

vi.  In addition to regulators, strategic consultants talked directly to Citi's C-level executives.  Citi's need for a new platform was obvious, and Accenture and other consultants communicated to Citi it needed a new platform.  But Citi refused to make this investment.  Instead, Citi was still building on systems that were too old.

d.  <u>In 2017, After Setbacks, Citi Abandoned Its "Project Rainbow" Initiative to Create an ERM System</u>:

i.  Prior to when FE-1 joined Citigroup in 2015, a strategic decision had been made to try to get everyone on one platform.  This initiative, called Project Rainbow was led by CTO John D'Onofrio and sought to create a modern-day platform that would allow Citi to put automated risk and controls around data.

ii.  In 2015 and 2016, there was such tremendous reliance on Project Rainbow that Citi deferred work on IMRs (Issue Management Resolutions, discussed further below) and let technological gaps and risk and control deficiencies pile up, justifying their inaction on the grounds that once Project Rainbow was released, it would fix everything.

1.  For example, at Business Risk and Controls Committee (BRCC) meetings FE-1 attended in 2016, Citi documented decisions to defer projects due to Rainbow's pending implementation.

2.  Similarly, on budget calls, Citi executives resolved not to fix deficiencies due to the future prospect of Project Rainbow, which was also documented in budget materials.  Everyone was waiting for Project Rainbow, the "promised land," as the "silver bullet" to solve the "tech debt" that built up.  Project Rainbow was the "magical platform that was supposed to happen," but it was "like Big Foot"—that is, "everyone talked about it, but no one had seen it."

iii.  Citi first tried to roll out this developing platform in the Asia Pacific region, but it was a "total disaster."  By 2017, Citi declared the new platform was a

"no go."  Following this failure, Global Consumer Bank CEO Bird, who had worked in the Asia Pacific region and witnessed the failure, no longer sought to get everything on one platform.  Citi pulled the plug and was simply not willing to provide the funding needed to fix its complex problems.

    iv.   But because Citi had "bet all the chips" on Project Rainbow and had been deferring all Citi's technology debt, when Project Rainbow was cancelled, the situation for Citi was hopeless.  Citi had racked up five years of tech debt and there was too big of a curve of tech debt to fix.  Citi was left with older, legacy systems that could not be combined to work together.

    v.   Citi had put too much reliance on Project Rainbow to fix its systems that caused the MRAs and MRIAs in the first place.  Without Project Rainbow, Citi was forced to use antiquated mainframes and clunky distributed systems that did not work in tandem with one another and necessitated flawed manual data searching because Citi did not have a way to automate controls in its systems.  Moreover, Citi did not have a planned solution to fix the systems that were deemed problematic by the regulators in the MRAs and MRIAs.

        1.   For example, pursuant to Bank Secrecy Act/Anti-Money Laundering requirements, Citi was required to track and report currency transactions totaling more than $10,000 during any business day conducted by or on behalf of a person.  But, without an integrated system or automated processes, Citi expended enormous effort trying to keep up manually, effectively using "duct tape and bailing wire."

        2.   Another example is that Citi did not have a "customer management system" or "customer 360" capabilities.  Such a system would have allowed one to look up a particular customer and identify all the data relating to that customer across the enterprise – "one view" of the customer.  The one view would have allowed Citi to have consistent data about that customer and an understanding of the "customer relationship."

e.   <u>Citi Executives Penalized FE-1 for Repeatedly Escalating Risk Management, Technology, and Data Quality Deficiencies</u>:

    i.   FE-1 consistently raised the data quality deficiencies to FE-1's boss, Jai Dorsey (then Managing Director, U.S. Consumer Bank Data Governance, Privacy, and Records Management Officer), and Dorsey's boss, Beth Satter (Chief Risk Officer, North American GCB), and did so to such an extent that FE-1 was penalized in performance reviews with a lower bonus.

ii. At the business CEO Level, FE-1 provided these concerns, including data lineage issues and deficiencies in Citi's Corrective Action Plans (or CAPs), and offered advice and feedback, but the Citi CEOs simply were "not taking the action necessary" to resolve these serious risk and control issues.

iii. FE-1 specifically raised these issues to CDO Burke, and Burke listened to FE-1's suggestions. But when Burke discussed the problems with Burke's own boss, CTO D'Onofrio, D'Onofrio "beat" Burke's "head into a wall." Burke agreed with FE-1 and encouraged FE's objections, saying that if FE-1 could find a way to convince senior management to tackle the data issues across the Global Consumer Bank, FE-1 should pursue it, but Burke "could not do it from his seat" and said he "cannot endorse this" because of the orders from senior executives, including CTO D'Onofrio, who reported to Head of Global ONT Callahan, who reported to Corbat.

iv. Finally, in 2020, management criticized FE-1 when FE-1 pointed out problems with the Company's approach to data lineage. The conflict over the deficiencies raised by FE-1 contributed to FE-1's departure from the Company shortly thereafter.

f. <u>Citi Misled Regulators by Using "Work Arounds" to Conceal Deficient Infrastructure and Firing Managers as Scapegoats to Show a "Body Count"</u>:

i. After cancelling Project Rainbow, Citi did not have a planned solution to fix the systems that had already been deemed problematic by the regulators in the MRAs and MRIAs. Even though everyone knew the technology at Citi had to be fixed and this was the long and expensive road needed to address "the stack of MRAs and MRIAs that Citi was working on for years." Indeed, Citi knew this was impossible without a large investment in a complete "reconstruction." But Citi was simply not willing to provide the funding needed to fix the complex problems it had.

ii. Citi instead "got rid" of key people to "show body count" to try to convince regulators that those executives had been responsible for Citi's failure to make strides in improving data and controls.

iii. The regulators wanted results, not gradual improvement the "whole company is on the line" in the eyes of regulators. But rather than fixing data these fundamental data deficiencies, Citi pursued a "bunch of work arounds" that were not accomplishing what the regulators directed Citi to do.

g. <u>Citi Knew Its Payment Transactions Infrastructure Was Flawed Prior to Making $900 Million in Erroneous Payments to Revlon's Creditors in August 2020</u>: Prior to August 2020, Citi's operational risk and controls team had identified a problem with wire transfers. Along with other people across the enterprise, FE-1 was sent to work on the wire transfer problem that ultimately led to the erroneous payment

to Revlon's creditors.  FE-1 emphasized that efforts to resolve the problem were not progressing.  Citi's intractable wire transfer problem was caused by Citi failing to implement effective enterprise-wide management.  Further, Citi had technical limitations, a lack of quality control on electronic processes, and was using a massive number of manual adjustments and changes of data.

    i.  Even though wire transfers had been around for decades, Citi's technology and infrastructure was so outdated that Citi could not reliably execute these transactions.  When FE-1 left the Company in 2020, the errors were still present.  FE-1 was not surprised to later hear that Citi had made the erroneous payments to Revlon's creditors.  In fact, Citi's problems were so severe that FE-1 questioned how many other erroneous electronic payments Citi had made as well.

h.  <u>Senior Management Was Contemporaneously Informed of Longstanding Noncompliance Through Regular Meetings and Reports</u>:  Citi used various types of reports to track, report on, and detail its longstanding risk management, data governance, and control deficiencies, including Global BDQRs, DQMs, CAPs, and IMRs.  These reports were reviewed and discussed at three levels of monthly BRCC meetings—(i) at the Company-wide level with CEO Corbat and CFOs Gerspach and Mason, (ii) at the global business level, and (iii) the individual business level.  Separately, CEO Corbat used Executive Scorecards to track, on a quarterly basis, Citi's risk and data quality deficiencies, MRAs and MRIAs, and regulatory noncompliance for all Citi businesses.

    i.  <u>Global BDQRs</u>:  Every quarter, at least since FE-1 joined Citi in 2015, a Global Business Data Quality Report (BDQR) was sent to CEO Corbat, CFO Gerspach or Mason, and other C-suite executives.  FE-1 believed BDQR went to the Board of Directors too as part of the internal audit pipeline for data quality reporting and serious metrics.

        1.  BDQRs were prepared by a team led by CDO Burke.  Given the poor and effective state of Citi's technology and infrastructure, this preparation process was complicated and time-consuming, sometimes requiring 60 days to complete a single BDQR.

        2.  The BDQRs aggregated CAPs, DQMs, and IMRs (each identified and discussed herein), including deficiencies regulators identified.  It was clear that the reason for the BDQRs was "we got concerns from the regulators."  Specifically, the BDQRs reported ERM problems and the fact that there were concerns about Citi's ability to handle and effectively manage risk across the enterprise.  The BDQRs also identified Citi's data quality management shortcomings against the enterprise standards.

        3.  On the Global BDQRs, Citi's unremediated deficiencies were highlighted in red.  The progression was supposed to be moving

from red, to amber, to green.  However, at Citi, there were issues in the Global BDQRs that were red and did not move out of there for years.

4. Corbat reviewed BDQRs, held monthly meetings (the BRCC Meetings) to discuss them, and personally corresponded with the relevant parties with respect to issues identified in BDQRs.  Corbat and the CFO (Gerspach or Mason) also saw whether there were issues that were colored red with respect to data governance or other regulatory matters that required remediation.  For example, Corbat communicated personally with CTO D'Onofrio and CDO Burke regarding the details of certain Citi deficiencies, even though those two executives were not Corbat's direct reports (*i.e.*, technically, CTO D'Onofrio and CDO Burke reported to Global Head of ONT Callahan who, in turn, reported to Corbat).

ii. <u>BRCC Monthly Meetings</u>:  Citigroup held three levels of monthly Business Risk and Controls Committee (BRCC) meetings.  Each of these BRCC meetings lasted at least an hour.  For each level, the meeting focused on risk management and controls, including BDQRs, CAPs, DQMs, IMRs, and risks related to Citi's businesses.

1. At the Citigroup level, CEO Corbat, CFO Gerspach (and later CFO Mason), and other senior leadership held top level BRCC meetings to discuss the Company-wide risks and controls rolled up from the respective lower-level BRCC meetings.  In these meetings, Corbat especially focused on Global BDQRs.  CTO D'Onofrio, who attended meetings with the regulators, also attended these meetings where the Global BDQRs were discussed.

2. At the global business level, each business-level CEO held a monthly BRCC meeting, where risks and controls around the risks related to their respective businesses were discussed.  FE-1 attended the meeting for the Global Consumer Bank (GCB), which encompassed the retail bank, mortgages, commercial, branded cards (such as the Citi bank credit card), and retail services (such as the Costco and Home Depot cards).  During FE-1's tenure, the GCB monthly BRCC meeting was led by Global Consumer Bank CEO Bird.

3. At the individual business level, each CEO held a monthly BRCC meeting.  FE-1 attended three of these monthly BRCC meetings with the CEOs for Citi's retail, mortgage, and commercial businesses, respectively.  As noted above, these three businesses fell under the purview of the GCB.

iii.   <u>Corrective Action Plans (CAPs)</u>:  Citi used CAPs to track risk management deficiencies, data deficiencies, and any other issues requiring remediation. FE-1 confirmed that "all the key issues" regarding lack of effective enterprise-wide risk management cited in 2020 Enforcement Orders had been identified in longstanding CAPs (as well as IMRs).  There were CAPs for regulatory warnings, including MRAs and MRIAs, which tracked how Citi was performing against its regulatory deficiencies.  A single MRA or MRIA might result in 20 CAPs.

    1.   CAPs were maintained in an ICAPs information system.  Once an issue was identified, it was required to be logged into the ICAPs system, followed by a deadline to do the "root cause analysis," a deadline to develop a solution, and a deadline to get funding and sign off from executive leadership.  The chief executive officers of each respective business had to sign off when a CAP was opened and when a CAP was closed.  For example, Global Consumer Bank CEO Bird signed off on CAPs concerning the GCB.

iv.   <u>Monthly Data Quality Measurement (DQM) Reports</u>:  Data quality of each business was monitored in a monthly DQM report, organized by each Citi business.  DQM reports detailed and rolled up to the top of the company. The DQM report for the entire company was shared with Corbat and Chief Risk Officer Brad Hu.

    1.   The DQM reports also tracked metrics and provided a data quality score for each business.  As noted above, for years, Citi's DQM reports were bright red, setting out significant and longstanding data quality deficiencies.  There were thousands of DQM reports.  The DQM reports were prepared by the Chief Technology Group working under CTO John D'Onofrio.

    2.   Though the DQM reports were monthly, because Citi lacked a data quality platform, it was unable to report on data quality in real time. Thus, the DQM reports were lagging, meaning the data was often 30 to 60 days old when released.  Delayed DQM reports were significantly less useful for the businesses.

v.   <u>CEO Attestations</u>:  On at least a quarterly basis, the CEOs of each business were required to execute attestations regarding the business's performance and results, including certifying Global BDQRs and DQMs within their purview.  All the performance results were rolled up and attested to by the CEOs of the businesses, and then packaged for Corbat, so that Corbat had certified results in front of him.  The attestations executed by each CEO certified that all of the information escalated to Corbat and top management is accurate and true.

vi. <u>IMRs (Issue Management Resolutions)</u>:   Citi used IMRs to track data quality deficiencies on an issue-by-issue basis in terms of their impact on critical data elements.   A single CAP may involve multiple IMRs.

1. FE-1 confirmed that "all the key issues" regarding Citi's lack of data governance and inability to implement an effective enterprise-wide program for data quality management cited in 2020 Enforcement Orders had been identified in longstanding IMRs (and CAPs).   This included Citi's data governance and data quality failures, such as lack of data lineage and data tracing, which was necessary to identify where Citi's data errors were occurring and how they originated.

2. Prior to 2020, the IMRs identified problems with data that were causing data integration issues and the volume of IMRs was going up.   These IMRs were taking too long to get fixed and a lot more of them could have been fixed much earlier because, at Citi, a "glacial speed was fast."

3. An operational review of IMRs took place on a monthly basis.   This monthly review was CBORC policy, carried out by Anthony Nappi, Global Head of Operational Risk and Control for the Consumer Bank.

vii. <u>Executive Scorecards</u>:   CEO Corbat evaluated his direct reports using Executive Scorecards.

1. The Executive Scorecards were completed once per quarter and scored each of Corbat's direct report on their progress on outstanding MRAs and MRIAs, the status of outstanding CAPs, an assessment of how the businesses under that direct report's purview performed regarding risk and data quality, among other areas.   The Executive Scorecards measured Corbat's direct report's performance against revenue goals.

2. The ratings on Executive Scorecards had serious implications for each business-level CEO.   FE-1 identified one CEO, Jonathan Larsen (the former Global Head of Retail Banking and Mortgages), who departed from Citi following poor marks on his scorecard.

**B.   Former Employee 2:  Managing Director, Data Governance Technology Audit for Global Functions**

187.   **FE-2** served as Managing Director, Data Governance Technology Audit for Global

Functions, from July 2013 to July 2018.  In this capacity, FE-2 led the team that audited, globally,

Citigroup's technology that underpinned processes and controls for risk, operational risk

management, Comprehensive Citigroup Capital Analysis and Review (CCAR), Basel Committee

on Banking Supervision's standard number 239 (BCBS 239), anti-money laundering (AML), and

corporate functions.  FE-2 reported to Chief Technology Auditor Sriram Padmanabhan, who in

turn reported to Citigroup's Chief Internal Auditor, who in turn reported to CEO Corbat.

a.  <u>Citi Failed to Implement Effective ERM or Correct Deficient Infrastructure</u>:  The actual underpinning data governance and data quality issues at Citi were that the legacy systems from Citi's acquisitions were never integrated and Citi had thousands of systems that could not talk to each other.  Indeed, these thousands of systems were "never technically designed to do what is asked of them today."  According to FE-2, who audited these systems, there was no question that replacing or removing systems had to be done to resolve the complexities.  Yet Citi was unwilling to do so.  Not only did Citi not seem to have any intention of creating an effective enterprise-wide system, it was also especially shut off to dissent and challenges by the audit teams who raised this.  FE-2 summarized that Citi had significant technology and data governance issues, but at the highest level, Citi's failure was that no enterprise-wide risk management system ever existed.

b.  <u>Corbat's Direct Reports Were Evaluated by Executive Scorecards that Tracked How Their Businesses Scored in Remediating Deficiencies</u>:  Corbat's direct reports were evaluated based on Executive Scorecards that held each of them to key performance indicators that included how well their businesses scored with respect to Audits and Action Plans.  As FE-2 explained, there were implications for Corbat's direct reports if there were reopens on audit or regulatory noncompliance on their Executive Scorecards.  Accordingly, Corbat tracked and was well informed of the status of each outstanding noncompliance and regulatory directive.

i.  To be sure, revenue carried a premium above the other metrics, and Corbat's direct reports who "made money for the bank" were rewarded even though their Executive Scorecards showed regulatory noncompliance.  For example, FE-2 noted that the CEO of the Institutional Clients Group (ICG), who oversaw a business with numerous issues regarding data quality and data governance, "always got a pass" because he was making money for the bank.  ICG's compliance issues were brushed aside by Citi management to avoid distractions that could jeopardize the ICG CEO profits.

c.  <u>Since 2016, Corbat's Direct Reports Were Directly Informed of All Regulatory Noncompliance in Quarterly Regulatory Noncompliance Meetings</u>:  Since 2016, Citi held Quarterly Regulatory Noncompliance Meetings helmed by Global Data Aggregation and Reporting Program Director Mary Sue Farley.  These quarterly meetings, attended by the most senior executives, including CFO Gerspach, Citibank CEO Desoer, Global Head of ONT Callahan, and the Citi business heads, reviewed all outstanding issues of regulatory noncompliance as well as the status of Citi's response to each deficiency.

i.   The first Quarterly Regulatory Noncompliance Meetings took place in 2016 and it was the first time some attendees had all the things put in front of them that needed remediation, and it was "interesting to see the shock." FE-2 added that it was obvious there had been a "silo effect," in that, prior to these meetings, the "right hand did not know what the left hand was doing." The Quarterly Regulatory Noncompliance Meetings ensured that Citi's senior management team was directly informed at least quarterly of all outstanding issues of regulatory noncompliance as well as the status of Citi's response to each deficiency.

ii.  In each Quarterly Regulatory Noncompliance Meeting, there were dozens and dozens of pages listing regulatory noncompliance that Citi was required by its regulators to address. In these meetings, the remediation discussed was not solutions to implement ERM, replace antiquated technology, or integrate Citi's thousands of disparate systems. Instead, Citi was resolved to keep its existing antiquated infrastructure and work within those constraints to perform minor tweaks. The information discussed at these meetings was tracked and presented in PowerPoint decks that Director Farley prepared and emailed to attendees.

d.  <u>Corbat's Direct Reports Were Apprised of Deficiencies at Quarterly Data Governance Stakeholder Meetings</u>: Corbat's direct reports also attended Quarterly Data Governance Stakeholder Meetings held in a conference room at Citi's headquarters in New York. The meetings were focused on whether data governance was being managed effectively in terms of remediation of data quality issues happening across the bank. Corbat's direct reports attended with their own direct reports who handled data governance in the respective areas of the business. Attendees at the quarterly meetings included CFO Gerspach, Global Head of ONT Callahan, Chief Data Officer Frank Burke, Chief Technology Officer John D'Onofrio, the heads of individual divisions of the consumer bank, and heads of the ICG.

i.   At these quarterly meetings, CDO Burke went through reports and hundreds of pages of slides that detailed the data quality scores for each of the business heads. In addition, there was open discussion of Action Plans, and the attendees quantified outstanding issues and data quality deficiencies so that they could report on them after each meeting. Among the findings were issues and gaps in Citi's data governance and audit reports showing that Citi needed to improve the strength of controls that measured data quality from the transaction level.

e.  <u>Citi Tracked Deficiencies and Regulatory Noncompliance with Action Plans (MAPs and CAPs) and Audit Reports Reviewed by Corbat's Direct Reports in Weekly Meetings Held in Citi's New York City Office</u>: Citi tracked its regulatory deficiencies in documents called Action Plans—which took the form of Management Action Plans (MAPs) and Corrective Action Plans (CAPs). Both

MAPs and CAPs identified the instances of regulatory noncompliance, but MAPs were at a higher level and a single MAP might comprise many CAPs.

    i. Farley worked on tracking MAPs. Citi had hundreds of MAPs because information crossed so many systems that did not talk to each other and Citi relied on manual processes rather than the kind of enterprise-wide infrastructure needed to meet regulators' requirements.

    ii. Comprehensive reports were prepared on the status of all CAPs and sent up the chain to ensure that there was both tactical and strategic oversight at the highest levels of the Company and identification and quantification of the issues, including: who owned the issues; what was being done about them; whether the responsible parties were hitting their deadlines; if the deadlines were met; whether the issues were turned over for validation in a timely manner; and if the validations were timely completed.

    iii. Citi's audit organization was tasked with validating whether issues in the Action Plans were remediated, and prepared audit reports reporting the outcome of these validation efforts. In situations where Citi's validation auditors determined that the remediation was not effective and did not resolve the deficiency at issue, the issue was listed as "Reopened."

    iv. FE-2 attended weekly meetings at Citi's New York City office with Corbat's direct reports to discuss outstanding Action Plans, audit reports, and instances where failed remediation had resulted in a "Reopen" of a deficiency or regulatory non-compliance. Corbat's direct reports included Global Head of ONT Callahan, Citibank CEO Desoer, and Global Consumer Bank CEO Bird, among others.

f. <u>Citi Was Under Constant OCC Monitoring and Supervision</u>: There was a large staff of OCC regulators working full time inside Citi's New York headquarters. The OCC regulators had access to Citi personnel and unexpectedly walked into Citi employees' offices with questions. Greg Sullivan was the OCC Examiner in Charge for Citi.

    i. In some instances, FE-2 met with management to advise them as to whether they were on the right path to remediation and to provide constructive criticism of plans written to address Matters Requiring Attention. In each case, FE-2 challenged the remediation efforts and plans along the same lines as set forth above. But FE-2's challenges and recommendations "fell on deaf ears."

g. <u>Since 2016, Citi Stopped Hiring Qualified Auditors and Significantly Degraded the Quality of Its Audits</u>: While FE-2 was initially provided the resources for a technology audit team staffed with qualified individuals, this changed in 2016. Citi prevented meaningful internal audits by severely limiting the amount of manpower for this task. Understaffed teams were forced to work 20-hour days under

"excruciating" conditions to complete the audits by unrealistic deadlines.  Since 2016, the internal audit function degraded every year because disgruntled and exhausted personnel quickly left, and Citi would only replace a fraction of them. Moreover, Citi hired its replacement personnel from low-cost locations, like the Philippines, where there were not qualified auditors who had the acumen to handle the complex tasks assigned to the New York audit team.  This only further increased pressure on Citi's internal auditors.  The pressure became so intense that one Managing Director in Internal Audit had a heart attack during the spring 2017 audit.

    i. Though FE-2 raised these concerns directly with Global Head of ONT Don Callahan, CDO Burke, CTO D'Onofrio, Chief Technology Auditor Padmanabhan, and Chief Auditor of Risk Management Ricci and proposed solutions, such as more training or management oversight, "no one was willing to make those investments."

h. <u>Since 2017, Citi Consistently Failed Its Internal Audits but Covered Up the Deficiencies by Giving Itself an Inauthentic Rating of Effective or Mostly Effective and Silencing Employees Raising Deficiencies</u>:  Citi's technology was "broken" and was "not automated in any sense."  The Company's internal strategy to try to plug the holes by hiring "armies" of cheap offshore labor in places like Poland and Costa Rica to "clean and cleanse the data to make it work."  These offshored laborers worked long hours to try to manually "clean" discrepancies and errors in the data and reporting generated by Citi's broken technology.  But this was a losing battle and failure was "inevitable."  Problems with data were "always blowing up" or did not work as intended.  Errors continued to pile up, and each year Citi's technology fell further behind as the banking system grew increasingly complex.

    i. <u>As a Result, Citi Consistently Failed Internal Audits and Assessments Due to Its Deficient Technology and Data Quality</u>:

        1. In Spring 2017, Citi's technology was designated "unsatisfactory" in its annual Comprehensive Capital Analysis and Review (CCAR). After looking at the controls and systems that the business was using to do capital reporting, the internal audit team working under FE-2 found such significant errors and problems in how the controls were being handled that they were forced to assign Citi an audit rating of "unsatisfactory."  Nonetheless, Citi rated its CCAR as "Effective or Mostly Effective," which was "not authentic" because technology was the "fundamental, critical component of everything else that comprised the audit," and with its "broken" underlying technology the CCAR could not "produce a sustainable and believable outcome."

        2. Citi failed its BCBS 239 Audit, with the entire program deemed "not effective."

3. Citi failed its AML Technology Audit which auditors designated "high risk" because of at least four separate technology failures, including that Citi was using "ineffective algorithms" that were incapable of consistently performing basic calculations.

4. Citi failed its Continuity of Business Audit because it had at least fifteen deficient issues, and additionally, issues that had been previously identified had never been fixed.

5. Citi failed its internal Finance Integrated Audit due to deficiencies with the "algorithms and math," and "errors" in the calculations Citi used for its financial reports. The software developed for Citi's financial reporting did not follow procedure, and there were gaps in executing the procedure that led to errors in financial calculations. But rather than upgrade its technology to ensure accurate financial reporting—and meet minimum regulatory requirements—Citi procured offshore laborers in Poland and elsewhere to try to manually correct the inaccurate financial reporting being generated by Citi.

6. Separately, in a Financial Reporting Systems Audit, FE-2 issued an audit finding of "needs improvement." Rather than improve Citi's deficient financial reporting, David Rafalovsky, the executive overseeing the deficient financial reporting, "berated" the entire audit team for 30 minutes because not passing the audit would hurt Rafalovsky's performance evaluation. FE-2 escalated this to D'Onofrio, who understood the deficiencies. Still, the deficiencies were not remediated.

ii. FE-2 Was Punished for Raising Deficiencies:

1. After designating Citi's technology "unsatisfactory" in the 2017 CCAR audit, FE-2 was removed from the CCAR audit and the 15 members of FE-2's team were reassigned to Ricci, where they were managed by another Managing Director, Sean Ibert, who had "no data governance experience whatsoever." FE-2 was being punished for "making too much noise" and failing to "toe the line," and moving the team under Ricci and Ibert was a means for Citi to bring the technology and data auditors "into the fold and control the messaging that was coming out of the team." Citi wanted to "avoid having outliers."

2. Separately, in a meeting of all managing directors in audit to present the information system to manage audits, FE-2 asked questions and raised the deficiencies in the system that still had not been remediated. Quickly, other managing directors sent FE-2 chat messages on FE-2's computer telling FE-2 "not to say anything;

don't ask anything" and FE-2 was "shut down." Nonetheless, after the meeting, FE-2 submitted a five-page document in which FE-2 was "constructively critical" about what the audit team needed the system to do, but none of FE-2's points were ever addressed or even acknowledged.

iii. <u>Citi's Failed Audits Were Escalated to Its Board of Directors</u>: Failed audits and assessments were sent to Citi's Board of Directors, where the audit reports written by FE-2 and FE-2's team detailing the failures were reviewed by the Board's Audit Committee. For each "unsatisfactory" or failed audit, time was scheduled on the Board's Audit Committee's agenda where the business leaders who were accountable for the underpinning issue had to appear before that Committee. Here, Citi had "failed" its own data quality attributes that the organization had set forth "for the data to be considered credible, accurate, with integrity." And, unless Citi addressed the real problem of the "broken technology," Citi was going to continue to face "the same issues." Still, Citi refused to invest in technology, and each department was ordered to try to maintain the "veneer" of compliance using the technology already in place.

iv. <u>Citi Added Manual Work Rather Than Fixing its Broken Technology, Which Was Unsustainable, Inefficient, and Did Not Meet Minimum Regulatory Requirements</u>: Citi's approach was not "sustainable." Citi's automated systems had failed and, rather than fix them, behind the scenes, Citi was injecting hundreds, if not thousands, of people to "scrub" and "clean" data to try to present "a facade of being good." But if the automated systems were functioning, none of these manual processes would have been necessary. And, as FE-2 explained, "system fixes do well consistently," whereas "manual fixes have a tendency not to work the way you want." This approach of sticking with existing systems while constantly trying to patch technology failures without upgrading Citi's infrastructure was akin to "changing the engine on an airplane during flight—you cannot just rip it out and the business goes on hold while you do what you need to" to comply with regulations. In other words, unless Citi actually invested in creating new "systems" that worked enterprise-wide, it could never modernize or meet the regulators' requirements. Citi's behind-the-scenes manual cleanup process was inefficient and did not comply with minimum regulatory requirements, FE-2 confirmed.

1. Citi, however, was not willing to make those investments. FE-2 raised concerns the "best [FE-2] could" with Padmanabhan, Ricci, Burke, D'Onofrio, Callahan, as well as with CCO Carawan.

2. The efforts of FE-2, CDO Burke, and others to push for effective enterprise-wide systems failed because senior leadership, including CCO Carawan, CTO D'Onofrio, and Chief Auditor of Risk

Management Ricci, all made clear they were unwilling to entertain such proposal.

3. CCO Carawan was "very hands on" in the internal audits and assessments that Citi routinely failed. FE-2 pointed to one meeting in which Carawan had a binder of 1,000 pages and was able to flip to a certain page in it without hesitation to provide a quote to the attendees. But appeals to Carawan that Citi must remediate its broken technology and bring itself into compliance to rectify longstanding regulatory violations were unsuccessful. Carawan was "less concerned with the broken stuff that is causing us" issues or "doing the right thing." Instead, Carawan was focused on whether the team was done with the assessment or audit right in front of them.

