# Exhibit 7

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.*<br>TAMIKA MILLER, and TAMIKA MILLER<br>individually,<br><br>                    Plaintiffs,<br><br>        v.<br><br>CITIGROUP INC., CITIBANK, N.A.,<br>CITIBANK INC., DOE CORPORATIONS<br>1-10,<br><br>             Defendants. | 19 Civ. 10970 (DLC) |

## DECLARATION OF GREG SULLIVAN

I, Greg Sullivan, hereby declare the following pursuant to 28 U.S.C. § 1746:

1. I have worked at the Office of the Comptroller of the Currency ("OCC") since 2002 as a bank examiner. In 2005, I became a commissioned National Bank Examiner and, since 2011, I have served as an Examiner-in-Charge or Acting Examiner-in-Charge for banks in the OCC's Large Bank portfolio. Banks in the OCC's Large Bank portfolio have assets of approximately $50 billion or more. From September 6, 2015 to December 20, 2020, I served as the OCC Examiner-in-Charge at Citibank, N.A. (hereafter, "Citibank" or the "Bank") and I am currently the OCC Examiner-in-Charge at JPMorgan Chase Bank, N.A.

2. As Citibank's OCC Examiner-in-Charge from September 6, 2015, to December 20, 2020, I managed a team of approximately 65 OCC examiners and other employees covering all aspects of the Bank's daily supervision. My supervisory responsibilities included, among other things, providing clear feedback on progress against Enforcement Actions and Matters Requiring Attention and developing and supporting the supervisory strategy for this large, complex, multinational institution with multiple deficiencies relating to risk management, data governance, and internal controls. In 2020, our examination work culminated in the 2020 OCC Consent Order and $400,000,000 CMP assessment to address the Bank's deficiencies.

3. This declaration is based on my personal knowledge as well as a review of certain OCC information related to: (1) the complaint submitted by Relator Tamika Miller ("Relator") to the OCC's Customer Assistance Group in July 2019

1

("Relator's CAG Complaint"); (2) the *qui tam* complaint filed by Relator in the above-captioned case ("Relator's *Qui Tam* Complaint"); (3) the July 20, 2015 OCC Consent Cease and Desist Order ("2015 Consent Order") and related $35,000,000 civil money penalty assessment against Citibank, N.A., and Department Stores National Bank (collectively, "the 2015 Orders"); (4) the November 20, 2018 termination of the 2015 Consent Order; (5) the October 7, 2020, OCC Consent Cease and Desist Order ("2020 Consent Order") and related $400,000,000 civil money penalty assessment against Citibank, N.A. ("2020 CMP Order") (collectively, "the 2020 Orders"); and (6) the OCC's general supervisory activities, conducted in the normal course, regarding Citibank, including but not limited to Citibank's third-party risk management.

4. I submit this declaration in support of the Memorandum of Law of the United States of America in Opposition to Relator's Motion for an Award of a *Qui Tam* Relator's Share in the above-captioned case. I was personally involved in determining the supervisory concerns that were escalated into and addressed by the 2020 Orders. As discussed in more detail below, the 2020 Orders did not address and were not based in any way on any allegations or information contained in Relator's CAG Complaint or *Qui Tam* Complaint, or on any information otherwise provided by Relator pertaining to those Complaints.

5. In addition, the 2020 Orders did not reflect the OCC's pursuit or resolution of any of Relator's claims set forth in either the Relator's CAG Complaint or *Qui Tam* Complaint. As discussed further below, the OCC reviewed Relator's claims and concluded that they were not substantiated.

## OCC'S MISSION AND AUTHORITY

6. The OCC charters, regulates, and supervises all national banks, federal savings associations, and federal branches and agencies of foreign banks (collectively, "regulated institutions"). The OCC is responsible for assessing the safety and soundness of regulated institutions and their compliance with applicable laws and regulations. The OCC conducts this assessment of the large banks it regulates through target reviews and ongoing supervisory activities.

7. The OCC has the statutory authority, pursuant to 12 U.S.C. § 1818, to pursue enforcement actions against regulated institutions that, among other things, engage in violations of laws or regulation or unsafe or unsound practices.

