**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| |
|---|
| IN RE CITIGROUP SECURITIES LITIGATION |

Case No. 1:20-cv-09132-LAP

**CLASS ACTION**

**PLAINTIFFS' REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF
MOTION FOR LEAVE TO AMEND**

<u>**UNREDACTED VERSION FILED UNDER SEAL**</u>

**BLEICHMAR FONTI & AULD LLP**
Javier Bleichmar
Joseph A. Fonti
Erin H. Woods
Benjamin F. Burry

7 Times Square, 27th Floor
New York, New York 10036
Telephone: (212) 789-1340
Facsimile: (212) 205-3960
jbleichmar@bfalaw.com
jfonti@bfalaw.com
ewoods@bfalaw.com
bburry@bfalaw.com

*Counsel for Lead Plaintiff Public Sector
Pension Investment Board and
Named Plaintiff Anchorage Police & Fire
Retirement System, and Lead Counsel for the
Putative Class*

**TABLE OF CONTENTS**

I.      THE MOTION TO AMEND IS NOT FUTILE ................................................................. 1

     A.      The SAC Includes Extensive New "Omitted Facts" Demonstrating
          Material Falsity under Long-Standing Precedent ....................................................... 1

          1.   Defendants' Omissions Are Actionable ............................................................. 4

          2.   The "Outright Untrue" Statements Are Actionable ........................................... 5

     B.      The SAC Includes Extensive Newly-Pled Allegations Supporting a
          Strong Inference of Scienter ..................................................................................... 9

II.     THERE IS NO UNDUE DELAY ...................................................................................... 13

III.    CONCLUSION ................................................................................................................. 14

i

# TABLE OF AUTHORITIES

**Cases**

*Baez v. Delta*,
 2013 WL 5272935 (S.D.N.Y. Sept. 18, 2013)............................................................ 13

*Barron v. Helbiz, Inc.*,
 No. 21-278, 2021 WL 4519887 (2d Cir. Oct. 4, 2021) (Summary Order) .............................. 13

*Cresci v. Mohawk Valley Cmty. Coll.*,
 693 F.App'x 21 (2d Cir. 2017) (Summary Order).................................................... 14

*Dobina v. Weatherford Int'l Ltd.*,
 909 F.Supp.2d 228 (S.D.N.Y. 2012) ................................................................. 9

*ECA, Local 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*,
 553 F.3d 187 (2d Cir. 2009) ...................................................................... 2, 5

*Ganino v. Citizens Utils. Co.*,
 228 F.3d 154 (2d Cir. 2000) ...................................................................... 2

*In re Am. Express Co. Sec. Litig.*,
 No. 02 CIV. 5533 (WHP), 2008 WL 4501928 (S.D.N.Y. Sept. 26, 2008),
 *aff'd sub nom. Slayton v. Am. Exp. Co.*,
 604 F.3d 758 (2d Cir. 2010) ...................................................................... 11

*In re AstraZeneca Sec. Litig.*,
 2022 WL 4133258 (S.D.N.Y. Sept. 12, 2022)........................................................ 13

*In re Bank of Am. AIG Disclosure Sec. Litig.*,
 980 F.Supp.2d 564 (S.D.N.Y. 2013), *aff'd*, 566 F.App'x 93 (2d Cir. 2014)............................ 5

*In re Doral Fin. Corp. Sec. Litig.*,
 563 F.Supp.2d 461 (S.D.N.Y. 2008),
 *aff'd sub nom. W. Va. Inv. Mgmt. Bd. v. Doral Fin. Corp.*,
 344 F.App'x 717 (2d Cir. 2009) ................................................................... 11

*In re Eaton Vance Mut. Funds Fee Litig.*,
 403 F.Supp. 310 (S.D.N.Y. 2005),
 *aff'd*, *Bellikoff v. Eaton Vance Corp.*,
 481 F.3d 110 (2007)............................................................................... 13

*In re Eletrobras Sec. Litig.*,
 245 F.Supp.3d 450 (S.D.N.Y. 2017) ............................................................... 9

*In re PXRE Grp., Ltd., Sec. Litig.*,
  600 F.Supp.2d 510 (S.D.N.Y. 2009),
  *aff'd sub nom. Condra v. PXRE Grp. Ltd.*,
  357 F.App'x 393 (2d Cir. 2009) ...................................................................................... 11

*In re Scholastic Corp. Sec. Litig.*,
  252 F.3d 63 (2d Cir. 2001) ....................................................................................... 10, 12

*In re Signet Jewelers Ltd. Sec. Litig.*,
  389 F.Supp.3d 221 (S.D.N.Y. 2019) (McMahon, C.J.) ............................................... 5

*In re Signet Jewelers Sec. Litig.*,
  2018 WL 6167889 (S.D.N.Y. Nov. 26, 2018) ............................................................... 6

*In re Synchrony Fin. Sec. Litig.*,
  988 F.3d 157 (2d Cir. 2021) ......................................................................................... 6

*In re Vivendi Universal, S.A.*,
  381 F.Supp.2d 158 (S.D.N.Y. 2003) ............................................................................ 7

*In re Vivendi, S.A. Sec. Litig.*,
  838 F.3d 223 (2d Cir. 2016) ...................................................................................... 2, 4

*In re Wachovia Equity Sec. Litig.*,
  753 F.Supp.2d 326 (S.D.N.Y. 2011) .......................................................................... 11

*Indiana Pub. Ret. Sys. v. SAIC, Inc.*,
   818 F.3d 85 (2d Cir. 2016) .......................................................................................... 2