4. For Ricci, even when FE-2 presented audit findings, demonstrating "here it is in black and white that technology is failing," improving the technology was a non-starter. With the support of Carawan, Ricci instead just looked for a way to pass the audit without fixing Citi's failures.

i. It Was Not Accurate for Citi to Represent to Investors that It Had a "Firm-Wide Risk Governance Framework" that Is "In Alignment" with OCC Heightened Standards:

i. Based on FE-2's personal knowledge from being at Citi at the time, it was not accurate for Citi to state, in February 2017 and the years thereafter, that Citi had a "firm-wide Risk Governance Framework [that] consists of the policies, procedures, and processes through which Citi identifies, measures, manages, monitors, reports, and controls risks across the firm" that "has been developed in alignment with the expectations of the Office of the Comptroller of the Currency (OCC) Heightened Standards" and "is also aligned with the relevant components . . . of the Federal Reserve's Enhanced Prudential Standards for Bank Holding Companies and Foreign Banking Organizations." Given the state of Citi's risk management and all the frustration of regulators at the time, this statement was a "half-truth," at best, FE-2 explained.

ii. As FE-2 explained, while there were policies, procedures, and processes to try to identify, measure, manage, monitor, report, and control risks, they did not operate "firm wide," were ineffective, and were not aligned with these regulatory standards. By February 2017, regulators had identified these functions as deficient and were frustrated by Citi's inability to fix them and bring itself into compliance with regulatory standards. FE-2 observed that a more accurate or complete statement would have involved telling investors that "we still have a lot of work to do" because "a lot of manual

work" is required in Citi's processes, that there were "insufficiencies of the controls themselves," and that Citi lacked a "sustainable set of systems."

j.   In 2018-2019, CDO Burke, CTO D'Onofrio, Global Head of ONT Callahan Were No Longer Able to Hide Citi's Non-Compliance with Regulators' Requirements, Regulators Lost Confidence, and Those Three Executives Abruptly Resigned:

   i.   CDO Burke, CTO D'Onofrio, and Global Head of ONT Callahan were long time Citi executives who had held a number of roles at the Company, understood its deficiencies, and were actively involved with discussions with OCC and other regulators.  They also understood their instructions from senior management that "improving the technology was a non-starter," and that they had to manage the regulators' requirements the best they could within a framework of Citi's unwillingness to improve existing infrastructure.  Citi had a "sweep it under the rug mentality."

   ii.  As such, OCC staff began to lose confidence in management.  After Citi would declare "victory" to the regulators, something would inevitably break because Citi was "painting over" its failed technology rather than fixing its underlying problems identified by regulators.   There was "constant frustration" coming from the regulators about why Citi's compliance failures had not been fixed and concerns about "when management was actually going to do what they said they were going to do."  When each deadline arrived for what management had "committed to do," there was "always some caveat" that "got in the way" of completing and "remediating the issue to the degree the regulators believed it was going to be remediated."

   iii. The frustration by regulators has been building since at least 2013, when FE-2 started at Citi, due to Citi "continuing failing" and either offering excuses or "kicking the can down the road all the time."  Over time, Citi's noncompliance with basic technology became increasingly difficult to hide.  "It only got worse" because "Citi never really addressed the problem."

   iv.  As a result, the regulators lost trust in D'Onofrio, Burke, and Callahan and did not have the confidence that they could lead the change required at the Company.  In the regulators' view, they were "not up to the task of what needed to be done."  Finally, frustrated with these issues and things not getting fixed, in one of their regular meetings, regulators told Callahan that he "should not be at Citi."  Then, in quick succession, from June 2018 to January 2019, Burke, D'Onofrio, and Callahan all left Citi.

   v.   Burke, D'Onofrio, and Callahan were the most experienced technical people at Citi, knew the Company's technology intimately, and were seasoned professionals.

vi. But they were just the "enablers of the business," in that Corbat, Carawan, Bird, and other management were not willing to spend money or invest in the necessary fixes. Given this situation, there was not much Callahan and his reports could do other than try to maintain a "veneer" of compliance.

vii. In effect, under the leadership of these senior executives, Citi had been demonstrating a prototype of a vehicle and convincing regulators the vehicle functioned properly. However, the technology did not function and under the hood, it was manual labor of offshore workers running with their feet on the ground to make it look like the vehicle moved. Once these senior executives left, the regulators could pop the hood and see the reality that they had been misled and the vehicle did not function at all. In other words, with their departures in late 2018 and early 2019, Citi was no longer able to mislead regulators in one way or another, and the regulators could get full visibility into the actual situation at Citi

C. **Former Employee 3: Senior Vice President, Senior Compliance Officer for Surveillance**

188.    **FE-3** was Senior Vice President, Senior Compliance Officer for Surveillance at Citigroup from February 2016 to September 2018. FE-3 was specifically hired to lead initiatives to improve Citigroup's surveillance systems and technology to bring it into compliance with regulators, including by designing and developing a tool that would evaluate and monitor trade-related risks.

a. Citi "Axed" Projects that Were Intended to Bring It into Compliance with Regulators and Instead Re-Allocated Employees to "Trivial" and "Nonsensical" Programming Tasks that Did Not Correct Deficiencies in Citi's Infrastructure:

i. Within one day of FE-3 joining Citigroup, the projects FE-3 was hired to lead were "axed" and "a freeze put on compliance." So instead of allowing FE-3 to design and implement a system for trade surveillance necessary for Citi to comply with minimum regulatory requirements, Citigroup paid FE-3 $200,000 per year to do "trivial" and "nonsensical" programming projects that could have been handled by "some high school student," "had no robustness" and could not "actually flag the anomalies" needed for compliance.

ii. FE-3 reported that Citi's growth through merger and acquisition of hundreds of companies resulted in a "gigantic mess of the legacy systems that did not talk to each other." Citigroup's data infrastructure was like a sewage system of pipelines where "no one knew what was in them or where they were going." As a result, data was lost.

iii. Citi's framework for surveillance was "completely flawed" and "non-sensical." As FE-3 explained, Citi was trying to use a rule-based framework that carried out surveillance by making predictions based on a fixed set of past samples. But the training data to run the algorithms was not available and/or could not be found, and the data feeds did not work. Moreover, this "crude" approach gave erroneous values, the requirements were poorly spelled out, and the methodology was "not robust, not accurate, and not repeatable." FE-3 received *some* data feeds, but due to Citi's back office running on a flawed patchwork of different systems, the effort was "insane and unwieldy," and the data feeds did not work. The entire methodology was non-sensical, as there was no logical consistency and no methodical manner to solve the problem. FE-3 repeatedly raised these issues with senior managers and other compliance and risk management colleagues, but they did not seem to care, and no action was taken.

iv. FE-3's managers—including Director of Trading Surveillance and Data Strategy David Tsui—said they did not have the budget to invest in the infrastructure that would actually improve systems and controls.

v. Citigroup was operating "in the world of electric cars, but making horse carriages."

vi. FE-3 shared FE-3's ideas to improve the infrastructure with several managers, but months went by and no one at Citi was interested in correcting the deficiencies.

vii. Frustrated with the idle projects and Citi's refusal to make necessary improvements, FE-3 memorialized these concerns to senior leadership in a "ten-point email" in August 2018, which identified the problems with culture, the technology, and lack of regulatory compliance. The email detailed why Citi's compliance infrastructure was ineffective and unsustainable. The email detailed deficiencies with the data sets Citi was using in its surveillance methodology, the lack of access to data sets, the existing rule-based engines missing important errors, and old systems not being updated. It also included hard evidence of the problems with surveillance tools at Citi, with specific use cases and data sets. FE-3's email pinpointed the flaws in the surveillance methodology, informed senior leadership of failures in the current methods, and explained that Citi's approach to surveillance was "not going to work – it was not a real-time surveillance system." To ensure it was seen by all senior leadership, FE-3 sent the email to the head of human resources and legal, and copied many compliance colleagues who shared FE-3's concerns.

b. It Was Not Accurate for Citi to Represent to Investors That It Had a "Firm-Wwide Risk Governance Framework" that It "Identifie[d], Measure[d], Manage[d], Monitor[ed], Report[ed], and Control[ed] Risks Across the Firm," and Was "In Alignment" with OCC Heightened Standards:

i.  Based on FE-3's personal knowledge from being at Citi at the time, it was not accurate for Citi to state, in February 2017 and the years thereafter that it had a "firm-wide Risk Governance Framework [that] consists of the policies, procedures, and processes through which Citi identifies, measures, manages, monitors, reports, and controls risks across the firm" that "has been developed in alignment with the expectations of the Office of the Comptroller of the Currency (OCC) Heightened Standards" and "is also aligned with the relevant components . . . of the Federal Reserve's Enhanced Prudential Standards for Bank Holding Companies and Foreign Banking Organizations."

ii.  During FE-3's tenure from February 2016 to September 2018, Citi did not have effective data governance, technology, surveillance, or enterprise-wide risk management, and was not in compliance with regulatory standards.  At Citi, compliance was "exceptionally bad."  FE-3 could "not believe a major bank was running a show like this."

iii.  Among other things, Citi did not have the necessary surveillance methodology to be compliant with regulatory standards.  Citi's surveillance system "lacked data, had poor data, poor analysis," and had "bad management" and "inadequate funding."  "The systems were not up to the mark" and the surveillance function was "not properly staffed."  As FE-3 explained, the surveillance systems in place were "elementary and rudimentary," "not rigorous," and the "error rate was very high."  Further, Citi's surveillance methodology lacked "predictability" and "repeatability" required for a compliant surveillance system.

iv.  When FE-3 and FE-3's bosses ran experiments on Citi's surveillance methodology, the results gave unpredictable and different answers that they were incapable of repeating.  FE-3 confirmed that these surveillance failures were part of the lack of effective ERM for which Citi was fined by regulators in 2020.  It was clear that Citi could not even develop a basic implementation of an enterprise-wide risk system with compliance seamlessly integrated.  Citi's methodology was to use a "cheap hack" that did not actually comply with regulatory requirements.

v.  Citi did not develop a full, real-time risk management system.  Such a system must have real-time financial data coming in to effectively manage risks associated with market conditions.  Real-time data was critically important to effectively monitor foreign exchange, yields, interest rates, and credit, as well as to hedge the underlying portfolio, derivatives, and other financial assets.  Incorporation of real-time data was also critical to effectively managing compliance in areas like insider trading.  Citi's risk management did not effectively incorporate real-time data and Citi was unwilling to provide the budget or resources to develop it.

c.  Citi's Senior Leadership Ignored FE-3's Complaints, Refused to Invest in Enterprise-Wide Risk Management, and Doubled-Down on Retaining Its Deficient Infrastructure:

i.   Following the August 2018 email, FE-3 received private assurances from colleagues agreeing with FE-3's assessments and complaints.  After FE-3 sent the email, FE-3 was also contacted by an HR representative and at least one Citi attorney.  The attorney was "not very happy" with FE-3.  But instead of taking action to remediate the substantive deficiencies raised by FE-3 and to remediate its ineffective compliance risk management, Citigroup retaliated against FE-3, eventually forcing FE-3 out of the Company shortly thereafter.

ii.  Similarly, FE-3's recommendation that Citi create an ERM system that works across the institution fell on deaf ears.  FE-3 had explained to senior managers and colleagues alike that Citi needed a unified system for risk and an ERM and integrated compliance risk system that works across equities, foreign exchange, and fixed income.  But these suggestions were ignored or flatly rejected.

iii. To the extent FE-3 received a response, there were two reasons given for Citi's refusal to improve its failing infrastructure.

1.  First, in the midst of massive cost cutting, there was no appetite to make the large up-front expenditure to clean up the place and bring Citi into compliance.  While FE-3 urged leadership that it made more sense to incur the cost to bring Citi into compliance by implementing effective systems and controls rather than to pay that same amount of money in fines over the years, Citi's management disagreed.

2.  Second, there was significant internal pressure to keep compliance "sufficiently weak" to avoid any impediment to Citi making money.  Compliance was not a profit center.  It was common knowledge at Citigroup that there was incompetence and deficiencies in compliance technology, but Citi wanted to avoid strengthening compliance in a way that hobbled the profit-making machine.

**D.  Former Employee 4:  Vice President in the Institutional Clients Group (ICG) for Strategic Data Solutions (SDS)**

189.  **FE-4** was Vice President in the Institutional Clients Group (ICG) for Strategic Data Solutions (SDS) at Citi from June 2016 to June 2018, after being promoted from Assistant Vice President.  FE-4's team was central to regulatory reporting, as it was responsible for the "analytics"

and for driving the data for purposes of regulatory reporting. Though FE-4's work fell under the Compliance function, FE-4 worked cross-functionally with Compliance, Internal Audit, and Information Technology.

a. <u>Citi Lacked Effective Enterprise-Wide Risk Management</u>: FE-4's compliance work was frustrated by the fact that Citigroup did not have effective enterprise-wide risk management. In fact, FE-4 reported, it was laughable for Citi to suggest otherwise. Citi had grown by acquisition, and FE-4 knew from access to strategic data repositories that Citi had thousands of systems that were not integrated with one another.

   i. Citi's inability to track risk across the Company was always at the forefront of discussions that FE-4 had with colleagues and managers, but Citi never made progress toward effective risk management because it was an "800-pound gorilla that was too unwieldy to handle."

   ii. The mess of antiquated and disconnected systems interfered with effective risk management. FE-4 tried to design models to get to the underlying data, but was frustrated due to thousands of data systems and repositories. A lot of the data was not vetted, making the records unreliable; and rather than integrating them, the information systems from entities acquired by Citi were pushed into "crude repositories." Many data issues fell by the wayside. Citi had issues with "mis-mapping" and "gaps in data" as a result of the vast array of systems that had not been integrated. Simply tracking down underlying data was a "huge task unto itself" and sometimes impossible due to Citi's internal failures.

b. <u>Citi Was Unwilling and Unable to Remediate Its Ineffective and Non-Compliant KYC System</u>:

   i. Citi failed to implement an effective and functioning know-your-customer (KYC) system. The data Citi needed for proper KYC was inaccessible and inconsistent. Moreover, Citi's process was not automated and did not have global reach. The OCC identified these deficiencies and, ultimately, issued an MRA directing remediation of the ineffective KYC system. The MRA was outstanding prior to Mark Carawan becoming Citi Chief Compliance Officer, while he was still Chief Internal Auditor.

   ii. FE-4 was the project lead on the analytics side and worked extensively with the compliance team to try to remediate these deficiencies and create a functioning global KYC system. But they were unable to do so for several reasons, such as:

      1. In some cases, Citi's systems were so antiquated that the data was not in electronic form and Citi was either unwilling or unable to

convert it into the electronic form necessary to create the automated KYC system required by regulators.  For example, Citi's client data in Japan was not in a database and could not be automated because "it was literally on scraps of paper."  Rather than tackle this problem, Citi deviated from the regulators' directives by internally instructing employees that Japan should be taken out of the scope of the Global KYC project.

2.  Citi's sales head was inexplicably unwilling to provide information and data required for Citi to create a KYC system.  Despite contentious calls and demands by FE-4 and other members of the compliance team, the Head of Sales refused to cooperate and provide the necessary data.  Again, rather than comply with regulators' directives and overcome these obstacles, Citi internally gave up on this aspect of the project and dramatically reduced the scope of their work in a way that precluded creating a functioning global KYC system.

iii.  As a result, Citi did not reach satisfaction in assessment of the project, and the objective to create a functioning KYC system was not attained.  FE-4 recounted that data quality and technology limitations at Citi prevented things from working the way they should have and Citi was not following good data management and organization processes.

c.  <u>Citi's Ocean System for Trade Orders and Activity Was so Ineffective and Unreliable that Using It Was "Like Trying to Find a Drop in the Ocean"</u>:

i.  Citi's repository trade orders and activity was the Ocean System.  But the system was a failure and its deficiencies frustrated compliance risk management.  The "Ocean" system was "not reliable."  Data was miscategorized.  Compliance personnel were not able to queue the system to generate information sets they were looking for.  Citi personnel were so frustrated by the ineffectiveness of the "Ocean" system that their running quip was that it was aptly named "Ocean" because "trying to find something in the Ocean System was like trying to find a drop in the ocean."

d.  <u>Citi Was Operating Under at Least 50 MRAs and MRIAs but They "Fell Through the Cracks" and Addressing Them Was Never Among Citi's Priorities or Goals</u>: FE-4 confirmed that Citigroup was constantly under MRAs and MRIAs, which FE-4 estimated to be at least 50.  In fact, there were so many MRAs and MRIAs and "so many aspects of what needed to be answered" that FE-4 and the compliance team was unable keep track and not sufficiently staffed to handle all of the regulatory requests.  "There was so much thrown at us" and "so much that fell through the cracks," FE-4 added.

i.  Citigroup was getting warnings from regulators about failures in its infrastructure, including anti-money laundering compliance and controls,

during FE-4's employment.   But despite warnings from regulators, Citigroup did not devote a lot of time to taking action to resolve the issues.

ii.   Citi was hindered in completing the compliance testing work scheduled for the year, including deficiencies identified by regulators, because "fire drills" usually ended up consuming 50 percent of the work time in the year. FE-4 and FE-4's team was frequently called into fire drills so frequently because Citi did not have enough processes automated, did not have proper controls in place and procedures in place, and suffered from technological failures.

iii.   Instead, Citi's priority was controlling costs.  Both the compliance director and managing director stated that there were no funds to pursue important projects.  Citi's refusal to devote the resources it needed to pursue important projects, like addressing the MRAs and MRIAs and creating an effective enterprise-wide risk management system, was so frustrating that it became a "running joke" that the compliance team was simply going to "doing the best we can with what we have."

**E.    Former Employee 5:  Senior Vice President, Chief of Staff to Head of Technology, Global Consumer Bank, and Technology Transformation Leader**

190.   **FE-5** was Senior Vice President at Citi from February 2017 to May 2021.  During this time, FE-5 also served as Chief of Staff to Head of Technology, Global Consumer Bank (who FE-5 said was referred to as the Chief Information Officer) Gavin Michael and also served as Technology Transformation Leader.

a.   <u>There Was General Agreement that Regulatory Compliance Was Not Achievable at Citi Unless It Implemented ERM, but Citi Never Evaluated or Prioritized It</u>: Before joining Citi, FE-5 had overseen IT simplification at a different large American company.  That other company had success in improving technology and reconciling old legacy systems because that CEO made it a priority, but this is not what happened at Citi.  At Citi, there was no focused effort to narrow down Citi's huge number of systems.  But this is what Citi needed to do (reducing the number of legacy systems) to make achieving regulatory compliance feasible.  Everybody recognized the problem.  It would have been near impossible for Citi to bring its existing disparate systems and legacy infrastructure into compliance with regulatory requirements.  Citi's existing infrastructure made even simple tasks very difficult and complex.  Multiple times FE-5 informally raised a proposal that a similar task needed to be accomplished at Citi.  In fact, FE-5 proposed this within months of starting employment in 2017.  There was a general agreement that this was something that was needed, but the proposed project was never formally evaluated or prioritized.  There were regular and almost constant meetings across

IT leadership, and when FE-5 brought up this ERM proposal during these meetings, it did not gain any traction.

b.  Poor Technology and Legacy Systems Created a Key Operational Risk For Citi: Poor technology was a key operational risk for Citi – "always and they knew it," FE-5 emphasized.

　　i.  Citi's technology created operational risk because the technology was incredibly complex, with acquired systems, all these different tools, legacy systems.  Citi had thousands of systems with different data, different data structures, with different technology stacks, and called the same things by different names that "it made things very difficult."  FE-5 reported that technology was also an operational risk due to the challenges of prioritizing and allocating resources to the project, including staffing and knowledge. Compounding the shortage of knowledgeable and experienced technology employees, myriad fire drills came up due to technology problems that took technology staff away from completing other tasks.

　　ii.  Before the 2020 Enforcement Orders were issued in October 2020, it was common to find technology problems in the credit card unit and there were cases where calculations caused things to be way off.  Clients were impacted at times, and Citi had to make them whole.  For example, there were problems where Citi miscalculated credits and misapplied interest rates, affecting its customers.  Sometimes Citi became aware of these issues internally, and other times because of complaints by customers.  Citi established an entire group to deal with the aftermath of its errors, notify regulators of the issues or efforts to remediate them, and determine what kind of remuneration was required and how to make the affected customers whole.

c.  Citi Had Significant Data Reliability Issues, Which, in Turn, Also Created Risk Management Deficiencies:

　　i.  FE-5 confirmed that there were significant issues with data reliability.  At Citi, "data was coming from everywhere" and "passing through many different functions," and there was "no clear ownership of the data."  There were many instances when data was not reliable and could not be trusted. One issue was legacy data problems that resulted from Citi changing tools and Citi's legacy systems from its acquisitions.

　　ii.  Citi's historical customer data was a big challenge.  One customer might have done business with a dozen or more Citi businesses, for instance. However, the customer identified or even name varied from business system to business system.  For example, there may be Venture Fund in the system/s of one Citi business, and Venture Fund LLP in the system(s) of another Citi business.  One problem with this was that if Citi needed to determine its exposure to Venture Fund, the Company could not do so

88

systematically.  Citi tried to resolve this manually, with workers reviewing all the name variations similar to Venture Fund across a plethora of systems to determine if the name variations applied to the same or a different customer.

iii. Citi was "very much aware" of the data reliability issues, but resolving them was extremely difficult.  Citi lacked effective data governance.  For example, by the time FE-5 departed in 2021, Citi was "still missing the [data] governance human structure," which included creating and implementing the "organization and processes that were day to day."

d. <u>Deficiencies Were Logged in ICAPs and CitiRisk Systems</u>:

i. Specific issues requiring remediation were logged into the ICAPs system, which also recorded the status of the remediation efforts.

ii. There were many times that the completion date for issues identified in the ICAPs system was delayed.  Through FE-5's regular interactions with Corbat's direct reports, FE-5 knew that deficiencies logged in ICAPs, including delays in completing the issues in the ICAPs system, were reported to CEO Michael Corbat and other C-suite executives.

iii. There was a constant source of frustration resulting from the ICAPs and CitiRisk systems not communicating with one another.  Depending on what system a person is working in day to day, that person would get completely different numbers and results on projects.  This problem contributed to Corbat's direct reports shouting at quarterly meetings FE-5 attended to discuss the status of technology-related remediation projects.

e. <u>Executive Scorecards Were Used to Evaluate Corbat's Direct Reports</u>:

i. FE-5 confirmed that Corbat's direct reports were evaluated based on Executive Scorecards.  FE-5 saw the Executive Scorecard for Gavin Michael, Head of Technology, Global Consumer Bank, who reported directly to Corbat, and it included business performance metrics, a section on risk and compliance, audit findings in Michael's organization, a certain threshold of ICAPs issues that needed to be resolved by set target dates, as well as very specific IT issues, such as the number of IT outages.

f. <u>Citi Was Not Surprised by the 2020 Enforcement Orders</u>:  The mood at Citi was somber when the OCC and Fed issued the 2020 Enforcement Orders in October 2020.  But employees were not surprised.  They knew something was coming from, among other things, prior communications from regulators.

**F.      Former Employee 6:  Director of Enterprise Compliance Risk**

191.    **FE-6** was employed by Citigroup for 19 years, from October 2000 to October 2019, where FE-6 was promoted through the Company all the way up from intern to Director of Enterprise Compliance Risk.  FE-6's prior positions included Internal Auditor, Vice President and Operational Risk Manager, and Vice President and Compliance Testing Control Officer.  In March 2017, FE-6 was promoted to Director of Enterprise Compliance Risk Management, and held that position until resigning to work for another financial institution in October 2019.  As Director of Enterprise Compliance Risk, FE-6 reported to Managing Director John Whitaker, who in turn reported to Chief Compliance Officer Mark Carawan, who in turn reported to CEO Michael Corbat.

    a.   <u>Corbat Was a Hands-On CEO, Very Focused on Risk and Controls, and Closely Followed Citi's Adherence to Risk Related Framework</u>:  FE-6 observed that, as compared to his predecessors, Corbat was much more hands on, very focused on risk and controls, and closely followed whether the Company was adhering to the risk related framework.  Corbat personally met with the business presidents and others on a regular basis for deep dives into risk exposure.  From the vantage point as Director, FE-6 saw Corbat's leadership team feeding information up to him regarding risk and he was plugged in to this information.

    b.   <u>The Individual Defendants Were Apprised of MRAs, MRIAs, and Compliance Deficiencies at Risk Committee Meetings</u>:  FE-6 confirmed that Citigroup operated under numerous MRAs and MRIAs during FE-6's employment.  These were a central topic of discussion at Citigroup Risk Committee meetings, which were attended by CEO Corbat, CFO John Gerspach and later CFO Mark Mason, CCO Carawan, members of the leadership council, and personnel from all lines of defense, including the business leaders and representatives of internal audit and compliance.

        i.   While serving as Director, FE-6 personally attended such Risk Committee meetings, sometimes as a guest speaker, in connection with work on risk management, or to take notes.  FE-6 confirmed that Corbat personally attended these meetings in New York, and also in instances when they were held in London, Singapore, and Hong Kong.  In other cases, FE-6 saw that Corbat attended the Risk Committee meetings remotely via Zoom or Skype.  FE-6 confirmed that these meetings were constant, and there were dozens of them during two and half years as Director.  While sometimes Corbat missed a Risk Committee meeting because he was meeting with a regulator,

in such instances Corbat instead sent a delegate specifically to provide him with updates on the information discussed.

    ii. At Risk Committee meetings, each business delivered updates via a Dashboard reporting system that allowed the presenters to save committee presentations on their laptops and/or tablets and pull up the material to be delivered and discussed at the meetings. Each business's Dashboard reporting included the status of Citi's outstanding MRAs and MRIAs. FE-6 observed that Corbat was attentive to this information at Risk Committee meetings and asked questions about the information being shared.

c. <u>Corbat Used Executive Scorecards to Track MRAs, MRIAs, and Unremediated Compliance Deficiencies</u>:  Senior leaders who reported to Corbat were evaluated based on Executive Scorecards. Performance areas in these Executive Scorecards included how well the executive's business was responding to the regulatory warnings, how quickly the relevant issues were being remediated, and how many MRAs and MRIAs the business was getting. The Executive Scorecards thereby also served to keep Corbat informed of all outstanding MRAs and MRIAs, compliance deficiencies, as well as Citi's responses to regulatory matters.

**G.    Former Employee 7:  Director of Regulatory Enforcement Action Management**

192.    **FE-7** was employed by Citi from 1998 to 2018 a variety of roles. In March 2012, FE-7 transferred to an operational risk management position. In 2014, FE-7 became the Director of Regulatory Enforcement Action Management where they were program manager, facilitating the tracking of remediation efforts and liaising with regulators. FE-7 retired from Citi in April 2018.

a. <u>ICAPs System Tracked Remediation Efforts</u>:  Internally, Citi used an ICAPs system to track remediation efforts. It has been in place since at least 2014.

b. <u>MAPs (Management Action Plans)</u>:  MAPs tracked and reported to Citi management the problems that had been identified by Citi's regulators, including the OCC. MAPs were presented to Citi's Board of Directors and top management in Advisory Board Committee Meetings, held quarterly, in lengthy PowerPoint presentations that were distributed to attendees by email, and the status of Citi's outstanding MAPs at a granular level.

c. <u>Advisory Board Committee Meetings</u>:

    i. The monitoring FE-7 and FE-7's colleagues performed in regulatory Enforcement Action management was centralized, and the team reported up

91

to Citi's Board of Directors on a quarterly basis via an Advisory Board Committee Meeting.  FE-7 gathered information in preparation for the quarterly meetings and sometimes attended personally.  The meetings lasted two to three hours and were held in a conference room at Citi's headquarters in New York.

ii.  Regular attendees included Citi's Global Head of Audit, Chief Risk Officer (Brad Hu), Committee Chair Gene McQuade, Managing Director Gail Kilmer, Global Consumer Bank CEO Bird, Citi's Head of Compliance, Chief Risk Officer for U.S. Consumer, Commercial, and Mortgage Banking Ray Romano, Tom Schlotterback (who led compliance for the credit card business) and at least a dozen others.  In the event Chief Executive Officer Michael Corbat did not personally attend, he was at a minimum, always informed of the matters discussed at the meetings.

1.  FE-7 confirmed that, for example, Global Consumer Bank CEO Bird was a direct report to Corbat.

iii.  A primary focus of the meetings was outstanding Management Action Plans (MAPs).  MAPs concerning OCC regulatory actions were discussed at the meetings.  Information on the MAPs was presented in PowerPoint presentations in a standard format, which FE-7 estimated were at least 50 pages in length.

1.  The progress on MAPs was tracked at the granular level and progress toward the completion dates on MAPs was presented among the PowerPoint slides at the Advisory Board Committee Meetings.

iv.  There were records and minutes maintained as documentation of the meetings.

d.  Project Rainbow Was Necessary to Unify the Patchwork of Disparate Systems, but Was a Spectacular Failure Due to Citi's Erratic Leadership:

i.  Project Rainbow was initiated around 2008, while FE-7 was still working in human resources.

ii.  CTO John D'Onofrio was leading Project Rainbow with another executive who was his counterpart.

iii.  The project was for the bank side of the business and was necessary because Citi had acquired so many banking networks and regional banks that the company needed to build a harmonious platform.  There was a patchwork of systems that needed to be unified, and this also required a change in operations and practices, which Citi failed to implement.

iv.  Project Rainbow was a spectacular failure.  Despite heavy expenditures, Citi did not get anywhere with the project.  Citi's erratic leadership did not provide the necessary guidance on what was needed for a unified platform to function properly and to meet the needs of the business, making the failure inevitable.

**H.     Former Employee 8:  Senior Vice President of Operational Risk for the Global Consumer Bank**

193.    **FE-8** was employed by Citigroup from January 2018 to July 2019 as Senior Vice President of Operational Risk for the Global Consumer Bank.  FE-8 reported to a Director of Operational Risk, who reported to a Managing Director of Operational Risk, both of whom regularly attended meetings with regulators.  FE-8's Director and Managing Director attended quarterly meetings with the OCC and tasked FE-8 with preparing information for those OCC meetings.  In July 2019, FE-8 left Citi voluntarily out of frustration with Citi's deficient operational risk practices and processes.

a.  The Lack of Effective Enterprise-Wide Risk Management, Along with a Myriad of Technology and Data Failures Stymied Citi's Operational Risk Management: FE-8's job responsibilities included documenting the key operational risks and pulling data from the CitiRisk system and packaging it for quarterly presentations for Citi's risk committee and senior executives.  Throughout this time, Citi's tools to manage operational risk were stuck in their infancy and inadequate for a bank of its size and complexity.

i.  CitiRisk was supposed to be Citi's "system of record" for top-level risk reporting for all of the divisions across the Global Consumer Bank and the Institutional Clients Group.  The top-level risk-reporting for all five divisions under the GCB and ICG was done through CitiRisk. The CitiRisk system was not integrated and instead relied on a challenging and cumbersome process whereby each division used its own different systems and processes to arrive at the values for key risk indicators.  The types of data required to report on an operational risk—like risk metrics, scenarios, issues, audits, and examinations—each came from a different group and all of these functions were managed differently, with no standardization.  Data had to be manually entered into the CitiRisk system and there was no way for operational risk personnel to review or challenge the data, or compare it with the data in the systems that first line or second line teams were using. Further, the risk aggregation was a manual process performed using spreadsheets, without the benefit of automation or technology.

    ii.   Another significant problem was that data pulled from CitiRisk was not validated, and therefore there was no way for FE-8 or anyone else to know whether the information Citi relied upon for operational risk was accurate. The incompatible systems were so arcane that operational risk personnel like FE-8 were dependent on subject-matter experts and teams pulling the data.

    iii.   Despite FE-8's work documenting key operational risks and instances risk indicators, Citi's operational risk tools remained in their infancy state. Citi's compliance leadership, including the Managing Director to whom FE-8 reported, had little experience with operational risk and did not know how to improve practices to mitigate risk. Making the necessary improvements in the risk management tools "would have been like trying to turn the Titanic."

  b.  <u>Operational Risk Failures Were Reported to Senior Executives</u>: Risk reports and data compiled by FE-8 documenting key operational risks were submitted to the Director of Operational Risk and reviewed at regular risk meetings attended by the Global Consumer Risk Committee, the Managing Director of Operational Risk, Global Consumer Bank CEO Bird, and Citigroup CRO Brad Hu including the Business Risk and Controls Committee (BRCC) meetings. This package of materials documenting key operational risks at Citi that FE-8 prepared for these meetings was hundreds of pages in a PDF format.

**I.    Former Employee 9:  Director, Enterprise Operations and Technology, IT Function Head; then Managing Director, Enterprise Operations and Technology, Senior IT Function Head**

194.    **FE-9** worked for Citi from April 1996 to May 2019, and held various roles, largely in operations and technology.  FE-9's last two roles were Director, Enterprise Operations and Technology (ONT), IT Function Head from June 2009 to April 2015 and Managing Director, Enterprise Operations and Technology, Senior IT Function Head from April 2015 to May 2019. For the last three years of FE-9's employment, they were the Regulatory Affairs Liaison for the Chief Technology Office.  In this capacity, FE-9 regularly met with the FRB, FDIC, OCC, and other regulatory representatives about Citi's open MRAs, data quality, and other matters.

a. <u>In 2018, Whitaker Replaced Callahan as Global Head of ONT and Implemented a Deal with Corbat to Slash Costs</u>:

  i. In 2018, Mike Whitaker was designated as the replacement for Global Head of ONT Don Callahan.  Whitaker took over that role when Callahan left Citi in December 2018.   CTO D'Onofrio left shortly thereafter, in January/February 2019.

  ii. Whitaker had a deal with Corbat that Whitaker would significantly cut costs.  So immediately upon taking his post, Whitaker furiously cut costs, particularly technology costs, where Citi was already lagging and non-compliant.   FE-9 had to rank FE-9's entire organization and make recommendations about who should stay and which positions should be eliminated as part of Whitaker's cost savings agenda.  FE-9 estimated that, under Whitaker's direction, there were about 100 members of the project management organization cut, but there were a couple thousand cuts across the board in ONT, with many of these severed employees being from technology.

b. <u>Whitaker Failed to Address Citi's Backlog of MRAs for Its Technology, Risk Management, Finance, and Compliance Systems</u>:

  i. Since 2015, when FE-9 became Managing Director, there were issues across the board that had to be resolved in terms of Citi's regulatory noncompliance.