## OCC'S 2015 ORDERS AGAINST CITIBANK

8. On July 20, 2015, the OCC issued the 2015 Orders to address certain practices at Citibank that resulted in violations of section 5 of the Federal Trade Commission Act, 45 U.S.C. § 15(a) (the "FTC Act"). Specifically, the Bank's billing practices with regard to identity protection products and its marketing and sales practices with regard to debt cancellation products were unfair or deceptive under the FTC

Act. In addition to consumer remediation, the 2015 Consent Order required the Bank to:

> (a) Develop a new or revise a written policy governing management of the Bank's third-party vendors that, pursuant to a contractual obligation to the Bank, provides marketing, sales, delivery, servicing, and/or fulfillment of services for consumer products ("Consumer Product Vendors") offered as optional add-on products to Bank credit cards and/or as optional add-on products to other consumer products of the Bank ("Add-On Consumer Products").
>
> (b) Develop a new or revised written enterprise-wide risk management program for Add-On Consumer Products offered to the Bank's customers, including, but not limited to, the Bank's credit cardholders and other consumers of the Bank's consumer products.
>
> (c) Develop a new or revised written Consumer Compliance Internal Audit Program for Add-On Consumer Products.

9. True and correct copies of the 2015 Orders are attached as Exhibits A and B.

10. On November 20, 2018, the OCC, pursuant to its Enforcement Action Policy, PPM 5310-3, terminated the 2015 Consent Order (the "2018 Termination") because the OCC verified that the Bank had adopted, implemented, and adhered to the corrective actions set forth in each of the 2015 Consent Order's actionable articles and validated that the corrective actions were effective and sustainable in addressing the bank's deficiencies. A true and correct copy of the 2018 Termination is attached as Exhibit C.

## OCC'S REVIEW OF RELATOR'S CAG COMPLAINT AND *QUI TAM* COMPLAINT

11. On July 3, 2019, Relator filed an anonymous complaint with OCC's Customer Assistance Group ("CAG") through her then-attorney, Nathan Inurria. On July 15, 2019, pursuant to OCC internal procedures, CAG forwarded this submission (defined above and referred to herein as Relator's CAG Complaint) to OCC Enforcement and an OCC examiner assigned to Citibank. On August 15, 2019, Relator's counsel provided OCC staff with unredacted versions of the documents Relator had submitted with her CAG Complaint. On September 26, 2021, certain OCC personnel interviewed Relator.

12. Relator's CAG Complaint set forth allegations and information pertaining to Relator's concerns with certain third-party risk management practices at Citibank, specifically in connection with audits of third-party service supplier agreements related to Citibank credit cards. In particular, Relator's CAG Complaint alleged that Citibank employees, including managers in third-party risk management,

3

(1) suppressed audit findings related to compliance with third-party service supplier agreements, (2) failed to follow policies and procedures in conducting audits of third-party service supplier agreements, and (3) over-rode the Bank's third-party risk management repository system so as to produce more favorable audit findings. Relator's CAG Complaint also alleged that the third-party risk management's organizational structure created a conflict of interest as third-party risk auditors reported directly to third-party officers who were also responsible for monitoring and managing the third-party suppliers. Finally, Relator's CAG Complaint alleged that Citibank retaliated against her for reporting her concerns to the Bank's internal ethics line.

13. Although I was not personally involved in the review of the allegations contained in Relator's CAG Complaint at the time that it was received by OCC, I have since reviewed and become familiar with the CAG Complaint and received information from relevant OCC staff regarding their review of Relator's CAG Complaint and the related information she provided. I have also developed an understanding of the steps that the relevant OCC staff undertook to thoroughly review the information that Relator provided to the OCC in connection with her CAG Complaint.