*Iowa Pub. Emps.' Ret. Sys., v. MF Glob., Ltd.*,
  620 F.3d 137 (2d Cir. 2010) ......................................................................................... 7

*Kopchik v. E. Fishkill, N.Y.*,
  759 F.App'x 31 (2018) (Summary Order) ................................................................... 13

*Lehman v. Ohr Pharm. Inc.*,
  2020 WL 6729116 (S.D.N.Y. Nov. 16, 2020) ............................................................ 13

*Litwin v. Blackstone Grp., L.P.*,
  634 F.3d 706 (2d Cir. 2011) ......................................................................................... 2

*Loc. No. 38 v. Am. Exp. Co.*,
  724 F.Supp.2d 447 (S.D.N.Y. 2010) .......................................................................... 11

*Loreley Financing (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*,
  797 F.3d 160 (2d Cir. 2015) ....................................................................................... 13

*Matrixx Initiatives, Inc. v. Siracusano*,
    563 U.S. 27 (2011)......................................................................................... 1, 2, 4, 8

*Meyer v. Jinkosolar*,
    761 F.3d 245 (2d Cir. 2014) ................................................................................... 5

*N.J. Carpenters Health Fund v. Royal Bank of Scotland Grp., PLC*,
    709 F.3d 109 (2d Cir. 2013) ................................................................................... 2

*New Orleans Emps. Ret. Sys. v. Celestica, Inc.*,
    455 F.App'x 10 (2d Cir. 2011) (Summary Order)................................................. 10, 12

*Novak v. Kasaks*,
    216 F.3d 300 (2d Cir. 2000) .............................................................................. 6, 9, 12

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
    575 U.S. 175 (2015)............................................................................................... 7

*Pasternack v. Shrader*,
    863 F.3d 162 (2d Cir. 2017) ................................................................................. 13

*Ritchie Cap. Mgmt., L.L.C. v. Gen. Elec. Cap. Corp.*,
    821 F.3d 349 (2d Cir. 2016) ................................................................................. 13

*S.E.C. v. Gabelli*,
    653 F.3d 49 (2d Cir. 2011) ..................................................................................... 4

*Schvimmer v. Off. of Court Admin.*,
    857 F.App'x 668 (2d Cir. 2021) (Summary Order)................................................. 14

*Singh v. Cigna*,
    918 F.3d 57 (2d Cir. 2019) ..................................................................................... 5

*State Trading Corp. of India v. Assuranceforeningen Skuld*,
    921 F.2d 409 (2d Cir. 1990) ................................................................................. 13

*Stratte-McClure v. Morgan Stanley*,
    776 F.3d 94 (2d Cir. 2015) ..................................................................................... 4

*Tellabs Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007)................................................................................................. 9

*Tesla Wall Sys., LLC v. Related Cos., L.P.*,
    2018 WL 4360777 (S.D.N.Y. Aug. 15, 2018)....................................................... 13

Rather than take on the extensive newly-pled facts in the SAC, Defendants' opposition reverts to the Court's ruling dismissing the CAC, contending that Plaintiffs "do not engage with— or even quote or mention—the Court's well-reasoned" opinion. That is not true. The SAC squarely addresses the Court's chief basis for dismissal (*i.e.*, that the CAC did not contain "factual allegations identifying with some level of specificity what contradictory information Citigroup had and when it had it") (Order at 45) by providing abundant contemporaneous, first-hand facts. Defendants have no response to the new allegations that Citi's ineffective and non-existent ERM was the subject of internal audit findings that were presented to the Board and Defendants. They also do not engage with the numerous internal management reports and meetings that tracked Citi's deficiencies. Nor do Defendants address their failure to remediate these known deficiencies, or their deliberate refusal to undertake the necessary investments to bring Citi's systems into compliance.[1] Plaintiffs' motion for leave to amend should be granted.

## I.   THE MOTION TO AMEND IS NOT FUTILE

### A.   The SAC Includes Extensive New "Omitted Facts" Demonstrating Material Falsity under Long-Standing Precedent

For nearly half a century, the Supreme Court has held that the alleged "omitted fact[s]" determine materiality. Misrepresentations are material where there is "'a substantial likelihood that the disclosure of the ***omitted fact[s]*** would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available.'" *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 38-39 (2011) (quoting *Basic* & *TSC*). The law does not require a statement to be a guarantee or complete assurance; there are no "bright-line rule[s]" rendering any

---

[1] Internal quotations and citations are omitted, terms are as defined in the proposed Second Amended Complaint ("SAC") (ECF 148-1), and emphasis is added, unless otherwise noted. "¶_" and "§_" refers to the SAC; ECF 139 is "Order"; ECF 147 is "Br."; ECF 152 is "Opp."; "Burry Decl." refers to the accompanying declaration of Benjamin F. Burry, and the exhibits thereto referred to as "Ex. _." The SAC and Br. are currently provisionally filed under seal (*see* ECF 151).

particular type of statement material (or immaterial). *Id*. at 30. Instead, Defendants' representations must be "taken together and in context" to determine whether they "would have misled a reasonable investor." *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 250 (2d Cir. 2016) ("Whether a misrepresentation is material is 'judged according to an objective standard' that turns on 'the significance of an omitted or misrepresented fact to a reasonable investor'" (quoting *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 568 U.S. 455, 459, 466 (2013))).[2] In the rare instance a District Court dismisses for a lack of materiality, the Second Circuit requires the alleged misstatements or omissions to be "so obviously unimportant to a reasonable investor that reasonable minds ***could not differ*** on the question of their importance."[3]