    1. Regulators had issued MRAs to Citi related to existing technology issues prior to 2015 that were still outstanding, and continued to issue additional MRAs on Citi's technology deficiencies after 2015, as new regulations required further improvements.

    2. Citi was also issued up to 30 MRAs on its risk management and compliance.

    3. Citi also lacked front line independent risk management, and lacked adequate training for data quality standards in the consumer and investment bank.

    4. Citi had an MRA for its deficient framework in end-user computing (EUC).  The operations organization had developed spreadsheets, but the use of them varied, there were problems uploading them into the main systems, and Citi did not have data quality checks against them.

  ii. D'Onofrio had owned the compliance, risk, finance, and human resources systems.  D'Onofrio, FE-9, and others reported to the regulators on these MRAs on a monthly basis.  But when Whitaker took over and let people go, the plans that D'Onofrio put in place could not be effectively executed.  At

this time, there were still a backlog of open MRAs that Citi had not resolved or remediated with regulators. MRAs as to technology, risk management, compliance, and finance were all outstanding.

c. Corbat Was Apprised of Regulatory Deficiencies at Executive Operational Committee Meetings and in Executive Scorecards:

    i. Since Corbat became CEO, Corbat and other executives were kept informed of these outstanding regulatory deficiencies as well as the status of Citi's response to them by Executive Operational Committee Meetings. FE-9 and Burke presented directly to Corbat and others at these meetings. Around 2015, the meetings became quarterly rather than monthly, but nonetheless continued in the same format.

    ii. In addition, Corbat evaluated the business chief executive officers who reported to him via Executive Scorecards. The Executive Scorecards included an evaluation of the executives' performance on risk and closing out Action Plans and regulatory matters.

**J.  Former Employee 10:  Director of Risk Management in Citi's Operations & Technology Division**

195.  **FE-10** worked in risk management at Citi from August 2002 to August 2019, ultimately working as Director of Risk Management in Citi's Operations & Technology Division, where FE-10 managed a staff of approximately fifty risk and quality personnel worldwide. FE-10 reported to Managing Director Darren Karp, who reported to CTO John D'Onofrio, who reported to the Head of Operations & Technology, who reported to Citi CEO Michael Corbat.

a. Citi's CTO Received Quarterly Reports of Significant Risk Matters, Including all CAPs, MRAs, MRIAs:

    i. FE-10 was responsible for preparing regular reports for CTO D'Onofrio on at least a quarterly basis that tracked the status of every risk matter the department was facing, including CAPs (Corrective Action Plans), MRAs/MRIAs that were on-time and past due, as well as problems identified by internal auditors and Citi's quality assurance process improvement group.

    ii. In the quarterly risk reports, significant risk matters were color-coded red, yellow, and green, with red automatically triggering a direct follow-up with all relevant personnel related to that risk and, depending on their response, a meeting with D'Onofrio as well. FE-10 confirmed that there were always red items in every quarterly report.

iii. One longstanding risk deficiency was that Citi was subject to multi-year directive from its regulators that it must implement a robust data governance program, which Citi memorialized as a CAP internally.  The regulatory directive had been initiated at least a year and half before FE-10 retired in August 2019—that is FE-10 began tracking it in the quarterly risk reporter by at least 2018 and possibly sometime in 2017.  Citi still had not completed remediation when FE-10 left Citi in August 2019.

**K.      Former Employee 11:  Managing Director**

196.    **FE-11** was a Managing Director at Citi until 2019.  FE-11 worked directly for CTO John D'Onofrio in the bank's technology organization, and managed Production Support & Strategic Planning, which included project management of technology programs that were being done to remediate issues.  FE-11 was aware of the October 2020 Enforcement Orders as well as previous fines and consent orders, and reported that Citi had done next to nothing to fix its problems, adding that, most of the money that was spent was spent terribly on all the wrong people, and no one cared what the government thought.

**L.      Former Employee 12:  Senior Risk Metrics Specialist for the Americas Region**

197.    **FE-12** worked for Citigroup as a Senior Risk Metrics Specialist for the Americas Region from October 2017 to October 2018.  FE-12 was part of the Independent Compliance Risk Management (ICRM) organization, which was focused on trying to compile metrics for risk and compliance reporting purposes.  In this role, FE-12 was specifically tasked with improving the reporting process for the Americas region, which included North America and Latin America.

a. <u>Citigroup's Infrastructure Was Not Comprehensive and Its Surveillance Tools Were Not Effective</u>:  In contrast to Bank of New York Mellon and to UBS, where FE-12 had worked for more than 20 years, the Citigroup infrastructure was not comprehensive and its surveillance and management reporting tools were not effective.  At Citi, they were stuck in silos without the ability to report across the group.  As Citi's Senior Risk Metrics Specialist explained, using Citi's tools for compliance and reporting was like going into a garage of boxes that were not labeled or organized so that finding something specific required opening and going through each box one-by-one.

## VI.    ADDITIONAL ALLEGATIONS OF SCIENTER

198.    Set forth below is a summary of the key allegations that support a strong inference of scienter.  Each of the following corroborates Defendants had knowledge, or at least recklessly disregarded, that Citi's enterprise-wide risk management systems and controls were ineffective, and not in alignment with regulatory requirements:  (A) Citi failed internal audits concerning its ineffective ERM and data governance that were escalated to Individual Defendants and their direct reports, Citi's Board of Directors, and the Board's Audit Committee; (B) Citi's ineffective ERM, data governance, and controls were well documented in regular internal reports to Individual Defendants Corbat, Gerspach, and Mason, as well as their direct reports; (C) Citigroup's ineffective ERM, data governance, and controls were well documented in regular internal meetings with Citi's Board, Individual Defendants Corbat, Gerspach, and Mason, and Corbat's direct reports; (D) objections to Citi's ineffective and broken technology, regulatory non-compliance, and ineffective and unsustainable infrastructure were sent to senior management including Individual Defendants and their direct reports; (E) the Declaration of OCC Examiner-in-Charge Greg Sullivan stating that the Enforcement Actions were based on longstanding deficiencies; (F) the post-Class Period admission by Director Dugan that he and the Board knew of the longstanding deficiencies underpinning the Enforcement Actions prior to the OCC and the Fed issuing their orders and penalties; (G) contemporaneous news articles; (H) the 2020 Enforcement Orders themselves; (I) Defendants' duty, as senior management and via the Citi and Citibank Board, to oversee enterprise-wide risk management and controls (and their statements confirming that they did so) and resulting knowledge; (J) Corbat's resignation; (K) the core operations nature of Citi's risk and control systems; and (L) imputation of corporate scienter through Individual Defendants' knowledge as well as particularized allegations of scienter by other senior officers and directors.

A. **Citi's Failed Internal Audits and Assessments of ERM Support
a Strong Inference Of Scienter**

199.     As detailed above, Citi consistently failed internal audits and assessments as to its

ERM systems, data governance, controls, and regulatory compliance, including its Comprehensive

Capital Analysis and Review (CCAR), BCBS 239 Audit, AML Technology Audit, Continuity of

Business Audit, Finance Integrated Audit, and Financial Reporting Systems Audit.  (FE-2.)  These

failed audits and assessments were escalated to Citi's Board of Directors, where the audit reports,

including those detailing Citi's failures that were prepared by Citi's Managing Director for Data

Governance Technology Audit for Global Functions were reviewed by the Board's Audit

Committee.  (FE-2.)  For each "unsatisfactory" or failed audit, time was scheduled on the Audit

Committee's agenda where the business leaders who were accountable for the underpinning issue

had to appear before that Board Committee.  (FE-2.)

200.     Indeed, Citi acknowledged as much in its Annual Reports, stating that Citi's audit

plans and methodology are "approved by the Audit Committee of the Citigroup Board of

Directors," that internal audits are conducted "under the oversight of the Audit Committee," and

that "Internal Audit also provides independent assurance to the Citigroup Board of Directors, the

Audit Committee of the Board, senior management and regulators regarding the effectiveness of

Citi's governance and controls designed to mitigate Citi's exposure to risks."  (2017 10-K at 68.)

Accordingly, Citi's repeated failure of these audits provided independent confirmation to

Individual Defendants and their direct reports, the Citigroup Board of Directors, the Audit

Committee of the Board, and senior management of the *lack of* effectiveness of Citi's ERM

systems, data governance, controls, and compliance.

B.     **Regular Internal Reports that Reflected the Ineffective Risk Management and Controls Further Support a Strong Inference of Scienter**

201.    As described in detail in Section IV.B, *supra*, Citi suffered from ineffective enterprise-wide risk management, ineffective operational risk management, ineffective compliance risk management, enterprise-wide data governance and data quality deficiencies, broken technology, and degraded and suppressed internal auditing.  The 2020 Enforcement Orders were issued for the same substantive failures at Citi that existed since at least the start of the Class Period.  Since 2016, Citi was constantly operating under at least 50 MRAs and MRIAs and, by the start of the Class Period, in 2017, Citi was operating under MRAs and MRIAs for its risk and control failures, but never devoted the resources to remediate them.  These concealed substantive deficiencies, and the longstanding MRAs and MRIAs they generated were identified in regular internal reports to Individual Defendants, their direct reports, and the Citi Board of Directors throughout the Class Period, before they were publicly revealed to investors in the 2020 Enforcement Orders.

202.    Citi's Director of Enterprise Compliance Risk, after nearly two decades at the Company, observed that, as compared to his predecessors, Corbat was much more hands on, very focused on risk and controls, and closely followed whether the Company was adhering to the risk related framework.  (FE-6.)  Corbat personally met with the business presidents and others on a regular basis for deep dives into risk exposure.  (FE-6.)  From the vantage point as Director, FE-6 saw Corbat's leadership, including Corbat's direct reports, feeding information up to him regarding risk and that he was plugged in to this information.  (FE-6.)

203.    More specifically, Defendants consistently had direct knowledge of Citigroup's data, risk, and controls deficiencies though regular internal reports to Individual Defendants Corbat, Gerspach, and Mason; Citi's Board; Corbat's direct reports, including Global Consumer

Bank CEO Bird, CCO Carawan, Global Heald of ONT Callahan, Citibank CEO Desoer, CRO Hu, and Head of EIO&T Whitaker; and other senior officers directly involved in the regular reports and regular internal meetings regarding Citi's risk management, data governance, and controls deficiencies, and Citi's longstanding failure to comply with regulatory requirements during the Class Period for which regulators issued the 2020 Enforcement Orders.  Two comprehensive reports issued to Corbat every quarter are especially notable:  Executive Scorecards and Global BDQRs.  The same deficiencies identified in these reports resulted in the 2020 Enforcement Orders.

        **1.**       **Executive Scorecards Were Used by Corbat to Track Executives' Progress on MRAs and MRIAs**

204.    Every quarter, Corbat used Executive Scorecards to evaluate each of his direct reports (which included Individual Defendants Gerspach and Mason during their tenures as CFO). The Executive Scorecards included the executive's progress on outstanding MRAs and MRIAs, the status of outstanding CAPs, an assessment of how the businesses in that executive's purview performed regarding risk and data quality; and their performance against revenue goals, among other areas.  (FE-1, FE-2, FE-5, FE-6, FE-9.)

205.    Executive Scorecards also were the basis for Corbat to evaluate each direct report on how well they scored with respect to audits and Action Plans which, among other things, had long identified Citi's lack of effective ERM, including "all the key issues" later cited in the 2020 Enforcement Orders.  (FE-1, FE-2.)

        **2.**       **Global BDQRs Reported ERM Problems, Data Quality Management Failures, and Regulatory Deficiencies to Corbat, Gerspach, and Mason**

206.    Every quarter, a Global Business Data Quality Report (BDQR) was issued to CEO Corbat, CFO Gerspach or Mason, and other C-suite executives.  (FE-1.)

207.   This report, prepared by Citi's Chief Data Officer, and accompanied by signed attestations executed by each business CEO certifying its accuracy, apprised Individual Defendants of Citi's ERM problems, concerns about Citi's ability to handle and effectively manage risk across the enterprise, Citi's data quality management shortcomings against the enterprise standards, as well as the outstanding CAPs, DQMs, IMRs (each identified and discussed herein), which included deficiencies identified by regulators.  (FE-1.)

208.   Corbat reviewed BDQRs, held monthly meetings (the BRCC Meetings) to discuss them, and he personally corresponded with the relevant parties with respect to issues identified in BDQRs.  (FE-1.)  Corbat and the CFO (Gerspach or Mason) also saw whether there were issues that were colored red to indicate data governance or other regulatory matters that required remediation.  (FE-1.)  In addition, Corbat communicated personally with CTO D'Onofrio and CDO Burke regarding the details of certain Citi deficiencies, even though those two executives were not Corbat's direct reports (*i.e.*, technically, CTO D'Onofrio and CDO Burke reported to Global Head of ONT Callahan who, in turn, reported to Corbat).  (FE-1.)

### 3.   MAPs, CAPs, DQM Reports, and IMRs Were Also Sent to Corbat, Citi's Board, or Both

209.   In addition to receiving direct reports every quarter through Executive Scorecards and Global BDQRs, Corbat was also consistently apprised of Citi's risk management, data governance, and control deficiencies, and its longstanding failure to comply with regulatory requirements, through MAPs, CAPs, DQM reports, and IMRs:

     a.   Management Action Plans (MAPs) tracked and reported to Citi's Board and top management the problems identified by Citi's regulators, including the OCC.  (FE-2, FE-7.)  MAPs were presented to Citi's Board of Directors and top management in Advisory Board Committee meetings (held quarterly), through lengthy PowerPoint presentations that were distributed to attendees by email and described the status of Citi's outstanding MAPs at a granular level.  (FE-7.)  Corbat attended or was always kept informed of MAPs through these Advisory Board Committee meetings, as well as by weekly

meetings among Corbat's direct reports at Citi's New York office to discuss outstanding Action Plans, audit reports, and Citi's failed remediation. (FE-2, FE-7.)  Citi had hundreds of MAPs because information crossed so many systems that did not talk to each other, and Citi relied on manual processes rather than the kind of enterprise-wide infrastructure needed to meet regulators' requirements.  (FE-2.)

b.  Corrective Actions Plans (CAPs) tracked Citi's regulatory deficiencies, including as to risk management, compliance, and controls.  (FE-1, FE-2, FE-5, FE-7, FE-10.)  "All the key issues" regarding lack of ERM cited in the 2020 Enforcement Orders had been identified in longstanding CAPs. (FE-1.)  CAPs were logged and tracked in an ICAPs information system designed to keep senior leadership informed of the status of all unremediated deficiencies at the Company.    (FE-1, FE-5, FE-7.) Deficiencies logged in ICAPs, including delays in completing the issues in the ICAPs system, were reported to CEO Corbat and other C-suite executives.  (FE-5.)  Corbat also received updates on the status of all CAPs as part of the Executive Scorecards and Global BDQRs, as described at ¶207, *supra*.

c.  Data Quality Measurement (DQM) reports were sent to Corbat and CRO Hu (among others) every month that labeled in bright red the data quality deficiencies, organized by each Citi business, and were accompanied by attestations from each business CEO certifying the accuracy of the deficiencies presented.  (FE-1.)  Deficiencies identified in these DQM reports were also reported to Corbat, Gerspach, and Mason in Global BDQRs, as described at ¶207, *supra*.

d.  Issue Management Resolutions (IMRs) tracked data quality deficiencies on an issue-by-issue basis in terms of their impact on critical data elements at Citi.  (FE-1.)  Prior to 2020, Citi's IMRs identified problems with data that were causing data integration issues, and the volume of IMRs was going up. (FE-1.)  Citi's Director of Data Strategy and Governance confirmed that "all the key issues" regarding Citi's lack of data governance and its inability to implement an effective enterprise-wide program for data quality management that were cited in the 2020 Enforcement Orders had been identified in longstanding IMRs.  (FE-1.)  These IMRs were taking too long to get fixed because, at Citi, "glacial speed was fast."  (FE-1.)  Corbat also received updates on the status of the IMRs, including as part of Global BDQRs, as described at ¶207, *supra*.

*                    *                    *

210.    Accordingly, by virtue of regular internal reports, Individual Defendants Corbat,

Gerspach, and Mason knew, or at least recklessly disregarded, Citi's substantive deficiencies and

failure to comply with regulatory requirements.  These regular reports to Individual Defendants detailed internal metrics showing MRAs and MRIAs outstanding since 2017 concerning Citi's lack of ERM capabilities, data governance deficiencies, and failed technology that were "exactly consistent" with the 2020 Enforcement Orders, as well as substantive deficiencies concerning Citi's lack of effective ERM, which included "all the key issues" later cited in the 2020 Enforcement Orders for which regulators imposed a historic $400 million CMP.

### C. Regular Internal Meetings During Which Citi's Ineffective ERM and Regulatory Failures Were Routinely Discussed Support a Strong Inference of Scienter

211.   Citigroup's risk management, data governance, and control deficiencies, and its longstanding failure to comply with regulatory requirements during the Class Period for which regulators issued the 2020 Enforcement Orders were well documented in regular internal meetings. Defendants consistently had direct knowledge of Citigroup's deficiencies and compliance failures though regular internal meetings—many of which took place on weekly, monthly, and quarterly bases—with Citi's Board; Individual Defendants Corbat, Gerspach, and Mason; Corbat's direct reports (including Global Consumer Bank CEO Bird, CCO Carawan, Global Heald of ONT Callahan, Citibank CEO Desoer, CRO Hu, and Head of EIO&T Whitaker); and other C-Suite executives and senior officers.

### 1. Corbat and/or Citi's Board Of Directors Held (i) Risk Committee Meetings, (ii) Advisory Board Committee Meetings, (iii) BRCC Meetings, and (iv) Executive Operational Committee Meetings

212.   <u>Risk Committee Meetings</u>:  Citi operated under numerous MRAs and MRIAs and these were a central topic of discussion at Citi Risk Committee meetings.  These meetings, attended by CEO Corbat, CFO John Gerspach and later CFO Mark Mason, CCO Carawan, members of the leadership council, and personnel from all lines of defense, including the business leaders and representatives of internal audit and compliance.  (FE-6.)

a. While serving as Director of Enterprise Compliance Risk, FE-6 personally attended such Risk Committee meetings, sometimes as a guest speaker, in connection with FE-6's work on risk management, or to take notes. (FE-6.) Corbat personally attended these meetings in New York, and in instances when they were held in London, Singapore, and Hong Kong. (FE-6.) In other cases, Corbat attended the Risk Committee meetings remotely via Zoom or Skype. (FE-6.) These meetings were constant, and there were dozens of them during FE-6's two and half years as Director. (FE-6.) While sometimes Corbat missed a Risk Committee meeting because he was meeting with a regulator, he sent a delegate specifically to provide him with updates on the information discussed. (FE-6.)

b. At Risk Committee meetings, each business delivered updates via a Dashboard reporting system that allowed the presenters to save committee presentations on their laptops and/or tablets, and to pull up the material to be delivered and discussed at the meetings. (FE-6.) Each business's Dashboard reporting included the status of Citi's outstanding MRAs and MRIAs. (FE-6.) Citi's Director of Enterprise Compliance Risk also observed that Corbat was attentive to this information at Risk Committee meetings and asked questions about the information being shared. (FE-6.)

213. <u>Advisory Board Committee Meetings</u>:  Management of regulatory Enforcement Actions against Citi was centralized and reported to Citi's Board of Directors on a quarterly basis in Advisory Board Committee Meetings. (FE-7.)

a. Advisory Board Committee Meetings focused on outstanding MAPs, which were presented in PowerPoint slides approximately 50 pages long, and described, at a granular level, the problems identified by Citi's regulators, including the OCC. (FE-7.)

b. The meetings lasted two to three hours and were held in a conference room at Citi's headquarters in New York. (FE-7.)  Regular attendees included Citi's Global Head of Audit, Chief Risk Officer (Brad Hu), Committee Chair Gene McQuade, Managing Director Gail Kilmer, Global Consumer Bank CEO Bird, Citi's Head of Compliance, Chief Risk Officer for U.S. Consumer, Commercial, and Mortgage Banking Ray Romano, Tom Schlotterback (who led compliance for the credit card business) and at least a dozen others. (FE-7.)  In the event CEO Corbat did not personally attend, he was at a minimum, always informed of the matters discussed at the meetings. (FE-7.)

c. Attendees received the PowerPoint slides by email, and records and minutes were also maintained to document these meetings. (FE-7.)

214.     <u>Business Risk and Controls Committee (BRCC) Meetings</u>:   CEO Corbat, CFO Gerspach (and later Mason), and other senior leadership held top level BRCC Meetings to discuss with business CEOs the risk and controls deficiencies rolled up from each global and individual business.  (FE-1.)  Corbat held these BRCC Meetings every month and they lasted at least an hour.  (FE-1.)  In BRCC meetings, Corbat especially focused on Global BDQRs which, as discussed above, detailed Citi's ERM problems, concerns about Citi's ability to handle and effectively manage risk across the enterprise, Citi's data quality management shortcomings against the enterprise standards, as well as the outstanding CAPs, DQMs, IMRs, including deficiencies regulators identified.  (FE-1.)  CTO D'Onofrio, who attended meetings with Citi's regulators, attended Corbat's monthly BRCC Meetings as well.  (FE-1.)

215.     <u>Executive Operational Committee Meetings</u>:   Corbat held Executive Operational Committee Meetings where he and other senior leadership were presented with Citi's outstanding regulatory deficiencies as well as the status of Citi's response to regulators.  (FE-9.)  As Managing Director, Enterprise Operations and Technology, Senior IT Function Head, and Regulatory Affairs Liaison for the Chief Technology Office, FE-9 (along with CDO Burke) presented directly to Corbat and other senior leadership at these meetings.  (FE-9.)  Since the start of the Class Period, Corbat held an Executive Operational Committee Meetings every quarter.  (FE-9.)

**2.      CFO Gerspach Also Attended Quarterly Regulatory Noncompliance Meetings and Data Governance Stakeholder Meetings**

216.     <u>Regulatory Noncompliance Meetings</u>:   Since 2016, Citi held quarterly Regulatory Noncompliance Meetings helmed by Global Data Aggregation and Reporting Program Director Mary Sue Farley.  (FE-2.)  The most senior executives, including CFO Gerspach, Citibank CEO Desoer, Global Heald of ONT Callahan, and the Citi business heads, attended these meetings.

(FE-2.)  During the meetings, attendees reviewed all outstanding issues of regulatory noncompliance as well as the status of Citi's response to each deficiency.  (FE-2.)

      a.  Consistent with the regulatory framework (Section VII, *infra*), the Quarterly Regulatory Noncompliance Meetings ensured that Citi's senior management team was directly informed of all outstanding issues of regulatory noncompliance as well as the status of Citi's response to each deficiency at a minimum of once per quarter.  (FE-2.)

      b.  In each Quarterly Regulatory Noncompliance Meeting, attendees reviewed dozens and dozens of pages listing regulatory noncompliance that Citi's regulators required Citi to address.  (FE-2.)  In these meetings, the remediation discussed was not solutions to implement effective enterprise-wide risk management, replace antiquated technology, or integrate Citi's thousands of disparate systems.  (FE-2.)  Instead, Citi was intent on keeping its existing antiquated infrastructure and working within those constraints to perform minor tweaks.  (FE-2.)  The information discussed at these meetings was tracked and presented in PowerPoint decks that Director Farley prepared and emailed to attendees.  (FE-2.)

217.  <u>Data Governance Stakeholder Meetings</u>:  CFO Gerspach, Global Heald of ONT Callahan, CDO Burke, CTO John D'Onofrio, the heads of individual divisions of the GCB, and the heads of the ICG held quarterly Data Governance Stakeholder Meetings in a conference room at Citi's headquarters in New York.  (FE-2.)  The meetings were focused on whether data governance was being managed effectively in terms of remediation of data quality issues happening across the bank.  (FE-2.)  Corbat's direct reports attended with their own direct reports who were responsible for data governance in the respective areas of the business.  (FE-2.)  At these quarterly meetings, CDO Burke went through reports and hundreds of pages of slides that detailed the data quality scores for each of the business heads.  (FE-2.)  There was also open discussion of Action Plans, and attendees quantified outstanding issues and data quality deficiencies so that they could report on them after each meeting.  (FE-2.)  Among the findings were issues and gaps in Citi's data governance and audit reports showing that Citi needed to improve the strength of controls that measured data quality from the transaction level.  (FE-2.)

### 3. Corbat's Direct Reports Also Held Weekly Meetings on Regulatory Non-Compliance and Failed Remediation

218.    <u>Weekly Meetings on Action Plans and Audit Reports</u>:  Corbat's direct reports held weekly meetings at Citi's New York City office to discuss outstanding Action Plans (*i.e.*, MAPs, CAPs), audit reports, and instances where failed remediation had resulted in a "Reopen" of a deficiency or a finding of regulatory non-compliance.  (FE-2.)  Corbat's direct reports included Global Heald of ONT Callahan; Citibank CEO Desoer; and Global Consumer Bank CEO Bird, among others.  (FE-2.)

### D. Objections to Citi's Broken Technology, Regulatory Non-Compliance, and Ineffective and Unsustainable Infrastructure Communicated to Senior Management Support a Strong Inference of Scienter

219.    In addition to the deficiencies raised in the day-to-day course of business, including the weekly, monthly, and quarterly meetings and reports described above, Citi executives took additional steps to escalate several specific objections directly to senior management.

220.    FE-2 took Citi's longstanding failure to comply with regulatory requirements head on.  (FE-2.)  Multiple times, FE-2 met with management and challenged Citi's lack of remediation, advising that Citi was not on the right path to remediation, and providing constructive criticism of plans written to address outstanding MRAs.  (FE-2.)  But FE-2's challenges and recommendations "fell on deaf ears."  (FE-2.)

221.    FE-3 tried a different approach.  Frustrated by Citi's refusal to remediate its failed data infrastructure and the "gigantic mess of the legacy systems that did not talk to each other," FE-3 memorialized these concerns to senior leadership in a "ten-point email" sent in mid-2018. (FE-3.)  FE-3's email identified the problems with Citi's ineffective and unsustainable compliance infrastructure, deficiencies with the data sets Citi was using in its surveillance methodology, a lack of access to data sets, that the existing rule-based engines missing important errors, and failure to

update old systems.  (FE-3.)  It also included hard evidence of the problems with surveillance tools at Citi, with specific use cases and data sets.  (FE-3.)  FE-3's email pinpointed the flaws in the surveillance methodology, informed senior leadership of failures in the current methods, and explained that Citi's approach to surveillance was "not going to work – it was not a real-time surveillance system."  (FE-3.)  To ensure it was seen by all senior leadership, FE-3 sent the email to the head of human resources, legal, and copied many compliance colleagues who shared FE-3's concerns.  (FE-3.)

222.    FE-3's recommendation that Citi create an effective enterprise-wide risk management system that worked across the institution fell on deaf ears.  (FE-3.)  FE-3 had explained to senior managers and colleagues alike that Citi needed a unified system for risk and an ERM and integrated compliance risk system that worked across equities, foreign exchange, and fixed income.  (FE-3.)  But these suggestions were ignored or flatly rejected.  (FE-3.)

223.    Similarly, instead of taking action to remediate the substantive deficiencies raised by FE-3 and remediate its ineffective compliance risk management, Citigroup retaliated against FE-3, eventually forcing FE-3 out of the Company a few months later.  (FE-3.)

224.    Likewise, FE-1 consistently raised objections to Citi's risk management, technology, and data quality deficiencies, but FE-1's concerns were ignored, and FE-1's compensation suffered because FE-1 raised them.  (FE-1.)

225.    FE-1 consistently raised the data quality deficiencies to FE-1's boss, Jai Dorsey (then Managing Director, U.S. Consumer Bank Data Governance, Privacy, and Records Management Officer), and Dorsey's boss, Beth Satter (Chief Risk Officer, North American GCB), but, rather than remediate the deficiencies, FE-1 was penalized in performance reviews and lower bonuses for doing so.  (FE-1.)

226.    At the business CEO level, FE-1 raised these concerns, including data lineage issues and deficiencies in Citi's Corrective Action Plans (or CAPs), and offered advice and feedback, but the Citi CEOs simply would "not tak[e] the action necessary" to resolve these serious risk and control issues.  (FE-1.)

227.    FE-1 specifically raised these issues to CDO Burke, and Burke listened to FE-1's suggestions.  But when Burke discussed the problems with Burke's own boss, CTO D'Onofrio, D'Onofrio "beat" Burke's "head into a wall."  (FE-1.)  Burke agreed with FE-1 and encouraged FE-1's objections, saying that if FE-1 could find a way to convince senior management to tackle the data issues across the Global Consumer Bank, FE-1 should pursue it.  (FE-1.)  But Burke "could not do it from his seat" and said he "cannot endorse this" because of the orders from senior executives, including CTO D'Onofrio, who reported to Head of Global ONT Callahan, who reported to Corbat.  (FE-1.)

228.    In another example, in 2020, management criticized FE-1 when FE-1 pointed out problems with the Company's approach to data lineage.  (FE-1.)  The conflict over the deficiencies raised by FE-1 contributed to FE-1's departure from the Company shortly thereafter.  (FE-1.)

229.    Citi's Senior Vice President and Chief of Staff to the Head of Technology for GCB tried too.  Citi's poor technology and legacy systems created a key operational risk for Citi— "always and they knew it."  (FE-5.)  Everybody recognized the problem, and there was general agreement that regulatory compliance was not achievable unless Citi were to implemented a proper ERM infrastructure.  (FE-5.)  Yet, when FE-5 brought up this ERM proposal in meetings across IT leadership, it did not gain any traction and Citi was not willing to prioritize it.  (FE-5.)

### E.   Sworn Declaration by OCC Examiner-in-Charge Greg Sullivan that the OCC Communicated the Supervisory Concerns in the 2020 Enforcement Orders Several Years Prior to July 2019 Supports a Strong Inference of Scienter

230.   The Declaration of Citibank's OCC Examiner-in-Charge confirms and corroborates that, during the Class Period, the OCC identified to Defendants the deficiencies that were later the subject of the 2020 Enforcement Orders.  Greg Sullivan was the OCC Examiner-in-Charge at Citibank from September 15, 2015, to December 20, 2020.  On April 21, 2022, the OCC filed a declaration by Sullivan (the "Sullivan Declaration" or "Sullivan Decl.") in a False Claims Act proceeding in which the relator claimed to have "blown the whistle" on the deficiencies underlying the 2020 Enforcement Orders (*United States v. Citigroup Inc., et al.*, 1:19-cv-10970-DLC).  The Sullivan Declaration made clear that "the OCC issued the 2020 Orders to address unsafe or unsound banking practices relating to the Bank's ***long-standing failure*** to establish effective risk management and data governance programs and internal controls and its noncompliance with 12 C.F.R. Part 30, Appendix D," *i.e.*, the OCC Heightened Standards.  (Sullivan Decl. ¶¶18, 21.) Critically, Sullivan declares, under penalty of perjury, that "[m]any of the supervisory concerns addressed by the 2020 Orders were identified by the OCC and communicated to the bank ***several years prior to***" July 3, 2019 (the date the False Claims Act action was filed).  (Sullivan Decl. ¶27; *see id.* ¶11.)