14. The OCC handled Relator's CAG Complaint in accordance with OCC's internal processes. OCC examiners and attorneys reviewed Relator's CAG Complaint and documentation supporting the CAG Complaint that Relator's counsel provided upon the OCC's request. After reviewing Relator's CAG Complaint and the supporting documentation, OCC examiners and attorneys interviewed the Relator regarding the allegations in her CAG Complaint. Because the Relator's CAG Complaint addressed third-party risk management, an OCC examiner familiar with the Bank's third-party risk management area also participated in this interview. The examiners also collected and reviewed additional documentation regarding the Bank's third-party risk management area. Based on the information collected and reviewed, the OCC examiners did not substantiate the allegations in Relator's CAG Complaint. This workstream, which also included the OCC's later review of Relator's *Qui Tam* Complaint after it was filed (the "CAG Workstream"), was separate and distinct from the then-already ongoing OCC workstream that ultimately led to the 2020 Orders (the "Enforcement Workstream").

15. I also understand that on or about November 26, 2019, Relator filed a *qui tam* complaint in the above-captioned matter (defined above and referred to herein as Relator's *Qui Tam* Complaint), setting forth allegations similar to those made in Relator's CAG Complaint. Although I was not personally involved in the review of Relator's *Qui Tam* Complaint at the time that it was filed, I have since reviewed and become familiar with the *Qui Tam* Complaint and received information from the relevant OCC staff regarding their review of the *Qui Tam* Complaint once they were alerted to its filing by the Department of Justice. I

4

have also developed an understanding regarding the steps that the relevant OCC staff undertook to thoroughly review the information provided by Relator pertaining to the *Qui Tam* Complaint. I understand that, as part of its review of the allegations in the Relator's *Qui Tam* Complaint, OCC staff attended an interview of Relator by an Assistant United States Attorney in March 2020.

16. OCC's review of the information provided by Relator in connection with her CAG Complaint and *Qui Tam* Complaint did not substantiate Relator's allegations in either submission. Moreover, the OCC has, in the normal course of its supervision of Citibank, reviewed the Bank's third-party risk management practices and its findings have not substantiated the allegations in Relator's CAG Complaint and *Qui Tam* Complaint.

17. Furthermore, as discussed in more detail below, third-party risk management concerns in general, including but not limited to the allegations made by Relator in her CAG Complaint and *Qui Tam* Complaint, were not among the concerns escalated to the 2020 Consent Order or upon which the 2020 CMP Order was based.

### OCC'S 2020 ORDERS AGAINST CITIBANK

18. On October 7, 2020, the OCC issued the 2020 Orders to address unsafe or unsound banking practices relating to the Bank's long-standing failure to establish effective risk management and data governance programs and internal controls and its noncompliance with 12 C.F.R. Part 30, Appendix D. The 2020 Orders were the culmination of discussions within the OCC, involving members of my exam team and myself that had begun as early as January 2019. These discussions centered around escalating certain supervisory concerns, some of which went back several years before the 2020 Consent Orders, into an enforcement action. Given the number of these concerns and their complexity, as evidenced by the 35-page 2020 Consent Order, the process of escalating these concerns into a public enforcement action took some time. True and correct copies of the 2020 Orders are attached as Exhibits D and E.

19. The Enforcement Workstream that culminated in the 2020 Orders was distinct from the CAG Workstream. The Enforcement Workstream involved close coordination between certain examiners on my exam team, including myself, and the OCC Law Department to determine and recommend the appropriate enforcement action(s) to address the long-standing supervisory concerns. These efforts also involved the development and drafting of the specific provisions contained in the 2020 Consent Order.

20. I was personally involved in determining the supervisory concerns to be escalated into the 2020 Consent Order and addressed by the 2020 CMP Order. None of these concerns were based on or addressed any of the allegations made, or the information provided, by Relator in her CAG Complaint or *Qui Tam* Complaint.

5

Thus, the 2020 Orders did not reflect the OCC's pursuit or resolution of any of Relator's claims set forth in either her CAG Complaint or *Qui Tam* Complaint.