In addition to not addressing the plethora of newly pled contemporaneous facts, Defendants do not acknowledge the context of their misrepresentations and omissions: Only a $500 billion taxpayer-bailout saved Citi from collapse due to "two key problems: [i] a lack of effective enterprise-wide management to monitor and control risks and [ii] a lack of proper infrastructure and internal controls." ¶9. To renew shareholder confidence following the bailout, Defendants repeatedly and specifically emphasized in investor calls and hundreds of pages of SEC filings the importance of risk management and reassured investors as to this issue of major concern. *See, e.g.*, ¶¶87, 119, 125, 128-30, §VIII.C; Br. 16-17. Analysts credited these representations, praising

---

[2] *See also N.J. Carpenters Health Fund v. Royal Bank of Scotland Grp., PLC*, 709 F.3d 109, 125-26 (2d Cir. 2013) (reversing dismissal; materiality is "inherently fact-specific"); *Litwin v. Blackstone Grp., L.P.*, 634 F.3d 706, 716-18 (2d Cir. 2011) (same); *Indiana Pub. Ret. Sys. v. SAIC, Inc.*, 818 F.3d 85, 96 (2d Cir. 2016) (reversing denial of leave to amend; materiality is a mixed question of law and fact).

[3] *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 162 (2d Cir. 2000); *see also ECA, Local 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 197 (2d Cir. 2009); *SAIC, Inc.*, 818 F.3d at 96. In applying this standard, a court cannot evaluate a fact (or statement) in isolation; rather, materiality is a holistic analysis requiring consideration of all allegations and facts. *Matrixx*, 563 U.S. at 46-47; *Litwin*, 634 F.3d at 717.

Citi and "recommend[ing] [its] stock" because it had purportedly remediated these deficiencies by instituting effective ERM, data governance, and controls that were aligned with regulatory requirements. ¶¶132; *see e.g.*, ¶¶86, 131. Indeed, Moody's twice upgraded Citi during the Class Period specifically because it had "largely completed its sweeping reengineering," had "an improved risk-attuned management culture," and had "significantly improved" its "risk management." ¶¶11, 88, 127.

As described in Plaintiffs' opening brief, the SAC now pleads these omitted facts:

- **Citi's risk management did not operate firm wide**. Citi ran on thousands of incompatible systems that failed to comply with minimum risk management requirements and had outdated technology, resulting in its inability to reliably identify or access information about Citi's customers or clients, its inability to access or use real-time financial data, and its erroneous wire transfers, lack of enterprise-wide search or automation, among other issues. *See, e.g.*, ¶¶80-81; 187(a), (h), (i); *see also* ¶¶59-67, 69-70, (referencing FE-1 through FE-5, FE-8, FE-12); 154-59.

- **Citi failed internal audits due to deficient ERM and data governance.** Citi failed internal audits of its ERM systems, data governance, controls, and regulatory compliance, and these audits were sent to Citi's Board and reviewed in Board meetings. *See, e.g.*, ¶¶99-107, 187(h), 322. Rather than address the identified deficiencies, Citi retaliated against the auditors, cut resources, and reduced audit staff. *See, e.g.*, ¶¶56-58, 99-107, 187(g)-(h)).

- **Citi cancelled Project Rainbow and had no other enterprise-wide compliant platform.** Prior to the Class Period, Project Rainbow was Citi's solution to bring the failed ERM and controls that led to its near collapse into compliance. *See, e.g.*, ¶¶89-92, 186(d), 192(d). But the early rollout of Project Rainbow in Asia failed so miserably that Citi killed the project by 2017. *See, e.g.*, ¶¶91, 186(d)(i)-(iv). Without Project Rainbow, Citi was left with legacy systems that *could not* work together. *See, e.g.*, ¶186(d)(iv).

- **Citi failed to manage risk or implement controls.** Lacking ERM, Citi resorted to using hundreds, if not thousands, of people behind the scenes to try to scrub and clean data across siloed systems. *See, e.g.*, ¶¶105-07, 187(h)(iv). In contrast to automated ERM processes that work consistently, these manual stopgaps were unreliable and resulted in errors. *Id.* Indeed, Citi routinely committed wire transfer errors that could not be remedied due to its lack of ERM, and its failure to fix this known deficiency led to the $900 million Revlon payment. *See, e.g.*, ¶¶59, 144-52, 186(g).

When the truth began to emerge in 2020, analysts exclaimed that Citi had deceived investors: "Citi and Corbat hadn't really done all they promised … to do to fix those systems,"

3

(¶150); "investors are … angry over their lack of transparency" (¶162); "contrary to Citi's statements … its restructuring was not sufficiently complete" (¶163); "[t]he system issues are worse than realized" and "one of the greatest disconnects that we've seen" (¶163); "the root problems were not transparent to investors" (¶171); and Citi "didn't prioritize risk management which is such a cornerstone since the last crisis" (¶172). The required remediation effort is still ongoing; it has cost $6 billion and ultimately will cost in excess of $9 billion. ¶¶177-84, 304-05.