### F.   Post-Class Period Admission by Director Dugan that the Board Recognized the Remediation Shortfalls Before the 2020 Enforcement Orders Supports a Strong Inference of Scienter

231.   Citigroup itself has admitted that, well before the 2020 Enforcement Orders and Civil Money Penalty were issued, it had knowledge of the underlying deficiencies.  At Citigroup's April 2021 Annual Meeting, John Dugan, in his role as Chair of the Board and member of both

the Audit and Risk Management Committees, admitted that "I and the Board did recognize the

remediation shortfalls before the consent order":

> Q:  How can investors reconcile that Chair John Dugan remains in his position when despite his expertise as head of the OCC during the global financial crisis, it appears that from an outsider's perspective, the Board did not recognize the seriousness of Citi's shortfalls until there was a formal regulatory consent order?

> A:  Thank you, Mike.  ***I and the Board did recognize the remediation shortfalls before the consent order.***  And we did spend a great deal of time overseeing a number of different remediation projects in the ***last several years***.  While a lot of work was done and a lot of progress was made, we came to realize that a more ***fundamental, holistic and systemic change was required***, what we now call the transformation.

> More specifically, we became fully focused on the need for Citi to ***fundamentally change its risk and control environment***.  As a result, the Board has formed a Transformation Oversight Committee to oversee these efforts, and it will hold management accountable for the successful execution of the transformation.  The Board believes that this change is absolutely critical, not just to remediate deficiencies identified by regulators but to modernize the technology and infrastructure that Citi will need to compete effectively, particularly in the new digital landscape.  The Board believes that the transformation is a critical part of Citi's strategy that will produce tangible benefits for our clients and investors and at the same time, strengthen the firm's safety and soundness.

**G.    News Articles and Analyst Coverage Reported that Regulatory Concerns Over Citi's Ineffective Risk Management Persisted for Years, Supporting a Strong Inference of Scienter**

232.    As the truth began to be revealed, news articles and analyst coverage reported that

Citi and Corbat had been suffering from ineffective risk management and suppressing regulatory

concerns for several years.  For instance, *The Wall Street Journal* reported on September 14, 2020

that "*[f]or years*, regulators have privately pressed Citigroup and Mr. Corbat to fix the bank's risk

systems."  *Business Insider* likewise reported on September 15, 2020 that Citigroup had received

numerous warnings from federal regulators in the form of MRAs and MRIAs which are "privately issued by regulators when they find controls or systems that aren't up to standards."

233.    According to *Business Insider's* September 15, 2020 report, rather than remediate the deficiencies, Citi had "multiple [MRAs and MRIAs] ***long past due***."  The regulators "were annoyed with Citigroup's noncompliance across numerous issues and felt as if they weren't being heard."  But rather than fix the systems, "[t]he CEO [Corbat] who had made operating efficiency and return-on equity a hallmark of his strategy was often reluctant to spend the money or dedicate enough people to fix a problem the right way."

234.    In his October 8, 2020 report titled "'Hangry' Investors + Reg Order = New Catalyst" analyst Mike Mayo described investors' "***ang[er] over their lack of transparency and why [the regulatory issues] were allowed to fester***."  Mayo, who covered Citi during the Class Period, specifically identified Defendants' Class Period statements as false:  "contrary to Citi's statements from a few years ago, its restructuring was not sufficiently complete in our view," and described it as "one of the greatest disconnects that we've seen between Citi's balance sheet and stock price value."

235.    An article by *The Motley Fool* on October 16, 2020 summarized it well: ***"management has known about at least some of these problems since at least 2013.***  How do you not fully address issues you've known were serious for at least seven years?"

**H.    The 2020 Enforcement Orders Findings that "For Several Years" Citi Had Failed to Implement and Maintain Enterprise-Wide Risk Management Supports a Strong Inference of Scienter**

236.    The findings and remedial actions required by the 2020 Enforcement Orders issued by the OCC and the Fed corroborate that Defendants knew of, or at least recklessly disregarded, the deficiencies for several years before the Enforcement Actions were issued.

237.     In the OCC Remediation Order, the OCC found that "*[f]or several years*, [Citibank] has failed to implement and maintain an enterprise-wide risk management and compliance risk management program, internal controls, or a data governance program commensurate with the Bank's size, complexity, and risk profile." (OCC Remediation Order Art. II ¶1.) Specifically, the OCC identified the following deficiencies, which it said violated the Heightened Standards and/or were unsafe or unsound practices "with respect to the Bank's enterprise-wide risk management and compliance risk management program" and its "data quality and data governance":

a.  Citibank had failed to establish frontline units, independent risk management, internal audit, and control functions, in violation of the Heightened Standards;

b.  Citibank had failed to establish an effective risk governance framework, in violation of the Heightened Standards;

c.  Citibank's enterprise-wide risk management policies, standards, and frameworks had failed to adequately identify, measure, monitor, and control risks;

d.  Citibank had failed to create compensation and performance management programs to incentivize effective risk management;

e.  Citibank had unsafe or unsound controls practices, including an absence of clearly defined roles and responsibilities, and noncompliance with multiple laws and regulations;

f.  Citibank had been unable to develop and execute a comprehensive plan to remediate data governance deficiencies, including data quality errors and the failure to produce timely and accurate management and regulatory reporting;

g.  Citibank had made inadequate progress in remediating identified deficiencies.

238.     As referenced above, these were issues that the OCC had discussed with Defendants well in advance of its Enforcement Action. Indeed, the OCC Remediation Order found that the Board's and senior management's oversight over these issues was "inadequate to ensure timely, appropriate actions to correct the *serious and longstanding deficiencies and unsafe or unsound*

*practices in the areas of risk management, internal controls, and data governance at the bank*." (*Id.* Art. II ¶5.)   In addition, the OCC Remediation Order stated that Citibank still had not even "diagnose[d] the root cause(s) of the underlying issues that led to internal control related concerns *identified by internal audit and/or federal regulators since 2017*." (*Id*. Art IX ¶1(a)(i).)   The OCC's conclusions corroborate the strong inference of scienter drawn from the contemporaneous facts alleged herein regarding deficiencies in the areas of Citi's risk management, controls, and data governance.

239.   The OCC Remediation Order's findings that the regulators had identified these issues to Citi years earlier also accords with the declaration of Greg Sullivan, the OCC's Examiner-In-Charge of Citibank during the Class Period, that, as noted above, declared: "Many of the supervisory concerns addressed by the 2020 Orders were identified by the OCC and *communicated to the Bank several years prior" to July 3, 2019*.   (Sullivan Decl., ¶27; *see id.* ¶11.)

240.   Similarly, the Fed's 2020 Cease and Desist Order explicitly stated that "Citigroup has not adequately remediated the longstanding enterprise-wide risk management and controls deficiencies previously identified by the Federal Reserve," including specific deficiencies dating back to at least 2013 and 2015.   (Fed Cease and Desist Order at 2.)   The Fed further described how the Citi Board failed to take appropriate remedial action regarding the "previously identified" deficiencies.   Specifically, the Fed ordered that Citi explain the "actions that the board of directors will take to hold senior management accountable for executing effective and sustainable remediation plans by committed deadlines" and "to ensure senior management improves, and thereafter maintains, effective and independent enterprise-wide risk management."   (Id. ¶¶2(a)-(c).)   The necessary implication is that Citi's "board of directors" and "senior management" had

not been "executing effective and sustainable remediation plans by committed deadlines" or "maintain[ing] effective and independent enterprise-wide risk management," despite being aware of the issues throughout the Class Period.   Thus, the Fed's Cease and Desist Order also corroborates the contemporaneous facts alleged herein that create a strong inference of scienter.

I.      **The Governing Regulatory Process, Particularly the Required Reporting from Regulators to the Boards, Further Supports a Strong Inference of Scienter**

241.    OCC and Fed guidelines require the regulators to provide the Citi and Citibank Boards with continuous communication, including but not limited to formal written reports concerning identified deficiencies, corroborating that Defendants knew of, or at least recklessly disregarded, the deficiencies for several years before the Enforcement Actions were issued. Among other communications specifically required, the OCC:

a.   Must "maintain[] communication with boards throughout the supervisory cycle to discuss OCC examination results and other matters," and "[d]eficiencies and excessive risks must be promptly communicated to the bank when they are identified either by sending a formal written communication to the board or by meeting with the board or management." (*Bank Supervision Process* at 43.)

b.   When issuing an MRA, "***must communicate such concerns*** to management and the board when the concerns are discovered," ***via a*** "***formal written communication to the board***" and ***the bank must respond by providing an*** "***action plan***, including specific information regarding milestones, the completion date, and staff who are accountable for implementation" ***or a*** "***commitment from bank management to develop a board-approved plan*** and provide it to the OCC within 30 days of receipt of the formal written communication containing the MRA."   (*Id.* at 43, 46-47.)   "When discussing MRAs, ***examiners must be clear with bank management and the board regarding the OCC's supervisory concerns and expectations***" and "must impress on the board its responsibility to provide oversight of management's corrective actions."   (*Id.* at 48.)   "***The OCC expects the bank's board to oversee timely and effective correction*** of the practices described in an MRA."   (*Id.* at 47.)

c.   Must prepare a Report of Examination at the end of each supervisory cycle that "summarizes supervisory activities, conclusions, and findings during the supervisory cycle" (*Id.* at 43), "contains conclusions on . . . the adequacy

of the BSA/AML compliance program," "discusses deficient risk management practices, violations, and excessive risks," and "details corrective actions to which bank management or the board has committed" (*Large Bank Supervision* at 27).  Each Report of Examination includes a section titled "Matters Requiring Attention" that describes "new MRAs and status updates for previously issued MRAs" to "focus[] the board's attention on deficient practices warranting the board's immediate acknowledgment and oversight." (*Bank Supervision Process* at 62.)  ***The Board* "*should thoroughly review" and sign each Report of Examination "to show[] that he or she has personally reviewed the entire ROE."*** (*Id.* at 60, 62).

242.    And among other communications specifically required, the Fed:

a.    Must "***formally communicate***" MRAs or MRIAs to the Board of Directors (or an executive-level committee of the Board), and ***the Board* "*is required to provide a written response***" to the Fed for each MRA and MRIA received.  (Bank Holding Company Supervision Manual §§1070.1.2.1-1070.1.2.2.)

b.    Must send an "annual roll-up report [that] summarizes the significant findings, based on outstanding MRIAs or MRAs, included in the reports of targeted reviews or other supervisory activities." (*Id.* §1070.1.2.)

243.    In addition to written documents, OCC and Fed examiners personally meet with Citi and Citibank senior management and Boards for every examination and directly convey their findings.  The OCC:

a.    Requires that a large national bank like Citibank "must receive a full-scope, on-site examination" every twelve months.  (*Bank Supervision Process* at 12-13.)

b.    Assigns a full-time examiner-in-charge (EIC) "to provide day-to-day supervision with the help of teams of examiners." (*Large Bank Supervision* at 2.)  The OCC's EIC of Citibank met with its Board and management to discuss "OCC's findings and conclusions, discuss deficiencies and obtain bank's management's commitments for corrective action, [and] areas of greatest risk to the bank." (*Bank Supervision Process* at 42*.*)  ***"Examiners must convey any significant decisions discussed with bank management during the exit meeting, when they meet with the board, and in written correspondence."*** (*Id.*)  In Citibank's case, OCC examiners were physically present at Citibank's headquarters where they are able to walk into senior management's offices without formal appointment and, at times, without warning. (FE-2.)

244.    Similarly, the Fed:

    a.   Requires an annual "exit meeting" with Citi's "management or management and board of directors" to "discuss key overall inspection findings, including preliminary composite and component numeric ratings."  (Fed BHC Supervision Manual §1065.0.1; *see also* §1045.0.6 n.7.)

245.    The contemporaneous facts alleged herein, including the extensive internal audits, internal regular reports (*e.g.*, the Executive Scorecards and Global BDQRs), internal regular meetings (*e.g.*, (i) Risk Committee Meetings, (ii) Advisory Board Committee Meetings, (iii) BRCC Meetings, (iv) Executive Operational Committee Meetings, (v) Regulatory Noncompliance Meetings, (vi) Data Governance Stakeholder Meetings, and (vii) Weekly Meetings on Action Plans and Audit Reports, and revelations in the Sullivan Declaration that the OCC communicated the supervisory concerns in the 2020 Enforcement Orders *several years prior* to July 2019 are wholly consistent with the regulatory mandate that the OCC and Fed must be in constant communication with the Citi and Citibank Boards, which included Corbat and other directors. Furthermore, the extensive regulatory framework further corroborates the detailed contemporaneous allegations herein predicated on Former Employees.  Taken together, these allegations establish a strong inference that Citi's longstanding deficiencies, noncompliance, and unsafe or unsound practices related to enterprise-wide risk management, compliance risk management, controls, and data governance identified in the 2020 Enforcement Orders were known to the Individual Defendants and Citi, or were at least recklessly disregarded by them, throughout the Class Period.

### 1.    The Amount of the $400 Million Civil Money Penalty Supports a Strong Inference of Scienter

246.    The OCC's issuance of a $400 million Civil Money Penalty provides additional support for the strong inference of scienter for the following reasons:

a. The OCC's *Bank Supervision Process* handbook provides that "[e]xaminers should propose CMPs for serious misconduct, including ***misconduct that is reckless, flagrant, willful, or knowing and that, because of its frequency or recurring nature, shows a general disregard for law or regulation***." (*Bank Supervision Process* at 51.)

b. The $400 million Civil Money Penalty is the third largest identified on the OCC's website, and only one of 14 listed in excess of $100 million or more. (The OCC's website records start in 1989 and list 346 Civil Money Penalties.)

c. The OCC's Civil Money Penalties are organized in tiers with different monetary penalties applicable to each tier. The highest tier, which caps Civil Money Penalties at $1 million or 1% of the institution's total assets, requires a finding that the penalized bank "knowingly" committed legal or regulatory violations, "knowingly" engaged in "unsafe or unsound practices," or "knowingly" breached a fiduciary duty. 12 U.S.C. §1818(i)(2).

247. Accordingly, the size of the $400 million Civil Money Penalties is indicative that the OCC found that Citi's misconduct was at least reckless, flagrant, willful, or knowing, and thereby supports a strong inference of Defendants' scienter.

**J.   Corbat's Resignation Immediately After the Revlon Incident and Before the 2020 Enforcement Orders Were Announced Supports a Strong Inference of Scienter**

248. The timing and circumstances of Corbat's abrupt departure further supports a strong inference of scienter. Corbat's resignation was announced on September 10, 2020 shortly after the Revlon incident, and before the 2020 Enforcement Orders were announced. Prior to that, on October 24, 2019, *The Wall Street Journal* had reported that Corbat intended to remain in the CEO role "for at least three more years," or until at least October 2022.

249. Although Citigroup attempted to obfuscate the timing and circumstances of Corbat's resignation, the true reasons for the departure—that Corbat was being forced to resign because of expected rebukes from the OCC and the Fed—were later reported by the media:

a.  Specifically, on September 10, 2020, within weeks of Citi's erroneous $900 million payment to lenders of Revlon, the Company announced that Corbat would resign effective February 2021.  Citi attempted to publicly spin the resignation into a typical planned event by telling *CNBC* that "[i]t has been Mike's intention to retire in 2021 since Jane was appointed president of Citi last year . . . Announcing his plans now allows ample time for a smooth CEO transition, which was important to Mike given that he did not benefit from one."

b.  Then, just four days after Citigroup told investors that "[i]t has been Mike's intention to retire in 2021," on September 14, 2020, *The Wall Street Journal* reported that the OCC and the Fed were "preparing to reprimand Citigroup . . . for failing to improve its risk-management systems" and revealed that the "expected rebuke" "accelerated planning" for Corbat's departure.  More recently, on September 14, 2022, *The Wall Street Journal* was more explicit, writing, "The reprimand hastened the departure of former CEO Michael Corbat and vaulted Ms. Fraser into the top job at the nation's third-largest bank."

250.  Corbat's sudden resignation and Citigroup's efforts to obfuscate the true reasons for the resignation support a strong inference of scienter.

**K.  Citigroup's Risk Management Systems Were Core Operations that Were the Constant Focus of the Individual Defendants, Thereby Supporting a Strong Inference of Scienter**

251.  Citigroup's enterprise-wide risk management systems and controls constituted core operations of the Company.  As Defendants expressly stated: "effective risk management is of primary importance to its overall operations."  To this end, as detailed further below (Section VIII.C.1, *infra*), Defendants spoke repeatedly throughout the Class Period about the importance of maintaining effective risk management and controls for Citi in the Management Discussion and Analysis sections of its SEC filings.  There is no set of systems that is more important to Citigroup than its risk management systems, data governance, and controls.

252.  As described below:

- Defendants spoke repeatedly throughout the Class Period about the importance of maintaining effective risk management and controls for Citigroup in the Management Discussion and Analysis sections of its SEC filings.

- Citigroup also explicitly acknowledged in its Annual Reports throughout the Class Period that for both Citi and Citibank, "effective risk management is of primary importance to its overall operations." The first page of Citigroup's 2019 Proxy (after the cover page and invitation to shareholders) was a letter issued by Citi's Board of Directors which stated that it was "critical to the firm's success" that "[m]anagement also made progress on the regulatory front last year."

- Moreover, Defendant Mason stated on July 15, 2019 that sufficiently investing in the Company's risk infrastructure and controls is "critical to the long-term sustainability of the franchise." And O'Neill, Citigroup's former Chair, explained on April 24, 2018 that "risk management is the bedrock of banking." And current Chair John C. Dugan (who also served as Comptroller of the Currency from 2005 to 2010) likewise recognized on April 16, 2019 that it was "absolutely critical" that Citigroup comply with OCC and Fed regulations.

- Finally, in an internal memo to Citi staff dated August 10, 2020, Corbat analogized the Company's "controls and stronger infrastructure" to brakes on a car and how "it's the brakes that let you control the car." Without the brakes, Citi would inevitably crash. Maintaining effective risk management and controls is critical for Citi's survival as well as the safety of the financial system as a whole, which is precisely why the Company is subject to strict OCC and Fed supervision. On January 15, 2016, Corbat stated that "[w]e've also made the necessary investments in our compliance, risk, and control functions which are ***critical to maintaining our license to do business,*** " further demonstrating those functions' central roles in the Company's operations and their necessity to Citigroup's survival.

253.    Given the admitted importance of effective risk management, data governance, and controls (and complying with the OCC and Fed regulations) to Citi's business, they constitute core operations and further support a strong inference of scienter.

### L.    Corporate Scienter

254.    Citigroup possessed scienter for two independent reasons. First, the Individual Defendants were senior executives and/or directors of Citi with binding authority over the

Company and acted within the scope of their apparent authority.  The scienter of the Individual Defendants is imputed to the Company.

255.   Second, and independently, certain allegations herein establish Citi's corporate scienter based on (i) the state of mind of senior executives (other than the Individual Defendants) whose intent can be imputed to the Company, and/or on (ii) the knowledge of senior executives who approved the statements alleged herein despite knowing the statements' false and misleading nature.  Given the significance of Citigroup's risk management, data governance, and controls to Citigroup's business, and the necessary involvement of numerous Citigroup departments and personnel—including risk, audit, and compliance personnel—additional executives unknown at this time and sufficiently senior to impute their scienter to Citigroup also knew of the fraudulent scheme alleged herein.  Accordingly, it can be strongly inferred that senior executives at Citigroup possessed scienter such that their intent can be imputed to the Company.

256.   Such executives include direct reports to CEO Corbat, who were evaluated by Corbat using Executive Scorecards, including, but not limited to, the following individuals:

    a.   Stephen Bird ("Bird") served as CEO of Citigroup Global Consumer Bank from October 1998 to October 2019.  As CEO of Citigroup Global Consumer Bank, Bird reported directly to Corbat.  (FE-2, FE-7.)  Indeed, Citi confirms in its annual report that "[t]he CEOs of each region and business report to the Citigroup CEO."  (2018 Form 10-K at 60)

    b.   Daniel "Don" Callahan ("Callahan") served as Global Head of Operations and Technology (ONT) at Citigroup from October 2007 through December 2018.  As Global Head of ONT, Callahan reported directly to CEO Corbat.

    c.   Mark Carawan ("Carawan") served as Chief Compliance Officer from February 2017 to June 2020.  As CCO, Carawan reported directly to CEO Corbat.

    d.   Barbara Desoer ("Desoer") served as CEO of Citibank, N.A. from April 2014 through April 2019.  Since 2019, Desoer has served as Director of Citigroup and Chair of Citibank.  As CEO of Citibank, Desoer reported directly to CEO Corbat.

e.   Bradford Hu ("Hu") served as Chief Risk Officer from January 2013 through December 2020.  As CRO, Hu reported directly to CEO Corbat.

f.   Mike Whitaker ("Whitaker") has served as Citigroup's Head of Enterprise Infrastructure, Operations and Technology (EIO&T) since November 2018. As Head of EIO&T, Whitaker "is considered part of the first line of defense" and "reports to the Citigroup CEO," according to Citi's annual report.  (2018 From 10-K at 60)

257.   Such executives also include C-Suite executives and senior officers directly involved in the regular reports and regular internal meetings regarding the Citi's risk management, data governance, and controls deficiencies, and its longstanding failure to comply with regulatory requirements during the Class Period that was the basis for the 2020 Enforcement Orders.  Those C-Suite executives and senior officers include, but are not limited to:

a.   Frank Burke ("Burke") served as Citigroup's Chief Data Officer from March 2015 to June 2018.

b.   John D'Onofrio ("D'Onofrio") worked for Citigroup for 34 years. D'Onofrio's most recent position was serving as Citigroup's Chief Technology Officer from June 2006 to February 2019.

c.   Mary Sue Farley was Citigroup's Global Data Aggregation and Reporting Program Director from May 2016 to June 2019 and CBNA Executive PMO/ Citi CAO Office Transformation Program Manager from June 2019 to August 2021.

d.   Anthony Nappi, who served as Global Head of Operational Risk and Control for the Consumer Bank (CBORC) from November 2015 to September 2019 and, in that capacity, reported to Global Consumer Bank CEO Bird.

e.   Sriram Padmanabhan ("Padmanabhan") served as Citi's Chief Technology Auditor and Managing Director from May 2017 to September 2020, after serving as Chief Auditor for ICG Technology and Operations from April 2016 to April 2017.

f.   Paul Ricci ("Ricci") served as Chief Auditor of Risk Management and Managing Director from December 2012 to December 2019.

g.   Ray Romano who served as Chief Risk Officer for U.S. Consumer, Commercial, and Mortgage Banking from September 2014 to March 2017 and Chief Administrative Officer (CAO), Latin America from March 2017 to December 2022.

h. Beth Satter, who served as Managing Director, Operational Risk from June 2013 to July 2019, after holding the position of Chief Administrative Officer, Regulatory Relationship Management from September 2010 to June 2013.

258.    As alleged in detail above, the foregoing executives had regular contact, or indirect contact, with Corbat through regular reports and meetings where they worked very closely with Citi's management and/or Board to keep them informed of outstanding regulatory deficiencies, including "all the key issues" regarding Citi's lack of effective enterprise-wide risk management that were later publicly revealed in the 2020 Enforcement Orders.  In many cases, the executives were evaluated every quarter by Corbat based on an Executive Scorecard that tracked progress on the outstanding MRAs and MRIAs and the status of CAPs and IMRs that had long identified "all the key issues" regarding Citi's lack of effective enterprise-wide risk management that were later publicly revealed in the 2020 Enforcement Orders.  They also attended regular meetings with Corbat, such as the Quarterly Data Governance Stakeholder Meetings and Weekly Meetings on Action Plans and Audit Reports, which covered details of all outstanding risk management deficiencies, data quality deficiencies, and all outstanding regulatory non-compliance at Citigroup, including "all the key issues" regarding lack of effective enterprise-wide risk management that were later publicly revealed in the 2020 Enforcement Orders.

259.    As-yet unidentified Citigroup senior executives also approved the false statements despite knowing of their false and misleading nature.  As alleged above, federal regulators had been pressuring Citigroup on a regular basis for years to fix the Company's deficient risk, data governance, and control systems.  Federal regulators also exercised continuous supervision with examiners always on-site at Citi's offices, engaged in ongoing discussions with senior management and Citi's Board, issued an annual Report of Examination, were required by regulation to report MRAs and MRIAs immediately to Citi's Board, and held exit meetings with

Citi all throughout the Class Period.  From this, it can be strongly inferred that senior executives at Citigroup approved the false and misleading statements in the Company's annual and quarterly SEC filings concerning the strength and functioning of Citigroup's enterprise-wide risk management, data governance, and control.

## VII.   THE RELEVANT OCC AND FED REGULATORY FRAMEWOK FOR CITIGROUP AND CITIBANK

260.    The allegations in this case relate to certain OCC and Fed regulatory requirements applicable to Citigroup and Citibank.  The 2020 Enforcement Orders the OCC and Fed issued due to Citigroup's and Citibank's violations of those requirements were the culmination of a series of events that constructively disclosed the fraud inherent in the alleged misstatements.  *See* Section IX, *infra*.

### A.    The Relevant OCC Regulatory Framework

261.    The OCC is the primary regulator of banks chartered under the National Bank Act. Its main purpose is to supervise, regulate, and provide charters to banks operating in the U.S. to ensure the soundness of the U.S. banking system.  The OCC had supervisory authority over Citibank and examined Citibank pursuant to the authority conferred by 12 U.S.C. §1481.  The OCC was required to conduct a "full-scope, on-site examination" of Citibank every 12 months. *See* 12 U.S.C. §1820(d)(1).  The examination and supervisory process applicable to Citibank was set forth in two handbooks: (1) *Comptroller's Handbook, Examination Process: Bank Supervision Process* ("*Bank Supervision Process*") and (2) *Comptroller's Handbook, Examination Process: Large Bank Supervision* ("*Large Bank Supervision*"), which "summarizes and expands on" *Bank*

*Supervision Process*.  The versions of these handbooks updated in September 2019 and referenced

herein are available through the OCC's website via the links below.[3]

262.   <u>The foundation for regulating safety and soundness is risk assessment</u>.  "The OCC's

primary concern is that the bank operates in a safe and sound manner and maintains capital

commensurate with its risk." *Large Bank Supervision* at 8.  "The foundation of midsize and large

bank supervision," according to *Large Bank Supervision*, "is a risk assessment framework

designed to determine whether banks effectively assess risks throughout their entire enterprise,

regardless of size, diversity of operations, or existence of subsidiaries and affiliates.  Under the

risk-based supervision approach, examiners focus on whether banks identify and effectively

manage the risks they assume.  As an organization grows more diverse and complex, its risk

management processes should keep pace.  When risk is not properly managed, the OCC directs

bank management to take corrective action." *Id.* at 8. "The risk-based supervision approach

concentrates on systemic risks and banks that pose the greatest risk to the federal banking system."

*Bank Supervision Process* at 30.

263.   <u>OCC examiners are in continuous communication with bank management and the</u>

<u>Board</u>.  The OCC assigns examiners to work full time at the largest and most complex banks

because of their vast and, in the case of banks like Citibank, global, operating scope.  In the section

concerning communication, *Large Bank Supervision* states that the OCC "is committed to

ongoing, effective communication with the banks that it supervises," including "formal and

informal conversations and meetings, ROEs [Reports of Examinations], supervisory letters, and

---

[3]   *Bank Supervision Process*, (Sept. 2019), https://www.occ.gov/publications-and-resources/publications/comptrollers-handbook/files/bank-supervision-process/pub-ch-bank-supervision-process.pdf; *Large Bank Supervision*, (Sept. 2019), https://www.occ.gov/publications-and-resources/publications/comptrollers-handbook/files/large-bank-supervision/pub-ch-large-bank-supervision-previous.pdf.

other written materials." *Large Bank Supervision* at 24. "Examiners should meet with bank management frequently and directors as needed to collect information and discuss supervisory issues" because, among other reasons, "[o]ngoing communication and discussions with bank management allow examiners to obtain the information necessary to reach sound and accurate conclusions." *Id.* at 24-25. "In addition to written communication throughout a supervisory cycle," which, as explained above, was a 12-month period for Citibank, "the OCC must provide the boards of the lead OCC-supervised bank and each affiliated OCC-supervised bank an ROE at least once during every supervisory cycle." *Id.* at 27 (emphasis in original). These reports contain conclusions, discuss "deficient risk management practices, violations, and excessive risks," and detail "corrective actions to which bank management or the board has committed." *Id.*

264. One type of written communication the OCC uses are MRAs—matters requiring attention—which it uses "to communicate concerns about a bank's deficient practices." *Bank Supervision Process* at 46. Where a bank violates a law or regulation, examiners should identify deficient practices that contributed to the violation and "[i]f bank management has not corrected deficient practices that caused or contributed to the violation, examiners must communicate the OCC's concern with these practices in an MRA." *Id.* at 48. MRAs are communicated in a standardized format that identifies the concern (*i.e.*, the deficient practice), the cause of the concern, the consequence of continuing the deficient practice, the corrective action management or the board must undertake to resolve the concern and eliminate the cause, and the commitment— *i.e.*, the bank's action plan to remediate the deficiency. *Id.* If management cannot provide an action plan, the examiner must obtain a commitment from bank management to develop a board-approved plan and provide it to the OCC within 30 days of the MRA. *Id.* at 46-47.

265.    "The OCC expects the bank's board to oversee timely and effective correction of the practices described in the MRA," including by "holding management accountable for the deficient practices," "directing management to develop and implement corrective actions," "approving the necessary changes to the bank's policies, processes, procedures," and "establishing processes to monitor progress and validate the effectiveness of management's corrective actions." *Id.* at 47-48.  When the examiner discusses MRAs with banks, the examiner "must be clear with bank management and the board regarding the OCC's supervisory concerns and expectations. Examiners must impress on the board its responsibility to provide oversight of management's corrective actions." *Id.* at 48.

266.    Consistent with this regulatory framework, the OCC Examiner-In-Charge of Citibank declared that "[m]any of the supervisory concerns addressed by the 2020 Orders were identified by the OCC and **communicated to the bank several years prior to . . . . July 3, 2019**." (Sullivan Decl. ¶27; *see id.* ¶¶3, 11.)  The 2020 Enforcement Orders were "the culmination of discussions within the OCC . . . that had begun as early as January 2019 . . . centered around escalating certain supervisory concerns, some of which went back several years before the 2020 Consent Orders, into an enforcement action." (*Id.* ¶18.)  Mr. Sullivan further declared that "[g]iven the number of these concerns and their complexity, as evidenced by the 35-page 2020 Consent Order, the process of escalating these concerns into a public enforcement action took some time." (*Id.*)

267.    OCC initiates Enforcement Actions for unsafe or unsound practices, violations of law, and violations of the Heightened Standards.  The OCC does not immediately initiate Enforcement Actions arising out of bank deficiencies.  Rather, "[t]he OCC typically first cites a violation or issues an MRA to address a bank's deficiencies." *Bank Supervision Process* at 49.

But "[w]hen a bank's deficiencies are severe, uncorrected, repeat, or unsafe or unsound, or negatively affect the bank's condition, the OCC may use formal enforcement actions to support the agency's supervisory objectives." *Id.* at 49-50.

268.   Enforcement Actions "require a bank's board and management to take actions to correct a bank's deficiencies." *Id.* at 134.  The Enforcement Actions the OCC may bring pursuant to 12 U.S.C. §1818(b) include a Cease and Desist proceeding, which it can bring when a covered institution is engaging, or about to engage, in an unsafe and unsound practice in conducting its business, or if it is violating, has violated, or is about to violate any applicable law, rule, or regulation, including the "OCC Guidelines Establishing Heightened Standards for Certain Large Insure National Banks, Insured Federal Savings Associations, and Insured Federal Branches" (the "Heightened Standards"). *Id.*; *see* 12 C.F.R. 30.1(b) (the Heightened Standards).