21. None of the OCC's supervisory concerns escalated into the 2020 Consent Order and upon which the 2020 CMP is based addressed the issue of third-party risk management, which was the focus of Relator's CAG and *Qui Tam* Complaints. The 2020 Orders also were not based on, and did not address, any supposed violations of the 2015 Orders. As stated above, the 2020 Orders addressed unsafe or unsound banking practices relating to the Bank's long-standing failure to establish effective risk management and data governance programs and internal controls and its noncompliance with 12 C.F.R. Part 30, Appendix D. As stated in the 2020 Orders, the Comptroller of the Currency found that these failures contributed to violations of law and regulation, including violations of the Fair Housing Act, 42 U.S.C. § 3601-19, and its implementing regulation, 24 C.F.R. Part 100; violations of the holding period for other real estate owned, 12 U.S.C. § 29 and 12 C.F.R. § 34.82; and violations of the Flood Disaster Protection Act, as amended, 42 U.S.C. § 4012a(f), and its implementing regulations (specifically 12 C.F.R. § 22.7(a)). The Comptroller of the Currency did not find that the failures addressed by the 2020 Orders resulted in unfair or deceptive acts or practices in violation of section 5 of the FTC Act, 45 U.S.C. § 15(a); or that the deficiencies at issue related to Add-On Consumer Products or Consumer Product Vendors, as alleged in Relator's *Qui Tam*. Furthermore, the Comptroller of the Currency also did not find that the unsafe or unsound practices or violations of law related to any of the allegations in Relator's CAG Complaint as the findings of fact do not mention third-party risk management or third-party suppliers at all.

22. The 2020 Orders addressed certain deficiencies in the Bank's risk management, but none of these were related to third-party risk management. In the context of OCC supervision, risk management is a very broad area and refers to policies, processes, personnel, and control systems that banks use to measure, monitor, and control credit, interest rate, liquidity, price, operational, compliance, strategic, and reputation risk. If any of these areas are deficient, then the bank's risk management is typically also deficient. The 2020 Orders addressed risk management deficiencies because the OCC concluded that the Bank had deficient policies, processes, personnel, and/or control systems in several of these areas, as evidenced by the Article titles in the 2020 Consent Order. (*See* Article VI, p. 13; Article VII, p. 17). None of these Articles address third-party risk management because the OCC did not identify deficiencies in that area.

23. Furthermore, the 2020 civil monetary penalty was assessed for Citibank's unsafe or unsound banking practices, which contributed to several violations of law and regulation, and its noncompliance with 12 C.F.R. Part 30, Appendix D. It was not based on Citibank's noncompliance with any prior formal, public enforcement action, including the 2015 Orders.

6

24. The 2020 Orders also were not based on, nor did they address, any: (1) false or fraudulent claim for payment made to the government by Citibank; or (2) improper avoidance of an obligation to pay or transmit money or property to the government by Citibank.

25. Furthermore, as noted above in Paragraphs 14 and 16, the OCC has never substantiated the allegations made in Relator's CAG or *Qui Tam* Complaints, either in the context of the OCC's review of Relator's specific allegations, or in the normal course of its examination of third-party risk management issues at Citibank.

26. In addition to the fact that the 2020 Orders did not address third-party risk management issues at Citibank, including but not limited to the types of issues identified by Relator, the 2020 Orders were also the culmination of discussions and work within OCC that long predated the OCC's receipt of Relator's Complaints in 2019.

27. Many of the supervisory concerns addressed by the 2020 Orders were identified by the OCC and communicated to the Bank several years prior to Relator's filing of her Complaints. Although certain supervisory concerns addressed by the 2020 Orders were identified and conveyed to the Bank close in time to or after the OCC's receipt of Relator's allegations, these concerns were identified through the OCC's ongoing supervisory process and were not based on or related to Relator's allegations in the CAG and *Qui Tam* Complaints.

28. As noted above, the CAG Workstream was separate and distinct from the Enforcement Workstream. I have personal knowledge, and I also understand through information provided to me by other relevant OCC staff, that the information Relator provided did not impact the Enforcement Workstream or alter the OCC's supervisory process that culminated in the 2020 Orders. In addition, Relator's allegations did not form the basis for any of the corrective action required by the 2020 Consent Order or the 2020 CMP. Therefore, the 2020 Orders did not reflect the OCC's pursuit or resolution of any of Relator's claims set forth in either her CAG Complaint or *Qui Tam* Complaint.

Dated:      April 21, 2022
            New York, New York

Greg Sullivan
National Bank Examiner, Large Bank
  Supervision
Office of the Comptroller of the Currency

7