### 1. Defendants' Omissions Are Actionable

Thus, even before turning to their "untrue outright" statements, Defendants are liable because their extensive statements in investor calls and SEC filings as to Risk Management are "misleading by virtue of what [they] omit[] to state." *Vivendi*, 838 F.3d at 239. Having chosen to speak about these issues, Defendants were obligated to tell the "whole truth" about them. *Id.* at 258 ("once a company speaks on an issue or topic, there is a duty to tell the whole truth"). As a result, their "so-called half-truths—literally true statements that create a materially misleading impression—will support claims for securities fraud." *S.E.C. v. Gabelli*, 653 F.3d 49, 57 (2d Cir. 2011). In the context of touting how Citi was "Managing Global Risk" in hundreds of pages of SEC filings (Exs. A-D), reasonable investors would have viewed Defendants' omitted facts as significantly altering the "total mix" of information made available,'" *Matrixx*, 563 U.S. at 38-39.

In addition, Defendants had an affirmative duty to disclose these material facts under Item 303. *See Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 101 (2d Cir. 2015); Br. 15-17. The SAC now pleads detailed contemporaneous facts showing that the "underinvestment in risk management or the eventual October 2020 Orders were 'presently known' to the Defendants at the relevant time," addressing the Court's concern. Order at 52; *see, e.g.*, §§VI, VIII.B; Exs. A-D.

Defendants' only counter to the SAC's omissions and Item 303 grounds for falsity is to invoke the Court's prior ruling. Opp. 12-13. But the ruling could not, and Defendants do not,

4

address the newly-pled facts alleged in the SAC. *See, e.g.*, Opp. 13 (not addressing ¶¶315-27).

Further, Defendants tellingly cannot point to any disclosure of the "known trends or uncertainties"

and "known events that will cause a material change in the relationship between costs and

revenues" (Item 303) due to Citi's non-existent ERM. Defendants only challenge the portion of

this claim by arguing that Citi warned of "Risk Factors." Opp. 13. That is legally insufficient

because their purported warnings spoke of future irrelevant risks, while concealing the

contemporaneous facts and the risks concerning ERM that had already materialized.[4]

### 2. The "Outright Untrue" Statements Are Actionable

Rather than grapple with the extensive, newly-pled material facts or demonstrate their

"obvious unimportance," Defendants raise improper factual disputes, mischaracterize Plaintiffs'

allegations, and misstate the law. Section VIII of the SAC specifically ties the above facts (and

others) to the eight false and misleading statements, demonstrating the material falsity of each.[5]

**Project Rainbow Statements:** The SAC alleges four new statements (Statements 2, 4, 5,

and 6) about Project Rainbow, which was touted as a major investment in Citi's ERM, but then

---

[4] Defendants' cited authority agrees; where "a party is aware of an actual danger or cause for concern, the party may not rely on a generic disclaimer in order to avoid liability." *In re Bank of Am. AIG Disclosure Sec. Litig.*, 980 F.Supp.2d 564, 571, 580 (S.D.N.Y. 2013), *aff'd*, 566 F.App'x 93 (2d Cir. 2014).

[5] The newly-pled facts are in line with *Meyer v. Jinkosolar*; the SAC centers on a "***failure to disclose [] problems***" that "could be found by a trier of fact to be an ***omission*** that renders misleading the comforting statements … about compliance," and the "generic warning of a risk will not suffice when ***undisclosed facts on the ground*** would substantially affect a reasonable investor's calculations of probability." 761 F.3d 245, 251 (2d Cir. 2014); *see supra* I.A. Nor is *ECA* in conflict, 553 F.3d at 205-06 (rejecting plaintiffs' contention that any statement regarding a bank's integrity and risk management is "*per se* material" where a relatively tiny transaction was allegedly misclassified). Further, *Singh v. Cigna*, 918 F.3d 57 (2d Cir. 2019), does not permit a "*per se*" materiality rule and did not alter the contextual analysis of material falsity. *See In re Signet Jewelers Ltd. Sec. Litig.*, 389 F.Supp.3d 221, 229-30 (S.D.N.Y. 2019) (McMahon, C.J.) (even for statements amounting to puffery, context—including "whether they comport (or contradict) the company's other disclosures and conduct" and "whether the conduct at the company contravenes the company's other public disclosures"—must be considered) (cleaned up).

secretly scuttled after its disastrous rollout in Asia.  ¶¶89-92, 186(d), 192(d).  Even after pulling the plug on Project Rainbow, Defendants represented that "major investments [in] Rainbow" were "paying great dividends" (¶286), that "the investments we made in Rainbow ... gave us the ability to have a holistic view" (¶290) and "now give[] us the ability to view the client holistically" (¶291), and, in response to an analyst question about Project Rainbow, that "we're tracking everything globally" (¶293).  These statements are contradicted by newly pled facts.  *Id.*; *see, e.g.*, §IV.C.2.

The Project Rainbow statements are material.  In particular, these statements were made in direct response to analyst questions.  ¶¶285-86, 289-93.  It is axiomatic that information volunteered to analysts in response to their questions to help them evaluate investments—which is their job—cannot be so obviously unimportant to reasonable investors that reasonable minds could not differ on the question of their unimportance.  *See In re Signet Jewelers Sec. Litig.*, 2018 WL 6167889, at *12 (S.D.N.Y. Nov. 26, 2018) (statements material when they "were made in response to direct questions ... in an effort to reassure the investing public about" the topic at issue).

Defendants argue that the Project Rainbow statements are immaterial because they are "vague" or "general and aspirational."  Opp. 9-11.  They are not.  Each statement is capable of being "concrete[ly]" untrue, and thus actionable.  *In re Synchrony Fin. Sec. Litig.*, 988 F.3d 157, 168 (2d Cir. 2021).  Indeed, Project Rainbow could not be "paying great dividends" or provide a holistic view of Citi's clients because, unbeknownst to investors, Project Rainbow ***was never implemented***.  Moreover, Citi decided to proceed without fixing its broken infrastructure.  *See, e.g.*, §IV.C.2; *see also Novak v. Kasaks*, 216 F.3d 300, 315 (2d Cir. 2000) (statements that "the inventory situation was 'in good shape' or 'under control'" were not puffery because they were untrue at the time).