269.   According to the OCC, the Heightened Standards were developed "[a]s a result of the financial crisis" in order "to enhance our supervision and strengthen the governance and risk management practices of large national banks" like Citibank.  Specifically, the Heightened Standards "reflected the OCC's supervisory experience during the financial crisis and addressed weaknesses the OCC observed in large institutions' governance and risk management practices during this time." 79 Fed. Reg. 54518 (Sept. 11, 2014).  To achieve that goal, the Heightened Standards set forth a series of "minimum standards for the design and implementation of a covered bank's risk governance framework and minimum standards for the covered bank's board of directors in providing oversight to the framework's design and implementation.  12 C.F.R. Part 30, Appx. D-I(2).  Among the Heightened Standards are the requirements to establish:  an effective risk governance framework; effective front-line units; independent risk management; an effective internal audit that ensures the risk governance framework complies with the Heightened Standards;

enterprise-wide risk management policies, standards, and frameworks to adequately identify, measure, monitor, and control risks; compensation and performance management programs to incentivize effective risk management; and policies, supported by appropriate procedures and processes, designed to provide risk data aggregation and reporting capabilities.

270.    Another type of Enforcement Action the OCC may bring pursuant to 12 U.S.C. §1818(b) is the imposition of Civil Money Penalties, sometimes referred to as CMPs, which are "for serious misconduct, including misconduct that is reckless, flagrant, willful, or knowing and that, because of its frequency or recurring nature, shows a general disregard for law or regulation." *Bank Supervision Process* at 51.  The amount of a Civil Money Penalty the OCC may issue is governed by 12 U.S.C. §1818 and further informed by OCC Policies and Procedures Manual 5000-7 ("PPM 5000-7").  Section 1818(i)(2) establishes a three-tiered system governing the issuance of Civil Money Penalties.  First tier penalties are limited to at most $5,000 per day during which the violation continues.  Second tier penalties are limited to $25,000 per day during which the violation continues.  Third tier penalties are limited to $1,000,000 or 1 percent of the institution's total assets per day.  Where the Civil Money Penalty is for unsafe and unsound practices, the penalties must be second or third tier.  And while second tier penalties can involve a "recklessly . . . unsafe and unsound practice" or behavior, third tier penalties require a finding that the institution "knowingly" committed violations, "knowingly" engaged in an unsafe or unsound practice, or "knowingly" breached a fiduciary duty.  PPM 5000-7 employs a matrix score to identify the suggested Civil Money Penalty.  The "matrix score" leads to suggested levels of Civil Money Penalties.  The largest penalty contemplated by PPM 5000-7, for the largest banks with the highest—*i.e.*, worst—matrix scores, is greater than or equal to $150 million.

| Suggested Action Based on Total Matrix Score and Total Assets of Bank | | | | | | | |
|---|---|---|---|---|---|---|---|
| Total matrix score | Total assets up to $50 million | Total assets $50 million+ to $250 million | Total assets $250 million+ to $1 billion | Total assets $1 billion+ to $5 billion | Total assets $5 billion+ to $25 billion | Total assets $25 billion+ to $100 billion | Total assets over $100 billion |
| 0–40 | No CMP | No CMP | No CMP | No CMP | No CMP | No CMP | No CMP |
| 41–70 | Up to $10,000 | Up to $20,000 | Up to $100,000 | Up to $300,000 | Up to $1.5 million | Up to $5 million | Up to $15 million |
| 71–100 | Up to $25,000 | Up to $50,000 | Up to $250,000 | Up to $1 million | Up to $5 million | Up to $15 million | Up to $30 million |
| 101–130 | Up to $50,000 | Up to $100,000 | Up to $500,000 | Up to $2 million | Up to $10 million | Up to $30 million | Up to $60 million |
| 131–160 | Up to $100,000 | Up to $200,000 | Up to $1 million | Up to $4 million | Up to $20 million | Up to $75 million | Up to $150 million |
| 161+ | $100,000+ but less than 1 percent of total assets | $200,000+ but less than 1 percent of total assets | $1 million+ but less than 1 percent of total assets | $4 million+ but less than 1 percent of total assets | $20 million+ but less than 1 percent of total assets | $75 million+ but less than 1 percent of total assets | $150 million+ but less than 1 percent of total assets |

271.    On October 7, 2020, the OCC initiated two Enforcement Actions against Citibank: the OCC Remediation Order and the OCC CMP Order.  The OCC issued findings that Citibank was operating in an unsafe and unsound manner and had failed to comply with the OCC's Heightened Guidelines, including those listed above.  The OCC Remediation Order required Citibank to undertake a number of steps to remedy these failings.  The OCC also issued a $400 million Civil Money Penalty against Citibank.  According to the OCC, this is the third largest penalty it has ever issued, and one of only 14 Civil Money Penalties issued by the OCC that are $100 million or greater.

### B.    The Relevant Fed Regulatory Framework

272.    The Fed is the regulator of bank holding companies and had supervisory authority over Citigroup, a bank holding company (also referred to as a "BHC"), and examined Citigroup pursuant to the authority conferred by 12 U.S.C. §5365; *see also* Board of Governors of the Federal

Reserve System, Division of Supervision and Regulation, *Bank Holding Company Supervision Manual* §1000.0.  That current version of the Manual is  available from the Fed at the link below.[4]

273.   <u>Fed examiners are in continuous communication with bank management and the Board</u>.  The *Bank Holding Company Supervision Manual* provides that "[c]ommunication of supervisory findings to the organization's board of directors is an important part of the supervision of a banking organization."  *Bank Holding Company Supervision Manual* §1070.1.2.  As such, written communications regarding such findings and issues, referred to generally as "reports," "are generally directed to the board of directors, or an executive-level committee of the board."  *Id.*  MRAs and MRIAs are specific types of formal communications issued by Fed examiners regarding significant matters.  The *Manual* requires both MRAs and MRIAs to be "formally communicate[d] . . . to the organization in these written reports." *Id.*, §1070.1.2.

274.   MRAs "constitute matters that are important and that the Federal Reserve is expecting a banking organization to address over a reasonable period of time but when the timing need not be 'immediate.'" *Id.* §1070.1.2.2.  Examiners are expected to communicate MRAs to the board of directors (or executive-level committee of the board) using the following standardized language: "The board of directors (or executive-level committee of the board), or banking organization *is required to . . .*" *Id.* (emphasis in original).  After reviewing an MRA, "the banking organization's board of directors is required to provide a written response to the Reserve Bank regarding its plan, progress, and resolution of the MRA," and the Fed "must follow-up on MRAs to assess progress and verify satisfactory completion." *Id.*

---

[4]   *Bank Holding Company Supervision Manual* (Feb. 2023), https://www.federalreserve.gov/publications/files/bhc.pdf.  The cited content of the regulations remained the same throughout the Class Period, though the specific section numbering within the *Bank Holding Company Supervision Manual* was altered during that time.  The section references provided herein are to the February 2023 version.

275.     MRIAs "are matters of significant importance and urgency that the Federal Reserve requires banking organizations to address immediately." *Id.* §1070.1.2.1.  Their importance and urgency are communicated using the following standardized language, which they are expected to include: "The board of directors (or executive-level committee of the board), or banking organization is *required to immediately . . .*" *Id.* (emphasis in original).  The Fed requires the banking organization's board of directors "to respond to the Reserve Bank in writing regarding corrective action taken or planned along with a commitment to corresponding time-frames" after reviewing an MRIA, and the Fed "must follow up on MRIAs to assess progress and verify satisfactory completion." *Id.*

276.     "For large banking organizations" like Citigroup, "an annual roll-up report summarizes the significant findings, based on outstanding MRIAs or MRAs, included in the reports of targeted reviews or other supervisory activities conducted during the supervisory cycle." *Id.* §1070.1.2.  This information is shared to "enable the banking organization's board of directors and any executive-level committee of the board to understand the substance and status of outstanding MRIAs or MRAs." *Id.*  Where a banking organization has received a large number of MRIAs or MRAs, it "may indicate that additional formal or informal investigation may be necessary or that the initiation of a formal or informal enforcement action may be warranted." *Id.* §1070.1.2.3.

277.     The Fed initiates formal Enforcement Actions for unsafe or unsound practices, including violations of Regulation YY.  Like the OCC, the Fed is empowered to initiate Enforcement Actions, including cease-and-desist orders, under 12 U.S.C. §1818(b).  According to the Federal Reserve's website, it generally "takes formal enforcement actions" against bank holding companies "for violations of laws, rules, or regulations, unsafe or unsound practices,

breaches of fiduciary duty, and violations of final orders."[5]  Formal Enforcement Actions include cease and desist orders, written agreements, prompt corrective action directives, removal and prohibition orders, and orders assessing civil money penalties.  *Id.*

278.    Among other regulations, the Fed can take formal Enforcement Actions for violations of Regulation YY, 12 C.F.R. 252.  Regulation YY was issued to implement aspects of the Dodd-Frank Act, 12 U.S.C. §5365, "which required the Board to establish enhanced prudential standards for nonbank financial companies supervised by the Board of Governors and bank holding companies" like Citi, including "overall risk management requirements."  12 U.S.C. §5365(b)(1)(A).  Regulation YY establishes risk management and risk committee assignments.  12 C.F.R. 252.33.  This provision requires the establishment of a risk-management framework "commensurate with its structure, risk profile, complexity, activities, and size."  12 C.F.R. 252.33(a)(2).  The risk-management framework "must include" "[p]olicies and procedures establishing risk-management governance, risk-management procedures, and risk-control infrastructure for its global operations" and "[p]rocesses and systems for implementing and monitoring compliance with such policies and procedures."  12 C.F.R. 252.33(a)(2)(i)-(ii).  These processes and systems must include processes and systems for:  identifying and reporting risks and risk-management deficiencies and ensuring effective and timely implementation of actions to remediate emerging risks and risk-management deficiencies; establishing managerial and employee responsibility for risk management; ensuring the independence of the risk-management function; and integrating risk management and associated controls with management goals and its compensation structure.  12 C.F.R. 252.33(a)(ii)(A)-(D).

---

[5]    https://www.federalreserve.gov/supervisionreg/enforcement-actions-about.htm  (last   visited May 24, 2023).

279.    On October 7, 2020, the Fed issued a Cease and Desist Order against Citigroup. The Fed Cease and Desist Order is explained further below.  Relevant here, the Order cited Citigroup's failure to comply with the provisions of 12 C.F.R. 252.33(a)(ii) set forth above, including its "longstanding enterprise-wide risk management and controls deficiencies previously identified" by the Fed in Consent Orders issued in 2013 and 2015.

## VIII.   ACTIONABLE FALSE AND MISLEADING STATEMENTS AND OMMISSIONS

280.    During the Class Period, Defendants are liable for:

a.    <u>Affirmative False and Misleading Statements Regarding Citi's Risk Management and Controls</u>:   Defendants repeatedly made affirmative, materially false statements in Citi's SEC filings and in public appearances concerning the adequacy, effectiveness, and functioning of Citi's risk management, data governance, and controls.   These statements were materially false at the time they were made as a factual matter and concealed the truth because Citi's risk management, data governance, and controls were not adequate, effective, or functional, and were not in alignment with the governing regulatory framework.

b.    <u>Omissions in the Management Discussion & Analysis of Citi's SEC Filings That Violated SEC Item 303</u>:   Throughout the Class Period, Item 303 of SEC Regulation S-K required that Defendants, in the Management Discussion and Analysis section of Citigroup's SEC filings, describe "any known trends or uncertainties that have had or that [Defendants] reasonably expect[] will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."   Item 303 further requires disclosure if Defendants "know[] of events that will cause a material change in the relationship between costs and revenues."   In violation of Item 303, Citi's Forms 10-K filed during the Class Period omitted the known, material uncertainties and events resulting from the true facts that existed concerning Citi's risk management and controls:   that its risk management and controls were not adequate, effective, or functional, and were not in alignment with the governing regulatory framework.

c.    <u>Materially Misleading Half-Truths and Omissions</u>:   Throughout the Class Period, Defendants made extensive disclosures concerning Citi's risk management, data governance, and controls.   Despite their lengthy and voluntary disclosures, Defendants' statements omitted material information concerning the true state of affairs that existed at the time of the statements concerning Citi's risk management, data governance, and controls:   that its risk management, data governance, and controls were not adequate, effective, or functional, and were not in alignment with the governing

regulatory framework.  Having chosen to speak, Defendants were required by law to speak the whole truth.  *See In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 240 (2d Cir. 2016).

281.   Defendants' statements alleged in this section were false and misleading and omitted and concealed the truth that before and during the Class Period:

    a.   Enterprise-Wide Risk Management (ERM):   Citi lacked effective enterprise-wide risk management.  Citi had grown by acquisition into one of the largest and most complex financial institutions in the world.  But rather than bring newly acquired entities onto a common platform, Citi continued to run acquired businesses on the information technology in place at the time of the acquisition.  Citi's haphazard approach meant that there were thousands of siloed data systems and repositories running on incompatible and outdated technology.  Citi left thousands of disparate systems as crude repositories of inaccessible and unverified data, and did not integrate them into a functional, automated risk management infrastructure.  Citi's approach resulted in significant risk management, control, data governance, and data quality failures, and was not aligned with minimum regulatory requirements.

    b.   Operational Risk Management:   Citi had ineffective operational risk management.   Lack of effective ERM created serious problems for managing operational risk.  Citi's tools to manage operational risk were underdeveloped and inadequate for a bank of its size and complexity.

    c.   Compliance Risk Management:  Citi's compliance risk management was ineffective and unsustainable.  Despite management reports of obsolete and ineffective infrastructure and surveillance tools, Citi scrapped its modernization projects and put a freeze on efforts to implement infrastructure that would work across the enterprise.

    d.   Data Governance and Data Quality:  Citi suffered from enterprise-wide data governance and data quality deficiencies, including that data was siloed in thousands of outdated systems that were not integrated and could not communicate with one another.  Citi also suffered from a lack of automated processes, unreliable data, the inability to verify data, ineffective controls, and the inability to reconcile discrepancies between data sources.

    e.   Technology:  Citi's technology was so obsolete and ineffective that it had an insurmountable technology debt that could only be cured by investing billions of dollars over many years in order to replace the thousands of incompatible systems with an effective enterprise-wide infrastructure. Defendants knew Citi's technology had to be fixed but did not want to spend the money and resources to do it; they instead tried to patch things over and

used *ad hoc* work-arounds to create a veneer of compliance with regulators' expectations.

f.   Internal Audits:  Citi consistently failed internal audits and assessments across the Company due to its deficient technology and data quality.  The failed audits included its Comprehensive Capital Analysis and Review (CCAR), BCBS 239 Audit, AML Technology Audit, Continuity of Business Audit, Finance Integrated Audit, and Financial Reporting Systems Audit.  The audit reports detailing Citi's deficiencies were escalated to Citi's Board of Directors, reviewed by the Board's Audit Committee, and the subject of hearings before the Board's Audit Committee.  At the same time, Citi degraded and suppressed its internal audit function by retaliating against auditors who reported on Citi's non-compliance, cutting resources, reducing audit staff, and imposing deadlines that forced staff to complete audits on unrealistic timelines.

g.   MRAs and MRIAs:  Citi was constantly operating under at least 50 MRAs and MRIAs, including MRAs and MRIAs for its ERM and control failures, but never resolved them.  The 2020 Enforcement Orders were "exactly consistent" with the requirements of these longstanding MRAs and MRIAs, and the OCC fined Citi for deficiencies that MRAs and MRIAs had identified years earlier since 2017.

h.   Citi Lacked an Effective Firm-wide Risk Governance Framework and Was Not Aligned with Regulatory Standards:  Throughout the Class Period, Citi did not have an effective firm-wide Risk Governance Framework.  To the extent that Citi employed policies, procedures, and processes to identify, measure, manage, monitor, report, and control risks, they did not operate "firm wide," were ineffective, and were not aligned with regulatory requirements.  Citi was unwilling to provide the required budget or resources to develop an effective real-time risk management system, and did not have the access to real-time and accurate financial data necessary to effectively manage risks associated with market conditions.  Incorporation of real-time data was also critical to effectively managing compliance in areas like insider trading.

i.   Citi Scrapped Projects that Would Have Brought It into Compliance with Regulators:  Citi scrapped planned initiatives to overhaul its infrastructure, surveillance systems, and technology that would have brought it into compliance with regulators.  Prior to the Class Period, Defendants focused almost exclusively on Project Rainbow as the anticipated solution to Citi's ERM inadequacies such that Citi deferred work on other projects and let technological gaps and risk and control deficiencies pile up.  Unbeknownst to the public, in 2017, however, Citi scrapped Project Rainbow.  After abandoning the Project Rainbow initiative, Citi had no plan to fix ERM systems that regulators identified as deficient in MRAs and MRIAs.  At the same time, Citi also froze investments in compliance.  For example, in 2016,

Citi also axed its project to design and develop a tool that would evaluate and monitor trade-related risks.

**A.    Defendants' Class Period Statements Were Materially False and Misleading When Made**

282.    For the avoidance of doubt, all the affirmative statements alleged to be actionably false and misleading when made are set out explicitly in this Section VIII.A.

**1.    Materially False and Misleading Statements in Citigroup's Form 10-K for 2016**

283.    On February 24, 2017, Citigroup filed its Annual Report for 2016 on Form 10-K with the SEC ("2016 Annual Report").  The 2016 Annual Report provided that "[t]hroughout this report, 'Citigroup,' 'Citi' and 'the Company' refer to Citigroup Inc. and its consolidated subsidiaries," which includes Citibank.  Individual Defendants Corbat and Gerspach signed the Annual Report.

284.    The 2016 Annual Report included the following materially false and misleading statement (at 64):

> Citi's firm-wide Risk Governance Framework consists of the policies, procedures, and processes through which Citi identifies, measures, manages, monitors, reports, and controls risks across the firm. . . . The Risk Governance Framework has been developed in alignment with the expectations of the Office of the Comptroller of the Currency (OCC) Heightened Standards.  It is also aligned with the relevant components . . . of the Federal Reserve's Enhanced Prudential Standards for Bank Holding Companies and Foreign Banking Organizations.

This statement (the "2016 10-K Statement") was materially false and misleading because (i) Citi did not have an effective firm-wide Risk Governance Framework; (ii) Citi did not effectively identify, measure, manage, monitor, report, and control risks across the firm; and (iii) Citigroup's Risk Governance Framework, to the extent it existed, was **not** "in alignment with" either the OCC Heightened Standards or the relevant components of the Fed's Enhanced Prudential Standards.

The true facts that existed, and that the 2016-K Statement concealed, are those specifically alleged in ¶281 and herein.

**2.     Materially False and Misleading Statements During the June 1, 2017 Bernstein 2017 Strategic Decisions Conference**

285.    On June 1, 2017, Bernstein analyst John McDonald asked Citigroup's executives "you've done a lot of investment spending, you've done some big projects upgrading major systems . . . . Are you kind of at the tail end of the major big projects you set upon the last couple of years?"

286.    Corbat provided the following materially false and misleading response:

> [f]rom an infrastructure perspective, we've got, really if not all, certainly most of the systems or base systems that we need. . . . [W]e've spent all the energy and effort in terms of creating these systems that have the ability to come back and communicate centrally. . . . So, as we look, again, I think from a regulatory perspective, major investments from a Rainbow and some of the big projects we talked about in the past and things that I think they're paying great dividends, those investments made.

Corbat's response (the "June 1, 2017 Statement") was materially false and misleading when made because (i) Citi did not have "if not all, certainly most of the systems or base systems we need"; (ii) Citi did not have effective systems with "the ability to communicate centrally"; (iii) Citi had abandoned Project Rainbow; and (iv) none of the systems were "paying great dividends" from a "regulatory perspective."   The true facts that existed, and that the June 1, 2017 Statement concealed, are those specifically alleged in ¶281 and herein, and also:

    a.   By 2017, the new platform to be developed pursuant to Project Rainbow had been declared a "no go." (FE-1.)  The early efforts to roll it out in the Asia Pacific region had been a "total disaster." (FE-1.)  Project Rainbow was a spectacular failure; despite heavy expenditures, Citi did not get anywhere with the project. (FE-7.)

    b.   Citi had pulled the plug on trying to achieve effective enterprise-wide risk management and controls and was simply not willing to provide the funding needed to "fix the complex problems." (FE-1.)

139

c.   Citi's erratic leadership did not provide the necessary guidance on what was needed for a unified platform to function properly and to meet the needs of the business.  (FE-7.)

d.   After abandoning the Project Rainbow initiative, Citi had no plan to fix the systems that were deemed deficient by the regulators in MRAs and MRIAs. (FE-1.)

e.   Citi did not have a "customer management system" or "customer 360" capabilities.  (FE-1.)  Such a system would have allowed one to look up a particular customer and identify all the data relating to that customer across the enterprise—"one view" of the customer—and allowed Citi to have consistent data about that customer and an understanding of the "customer relationship."  (FE-1.)

### 3.   Materially False and Misleading Statements in Citigroup's Form 10-K for 2017

287.   On February 23, 2018, Citigroup filed its Annual Report for 2017 on Form 10-K with the SEC ("2017 Annual Report").  The 2017 Annual Report provided that "[t]hroughout this report, 'Citigroup,' 'Citi' and 'the Company' refer to Citigroup Inc. and its consolidated subsidiaries," which includes Citibank.  Individual Defendants Corbat and Gerspach signed the 2017 Annual Report.

288.   The 2017 Annual Report (at 66) included the following materially false and misleading statement:

> Citi's Company-wide risk governance framework consists of the policies, procedures, and processes through which Citi identifies, measures, manages, monitors, reports, and controls risks across the Company. . . . The risk governance framework has been developed in alignment with the expectations of the Office of the Comptroller of the Currency (OCC) Heightened Standards.  It is also aligned with the relevant components . . . of the Federal Reserve's Enhanced Prudential Standards for Bank Holding Companies and Foreign Banking Organizations.

This statement (the "2017 10-K Statement") was materially false and misleading because (i) Citi did not have an effective risk governance framework; (ii) Citi did not effectively identify, measure, manage, monitor, report, and control risks across the firm; and (iii) Citigroup's risk governance

framework, to the extent it existed, was ***not*** "in alignment with" either the OCC Heightened Standards or the relevant components of the Fed's Enhanced Prudential Standards.  The true facts that existed, and that the 2017-K Statement concealed, are those specifically alleged in ¶281 and herein.

> **4.      Materially False and Misleading Statements Regarding Project Rainbow at the May 30, 2018 Bernstein 2018 Strategic Decisions Conference and in Citigroup's 2018 Q3 Earnings Call**

289.      At the Bernstein 2018 Strategic Decisions Conference on May 30, 2018, a Bernstein analyst asked, "[W]hat did you learn in Asia that made it successful that you can bring here?"

290.      Corbat provided the following materially false and misleading response:

> If you remember some of the investments we made in Rainbow that gave us the ability to have a holistic view.  So, if you go back not that far in time, and as you covered our company, it was Citi Cards, it was CitiMortgage, it was vertical or silos, as we call them, of product-driven interactions.  Technology today here in the U.S. gives us the ability to have a holistic view. So, you're a Cards client, you're a Retail Bank client, you're Wealth, you're Citigold, you're Citi Blue, we have the ability to see you and think of you and present to you from a holistic view.

291.      On October 12, 2018, during Citi's Q3 Earnings call, Corbat made the following materially false and misleading statement claiming Project Rainbow was a successful infrastructure project that gave Citi new "holistic[]" capabilities:

> I think the work that was done in terms of Rainbow and other technology implementations now gives us the ability to view the client holistically.

292.      Analyst Mike Mayo followed up later in the same conference, asking whether "you have a lot more capability internally, given what you've done with Project Rainbow," and adding his understanding that Project Rainbow had successfully consolidated Citi's legacy systems from its earlier acquisitions: "I thought that was a good reference like a decade or two to consolidate all

the retail system after all those earlier acquisitions.  So now that you have these capabilities to serve customers, maybe you can provide us with more information on any incremental success you're having."

293.   CFO Gerspach responded with a materially false and misleading purported confirmation of Citi's enterprise-wide capabilities:

> Right now, we're tracking everything globally.  So we'll see how
> we build this into something else.

294.   The statements in ¶¶290-293 were materially false and misleading because (i) Citi had abandoned Project Rainbow entirely in 2017; (ii) Citi did not have effective enterprise-wide risk management; and (iii) Citi did not have the ability to have a "holistic view" of its clients the true facts that existed.  The true facts that the 2018 Project Rainbow Statements concealed are those specifically alleged in ¶281 and herein, and also:

a.   By 2017, the new platform to be developed pursuant to Project Rainbow had been declared a "no go."  (FE-1.)  The early efforts to roll it out in the Asia Pacific region had been a "total disaster."  (FE-1.)  Project Rainbow was a spectacular failure; despite heavy expenditures, Citi did not get anywhere with the project.  (FE-7.)

b.   Citi had pulled the plug on trying to achieve effective enterprise-wide risk management and controls and was simply not willing to provide the funding needed to "fix the complex problems."  (FE-1.)

c.   Citi's erratic leadership "did not provide the necessary guidance on what was needed for a unified platform to function properly and to meet the needs of the business."  (FE-7.)

d.   After abandoning the Project Rainbow initiative, Citi had no plan to fix the systems that were deemed deficient by the regulators in MRAs and MRIAs. (FE-1.)

e.   Citi did not have a "customer management system" or "customer 360" capabilities.  (FE-1.)  Such a system would have allowed one to look up a particular customer and identify all the data relating to that customer across the enterprise—"one view" of the customer—and allowed Citi to have consistent data about that customer and an understanding of the "customer relationship."  (FE-1.)

5.      **Materially False and Misleading Statements in Citigroup's Form 10-K for 2018**

295.    On February 22, 2019, Citigroup filed its Annual Report for 2018 on Form 10-K with the SEC ("2018 Annual Report").  The 2018 Annual Report provided that "[t]hroughout this report, 'Citigroup,' 'Citi' and 'the Company' refer to Citigroup Inc. and its consolidated subsidiaries," which includes Citibank.  Individual Defendants Corbat and Gerspach signed the 2018 Annual Report.

296.    The 2018 Annual Report (at 59) included the materially false and misleading statement that:

> Citi's Company-wide risk governance framework consists of the policies, standards, procedures, and processes through which Citi identifies, assesses, measures, manages, monitors, reports, and controls risks across the Company. . . . The risk governance framework has been developed in alignment with the expectations of the Office of the Comptroller of the Currency (OCC) Heightened Standards.  It is also aligned with the relevant components . . . of the Federal Reserve's Enhanced Prudential Standards for Bank Holding Companies and Foreign Banking Organizations.

This statement (the "2018 10-K Statement") was materially false and misleading because (i) Citi did not have an effective risk governance framework; (ii) Citi did not effectively identify, measure, manage, monitor, report, and control risks across the firm; and (iii) Citigroup's risk governance framework, to the extent it existed, was ***not*** "in alignment with" either the OCC Heightened Standards or the relevant components of the Fed's Enhanced Prudential Standards.  The true facts that existed, and that the 2018-K Statement concealed, are those specifically alleged in ¶281 and herein.

6.    **Materially False and Misleading Statements in the September 10, 2020 Press Release**

297.    On September 10, 2020, Citigroup issued a press release titled "Citi CEO Michael Corbat Announces Plans to Retire in February 2021" in which Corbat was quoted as making the following materially false and misleading statement:

> We completed our transformation from the financial crisis and emerged a simpler, safer and stronger institution.

This statement (the "September 10, 2020 Press Release Statement") was materially false and misleading because Citi had not completed its "transformation from the financial crisis." The true facts that existed, and that the September 10, 2020 Press Release Statement concealed, are those specifically alleged in ¶281 and herein, and also:

a.    As John Dugan, Independent Chair, later conceded at a post-Class Period Citigroup Inc. Annual Shareholders Meeting on April 27, 2021, the "transformation" had not even yet begun. Dugan further acknowledged that proper remediation of the deficiencies existing from (at least) the beginning of the Class Period and identified in the Enforcement Orders required "a more fundamental, holistic and systematic change" which Dugan characterized as a "transformation." As a result, in 2021, the Board formed a "Transformation Oversight Committee" to address this reality.

b.    As a result of its obsolete technology and lack of effective enterprise-wide risk management and compliance systems, at the time of Corbat's statement, Citi had erroneously paid $900 million of its own money to lenders of Revlon Corp. *See* ¶¶137-40, 186, *supra*.

c.    As reported for the first time on September 14, 2020 in *The Wall Street Journal*, "Federal regulators are preparing to reprimand Citigroup Inc. for failing to improve its risk-management systems" and that "[f]or years, regulators have privately pressed Citigroup and Mr. Corbat to fix the bank's risk systems." The *WSJ* report corroborates the true facts that existed at the time CEO Corbat made September 10, 2020 Press Release Statement, as alleged herein (and specifically in ¶281).

**B.     Defendants' Omissions in Citi's Management Discussion and
Analysis Violated SEC Item 303 Disclosure Obligations**

298.    During the Class Period, Item 303 of Regulation S-K ("Item 303") required that the

Management Discussion and Analysis section of Citigroup's SEC filings describe "any known

trends or uncertainties that have had or that [Defendants] reasonably expect[] will have a material

favorable or unfavorable impact on net sales or revenues or income from continuing operations."

17 C.F.R. §229.303(a)(3)(ii) (as effective during the Class Period).  In addition, if a Defendant

"knows of events that will cause a material change in the relationship between costs and revenues

(such as known future increases in costs of labor[)] . . . , the change in the relationship shall be

disclosed." *Id.*

299.    The failure to disclose a material trend, uncertainty, or event in violation of

Item 303 is an omission that is actionable under the federal securities laws.  *See Stratte-McClure

v. Morgan Stanley*, 776 F.3d 94, 101 (2d Cir. 2015).

300.    The SEC's May 18, 1989 interpretive release (No. 33-6835) provides a two-step

test to determine whether disclosure under Item 303 is required:

> Where a trend, demand, commitment, event or uncertainty is known,
> management must make two assessments:
>
> (1) Is the known trend, demand, commitment, event or uncertainty
> likely to come to fruition?  If management determines that it is not
> reasonably likely to occur, no disclosure is required.
>
> (2) If management cannot make that determination, it must evaluate
> objectively the consequences of the known trend, demand,
> commitment, event or uncertainty, on the assumption that it will
> come to fruition.  Disclosure is then required unless management
> determines that a material effect on the registrant's financial
> condition or results of operations is not reasonably likely to occur.