6

Defendants' remaining arguments concerning Project Rainbow also fail:

- These statements are not solely "about Mexico in 2017." Opp. 8-9. In addition to raising factual disputes, Defendants are wrong. Mexico is identified as an **exception** to Corbat's false statement that "major investments" in Rainbow, a risk management platform, and other big projects are "paying great dividends." ECF 117-9 at 4-5; *see* ¶285.

- Corbat's statements about Project Rainbow are not inactionable "opinion," Opp. 9, 12, because his representations were factual and did not "fairly align[] with the information" available to him (but not investors) that Rainbow's initial rollout had disastrously failed and the project had been abandoned. *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 188-89 (2015).

- Defendants cannot graft new meaning onto Corbat's factual representation in ¶¶290, 291 by speculating that he merely "wanted" to develop a more "holistic view" (Opp. 10) or *could have been* referencing "unspecified" investments that did achieve this result (Opp. 11). Corbat said Rainbow "gave us the ability to have a holistic view." ¶290. Defendants do not contend his statement is true, and it is improper to create a factual dispute—especially by proffering an alternative secret meaning. Opp. 10-11; *see, e.g.*, ¶¶186(a)(ii)(2), (d)(v)(2).

- Defendants mischaracterize Plaintiffs' allegation regarding Gerspach's statement. Opp. 12. What is actionable is a present fact: "Right now, we're tracking everything globally." Defendants' assertion that the rest of this statement is forward looking is irrelevant.[6]

- Defendants are wrong that only FE-1 mentions Project Rainbow and FE-1's account is "broad brush." Opp. 11. FE-7 also addresses Project Rainbow (*see* ¶192(d)), and the accounts of both FE-1 and FE-7 detail Project Rainbow's importance to Citi's efforts to develop an ERM system, Rainbow's failure and abandonment, and Citi's deliberate decision to not make the investment necessary to fix these deficiencies or comply with regulatory requirements. *See, e.g.*, §IV.C.2. In addition, the Motion points out that five FEs reported that Citi refused to make the necessary investments. Br. 17.

**Risk Governance Framework Statements:** The SAC alleges Defendants' statements in the 2016-2018 Annual Reports about Citi's purported "Risk Governance Framework" (Statements 1, 3, and 7) are materially false and misleading based on contemporaneous facts. *Supra* I.A.

- Defendants do not contest a central basis for material falsity—that, contrary to these statements, Citi lacked a "**firm-wide**" risk framework and could not effectively identify,

---

[6] A separate forward-looking portion is "severable." *Iowa Pub. Emps.' Ret. Sys., v. MF Glob., Ltd.*, 620 F.3d 137, 144 (2d Cir. 2010). Further, even if construed as forward-looking, the boilerplate warning that a disclosure "may contain forward-looking" statements (ECF 153-4 at 2) is insufficient to trigger the safe harbor. *In re Vivendi Universal, S.A.*, 381 F.Supp.2d 158, 183 (S.D.N.Y. 2003) ("boilerplate warnings will not suffice" to trigger safe harbor).

measure, manage, monitor, report, and control risks "***across the firm***."  ¶¶284, 288, 296. Citi's contemporaneous lack of ERM alone establishes that these statements were materially false or misleading.

- Contrary to Defendants' arguments (Opp. 5), the SAC challenges the existence of an effective risk governance framework and its "alignment" with regulatory standards, including through the accounts of FE-2 and FE-3 specifically identifying Statements 1, 3, and 7 as false when made, *see, e.g.*, ¶84, 59-67, 69-70, 80-81; *see also* ¶¶187, 188; §IV.B.[7]

- Defendants' statements are not "general and aspirational." Opp. 4. They reassured investors of Citi's compliance, which was a major concern given the bank's past costly risk management failures and significant regulatory violations. ¶¶1, 9, 49; *see Matrixx*, 563 U.S. at 43-47.  In fact, analysts and ratings agencies recommended and upgraded Citi's stock based on its assurances on risk management and compliance.  *See* 2-3, *supra*.

- Defendants' materiality challenge is not "buttressed" by the Risk Factors section of Citi's Annual Reports, Opp. 4-5. Those purported warnings addressed potential future risks while concealing the known contemporaneous facts newly alleged in the SAC.  *See* 4-5 & nn.4-5, *supra*.

**Transformation Statement:**    The SAC alleges that Corbat's assurance that Citi "completed [its] transformation from the financial crisis" (Statement 8) is actionable based on the contemporaneous facts.  *Supra* I.A.  Defendants' arguments again are unavailing:

- Defendants' challenge to the statement as "vague" (Opp. 7) fails for the reasons above.

- Defendants mischaracterize Corbat's statement.  They say his representation that Citi had "completed its transformation from the financial crisis" referred solely to some amorphous "diffuse set of metrics," such as "climate change" and "gender equality," and was wholly unrelated to risk management.  Opp. 7-8.  That characterization defies common sense and the plain meaning of the words he spoke, and ignores that Citi's near collapse during the financial crisis was caused by its lack of ERM and controls.  ECF 117-23 at 3; *see also* ¶9.