301.    In violation of Item 303, Citi's Forms 10-K filed during the Class Period omitted

the known, material uncertainties resulting from the true facts that existed as specifically alleged

in Paragraph 281, *supra*.  Those deficiencies at Citi included:  (i) a lack of effective enterprise-wide risk management; (ii) ineffective operational risk management; (iii) ineffective and unsustainable compliance risk management; (iv) enterprise-wide data governance and data quality deficiencies; (v) obsolete and ineffective technology that gave rise to an insurmountable "technology debt," (vi) consistent failures in internal audits and assessments due to deficient technology and data quality; (vii) deficiencies resulting in Citi constantly operating under at least 50 MRAs and MRIAs that it never resolved; (viii) a lack of a firm-wide risk governance framework such that Citi was not aligned with regulatory standards; and (ix) the scrapping of planned initiatives to overhaul Citi's infrastructure, surveillance systems, and technology that would have brought it into compliance with regulators.  *See id.*

302.    Defendants knew of the material uncertainty arising from these deficiencies because, as set forth in detail in Section VI herein: (i) Defendants, the Board of Directors, and Audit Committee were informed of each of Citi's numerous failed internal audits; (ii) Defendants requested and received regular internal reports regarding Citi's data, risk and controls deficiencies, including Executive Scorecards, Global BDQRs, MAPs, CAPs, DQM reports, and IMRs; (iii) the Individual Defendants, the Board of Directors, and Corbat's direct reports attended regular internal meetings during which Citi's ineffective ERM and regulatory failures (including the MRAs and MRIAs) were routinely discussed, including in Risk Committee Meetings, Advisory Board Committee Meetings, BRCC Meetings, Executive Operational Committee Meetings, Regulatory Noncompliance Meetings, Data Governance Stakeholder Meetings, and weekly meetings on Action Plans and Audit Reports; (iv) senior management received specific objections to Citi's broken technology, regulatory non-compliance, and unsustainable infrastructure from Citi employees; (v) as the OCC Examiner-in-Charge Sullivan declared: "[m]any of the supervisory

concerns addressed by the 2020 Orders were identified by the OCC and communicated to the bank *several years prior to*" July 3, 2019 (Sullivan Decl. ¶27; *see id.* ¶11); (vi) Director Dugan admitted on June 16, 2021, that the Board of Directors "recognize[d] the remediation shortfalls before the consent order"; (vii) news and analyst coverage reported regulatory concerns over Citi's ineffective risk management persisted for years; (viii) the 2020 Enforcement Orders found that "for several years" Citi had failed to implement and maintain effective ERM; (ix) the governing regulatory process required reporting from regulators to the Board regarding Citi's deficiencies, including MRAs and MRIAs; (x) the amount of the $400 million penalty indicates Defendants' misconduct was "reckless, flagrant, willful, or knowing"; (xi) Corbat's resignation was widely reported to have been accelerated due to Citi's deficiencies and the 2020 Enforcement Orders; and (xii) Citi's risk management systems were core operations that were the constant focus of the Individual Defendants.

303.    The known uncertainty was materially unfavorable.  During the Class Period, Defendants knew that if Citi did not remediate its ERM and control deficiencies, regulators would impose a Cease and Desist Order for these deficiencies.  Further, Defendants knew that the remediation necessary to render Citi's ERM and controls effective would cost billions of dollars and would take years to undertake.

304.    The uncertainties known to Defendants were both qualitatively and quantitatively material.  Since the 2020 Enforcement Orders, Citi has been required to spend billions of dollars to remediate its systems and has devoted tens of thousands of employees to these efforts.  More specifically, through the end of 2022, Citi has spent at least $5.7 billion to $6.2 billion on remediation expenses and the related 2020 Enforcement Orders.  Citi also expects remediation-related investments to continue to be a primary driver of expense growth in 2023 and that these

investments will continue into 2024, requiring additional billions of dollars in costs. Conservatively assuming that Citi will incur an additional $1.5 billion in costs in each of those years, Citi will likely incur costs in excess of $9 billion to remediate its deficiencies.

305.    Citi's labor costs have materially increased due to the required remediation efforts. By September 2022, Citi had reportedly added 30,000 employees to teams involved in remediating Citi's deficiencies, amounting to 12.5% of Citi's total workforce.  This additional labor cost has materially impacted Citi's financial statements.  As seen in the chart below, Citi's labor cost was steady at approximately $19 billion to $20 billion in each year from 2016 to 2019 but jumped to $23 billion in 2021 and to $25 billion in 2022.  Put in perspective, labor cost averaged 30% of revenue in each year from 2016 to 2019 but jumped to 35% of revenue by 2022.  A significant part of this additional labor cost was due to Citi hiring additional employees as part of its remediation efforts.



306.    That Citi's deficiencies required such expansive remediation was also qualitatively material.  Defendants acknowledged the importance of risk management in their communications with investors.  Citi's then-Chair declared during the Class Period, "risk management is the

bedrock of banking." And its Class Period Annual Reports repeatedly emphasized that "effective risk management is of primary importance to [Citi's] overall operations." These and other emphatic statements regarding the central importance of Citi's risk management indicate that the truth of the massive investments needed to remediate Citi's deficient ERM was also material.

307.   At the close of the Class Period, analysts expressed concern regarding the remediation and its costs, denoting its materiality. On October 13, 2020, Credit Suisse issued an analyst report in which it lowered its target price for Citi shares and acknowledged that "Citi's shares were down another 5%, with underperformance evidencing frustration with Consent Orders, both the issues they cover and the related costs to remedy." Barclays also issued a report that day, lowering its 2021 EPS estimate on the expectation that Citi would have "a higher expense base to compile [sic] with its Consent Orders," and that the "reduced multiple reflects the increased uncertainty created by its recent Consent Orders."

308.   Citi's subsequent Forms 10-K have each included a section regarding "Citi's Consent Order Compliance." That section of each Form 10-K describes Citi's "multiyear transformation with the target outcome to change Citi's business and operating models such that they [] strengthen risk and controls," and discloses the need for "continued investments" to implement the "remediation" called for by the 2020 Enforcement Orders. This section appears within the first ten pages of each of the 2020, 2021, and 2022 Forms 10-K, and is second only to the "Executive Summary" within Citi's Management Discussion and Analysis. Citi's prioritizing of this topic in each of its subsequent annual reports demonstrates that Citi itself views its remediation work and the related expenses as qualitatively material information.

309.   In addition, Defendants also violated Item 303 by omitting the known events of the deficiencies summarized in Paragraphs 281 and 301, *supra*, and that they would cause a material

change in the relationship between Citi's costs and revenues, whether due to regulatory actions (*e.g.*, the 2020 Enforcement Orders) or self-inflicted errors (*e.g.*, the $900 million Revlon error). Defendants knew during the Class Period that the billions of dollars required to resolve the ERM deficiencies and remediate Citigroup's "tech debt" would result in a material change in the relationship between its costs and revenues.  Defendants also knew that it would require Citi to invest in thousands of employees devoted to these efforts, meaning Defendants were aware of the "known future increases in costs of labor," requiring disclosure.

310.    The SEC's two-part test addresses when known events must be disclosed.  First, management must determine if the event "is likely to come to fruition," *e.g.*, result in material remediation costs (including increased labor costs), and if it cannot make that determination, it must evaluate the event "on the assumption that it will come to fruition."  Second, management must disclose the event unless management is able to determine that "a material effect . . . is not reasonably likely to occur."  Given the contemporaneous condition of Citi's ineffective ERM and controls during the Class Period, there is no basis for Defendants to have determined that it was unlikely that remediation of the magnitude now purportedly being undertaken would be required. The required remediation certainly necessitated a massive increase in future labor costs.

311.    The costs of remediating Citi's data, control, and risk management systems are expenses that do not result in additional revenues, such that these costs result in materially lower margins.  Citi executives have acknowledged this impact.  For example, during Citi's 4Q 2020 earnings call on January 15, 2021, Defendant Mason acknowledged that, in 2020, "Operating margin declined 5% on lower revenues and 2% increase in expenses, primarily reflecting investments in infrastructure and controls."  For this reason, the answer to Step Two of the SEC's

test was met—the remediation of the known deficiencies would require increased labor costs, requiring disclosure in the Management Discussion and Analysis section of Citi's Forms 10-K.

312.     Accordingly, for the reasons set forth above, the 2016 10-K, 2017 10-K, 2018 10-K, and 2019 10-K omitted the disclosures required under Regulation S-K Item 303.

## C.     Defendants Omitted the Material Truth from Their Class Period Statements

313.     Defendants also made numerous Class Period statements that are actionable because they omitted information required to make what they said not materially misleading.

314.     A statement is actionable when it is "either untrue outright or misleading by virtue of what it omits to state." *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 239 (2d Cir. 2016). "[H]alf-truths—literally true statements that create a materially misleading impression—will support claims for securities fraud." *Id.* at 240 (quoting *S.E.C. v. Gabelli*, 653 F.3d 49, 57 (2d Cir. 2011)). Selective disclosure of "only favorable matters" while simultaneously omitting "all reference to unfavorable matters" is "as much a false representation as if all the facts stated were untrue." *Id.* Thus, the question "is not whether the statement is misleading in and of itself, but whether the defendants' representations, ***taken together and in context***, would have misled a reasonable investor." *Id.* at 250 (emphasis in original).

## 1.     Defendants Extensively and Repeatedly Stated that Citi's Risk Management Was Effective and Central to Citi's Business

315.     Throughout the Class Period, Defendants extensively and repeatedly stated that effective risk management was of central importance in the functioning and running Citi's business.  Specifically, Defendants included a dedicated section in each of Citigroup's 2016 10-K, 2017 10-K, 2018 10-K, and 2019 10-K entitled "Managing Global Risk," which began by stating: "For Citi, effective risk management is of primary importance to its overall operations." Demonstrating the centrality of risk management, Citigroup's "Managing Global Risk"

disclosures spanned more than 50 pages in each Form 10-K during the Class Period, complete with its own table of contents.  These disclosures constituted almost 20% of each filing.

316.    According to Defendants, Citi's "Company-wide risk governance framework consists of the policies, procedures, and processes through which Citi identifies, measures, manages, monitors, reports and controls risks across the Company."  This purported firm-wide risk governance framework "emphasizes Citi's risk culture and lays out standards, procedures and programs that are designed and undertaken to enhance the Company's risk culture, embed this culture deeply within the organization, and give employees tools to make sound and ethical risk decisions and to escalate issues appropriately."   As noted above, Citigroup claimed that this framework "has been developed in alignment with the expectations of the [OCC] Heightened Standards" and "the Federal Reserve's Enhanced Prudential Standards for Bank Holding Companies and Foreign Banking Organizations."

317.    In its Forms 10-K issued during the Class Period, Citigroup discussed the primary segments of its risk governance framework, including:  Credit Risk, Liquidity Risk, Market Risk, Operational Risk, Compliance Risk, Conduct Risk, Legal Risk, Reputational Risk, and Strategic Risk.  In addition, each of the 2016, 2017, and 2018 Forms 10-K issued during the Class Period represented that Citigroup's risk governance framework was purportedly managed through "three lines of defense: (i) business management, (ii) independent control functions and (iii) internal audit."  The 2019 Form 10-K issued during the Class Period contained the same "three lines of defense," but replaced "independent control functions" with the more specific "Independent Risk Management and Independent Compliance Risk Management and other control functions." According to Citigroup, "[t]he three lines of defense collaborate with each other in structured

forums and processes to bring various perspectives together and to lead the organization toward outcomes that are in clients' interests, create economic value and are systemically responsible."

318.    Citigroup's first line of defense, "business management," purportedly managed risk by, *inter alia*, having "the CEOs of each region and business" as well as the "Head of Operations and Technology" and the "Head of Productivity" "report to the Citigroup CEO," *i.e.*, CEO Corbat.

319.    Citigroup's second line of defense included its Independent Compliance Risk Management ("ICRM") organization, which was purportedly "designed to protect Citi by overseeing senior management, the businesses, and other control functions in managing compliance risk, as well as promoting business conduct and activity that is consistent with Citi's mission and value proposition."  Further to the ICRM organization, Citigroup's Chief Risk Officer Hu, CCO Carawan, Head of Human Resources, General Counsel, and CFOs Gerspach and Mason reported directly to Citigroup CEO Corbat.

320.    Defendants called Citi's ICRM "the champion of responsible finance," and touted its "primary objectives" to:

     a.    Maintain a framework that facilitates enterprise-wide compliance with local, national or cross-border laws, rules or regulations, Citi's internal policies and procedures and relevant standards of conduct;

     b.    Support Citi's operations by assisting in the management of compliance risk across products, business lines, functions and geographies, supported by globally consistent systems and processes; and

     c.    Drive and embed a risk culture of compliance, control and ethical conduct throughout Citi.

321.    With respect to ICRM, Citi also touted its "global independent compliance risk management framework for assessing, monitoring and communicating compliance risks," which is to, among other things:

a.   Report to senior management and the Citigroup Board of Directors or their designated committees on the effectiveness of the processes and standards implemented to manage compliance risk.

b.   Identify regulatory changes and oversee the assessment of impact, as well as capture and monitor adherence to existing regulatory requirements, providing the businesses with guidance and support as needed in accordance with the regulatory change management standard.

c.   Perform compliance assurance activities to oversee adherence to applicable requirements.

d.   Manage regulatory examinations and other supervisory activity impacting Citi's businesses and global control functions in accordance with the regulatory exam management governance and process standards.

e.   Escalate through the appropriate channels, which may include governance forums, the results of monitoring, testing, reporting or other oversight activities that may represent a violation of law, regulation, policy or other significant compliance risk and take reasonable action to see that the matter is appropriately identified, tracked and resolved, including through the issuance of corrective action plans against the first line of defense.

f.   Advise, as needed or when required by policy, on the degree to which existing and new business processes, methodologies, performance, products, services, transactions or customer segments satisfy Citi standards and are consistent with the prudent management of compliance risk.

322.   Citigroup's third line of defense was its internal audit, a function through which Citigroup claimed to "independently review[] activities of the first two lines of defense based on a risk-based audit plan and methodology approved by the Audit Committee of the Citigroup Board of Directors," and to "provide[] independent assurance to the Citigroup Board of Directors, the Audit Committee of the Board, senior management and regulators regarding the effectiveness of Citi's governance and controls designed to mitigate Citi's exposure to risks and to enhance Citi's culture of compliance and control."  Citigroup's Chief Auditor reported both to the Chair of the Citigroup Audit Committee and to CEO Corbat.

323.    Citigroup's sprawling and repeated disclosures regarding its "risk governance framework" created the materially false and misleading impression that the Company maintained a cohesive and effective system of managing Citigroup's risk.   The disclosures omitted the undisclosed truths that Citigroup had ineffective enterprise-wide risk management, ineffective operational risk management, ineffective compliance risk management, deficient enterprise-wide data governance, deficient data quality, broken technology, and degraded and suppressed internal auditing.  The repeated disclosures about Citigroup's "risk governance framework" also omitted the undisclosed truth that Citi was subject to longstanding MRAs and MRIAs for exactly the deficiencies regulators later identified in the 2020 Enforcement Orders, but which Citigroup never remediated.

324.    The same analysis applies to Defendants' statements to investors in conference calls, earnings presentations, and Proxy Statements.

325.    For example, on July 25, 2017, Corbat led Citi's Investor Day with prepared remarks, claiming that "Citi has crossed an inflection point" because "[w]e have been rebuilding our credibility, our relationships with our regulators" and had made investments "in controls – to improve processes across risk, compliance and audit – which gives us our licenses to run and to grow our business."   Corbat continued, "As I've said, *our restructuring is over*. . . .  We're competing from a position of strength in terms of regulatory infrastructure . . . ."

326.    And in Citigroup's "Letter from the Board of Directors to Our Shareholders" that accompanied its April 16, 2019 Proxy Statement, Defendants wrote: "As it should be for a global firm like Citi, prudent risk management was top of mind for both management and the Board in 2018.  Our three lines of defense – the business lines, the control functions, and internal audit – dove deeply and, where necessary, took proactive steps in critical risk areas such as Brexit, the

potential fall-out from trade wars, evolving industry underwriting standards in leveraged lending, and the potential turn of the credit cycle. . . . The Board and our Risk Committee engage deeply in the oversight of risk management practices in these and other areas, always recognizing that, while Citi is in the business of taking risk, these risks must be understood, measured, monitored, and controlled."

327.   These statements to investors created the materially false and misleading impression that the Company maintained a cohesive and effective system for managing Citigroup's risk.

328.   Further, each of Defendants' Class Period Forms 10-K included "Risk Warnings" addressing subjects that, once raised, required them to tell the whole truth so as not to make them materially misleading.

329.   For instance, in their 2016 Form 10-K, issued February 24, 2017, Defendants purported to warn of "regulatory uncertainties" and the requirement "to implement a significant number of regulatory changes across all of its businesses and functions, and these changes continue."  They continued to warn that compliance uncertainty is accompanied by "heightened regulatory scrutiny and expectations in the U.S. . . . for the financial services industry with respect to governance and risk management practices, including its compliance and regulatory risks" and that, "[a]t any given time, Citi is defending a significant number of legal and regulatory proceedings and is subject to numerous governmental and regulatory examinations, investigations and other inquiries."  And Defendants warned that "Citi could incur significant losses *if* its risk management models or strategies are ineffective in properly anticipating or managing these risks."

330.   These general warnings were accompanied by specific examples, including regulatory uncertainties due to changes arising from the U.S. Presidential administration and

Congress; "potential changes to various aspects of the regulatory capital framework," and "the terms of and other uncertainties resulting from the U.K.'s potential exit from the European Union"; heightened regulatory scrutiny due to "the Volcker Rule" and "a proliferation of laws relating to the limitation of cross-border data movement"; regulatory interest in "'conduct risk,' a term that is used to describe the risks associated with behavior by employees and agents"; and increased "severity of the remedies sought in legal and regulatory proceedings to which Citi is subject." And Defendants warned that the "failure to comply with regulations and requirements, or failure to comply as expected, can result in enforcement and/or regulatory proceedings"—"Citi may be required to accept or be subject to similar types of criminal remedies, consent orders, sanctions, substantial fines and penalties or other requirements in the future."

331.   These warnings gave investors the materially misleading impression that Defendants had disclosed Citi's then-present risks.  The risk warnings concealed the reality that the risk management models and strategies were ineffective and Citi did not effectively identify, measure, manage, monitor, report, or controls risks.  Without actual changes to the "regulatory capital framework," and despite having chosen to warn investors about "regulatory uncertainties," "heightened regulatory scrutiny . . . with respect to governance and risk practices," the "numerous governmental and regulatory examinations" Citi was subject to, and the losses possible if its "risk management models or strategies are ineffective," Defendants omitted to disclose the whole truth that its risk management was in fact ineffective.

332.   Notably, while Defendants did identify specific examples of the risks Citi faced within these categories, they omitted disclosing the material truths that Citi had ineffective enterprise-wide risk management, ineffective operational risk management, ineffective compliance risk management, deficient enterprise-wide data governance, deficient data quality,

broken technology, and degraded and suppressed internal auditing.  Defendants also failed to disclose that regulators had already issued MRAs and MRIAs on these deficiencies, that Citi was already failing to comply with these MRAs and MRIAs, and that these failures to comply with these outstanding MRAs and MRIAs would foreseeably lead to an Enforcement Action.  The risk warnings, which touched on these general subjects, omitted these more specific material truths that were known facts at the time.

333.     Subsequent Class Period Forms 10-K, including Citi's 2017, 2018, and 2019 Forms 10-K repeated near identical risk warnings in a section called "Risk Factors."  For the same reasons discussed above, the warnings in these Forms 10-K concealed the reality that Citi's risk management models and strategies were ineffective and Citi did not properly anticipate or manage its risks.

## 2.     Defendants' Class Period Statements, Taken Together and in Context, Omitted the Truth and Are Therefore Actionable

334.     Defendants' repeated and extensive disclosures in the 2016 10-K, 2017 10-K, 2018 10-K, and 2019 10-K and other presentations specified herein concerning Citigroup's risk management omitted the material true facts that existed at the time, as alleged in ¶281 and herein. Having chosen to speak extensively about the Company's purported "risk management framework," Defendants were required to disclose, but omitted the material facts that (i) Citi lacked effective enterprise-wide management capabilities; (ii) Citi had ineffective operational risk management, ineffective compliance risk management, deficient enterprise-wide data governance and data quality, broken technology, and degraded and suppressed internal auditing; and (iii) Citi was subject to longstanding MRAs and MRIAs for exactly what the regulators later identified as deficiencies in the 2020 Enforcement Orders.  Given these facts, Defendants' selective disclosure of "only favorable matters" (*e.g.*, the few working processes in place) while simultaneously

omitting "all reference to unfavorable matters" (*e.g.*, Citigroup's obsolete technology and lack of enterprise-wide risk management and compliance systems) was "as much a false representation as if all the facts stated were untrue." *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 240 (2d Cir. 2016).

## IX.   LOSS CAUSATION

335.   As alleged herein, Defendants' conduct, misstatements, and omissions of material facts directly and proximately caused Plaintiffs and the Class to suffer substantial losses.  Those losses were a result of Plaintiffs' and the Class's purchases of Citigroup common stock and/or exchange-traded call options on Citigroup common stock at artificially inflated prices during the Class Period.  Defendants' fraudulent conduct also directly and proximately caused the Class to suffer substantial losses as a result of the Class's sales of exchange-traded put options on Citigroup common stock at artificially deflated prices during the Class Period.

336.   Defendants, through each category of false and misleading statements and omissions, concealed throughout the Class Period that:  (i) Citi lacked effective enterprise-wide risk management; (ii) Citi had ineffective operational risk management; (iii) Citi's compliance risk management was ineffective and unsustainable; (iv) Citi suffered from enterprise-wide data governance and data quality deficiencies; (v) Citi's technology was so antiquated, obsolete, and ineffective that it had an insurmountable "technology debt"; (vi) Citi consistently failed its internal audits and assessments across the Company due to its deficient technology and data quality; (vii) Citi was constantly operating under at least 50 MRAs and MRIAs, including MRAs and MRIAs for its ERM and control failures, but never took efforts to truly resolve them; (viii) Citi lacked an effective firm-wide risk governance framework and was not aligned with regulatory standards; and (ix) Citi scrapped planned initiatives to overhaul its infrastructure, surveillance systems, and technology that would have brought it into compliance with regulators.  Defendants

also concealed the attendant risks and uncertainties arising from the necessary remediation of these deficiencies, including but not limited to, the foreseeable risks that:

- Citi would be subject to additional regulatory oversight and regulatory requirements, and fined by regulators a substantial amount due to its longstanding failure to establish effective risk management, data governance, and controls;

- Citi would have to incur billions of dollars to remediate its lack of effective enterprise-wide risk management, data governance, and controls;

- Citi would have to spend many years and require the expense of devoting and/or hiring thousands of employees to remediate the shortcomings; and

The concealed risks bear directly on Citi's true operational and financial condition, and the value of its common stock and exchange traded options.

337.    Beginning on Monday, September 14, 2020, the concealed risks began to materialize through a series of negative events and disclosures that constructively revealed, on a piecemeal basis, the truths that Defendants' Class Period false and misleading statements and omissions concealed.  Despite these partially corrective events and disclosures, Citi's common stock remained artificially inflated through the end of the Class Period.  Citi's share prices remained artificially inflated and were prevented from declining to their true value by Defendants' continued materially false and misleading statements and omissions that had the effect of, at least temporarily, concealing their fraud.

338.    Likewise, despite these partially corrective events and disclosures, the exchange-traded call options on Citigroup common stock remained artificially inflated and the exchange-traded put options on Citigroup common stock remained artificially deflated.

339.    As the relevant truth leaked out into the market from September 14, 2020 to October 13, 2020, the Class suffered losses.  No single disclosure was sufficient to fully negate the:

(i) artificial inflation present in the prices of Citigroup common stock or exchange-traded call options on Citigroup common stock; or (ii) artificial deflation present in put options on Citigroup common stock, because each single event and/or disclosure only partially revealed the truth concerning the misrepresentations at issue in this case.  The loss that the Class suffered was foreseeable and caused by the materialization of the risks that Defendants' fraudulent conduct concealed from investors.

340.    The cascade of events and disclosures that were the materialization of the concealed risks and the revelation of the truth include reports anticipating the 2020 Enforcement Orders resulting from Citi's longstanding failure to establish effective risk management and data governance programs and controls; the issuance of the 2020 Enforcement Orders; and the revelation that Citi would be required to spend billions of dollars and devote thousands of employees over many years to remediate the deficiencies.  Together, these events and disclosures, including those set forth below, revealed the concealed failure of Citi's enterprise-wide risk management, data governance, and controls.

A.    **September 14, 2020**

341.    On Monday, September 14, 2020, *The Wall Street Journal* published an article during trading hours entitled "Regulators Prepare to Reprimand Citigroup for Failing to Improve Risk Systems."  The article revealed that "[f]ederal regulators are preparing to reprimand Citigroup Inc. for failing to improve its risk-management systems—an expansive set of technology and procedures designed to detect problematic transactions, risky trades and anything else that could harm the bank."  It also reported that "[a] consent order likely would require Citigroup to develop and execute a plan to fix its risk systems," as the 2020 Enforcement Orders later demanded.  The article added that "[f]or years, regulators have privately pressed Citigroup and [CEO] Corbat to fix the bank's risk systems" and that "[r]egulators have faulted Citi's management for not giving

priority to the risk-management overhaul," revealing the additional truths that the Company's positive representations about its risk and control environment were baseless.  The article further stated that "[t]he expected rebuke from the [OCC] and the Federal Reserve accelerated planning for [] Corbat's retirement," conflicting with Citigroup's characterization on September 10, 2020 that it was an ordinary transition that had been planned for years.  The materialization of the news of the expected regulatory Enforcement Actions and sanctions caused the price of Citigroup common stock to decline $2.85, or approximately 5.6%, from $51.00 per share at the close of trading on Friday, September 11, 2020, to $48.15 per share at the close of trading on Monday, September 14, 2020 (the next trading day).

342.    On Monday, September 14, 2022, Citigroup's stock performance was the worst in the 66-company S&P 500 Financials Index.  Later that day, *The Wall Street Journal* reported that "Citigroup's shares closed down 5.6% to $48.15 after *The Wall Street Journal* reported the expected regulatory action.  The KBW Nasdaq Bank Index rose 1.8%."  *Reuters* likewise reported that "Citigroup slips after media report of regulatory reprimand . . . [and] that Federal regulators are preparing to reprimand co[mpany] for failing to improve its risk-management systems."

343.    Analysts anticipated that regulators would inevitably issue the 2020 Enforcement Orders due to Citi's longstanding failures, and acknowledged that the stock price already reflected that impact.  UBS issued a report on September 14, 2020 entitled "Double trouble: lackluster guidance and news reports suggesting regulatory actions hit stock."  UBS reported that "Citigroup shares fell 5.6% on a day when bank stocks rallied (BKX was up 1.8%).  The shares began lagging when CFO Mark Mason gave updated financial guidance at an investor conference and the declines accelerated with news reports this afternoon that the Fed and the OCC may issue consent orders related to risk control deficiencies and that this accelerated CEO Mike Corbat's decision to retire."

UBS acknowledged that the "[n]ews report suggesting operation risk deficiencies is the bigger news."

344.     Reflecting on the day's events, Wells Fargo published a report entitled "Reboot Citi Now Given New Control Issues."  The report stated that, in response to *The Wall Street Journal* article revealing "that Citi would likely receive a consent order from the Fed and OCC for weaknesses in risk management processes and systems," Wells Fargo had lowered its price target to "reflect[] the likely overhang from greater regulatory oversight."

**B.     September 15, 2020**

345.     The price of Citigroup stock declined further on Tuesday, September 15, 2020 as investors continued to digest the information regarding the anticipated consent orders and news after the close of trading on September 14 provided further details about Citigroup's risk management and controls shortcomings.  Specifically, after the market closed on Monday, September 14, 2020, *Business Insider* made public the internal memo that Corbat had sent to Company employees on August 10, 2020.  In the memo, Corbat conceded that, contrary to Defendants' Class Period representations, Citi still needed improved controls, infrastructure, and governance, noting "execution challenges" in remediating Citigroup's controls and risk systems and urged employees to "chang[e] our mindset" and "think about infrastructure and controls very differently.  We can't think of them as just something that is important to our regulators.  It's not about getting remediation projects done or checking boxes," reflecting, as alleged specifically above, the culture at Citigroup that prevailed during the Class Period.

346.     *Business Insider* then published another article before the market opened on Tuesday, September 15, 2020 entitled "The Real Reasons Behind Citigroup CEO Mike Corbat's Retirement."  It linked Corbat's so-called retirement to his failure to prioritize fixing the longstanding and systemic failings in the Company's risk controls despite significant pressure

from regulators.  "[T]he fines and lack of progress were a testament to Corbat's focus on cost controls," the article said.  Corbat "had made operating efficiency and return-on equity a hallmark of his strategy [and] was often reluctant to spend the money or dedicate enough people to fix a problem the right way."  The *Business Insider* article also revealed that "Entering [2020], [] Citigroup had numerous outstanding compliance- and technology-related issues that had been outlined in regulatory notices known as Matters Requiring Attention and Matters Requiring Immediate Attention," and that "Citigroup had multiple ones long past due."  *Business Insider* further reported that regulators "were annoyed with Citigroup's noncompliance across numerous issues and felt as if they weren't being heard," while Corbat, "who had made operating efficiency and return-on-equity a hallmark of his strategy was often reluctant to spend money or dedicate enough people to fix a problem right away."

347.   *Dealbreaker* also published an article on Tuesday, September 15, 2020, writing, "Unfortunately, Citi's woeful risk management infrastructure did what it does, over and over and over again, and reminded regulators that Citi and Corbat hadn't really done all they promised, *sotto voce*, to do to fix those systems, and that maybe a highly public reminder to do so was in order."

348.   As these facts materialized, the price of Citigroup common stock declined $3.34, or approximately 6.9%, from $48.15 per share at the close of trading on Monday, September 14, 2020 to $44.81 per share at the close of trading on Tuesday, September 15, 2020.

349.   In an analyst report published on Wednesday, September 16, 2020, entitled "Investors Are Upset; Citi Should Consider Accelerating CEO Transition," Wells Fargo ascribed the negative impact on Citi's share price to revelations that Corbat's departure resulted from his failure to correct Citi's deficiencies.  The report stated, "[I]nvestors are upset because a CEO retirement/transition that was billed by the company as normal course of business seems

increasingly not the case, given possible new regulatory actions," suggesting Corbat was forced out because of the regulatory pressure.  The report also observed that "the recent mishap (Revlon) seems like a manifestation of problems from systems and processes that should have been addressed years ago via improved automation (an issue for Citi firm-wide)."

350.    An article published by *Investopedia* on Wednesday, September 16, 2020 likewise noted how "Citigroup Inc. (C) stock has sold off more than 15% in two days after *The Wall Street Journal* alleged that the banking giant could get reprimanded by regulators for failing to improve risk management systems."

**C.    October 8, 2020**

351.    As was widely anticipated in the September 14-15, 2020 reporting, after the market closed on Wednesday, October 7, 2020, the OCC and the Fed released the 2020 Enforcement Orders.  The specific disclosures in the enforcement orders, including that Citi is required to remediate its deficient ERM systems, controls, and technology, pay a $400 million penalty, and seek the OCC's approval before making a significant new acquisition, among other requirements, were the materialization of the risks Defendants' material misstatements and omissions concealed.

352.    *Marketwatch* reported on Thursday, October 8, that "The [OCC] assessed a $400 million civil money penalty against Citibank, N.A., and said the bank is required to seek OCC approval before making new acquisitions, and the OCC reserved the right to implement business restrictions and require senior management changes."  The *Marketwatch* article further described how the J.P. Morgan analyst (Vivek Juneja) wrote in a note to clients that "Citi has a credibility gap versus peers due to its much weaker profitability, and these orders will add to the pressures as it will need to add resources—inadequate staffing and technology in certain areas were explicitly mentioned in the orders. . . . This will be an overhang on Citi and the new CEO, with timing unknown."

353.    The referenced J.P. Morgan report, also issued on Thursday, October 8, 2020, further highlighted certain elements of the OCC order including:  "1) senior management and The Board had inadequate oversight of risk management and compliance for several years, and Citi's 'unsafe' and 'unsound' practices were part of a pattern of misconduct; 2) failure of compensation and performance programs to incentivize effective risk management; 3) explicitly requires adequate staffing and technology resources; 4) cites calculations of risk weighted assets and capital calculations; 5) need for improvements in liquidity risk management systems and data quality; 6) failure to establish front-line and independent risk management; 7) failure to maintain risk management, compliance risk management, internal controls, and data governance programs in line with Citi's size, complexity, and risk profile; and 8) lack of effective risk governance."