---

[7] FE-2 (Citi's Global auditor of risk management, July 2013 to July 2018) (¶187) and FE-3 (Citi's Senior Compliance Officer, February 2016 to September 2018) (¶188) had personal knowledge of the falsity of Statements 1 and 3 at the time they were made.  Statement 5 was made on February 22, 2019, and the SAC amply establishes that the deficiencies persisted through the issuance of the 2020 Enforcement Orders and well beyond.  *See, e.g.*, ¶¶177-84; 186(a), (b), (d), (g) (FE-1, Citi Director of Data Strategy and Governance from August 2015 to August 2020); 190(a)-(c) (FE-5, Senior Vice President, February 2017 to May 2021); 231.

**B.    The SAC Includes Extensive Newly-Pled Allegations Supporting a Strong Inference of Scienter**

The SAC specifically pleads a strong inference of Defendants' contemporaneous "knowledge of facts or access to information contradicting [their] public statements" at the time they were made. *Novak*, 216 F.3d at 308. The inference of scienter "need not be irrefutable, *i.e.*, of the 'smoking gun' genre, or even the most plausible of competing inferences." *Tellabs Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007); *see also* Br. 19.

To begin, the SAC includes detailed, first-hand allegations that Defendants and Citi's Board received internal audit reports that specifically identified widespread failures in Citi's ERM systems, data governance, controls, and compliance. *See* ¶187(h);[8] *see also* ¶¶56-58, 68, 71-72, 99-107, 199-200, 322.[9] Defendants' sole response is to argue that this evidence is "merely a repackaged version of Plaintiffs' prior theory" (Opp. 15), but allegations about internal audit reports are pled for the first time in the SAC. They do not "repackage" anything.

These internal audit reports are sufficient to establish scienter.[10] But the SAC alleges additional ways that Defendants were aware of Citi's ineffective and non-compliant ERM:

---

[8] In particular, internal audit reports to Citi's Board showed, among other things, that due to the inadequate ERM: (i) Citi's CCAR could not produce sustainable and believable outcomes; (ii) Citi had no effective program to identify and manage bank-wide risks (BCBS 239); (iii) Citi suffered a "high risk" failure to meet Anti-Money Laundering requirements; (iv) Citi could not generate accurate financial calculations or financial reports; and (v) Citi's data was not "credible" or "accurate" under its own standards—but Defendants ***decided against*** making the investments to fix these problems.

[9] The Board's contemporaneous knowledge is further confirmed by John Dugan's concession that he and the Board recognized shortfalls "before" the Consent Order. ¶231. Defendants inexplicably redefine the word "before" to mean "after," insisting that Dugan said the opposite of the plain words of his statement. Opp. 18. This too fails.

[10] *In re Eletrobras Sec. Litig.*, 245 F.Supp.3d 450, 468 (S.D.N.Y. 2017) (internal audits that "indicated significant problems with a lack of controls …. support a strong inference that [defendants] acted with scienter" in making statements about adequacy of controls); *Dobina v. Weatherford Int'l Ltd.*, 909 F.Supp.2d 228, 247 (S.D.N.Y. 2012) (allegations that defendants were aware of "audits [that] turned up multiple control deficiencies" supported inference of scienter concerning statements regarding adequacy of controls).

9

- **Internal Management Reports** (§VI.B):  Corbat, Gerspach, Mason, and Citi's Board received internal management reports that are alone sufficient to establish scienter. Defendants claim that the recipients of the reports are "unnamed" and their contents are "unspecified."  Opp. 15-16.  Not so.  The SAC alleges, among other things, that (i) Corbat, Gerspach, Mason,[11] and Citi's Board each received periodic reports on a quarterly, monthly, or weekly basis; and (ii) each report concerned risk management, noncompliance, inadequate controls, or data quality deficiencies.  *See, e.g.*, ¶¶206-09.

  - As to the "specific contradictory information [] available to the defendants … at the time they made their misleading statements" (Order at 58-59; Opp. 15), the SAC alleges, for example: quarterly since at least 2015, the Chief Data Officer's team prepared a Global BDQR report and sent it to Corbat and Gerspach (and later Mason) that identified: (i) Citi's ERM problems, (ii) concerns about Citi's ability to handle and effectively manage risk across the enterprise, and (iii) Citi's data quality management shortcomings against the enterprise standards, with unremediated deficiencies highlighted in red.  ¶186(h)(i) (account of FE-1, Citi Director of Data Strategy and Governance from August 2015 to August 2020).  The SAC further provides detailed first-hand allegations that Corbat reviewed and discussed each of these reported deficiencies in monthly meetings and personally spoke with the relevant parties about the details of these deficiencies.  *Id.*[12]

- **Internal Meetings** (§VI.C):  Corbat, Gerspach, Mason, and Citi's Board attended regular internal meetings to discuss Citi's ineffective ERM and controls.  Defendants' only response is to contend that the attendees are purportedly "unnamed."  Opp. 15.  This is incorrect.  *See e.g.*, ¶¶215 (FE-9 presented "directly to Corbat" at Executive Operational Committee Meetings held "every quarter"); ¶187(c) (every quarter since 2016, Director Farley reported Citi's noncompliance in a PowerPoint presentation to Gerspach, Desoer, and Callahan, but they resolved to make "minor tweaks" to existing antiquated infrastructure rather than to implement ERM, replace antiquated technology, or integrate Citi's thousands of disparate systems).