354.    Likewise, Wells Fargo released a report on Thursday, October 8, 2020 entitled "'Hangry' Investors + Reg Order = New Catalyst."  The report stated that Wells Fargo, "like other investors, are 'hangry'—i.e., hungry for more information on how and when the regulatory issues will get resolved and angry over their lack of transparency and why there were allowed to fester." The report also emphasized that the 2020 Enforcement Orders brought "[t]wo decades of system issues to the fore," by "highlight[ing] a need to modernize systems (data, controls, compliance risk).  This is bad given Citi had the worst large bank performance over the past two decades with a series of mishaps."

355.    The report further revealed the disconnect between Citi's actual state of affairs and the false and misleading impression conveyed by Defendants' statements:  "The system issues are worse than realized, as if we collectively thought that Citi improved from a grade of 'F' around the global financial crisis to a 'B-/C+' but only to find out the grade is 'D'—i.e., improved but not

by enough.  This perspective has contributed to one of the greatest disconnects that we've seen between Citi's balance sheet strength and stock price value."

356.   Regarding the impact of the 2020 Enforcement Orders on Citi's stock price, *Barron's* published an article on Thursday, October 8, 2020 explaining that "[w]hile the regulators' moves were largely expected in light of recent reporting, Citigroup's shares fell 1.2% in after-hours trades, but was up 0.1% at 10:14 a.m. Thursday."  This compares to "[s]hares of JPMorgan Chase (JPM) and Bank of America (BAC) [which] rose 1.5% and 0.7% Thursday morning."

357.   As these facts continued to materialize, the price of Citigroup common stock declined $0.12, or approximately 0.3%, from $44.84 per share at the close of trading on Wednesday, October 7, 2020, to $44.72 per share at the close of trading on Thursday, October 8, 2020.  In contrast, The S&P 500 Index rose approximately 0.8% and the KBW Nasdaq Bank Index rose 1.5% on October 8, 2020.

**D.   October 13, 2020**

358.   Before the market opened on Tuesday, October 13, 2020, Citi reported earnings for 3Q 2020, beginning the disclosure of the financial impact of the necessary remediation of the ineffective enterprise-wide risk management, data governance, and controls that existed during the Class Period.  Citi reported that "the civil money penalty," *i.e.*, the $400 million fine, and "investments in infrastructure, risk management and controls" contributed to a 5% year-over-year increase in expenses.  The $400 million fine alone negatively impacted the Company's earnings by $0.19 per share.  Citi further reported that its net income had declined 34% in 3Q 20 compared to the prior year, driven in part by "an increase in expenses," including the $400 million civil money penalty and Citi's remedial investments in its infrastructure, risk management, and controls.

359.   During the earnings call that day, Corbat admitted that the Company had not yet even calculated the total cost to fix its deficient risk and control systems, only that it will be a

significant, "multiyear transformation" that "won't be a quick or easy fix."  Corbat also stated that Citi had already "added thousands of people since the beginning of the year" to work to remediate Citi's deficiencies.  Mason stated that Citi had already incurred "an incremental spend of about $1 billion this year [*i.e.*, in 2020] that has gone towards infrastructure, risk and controls," and that Citi would "spend [that] again" on additional efforts in 2021.  Analysts also seriously criticized the Company's credibility on the October 13 earnings call (¶¶170-73).

360.    Credit Suisse issued an analyst report on Tuesday, October 13, 2020 entitled "Solid Results Overshadowed by the Cost of Consent Orders; TP Reduced to $65"—referring to Credit Suisse dropping its target price of Citi shares by 13.3%.  The report stated that "Citi's shares were down another 5%, with underperformance evidencing frustration with Consent Orders, both the issues they cover and the related costs to remedy.  Resolution will take time; sustained share price outperformance will require both clarity on the path to resolution and a clearly articulated longer term plan from incoming CEO Jane Fraser."

361.    Barclays also issued an analyst report on Tuesday, October 13, 2020 entitled "3Q20 EPS Review: Uncertainty around Costs, Consent Orders Weigh" that stated "we are lowering our 2021 estimate [of EPS] to $6.00 (-$0.75) as our EPS estimate now includes a higher expense base to compile [sic] with its Consent Orders," and the "reduced multiple reflects the increased uncertainty created by its recent Consent Orders."

362.    JPMorgan similarly published an analyst report on Wednesday, October 14, 2020 entitled "Mixed 3Q: Consent Orders – Board, Management, Comp Changes Needed; Further Costs Unknown" that stated the "consent orders . . . led us to downgrade the stock and move to the sidelines," and that "in our view, Board and further senior management changes are needed given

these failures" and "incentive compensation changes are needed, including clawbacks, given the comments by regulators."

363.   In sum, investors came to learn of Citi's ineffective enterprise-wide risk management, data governance, and controls; the impact of the $400 million fine and increased spending on infrastructure, enterprise-wide risk management, data governance, and controls; the significance of the steps Citigroup still needed to take to remediate issues; and how the Company was not even able to fully estimate how much it would cost, or how long it would take.  As these facts materialized, the price of Citigroup common stock declined $2.20, or approximately 4.8%, from $45.88 per share at the close of trading on Monday, October 12, 2020, to $43.68 per share at the close of trading on Tuesday, October 13, 2020.

*       *       *

364.   As a result of the materialization of the foreseeable risks that Defendants' materially false and misleading statements and omissions concealed during the Class Period, and the revelation of the true condition of Citi's enterprise-wide risk management, data governance, and controls, including in response to the events set forth above, Citi's share prices declined precipitously as the relevant truth leaked out into the market from September 14, 2020 to October 13, 2020.  Specifically, in response to news of the events revealing Defendants' fraud, the price of Citi common stock declined from a closing price of $51.00 on September 11, 2020 (the last day of trading prior to news that Citi would likely receive the 2020 Enforcement Orders)  to a closing price of $43.68 per share on October 13, 2020, a decrease of $7.32, or approximately 14.4%.

## X.   INAPPLICABILITY OF STATUTORY SAFE HARBOR OR BESPEAKS CAUTION DOCTRINE

365.   The statutory safe harbor and bespeaks caution doctrine applicable to forward-looking statements under certain circumstances does not apply to any of the false or misleading statements and omissions alleged herein.   The statements and omissions complained of herein concerned then-present or historical facts or conditions that existed at the time the statements were made.

366.   To the extent any of the untrue or misleading statements alleged herein can be construed as forward-looking, (a) they were not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statements, and the generalized risk disclosures Citigroup or other Defendants made were not sufficient to shield Defendants from liability, and (b) the person who made each such statement knew that the statement was untrue or misleading when made, or each such statement was approved by an executive officer of Citigroup who knew that the statement was untrue or misleading when made.

## XI.   PRESUMPTION OF RELIANCE AND FRAUD ON THE MARKET DOCTRINE

367.   Plaintiffs are entitled to a presumption of reliance on Defendants' material misrepresentations and omissions pursuant to the fraud-on-the-market doctrine.   At all relevant times, the market for Citigroup common stock and exchange-traded call and put options was efficient for the following reasons, among others:

    a.   Citigroup's common stock met the requirements for listing, and was listed and actively traded, on the NYSE;

    b.   The average weekly trading volume of Citigroup's common stock was significant and amounted to 86,992,454 shares during the Class Period;

c. As a regulated issuer, Citigroup filed public reports with the SEC and NYSE;

d. Citigroup was eligible to file simplified SEC filings;

e. Citigroup regularly communicated with the public through established market communication channels, including through the regular dissemination of news releases through major newswire services, communications with the financial press, and other wide-ranging public disclosures;

f. Numerous securities and credit analysts followed Citigroup and wrote reports that were published, distributed, and entered the public domain;

g. The market reacted promptly to public information disseminated by Citigroup;

h. Citigroup exchange-traded call and put options were listed and actively traded on national exchanges;

i. The material misrepresentations and omission alleged herein would tend to induce a reasonable investor to incorrectly value Citigroup common stock and exchange-traded options; and

j. Without knowledge of the misrepresented or omitted material facts alleged herein, Plaintiffs and other members of the Class purchased Citigroup common stock and/or exchange-traded call options, and/or sold exchange-traded put options, between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed.

368.   Accordingly, the market for Citigroup common stock and exchange-traded call and put options promptly digested current information regarding the Company from all publicly available sources and reflected such information in the price of such securities.  Under these circumstances, all purchasers of Citigroup common stock and/or exchange-traded call options during the Class Period suffered similar injury through their purchases at artificially inflated prices, and a presumption of reliance applies.  Likewise, all sellers of Citigroup exchange-traded put options during the Class Period suffered similar injury through their sales at artificially deflated prices, and a presumption of reliance applies.

369.     In addition, or in the alternative, Plaintiffs are entitled to a presumption of reliance pursuant to *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), and its progeny, because the claims asserted herein are predicated in part upon omissions of material fact that Defendants had a duty to disclose under Rule 10b-5 and Item 303 of SEC Regulation S-K.

## XII.   CLASS ACTION ALLEGATIONS

370.     Plaintiffs bring this action as a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure, on behalf of themselves and all others similarly situated who purchased or otherwise acquired Citigroup common stock between February 24, 2017 and October 12, 2020, inclusive (the "Class Period"), and were damaged thereby.   Plaintiffs also bring this action on behalf of those persons and entities that during the Class Period (i) purchased the exchanged-traded call options on Citigroup common stock listed in Exhibit A; and/or (ii) sold the exchange-traded put options on Citigroup common stock listed in Exhibit A, and were damaged thereby.

371.     Each series of exchange-traded options that was damaged and included in the Class is listed in Exhibit A.   Any series not included in the list is excluded from the Class.

372.     Also excluded from the Class are: (i) Defendants and any affiliates or subsidiaries thereof; (ii) present and former officers and directors of Citigroup and their immediate family members (as defined in Item 404 of SEC Regulation S-K, 17 C.F.R. §229.404, Instructions (1)(a)(iii) & (1)(b)(ii)); (iii) Defendants' liability insurance carriers, and any affiliates or subsidiaries thereof; (iv) any entity in which any Defendant had or has had a controlling interest; (v) Citigroup's employee retirement and benefit plan(s); and (vi) the legal representatives, heirs, estates, agents, successors, or assigns of any person or entity in the preceding categories.

373.     The Class is so numerous that joinder of all members is impracticable.   Plaintiffs believe that the Class members number at least in the thousands.   The disposition of their claims

in a class action will provide substantial benefits to the parties and the Court.  Throughout the Class Period, Citigroup common stock had an average daily volume on the NYSE of approximately 17,982,261 shares.  As of March 31, 2023, Citigroup had 1,946,751,837 shares outstanding.

374.   Plaintiffs' claims are typical of the claims of Class members.  All Class members are similarly situated in that they sustained damages as a result of transacting in Citigroup common stock and/or exchange-traded options at prices that were artificially inflated or deflated, as applicable, by the wrongful conduct complained of herein.

375.   Plaintiffs will fairly and adequately protect the interests of the Class.  Plaintiffs have retained counsel competent and experienced in class action and securities litigation.  Plaintiffs have no interests that conflict with those of the Class.

376.   Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members.  The questions of law and fact common to the Class include, but are not limited to, the following:

   a.   Whether Defendants' conduct violated the federal securities laws, as alleged herein;

   b.   Whether Defendants made any untrue statements of material fact or omitted to state any material facts required to be stated therein or necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

   c.   Whether Defendants acted with scienter under Section 10(b) of the Exchange Act;

   d.   Whether the Individual Defendants were controlling persons of Citigroup under Section 20(a) of the Exchange Act;

   e.   Whether and to what extent the prices of Citigroup common stock and exchange-traded call options were artificially inflated during the Class Period due to the misstatements and omissions complained of herein;

f.   Whether and to what extent the prices of Citigroup exchange-traded put options were artificially deflated during the Class Period due to the misstatements and omissions complained of herein;

g.   Whether reliance may be presumed under the fraud-on-the-market doctrine;

h.   Whether Defendants' conduct caused the members of the Class to sustain damages; and

i.   Whether and to what extent Class members have sustained damages as a result of the conduct complained of herein and, if so, the proper measure of damages.

377.   A class action is superior to other available methods for the fair and efficient adjudication of this controversy because joinder of all Class members is impracticable. Additionally, the damages suffered by some individual Class members may be small relative to the burden and expense of individual litigation, making it practically impossible for such members to redress individually the wrongs done to them.

378.   There will be no difficulty in the management of this action as a class action.

379.   Class members may be identified from records maintained by the Company or its transfer agent(s), or by other means, and may be notified of the pendency of this action by mail and by publication, using a form of notice similar to that customarily used in securities class actions.

## XIII.   CLAIMS FOR RELIEF

### COUNT I
### For Violation Of Section 10(b) Of The Exchange Act And Rule 10b-5
### Against All Defendants

380.   Plaintiffs incorporate all paragraphs above by reference as if fully set forth herein.

381.   During the Class Period, Defendants made, disseminated or approved the false and misleading statements specified above, which they knew or recklessly disregarded were false and misleading in that the statements contained material misrepresentations and failed to disclose

material facts required to be stated therein or necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

382.    Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they:

    a.    Employed devices, schemed, and artifices to defraud;

    b.    Made untrue statements of material fact or omitted to state material facts required to be stated therein or necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or

    c.    Engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiffs and others similarly situated in connection with their transactions in Citigroup common stock and exchange-traded options during the Class Period.

383.    Plaintiffs and other members of the Class suffered damages in connection with their purchases of Citigroup common stock and exchange-traded call options, and sales of Citigroup put options during the Class Period.  In reliance on the integrity of the market, Plaintiffs and the Class transacted in Citigroup common stock and/or exchange-traded options and experienced losses when the artificial inflation was removed from the common stock and exchange-traded call options and the prices of those securities declined, and the artificial deflation was removed from the exchange-traded put options and the prices rose.  Plaintiffs and the Class would not have purchased Citigroup's common stock and exchange-traded call options at the prices they paid, or at all, or sold Citigroup's exchange-traded put options at the prices they sold, or at all, if they had been aware that the market prices of those securities had been artificially inflated or deflated, as applicable, by Defendants' false and misleading statements and omissions.

384.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the Class suffered damages in connection with their transactions of Citigroup common stock and/or exchange-traded options during the Class Period.

**COUNT II**
**For Violation Of Section 20(a) Of The Exchange Act**
**Against The Individual Defendants**

385.    Plaintiffs incorporate all paragraphs above by reference as if fully set forth herein.

386.    During the Class Period, the Individual Defendants acted as controlling persons of Citigroup within the meaning of §20(a) of the Exchange Act.  By reason of their positions of control and authority as officers of Citigroup, the Individual Defendants had the power and authority to direct the management, policies, and activities of the Company and its employees, including its decision-making process, and to cause the Company to engage in the wrongful conduct complained of herein.  The Individual Defendants were able to and did influence and control, directly and indirectly, the content of the public statements made by Citigroup during the Class Period, including its materially false and misleading statements and omissions concerning the adequacy, effectiveness, and functioning of Citi's risk management, data governance, and controls, thereby causing the dissemination of the false and misleading statements and omissions of material facts as alleged herein.

387.    In their capacity as senior corporate officers of Citigroup, the Individual Defendants had direct involvement in the day-to-day operations and oversight of the Company.  Each of the Individual Defendants signed certain of the Company's SEC filings during the Class Period and the Individual Defendants were directly involved in providing false information and certifying and approving the false statements disseminated by Citigroup during the Class Period.

388.    Given the Individual Defendants' senior executive positions at Citigroup and involvement in its day-to-day operations and key strategic decisions, and access to material non-public information regarding the Company, the Individual Defendants acted as controlling persons of Citigroup and influenced and controlled its decision-making process.  As a result of the

foregoing, the Individual Defendants are controlling persons of Citigroup within the meaning of Section 20(a) of the Exchange Act.

389.    As set forth above, Citigroup violated Section 10(b) of the Exchange Act by its acts and omissions as alleged in this Complaint.

390.    By virtue of their positions as controlling persons of Citigroup and as a result of their aforementioned conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act, jointly and severally with, and to the same extent as, the Company is liable under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, to Plaintiffs and the other members of the Class.

391.    As a direct and proximate result of the Individual Defendants' conduct, Plaintiffs and the other members of the Class suffered damages in connection with their transactions in Citigroup common stock and/or exchange-traded options.

## XIV.  JURY DEMAND AND PRAYER FOR RELIEF

392.    Plaintiffs, on behalf of themselves and the Class, hereby demand a trial by jury.

393.    WHEREFORE, Plaintiffs pray for relief and judgment as follows:

   a. Declaring this action to be a proper class action pursuant to Rule 23 of the Federal Rules of Civil Procedure;

   b. Awarding Plaintiffs and the Class damages, including interest;

   c. Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and experts' fees; and

   d. Granting such other and further relief as the Court may deem just and proper.

Dated:  May 24, 2023

Respectfully submitted,

**BLEICHMAR FONTI & AULD LLP**

 _/s/   Javier Bleichmar_
Javier Bleichmar
Joseph A. Fonti
Erin H. Woods
Benjamin F. Burry

7 Times Square, 27th Floor
New York, New York 10036
Telephone: (212) 789-1340
Facsimile: (212) 205-3960
jbleichmar@bfalaw.com
jfonti@bfalaw.com
ewoods@bfalaw.com
bburry@bfalaw.com

*Counsel for Lead Plaintiff Public Sector
Pension Investment Board and
Named Plaintiff Anchorage Police & Fire
Retirement System, and Lead Counsel for the
Putative Class*

# EXHIBIT A

## EXCHANGE TRADED OPTION SERIES[1]

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 1. | C | 201016P00050000 | 2. | C | 200918P00050000 | 3. | C | 210115P00065000 |
| 4. | C | 210115P00070000 | 5. | C | 200918P00055000 | 6. | C | 220121P00050000 |
| 7. | C | 201218P00060000 | 8. | C | 210115P00060000 | 9. | C | 210115C00050000 |
| 10. | C | 210115P00055000 | 11. | C | 210115P00050000 | 12. | C | 200918C00045000 |
| 13. | C | 210115P00075000 | 14. | C | 200918C00050000 | 15. | C | 220121C00050000 |
| 16. | C | 200918P00052500 | 17. | C | 210115C00055000 | 18. | C | 210115P00045000 |
| 19. | C | 220121P00060000 | 20. | C | 210115P00062500 | 21. | C | 210115C00060000 |
| 22. | C | 200918P00050500 | 23. | C | 200925P00051000 | 24. | C | 201218C00045000 |
| 25. | C | 220121P00055000 | 26. | C | 200918P00049000 | 27. | C | 210115P00052500 |
| 28. | C | 210115P00072500 | 29. | C | 201218C00052500 | 30. | C | 200925P00051500 |
| 31. | C | 220121C00055000 | 32. | C | 210115P00040000 | 33. | C | 220121P00045000 |
| 34. | C | 220121C00060000 | 35. | C | 201218P00052500 | 36. | C | 210319P00050000 |
| 37. | C | 210115C00045000 | 38. | C | 210115P00067500 | 39. | C | 201218P00047500 |
| 40. | C | 220121C00045000 | 41. | C | 210115C00040000 | 42. | C | 210115P00090000 |
| 43. | C | 201218P00045000 | 44. | C | 201016C00055000 | 45. | C | 210115P00057500 |
| 46. | C | 210115P00047500 | 47. | C | 220121C00040000 | 48. | C | 201016C00050000 |
| 49. | C | 200918P00060000 | 50. | C | 210618P00045000 | 51. | C | 210618P00050000 |
| 52. | C | 220121P00065000 | 53. | C | 220121P00040000 | 54. | C | 210115C00047500 |
| 55. | C | 210115C00052500 | 56. | C | 201016P00047500 | 57. | C | 201218P00050000 |
| 58. | C | 210115P00080000 | 59. | C | 210115P00042500 | 60. | C | 201218C00055000 |
| 61. | C | 210319P00045000 | 62. | C | 200918P00051000 | 63. | C | 200918P00065000 |
| 64. | C | 220121P00072500 | 65. | C | 200918P00047500 | 66. | C | 220121P00057500 |
| 67. | C | 201218P00042500 | 68. | C | 201218C00050000 | 69. | C | 210319P00047500 |
| 70. | C | 210319P00040000 | 71. | C | 210917C00042500 | 72. | C | 210115C00057500 |
| 73. | C | 210115C00042500 | 74. | C | 201218C00047500 | 75. | C | 220121P00062500 |

---

[1]     Each option series is referenced based on a series of letters and numbers that correspond to key information about the option.  The following table explains the meaning of each letter and number using the example of the first option listed above: C  201016P00050000.

| Component | Value | Portion of Symbol |
|---|---|---|
| Root Common Stock Symbol | C (Citigroup) | C  201016P00050000 |
| Expiration Year | 20 | C  201016P00050000 |
| Expiration Month | 10 | C  201016P00050000 |
| Expiration Day | 16 | C  201016P00050000 |
| Call or Put | Put | C  201016P00050000 |
| Strike Price (The decimal point falls 3 places from the right) | $50.00 | C  201016P00050000 |

| 76. | C | 220121P00042500 | 77. | C | 201218C00057500 | 78. | C | 210618C00050000 |
|---|---|---|---|---|---|---|---|---|
| 79. | C | 201218C00060000 | 80. | C | 201120P00050000 | 81. | C | 200918P00067500 |
| 82. | C | 200918P00045000 | 83. | C | 201016C00043000 | 84. | C | 201016P00045000 |
| 85. | C | 201218P00065000 | 86. | C | 210115P00077500 | 87. | C | 200918P00048000 |
| 88. | C | 220121P00070000 | 89. | C | 210115C00065000 | 90. | C | 210618C00055000 |
| 91. | C | 220121P00075000 | 92. | C | 201106P00042000 | 93. | C | 210319P00042500 |
| 94. | C | 201016C00042500 | 95. | C | 201016P00042500 | 96. | C | 201016P00052500 |
| 97. | C | 220121C00075000 | 98. | C | 220121P00047500 | 99. | C | 210917P00045000 |
| 100. | C | 201016C00045000 | 101. | C | 210618P00040000 | 102. | C | 201016C00052500 |
| 103. | C | 200918P00049500 | 104. | C | 210618P00055000 | 105. | C | 201218C00040000 |
| 106. | C | 200918P00057500 | 107. | C | 220121P00052500 | 108. | C | 220121C00030000 |
| 109. | C | 210618C00052500 | 110. | C | 200918C00052500 | 111. | C | 200918C00047500 |
| 112. | C | 201002P00050000 | 113. | C | 220121P00037500 | 114. | C | 210618C00047500 |
| 115. | C | 201016C00047500 | 116. | C | 210618P00042500 | 117. | C | 201016C00042000 |
| 118. | C | 220121P00080000 | 119. | C | 210618C00060000 | 120. | C | 200918P00051500 |
| 121. | C | 210115C00070000 | 122. | C | 210319C00052500 | 123. | C | 220121C00047500 |
| 124. | C | 200918C00048000 | 125. | C | 210618P00047500 | 126. | C | 200918P00052000 |
| 127. | C | 201218P00040000 | 128. | C | 220121C00070000 | 129. | C | 210917P00047500 |
| 130. | C | 210618C00045000 | 131. | C | 220121C00052500 | 132. | C | 201218P00055000 |
| 133. | C | 210115P00082500 | 134. | C | 210115P00037500 | 135. | C | 210618P00072500 |
| 136. | C | 210319C00050000 | 137. | C | 210917P00040000 | 138. | C | 220121C00065000 |
| 139. | C | 220121C00057500 | 140. | C | 201218P00072500 | 141. | C | 200918P00075000 |
| 142. | C | 210115C00035000 | 143. | C | 210917C00052500 | 144. | C | 210618C00042500 |
| 145. | C | 210618C00040000 | 146. | C | 220121C00062500 | 147. | C | 220121C00042500 |
| 148. | C | 200918P00070000 | 149. | C | 210115P00085000 | 150. | C | 220121P00067500 |
| 151. | C | 201120C00050000 | 152. | C | 201016C00044000 | 153. | C | 200918C00055000 |
| 154. | C | 201016C00043500 | 155. | C | 201120C00047500 | 156. | C | 220121C00035000 |
| 157. | C | 210115C00037500 | 158. | C | 200918C00042500 | 159. | C | 210319P00052500 |
| 160. | C | 210618P00060000 | 161. | C | 210618P00037500 | 162. | C | 210115P00095000 |
| 163. | C | 201120C00040000 | 164. | C | 210917P00050000 | 165. | C | 200925P00050000 |
| 166. | C | 210115P00035000 | 167. | C | 201218P00057500 | 168. | C | 201016C00046000 |
| 169. | C | 201120C00045000 | 170. | C | 201002P00048500 | 171. | C | 210618P00065000 |
| 172. | C | 200918P00048500 | 173. | C | 200918P00062500 | 174. | C | 210618P00035000 |
| 175. | C | 230120P00045000 | 176. | C | 200918P00047000 | 177. | C | 200925C00052000 |
| 178. | C | 200925P00048000 | 179. | C | 210115C00062500 | 180. | C | 200918C00051000 |
| 181. | C | 201023P00047500 | 182. | C | 201218P00080000 | 183. | C | 200918C00052000 |
| 184. | C | 210319C00045000 | 185. | C | 201218C00042500 | 186. | C | 200918P00046000 |
| 187. | C | 210319C00055000 | 188. | C | 210115C00075000 | 189. | C | 201120C00042500 |
| 190. | C | 220121P00115000 | 191. | C | 200918P00077500 | 192. | C | 201218C00062500 |
| 193. | C | 210618C00065000 | 194. | C | 201218P00070000 | 195. | C | 210319C00047500 |
| 196. | C | 210319C00040000 | 197. | C | 210917C00055000 | 198. | C | 201218C00037500 |
| 199. | C | 210917C00047500 | 200. | C | 201016P00055000 | 201. | C | 210115C00032500 |
| 202. | C | 200925P00055500 | 203. | C | 220121P00035000 | 204. | C | 210115C00072500 |
| 205. | C | 201120P00042500 | 206. | C | 201016C00045500 | 207. | C | 200918C00049000 |
| 208. | C | 201016C00060000 | 209. | C | 201218P00077500 | 210. | C | 220121C00080000 |
| 211. | C | 201002P00045000 | 212. | C | 201016P00057500 | 213. | C | 200918C00040000 |

2

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 214. | C | 201120P00047500 | 215. | C | 201120P00045000 | 216. | C | 230120C00050000 |
| 217. | C | 200918P00054000 | 218. | C | 210618C00035000 | 219. | C | 201002C00049000 |
| 220. | C | 210917P00042500 | 221. | C | 220121C00020000 | 222. | C | 200925C00051500 |
| 223. | C | 210115C00067500 | 224. | C | 201218P00037500 | 225. | C | 200925P00050500 |
| 226. | C | 200918P00053000 | 227. | C | 200925P00054000 | 228. | C | 210618C00037500 |
| 229. | C | 200925C00052500 | 230. | C | 230120P00055000 | 231. | C | 210618P00052500 |
| 232. | C | 201030C00045000 | 233. | C | 200925C00051000 | 234. | C | 201218P00067500 |
| 235. | C | 201023P00049500 | 236. | C | 201016C00046500 | 237. | C | 200925P00049500 |
| 238. | C | 220121P00030000 | 239. | C | 210319C00062500 | 240. | C | 201002C00051500 |
| 241. | C | 210618C00057500 | 242. | C | 200918C00051500 | 243. | C | 220121C00072500 |
| 244. | C | 201023P00050500 | 245. | C | 201009P00051000 | 246. | C | 220121P00032500 |
| 247. | C | 201002P00051000 | 248. | C | 201009P00051500 | 249. | C | 210319P00037500 |
| 250. | C | 201218C00035000 | 251. | C | 220121C00100000 | 252. | C | 200918P00046500 |
| 253. | C | 210115P00032500 | 254. | C | 210319C00057500 | 255. | C | 200925P00056000 |
| 256. | C | 201120C00052500 | 257. | C | 230120C00035000 | 258. | C | 200918C00053000 |
| 259. | C | 210917C00062500 | 260. | C | 201218C00065000 | 261. | C | 201218P00062500 |
| 262. | C | 230120C00030000 | 263. | C | 201106P00048500 | 264. | C | 201016C00047000 |
| 265. | C | 200925C00055000 | 266. | C | 200925C00045000 | 267. | C | 210917C00050000 |
| 268. | C | 220121C00085000 | 269. | C | 210618P00062500 | 270. | C | 201120P00040000 |
| 271. | C | 201009C00045000 | 272. | C | 201016P00045500 | 273. | C | 210319C00060000 |
| 274. | C | 201023C00042000 | 275. | C | 210115P00100000 | 276. | C | 200925P00049000 |
| 277. | C | 200918P00042500 | 278. | C | 230120C00025000 | 279. | C | 200918C00050500 |
| 280. | C | 201030C00047500 | 281. | C | 201023P00050000 | 282. | C | 210618C00062500 |
| 283. | C | 210618C00030000 | 284. | C | 201218P00075000 | 285. | C | 201016C00057500 |
| 286. | C | 201023P00048000 | 287. | C | 201016P00044000 | 288. | C | 201218P00035000 |
| 289. | C | 201002P00050500 | 290. | C | 201016C00040000 | 291. | C | 201120P00037500 |
| 292. | C | 201023C00045000 | 293. | C | 201009P00047500 | 294. | C | 210319P00055000 |
| 295. | C | 210618P00057500 | 296. | C | 210618P00075000 | 297. | C | 201009C00054000 |
| 298. | C | 230120P00035000 | 299. | C | 201023C00048000 | 300. | C | 220121C00067500 |
| 301. | C | 200925P00052500 | 302. | C | 201023P00048500 | | | |

# EXHIBIT B

## **CERTIFICATION**

I, Mélanie Bernier, on behalf of Public Sector Pension Investment Board ("PSP"), as Senior Vice President and Chief Legal and People Officer of PSP, hereby certify as follows:

1.  I am fully authorized to enter into and execute this Certification on behalf of PSP.

2.  I have reviewed the Second Consolidated Amended Class Action Complaint (the "Complaint") against Citigroup, Inc. ("Citigroup") and others alleging violations of the federal securities laws and have authorized its filing.

3.  PSP did not purchase or sell securities of Citigroup that are the subject of the Complaint at the direction of counsel in order to participate in any private action under the federal securities laws.

4.  PSP is willing to serve as lead plaintiff in this matter, including providing testimony at deposition and trial, if necessary.

5.  PSP's transactions in the Citigroup securities that are the subject of the Complaint during the class period specified therein of February 24, 2017 to October 12, 2020, inclusive (the "Class Period") are reflected in Schedule A, attached hereto.

6.  For securities retained, PSP owns and holds legal title to the securities that are the subject of the Complaint.  For securities sold, PSP owned and held legal title to the securities that are the subject of the Complaint at all relevant times.

7.  PSP has not sought to serve as a representative party in a class action under the federal securities laws during the last three years, other than in this instant action.

DocuSign Envelope ID: 955E8BBB-22B8-44AB-94BB-6FD9644CA05A

8.      Beyond its *pro rata* share of any recovery, PSP will not accept payment for serving as lead plaintiff on behalf of the Class, except the reimbursement of such reasonable costs and expenses including lost wages as ordered or approved by the Court.

I declare under penalty of perjury, under the laws of the United States, that the foregoing is true and correct this 24th day of May, 2023.