- **FE Objections To Senior Executives** (§VI.D)**:**  FE-1, FE-2, FE-3, and FE-5 reported their concerns to C-Suite and other senior executives, and the SAC provides facts showing that Citi's broken technology, non-compliance, and infrastructure were so bad that they went outside ordinary channels to do so.  *See, e.g.*, ¶¶219-29.  Contrary to Defendants' assertion (Opp. 15 n.11), the SAC alleges specific objections and establishes personal knowledge of

---

[11] Contrary to Defendants' protestations (Opp. 4 n.2), Defendant Mason signed the 2019 10-K and is liable for the materially false and misleading statements therein.  *See, e.g.*, §VIII.B & C; Ex. D.

[12] *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 73 (2d Cir. 2001) (allegations "specifying who prepared internal company reports, how frequently the reports were prepared, and who reviewed them" supported inference of scienter); *see also New Orleans Emps. Ret. Sys. v. Celestica, Inc.*, 455 F.App'x 10, 14 (2d Cir. 2011) (Summary Order) (allegations "as to who prepared the spreadsheets, how frequently they were prepared, who reviewed them, and the issues they addressed" supported inference of scienter).

specific senior executives, including C-Suite executives CDO Burke and CTO D'Onofrio (¶227).[13]

In addition, regulators have confirmed that deficiencies were reported to Citi's Board and management, as required by Federal regulations.  §§VI.E - VI.I; §VII.  As set forth in the 2020 Enforcement Orders, Citibank had not even "diagnose[d] the root cause(s) of the underlying issues that led to internal control related concerns *identified by internal audit and/or federal regulators since 2017*."  ¶¶24, 154-59.  Likewise, the sworn declaration by Citi's OCC Examiner-in-Charge (Sullivan) stated that "[m]any of the supervisory concerns addressed by the 2020 Orders were identified by the OCC and communicated to the bank *several years prior to*" July 3, 2019, ¶230, which is consistent with federal regulations requiring the OCC and Fed to raise these deficiencies with Citi's Board and Management (¶¶241-45; *see also* ¶¶77, 236-40).[14]  The SAC alleges corroborating contemporaneous facts.  *See, e.g.*, §IV.B.4, ¶¶148-49.[15]

---

[13] The SAC's allegations are in stark contrast to the cases Defendants cite, where former employees had no contact with individual defendants and would not otherwise have knowledge of what the individual defendants knew or should have known.  *In re Am. Express Co. Sec. Litig.*, No. 02 CIV. 5533 (WHP), 2008 WL 4501928, at *8 (S.D.N.Y. Sept. 26, 2008), *aff'd sub nom. Slayton v. Am. Exp. Co.*, 604 F.3d 758 (2d Cir. 2010); *In re Wachovia Equity Sec. Litig.*, 753 F.Supp.2d 326, 352 (S.D.N.Y. 2011) ("there is no allegation that any [FE] met the Individual Defendants, reported any concerns, received any instructions, or made any personal contact with them"); *Loc. No. 38 v. Am. Exp. Co.*, 724 F.Supp.2d 447, 460 (S.D.N.Y. 2010) (similar); *In re Doral Fin. Corp. Sec. Litig.*, 563 F.Supp.2d 461, 466 (S.D.N.Y. 2008) (FE provided "no time frame within which the meetings occurred, no indication of where within the PwC hierarchy the 'representatives' fell, and no information regarding how extensively or in what manner the reports were discussed"), *aff'd sub nom. W. Va. Inv. Mgmt. Bd. v. Doral Fin. Corp.*, 344 F.App'x 717 (2d Cir. 2009); *In re PXRE Grp., Ltd., Sec. Litig.*, 600 F.Supp.2d 510, 537 (S.D.N.Y. 2009) ("no allegation … that these concerns … were ever brought to the attention of the Individual Defendants"), *aff'd sub nom. Condra v. PXRE Grp. Ltd.*, 357 F.App'x 393 (2d Cir. 2009).

[14] Nothing in the Sullivan Declaration negates this statement.  Instead, the Sullivan Declaration's admission that "escalating [OCC's] concerns into a public enforcement action *took some time*" (Opp. 17 n.14), is wholly consistent with SAC's detailed factual allegations beginning in 2017.

[15] The suggestion that Corbat's tracking of non-compliance through Executive Scorecards is "responsible corporate behavior" (Opp. 17) ignores that he concealed Citi's noncompliance and gave his reports (*e.g.*, the CEO of ICG) a "pass" so long as they were "making money."  ¶187(b).

These facts plead a strong inference of scienter, as Corbat, Gerspach, Mason, and Citi's Board knew, or at best recklessly disregarded, that Citi's enterprise-wide risk management systems and controls were ineffective and not in alignment with requirements. They made deliberate decisions to retain Citi's failed systems and use cheap hacks to create a veneer of compliance in the hope they could avoid incurring the large cost and hobbling profitable parts of the Company to develop and implement effective risk management and controls and comply with regulatory requirements. *See, e.g.*, ¶¶63-70, 104, 107, 148-49, 219-29. With the SAC's new allegations, that inference is **at least as likely** as the inference "that the Defendants thought that their risk management systems and controls were adequate at the time they made the statements." Order at 62. The latter cannot be a **more** plausible inference if the SAC were taken as true.