Mélanie Bernier
Senior Vice President and
Chief Legal and People Officer
*Public Sector Pension Investment Board*

2

DocuSign Envelope ID: 955E8BBB-23B8-44AB-94BB-6FD9644CA05A

## SCHEDULE A
### TRANSACTIONS IN
#### Citigroup, Inc.

| Transaction Type | Trade Date | Shares | Price Per Share | Cost/Proceeds |
|---|---|---|---|---|
| Purchase | 02/24/2017 | 14,450.00 | 59.47 | ($859,311.16) |
| Purchase | 02/27/2017 | 3,615.00 | 59.93 | ($216,660.69) |
| Sale | 03/01/2017 | -257.00 | 61.70 | $15,857.93 |
| Sale | 03/02/2017 | -14,426.00 | 60.76 | $876,568.48 |
| Sale | 03/02/2017 | -14,420.00 | 61.01 | $879,692.10 |
| Purchase | 03/03/2017 | 14,530.00 | 60.95 | ($885,673.24) |
| Purchase | 03/03/2017 | 9,200.00 | 61.00 | ($561,200.00) |
| Purchase | 03/06/2017 | 1,453.00 | 60.37 | ($87,716.74) |
| Sale | 03/08/2017 | -57.00 | 61.60 | $3,511.13 |
| Purchase | 03/15/2017 | 5,082.00 | 61.08 | ($310,409.58) |
| Sale | 03/15/2017 | -5,594.00 | 61.20 | $342,334.90 |
| Purchase | 03/17/2017 | 1,000.00 | 60.37 | ($60,370.00) |
| Sale | 03/17/2017 | -16,300.00 | 60.37 | $984,031.00 |
| Sale | 03/21/2017 | -14,275.00 | 58.20 | $830,790.73 |
| Purchase | 03/22/2017 | 5,078.00 | 58.01 | ($294,580.37) |
| Purchase | 03/22/2017 | 9,432.00 | 57.92 | ($546,311.82) |
| Purchase | 03/22/2017 | 4,199.00 | 57.88 | ($243,017.54) |
| Purchase | 03/27/2017 | 1,221.00 | 57.72 | ($70,477.22) |
| Sale | 03/28/2017 | -3,628.00 | 59.37 | $215,378.03 |
| Sale | 03/29/2017 | -7,256.00 | 59.52 | $431,906.14 |
| Purchase | 03/30/2017 | 10,442.00 | 60.36 | ($630,281.21) |
| Sale | 03/30/2017 | -3,627.00 | 60.65 | $219,984.44 |
| Sale | 03/31/2017 | -479.00 | 60.30 | $28,883.17 |
| Purchase | 04/03/2017 | 1,006.00 | 59.86 | ($60,215.84) |
| Sale | 04/04/2017 | -2,383.00 | 59.51 | $141,821.15 |
| Sale | 04/05/2017 | -7,354.00 | 60.37 | $443,947.74 |
| Sale | 04/05/2017 | -7,356.00 | 59.70 | $439,120.10 |
| Sale | 04/06/2017 | -13,709.00 | 59.82 | $820,121.73 |
| Purchase | 04/07/2017 | 3,680.00 | 59.50 | ($218,960.74) |
| Purchase | 04/07/2017 | 3,675.00 | 59.81 | ($219,795.14) |
| Purchase | 04/11/2017 | 7,360.00 | 58.77 | ($432,556.03) |
| Purchase | 04/12/2017 | 5,391.00 | 58.62 | ($316,012.33) |
| Purchase | 04/13/2017 | 3,680.00 | 58.79 | ($216,332.11) |
| Purchase | 04/19/2017 | 3,903.00 | 58.43 | ($228,056.97) |
| Sale | 04/20/2017 | -50,600.00 | 58.41 | $2,955,546.00 |
| Sale | 04/21/2017 | -24,600.00 | 57.72 | $1,419,912.00 |
| Sale | 04/21/2017 | -30,700.00 | 57.72 | $1,772,004.00 |
| Sale | 04/24/2017 | -24,000.00 | 59.44 | $1,426,560.00 |

| Sale | 04/25/2017 | -24,100.00 | 60.21 | $1,451,061.00 |
|---|---|---|---|---|
| Sale | 04/26/2017 | -562.00 | 60.17 | $33,813.57 |
| Sale | 04/26/2017 | -23,800.00 | 60.10 | $1,430,380.00 |
| Sale | 05/02/2017 | -27,700.00 | 59.71 | $1,653,967.00 |
| Sale | 05/03/2017 | -511.00 | 59.50 | $30,405.93 |
| Sale | 05/03/2017 | -23,200.00 | 60.24 | $1,397,568.00 |
| Sale | 05/04/2017 | -7,356.00 | 60.33 | $443,752.17 |
| Purchase | 05/10/2017 | 3,680.00 | 60.41 | ($222,299.97) |
| Purchase | 05/10/2017 | 3,129.00 | 60.36 | ($188,859.56) |
| Sale | 05/10/2017 | -45,500.00 | 60.37 | $2,746,835.00 |
| Purchase | 05/11/2017 | 7,384.00 | 60.72 | ($448,364.60) |
| Sale | 05/11/2017 | -20,900.00 | 60.70 | $1,268,630.00 |
| Sale | 05/12/2017 | -32,500.00 | 61.07 | $1,984,775.00 |
| Purchase | 05/15/2017 | 35,900.00 | 61.42 | ($2,204,978.00) |
| Purchase | 05/17/2017 | 3,685.00 | 61.84 | ($227,868.24) |
| Sale | 05/17/2017 | -14,723.00 | 60.08 | $884,616.73 |
| Sale | 05/17/2017 | -14,719.00 | 60.11 | $884,753.20 |
| Sale | 05/18/2017 | -3,828.00 | 59.92 | $229,359.21 |
| Sale | 05/19/2017 | -7,361.00 | 61.27 | $450,993.75 |
| Sale | 05/19/2017 | -19,865.00 | 61.30 | $1,217,754.30 |
| Sale | 05/22/2017 | -3,680.00 | 61.08 | $224,760.05 |
| Purchase | 05/24/2017 | 9,900.00 | 62.27 | ($616,473.00) |
| Sale | 05/24/2017 | -2,817.00 | 62.01 | $174,672.31 |
| Purchase | 05/31/2017 | 7,182.00 | 60.42 | ($433,958.70) |
| Purchase | 06/01/2017 | 256.00 | 60.54 | ($15,498.24) |
| Sale | 06/06/2017 | -12,065.00 | 61.00 | $736,003.61 |
| Sale | 06/07/2017 | -7,255.00 | 61.83 | $448,587.53 |
| Purchase | 06/16/2017 | 1,000.00 | 63.89 | ($63,888.00) |
| Purchase | 07/03/2017 | 184.00 | 67.19 | ($12,362.13) |
| Sale | 07/11/2017 | -16,900.00 | 66.82 | $1,129,258.00 |
| Purchase | 07/14/2017 | 7,785.00 | 66.64 | ($518,828.99) |
| Purchase | 07/26/2017 | 1,555.00 | 68.23 | ($106,100.76) |
| Purchase | 07/28/2017 | 3,888.00 | 67.47 | ($262,342.02) |
| Purchase | 07/31/2017 | 1,557.00 | 68.15 | ($106,109.55) |
| Purchase | 08/01/2017 | 80.00 | 68.47 | ($5,477.25) |
| Purchase | 08/09/2017 | 10,285.00 | 68.43 | ($703,802.55) |
| Purchase | 08/14/2017 | 1,573.00 | 67.98 | ($106,937.42) |
| Purchase | 08/16/2017 | 161,334.00 | 67.64 | ($10,912,180.02) |
| Purchase | 08/18/2017 | 162,098.00 | 67.09 | ($10,875,041.35) |
| Purchase | 08/29/2017 | 9,438.00 | 67.55 | ($637,489.71) |
| Sale | 08/30/2017 | -9,944.00 | 68.18 | $677,988.88 |
| Purchase | 08/31/2017 | 79,872.00 | 67.91 | ($5,423,780.04) |
| Purchase | 09/01/2017 | 74.00 | 68.03 | ($5,034.45) |

| Sale | 09/15/2017 | -2,200.00 | 69.04 | $151,891.30 |
|---|---|---|---|---|
| Purchase | 09/26/2017 | 2,522.00 | 70.84 | ($178,658.48) |
| Sale | 09/29/2017 | -3,552.00 | 72.65 | $258,035.40 |
| Purchase | 10/02/2017 | 1,811.00 | 73.71 | ($133,489.90) |
| Sale | 10/09/2017 | -8,895.00 | 75.24 | $669,273.14 |
| Purchase | 10/10/2017 | 450,000.00 | 75.18 | ($33,831,000.00) |
| Purchase | 10/12/2017 | 129,242.00 | 73.08 | ($9,445,250.92) |
| Purchase | 10/17/2017 | 40,082.00 | 72.49 | ($2,905,524.14) |
| Purchase | 10/17/2017 | 50,000.00 | 72.53 | ($3,626,410.00) |
| Purchase | 10/18/2017 | 8,698.00 | 73.10 | ($635,833.37) |
| Purchase | 10/18/2017 | 8,895.00 | 73.09 | ($650,120.43) |
| Purchase | 10/18/2017 | 197.00 | 72.99 | ($14,379.03) |
| Purchase | 10/19/2017 | 1,779.00 | 72.81 | ($129,531.48) |
| Sale | 10/23/2017 | -17,790.00 | 73.71 | $1,311,242.19 |
| Purchase | 10/24/2017 | 17,772.00 | 74.41 | ($1,322,350.54) |
| Purchase | 10/25/2017 | 10,007.00 | 73.68 | ($737,306.75) |
| Purchase | 10/26/2017 | 148,000.00 | 73.79 | ($10,920,920.00) |
| Purchase | 10/27/2017 | 367,000.00 | 73.87 | ($27,110,290.00) |
| Purchase | 11/01/2017 | 189.00 | 73.64 | ($13,918.66) |
| Sale | 11/01/2017 | -8,930.00 | 73.92 | $660,146.68 |
| Purchase | 11/02/2017 | 4,465.00 | 74.47 | ($332,509.44) |
| Sale | 11/02/2017 | -10,053.00 | 74.24 | $746,375.94 |
| Purchase | 11/09/2017 | 8,935.00 | 72.08 | ($644,022.29) |
| Sale | 11/10/2017 | -264,000.00 | 72.25 | $19,074,000.00 |
| Purchase | 11/16/2017 | 4,468.00 | 71.84 | ($320,994.08) |
| Purchase | 11/16/2017 | 13,412.00 | 71.89 | ($964,141.74) |
| Sale | 11/29/2017 | -9,470.00 | 75.09 | $711,131.66 |
| Sale | 11/29/2017 | -17,869.00 | 75.09 | $1,341,868.98 |
| Purchase | 12/01/2017 | 33.00 | 75.50 | ($2,491.50) |
| Sale | 12/01/2017 | -17,890.00 | 75.32 | $1,347,507.00 |
| Sale | 12/06/2017 | -4,473.00 | 75.29 | $336,778.88 |
| Purchase | 12/12/2017 | 8,940.00 | 76.46 | ($683,594.42) |
| Sale | 12/15/2017 | -3,400.00 | 74.77 | $254,218.00 |
| Purchase | 12/19/2017 | 8,960.00 | 75.04 | ($672,324.35) |
| Purchase | 12/27/2017 | 616.00 | 74.60 | ($45,953.60) |
| Purchase | 01/02/2018 | 424.00 | 74.41 | ($31,549.84) |
| Sale | 01/02/2018 | -23,412.00 | 74.29 | $1,739,343.03 |
| Purchase | 01/09/2018 | 18,730.00 | 75.57 | ($1,415,474.80) |
| Purchase | 01/09/2018 | 18,730.00 | 75.62 | ($1,416,401.93) |
| Sale | 01/10/2018 | -18,730.00 | 75.63 | $1,416,617.33 |
| Purchase | 01/11/2018 | 689,000.00 | 75.56 | ($52,060,840.00) |
| Purchase | 01/17/2018 | 18,710.00 | 77.50 | ($1,449,995.06) |
| Purchase | 01/18/2018 | 18,710.00 | 77.33 | ($1,446,805.01) |

| Purchase | 01/19/2018 | 18,710.00 | 78.27 | ($1,464,476.60) |
|----------|------------|-----------|-------|-----------------|
| Purchase | 01/23/2018 | 5,600.00 | 78.55 | ($439,880.00) |
| Purchase | 01/24/2018 | 15,464.00 | 79.27 | ($1,225,883.86) |
| Sale | 01/24/2018 | -18,715.00 | 79.27 | $1,483,577.35 |
| Sale | 01/25/2018 | -313.00 | 79.45 | $24,867.85 |
| Sale | 01/30/2018 | -9,315.00 | 78.83 | $734,284.68 |
| Sale | 01/31/2018 | -15,406.00 | 78.77 | $1,213,513.67 |
| Sale | 02/01/2018 | -275.00 | 78.48 | $21,582.00 |
| Sale | 02/02/2018 | -23,154.00 | 77.72 | $1,799,640.02 |
| Sale | 02/02/2018 | -23,146.00 | 77.83 | $1,801,557.34 |
| Purchase | 02/05/2018 | 5,427.00 | 76.26 | ($413,860.85) |
| Purchase | 02/06/2018 | 9,260.00 | 74.41 | ($689,040.30) |
| Purchase | 02/07/2018 | 18,520.00 | 75.55 | ($1,399,152.66) |
| Sale | 02/08/2018 | -18,520.00 | 73.52 | $1,361,564.47 |
| Purchase | 02/13/2018 | 9,255.00 | 75.19 | ($695,864.01) |
| Purchase | 02/14/2018 | 18,510.00 | 76.35 | ($1,413,264.41) |
| Sale | 02/15/2018 | -23,939.00 | 76.82 | $1,839,041.86 |
| Sale | 02/15/2018 | -12,043.00 | 76.81 | $925,004.77 |
| Sale | 02/27/2018 | -367,000.00 | 76.38 | $28,031,460.00 |
| Sale | 02/28/2018 | -148,000.00 | 75.49 | $11,172,520.00 |
| Sale | 03/01/2018 | -29.00 | 75.49 | $2,189.21 |
| Sale | 03/06/2018 | -6,441.00 | 74.06 | $477,013.37 |
| Purchase | 03/14/2018 | 3,500.00 | 73.80 | ($258,282.50) |
| Purchase | 03/14/2018 | 9,000.00 | 74.06 | ($666,536.40) |
| Sale | 03/16/2018 | -4,200.00 | 73.47 | $308,574.00 |
| Purchase | 03/26/2018 | 17,000.00 | 69.46 | ($1,180,835.30) |
| Purchase | 03/29/2018 | 4,603.00 | 69.34 | ($319,189.05) |
| Purchase | 04/02/2018 | 112.00 | 67.54 | ($7,564.74) |
| Purchase | 04/05/2018 | 9,914.00 | 70.44 | ($698,317.38) |
| Sale | 04/09/2018 | -4,715.00 | 69.68 | $328,547.33 |
| Sale | 04/10/2018 | -9,914.00 | 70.96 | $703,486.53 |
| Purchase | 04/13/2018 | 14,205.00 | 70.38 | ($999,681.14) |
| Purchase | 04/17/2018 | 15,929.00 | 70.39 | ($1,121,285.32) |
| Purchase | 04/18/2018 | 4,735.00 | 69.35 | ($328,382.19) |
| Purchase | 04/18/2018 | 14,560.00 | 70.12 | ($1,020,926.82) |
| Purchase | 04/20/2018 | 4,735.00 | 70.00 | ($331,426.80) |
| Purchase | 04/24/2018 | 9,535.00 | 69.05 | ($658,355.52) |
| Purchase | 04/25/2018 | 9,535.00 | 69.24 | ($660,223.42) |
| Purchase | 04/25/2018 | 4,768.00 | 68.99 | ($328,921.43) |
| Purchase | 04/25/2018 | 2,663.00 | 68.94 | ($183,596.01) |
| Purchase | 04/25/2018 | 23,900.00 | 68.71 | ($1,642,147.49) |
| Purchase | 04/27/2018 | 6,800.00 | 69.10 | ($469,852.12) |
| Purchase | 05/02/2018 | 7,798.00 | 68.51 | ($534,230.06) |

| Sale | 05/09/2018 | -1,147.00 | 71.48 | $81,989.17 |
|---|---|---|---|---|
| Purchase | 05/16/2018 | 842.00 | 72.16 | ($60,758.80) |
| Purchase | 05/24/2018 | 4,011.00 | 69.39 | ($278,320.48) |
| Purchase | 05/24/2018 | 6,499.00 | 69.41 | ($451,090.39) |
| Purchase | 05/29/2018 | 1,919.00 | 65.73 | ($126,138.94) |
| Purchase | 05/29/2018 | 270,000.00 | 65.71 | ($17,741,700.00) |
| Purchase | 05/30/2018 | 3,295.00 | 66.65 | ($219,607.14) |
| Purchase | 05/30/2018 | 3,838.00 | 66.64 | ($255,754.73) |
| Purchase | 06/01/2018 | 1,177.00 | 66.80 | ($78,625.84) |
| Purchase | 06/06/2018 | 5,297.00 | 68.01 | ($360,236.79) |
| Sale | 06/13/2018 | -774.00 | 67.40 | $52,168.68 |
| Purchase | 06/19/2018 | 200,000.00 | 66.78 | ($13,355,180.00) |
| Purchase | 06/19/2018 | 100,000.00 | 66.75 | ($6,675,000.00) |
| Purchase | 06/19/2018 | 33,300.00 | 66.16 | ($2,202,974.82) |
| Purchase | 06/20/2018 | 4,203.00 | 67.42 | ($283,348.19) |
| Purchase | 06/26/2018 | 3,882.00 | 66.43 | ($257,874.27) |
| Purchase | 06/27/2018 | 259.00 | 66.46 | ($17,213.24) |
| Sale | 06/28/2018 | -3,880.00 | 66.79 | $259,138.99 |
| Sale | 06/29/2018 | -14,551.00 | 67.61 | $983,860.04 |
| Purchase | 07/03/2018 | 4,890.00 | 66.50 | ($325,207.01) |
| Sale | 07/05/2018 | -3,665.00 | 66.65 | $244,259.42 |
| Sale | 07/11/2018 | -8,716.00 | 68.13 | $593,777.50 |
| Sale | 07/12/2018 | -270,000.00 | 68.51 | $18,497,700.00 |
| Purchase | 07/13/2018 | 4,890.00 | 67.03 | ($327,798.22) |
| Purchase | 07/18/2018 | 1,823.00 | 69.85 | ($127,329.26) |
| Sale | 07/18/2018 | -5,517.00 | 69.91 | $385,672.51 |
| Sale | 07/20/2018 | -200,000.00 | 69.00 | $13,800,000.00 |
| Purchase | 07/25/2018 | 1,829.00 | 71.17 | ($130,176.70) |
| Sale | 07/25/2018 | -9,822.00 | 71.29 | $700,229.04 |
| Sale | 07/26/2018 | -9,823.00 | 71.50 | $702,373.97 |
| Sale | 07/26/2018 | -100,000.00 | 71.37 | $7,137,120.00 |
| Sale | 07/27/2018 | -19,645.00 | 71.60 | $1,406,642.90 |
| Sale | 07/30/2018 | -19,645.00 | 72.56 | $1,425,378.34 |
| Sale | 07/30/2018 | -875,000.00 | 72.29 | $63,253,750.00 |
| Sale | 07/31/2018 | -4,788.00 | 72.06 | $345,007.96 |
| Purchase | 08/01/2018 | 125.00 | 71.90 | ($8,987.95) |
| Sale | 08/02/2018 | -35,269.00 | 71.64 | $2,526,618.26 |
| Sale | 08/07/2018 | -42,463.00 | 72.60 | $3,082,953.93 |
| Purchase | 08/27/2018 | 11,000.00 | 72.05 | ($792,531.30) |
| Purchase | 08/31/2018 | 7,700.00 | 70.93 | ($546,125.58) |
| Purchase | 09/10/2018 | 191,800.00 | 69.63 | ($13,355,034.00) |
| Sale | 09/21/2018 | -1,600.00 | 74.15 | $118,640.00 |
| Purchase | 09/28/2018 | 107,600.00 | 71.74 | ($7,719,224.00) |

| Purchase | 10/10/2018 | 45,400.00 | 69.95 | ($3,175,730.00) |
|----------|------------|-----------|-------|-----------------|
| Purchase | 10/25/2018 | 23,400.00 | 64.97 | ($1,520,298.00) |
| Purchase | 10/31/2018 | 11,680.00 | 65.95 | ($770,271.47) |
| Purchase | 11/01/2018 | 110.00 | 65.46 | ($7,200.60) |
| Purchase | 11/07/2018 | 4,840.00 | 67.27 | ($325,589.70) |
| Purchase | 11/07/2018 | 30,300.00 | 68.26 | ($2,068,278.00) |
| Sale | 11/13/2018 | -237,200.00 | 64.78 | $15,365,816.00 |
| Sale | 11/14/2018 | -481.00 | 65.13 | $31,328.30 |
| Purchase | 11/16/2018 | 11,815.00 | 64.88 | ($766,600.92) |
| Sale | 11/19/2018 | -11,803.00 | 65.18 | $769,312.46 |
| Sale | 11/20/2018 | -4,359.00 | 62.77 | $273,634.92 |
| Sale | 11/21/2018 | -42,100.00 | 62.87 | $2,646,827.00 |
| Sale | 11/27/2018 | -2,360.00 | 63.16 | $149,064.92 |
| Sale | 11/29/2018 | -2,079.00 | 65.02 | $135,179.91 |
| Sale | 11/30/2018 | -1,326.00 | 64.73 | $85,829.86 |
| Sale | 12/03/2018 | -1,511.00 | 65.40 | $98,815.47 |
| Sale | 12/04/2018 | -1,584.00 | 62.53 | $99,046.73 |
| Sale | 12/06/2018 | -1,766.00 | 59.19 | $104,536.07 |
| Sale | 12/07/2018 | -1,176.00 | 58.89 | $69,258.29 |
| Sale | 12/12/2018 | -46,000.00 | 56.67 | $2,606,649.80 |
| Sale | 12/21/2018 | -2,900.00 | 50.24 | $145,696.00 |
| Purchase | 01/04/2019 | 32,154.00 | 54.78 | ($1,761,537.60) |
| Sale | 01/16/2019 | -43,525.00 | 62.15 | $2,705,035.23 |
| Sale | 01/28/2019 | -38,854.00 | 63.83 | $2,479,891.52 |
| Sale | 02/01/2019 | -41,295.00 | 64.02 | $2,643,577.89 |
| Purchase | 02/14/2019 | 34,600.00 | 62.42 | ($2,159,732.00) |
| Sale | 03/15/2019 | -4,800.00 | 65.19 | $312,912.00 |
| Purchase | 03/21/2019 | 39,800.00 | 63.91 | ($2,543,618.00) |
| Purchase | 04/16/2019 | 42,500.00 | 68.25 | ($2,900,531.50) |
| Purchase | 05/13/2019 | 19,100.00 | 64.38 | ($1,229,658.00) |
| Purchase | 05/14/2019 | 29,600.00 | 65.26 | ($1,931,696.00) |
| Purchase | 06/21/2019 | 56,900.00 | 67.97 | ($3,867,493.00) |
| Purchase | 07/16/2019 | 33,100.00 | 71.32 | ($2,360,692.00) |
| Purchase | 07/22/2019 | 21,783.00 | 70.98 | ($1,546,166.05) |
| Purchase | 07/26/2019 | 22,000.00 | 72.16 | ($1,587,520.00) |
| Purchase | 08/01/2019 | 22,500.00 | 69.52 | ($1,564,267.50) |
| Purchase | 08/05/2019 | 24,300.00 | 65.18 | ($1,583,874.00) |
| Purchase | 08/15/2019 | 33,500.00 | 61.32 | ($2,054,220.00) |
| Purchase | 09/05/2019 | 4,155.00 | 66.34 | ($275,642.70) |
| Purchase | 09/05/2019 | 21,300.00 | 66.34 | ($1,413,042.00) |
| Purchase | 09/16/2019 | 7,200.00 | 69.83 | ($502,776.00) |
| Sale | 09/20/2019 | -8,900.00 | 69.35 | $617,215.00 |
| Purchase | 11/01/2019 | 36,000.00 | 73.95 | ($2,662,164.00) |

| Purchase | 11/04/2019 | 18,000.00 | 74.59 | ($1,342,668.60) |
| Purchase | 11/13/2019 | 49,400.00 | 73.91 | ($3,651,154.00) |
| Purchase | 11/22/2019 | 18,000.00 | 74.70 | ($1,344,558.60) |
| Sale | 12/03/2019 | -135,500.00 | 72.83 | $9,868,248.20 |
| Sale | 12/11/2019 | -9,500.00 | 75.55 | $717,725.00 |
| Sale | 12/12/2019 | -13,920.00 | 77.05 | $1,072,536.00 |
| Sale | 12/16/2019 | -13,870.00 | 76.91 | $1,066,741.70 |
| Sale | 12/20/2019 | -11,460.00 | 78.51 | $899,724.60 |
| Purchase | 01/23/2020 | 16,876.00 | 79.13 | ($1,335,438.38) |
| Sale | 01/30/2020 | -9,500.00 | 75.55 | $717,725.00 |
| Sale | 01/30/2020 | -20,000.00 | 75.77 | $1,515,300.00 |
| Sale | 01/30/2020 | -68,579.00 | 75.91 | $5,206,051.34 |
| Sale | 01/30/2020 | -10,500.00 | 75.94 | $797,317.50 |
| Sale | 02/25/2020 | -10,000.00 | 69.43 | $694,300.00 |
| Purchase | 03/02/2020 | 76,900.00 | 63.97 | ($4,919,231.48) |
| Sale | 03/02/2020 | -38,659.00 | 64.11 | $2,478,443.95 |
| Sale | 03/11/2020 | -47,390.00 | 50.79 | $2,406,938.10 |
| Sale | 03/12/2020 | -103,200.00 | 43.26 | $4,464,432.00 |
| Sale | 03/16/2020 | -142,200.00 | 43.01 | $6,115,837.14 |
| Sale | 03/17/2020 | -72,000.00 | 41.22 | $2,968,077.60 |
| Sale | 04/14/2020 | -30,500.00 | 45.42 | $1,385,310.00 |
| Purchase | 04/27/2020 | 102,000.00 | 45.26 | ($4,616,050.80) |
| Purchase | 04/28/2020 | 60,000.00 | 47.37 | ($2,842,194.00) |
| Purchase | 05/07/2020 | 68,000.00 | 44.77 | ($3,044,489.20) |
| Purchase | 05/08/2020 | 68,000.00 | 45.32 | ($3,081,664.80) |
| Purchase | 05/27/2020 | 62,000.00 | 51.98 | ($3,223,045.20) |
| Sale | 06/08/2020 | -112,500.00 | 60.41 | $6,796,226.25 |
| Sale | 06/10/2020 | -146,000.00 | 58.16 | $8,492,002.40 |
| Purchase | 06/12/2020 | 101,000.00 | 51.22 | ($5,173,220.00) |
| Sale | 06/19/2020 | -7,600.00 | 52.92 | $402,192.00 |
| Purchase | 06/22/2020 | 20,700.00 | 52.06 | ($1,077,642.00) |
| Sale | 07/13/2020 | -1,657.00 | 52.47 | $86,944.28 |
| Purchase | 07/17/2020 | 22,600.00 | 50.22 | ($1,134,972.00) |
| Purchase | 07/20/2020 | 1,657.00 | 50.12 | ($83,048.67) |
| Purchase | 07/23/2020 | 28,700.00 | 52.08 | ($1,494,696.00) |
| Purchase | 07/27/2020 | 68,000.00 | 51.19 | ($3,480,954.00) |
| Purchase | 08/06/2020 | 70,000.00 | 50.89 | ($3,562,300.00) |
| Sale | 09/16/2020 | -407,300.00 | 45.58 | $18,566,159.55 |
| Purchase | 09/29/2020 | 84,500.00 | 42.51 | ($3,592,204.85) |
| Purchase | 10/05/2020 | 9,372.00 | 45.00 | ($421,782.17) |
| Sale | 10/06/2020 | -15,510.00 | 44.41 | $688,799.10 |
| Sale | 10/08/2020 | -70,000.00 | 44.72 | $3,130,400.00 |
| Purchase | 10/09/2020 | 207,500.00 | 44.98 | ($9,334,180.00) |

| Purchase | 10/12/2020 | 3,000.00 | 45.46 | ($136,369.80) |

# EXHIBIT C

### CERTIFICATION

I, Edward A. Jarvis, on behalf of Anchorage Police & Fire Retirement System ("Anchorage"), as Director of Anchorage, hereby certify as follows:

1.     I am fully authorized to enter into and execute this Certification on behalf of Anchorage.

2.     I have reviewed the Second Consolidated Amended Class Action Complaint (the "Complaint") against Citigroup, Inc. ("Citigroup") and others alleging violations of the federal securities laws and have authorized its filing.

3.     Anchorage did not purchase or sell securities of Citigroup that are the subject of the Complaint at the direction of counsel in order to participate in any private action under the federal securities laws.

4.     Anchorage is willing to serve as a representative plaintiff on behalf of the Class in this matter, including providing testimony at deposition and trial, if necessary.

5.     Anchorage's transactions in the Citigroup securities that are the subject of the Complaint during the class period specified therein of February 24, 2017 to October 12, 2020, inclusive (the "Class Period") are reflected in Schedule A, attached hereto.

6.     For securities retained, Anchorage owns and holds legal title to the securities that are the subject of the Complaint.  For securities sold, Anchorage owned and held legal title to the securities that are the subject of the Complaint at all relevant times.

7.     Anchorage sought to serve as a representative party in a class action under the federal securities laws during the last three years in the following:

- *Zaidi v. Adamas Pharmaceuticals, Inc.*, 19-cv-08051 (N.D. Cal.)
- *Greene v. Granite Construction Inc.*, 19-cv-04744 (N.D. Cal.)
- *Caliendo v. Century Link, Inc.*, 19-cv-01629 (C.D. Cal.)

- *Ontario Teachers' Pension Plan Board v. Teva Pharmaceutical Industries Ltd.*, 17-cv-00558 (D. Conn.)

8.       Beyond its *pro rata* share of any recovery, Anchorage will not accept payment for serving as a representative party on behalf of the Class, except the reimbursement of such reasonable costs and expenses including lost wages as ordered or approved by the Court.

I declare under penalty of perjury, under the laws of the United States, that the foregoing is true and correct this 19 day of May, 2023.

Edward A. Jarvis
Director
*Anchorage Police & Fire Retirement System*

2

**SCHEDULE A**
TRANSACTIONS IN
Citigroup, Inc.

| Transaction Type | Trade Date | Shares | Price Per Share | Cost/Proceeds |
|---|---|---:|---:|---:|
| Purchase | 10/03/2018 | 5,000.00 | 72.57 | ($362,865.00) |
| Purchase | 10/09/2018 | 5,800.00 | 72.23 | ($418,956.04) |
| Purchase | 01/17/2019 | 2,100.00 | 61.44 | ($129,018.96) |
| Purchase | 01/31/2019 | 1,500.00 | 63.85 | ($95,772.90) |
| Purchase | 04/12/2019 | 2,000.00 | 67.35 | ($134,695.00) |
| Purchase | 09/12/2019 | 2,700.00 | 68.80 | ($185,766.75) |
| Sale | 11/26/2019 | -1,200.00 | 75.08 | $90,096.00 |
| Sale | 07/22/2020 | -3,300.00 | 51.46 | $169,819.98 |
| Sale | 07/24/2020 | -2,100.00 | 51.80 | $108,773.07 |