Finally, Defendants incorrectly maintain that the allegations derived from Citi former employees should not be credited. Opp. 15-17. But what is required is that the FEs be "described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." *Novak*, 216 F.3d at 314. Tellingly, Defendants do not dispute that the SAC's allegations meet this standard. *Compare* ¶¶186-97. Further, allegations based on FEs need not quote or attach documents or offer evidentiary matter to establish "knowledge of facts or access to information contradicting [defendants'] public statements" at the time they were made. *Novak*, 216 F.3d at 308 (sufficient for complaint to allege "facts demonstrating that defendants failed to review or check information that they had a duty to monitor"); *see also In re Scholastic*, 252 F.3d at 72 ("[W]e do not require the pleading of detailed evidentiary matter in securities litigation."); *Celestica, Inc.*, 455 F.App'x at 13 (allegations that confidential witnesses "participated in meetings" with defendants where they were "informed by

12

others" about facts contrary to their statements supported inference of scienter).  The SAC exceeds the Second Circuit's standards.[16]

## II.    THERE IS NO UNDUE DELAY

Finally, Defendants argue "undue delay" because Plaintiffs did not seek to amend prior to the Court's ruling on the first motion to dismiss.  In doing so, Defendants fault Plaintiffs for failing to make the "Hobson's choice" the Second Circuit explicitly prohibited in *Loreley Financing (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160 (2d Cir. 2015).  Defendants' pre-*Lorely* citations are thus irrelevant,[17] as are Defendants' remaining cases.[18]

"It is inappropriate to deny a plaintiff the opportunity to replead after a defendant's motion to dismiss is granted, simply because the plaintiff decided not to replead before learning whether the court would find the complaint insufficient." *Kopchik v. E. Fishkill, N.Y.*, 759 F.App'x 31, 38 (2018) (Summary Order) (reversing denial of leave to amend).  There is no reason to depart here from established Second Circuit authority.[19]

---

[16] Defendants' conclusory reference to their loss causation argument as to the prior CAC (Opp. 19 n.15) does not address newly-pled allegations (*see* §IX) and in any event fails to satisfy the "heavy" burden required for dismissal on that basis (ECF 123 at 39-40).  Plaintiffs' Section 20(a) claims should be sustained because the SAC pleads a predicate 10(b) violation and Defendants do not dispute that the Individual Defendants are controlling persons within the meaning of Section 20(a).

[17] And many of Defendants' pre-*Lorely* cases are factual inapposite, *see State Trading Corp. of India v. Assuranceforeningen Skuld*, 921 F.2d 409, 418 (2d Cir. 1990) (failure to proffer proposed amended complaint); *In re Eaton Vance Mut. Funds Fee Litig.*, 403 F.Supp. 310, 318 (S.D.N.Y. 2005) (same), *aff'd*, *Bellikoff v. Eaton Vance Corp.*, 481 F.3d 110 (2007); *Baez v. Delta*, 2013 WL 5272935, at *7 (S.D.N.Y. Sept. 18, 2013) (leave sought after close of discovery).

[18] *See Ritchie Cap. Mgmt., L.L.C. v. Gen. Elec. Cap. Corp.*, 821 F.3d 349, 351-52 (2d Cir. 2016) (leave not sought before the district court); *In re AstraZeneca Sec. Litig.*, 2022 WL 4133258, at *10 (S.D.N.Y. Sept. 12, 2022) (no explanation of how plaintiffs would amend); *Lehman v. Ohr Pharm. Inc.*, 2020 WL 6729116, at *1 (S.D.N.Y. Nov. 16, 2020) (no proposed amended complaint proffered); *Tesla Wall Sys., LLC v. Related Cos., L.P.*, 2018 WL 4360777, at *6-7 (S.D.N.Y. Aug. 15, 2018) (leave sought after summary judgment briefing commenced).

[19] *See Pasternack v. Shrader*, 863 F.3d 162, 174 (2d Cir. 2017) (reversing denial of leave to amend: proposed complaint was "the first complaint to be considered after the district court decided a motion to dismiss");  *Barron v. Helbiz, Inc.*, No. 21-278, 2021 WL 4519887, at *3 (2d Cir.

## III.    CONCLUSION

For the reasons set forth above, the Court should grant Plaintiffs' motion to amend.

Dated: August 4, 2023

Respectfully submitted,

**BLEICHMAR FONTI & AULD LLP**

 /s/ Javier Bleichmar
Javier Bleichmar
Joseph A. Fonti
Erin H. Woods
Benjamin F. Burry

7 Times Square, 27th Floor
New York, New York 10036
Telephone: (212) 789-1340
Facsimile: (212) 205-3960
jbleichmar@bfalaw.com
jfonti@bfalaw.com
ewoods@bfalaw.com
bburry@bfalaw.com

*Counsel for Lead Plaintiff Public Sector
Pension Investment Board and
Named Plaintiff Anchorage Police & Fire
Retirement System, and Lead Counsel for the
Putative Class*

---

Oct. 4, 2021) (Summary Order) (reversing denial: "We have been particularly skeptical of denials of requests to amend when a plaintiff did not previously have a district court's ruling on a relevant issue because without the benefit of a ruling, many a plaintiff will not see the necessity of amendment or be in a position to weigh the practicality and possible means of curing specific deficiencies."); *Schvimmer v. Off. of Court Admin.*, 857 F.App'x 668, 673 (2d Cir. 2021) (Summary Order) (abuse of discretion to deny leave to amend for undue delay due to failure to amend complaint prior to motion to dismiss decision); *Cresci v. Mohawk Valley Cmty. Coll.*, 693 F.App'x 21, 25 (2d Cir. 2017) (Summary Order) (reversing denial: "It is the District Court's ruling, not the defendant's arguments in support of a motion to dismiss, that puts a plaintiff on notice of the complaint's deficiencies.").